Filed with Classified
Information Security Officer

CISO _____

No. 11-5102

Date _____ 1/31/12

[ORAL ARGUMENT NOT YET SCHEDULED]

IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

**RAZAK ALI, a.k.a. Saeed Bakhouch,**
**Appellant**

v.

**BARACK OBAMA, et al.,**
**Appellees**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
**Case No. 1:10-cv- 1020**

BRIEF OF APPELLANT RAZAK ALI

H. Candace Gorman
Law Office of H. Candace Gorman
220 S. Halsted
Chicago, Illinois 60661
(312) 427-2313

## CERTIFICATE OF PARTY

Counsel for Plaintiff, pursuant to Circuit Rule 28 (A) (1) the following Disclosure Statement:

The only law firm and attorney who has appeared for Petitioner and who is expected to appear in this court is: H. Candace Gorman from the Law Office of H. Candace Gorman.

Appellant's appeal from the February 28, 2011, order of the United States District Court for the District of Columbia (Judge Leon) and all subsidiary orders thereto, denying Appellant's request for a writ of habeas corpus. The order is found in the Appendix at O.

There are no related cases.

Dated: January 30, 2013

H. Candace Gorman

1

# TABLE OF CONTENTS

CERTIFICATE OF PARTY ....................................................... 1

TABLE OF CONTENTS ......................................................... 2

TABLE OF AUTHORITIES............................................... 4

GLOSSARY OF ABREVIATIONS ................................................6

JURISDICTIONAL STATEMENT.......................................... 7

ISSUES PRESENTED FOR REVIEW ......................................... 8

STATEMENT OF THE CASE................................................... 9

STATUTES AND REGULATIONS ...  .......................................9

STATEMENT OF THE FACTS ......................................... 10

SUMMARY OF ARUMENT ................................................... 42

ARGUMENT...................................................................... 43
    I.   WINNING THROUGH MALFEASANCE................... 43
        A.   The government Failed to Provide
        Exculpatory Evidence .........................................45
        B.   The government Submitted a
        Fraudulent Document to Justify Detention ..................49
        C.   The government Developed a New
        Theory for Detention on Eve of Hearing...  .............. 49
        D.   The government Engaged in
        Gamesmanship over Amended Return ..................... 50
        E.   The government Engaged in
        Gamesmanship over Exhibits ................................. 50
        F.   The District Court's Exacerbated
        and Facilitated the government's Gamesmanship ...... 51

    II.  THE GOVERNMENT FAILED TO MEET ITS BURDEN
       TO JUSTIFY DENYING THE HABEAS PETITION ......... 56

*Government point 1:* "PETITIONER WAS A "PERMANENT MEMBER" OF ABU ZUBAYDAH'S FORCE."………………56

*Government point 2:* PETITIONER WAS PRESENT IN AFGHANISTAN AFTER SEPTEMBER 11TH AND HE FLED AFGHANISTAN ALONG THE SAME ROUTE USED BY ABU ZUBAYDAH'S FORCE AFTER OPERATION ENDURING FREEDOM BEGAN,EVENTUALLY ARRIVING AT A GUESTHOUSE IN FAISALABAD, PAKISTAN...……………………………………………………63

*Government point 3:*    PETITIONER WAS PRESENT AND CAPTURED AT A GUESTHOUSE WITH ABU ZUBAYDAH AND OTHER MEMBERS OF ZUBAYDAH'S FORCE WHERE THE FORCE WAS TRAINING IN EXPLOSIVES, ELECTRONICS, COMPUTERS, AND THE ENGLISH LANGUAGE IN ORDER TO CONDUCT MARTYRDOM OPERATIONS AGAINST US AND COALITION FORCES.65

*Government point 4:* PETITIONER USED KNOWN COUNTER-INTERROGATION TECHNIQUES TO HIDE HIS ACTIVITIES; INCLUDING ███████████
████████████████████████████..……………67

III.    BEING IN A GUESTHOUSE SHOULD NOT BE ENOUGH FOR LIFETIME DETENTION…………………………………68

CONCLUSION …………………………………………………  74

CERTIFICATE OF COMPLIANCE……………………………..  75

CERTIFICATE OF SERVICE …………………………………  76

## TABLE OF AUTHORITIES

### CASES

*Almerfidi v Obama*, 654 F3d 1 (DC Cir 2011)...........................69

*Alsabri v. Obama*, 684 F.3d 1298 (DC Cir 2012).......................68

*Barhoumi v. Obama*, 609 F.3d 416 (DC Cir 2010)............23,25, 69

*Boumediene v. Bush*, 553 U.S. 723  (2008)..............................44

*Miller v. United States*, 14 A.3d 1094, 1107-08 (D.C. 2011).........55

*Pescatore v. Pan American World Airlines, inc.* 97 F3d 1, 21
(D.C. Cir. 1996) ...............................................................74

*Thompson v. US*, 45 A. 3d 688 (D.C. Cir. 2012) ......................55

*United States v. Agurs*, 427 U. S. 97, 112 (1976) .....................56

*United States v. Edmond*, 52 F. 3d 1080, 1099 (D.C. Cir 1995).....52

*United States v. Microsoft Corp*, 56 Fed 1448, 1463
(D.C. Cir. 1995)..............................................................74

*United States v. Norris*, 873 F.2d 1519, 1526 (D.C.Cir. 1989)......53


### STATUTES AND RULES

28 U.S.C.
     §1291 ......................................................................7
     § 1331.....................................................................7
Authorization for Use of Military Force, Pub. L. No. 107-40
     115 Stat. 224 (2001) ..............................................9
D.C. Cir. R. 28(a) ..............................................................1

OTHER AUTHORITIES:

Military database for Guantanamo Detainees ............................63
http://www.dod.gov/pubs/foi/detainees/detaineesFOIArelease15May2006.pdf

Pervez Musharraf, *In the Line of Fire*: *A Memoir*, .........................12
New York Free Press, 2006

Benjamin Wittes, *The Significance of Guesthouses and Training*.........70
Lawfare blog (June 11, 2011)
http://www.lawfareblog.com/2011/06/the-significance-of-guesthouses-and-training/

Andy Worthington, *In Abu Zubaydah's Case, Court relies on Lies and
Progaganda(Ex. 40)*..............................................................68
Andy Worthington blog (July 21, 2010)
http://www.andyworthington.co.uk/2010/7/21/in-abu-zybaydays-case-
court-relies-on-propaganda-and-lies/

# **GLOSSARY OF ABBREVIATIONS**

AKA means "Also Known As"

@ is a symbol that means "At"

AR refers to the government's Amended Return presented at hearing

Ap refers to the Joint Appendix

Ex refers to Exhibit

D refers to the District Court Docket

## JURISDICTIONAL STATEMENT

Jurisdiction in the District Court was based on 28 U.S.C. Sec. 1331, 1343(3) and 1367. This Court has jurisdiction under 28 U.S.C. §1291.  On January 11th 2011 the District Court entered an unclassified memorandum Opinion denying Petitioner's Habeas Petition (Docket 1448) and on February 28, 2011 the District Court entered its Classified Memorandum Opinion. Petitioner filed a notice of appeal regarding those Orders and the notice of appeal was timely filed on March 8, 2011 within 60 days of entry of the judgment.[1] The appeal is from a final judgment disposing of all claims of all parties.

---

[1] On March 9th, 2011 the District Court entered "Final Judgment" (Docket no. 1472) perhaps realizing that the Classified opinion had not been noted on the docket sheet. In an abundance of caution Petitioner filed a second notice of appeal following the Court's entry of "final judgment." (Docket no. 1489)

## ISSUES PRESENTED FOR REVIEW

1.     Did the District Court's hearing on Petitioner's habeas petition constitute a meaningful opportunity to challenge the legality of his detention where (A) the government knowingly relied on witness statements and evidence that it knew was unreliable but upon which it deliberately misled the Court and Petitioner's counsel concerning its own knowledge of unreliability, (B) the government  proceeded prior to and during the hearing on a theory that it knew it would withdraw after the hearing based upon its knowledge of unreliability, (C) the government engaged in the gamesmanship of deliberately altering both the substance of its contentions and its procedural presentations (and inclusion of new and heretofore undisclosed items).

2.     Is being in a guesthouse in Pakistan enough for a life sentence of detention without charge or trial absent any competent proof of hostile actions or intentions against the United States or its allies?

3.     Whether, on the circumstances of this case, the District Court erred in denying Petitioner's petition for habeas corpus?

## STATEMENT OF THE CASE

In 2005, Saeed Bakhouche filed a petition for writ of habeas corpus challenging his continued detention at the United States Naval Station at Guantánamo Bay, Cuba. The District Court denied the petition on February 28, 2011, and Bakhouche now appeals.

## STATUTES AND REGULATIONS

In the Authorization for use of Military Force (AUMF), Congress empowered the President to use all necessary and appropriate force against those...he determines planned, authorized, committed, or aided the terrorist attacks....on September 11, 2001.  Pub. L. No. 107-40, 115 stat. 224 (2001)

9

## STATEMENT OF FACTS

### I.    Background

Petitioner, Saeed Bakhouch, is an Algerian from the Khanch province, in Algeria. He is from the Shawi tribe, which is a Berber tribe. Petitioner was born on July 17, 1970 at Babar, Algeria. Petitioner had limited schooling, only finishing the fifth grade. Prior to the fall of 2001 he had only left Algeria on one occasion and that was to work in Libya for a short time in the 1990s at a relative's shop. He stayed in Libya for approximately three months and then returned to Algeria. (Ap.B,Ex.23{**JA197**})

In Algeria, Petitioner worked at various odd jobs, including working as an automobile mechanic and helping out in various restaurants and coffee shops. During the fall of 2001 he had the opportunity to travel to Pakistan to study the Koran and learn how to proselytize Islam. The organization that invited him to Pakistan was called Tabligh and they offered to train Petitioner to pass on the message of Islam. Much like some Christian evangelical organizations, the Tablighis took care of expenses for those who agreed to stay with them for at least two years and to assist them in missionary activities overseas. Petitioner traveled to Pakistan on a

valid Algerian passport. He traveled by plane from Algiers to Karachi. The plane made several stops but Petitioner did not stay at any of those locations. (Ap.B,Ex.23{**JA197**})

After the plane landed in Karachi, Petitioner traveled by train north to Lahore, the location of the Tabligh Center where his training as a Tablighi was to take place. He was accompanied by a friend from Algeria by the name of Rahman[2]. Petitioner himself was not a particularly religious person at this time, but he took advantage of the opportunity so that he could leave Algeria and travel to other countries. At the time, Algeria suffered from instability and political turbulence, as the country was still reeling from over ten years of civil war. (Ap.B,Ex.23{**JA197**})

Petitioner stayed in Pakistan for approximately five months. During the first three months, he attended the Tablighi's classes on the Koran in the city of Lahore. But in the last two months of his stay, the situation in Pakistan rapidly deteriorated. Foreigners, particularly from Arab countries, became the targets of kidnappings and violence. In the wake of the 9/11 events, the Pakistani authorities began arresting Arabs (persons from Arab-

---

[2] For unknown reasons (most likely translation problems) the military actually added Rahman's name to *Petitioner's name.* (Ap.F, {**JA516**})

speaking North Africa and the Middle East) and turning them over to the United States for a bounty of about $5,000 per person. Petitioner became afraid of the violence to the point that he would not go outdoors. (Ap.B,Ex.23{**JA198**}) [3]

Petitioner had been staying at a mosque in Lahore run by the Tablighis, but when the kidnapping of Arabs became profitable and widespread, it was suggested that the Arab men at the Tablighi's center move to a guesthouse where they would be safer. For approximately one month Petitioner stayed at a guesthouse that the Tablighis arranged near Lahore. No one at this guesthouse spoke fluent Arabic, and it was at this location that Petitioner's passport was either lost or stolen. (Ap.B,Ex.23{**JA198**})

After approximately one month, the Tabligh Center said that they could no longer help their students because the situation in Pakistan had become too unsettled. The people at the guesthouse suggested a second guesthouse for Petitioner, where there were other Arabic-speaking people.

---

[3] At the time of the raid Pakistani forces were being paid a premium bounty by the Americans for turning over Arabs. Former President of Pakistan Pervez Musharraf admitted in his autobiography that his own government made *millions* of dollars under this program. (*In the Line of Fire: A Memoir*, New York Free Press, 2006.)

Petitioner agreed and moved to the second guesthouse, located in the city of Faisalabad, Pakistan around the middle of March of 2002. As far as he knew, the guesthouse was owned by a Pakistani man. (Ap.B,Ex.23{**JA198**})

Even at this supposedly more amenable guesthouse, the Petitioner continued to stay inside, as he feared being turned over for a bounty. He did not know anyone at this guesthouse, where most of the people kept to themselves and he only spoke to a few people during the two weeks that he stayed there. Petitioner spent his time reading the Koran and kicking a soccer ball around in the enclosed backyard. He was told that someone would help him get a new passport once things calmed down. (Ap.B,Ex.23{**JA198**})

Less than two weeks after Petitioner arrived at the guesthouse, it and five other guesthouses were simultaneously raided by Pakistani and U.S. Forces. Petitioner was arrested along with all of the Arab speakers staying at the house (although all Pakistanis and all women, who numbered approximately three dozen, were released, either immediately or within a few days).(Ap.B,Ex.1{**JA061-64**})

During the brief period that Petitioner was at this guesthouse, several people came to the guesthouse while a number of others left. One

individual who arrived at the guesthouse a few days before the raid was introduced to Petitioner as "Daoud." Long after the raid, Petitioner learned that "Daoud" was wanted by the US under the nickname "Abu Zubaydah." (Ap.B,Ex.23{**JA204**})

Although he did nothing to resist arrest, Petitioner was struck with a rifle butt by Pakistani police at the time of the raid when he tripped and fell walking out of the house. Petitioner was in tremendous pain and the Pakistani forces finally brought him to a hospital when he was observed vomiting blood and was found to have blood in his urine. It was while at the hospital that a Pakistani official suggested he pretend to be Libyan, as the Libyans were all being sent home and from Libya he could go back to his home in Algeria. Petitioner heeded this advice. (Ap.B,Ex.23{**JA199-200**})

When Petitioner was returned to the jail from the hospital he identified himself as Libyan and the government has apparently confused him with a Libyan man arrested at another guesthouse named Abdul Razzaq. Unfortunately, Petitioner was not turned over to the Libyans but instead was turned over to the Americans. Petitioner decided to wait for an opportune time to correct his name and nationality because he feared worse treatment if he tried to correct that information. {**JA200**}

Government reports and media accounts have provided conflicting information as to who was actually in which guesthouse at the time of the raids. As further described below, the government asked for the presumption that intelligence and interview reports at issue in this case are reliable, *except* when this intelligence and these reports are not convenient to its theory of the case. In point of fact, the FBI reports *from the time of the raid* place a Libyan individual by the name of Abdul Razzaq in a guesthouse referred to as the ███ house, as do *some* statements from other detainees. As the government admits, Petitioner never stayed at the ███ house: he was in the house sometimes referred to as the ███ guesthouse, the guesthouse where ███ ███ was arrested. (Ap.B,Ex.2██{JA065-91████(AR@49)

Notwithstanding the fact that Petitioner was never in the ███ house, the government argued below that the FBI report prepared on or about April 1, 2002, from notes immediately following the raid at the ███ house, contained an interview with Petitioner. The report in question describes an interview with an individual from the ███ house named Abdul Razzaq who was Libyan. The report contains a statement from the person, a detailed description of the house, and a description of the location of the

bedroom where the individual slept in the ███ house.  The individual who was interviewed that day admitted to having traveled in Afghanistan.(Ap.B,Ex.2{**JA074-75**})

The government submitted an affidavit a few days prior to Petitioner's habeas hearing from the former FBI agent who prepared the report, and who interviewed the individual referred to as Abdul Razzaq. The former agent confirmed that he had no independent knowledge of the identity of the interview subject who claimed he was a Libyan named Abdul Razzaq and stated unequivocally  that the report was accurate in that it was an individual he interviewed from the ███ house (and not, of course, from the ███ house). Sometime later, according to the FBI agent's affidavit, the individual named Abdul Razzaq was identified *by unknown others* as Petitioner. {**JA**092-96}Inexplicably the government simultaneously claims that the report is *inaccurate* as to the guesthouse where Petitioner was staying but accurate in identifying the subject of an interview with Petitioner immediately following the raid, at a house he was never at.[4]

---

[4] Further proof that it was not Petitioner that was interviewed by agent ███ at the ██ house was that the FBI agent stated under oath that the

Despite these facts, both at the hearing, and evidently to this day, the government has insisted that the interview by ▮▮▮▮▮▮ was with the Petitioner so that they can try to place Petitioner in Afghanistan.[5] The person that was interviewed, a Libyan who went by the name "Abdul Razzak," admitted having traveled to Afghanistan and the government has long claimed that this interview proves that Petitioner traveled to Afghanistan- in order to have something more than Petitioner's apprehension in a suspicious guesthouse and nothing more; in fact, Petitioner had never visited Afghanistan (until taken there by United States forces) and never left Pakistan during his stay there.(ApB23{**JA201**}) Military records do not show Petitioner *ever* being known as "Abdul Razzak[6]" although there were more than 9 individuals at Guantánamo with that name. (AP.F{**JA602-604,604@6b&5i**}D1459). According to military records at the time Petitioner was sent to Guantánamo he was referred to

---

individual he interviewed was, unlike Petitioner, not injured during the raid. (Ap.B,Exs. 3{**JA092-96**})

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[6] The government also admitted that one of the photos that was used for others to identify Petitioner was of an unknown individual known to the military as "Abdul Razzak."(Ap.I,pg.38{**JA739**})

by the military as "abd al-azak ali abd ((al **Rahman**))." And no aliases were associated with the Petitioner. (Ap.F,{**JA 516**}@6b)

## II.    Petitioner's Treatment from the Time of Arrest

As mentioned above, during the raid at the guesthouse, Petitioner was badly injured by the Pakistani security forces with the butt of a rifle after he tripped while being led out of the house. Although the District Court denied Petitioner's request for records from his detention prior to arriving at Guantánamo, several items in the record confirm that the Petitioner was hospitalized in Pakistan shortly after his arrest (Ap.B,Exs.16█ 23{**JA165**█ **199-200**}).

Petitioner was in the hospital for three days before he was moved first to a jail in Islamabad, then to a facility in Lahore and finally to Bagram Airfield, the first time he was actually in Afghanistan. Petitioner describes his treatment in each of those facilities in his affidavit. According to Petitioner, he was first interviewed by American officials approximately one month after his arrest. Medical records from the time Petitioner arrived at Guantánamo showed multiple cigarette burns, lacerations, and a facial injury. Petitioner's affidavit confirms the physical abuse. (Ap.B,Ex.23{**JA199-200**})

Petitioner also describes his treatment at Guantánamo up until 2004 in his affidavit. (Ap.B,Ex.23{**JA202-03**}) The government, in its original Return narrative, admitted that while at Guantánamo Petitioner was subjected to "a potentially unauthorized interrogation technique."(D741) What is clear is that the techniques used on Petitioner violated both the Army Field Manual and the 1949 Geneva Convention relative to the treatment of prisoners of war. Petitioner asked the District Court to disregard statements made by the Petitioner during this time frame, although the District Court never ruled on that request. {**JA017-19**}

Because of the ongoing abuse from the time of his capture in March of 2002 until 2004,[7] Petitioner refrained from explaining or clarifying his correct name and Algerian nationality until such time as the abuse ceased and he felt safe enough to disclose the truth.(Ap.B,Ex.23{**JA201-04**})

---

[7] The Petitioner also explained the "old policy" of not being allowed to have medical consultations without first obtaining approval by interrogators.(Ap.B,Ex.27{**JA226**})

Finally, the evidence showed that the Petitioner was not hiding his real name and country of origin because of any trouble that he had in his homeland or because of a problematic background. Petitioner left his country in good standing with a valid passport and had every intention of returning to his homeland. Unfortunately by calling himself a Libyan after leaving the hospital he ended up being confused with a Libyan from the ███████ that was arrested and interrogated named Abdul Razzaq who admitted traveling to Afghanistan. (Ap.B,Exs.16, 20,23{**JA161;184;197**}).

Eventually the authorities corrected its records regarding the house Petitioner was staying at but never disassociated Petitioner from the narrative told by the Libyan individual at the ██████ who had traveled in Afghanistan. To add insult to injury the government continues to claim that its own errors somehow prove that Petitioner lied about being in Afghanistan.

## III.    The Government's Allegations Until September 2010

In each of the previous four Returns filed by the government, the government relied on the following alleged "admissions" by Petitioner in framing the narrative used to justify his detention: that he had 45 days of "training" in Pakistan; that he knew "they" were trying to make chemical

weapons in the guesthouse where he was staying; that he had been to Afghanistan; and that he had been in Pakistan for two years. {JA02;20-32} These false allegations were not only made in the many Returns but also in almost every document filed by the government in Petitioner's case.[8] These allegations clearly formed the government's entire case against Petitioner until the summer of 2010.

The "facts" that allegedly supported this theory came from a *summary* of a meeting between the Petitioner ███████████████ in March of 2006.(Ap.B,Ex.15{JA142-145}) However, the government's allegations against Petitioner fell apart when Judge Lamberth[9] ordered the government to provide the actual transcript from the March 2006 meeting. With the transcript disclosed it was clear that the government had

---

[8] Upon information and belief the government has also used these false "admissions" by Petitioner to bolster its cases against other men arrested the night of the raid and never corrected the fraudulent error.

[9] Judge Lamberth later recused himself after the government admitted engaging in an *ex parte* discussion with him regarding discovery in this case.(D1418) The government refused to disclose the nature of the conversation claiming it had a *privileged relationship* with the judge.(D1370) The fully briefed motion can be found at D1361,1370&1372. Later it became apparent that the government had privately asked the Judge whether it was required, under the rules established by him in the Guantánamo cases, to disclose exculpatory information regarding government expert witnesses and upon information and belief the judge told the government that it had no such obligation.

provided knowingly false information to the court and counsel in its "summary." The actual transcript shows unequivocally, not only that Petitioner had not made those admissions at all, but that he had stated the *exact opposite* during the meeting.(Ap.B,Ex.16{**JA162-68**})

The government was forced to withdraw reliance on the fake summary on September 3, 2010.(D1425) Also, as a result of its fraud on the court, the government was required, by the Court, to identify other summaries made by those same government officials involved in the authorship of the fake summary. The government only partially complied by identifying three other interrogations in which the *interpreter* (but not the interrogator) who filed the fake summary was involved: those interrogations are dated ███████████████ and ████████ ████ (Ap.B,Ex.18{**JA177**}) Petitioner asked the Court to bar the government from relying on those interrogation summaries, and based on the Court's ruling, believes that the Court did not actually rely on other interrogations from that interpreter. Unfortunately, however, the record is not clear on this point as the Court never clearly ruled on the issue. On April 4, 2011, months after the hearing was completed, the government disclosed that yet

another of Petitioner's interrogators was involved in abusive tactics which undermined the credibility of still other interrogations.(Ap.H{JA656-700)[10]

## IV.   The Government's New Allegations in September 2010

On September 10, 2010, the government presented its new theory as to why Petitioner should be indefinitely held- after having to abandon its earlier theories because of the false statements in the fake summary, then at the cornerstone of its case.(D1427) This new theory was radically different and there was less than one month to file an Amended Traverse and for Petitioner's counsel to prepare for the scheduled habeas hearing.

The new theory rested on an allegation that Petitioner had used the nicknames: "Abu Usama"; "Usama Al-((Jaza'iri))"; "Usama al Libi" *or* "Usama al Jaziri"; and/or "Moorad." The government then attempted to weave those nicknames into a dramatic tale involving a Syrian named ███ ████████ who supposedly had ties to Abu Zubaydah and who kept a diary.[11] Earlier that summer a panel of this Court accepted the apparent validity of the so-called "al-Suri diary" in another case, *Barhoumi v. Obama,*

---

[10] The copy counsel received at the secure facility shows it was filed but it does not appear on the docket sheet.

[11] Ironically, and after water boarding the man 100 times, the Government in Abu Zubaydah's own case has abandoned claims that Abu Zubaydah is, or ever was, a part of al-Qaeda. (Ap.B,Exs.31,40,77{JA227-33;237-41;521-25})

609 F. 3d 416 (D.C. Cir. 2010) and the government evidently thought it could bootstrap the use of the "diary" to justify its case against Petitioner, although the government never alleged that Petitioner was part of the "force" in Abu Zubaydah's own case. (Ap.B,Ex.77{**JA521-25**})

The government admitted in its "amended return" that al- Suri also used the name ▮▮▮▮▮▮ al Suri. (AR@41) What it still refuses to admit is that the hapless ▮▮▮▮▮▮, who used the nickname ▮▮▮▮ and not, as the government has claimed, the nickname '▮▮▮▮ was a teenager [12]who fancied himself a computer specialist, writer, and proficient in his self-taught English, and who admitted he had only met ▮▮▮▮▮▮ a short time prior to the raid.(Ap.B,Exs.57{**JA296**}&69{**JA327-31**}) The young ▮▮▮▮ Al-Suri, the real author of the diary was wounded in the raid but survived to be rendered to Morocco and eventually back to Syria where it is assumed he was tortured. (Ap.B,Exs.57,59&69{**JA293;300;337**}) [13]

The District Court would not allow Petitioner to substantively argue that the "diary" was really a combination of fantasy, teenage angst, news

---

[12] Various ages and birth years are shown for this young man-most likely because of translation to the Gregorian calendar. The UN records confirm he was a teenager.(Ap.B,Ex.59{**JA300**})

[13] The teenagers disappearance and rendition to Syria has long been of concern to the United Nations.(Ap.B,Ex.59{**JA300**})

reports from the internet, and adaptations of writings by Sheik Abdullah Azzam, because of this Court's decision in *Barhoumi v. Obama*, 609 F3d 416 (2010).(Ap.I,{**JA737&857**};Ap.J,{**JA990-1002**})  However,  the government's own records confirm that it has conflated the identities and names of two individuals at the house in order to frame its narrative about the "diary." The young Syrian who actually authored the papers (referred to as a "diary") was ███████████ al Suri aka ████████ while the only other ███ ███████ in the house (who was not even Syrian but most likely Pakistani or Palestinian) was ████████████████ (Ap.E{**JA582**};Ap.B,Ex.48{**JA264**} Ex.49{**JA267-8**}Ex.57{**JA285**};Ex.67{**JA305**};Ex.69,{**JA339-40**})  In its amended return the government briefly describes ██████ as a former trainer at Khaldan- while describing ████████ as a friend and confidant of ████ ████████.[14]

The government conflated the identity of the Pakistani/Palestinian ████████ for whom little is known- but he is perhaps ██████████ with the young and emotionally compromised Syrian, ██████████ ████████(Ap.B,Ex.48{**JA265**,Ex.68{**JA309-09**};Ex.67{**JA305**};Ap.F,{**JA600**} That

---

[14] In a demonstrative the government asserted that ██████ was a Syrian and gave ████████████████████████ while admitting that ██████ was the computer specialist. (Ap.E)

████████ and not the Pakistani/Palestinian, ████████ was the author of these papers is confirmed in multiple accounts by both the FBI and other detainees staying at the guesthouse regarding the identities of the two ████████.[15] As to ████████ an FBI report notes that he is-"Known to investigators as ████████ a Pakistani. Subject knew him as ████████ As to ████████" the FBI report notes, "A photo of the a [sic] known to investigators as ████████, the other subject who was hospitalized along with ████████. [REDACTED] identified the subject as ████████ frequently used the computer that was located in the house and bragged to [REDACTED] that he had a two year college degree in computer studies. [REDACTED] saw ████████ with many different computer books.; ████████ ████████ was asked to build a website about *Abdul Azzam* because of his computer experience and was to be paid for that work. The "diary" itself contains excerpts and rewritings of Azzam's     works.(Ap.F,Ap.b,Ex.57;Ex.67;Ex.68;&Ex.70{**JA294,591.265-66, 310,331, 343-413**})

---

[15] All of the Arabic names are phonetically spelled and the differentiation in spelling is based on the translators' predilections.

Finally, according to the government's list of who was in the house at the time of the raid there are only two Syrians listed (al-Suri's)- a doctor who was killed and ▮▮▮▮▮▮ who was known by the other men at the house as ▮▮▮ (Ap.C{**JA564-68**}) Although the government does not list ▮▮▮ as Syrian, ▮▮▮ self-identifies as Syrian and ISN 707, who was friends with▮▮▮ confirmed he was Syrian.

(Ap.B,Exs.57&69;Ap.F{**JA293,312,597**})

Without having the original document it is difficult to show this Court that it is not a real diary but instead a compilation of papers that jumps from historical writings to present day news to personal notes-without apparent differentiation. The "translated" version is made even more convoluted by the translator who repeatedly inserts his or her own opinion as to the *meaning* of the writings (especially when unable to translate in a way that makes any sense.) For example, the translator explains that the word "jihad" is another name for the author's brother. (Ap.B,Ex.70{**JA374**})

In the actual writings ▮▮▮ identifies an individual using the nickname "Usama Al-((Jaza'iri))," and the government has claimed that the individual al-Suri was referring to is Petitioner. As further discussed below

the two interviews of the writer proves that he not only had only met ███████ ████████ a short time prior to the raid but that he did not know the Petitioner.(Ap.B,Exs.57;Ex.69{**JA296;339**})

The government's entire "new and improved" case now turned on its ability to link the nicknames in the teenager's papers to Petitioner. The government relied on interrogations from two detainees to try to tie Petitioner to a name in the diary: ISN 839 and ISN 707.[16] As to ISN 707 the government falsely claimed that ISN707 was not only reliable but had no complaints with his treatment at Guantánamo.(Ap.I,{**JA741-44;752-53**;Ap.J{**JA925-26**};Ap.K{**JA1027,1034**}) As shown below, he was neither- he was mentally disturbed. ISN 707 looked at a photo that the government claims is Petitioner and he referred to the man as "Usamah al Jaza'iri, a driver in Algeria."(Ap.B,Ex.43{**JA251**})  As shown below the photo was not of Petitioner. As further described herein the government *eventually* also withdrew reliance on its other "witness" ISN 839.

Ultimately the attempts to link the diary to Petitioner failed (after numerous post trial motions described below) and the District Court and

---

[16] The government also attempted to utilize ISN696 but because that detainee was found by others judges to not be credible and the detainee recanted all of his statements the Court did not rely on him either.

the government were left with only one theory -- guilt by association, or perhaps, "guilt by guesthouse." Since Petitioner was arrested in the same guesthouse as Abu Zubaydah, the District Court eventually concluded, that regardless of the unreliability *of all of the other evidence*, it was undisputed that Petitioner was arrested at the same place as Abu Zubaydah, and hence, Petitioner must be a bad guy[17], and that was enough to justify the legality of the government's decision to detain him forever. (Ap.P, {**JA1222**})

As argued below, proof that those nicknames did not belong to Petitioner comes from military documents and also comes from the fact that several of the individuals who linked those nicknames to Petitioner (including ISN 707) identified photos that were not of Petitioner, but of other detainees. Government documents confirm that the actual individual who used the nickname Usama al Jaza'iri was described in an interview by ISN 215, a detainee the military deemed reliable and who personally knew "Usamah al-((Jaza'iri))." ISN 215 identified Usamah al Jaza'iri as a trainer

and *as having blond hair*.[18] (Ap.B,Ex.50{**JA269**}) (Petitioner does not have blond hair.) That document also clarifies that the government actually thought that the alias "Usamah al- ((Jaza'iri))" belonged to ISN 695. ███

████████████████████████████████████████████

████████████████████████████████████████████

███(Ap.B,Ex.50{**JA270**})

## PHOTO IDENTIFICATION MISTAKES WERE SYSTEMIC

The government confirmed that Petitioner's identification number while held at Bagram ████████████ (at Guantánamo, Petitioner's identification number is **ISN 685**). Unfortunately for Petitioner, the Bagram photograph ████████████ that followed Petitioner from Bagram to Guantánamo is not of Petitioner but is of another individual, Fahd Al Sharif, **ISN 215** (hereinafter "al-Sharif") who apparently shared that same ███ number at Bagram.(Ap.B,Exs.5[19]-6{**JA100,103**}) al-Sharif's photo became the official photograph for *Petitioner* in his prison folder at Guantánamo and was used by the government *for years* to identify the

---

[18] We also know from other sources that there was in fact a blond Arab that visited the guesthouse several times prior to the raid.(Ap.F, {**JA586**})
[19] The number ███ is not visible on later copies of the photo but the government does not dispute that the number is present and that this photo was used as Petitioner's photo.(Ap.I, {**JA767**})

Petitioner (Ap.B,Ex.6{**JA103**}). Al-Sharif is an admitted jihadist who fought in Afghanistan, fled to Pakistan and *admitted* training at the Khaldan camp. The allegations that the government continues to assert against the Petitioner parallel the actual admissions by al-Sharif, the man whose photo was mistakenly on Petitioner's prison folder for identification purposes for literally years.(Ap.B,Ex.14{**JA135-141**})

There was no indication in Petitioner's file up until his habeas hearing that a correct photo was ever substituted into his file. At his habeas hearing the Government tendered an undated "correction" regarding the use of the wrong photo. There is no indication that this correction was for any other purpose than for use at the hearing and no attempt was made by the government to establish a date for when, or if, the correction was actually carried out.

Other examples of the systemic problem with photos include:

- Importantly, in November 2002, shortly after ISN 707 looked at photo ███ and identified the individual as "Usamah al Jaza'iri," ███ looked at two photos ostensibly of Petitioner and pointed out that photo ███ was *not* of Petitioner and was not of the man he had identified earlier as "Osama." ███

stated that he thought the photos were of two different people"but both went by Osama." Remarkably, no investigation was done and the government continued to use wrong photos when asking other detainees to identify the Petitioner. (Ap.B,Ex.8{**JA112,114**})

- In 2003, **ISN 696** also pointed out an error with petitioner's photo. When **ISN 696** was shown a photo alleged to be Petitioner, he stated that the photo was not actually Petitioner. The interrogator checked and realized that al-Sharif's photo (**ISN 215**) was incorrectly shown as the photo for the Petitioner in Petitioner's official prison folder.(Ap.B,Exs.6,7,38{**JA103,110-11,234-35**})

- In 2004, **ISN 839,** when confronted with a statement that he had made previously about Petitioner, stated that the photo that he was then viewing "was not the same 'Usama' I talked about before."(Ap.B,Ex.9{**JA119**})

- Also, on at least one occasion Petitioner's ISN (**685**) was identified with a different detainee's name, Ghasan, whose real

ISN, is **682.** In this document Ghasan was listed as detainee

**ISN 685,** Petitioner's identification number.(Ap.B,Ex.10{**JA120**})

- Exhibit 11 states "a review of ███████ file depicts two different detainee photographs," and then notes (unlike in Petitioner's case) that *a request to correct the files was submitted.* (Ap.B,Ex.**11**{**JA124**})

- Exhibit 11 also shows that the FBI was identifying **ISN 685** (Petitioner's number) as "Abdullah Azak."(Ap.B,Ex.11{**JA125**})

- In Exhibit 12 interrogators observed in regards to ██████, "interviewers also believe the two photos may not be of the same person."(Ap.B,Ex.12{**JA128**})

- Exhibit 13 notes that the photo of ██████ may be incorrect after detainee **ISN 707** claimed that the "photo shown to him today was not the same man shown to him back in August." (Ap.B,Ex.13{**JA133**})

- *Even interrogators* remarked that there were individuals incorrectly identified in photographs.(Ap.B,Ex.10,{**JA121**})

As further described below, coupled with these known errors are numerous photo identifications where the actual photo being used is not

known, or the individual being shown the photo does not realize or comment on the error. There is no indication in the records that these errors were ever corrected. Despite these facts the District Court found-without ever actually seeing the Petitioner-that the photo the government claimed and which Petitioner's counsel could not identify as her client ▇▇▇▇ was in fact his photo, even though another detainee looked *at that same photo* shortly after ISN 707 and said it was not Petitioner. (Ap.O,{**JA1215**@ftnt.3},Ap.B,Ex.8,@1,3{**JA112,114**};Ap.I,@73,79-81{**JA774,780-82**})

## V.    The "Hearing"

Petitioner's habeas hearing commenced the week of December 13, 2010. Petitioner was allowed to listen by speakerphone to about half of the "unclassified" opening statement before the military authorities disconnected the call for evidently exceeding the allotted time that the military provided for the telephone call. That was the entire "participation" by Petitioner in a hearing that determined whether he could be held for life without charge or trial.

In addition to the irregularities described above, the *hearing* itself included such other *irregularities* as the government's objection, sustained

by Judge Leon, to deny Petitioner's counsel's (a solo practitioner) request to engage a co-counsel (with proper security clearance and signed onto the protective order) to assist at the hearing itself for the *sole purpose* of helping with organizing the many documents at the habeas hearing[20](Ap.J{**JA890-91**}); followed shortly thereafter (two days prior to the commencement of the hearing) by the DOJ's *re-organizing all of its thousands of pages of exhibits* to be used at the habeas hearing (Ap.I{**JA703-11**},Ap.J,{**JA887-902**}); requiring Petitioner to address five separate Returns in his Amended Traverse[21](Ap.A,{**JA01-02**},Ap.I{**JA703-11**}); allowing the government to utilize an amended narrative on the very day of the hearing combining the previous narratives and adopting the new numbering system (Ap.C{**JA526-580**}); the government's ongoing withholding of exculpatory documents

---

[20] This took place at the prehearing conference on Dec. 7, 2010. According to the court reporter the Court refused to allow that transcript from that hearing to be transcribed because it was "off the record." The Court maintained there was no court reporter. In a motion to reconsider counsel for Petitioner filed an affidavit regarding the presence of a court reporter but the Court denied the motion on March 7, 2011, as "moot." (D1453,1460,1462,1464)

[21] The government informed Counsel after it filed its *second to last* "amended return" on September 10th, 2010 that the multiple Returns (three narratives and thousands of pages) filed by the Government were to be read cumulatively and that the Return it filed that day was not really an *"amended"* Return as shown by the title but was instead a *supplement* to the earlier filings. (Ap.A,{**JA01-2**})

regarding its main detainee "witness" until *after* the hearing was completed and after the District Court Judge indicated he was prepared to rule(Ap.L{**JA1104-05**},D1444); and, the government's withholding of other exculpatory evidence until long after the Court denied the habeas petition. (D1468,D1480)

As to the Amended Traverse, Petitioner responded accordingly and replied to the four separate narratives because of the limited time allowed by the Court for filing the Traverse but counsel also asked the Court to strike the improper Returns as this Court never gave the government leave to "supplement" the earlier filed Returns but specifically granted the government's request for leave to "amend" the Return by September 10, 2010.(Ap.A@{**JA01-2**}) The Court ignored that application and on the day of the hearing – three days after the government renumbered all of its exhibits -- the government presented a final amended Return combining all of the earlier Returns and citing to the new exhibit list.(Ap.C{**JA526-80**};Ap.G{**JA615-55**};D1447) The District Court compounded the Government's abusive shenanigans and misconduct by berating Petitioner's attorney for purportedly not being able to keep up with the government documents and for not being able to tell the Judge the

government's document number for the Petitioner's exhibits.(Ap.I, {**JA703-11,783-85,794,825-26,829-31,852**};Ap.J{**JA887-902**}).

## VI.    The District Court's Decisions Denying the Writ

By way of background, the government filed what were later learned to be exculpatory materials in an *ex parte* filing submitted to the Court the day before the pretrial hearing (D1444). At the pretrial hearing itself the government attorneys mentioned its *ex parte* filing to the District Court, but did not mention that the documents submitted in that filing were actually exculpatory. The judge admonished the government that it would not review the *ex parte* documents unless it made a showing that national security would be threatened by disclosing the documents to counsel for Petitioner. At the same time the Court reminded the *six* government attorneys that all exculpatory documents had to be tendered to counsel for Petitioner as per his standing order.(Ap.L{**JA1110-12**})

The government never mentioned its *ex parte* filing again until the day the Judge entered an Order stating that he was ready to rule on the Petition. At that point the government admitted to the District Court, in an *ex parte* discussion, that the documents that it had filed  *ex parte*, the day before the pretrial hearing, were in fact exculpatory materials regarding its

*main detainee witness* against Petitioner (ISN839) and that the documents were never disclosed to Petitioner's counsel.(D1445;Ap.L{**JA1102-1112**}) In yet another *ex parte* proceeding (again this took place weeks after the hearing was completed) the District Court allowed the government to withdraw its reliance on the detainee (ISN 839), in lieu of providing the exculpatory documents to Petitioner's counsel.(D1445)  Petitioner's counsel was informed of these discussions and "deal" after the agreement was reached.(Ap.L{**JA1102-1112**})

Realizing that it would be impossible for the District Court to ferret out the documents and arguments regarding ISN 839 (the government's main "witness") from the transcript of the proceedings, counsel for Petitioner asked for a new hearing and for sanctions. (D1447)  That motion and the renewed motion for new hearing and sanctions were summarily denied by the Court. (ApP,Q{**JA1221-23,1224,26**)}

On January 11, 2011 the Court entered its unclassified opinion and on February 28, 2011 the Court entered its classified memorandum opinion in which it found the Petitioner detainable because he was captured in a raid with "a well known al Qaeda facilitator: Abu Zubaydah."(Ap.N{**JA1196**}) The Court went on to find that it is "more likely than not that petitioner

Bakhouche was, in fact, a member of Abu Zubaydah's force."(Ap.N, {JA1200}) In ultimately finding the Petitioner detainable, the District Court determined that the other detainee whose statements were relied on by the government (ISN 707) was credible and that his one and only alleged identification of Petitioner, on August 11, 2002, as using the nickname Usamah al Jaza'iri was also reliable.(Ap.N,{**JA1201**}) From that determination the Court in turn concluded that Petitioner was the same individual referred to in the so called "al-Suri diary" by the name of Usamah al Jaza'iri and was, hence, a member of the "Abu Zubaydah force."

In addition, the District Court concluded that Petitioner was taking English lessons at the house and that English lessons was on the "al-Suri list" of activities for Abu Zubaydah's "force." Combining these English lessons with the evidence of the nickname, the District Court found that this set of "facts" was sufficient to link the Petitioner to Abu Zubaydah's force. (Ap.N,{**JA1202-03**}) The District Court also held that ISN 707's testimony of traveling with an individual by the name of Usamah al Jaza'iri was corroborated by a certain fire report that placed an individual with that nickname in Afghanistan on November 15, 2001.(Ap.N,{**JA1203-04**})

Finally, the District Court found further corroboration in what it describes as "petitioner's own admission" that he had gone to Afghanistan to "fight Jihad." (Ap.N,{**JA1204**})[22]

## VII. Post-Hearing Motions

Petitioner filed a number of post hearing motions. Of primary relevance to this appeal, Petitioner moved for a new hearing based on the accumulation of misconduct by the government attorneys which effectively denied Petitioner a fair hearing.(D1447,1451,1452,1468,1487&Ap.G{**JA615-55**}) Petitioner also filed motions for reconsideration relating to "facts" that the Judge found against Petitioner and then relied on in rendering his decision denying Habeas relief which were actually no longer even at issue; specifically, following the government's own misconduct in not

---

[22]As shown during the hearing and as further discussed below, this Court's reliance on the FBI interview with the individual at the ███ house was clearly an error (which he corrected in his classified Opinion after counsel for Petitioner pointed out the error in a post trial motion) as the governments own witness, FBI agent ███ confirmed in his affidavit (Ap.B,Ex.3{**JA092-96**}) that the person he interviewed for that report had not been arrested in the ████████ house but was arrested at a different guesthouse on that same date, and hence, was not Petitioner. In addition, the "fire report" should no longer have been at issue following the withdrawal of ISN 839. The Court later acknowledged that fact by finding it didn't matter because being in the guesthouse was enough.(Ap.P{**JA1222**})

informing the Court or Petitioner's counsel of the exculpatory evidence regarding ISN 839, the government and the District Court agreed that the government's case would not rely on statements and documents attributable to ISN 839.(Ap.L{**JA1108**}) In addition, Petitioner moved to compel the exculpatory materials.(D1452)

Petitioner, also moved for reconsideration based upon newly discovered information regarding ISN 707 specifically, that the Court should not have relied on ISN 707 because documents and reports released by the military *after* the hearing (but never tendered to Petitioner) confirmed he suffered from severe mental impairment.(ExY{**JA1951-1988**}D1468) The government responded to that motion by filing even more exculpatory documents regarding that detainee.(D1480)

Petitioner also moved for a new hearing based on the fact that the official photo disclosed by wikileaks of Petitioner was not of the same man the government claimed was Petitioner at the hearing and also raised new issues with how photo identifications were made at Guantánamo.(D1487)

Finally, Petitioner moved for Clarification as to the actual order denying habeas relief as the reasons set forth in the opinion were no longer viable.(D1498)

The District Court denied all of those motions, most without comment. (But see, Ap.P&Q{**JA1221-23,1224-26**}) The District Court ultimately determined matters (which by the government's own admission undermined the vast majority of the government's purported case against Petitioner establishing the purported legal basis for detention) were of no moment because the District Court concluded that "guilt by guesthouse" was sufficient, to wit, that the Petitioner was staying at the same guesthouse in Pakistan where Abu Zubaydah was arrested, a fact that Petitioner has never disputed, is, by itself, with no other showing of anything indicating hostile action or intent on the part of Petitioner, a sufficient legal basis to establish the government's entitlement to hold Petitioner in custody, indefinitely.(D1496,1500)

## SUMMARY OF ARGUMENT

Petitioner did not get a fair hearing. Had he received a fair hearing-based on the evidence- his habeas petition would have been granted. Petitioner asks this Court to grant the writ or, at the very least, to order a new hearing with a new judge.[23]

---

[23] Sending him back for a new hearing will clearly add several more years to his unconscionable detention and if this Court should order a new hearing

Further, contrary to the District Court's conclusion, this Court has not, at least to date, expressly held that a Guantanamo detainee's apprehension at a guesthouse in Pakistan, by itself, with no other indicia of hostile actions or intent, is a sufficient basis for detention, and the government's presentation of "evidence" from ISN 839 and 707 that it knew was unreliable in order to have more than merely the guesthouse connection demonstrate that the government is also quite aware that the guesthouse -- alone — is not a sufficient legal basis to detain the Petitioner.

## ARGUMENT

I.  **WINNING THROUGH MALFEASANCE – PETITIONER RECEIVED NEITHER A FAIR HEARING, NOR ANYTHING REMOTELY RESEMBLING A FAIR HEARING**

Black letter law would suggest that a meaningful opportunity to pursue a writ of Habeas Corpus is *supposed* to be a bedrock right, as recognized in *Boumediene v. Bush*, 553 U.S. 723 (2008), where the United States Supreme Court held:

> We do consider it uncontroversial, however, that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to

---

Petitioner asks this Court to remand not only with a new judge but with Orders that the government cannot change theories yet again.

demonstrate that he is being held pursuant to "the erroneous application or interpretation" of relevant law.

Unfortunately, in the present case, Petitioner has not received a meaningful opportunity to demonstrate that he is being held pursuant to the wrongful application and interpretation of law. The four-day-long oral argument – charitably characterized as a "habeas hearing"[24]-- was a fiasco even before it began, and in no sense provided Petitioner with any meaningful opportunity to challenge the basis of his detention; nor for that matter, was Petitioner afforded an opportunity to demonstrate that the abuse and misconduct he suffered at the hands of the government, or the acquiescence to that misconduct displayed by the District Court, also demonstrated that he did not have a meaningful opportunity to challenge the lawfulness of his detention.

## A.    The Government Failed to Provide Exculpatory Evidence

Notwithstanding that actual witness testimony was not presented the government's "star witnesses" were detainees designated ISN 707 and ISN

---

[24] Even the Court acknowledged that it really was *not* a "hearing."(Ap.I{JA765-66,823})

839; as set forth above, the government failed to reveal essential details in its knowledge concerning them. As to ISN 839, counsel for Petitioner still does not know the extent of exculpatory information that the government withheld, as the Court allowed the government to continue to withhold that information and withdraw reliance on that detainee several weeks *after* the hearing, rather than provide the exculpatory information to counsel.

In addition to the above-mentioned injustices and procedural irregularities, at the hearing, the government decided to put forth statements from ISN 839 that it knew prior to the start of the hearing were not credible. The government knew that neither the judge nor Petitioner's counsel were aware that documents that it had attempted to file *ex parte* and under seal – but which the Judge refused to review on that very basis – contained exculpatory information about that witness (ISN 839). Despite that knowledge on the part of the government, the hearing focused primarily on ISN 839. This bad faith strategy forced counsel for Petitioner and the Court itself to focus on the statements and documents related to that witness whom the government later admitted were not reliable (and it knew were not reliable at the time presented). Several weeks after the hearing was completed, the government was finally forced to acknowledge

its malfeasance and withdraw reliance on that witness. Unfortunately, the damage was done and could not be undone – as shown by the Judge's decision which continued to rely on "facts" that were derived entirely from the discredited and withdrawn ISN 839.

As to ISN 707, the government repeatedly assured the District Court that he had made no allegations of mistreatment and that he was reliable. Six weeks after the judge ruled that ISN 707 was a reliable witness for the government the military disclosed documentation related to ISN 707 on its webpage. The documents disclosed that ISN 707 had severe cognitive and psychological problems that were exacerbated by the extremely harsh treatment that the man had been subjected to by the military, just prior to his arrival at Guantánamo. Not only did those documents undermine the credibility of ISN 707, they also contradicted the government's position, consistently taken before the District Court, that ISN 707 had not suffered any mistreatment. The government repeatedly misled the judge and counsel by proclaiming that ISN 707 was a witness who had not only not made any complaints whatsoever about any mistreatment but who the government boasted had no complaints with his treatment at Guantánamo.

The lead DOJ attorney later claimed not to know about the lack of reliability of ISN 707 because ISN 707 was being tried in the military commission. This claim of ignorance does not withstand the slightest bit of scrutiny – in fact, there were at least two attorneys from the Department of Defense sitting at the government table during the Petitioner's entire "hearing." In addition, after Petitioner's counsel learned of the problems with ISN 707 through documents released by the military on its website, the DOJ itself presented additional documents to Petitioner's counsel confirming that detainee's severe psychological and cognitive problems. These tardy disclosures completely compromised the credibility of ISN 707 and should have been tendered before the so-called hearing, let alone leaving counsel for Petitioner to discover these on the military website after the government's extensive reliance on 707's statements.

The exculpatory information withheld went to the heart of that detainee's reliability. In particular the one statement relied upon by the Government at Petitioner's habeas hearing comes from a summary of an interrogation of ISN 707, six days after he arrived from Bagram and the "dark prison." The government argued extensively during the merits hearing that this one particular document claiming to summarize an

interrogation of ISN 707 in which he ostensibly placed Petitioner in Afghanistan utilizing the nickname Usamah al Jaza'iri, was reliable. It is now clear that ISN 707 had alleged that he was being subjected to severe and brutal treatment during this exact time period and that the government was aware of his claims at least as far back as June of 2010 (and most likely even earlier).

Based on those newly available documents it was undeniable that ISN 707 had indeed made substantial allegations related to his treatment, and such allegations include contentions that he was subjected to so-called enhanced interrogation techniques and other forms of coercion *both immediately before and during the time frame* related to the one document that the government had asked the District Court to rely on in Petitioner's case as proof of Petitioner being identified as "Usamah al Jaza'iri" and being in Afghanistan.

**B.    The Government Submitted a Fraudulent Document to Justify Petitioner's Detention**

The government relied on a summary ███████████████

███████████████████████ to show that the Petitioner was

engaged in terrorist activities. This document was debunked following

Judge Lamberth's order requiring that the actual transcript of the meeting

be turned over in discovery.  The transcript proved that the "summary" of

that meeting was a fabrication, and that Petitioner had never made the

statements which the summary attributed to him, but in fact had stated the

very opposite. The government was forced to withdraw the fraudulent

allegations and concoct a new theory for his detention.

## C.   New Theory for Detention on Eve of Hearing

In addition to not being provided with exculpatory materials for the

two detainee witnesses whose statements were utilized by the government

in its case contesting Petitioner's habeas petition, the government changed

its entire theory as to why the Petitioner's habeas petition should be

denied. This radical shift in the government's approach occurred shortly

before the actual hearing and only after the government's previous theory

of detainability was uncovered as a complete fraud.

## D.   The Government Engaged in Gamesmanship over its Amended Return

Although the government was granted leave to file an amended return in August 2010, over the objection of Petitioner (after the fraud discussed in section B above was uncovered) the government instead filed (without notifying the District Court Judge) what it later called a "supplemental" return, which required Petitioner's counsel to respond to four separate returns in Petitioner's Amended Traverse. The government then presented its actual "amended" return on the first day of the hearing, December 13, 2010.

### E.     The Government Engaged in Gamesmanship over Exhibits

In a successful effort to cover up its malfeasance regarding the Amended Return, the government reorganized and numbered all of its exhibits and tendered the two binders containing 149 *reorganized* exhibits to counsel on Friday December 10, 2010 at approximately 5pm-less than three days prior to the hearing. A week earlier the government objected to Petitioner's counsel's announcement that she was bringing in an additional attorney – (with security clearance and signed onto the protective order) whose only role at the hearing was to serve as a paralegal to help keep the many documents organized. The government, which had six attorneys and

two paralegals in attendance at all times during the "hearing" vigorously (and successfully) fought to make sure that Petitioners counsel, a solo practitioner, sat alone at her table and was forced to sort through several hundred re-organized documents without assistance. Counsel for Petitioner had insufficient time to try to match up the new system with the previous five sets of documents tendered by the government. As the previous sets of documents contained all of counsel's notes for challenging and rebutting the government's position they were made practically worthless under the government's new numbering scheme.

### F.    The District Court's Exacerbation and Facilitation of the Government's Gamesmanship

In addition to the above-mentioned injustices and procedural irregularities, at the hearing, the problems with the government's case were only exacerbated by the District Court Judge who seemed to exhibit an irrational bias against Petitioner's counsel – repeatedly questioning and admonishing counsel when she did not know the government's exhibit numbers – despite the fact that he was well aware of the reorganizing of the government's exhibits by the government, on the eve of the hearing, and chose to do nothing about it. When counsel raised the issue again on

the second day of the hearing the judge was clearly irritated at Counsel's complaints about being blindsided and he referred to Petitioner's counsel as a "peculiar" attorney. At the time Counsel attempted to diffuse the hostility emanating from the Court by stating that she hoped that his description was meant as a compliment. It clearly was not a compliment and apparently the Court recognized his insult, as evidenced by the editing of the official transcript and *changing* the words "peculiar attorney" to "mysterious practitioner of the art of law, to say the least." (Ap.J{**JA889**})

The District Court also suggested that counsel was overstating the problem with the government's renumbering of exhibits because she wasn't prepared to do her closing, despite the fact that she was quite ready to deliver a closing argument. The transcript shows example after example of the District Court's lack of appropriate judicial demeanor, if not self-evident bias, directed against Petitioner's counsel.

This Court has held "In reviewing a claim of judicial bias, we must determine "whether the judge's behavior was so prejudicial that it denied [appellants] a fair, as opposed to a perfect, trial."" *United States v. Edmond*, 52 F. 3d 1080, 1099 (D.C. Cir 1995) (quoting *United States v. Logan*, 998 F.2d 1025, 1029 (D.C.Cir.1993)). This Court requires that a District Court judge

hearing a case remain a "disinterested and objective participant in the proceedings," *United States v. Norris*, 873 F.2d 1519, 1526 (D.C.Cir. 1989). Petitioner did not receive a fair hearing and the District Court was a far cry from being "disinterested and objective."

The procedural maladies described above set the stage for the substantive difficulties that ultimately resulted in the denial of the writ. Practically speaking, the entire hearing was devoted not to adjudicating issues concerning the actual reasons for Petitioner's detention, but to issues that the government ended up conceding should not have been included in the hearing at all (directly, or indirectly by the government's deliberate failure to even tell the judge, nevertheless counsel for Petitioner, about the exculpatory information until after the hearing). This resulted in a hearing that was substantively unfair.

It defies all credulity as the government attorneys later claimed – that not one of the six government attorneys sitting at the government's table during the four days of the hearing could remember that the documents that they filed *ex parte* one day prior to the prehearing conference and which the judge made clear, under no uncertain terms, that he would not review – were actually exculpatory and involved evidence completely

undercutting the probative value and credibility of their key detainee witness (the very witness whose testimony supposedly established a basis for continuing to hold Petitioner.)

It would appear simply that a tactical decision was made to keep the focus of the hearing on ISN 839 – even though the government knew he was not a credible witness – because without ISN 839, the government's case was left entirely dependent on only one document relating to one interrogation with ISN 707 from the week he arrived at Guantanamo after months of "enhanced interrogations" at Bagram and at the so-called "dark prison" in Afghanistan. Clearly the government could not rest its case of claiming that Petitioner was the notorious "Usamah al Jaza'iri" with only that one contradictory identification.

In other words, given 707's unreliability and the inability to tie the Petitioner to the events of the so called "al-Suri diary," without ISN 839 placing Petitioner in Afghanistan, the government was going to be left arguing that being in the guesthouse, and nothing more, was enough to deny the habeas petition. The government had never taken this position at any time in its Return or prior proceedings; of course, once the District Court Judge suggested in Petitioners classified opening that based on his

own interpretation of this Court's rulings (and notwithstanding that counsel is aware of any case where "guesthouse alone" was a sufficient legal basis for detention) that "guilt by guesthouse" was a sufficient basis to justify detention, the government signed on to that proposition.(Ap.J, {JA962-64})

The Supreme Court and this Court have long held that the misconduct on the part of the government, as outlined above and as further exhibited in the transcript, are not acceptable practices and have no place in a courtroom: "consistent with the Due Process Clause, the government "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction," nor may it allow such testimony, though not solicited by the government, "to go uncorrected when it appears."" *Thompson v. US*, 45 A. 3d 688 (D.C. Cir. 2012) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)." The Constitution requires that disclosure be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case.... Prosecutorial resort to a strategy of `delay and conquer' ... is not acceptable." *Miller v. United States*, 14 A.3d 1094, 1107-08 (D.C. 2011) Suppression of evidence amounts to a constitutional violation when it deprives the defendant of a fair trial, as is

consistent with "our overriding concern with the justice of the finding of guilt." See, *United States v. Agurs*, 427 U. S. 97, 112 (1976).

Petitioner is entitled to a fair hearing and he did not get one.

## II. THE GOVERNMENT FAILED TO MEET ITS BURDEN TO JUSTIFY DENYING THE HABEAS PETITION

At the beginning of the hearing the District Court correctly stated that what the hearing was about is whether or not Petitioner was "Usama al Jaza'iri"… "Was he properly identified by a preponderance of the evidence as al-Jaza'iri? That's what this case really boils down to." (Ap.I, {JA732})    That is also what the government claimed that this case was about and at the beginning of the hearing the government listed what it referred to as the four "factual issues in dispute" (Ap.D{JA581}) which it argued would justify the continued detention of petitioner, as follows:

*Government point 1:* "PETITIONER WAS A "PERMANENT MEMBER" OF ABU ZUBAYDAH'S FORCE."

As described above, the government conflated[25] the identities of two individuals at the guesthouse to give credence to its narrative that the "diary" was written by someone it could assert (with a straight face) was informed and reliable because nothing was known about him. The

---

[25] See also, Ap.F, {JA594-98,600} actually conflating both names.

government took the identity of a non Syrian man who was staying at the guesthouse, known as "Kamil," and reconfigured him into the Syrian author of a "diary" while at the same time renaming ▇▇▇▇ the actual Syrian whose papers were found, as ▇▇▇▇

In the governments response to the Amended Traverse (D1443) the government tried to bolster its argument that the author of the diary was actually named "Kamil" as opposed to ▇▇▇▇ and by way of "proof" offered the absurd conclusion that ▇▇▇▇ could not be the author of the diary because the diary referred to ▇▇▇▇ in the third person. However, ▇▇▇▇ the real author, extensively discussed Abu Kamil, in the third person in his writings- confirming, under the government's theory, that "Kamil" could not be the author of the diary. Amongst other entries in his writings ▇▇▇▇ discusses placing a call to Abu Kamil, later the arrest of Abu Kamil during Ramadan, and at the time of one of his entries (February 4-6, 2002) that Abu Kamil was still in custody. (Ap.B,Ex.70{**JA373-74**}) The so called "translator"[26] attempted to *explain* this conflict with the governments narrative (of Kamil apparently talking about himself in the third person) by inserting one of the many opinion notes found in the document, this one

_____

[26] The translation of the "diary" is not a court certified translation.

asserting that it *was another* "Abu Kamil" that was being referenced-but of course there is no evidence to support that *opinion*. Finally, as noted above, the idea that the Syrian diary was written by a Pakistani (or Palestinian) is absurd.

The documents ("Diary")(Ap.B,Ex.70{**JA343-413,331,265-66,294**}) are clearly a combination of news reports, historic writings, and the confused reflections of a teenager that include such musings as: "They both think I am disturbed and have psychological problems and that I have issues with them…" (Ap.B,Ex.70{**JA392**}); "I said goodbye to this day with a bad mood because of my brother Asher al Jaza'iri who told me I am fat. He said it to my face many times you are fat, fat, fat, fat and fat while I was saying No, No, No, No…( Ap.B,Ex.70{**JA402**})[27]; my brother Abudllah al Muslim was lifting my spirit while telling me (of course he plays tricks) that I have precious ideas and feelings (Ap.B,Ex.70,{**JA402**}); and finally, "I feel sad and I cry almost every day after every behavior or words he says to me because of my sensitivity and because of my broken heart and spirit." (Ap.B,Ex.70{**JA405**})

---

[27] We also know independently that ▇▇▇▇ was indeed quite "fat" weighing more than 300 pounds. (Ap.B,Exs.57&Ap.F{**JA297,597**}{**JA**}

If this seems too confusing it is because that was the government's intent. The important thing to keep in mind is that according to the government's own lists there were only two Syrian's at the house- the badly wounded and emotionally compromised teenager ███████ and the doctor who was killed; and there were only two ███████ the Pakistani ███████ and the Syrian ███████ The government never claimed the book was written by the only other Syrian (the doctor) and for reasons counsel will not explore here- it would be impossible for the government to make that claim. It also defies credibility for the government to claim that the Syrian "diary" was actually written by a Pakistani (or Palestinian) man. The one thing we can be sure of is that the reason that the government would like the elusive ███████ to be the writer is because the real writer, ███████ an emotional teenager who only just met ███████████ would have been a hard sell as the author of an authoritative treatise on " ███████ ███████ force."

Even if the so called "diary" written by the teenager that only met ███████ ███████ a few weeks prior to the raid was a true and accurate account of "a force" led by ███████████ Petitioner was not a member of that force. In order to prove this first of the four issues that the government claimed

were in dispute the government had to prove that Petitioner used the name "Usamah al Jaza'iri." Petitioner's actual name is no where to be found in the *diary* so in order for the government to prove that Petitioner was a permanent member of the so-called force it had to link the nickname to Petitioner. As ultimately found by the District Court, when it held that it was enough to forever detain Petitioner because he was in that guesthouse, the government was unable to link the nickname to Petitioner.

The only person who ostensibly linked the nickname of Usamah al Jaza'iri to Petitioner is one detainee, ISN 707, who as described above, on one occasion identified a photo and described the man in the photo as using the nickname and being a driver in Algeria.[28] Despite ISN 707's own undisputed presence in Afghanistan and his leadership role at the Khaldan camp he never claimed to have seen the person in that photo in Afghanistan or at that camp and more importantly he never identified the Petitioner as someone he saw in Afghanistan or the Khaldan camp.

Not only was ISN 707 not a credible witness- as set forth above after

---

[28] Counsel for Petitioner made clear that she could not identify Petitioner from the photo as it did not look like him and she has visited him many times since 2006. The Court, who has never seen Petitioner, declared that the Photo was "unequivocally" of Petitioner. (Ap.I{**JA774,780-82**;Ap.O{**JA1215@ftnt.3**})

materials regarding his mental health problems and severe abuse surfaced (after Petitioner's hearing was over)- but also the evidence showed that ISN 707 was not identifying Petitioner when he identified a man as going by the name of Usama al-Jaza'iri. First, as described above, ███████ confirmed that the photo █████ was not of Petitioner.

ISN 707 does not identify Petitioner, who was staying at the same guesthouse, as having been in Afghanistan and he does not identify Usama al Jaza'iri as having been in the guesthouse with him.

As shown above Government documents confirm that the actual individual who used the nickname Usama al Jaza'iri was described by ISN 215, a detainee who trained at Khaldan and who personally knew "Usamah al-((Jaza'iri)) *as having blond hair*. (Petitioner does not have blond hair.)

In addition, not one individual at Guantánamo has identified the

Petitioner as someone they knew or saw at the Khaldan camp….including ISN 707, who gave detailed descriptions for the individuals that he identified including whether they were members of al-Qaeda, whether they had training at Khaldan, whether they had training somewhere else, whether he met the individual at a guesthouse, etc. (See also, Ap.B,Exs.43,44{JA247-55,256-58})

Also a government interrogator noted that the individual that ISN 707 identified as Usama al Jaza'iri *is known by the military as "Abdu Razzaq."* Exhibit 43 is dated two months after Petitioner arrived at Guantánamo from Bagram. Not only had Petitioner *not been known* by the military as "Abdu Razzaq" or as "Abdul Razzak" the "knowledgeability brief" prepared on the day Petitioner arrived at Guantánamo from Bagram) shows that when Petitioner arrived at Guantánamo he had been known at Bagram as abd al–azak ali abd ((al rahman)) and that he had no aliases. (AP.F,{JA604,516) The official military listing for Petitioner as of May 2006 was ABDELRAHMAN, ABDELRAZAK ALI[29] (Pg.1,line 16). The same military listing also lists at least *nine* "Abdul Razzaqs" at Guantánamo-*not*

---

[29] http://www.dod.gov/pubs/foi/detainees/detaineesFOIArelease1 5May2006.pdf

*one of whom is the Petitioner.* (ISNs 67,99,219,233,356,489,923,942,1043). In fact, government documents consistently show that the military knew Petitioner as "Abdul Rahman" and on a few occasions as "al-Rizak" making it clear that identifications referring to Abdul Razzaq were not referring to Petitioner. Finally, the government admitted at the hearing that the photo that was used to identify Petitioner was of the person *known to the military* as Abdul Razzaq (which Petitioner was not) (Ap.I, {**JA739**})

Hence, on its own terms, 707's identification is not viable: without even taking ISN 707's credibility into account and the government has not shown that the nickname Usamah al Jaza'iri was used by the Petitioner.

### *Government point 2: PETITIONER WAS PRESENT IN AFGHANISTAN AFTER SEPTEMBER 11TH AND HE FLED AFGHANISTAN ALONG THE SAME ROUTE USED BY ABU ZUBAYDAH'S FORCE AFTER OPERATION ENDURING FREEDOM BEGAN, EVENTUALLY ARRIVING AT A GUESTHOUSE IN FAISALABAD, PAKISTAN.*

First, the idea that Abu Zubaydah had his own particular route out of Afghanistan is absurd. There were only three routes to get into and out of Afghanistan from Pakistan and those routes were being traveled by more than one million people after the fall of the Taliban. (Ap.B,Ex.72{**JA469-475,511**)** In addition, the only evidence the government submitted regarding its claim that Petitioner was ever in Afghanistan was the alleged

statement described above by the individual interrogated by FBI agent ███████████ at the ███ house (which was not Petitioner) and a fire report that listed someone called "Usamah al Jaza'iri."

Although, for the reasons stated above, that individual at the ███ house clearly could not have been the Petitioner- that individual's travels have unfortunately followed the Petitioner. In addition, the fire report that identified someone using the name Usamah al jaza'iri as being present near Khost on or about November 15, 2001 cannot be used to show that Petitioner was at that location- only that someone using that nickname was at that location.

The District Court, not realizing that the fire report could no longer be relied on as relating to Petitioner after ISN 839 was withdrawn from the case, also at first relied on that document in denying the writ. The problem was that ISN 707 could not be used to corroborate that report and so without the discredited and badly abused ISN 839 (who said whatever he was told, to avoid execution) the report alone had no evidentiary value. As argued at the second closing argument the fire report should also have been withdrawn (Ap.M{**JA1165-67**}) because the appearance of a nickname on reports cannot be assumed to be referring to Petitioner without more.

And there was nothing more. Eventually the District Court in his classified opinion found that the name Usamah al Jaza'iri on the fire report was enough to implicate Petitioner because the Court held that the name belonged to Petitioner.

**Government point 3**:     *PETITIONER WAS PRESENT AND CAPTURED AT A GUESTHOUSE WITH ABU ZUBAYDAH AND OTHER MEMBERS OF ZUBAYDAH'S FORCE WHERE THE FORCE WAS TRAINING IN EXPLOSIVES, ELECTRONICS, COMPUTERS, AND THE ENGLISH LANGUAGE IN ORDER TO CONDUCT MARTYRDOM OPERATIONS AGAINST US AND COALITION FORCES.*

One fact needs to be made crystal clear here, there were no explosives or anything else in this guesthouse that could be used to *conduct martyrdom operations* against anyone. The lack of anything related to martyrdom operations was clearly established by the government index of materials located at the house. (Ap.B,Ex.56{**JA280-92**})

The government also alleged that Petitioner was taking English lessons in furtherance of the *alleged* operations and the fact that he denies taking those lessons confirms he should be detained indefinitely. ▮

▮▮▮▮▮

65

███████████████████████████████████

██████████ Once again the government asked the District Court to disregard government documents when those documents do not fit its theory and the District Court ignored ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████There is nothing sinister about taking English lessons and there is no reason to think that Petitioner, who was barely literate in Arabic at the time, would have thought taking those lessons would be something he should deny.

It was ISN 707 who actually asked for English lessons from ████████ (a man who had studied at a University in the United States which is why the English lessons have been described as *American accented English*). As noted above, according to ISN 707 the lesson(s) were not started until *two days before they were all arrested*. ISN 707 never mentioned Petitioner participating in the class. (Ap.F, {**JA614**})

*Government point 4: PETITIONER USED KNOWN COUNTER-INTERROGATION TECHNIQUES TO HIDE HIS ACTIVITIES; INCLUDING* ████████████████████████████████████ ████████████████████████████

Petitioner has explained why he was reluctant to correct his identity-if this Court thinks that someone in his situation should have corrected the information sooner, so be it. The question then becomes, are we really going to detain a man forever without charge because he was afraid to correct his name and country? Petitioner was not hiding a belligerent past when withholding his name and country, he was afraid.

In so far as the shifting "cover stories" the government continues to rely on the interrogation taken on the night of the raid of an individual at the ███████ (even though it was physically impossible for it to have been Petitioner). The government blindly claims that this interrogation proves that Petitioner admitted to being in Afghanistan before denying being in Afghanistan and his failure to continue with the "admission" is a counter-interrogation technique.

### III.     BEING IN A GUESTHOUSE SHOULD NOT BE ENOUGH FOR LIFETIME DETENTION

After counsel for Petitioner proved in post trial motions that the facts relied upon by the District Court in denying the Writ were unreliable and could not withstand scrutiny the Court declared that it didn't matter if Petitioner used the name Usamah al Jaza'iri because being in the

guesthouse was enough. Petitioner respectfully suggests that it should not be enough to detain Petitioner forever without charge- because he happen to find himself in the same house as a man that the government *thought* was the number 2 al- Qaeda operative (Abu Zubaydah) only to learn, after water boarding him 100 times, that he was nothing more than a travel agent with mental health issues. (Ap.B,Ex.40{**JA227-33,237-241**})    In addition, a hearing was not necessary if being in a guesthouse alone is considered enough.

This Court has held that a key feature of al Qaeda guesthouses, as opposed to other guesthouse, is that al Qaeda guesthouses are not generally open to the public. See, *Alsabri v. Obama,* 684 F.3d 1298 (DC Cir 2012) As noted above, the ███████ guesthouse and the other guesthouses raided that night were open to members of the public. Indeed, over three dozen people –females and non-Arab males — were promptly released either immediately without arrest or shortly thereafter. Indeed, even in the case erroneously relied on for the proposition that "guilty by guesthouse" would suffice, the Petitioner there was also found to have engaged in terrorist training at the Khaldan training camp. See, *Barhoumi v. Obama,* 609 F.3d 416 (DC Cir 2010). See also, *Almerfidi v Obama,* 654 F3d 1 (DC Cir

2011) (Detainee alleged to have stayed at al-Qaeda affiliated guesthouse for two and a half months in Tehran, Iran and had $2000 in unexplained cash when arrested by Iranians.)

The government presented absolutely no evidence to suggest that the house that the Petitioner was arrested at had any affiliation with al-Qaeda, or anything else criminal or terror related. The fact that Abu Zubaydah stayed at the house for a few nights should not be enough to turn the house into something it is not.

69

A.     AS OBSERVED[31] BY A NOTED COMMENTATOR BENJAMIN WITTES, GUESTHOUSE ALONE SHOULD NOT BE ENOUGH

Memo to the D.C. Circuit: Staying at a guesthouse is not the same as taking military training.

Ever since the D.C. Circuit's decision in last year, its opinions have repeated some language that was originally buried in a footnote in Judge Janice Rogers Brown's opinion in that case concerning how the courts should treat "evidence suggesting that [a detainee] attended Al Qaeda training camps in Afghanistan and visited Al Qaeda guesthouses." Judge Brown–writing for herself and Judge Brett Kavanaugh–noted that "evidence supporting the military's reasonable belief of either of those two facts with respect to a non-citizen seized abroad during the ongoing war on terror would seem to overwhelmingly, if not definitively, justify the government's detention of such a non-citizen." The language was by no means a holding, but it has nonetheless become part of the court's boilerplate language in subsequent opinions about the scope of detention authority. In yesterday's *Almerfedi* decision, for example, Judge Laurence Silberman, also in a footnote and citing *Al Bihani*, wrote that, "of course, that a petitioner trained at an al Qaeda camp or stayed at an al Qaeda guesthouse 'overwhelmingly' would carry the government's burden."

The court's emerging doctrine on this point seems to me to reflect an unexamined assumption–and one that I think is empirically flawed. So readers should consider this my amicus brief to the D.C. Circuit on the general question of what weight guesthouse attendance and terrorist training should carry in Guantanamo

---

[31] http://www.lawfareblog.com/2011/06/the-significance-of-guesthouses-and-training/

habeas cases. To put the matter simply, I think the court should treat them differently from one another–and should treat neither the way the *Bihani* language proposes.

The two factual issues are linked for two reasons–first, because they are both recurrent facts that arise in a great many of these habeas cases, and second, because both guesthouse stays and training reflect elements of the Al Qaeda recruitment process. In the years before September 11, young Muslim men would be routed by recruiters and facilitators to Afghanistan, generally traveling through Pakistan; they would stay in guesthouses in both Pakistan and Afghanistan, and from those guesthouses would be sent on to training camps. After a period of training, the more promising ones would be sent on to more specialized terrorist training, while others would be attached to units fighting for the Taliban. The apparent logic of the D.C. Circuit's doctrinal point here is that someone who went through either of these recruitment processes would, by virtue of that fact alone, very likely have become "part of" the enemy.

In my view, at least, this premise is complicated but crudely accurate with respect to training, but it is far less accurate with respect to guesthouse stays. Were it up to me, I would arrange the doctrine modestly differently with respect to training and quite differently with respect to guesthouse stays.

While both guesthouse stays and training are parts of the recruitment process, they are very different parts of it–and they reflect different levels of commitment. Taking training reflects a conscious decision to receive military instruction from a particular group. Just as someone who goes to basic training in the U.S. military can be reasonably presumed to have joined up, someone who trained at Al Farouq has cast his lot with the jihadis. The only question in my mind after someone has been to Al Farouq or some similar camp is whether that person later broke with the enemy–a question that can be quite difficult to answer sometimes. But I have no doubt that absent a later break, taking training from a group reflects a sufficient level of joining up so as to make a person "part of" that group. Because of the possibility of a later

break, a factual claim made in many habeas cases, it overstates the matter to say that training alone "overwhelmingly" supports a detention. The better approach for the court, in my view, would be to treat the fact of training as establishing that the detainee became, at that time, part of the enemy and creating a rebuttable presumption of a detainee's remaining part of it until the time of capture–a presumption that would shift the burden of proof to the detainee to prove that he quit at some point between training and capture.

A guesthouse stay is quite different. It takes place, in most cases, at an earlier phase of the recruitment process. Some people stayed in guesthouses but got spooked and left before they made it to training camps. In and of itself, a guesthouse stay reflects only a very minimal associational commitment. Some people in guesthouses–even real Al Qaeda safe-houses–were actual guests. Someone who stayed in a guesthouse could be anything from a hard-core terrorist to an early-phase recruit to someone who has socially fallen in with the wrong crowd–which is now trying to recruit him–to, in one famous case, someone who came over for dinner, stayed the night, and got caught in a raid on the house. I don't doubt that a guesthouse stay is probative of membership, sometimes very probative. But on its own, it strikes me as far from "overwhelming" evidence in support of a detention; indeed, unlike training, it does not even in my view create a presumption of membership, and it should not shift the burden of persuasion to the detainee. The court, rather, should treat it only as one probative indicator of a relationship between an individual and a group–one that may well suggest, in combination with other things, that a detainee joined up but is not alone proof of that claim.

The present case is the perfect illustration of Mr. Wittes's point: the government's attempts to show "evidence" of terrorist training and other indicia of hostile activities have utterly failed. Without linking the

nickname to the Petitioner the government was left only with "guilt by guesthouse" and with the fact, that Petitioner incorrectly identified himself as Libyan instead of Algerian upon his return to the jail from the hospital. Petitioner submits that his real name and home country add nothing to the government's case and do not demonstrate any hostile act or intention on the part of Petitioner let alone make him out to be detainable. Even if this Court does not accept his explanation regarding his identify, that alone does not warrant Petitioner's indefinite detention. The evidence clearly shows that Petitioner is guilty of nothing other than failing to correct his name and home country because of fear of even worse abuse than he had already suffered. This is not the same as a showing of staying in an al Qaeda guesthouse with other indicia of terrorism, and should not, ipso facto, be a determination of detainability by itself.

## IV.    CONCLUSION/RELIEF SOUGHT

Wherefore, Petitioner prays that this Court either enter the writ based on the clear evidence presented by Petitioner or remand the case for a new hearing with a different judge.[32]

---

[32] As Appellant has outlined above, the District Court demonstrated a pattern of disqualifying behavior and bias. As this Court noted in Microsoft

Respectfully Submitted,

Attorney for Petitioner


H. Candace Gorman
Law Office of H. Candace Gorman
220 S. Halsted
Chicago, Illinois 60661

---

Corp.,"[The] recusal statute, 28 U.S.C. §455(a)(1988), and our general supervisory power to "require such further proceedings to be had as may be just under the circumstances," 28 U.S.C. §2106 (1988), allow us to reassign this case to a different judge on remand. *United States v. Microsoft Corp*, 56 Fed 1448, 1463 (D.C. Cir. 1995). Appellant notes that even the appearance of bias may be grounds for reassignment on remand. *Pescatore v. Pan American World Airlines, inc.* 97 F3d 1, 21(D.C. Cir. 1996).

## CERTIFICATE OF COMPLIANCE WITH RULE 32

The undersigned, counsel of record for Petitioner-Appellant states that this brief complies with the type volume limitations of Fed. App. P. 32(a) in that the brief contains 13,946 words from the Jurisdictional Statement through Conclusion. Counsel used Word Perfect version x4 to prepare the brief. The font style is Book Antiqua and the size of the type is 14 point.

H. Candace Gorman

75

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of January, 2013, I caused the

foregoing Brief of Petitioner-Appellant to be served via the Court Security

Officer on counsel for the government at the following address:

Robert M. Loeb,Esq.
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington DC 20530-0001

H. Candace Gorman