UNCLASSIFIED//FOR PUBLIC RELEASE

Filed with Classified
Information Security Officer

CISO _____

Date _____ 1/28/13

No. 11-5102

---

[ORAL ARGUMENT NOT YET SCHEDULED]

---

IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

---

**RAZAK ALI, a.k.a. Saeed Bakhouch,**
**Appellant**

v.

**BARACK OBAMA, et al.,**
**Appellees**

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA
**Case No. 1:10-cv- 1020**

---

REPLY BRIEF OF APPELLANT RAZAK ALI

---

H. Candace Gorman
Law Office of H. Candace Gorman
220 S. Halsted
Chicago, Illinois 60661
(312) 427-2313

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................3

OTHER AUTHORITIES...................................3

ADDITIONAL GLOSSARY ...........................3

JURISDICTIONAL STATEMENT...................... 4

SUMMARY OF ARUMENT ........... ..............6

STANDARD OF REVIEW...............................8

ARGUMENT................ ...........................9
    I.THE GOVERNMENT CONTINUES
        ITS OSTRICH STANCE .................9
    II.THE GOVERNMENT'S ATTITUDE
      REGARDING ITS OWN
      MISCONDUCT iS REPREHENSIBLE.....25
    III.BEING IN A *PUBLIC* GUESTHOUSE
      SHOULD NOT BE ENOUGH FOR
      LIFETIME DETENTION......................28

CONCLUSION ...........................................32

CERTIFICATE OF COMPLIANCE..................33

CERTIFICATE OF SERVICE ..........................34

## TABLE OF AUTHORITIES

### CASES

*Barhoumi v. Obama*, 609 F.3d 416 (DC Cir 2010)…………passim

*Obaydullah v. Obama*, 688 F.3d 784 (D.C. Cir. 2012)……………6

### STATUTES AND RULES

28 U.S.C.
     §1291 ……………………………………………………..4
     § 1331……………………………………………………..4
FRAP Rule 4…………………………………………… .4,5,6
D.C. Cir. R. 28(a) ………………………………………… …...4

### OTHER AUTHORITIES:

Military database for Guantanamo Detainees ……………11, 18
http://www.dod.gov/pubs/foi/detainees/detaineesFOIArelease15May2006.pdf

*Wigmore on Evidence*, §278.(2), Vol. II P. 133 …………………..27
Little Brown, 1979

### ADDITIONAL GLOSSARY

PB refers to Petitioner's Opening Brief

GB refers to Government's Response Brief

JA refers to the Joint Appendix

## JURISDICTIONAL STATEMENT

Jurisdiction in the District Court was based on 28 U.S.C. Sec. 1331, 1343(3) and 1367. This Court has jurisdiction under 28 U.S.C. §1291. On January 11th 2011 the District Court entered an unclassified memorandum Opinion denying Petitioner's Habeas Petition (Docket 1448), on February 28, 2011 the District Court entered its Classified Memorandum Opinion and on March 9th, 2011 the District Court entered final judgment. Petitioner filed notices of appeal on March 8, 2011 and on May 2, 2011. The government in its response brief (GB@3) has taken the position that that a motion that was filed by Petitioner prior to the entry of final judgment and prior to the filing of the two notices of appeal is not timely (specifically Petitioner's Motion to Supplement filed on February 25, 2011, D1468-filed as a supplement to D1447) because the District Court did not rule on that motion until May 18th, 2011. The government's self-serving and erroneous reading of FRAP Rule 4(a) is wrong. In point of fact, Rule 4(a)(4)(A) was specifically amended to alleviate the effective trap set up by the old rule whereby litigants might timely appeal from a final judgment (with motions which might impact that judgment still outstanding), only to end up forfeiting that appeal by failing to file *a*

*second* notice of appeal (or in this case- a third notice of appeal). See, Notes of Advisory Committee on Rules, 1993 Amendment to Rule 4(a)

The cases that the government relies on for its proposition that the motion is not timely appealed, unlike the present case, involved substantive motions filed *after* the filing of a notice of appeal from a final judgment. The motion that the government asserts is not timely appealed in the present case was filed prior to final judgment and prior to the notice of appeal and was in the nature of the rule 52 "amend or make additional factual findings" or rule 59 "alter or amend judgment or for new trial"... and hence, is within the rule. Not only did Petitioner's counsel rely on that fact but the government acquiesced in the Court of Appeals Stay Application which was filed on May 9, 2011, nine days prior to the District court's ruling on Petitioner's Supplemental Motion[1].

This Court has acknowledged that FRAP Rule 4(a) is in effect a "claims processing" rule, rather than the jurisdictional bar urged by the government in its ongoing and ever more desperate efforts to avoid this Court from reaching the actual merits of this case. Hence, in *Obaydullah v.*

_____

[1] The fact that Petitioner's counsel erred in her description of the outstanding motions in the stay motion does not change the nature or timeliness of the motion at issue.

*Obama*, 688 F.3d 784 (D.C. Cir. 2012), another Guantánamo detainee habeas case, this Court even permitted an arguably late appeal to proceed to be heard on the merits, based upon the time expansion provision of FRAP Rule 4(a).

## SUMMARY OF ARGUMENT

This case hinges on whether the Petitioner is "Usamah al Jazai'iri." Petitioner believes that in a fair hearing he would be able to show unequivocally that he never used that nick name. The government's response brief confirms that Petitioner did not receive a fair hearing. It is not a fair "hearing" when *after* the hearing is completed the government discloses that it withheld exculpatory documents regarding the detainee that the government primarily relied upon in its Final Amended Return and at the hearing. It is not a fair hearing when counsel for Petitioner independently discovers other undisclosed exculpatory evidence after the hearing. The government's position that there was no harm to Petitioner from all of the misconduct outlined in the initial brief, in this brief, and in the various motions filed before the District Court- because *some* of the evidence came to light weeks and months after the hearing was completed is, at a minimum, disconcerting. In addition, the government's

cavalier approach to the so called "al-Suri diary" in which the government- in essence- shrugs its collective shoulders and feigns a lack of knowledge as to whether the identity of the actual author of the so called "diary" makes any difference, is disingenuous, at best. Exactly how the government can, in good faith, assert that it does not matter if the collection of papers that the government has called a "diary" (but asserts is a treatise outlining an associated force under the AUMF) were collected and composed by a teenager with grandiose dreams of being a writer and who admitted in his interrogation that he only met Abu Zubaydah a few weeks prior to the raid, is disturbing. Petitioner believes that this is an important fact that this Court should consider prior to placing a rubber stamp on the *Barhoumi* case. The evidence is clear that Petitioner was never a part of "Abu Zubaydah's force," "al-Suri's force" or any other "force" and the evidence points to the conclusion that the "force" was, most likely, fantasy writings by a teenager intermingled with other writings. In addition, the accumulation of evidence showing that the government utilized photos in interrogations for purposes of identifying Petitioner -which were not of the Petitioner- underscores the unreliability of those detainee identifications. Which leaves us with the issue that the

District Court held was enough- and the government now embraces- is being in a public guesthouse in Pakistan enough in this great country to hold a man forever without trial?

## STANDARD OF REVIEW

The government correctly stated the "usual" standard of review in this Court. However, this is not the "usual" case. Following the numerous post hearing motions pointing out for the District Court the errors in its factual findings (based on newly disclosed evidence and evidence that was not properly before the Court after the government withdrew all reliance regarding and flowing from ISN 839) the District Court ultimately held that Petitioner's presence in the guesthouse, coupled with this Court's decision in *Barhoumi,* without more, were sufficient to deny the habeas petition. Counsel for Petitioner asked the District Court to provide a clarification of its ruling that would disclose which facts, if any, in addition to the Petitioner being present in the guesthouse, the Court continued to rely- so that there would be precision in the appeal. However the District Court declined to clarify its later rulings thereby making it impossible to know which, if any, specific findings other than being in the guesthouse-the District Court relied on. (D1498;Ex.R{JA1221-

1222}) Therefore Petitioner respectfully suggests that the standard of review for the factual findings in this case should be *de novo*.

## ARGUMENT

### I.  THE GOVERNMENT CONTINUES ITS OSTRICH STANCE

With its head firmly placed in the sand the government continues to assert that the Petitioner used the name Usamah al-Jaza'iri despite the fact that it has absolutely no competent evidence to support its position. Instead the government ignored the fact that all of the evidence supports Petitioner's claim that he did not use that name and marched on in its response brief with its narrative of an individual who used the name "Usamah al Jaza'iri" as found in the al- Suri "diary" and other documents.

Petitioner is not Usamah al-Jaza'iri and has always maintained that he never used that nickname. There is absolutely no evidence that the Petitioner was anything more than a man who was staying in a public

guesthouse where another guest ████████████, unknown to Petitioner, later arrived. In fact, it is not even clear how many days ████████████ was in the house. We only know Petitioner stayed at the guesthouse just over two weeks and that ████████████ ████████████████

████████████████████████████████████████████

████ "came and went and did not stay the whole time." ████████████ ;Ex.43B{JA249}). ████████████████████████████

████ the police raided the guesthouse looking for Abu Zubaydah and Petitioner was picked up in the sweep. Petitioner is now entering his twelfth year at Guantánamo because of that misfortune. Not only is Petitioner not "Usamah al Jaza'iri" but, as further shown below, in Petitioner's initial brief, and in his Amended Traverse (Ex.AJA001), the so-called "diary" is most likely a collection of *random* documents-- some personal notes, internet news stories and writings from Sheik Abdullah Azzam--that were found and organized by someone other than the author(s).

a.    *The Name "Usamah al-Jaza'iri"*- As described in Petitioner's multiple court documents- although Algerian, he was never known by the name Usamah al Jaza'iri by anyone. On one occasion in August of 2002–within

a week of arriving at Guantánamo from the *dark prison* ISN 707 reviewed

approximately 60 photographs- when viewing a photograph marked

██████ the detainee identified the individual as being a driver in Algeria

who he knew by the name of Usamah al-Jaza'iri. (Ex.B43{JA251}) In that

same interview the interrogator noted that the individual in the photo

was known by the military as "Abdul Razzak." Although the military lists

nine "Abdul Razzak's" at Guantánamo *not one of those men is the*

*Petitioner.*[2] Petitioner himself was not known by the military as Abdul

Razzak. Petitioner does not know who the person is in the photo ██████

(Ex.X{JA1948-50}) that the government claimed at the hearing was him-

only that it is not him. (Ex.Ipgs73,79-81{JA774,780-782}) Despite this fact,

the District Court "declared" the photo was of Petitioner even though to

this day the Judge has never actually seen Petitioner and even after the

Court asked Petitioner's counsel to confirm that the photo was of her

client, and she could not.

Shortly after ISN 707 identified the individual in photo ██████ as

"Usamah al Jaza'iri" ISN ██████ looked at two photos, ostensibly of

---

[2]http://www.dod.gov/pubs/foi/detainees/detaineesFOIArelease15May
2006.pdf

Petitioner, and pointed out that photo ▋▋▋ was *not* of Petitioner and was not of the man he had identified earlier as "Osama." Despite these facts the government continues to insist that photo ▋▋▋ is a photo of the Petitioner and that Petitioner uses the nickname Usamah al-Jaza'iri. The government, who withdrew reliance on ISN ▋▋ prior to the hearing, goes so far as to try to rewrite the above interrogation of ISN ▋▋ The interrogation report clearly confirms that ISN ▋▋ was shown two photos that the government claims were of Petitioner. (Ex.8pg3{JA114}) ISN ▋▋ after looking at both photos, stated that the person depicted in the photo marked with Petitioners ISN number (ISN 685) was *not* the same individual depicted in ▋▋▋ (Ex.8Bpg1{JA112}). (For obvious reasons, the government has never produced the photo that was marked with Petitioner's ISN number 685.) Apparently the government is compounding the photo errors related to identifications of Petitioner by

---

[3] The government acknowledged after Petitioner's counsel presented a demonstrative showing the purported travels of ISN 839 were impossible (in a war zone nevertheless) and how ISN 839's accounts of his travels conflicted with ISN ▋▋ accounts of his travels and therefore the two accounts could not support the supposed travels of a man identified as "Usamah al Jaza'iri" who the government claimed was at or near the scene of a fire. (ExI@157-58{JA858-59})(Ex. S{JA1228})

suggesting that yet another photo –one that was actually marked with Petitioner's identifying ISN 685 (petitioner's ID number at Guantánamo) - was actually *not* of the Petitioner-but that instead the photo marked ███ is a photo of Petitioner- despite the fact that counsel, the only individual at the hearing who has ever seen Petitioner, could not identify her client from that photo-when asked by the District Court. (Ex.Ipgs73,79-81{JA774,780-782}) That one statement by ISN 707 is the only "evidence" by the government to support its theory that the nickname belonged to Petitioner.

**b.** *ISN 707-* the detainee who looked at photo ███ and identified the man in the photo as Usamah al Jaza'iri was a detainee that the government claimed at the hearing was reliable- in fact the government went so far as to claim that the man had no complaints with his treatment at the hands of US forces. (Ap.I,pg.40-43,51-52{JA741-44,752-53}Ap.Jpgs.50-51{JA925-26};Ap.Kpgs.9,16{JA1027,1034}) That was of course false-and the government had to know it was false- because sitting at the government's table of six attorneys (and two paralegals) were two attorneys from the department of defense. ISN 707 was a trainer and caretaker at the Khaldan camp from 1996 until it closed in 2000. (Ex.13B{JA132}) The

government claims that Petitioner too was a trainer at Khaldan (under the name Usamah al Jaza'iri). (AR@2{JA527}) However, ISN 707-who the government still maintains as credible- stated in an interrogation that there were no Khaldan trainers or instructors at Guantánamo. (Ex13B{JA133¶11})

*After the hearing*- and not from the government pursuant to its obligation to provide exculpatory information- but rather from the military's website, counsel for Petitioner learned for the first time, that detainee ISN 707 had severe psychological impairments. These impairments apparently predated the torture the man was subjected to in what is infamously known as the "dark prison." The documents confirmed that the interview that the government relied regarding the photo identification of Usamah al Jaza'iri took place shortly after ISN 707 arrived at Guantánamo from the dark prison. (D1468)

Because the government is unable to admit mistakes it cavalierly maintains -to this day- that it still considers ISN 707 reliable- additionally the government contends there is *no harm-no foul* because Petitioner's counsel found the information on her own and presented it to the Court- almost two months *after* the hearing was completed-and a few short days

after the military provided the materials regarding ISN 707 on its website. (D1468) In addition, the government provided even more exculpatory documents related to ISN 707 *after* Petitioner filed the supplemental motion regarding the credibility of ISN 707 and the Petitioner was never provided a forum to fully explore that evidence with the Court.(D1484)

As the government stated in its response brief, ISN 707, was a former trainer from the Khaldan camp who worked out a plea deal in the military commission and is set to be released soon. The military required ISN 707 to deny the torture he was subjected to at the dark prison and at Guantánamo in exchange for the plea and the government claims that the fact that ISN 707 agreed to that condition as part of his plea is significant. (GB@36-37) The plea was ISN 707's only ticket out of Guantánamo. The fact that he was forced to lie as a condition of release from Guantánamo should be given absolutely no weight. In any event, the District Court apparently backed away from relying on ISN 707 by ultimately relying on the fact that Petitioner was in the guesthouse and according to the District Court and pursuant to this Court's *Barhoumi* decision-that was enough.

c. *The name "Abdul Razzak"*- On March 28, 2002 there was a raid at five separate guesthouses in Pakistan. Petitioner who was staying at the

UNCLASSIFIED//FOR PUBLIC RELEASE

██████ guesthouse was injured while being escorted from the guesthouse by the police. FBI agent ██████ interviewed a man from one of the other guesthouses that was raided that same night- the ██████ house.(Ex.2{JA74,80,88}) The individual that the FBI agent interviewed was a Libyan who went by the name "Abdul Razzak," an individual who admitted having traveled to Afghanistan and who agent ██████ stated in his affidavit showed no signs of being injured that night. (Ex.3{JA94-95}) The man provided a detailed description of the ██████ house and his room at the ██████ house. Despite the fact that it was physically impossible for the person interviewed at the ██████ house by FBI agent ██████ to be Petitioner, the government continues with that position.

As noted above, the government provided to Petitioner's Counsel an exculpatory affidavit, a few days prior to the hearing in this case, by FBI agent ██████ (Ex.3B{JA92-96}) Agent ██████ confirmed in his affidavit that he had no independent knowledge of the identity of the interview subject who claimed he was a Libyan named Abdul Razzaq. However, agent ██████ stated *unequivocally* that the report was accurate in that it was an individual he interviewed from the ██ house (and not,

UNCLASSIFIED//FOR PUBLIC RELEASE

of course, from the house where Petitioner had been staying).(Ex.3B{JA93})

In addition, the Petitioner stated that the first time he was interviewed by an English speaking person was approximately one month after he was detained.(Ex.23{JA199-200}) Despite the affidavit from its own agent, the government still insists that the individual from the ███ house *has to be* Petitioner. The government asked the District Court to infer that the FBI agent was lying in both his report and affidavit and to assume– with no evidence to support its theory- that the FBI agent was really interrogating the Petitioner.[4] It is unclear whether the District Court credited the government's theory over the FBI agents affidavit/report but in the end the District Court held that it was enough for the Petitioner to

---

[4] The government claimed at the hearing that the personal information provided by the Libyan man at the ███ house matched Petitioner's personal information but they are incorrect- the names of the parents and one sibling that this individual reported was never provided by the Petitioner but- like that man's travels to Afghanistan- that personal information followed Petitioner until Petitioner was actually asked to provide the names of his own family members- the names of Petitioner's parents and his six siblings are quite different from the man interviewed at the ███ house. (Ex.16B{JA149-50})The fact that the man also shared the same birth month and year is not statistically relevant when virtually all of the men detained were of similar age.

UNCLASSIFIED//FOR PUBLIC RELEASE

have been at the ▮▮▮▮ house to be detainable, suggesting that in the end, the Court did not credit the government's theory.

The name Abdul Razak is itself a common Arabic name and the government has made the name a point of confusion throughout this case. What is still unknown is how many of the documents that the government claims relates to Petitioner actually relate to men that the government actually knew (or knows) by the name of Abdul Razzak. One thing is clear; the military has never used the name Abdul Razzak as an identifying name for Petitioner except in this litigation. When Petitioner arrived at Guantánamo he had been known at Bagram as abd al–azak ali abd ((al rahman)) and that he had no aliases. (AP.F{JA602-604,604@6b&5i}) The official military listing for Petitioner as of May 2006 was still ABDELRAHMAN, ABDELRAZAK ALI[5]. As stated above nine men were or are held at Guantánamo who are known by the military as Abdul Razzak and none of those nine are Petitioner. In addition, government documents confirm that two men with the name "Abdul Razzak were detained in Pakistan-the Libyan arrested at the ▮▮▮▮▮▮▮

---

[5]http://www.dod.gov/pubs/foi/detainees/detaineesFOIArelease15May2006.pdf
(@Pg.1, line 16)

and ████████████████████████████████████████

████████████████████

The FBI report and the agent's affidavit make clear that the person that was interviewed could not have been Petitioner- it was impossible for that individual to be Petitioner because Petitioner was never at the ███ house and could not have provided the detailed information about the house - but that has not stopped the government from maintaining that the interview was of Petitioner. If the Court did rely on the interview of the man at the ███ house as evidence that the Petitioner admitted being in Afghanistan then that finding was clear error.

**d.** *The so called "al-Suri diary"*- The government, in its response brief, appears to now be distancing itself from the so called "al-Suri diary."(Ex.70{JA343-413} As well it should. The government now focuses on the language from this Court in *Barhoumi v. Obama*, 609 F.3d 416 (DC Cir 2010) and the District Court's reliance on that decision in making its final determination that pursuant to *Barhoumi* it was enough that Petitioner was in that house- to be forever detainable.

While the government refuses to acknowledge that this Court was misled about the reliability of the so called "al-Suri diary" (and its author)

the government shows its hand when questioning why it would make any difference if Petitioner were correct about who the author of that fantasy account was (GB @ 39). As outlined in Petitioner's initial brief and in his Amended Traverse (Ex.A{JA010-12,32-40,47-48}) the real author of those papers most certainly has to be the surviving Syrian (al-Suri) ████ and not the Pakistani/Palestinian ████ Incredibly, the government apparently fails to understand how knowing who the author is would make a difference.

The question should be, how could knowledge of who the author is *not* make a difference? Under the governments theory the author of the "diary" traveled with Abu Zubaydah since January 2002 on a special route and was not only a member of his "force," but the organizer of the "force." ████ a pathetic and emotionally challenged teenager, claimed in his own interrogation that he only met Abu Zubaydah the same month of

---

[6] In fact, ████ describes in his interrogation an individual from the guesthouse that he knew as "Osama" - a Palestinian, the government document shows that individual was also known as ████ (Ex.57{JA295}) However, in yet another document the government conflates the names of ████ (Ex.F{JA600})

the raid in Lahore Pakistan and basically pieced together that the man was Abu Zubaydah. (Ex.B57{JA296}Ex.B69{JA327-332})

Again, how does the real identity of the author not make a difference? This teenager created a fantasy account-perhaps even the beginnings of a novel- which is intermingled with pages of internet news stories and writings from Sheik Abdullah Azzam (about whom ████ claimed to be writing a book in which he was to be paid anywhere from $15,000 to $50,000. (Ex.57B{JA294})Ex.48B{JA265-66}) and the government presents this "author as not only the brains behind the "associated force" but the individual who created that "force" (Ex.Ipg.57{JA758})

The government admitted at the habeas hearing that the "diary" reflects a program that was supposedly being organized at the guesthouse and that was created by the author of the "diary." On the first day of the hearing the government explained its theory about the origin of the "program" it maintained was in place at the guesthouse. According to the government after the "author" of the diary announced he had arrived at the house in Faisalabad- a guesthouse that he described as "a

luxurious house" – he then proclaimed "I believe this is where we will

start *my* program." *(emphasis added)* (Ex.I@57{JA758}(Ex.70Bpg.54{JA397})

On the second day of the hearing the government elaborated about its

theory. This is how the government described the formation of the so

called "force" on that day:

> Al-Suri identifies himself, self-identifies in the diary as at
> the same house, yes. Now, to continue, he says he is gathering
> instructors two of each kind from each military subject and they
> will be the nucleus of his future work. He says he is starting
> again from zero. I would say not another—I    would    not    say
> another time. Maybe it is the tenth.
> Now, this starting over from zero and taking people who
> are specialists to this Faisalabad guesthouse, he discusses it at
> page 76 as well. He says there he says in the second paragraph
> there that he is starting from zero again and then if you move to
> the second sentence in that paragraph he says: with me are some
> brothers, some of them were instructors at Kaldan and I chose
> them myself and some were moved by their circumstances to
> follow me and that with them I will start, God willing and God
> is sought for assistance. (Ex.J@47{JA922}).

Does the government really not think it makes a difference

whether these writing are from a mature adult or a teenager, a teenager

who claims to be starting over after his *tenth* such program? Could this

teenager really be the "leader" of an "associated force" who admits in

that same "diary" the following: "They [others at the house] both think I

am disturbed and have psychological problems and that I have issues with them…" (Ex.B70,pg.49{JA392}); "I said goodbye to this day with a bad mood because of my brother Asher al Jaza'iri who told me I am fat. He said it to my face many times you are fat, fat, fat, fat and fat while I was saying No, No, No, No…(ExB70,pg.59{JA402})[7]; my brother Abdullah al Muslim was lifting my spirit while telling me (of course he plays tricks) that I have precious ideas and feelings (ExB70,Pg.59{JA402}); and finally, "I feel sad and I cry almost every day after every behavior or words he says to me because of my sensitivity and because of my broken heart and spirit." (ExB70,pg.62{JA405})

Although the government has backed off its claim that ▮▮▮ was ever at the Khaldan camp either as an instructor or a trainee it still refuses to acknowledge that this kid and his "diary" are not only not reliable but have no place in these proceedings. (Ex.I@61-62{JA762-63}) The government continues to portray these pieces of paper as an authoritative treatise outlining a nefarious "force"-- and the government thinks it makes no difference who the author is? (Ex.I@20{JA721})

---

[7] As mentioned in the initial brief ▮▮▮ was indeed quite "fat" weighing more than 300 pounds. (ExB57{JA297}&ExF{JA596pg9@¶f})

Additionally, this particular hapless teenager admitted in his two interrogations (before being rendered to Morocco and then to Syria) (Ex.B59{JA300}) that he had no idea who Petitioner is and he does not identify Petitioner as using the name of Usamah al Jaza'iri. (ExB57{JA 296}ExB69{JA339}) The government, at the hearing, tried to explain how it was possible that ███ could not know Petitioner by the nickname found in the diary by *hypothesizing* that perhaps ████ did not know Petitioner by that nickname because Petitioner used a different nickname when around him.(Ex.I@104-106{JA805-07}) However, if these were ████ papers-which they most certainly were -and the government is asking the Court to assume that the author knew Usamah al Jaza'iri and the other characters in his tale- how could this author be simultaneously aware of the person called "Usamah al Jaza'iri"- and ostensibly travel with him, yet not know it was Petitioner? The answer of course -is that it was not Petitioner who used that name.

Finally, the government admitted at the hearing that they had absolutely <u>no</u> independent evidence or knowledge – that the individual they claim was the author (███ even existed- the government admitted that it still, at the time of the hearing, did not know who ███ is (or was)

UNCLASSIFIED//FOR PUBLIC RELEASE

only that ████ self identified in the diary and that the man was never interrogated. (Ex.I@ 42,63{JA743,764};Ex.J@47{JA922}) As for the supposed "self identification" of Kamil[8] in the diary, the government continues to ignore the fact that Kamil is repeatedly discussed in the third person throughout the "diary." As discussed in Petitioner's initial brief amongst other entries in the "diary" ████ (the real author) discusses placing a call to Abu Kamil, later the arrest of Abu Kamil during Ramadan, and at the time of one of his entries (February 4-6, 2002) that Abu Kamil was still in custody. (ExB70pgs.30-31{JA373-74}) The fact that the government has absolutely no clue who "Kamil" is and that it does not understand why it would even matter if the writer of these documents is/was a teenager with visions of grandeur or someone else all together that it knows nothing about, is frankly appalling.

## II.    THE GOVERNMENT'S ATTITUDE REGARDING ITS OWN MISCONDUCT IS REPREHENSIBLE

The government has apparently decided that the rules do not apply to them. Petitioner has outlined the gross misconduct by the

---

[8] Petitioner points out once again that the government has not provided a court certified translation of these papers and the document is not even a straight out translation as the "translator"s repeatedly inserts his or her opinion as to what certain things *probably* mean. (PB@27)

UNCLASSIFIED//FOR PUBLIC RELEASE

government in its initial brief – the government has responded by claiming that everything that it did wrong was "fully remediated" and that there was no harm to Petitioner. That is absurd. The government knowingly withheld exculpatory documents, filed a new return at the hearing[9], renumbered exhibits at the last minute (and not for the convenience of Petitioner's counsel); maintained a fraudulent document as the center of its defense until *forced* by Judge Lamberth to provide the actual transcript of the document; switched its theories at the last minute; and engaged in gamesmanship. As for the judges' suggestion to provide a list to Petitioners counsel to help her figure out the documents at the hearing the government went out of its way to provide something that was completely unusable. (Ex;I @125{JA825-26})

Finally, the government falsely claims that *it thought* it had communicated to the judge the nature of the exculpatory documents it had filed under seal. (GB@42-43) That assertion is put to rest by the

---

[9] The government's disregard of court orders is further exhibited in its response brief when it claims not to understand why Petitioner would respond to all 4 of the previous narratives in its Amended Traverse after being told by government counsel that the Return it filed on 9/10/10 was only a supplement to the previous narratives-apparently expecting that Petitioner's counsel too would disregard the Court's order to file an *Amended* pleading-not a supplemental pleading. (Ex.A@1-2{JA001-2})(GB@51)

District Court's blistering criticism of the government when it learned of

its shenanigans. (Ex;L(JA1102-1112}) The withheld documents eventually

led the government to withdraw all testimony and documents related to

ISN 839 because he was not in fact reliable, but unfortunately for

Petitioner this occurred not only weeks after the hearing was completed

but *after* three days of an actual hearing that focused almost entirely on

ISN 839. Perhaps to the government this is just business as usual but the

conduct displayed by the government should require an adverse

inference regarding the government's theories:

> It has always been understood- indeed the inference is one of the
> simplest in human experience- that a party's falsehood or other fraud in
> the preparation and presentation of his cause, his fabrication or
> suppression of evidence by bribery, spoliation and all similar conduct is
> receivable against him as an indication of his consciousness that his case
> is a weak or unfounded one; and from this consciousness may be inferred
> the fact itself of the cause's lack of truth or merit. The inference does not
> necessarily apply to any specific fact of the cause, but operates,
> indefinitely though strongly, against the whole mass of alleged facts
> constituting his cause."
> *Wigmore on Evidence*, §278.(2), Vol. II P. 133 (Little Brown, 1979).

The government should be embarrassed by the antics it engaged in

but instead the government tacitly acknowledged that it was business as

usual and Petitioner should just move along.

## III.    BEING IN A *PUBLIC* GUESTHOUSE SHOULD NOT BE ENOUGH FOR LIFETIME DETENTION

The government is left with the absurd position that staying in a public guesthouse is enough to detain someone forever-if someone else staying at the guesthouse is *suspected* of being up to no good. Although the government claims that the only evidence provided by the Petitioner on the public use of the house was a newspaper article is not true.

In order to make its position of being in this particular guesthouse more sustainable the government tries to conflate the public guesthouse with the so called "al–Suri diary" in an effort to turn this public guesthouse into something it was not. However the government's description of the guesthouse as a headquarters for a terrorist "force" falls apart when the reliability of the so called "al-Suri diary" and its author are fully understood. The government's attempt to use the diary to create not only a "force" but an atmosphere at the guesthouse that is not supported by any credible evidence can only be explained by a government determined to justify the unjustifiable.

The government also continues to claim that items indicia of terror related activities were found at the house: an old ███████ which "could" be used to detonate bombs- (millions of these ██████ are still sold world wide and there was no indication of any tampering with the one particular ██████ found on a person at this house); ████████████ when one of the inhabitants was an electronics student (but of course that too is suspicious according to the government because the teenager ██████ claimed he was gathering experts at the house...); and various <u>books</u> that were apparently never translated that *might have* related to ████████████████████ ████████████ The fact that the government has never bothered to translate *any* of those books suggests that the books were innocuous-if the government had *any* indication that any book was found in the house that might have related to clandestine activities that information would have been provided to bolster its case- instead of a teenager's papers. In fact, an FBI team reviewed the inventory from the house on three separate occasions and found no evidence of any materials that suggests terror related activities. (ExB56{JA280-92})

In addition, the government falls back on its absurd argument that the Petitioner took English lessons at the house and that proves that he

UNCLASSIFIED//FOR PUBLIC RELEASE

was part of the "force." In fact, according to the government, Petitioner's role

in this so-called force was to learn English. Really? Petitioner with his 3rd or

4th grade education (who not coincidentally failed to make the governments

list of "thinkers" at the guesthouse (ExE{JA582-84}) was recruited by al-Suri

and Abu Zubaydah to learn English for the special "force"? The claim itself

is patently ridiculous. In addition, the government again ignores

and

instead prefers to rely on two detainees interrogated some later time[10]-

thereby suggesting                                    Although

the government claims that ISN 707 (the detainee who asked for the English

lessons) confirmed that Petitoner was part of those (two days of classes) the

government is wrong.

Once again the government only wants

its own investigations credited when the facts suit them.

Finally, the government offers the severely damaged ISN 696 al-

Qahtani- who spent months in the dark prison- to suggest that Petitioner

UNCLASSIFIED//FOR PUBLIC RELEASE

knew something "illegal" was going on in the house (even though no evidence was produced that anything illegal was going on in the house). (Ex56B{JA280-92} While still at Bagram al-Qahtani looked at a photo of an individual bearing the designation "████" and supposedly indicated that the man in the photo- an individual he knew as "Moorad" [Moroccan] - knew of the training taking place at the guesthouse. Not only was Petitioner not known as "Moorad" by anyone but the photo of ████ was not a photo of Petitioner and the government presented absolutely no competent evidence that an actual photo of Petitioner was used. (PB@30-31)

In fact, without the helpful prompting by the government ISN 696 was apparently unable to state a name for Petitioner when shown a photo in 2003-ostensibly of Petitioner. (Ex10B{JA121}) The unfortunate Mr. al- Qahtani later admitted he made up everything he said while at Bagram because of the torture and threats to his life. (ExA@27-28{JA27-28})

## CONCLUSION/RELIEF SOUGHT

Wherefore, for the reasons stated in his initial brief and in this reply

brief, Petitioner asks this Court to reverse the judgment of the district

court and remand with instructions that Petitioner's petition for habeas

corpus be granted and for such other relief as this Court deems just.

Respectfully Submitted,

Attorney for Petitioner

H. Candace Gorman
Law Office of H. Candace Gorman
220 S. Halsted
Chicago, Illinois 60661
312.427.2313

UNCLASSIFIED//FOR PUBLIC RELEASE

## **CERTIFICATE OF COMPLIANCE WITH RULE 32**

The undersigned, counsel of record for Petitioner-Appellant states

that this brief complies with the type volume limitations of Fed. App. P.

32(a) in that the brief contains 5603 words from the Jurisdictional

Statement through Conclusion. Counsel used Word Perfect version x4 to

prepare the brief. The font style is Book Antiqua and the size of the type is

14 point.

H. Candace Gorman

UNCLASSIFIED//FOR PUBLIC RELEASE

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of January, 2013, I caused the

foregoing Reply Brief of Petitioner-Appellant to be served via the Court

Security Officer on counsel for the government at the following address:

Robert M. Loeb,Esq.
Sydney Foster
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington DC 20530-0001

H. Candace Gorman

UNCLASSIFIED//FOR PUBLIC RELEASE