SECRET//NOFORN

[NOT YET SCHEDULED FOR ORAL ARGUMENT]

Filed with Classified
Information Security Officer

No. 11-5102      CISO ~~~~~~~

Date  2/19/13

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ABDUL RAZAK ALI,
Petitioner-Appellant,

v.

BARACK OBAMA, President, et al.,
Respondents-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FINAL BRIEF FOR THE RESPONDENTS-APPELLEES**

STUART F. DELERY
  Principal Deputy Assistant
  Attorney General

IAN HEATH GERSHENGORN
  Deputy Assistant Attorney General

ROBERT M. LOEB
SYDNEY FOSTER
  (202) 616-5374
  Attorneys, Appellate Staff
  Civil Division, Room 7528
  U.S. Department of Justice
  950 Pennsylvania Ave., N.W.
  Washington, D.C.  20530

SECRET//NOFORN

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A. Parties and Amici

Petitioner-appellant is Abdul Razak Ali. Respondents-appellees are Barack

Obama, Leon E. Panetta, Jeffrey Harbeson, and Donnie Thomas in their official

capacities. There are no amici curiae or intervenors.

### B. Rulings Under Review

The district court rulings under review, all of which were issued by Judge

Richard J. Leon, are as follows: (1) unclassified order of January 11, 2011, Joint

Appendix ("JA") 1196-210, *Ali v. Obama*, 741 F. Supp. 2d 19 (D.D.C. 2011); (2)

classified opinion of February 28, 2011, JA 1211-20, *Ali v. Obama*, 770 F. Supp. 2d 1

(D.D.C. 2011) (unclassified version); (3) unclassified final judgment of March 9, 2011,

JA 1345, *Ali v. Obama*, 2011 WL 814500 (D.D.C. 2011) (unpublished); and (4)

unclassified order of March 14, 2011, JA 1346, *Ali v. Obama* (unpublished) (no official

citation).

### C. Related Cases

This case was previously before this Court on petitioner's appeal from an order

administratively closing the case and denying pending motions without prejudice until

resolution by this Court of whether the district court had jurisdiction over the case.

*See Al Sanani v. Bumgarner*, No. 07-5040 (D.C. Cir.). That appeal was remanded to the

SECRET//NOFORN

district court after the Supreme Court decided *Boumediene v. Bush*, 553 U.S. 723 (2008).

*See* Order of Aug. 29, 2008, *Al Sanani v. Bumgarner*, No. 07-5040 (D.C. Cir.).

This case was also before this Court on respondents' appeal from an order requiring respondents to provide petitioner with advance notice of any transfer. *See Al Sanani v. Bush*, No. 08-5322 (D.C. Cir.). This Court vacated the district court's order. *See* Order of Sept. 3, 2010, *Khadr v. Obama*, Nos. 08-5233 et al. (D.C. Cir.) (filed in D.C. Cir. No. 08-5322), *cert. denied*, 131 S. Ct. 2900 (2011).

Counsel is not aware at this time of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Sydney Foster
Counsel for Respondents-Appellees

SECRET//NOFORN

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

GLOSSARY

STATEMENT OF JURISDICTION ................................................................1

STATEMENT OF THE ISSUES ...................................................................4

PERTINENT STATUTES .............................................................................4

STATEMENT OF THE CASE ......................................................................4

STATEMENT OF FACTS .............................................................................4

A.    Factual Background ............................................................................4

    1.    Abu Zubaydah And The Force He Assembled At The
        Faisalabad Safehouse ................................................................4

    2.    Petitioner's Time At The Abu Zubaydah Safehouse And
        The Safehouse Raid ..................................................................6

    3.    Petitioner's Travels In Afghanistan Prior To His Arrival
        At The Abu Zubaydah Safehouse ...........................................8

B.    Procedural Background .......................................................................9

    1.    The Habeas Hearing And The Government's Prior
        *Ex Parte* Motion ......................................................................9

    2.    The District Court's Order And Opinion Denying The Writ ..................11

    3.    The District Court's Orders Denying Petitioner's Motion
        (And "Supplement" Thereto) For A Grant Of The Writ
        Or A New Hearing ..................................................................13

SUMMARY OF ARGUMENT ...................................................................14

SECRET//NOFORN

SECRET//NOFORN

STANDARD OF REVIEW................................................................17

ARGUMENT.................................................................................17

I.   THE DISTRICT COURT PROPERLY CONCLUDED THAT
     PETITIONER IS LAWFULLY DETAINED UNDER THE AUMF............17

     A.   The district court's well-supported factual findings establish
          that petitioner was part of Abu Zubaydah's force......................19

          1.   Petitioner's capture at the Zubaydah safehouse is sufficient
               to establish that he was part of Zubaydah's force..................19

          2.   Additional evidence bolsters the conclusion that petitioner
               was part of Zubaydah's force...........................................23

               a.   The al-Suri diary lists petitioner as a "permanent"
                    member of Zubaydah's force.....................................24

               b.   Petitioner participated in the training program
                    at the Zubaydah safehouse.......................................25

               c.   Prior to his stay at the Zubaydah safehouse,
                    petitioner went to Afghanistan to fight and then
                    fled with other fighters............................................27

               d.   Petitioner made numerous false exculpatory
                    statements..............................................................29

     B.   Petitioner's attacks on the district court's factual findings
          are meritless..................................................................30

          1.   The district court did not clearly err in rejecting
               petitioner's misidentification arguments............................30

               a.   The district court's finding that petitioner is
                    Usama al-Jaza'eri is not clearly erroneous...................30

SECRET//NOFORN

SECRET//NOFORN

b.    The district court did not clearly err in concluding that petitioner was the "Abdul Razzaq" who made incriminating statements in an FBI interview shortly after his capture ..........................................................36

2.    The district court did not clearly err in finding the al-Suri diary to be reliable ..................................................38

II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DECLINING TO ORDER A NEW HEARING OR GRANT THE WRIT BASED ON ALLEGED PROCEDURAL IRREGULARITIES..................................................................40

A.    The government's handling of potentially exculpatory evidence did not render petitioner's hearing unfair ......................................40

B.    Petitioner's hearing was meaningful and fair ..............................45

CONCLUSION ..................................................................................51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

SECRET//NOFORN

SECRET//NOFORN

## TABLE OF AUTHORITIES

**Cases:**                                                                        Page

* *Al-Adahi v. Obama,*
    613 F.3d 1102 (D.C. Cir. 2010)......................................................21, 22, 29, 40

*Al-Bihani v. Obama,*
    590 F.3d 866 (D.C. Cir. 2010)........................................................18, 22, 41, 45

*Al-Madhwani v. Obama,*
    642 F.3d 1071 (D.C. Cir. 2011).............................................................. 22, 40

* *Almerfedi v. Obama,*
    654 F.3d 1 (D.C. Cir. 2011) ..................................................................... 22, 29

* *Alsabri v. Obama,*
    684 F.3d 1298 (D.C. Cir. 2012)......................................................17, 18, 22, 28

*Al Alwi v. Obama,*
    653 F.3d 11 (D.C. Cir. 2011).........................................................40, 47, 49, 50

*Awad v. Obama,*
    608 F.3d 1 (D.C. Cir. 2010) ..................................................................... 18, 27

* *Barhoumi v. Obama,*
    609 F.3d 416 (D.C. Cir. 2010).................................................. 4, 5, 6, 11, 14, 15
                                                                              19, 24, 25, 38, 39
*Bensayah v. Obama,*
    610 F.3d 718 (D.C. Cir. 2010)..........................................................18, 40, 51

*Boumediene v. Bush,*
    553 U.S. 723 (2008) ............................................................................................1

*Carrascosa v. McGuire,*
    520 F.3d 249 (3d Cir. 2008)................................................................................3

* Authorities upon which we chiefly rely are marked with asterisks.

SECRET//NOFORN

SECRET//NOFORN

*Coll v. First Am. Title Ins. Co.*,
　642 F.3d 876 (10th Cir. 2011) ...........................................................................3

*Funk v. Stryker Corp.*,
　631 F.3d 777 (5th Cir. 2011) .............................................................................3

*Independent Petroleum Ass'n of Am. v. Babbitt*,
　235 F.3d 588 (D.C. Cir. 2001) ...........................................................................3

*Khalifh v. Obama*,
　2010 WL 2382925 (D.D.C. 2010) .....................................................................22

*Khan v. Obama*,
　655 F.3d 20 (D.C. Cir. 2011) ...........................................................................41

*Kiyemba v. Obama*,
　561 F.3d 509 (D.C. Cir. 2009) ...........................................................................1

*Latif v. Obama*,
　677 F.3d 1175 (D.C. Cir. 2012) ................................................................. 38, 51

*Mousovi v. Obama*,
　2013 WL 97355 (D.D.C. 2013) .......................................................................41

*Obaydullah v. Obama*,
　688 F.3d 784 (D.C. Cir. 2012) ........................................................................41

*Peyton v. DiMario*,
　287 F.3d 1121 (D.C. Cir. 2002) .......................................................................17

*Salahi v. Obama*,
　625 F.3d 745 (D.C. Cir. 2010) ........................................................................18

*Suleiman v. Obama*,
　670 F.3d 1311 (D.C. Cir. 2012) .......................................................................21

*Uthman v. Obama*,
　637 F.3d 400 (D.C. Cir. 2011) ................................................18, 22, 29, 38

SECRET//NOFORN

~~SECRET//NOFORN~~

**Statutes:**

28 U.S.C. § 1291 .................................................................................................3

28 U.S.C. § 2241(a) .............................................................................................1

28 U.S.C. § 2253(a) .............................................................................................3

Pub. L. No. 107-40, 115 Stat. 224 (2001) ..................................................... 11, 17

Pub. L. No. 112-81, 125 Stat. 1298 (2011) ......................................................18

**Rules:**

Fed. R. App. P. 3 .................................................................................................2

Fed. R. App. P. 4 ............................................................................................. 2, 3

**Legislative Materials:**

Testimony of Ali Soufan, Senate Judiciary Committee (May 13, 2009) .........................35

SECRET//NOFORN

# GLOSSARY

AUMF      Authorization for Use of Military Force

GE         Government's Exhibit[1]

Doc.       Docket Number

IED        Improvised Explosive Device

ISN        Internment Serial Number

JA         Joint Appendix

PE         Petitioner's Exhibit

---

[1] This abbreviation and the "PE" abbreviation appear in the government's proof briefs but will not appear in the government's final briefs.

SECRET//NOFORN

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 11-5102

ABDUL RAZAK ALI,
Petitioner-Appellant,

v.

BARACK OBAMA, President, et al.,
Respondents-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FINAL BRIEF FOR THE RESPONDENTS-APPELLEES

## STATEMENT OF JURISDICTION

1. Petitioner invoked the district court's jurisdiction in this habeas case

pursuant 28 U.S.C. § 2241(a), as well as directly under the Constitution. *See Kiyemba v.*

*Obama*, 561 F.3d 509, 512 n.2 (D.C. Cir. 2009); *Boumediene v. Bush*, 553 U.S. 723, 799

(2008) (Souter, J., concurring).

2. The district court issued an unclassified order denying the habeas petition on

January 11, 2011. JA 1196-210. On February 28, 2011, the court issued a classified

opinion elaborating on the basis for its decision, JA 1211-20, and it entered final

judgment on March 9, 2011, JA 1345.

SECRET//NOFORN

SECRET//NOFORN

On March 14, 2011, the court entered an order denying petitioner's January 3,

2011, motion under Federal Rule of Civil Procedure 59 requesting, *inter alia*, a grant of

the writ or a new hearing. JA 1346. On May 18, 2011, the district court entered an

order denying petitioner's February 25, 2011, "supplement" to his January 3 motion.

JA 1221-23.

3. On March 8, 2011, petitioner filed a notice of appeal "from the Classified

Memorandum Opinion entered in this case on February 28, 2011 denying Petitioner's

habeas petition and related motions." JA 1501-12. On May 2, 2011, petitioner filed a

second notice of appeal "from the Order entered in this case denying Petitioner's

habeas petition and related motions." JA 1347.

4. a. Petitioner's notices of appeal are timely and sufficient with respect to his

appeal of the rulings in the January 11 order and February 28 opinion. *See* Fed. R.

App. P. 4(a)(1)(B), 4(a)(2), 4(a)(4)(A).

b. In addition, petitioner's May 2 notice of appeal is timely and sufficient with

respect to his appeal from the district court's March 14 order denying his January 3

motion, which he challenges at Br. 43-46, 48-56. Under Federal Rule of Appellate

Procedure 3(c)(1)(B), a notice of appeal must "designate the judgment, order, or part

thereof being appealed." Although petitioner's May 2 notice of appeal "from the

Order entered in this case denying Petitioner's habeas petition and related motions,"

JA 1347, did not specifically identify the district court's March 14 order, it could be

construed as an appeal from that order, and it is timely with respect to that order, *see*

SECRET//NOFORN

Fed. R. App. P. 4(a)(1)(B), 4(a)(4)(A)(iv), 4(a)(4)(B)(ii). This Court thus has jurisdiction over the appeal from that order. *Cf. Independent Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 593 (D.C. Cir. 2001).

c. This Court lacks jurisdiction over petitioner's appeal from the district court's order denying his February 25 "supplement," which he challenges at Br. 28, 41, 46-48, 54, 60-61. Federal Rule of Appellate Procedure 4(a)(4)(B)(ii) provides that "[a] party intending to challenge an order disposing of[, *inter alia*, a motion under Federal Rule of Civil Procedure 59] . . . must file a notice of appeal, or an amended notice of appeal—in compliance with Rule 3(c)—within the time prescribed by this Rule measured from the entry of the order disposing of the last such remaining motion."

Here, the district court denied petitioner's February 25 "supplement" on May 18, 2011, JA 1221-23, after petitioner filed his two notices of appeal, and petitioner did not file a new or amended notice of appeal from that order. This Court therefore lacks jurisdiction over petitioner's appeal of the district court's denial of the "supplement." *See, e.g., Carrascosa v. McGuire*, 520 F.3d 249, 251-54 (3d Cir. 2008); *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 884-86 (10th Cir. 2011); *Funk v. Stryker Corp.*, 631 F.3d 777, 780-81 (5th Cir. 2011).

5. This Court has jurisdiction to review the district court's decisions from which petitioner filed timely and sufficient notices of appeal under 28 U.S.C. §§ 1291 and 2253(a).

SECRET//NOFORN

SECRET//NOFORN

## STATEMENT OF THE ISSUES

1. Whether the district court erred in concluding that petitioner is lawfully

detained, when the facts credited by the district court demonstrated that he was part

of an al-Qaida-associated force led by Abu Zubaydah.

2. Whether the district abused its discretion in denying petitioner's motion for a

grant of the writ or a new hearing based on alleged procedural irregularities.

## PERTINENT STATUTES

Pertinent statutes are attached as an addendum to this brief.

## STATEMENT OF THE CASE

This appeal arises from a petition for a writ of habeas corpus challenging the

lawfulness of petitioner's military detention at Guantanamo Bay. The district court

denied the habeas petition, JA 1196-1210, 1211-1220, 1345, and petitioner's motion

under Federal Rule of Civil Procedure 59 for a grant of the writ or a new hearing, JA

1346. Petitioner appeals.

## STATEMENT OF FACTS

**A.    Factual Background**

**1.    Abu Zubaydah And The Force He Assembled At The Faisalabad
Safehouse**

Prior to the attacks of September 11, 2001,        was a key facilitator

for terrorist training camps in Afghanistan, including a camp known as the "Khaldan

camp." *See, e.g.*, JA 1545, 1548, 1620, 1684; *Barhoumi v. Obama*, 609 F.3d 416, 418, 425

SECRET//NOFORN

4



A diary written by Abu Kamil al-Suri, a close associate of Zubaydah, explains

that, during the first few months of 2002, Zubaydah had assembled a "group," JA

1919, that he was "preparing and training . . . for martyrdom operations and to

destroy America soon," JA 1910-11. *See Barhoumi*, 609 F.3d at 427-32 (crediting diary

as reliable). Zubaydah trained group members on building explosive devices for use

against the U.S. *See, e.g.* JA 1600, ▓▓ *see also* JA 1653-56.

The force Zubaydah assembled was headquartered in early 2002 at a safehouse

in Faisalabad, Pakistan, and consisted of "more important or serious people that were

involved with Al-Qaeda." JA 1651; *see also* JA 1736 ▓▓▓▓ ("I have chosen

some brothers, cadres, for the military matters, especially explosives (making it) and

detonation from a distance (remote control)"); JA 1741. According to one resident of

the safehouse, "all the people in the house were Al-Qaeda people or 'jihadis.'" JA

1650-51.

The al-Suri diary included a "veritable membership list" of Zubaydah's force,

*Barhoumi*, 609 F.3d at 426, listing thirteen current members and noting whether each

was "permanent." JA 1919. In addition to Zubaydah and al-Suri, the force included

SECRET//NOFORN

Sufyian Barhoumi (ISN 694),[2] also known as Ubaydah al-Jaza'iri, a former trainer and

trainee at the Khaldan camp whom this Court found to be lawfully detained in

*Barhoumi*. *See* 609 F.3d at 426-27[3]; JA 1895, 1919. Another member of the force was

████████████████████████████████████████████████, *see* JA

1688, who was undergoing training on electronics to work with explosives in

Afghanistan. *See* JA 1919. ████████ also trained other members of the force in

English as part of Zubaydah's training program. *See, e.g.*, JA 1676, 1688. The force also

included Muhammed Noor Uthman (ISN 707), known as Akrama, *see* JA 1684, who

was a former trainer at the Khaldan camp. *See* JA 1612, 1684, 1858, 1919. In district

court, the government submitted a demonstrative exhibit identifying others in

Zubaydah's force. *See* JA 582-84.

## 2.   Petitioner's Time At The Abu Zubaydah Safehouse And The Safehouse Raid

Petitioner admits that he was at Zubaydah's Faisalabad safehouse for

approximately eighteen days in March 2002. JA 198, 1666. Indeed, petitioner has

identified others at the safehouse, including Zubaydah (whom petitioner knew as

"Daood" ████████ JA ██ 1666.

---

[2] ISN stands for "Internment Serial Number." The Department of Defense assigns each detainee held at Guantanamo Bay such a number. *See* Dep't of Defense Directive 2310.01E, at 3 (Sept. 5, 2006).

[3] Following this Court's decision in *Barhoumi*, the petitioner in that case filed a motion in district court for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b). Notice Of Filing, Doc. 232, D.D.C. No. 05-cv-1506. That motion remains pending.

SECRET//NOFORN

SECRET//NOFORN

According to individuals petitioner lived with at the safehouse, petitioner went by two names when he was at the safehouse—Usama al-Jaza'eri and Abdul Razzaq.[4] *See* JA 1687; JA 258, 263, 1599, 1672. "Abu 'Usamah al-Jaza'iri" is listed in the al-Suri diary as one of the "permanent" members of the Zubaydah force. JA 1919. Petitioner's affiliation with the Zubaydah force is corroborated by statements by others who were housed at the Zubaydah house. JA 1676, 1680, 1688, 1762, 1782[5].

In the early morning hours of March 28, 2002, authorities raided the Zubaydah safehouse.             A firefight erupted during the raid, but Zubaydah and petitioner were captured, as were                      Uthman (ISN 707),

                                                                                    JA 1566-67, 1657-58, 1666,     Materials seized from the safehouse included an artillery manual and other writings bearing the designation "al Qaida"; electrical components and a                that can be modified for use as a timer in improvised explosive devices ("IEDs"); texts, notes, and diagrams appearing to address electronics, circuitry analysis, explosives, artillery or mortar firing tables, and ambush tactics and techniques; and texts and notes for English studies, JA 284-85, Nos. 23, 29-38, 64, 67-68, 73; JA 287-88, 290-92; JA 1937-39; *see also* JA 1531.

---

[4] The record includes various spellings of these names (and other names in this case). Unless quoting a source document using a different spelling, this brief will use the spellings above.

[5] Petitioner and Jabran Sa'id al-Qahtani (ISN 696) are both referred to in this report by their "MP" numbers, which is assigned at the time of capture and is different from the "ISN." Al-Qahtani was assigned              JA 1776, and petitioner was assigned            JA 603.

SECRET//NOFORN

SECRET//NOFORN

**3.    Petitioner's Travels In Afghanistan Prior To His Arrival At The Abu Zubaydah Safehouse**

Petitioner claims that he was never in Afghanistan prior to arriving at the

Zubaydah safehouse, JA 199, but that account is contradicted by other evidence. The

al-Suri diary explained that Usama al-Jaza'eri "worked as [a] trainer[]" in the Khaldan

camp in Afghanistan before that camp closed in 2000. JA 1858; *see also* JA 1549, 1700.

Al-Jaza'eri later went to the "Khoust guest house," as established by a report by an al-

Qaida operative describing a November 2001 fire at the guesthouse. *See* JA 1767,

1808.

According to a statement by Uthman (ISN 707), al-Jaza'eri later met up with

Uthman, Zubaydah, and others in Barmal, Afghanistan, as they were fleeing U.S.

strikes. JA 1685; *see also* JA 1857-58 (al-Suri diary) (stating that al-Jaza'eri was with

Zubaydah's force on the Afghanistan-Pakistan border in January 2002). Eventually,

the force made its way to the Faisalabad safehouse where they were ultimately

captured. *See* JA 1685, 1906. Consistent with the foregoing, when the FBI interviewed

petitioner, then using the name Abdul Razzaq,[6] less than 48 hours after the safehouse

raid, he stated that he went "to Afghanistan to fight in the war." JA 1574.

---

[6] Petitioner argues (Br. 14-18, 64) that he was not the Abdul Razzaq in the interview.
We discuss why the district court correctly rejected that claim at pages 36-38, *infra*.

SECRET//NOFORN

**B.  Procedural Background**

**1.  The Habeas Hearing And The Government's Prior *Ex Parte* Motion**

Prior to the habeas hearing in petitioner's case, on December 6, 2010, the

government submitted a Top Secret *ex parte* motion to the district court requesting

permission to file three highly classified, potentially exculpatory[7] documents on an *ex

parte* basis with the court in lieu of any obligation the government may otherwise have

had to produce the documents to petitioner's counsel. JA 1201, 1304, 1489-91. The

three documents in question potentially concerned the credibility of Musa'ab al

Madhwani (ISN 839), a detainee on whose statements the government was relying. *Id.*

At a December 7 pre-hearing conference, the court stated that it would not look at

the filing until there was a need to do so based on the government's reliance on the

evidence in its case-in-chief or in rebuttal. JA 1201-02, 1492. Concerned that the court

believed that the government's submission contained inculpatory information and

thus did not intend to look at it, counsel for the government called the court's

chambers around December 10 and told the court's law clerk that the evidence

contained in the filing was not inculpatory, and the court needed to review it. JA

1493-94.

---

[7] Although this is not a criminal proceeding, throughout this brief we use
"inculpatory" as shorthand to mean tending to provide a basis for detention under the
AUMF and "exculpatory" as shorthand to mean tending to disprove a basis for
detention.

The court conducted the merits hearing on December 14, 15, and 17. JA 1202. On December 23, the court scheduled the announcement of its decision for a week later. *See* JA 1260. Concerned that the court may issue a decision without addressing the *ex parte* filing, counsel for the government called the court's chambers that same day and informed the law clerk that the *ex parte* filing concerned exculpatory information. JA 1495. The court held an *ex parte* conference the same day. During the conference, pursuant to the court's request, the government did not reveal the substance of the *ex parte* motion, but it explained that the information related to the credibility of al Madhwani. JA 1202-03, 1497. The court ruled that the government must either withdraw reliance on the statements by al Madhwani or appear for an *ex parte* hearing on December 28 at which an official from the originating agency would have to explain why the information at issue could not be disclosed to petitioner's counsel without endangering national security. JA 1203, 1497.

On December 27, the government filed a public notice stating that it "do[es] not concede any insufficiency with respect to the grounds set forth in [its] *ex parte* motion," but that, "under the circumstances," it was withdrawing reliance on statements by al Madhwani, "with reservation of all rights." JA 1306.[8] During a December 28 conference call between the court and the parties, petitioner's counsel

---

[8] Because the notice was filed publicly, it did not include al Madhwani's name. Instead, the notice stated that the government was withdrawing reliance on statements by a "particular detainee witness" and then it cited exhibit numbers corresponding to statements by al Madhwani. JA 1305.

requested the opportunity to offer her view on how the government's withdrawal of

reliance on al Madhwani affected petitioner's merits case. JA 1112. Counsel stated that

one hour of argument would be sufficient, and the court ordered that relief. JA 1113-

14. Accordingly, the court held supplemental closing arguments on January 4, 2011.

JA 1204.

## 2.    The District Court's Order And Opinion Denying The Writ

On January 11, 2011, the district court entered an unclassified order denying

the habeas petition, JA 1196-1210, and on February 28, 2011, the court entered a

classified opinion elaborating on the basis for its decision, JA 1211-20. The court's

opinion started by observing that this Court has "recognized that Abu Zubaydah and

his band of followers . . . constitute an 'associated force' under the" Authorization for

Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001)

("AUMF"). JA 1214 (citing *Barhoumi*, 609 F.3d at 420). Thus, the court explained, an

individual who was "part of" Zubaydah's force is necessarily lawfully detained under

the AUMF. JA 1214.

After reviewing the evidence, the court concluded that petitioner was part of

Zubaydah's force. The court found that Zubaydah was "assembling a force to attack

U.S. and Allied forces" around the time of the safehouse raid. JA 1212. The court

concluded that petitioner's stay and capture at the Zubaydah house, alone, were

enough to warrant petitioner's detention, JA 1214, observing that it was an "obvious

and common-sense inference that a terrorist leader like Abu Zubaydah would not

SECRET//NOFORN

tolerate an unknown and untrusted stranger to dwell in a modest, two-story

guesthouse for two weeks with himself and ten or so of his senior leadership, while

they are preparing for their next operation," JA 1217.

The court found that petitioner's lawful detention is further supported by

petitioner's actions conducted under the two names the district court found he went

by then, Usama al Jaza'eri and Abdul Razzaq, JA 1215-16. First, the court found that

petitioner was "participating in one of Abu Zubaydah's various training programs" at

the safehouse and that the al-Suri diary listed petitioner as a permanent member of

Zubaydah's force. JA 1215-18. The court also concluded that additional evidence—a

statement by Uthman (ISN 707), the al-Suri diary, a report by an al-Qaida operative,

and petitioner's interview shortly after his capture—"plac[ed] the petitioner with Abu

Zubaydah's force in various places in Afghanistan prior to his stay at the Faisalabad

guesthouse." JA 1217.

The court thus concluded that the government "proffered more than enough

credible evidence for this Court to conclude that it is more likely than not that

petitioner was, indeed, a member of Abu Zubaydah's force." JA 1219. In reaching this

conclusion, the court rejected petitioner's argument that Uthman's identification of

him as Usama al Jaza'eri was not reliable, explaining that petitioner's challenge is

"undercut by petitioner's own admission that he had stayed at the Abu Zubaydah

guesthouse with" Uthman. JA 1219; *see also* JA 1215 n.3. Furthermore, the court held

that petitioner's arguments are "undermined by his own lack of credibility on certain

critical points," including petitioner's claim "that he had never been to Afghanistan, and did not know or interact in any way with Abu Zubaydah and his lieutenants in that relatively small guesthouse where they were all captured together." JA 1220.

## 3. The District Court's Orders Denying Petitioner's Motion (And "Supplement" Thereto) For A Grant Of The Writ Or A New Hearing

On January 3, 2011, the day before the final day of closing arguments, petitioner filed a motion under Federal Rule of Civil Procedure 59 requesting a grant of the writ, a new hearing, and/or sanctions. Petitioner claimed that the initial hearing was unfair for a number of reasons, including the government's treatment of exculpatory evidence pertaining to al Madhwani (ISN 839). *See* JA 627-39. On March 14, 2011, the court denied petitioner's motion. JA 1346.

Meanwhile, on February 25, 2011, after the district court issued its order denying the habeas petition, petitioner filed a "supplement" to his January 3 motion, arguing that the government had breached its duty to disclose to petitioner's counsel certain exculpatory documents concerning the reliability of Uthman (ISN 707). JA 1951-88. The district denied this "supplement" on May 18, 2011. JA 1221-23. The court held that the government did not improperly withhold exculpatory documents, explaining, *inter alia*, that there was "no basis to conclude that the documents . . . were, in fact, reasonably available to the Government." JA 1222.

The court also held that the new documents did not necessitate a new hearing because "even if petitioner's allegations were correct—which they are not—petitioner

SECRET//NOFORN

has not shown, and cannot show, that his having the documents in question to

challenge the credibility of [Uthman] would have changed the outcome of his case."

JA 1222. The court explained that it "essentially concluded to the contrary" when it

held in its January 11 order that "'petitioner's presence at [the Faisalabad] guesthouse

is enough, *alone*, to find that he was more likely than not a member of Abu

Zubaydah's force.'" JA 1222 (quoting JA 1207-08) (alteration and emphasis in

original).

## SUMMARY OF ARGUMENT

I. This Court has recognized that Abu Zubaydah's force is an associated force

of al-Qaida, *Barhoumi v. Obama*, 609 F.3d 416, 423 (D.C. Cir. 2010), and petitioner

does not dispute that Zubaydah's force qualifies as an associated force, nor did he

challenge that conclusion in district court. The district court properly concluded that

petitioner is lawfully detained under the AUMF because, at the time of his capture, he

was part of Zubaydah's force. That conclusion is well supported by petitioner's own

admission that he was captured, with Zubaydah, at a safehouse where petitioner had

been living for at least several weeks and where Zubaydah was training his force for

terrorist operations. As the district court held, petitioner's stay and capture at the

Zubaydah safehouse, together with Zubaydah, were sufficient to establish that

petitioner was part of Zubaydah's force.

The district court further found that additional evidence supported the

conclusion that petitioner was part of Zubaydah's force. In *Barhoumi*, this Court

SECRET//NOFORN

recognized that a diary of one of Zubaydah's close associates, Abu Kamil al-Suri, was reliable and included a "veritable membership list" of the members of Zubaydah's force, *id.* at 426-32. The district court found that petitioner is included on al-Suri's list under one of the names petitioner went by at the time, Usama al-Jaza'eri. The court also properly credited statements by a number of petitioner's housemates at the Zubaydah safehouse that petitioner was actively engaged in Zubaydah's martyrdom training program.

In addition, the court found that, prior to his stay at the Zubaydah safehouse, petitioner had gone to Afghanistan to fight in the war against the United States and had fled with other fighters, including Zubaydah. That finding is well supported by (1) an interview taking place within 48 hours of petitioner's capture in which petitioner, then going by the name Abdul Razzaq, admitted that he went to Afghanistan to fight in the war; (2) a report by an al-Qaida operative placing petitioner at an armed guesthouse in Afghanistan in November 2001 under the name Usama al-Jaza'eri; (3) a statement by petitioner's housemate Muhammed Noor Uthman (ISN 707), who identified petitioner's photo as Usama al-Jaza'eri and stated that petitioner fled the U.S. airstrikes with Zubaydah and others; and (4) the al-Suri diary, which places petitioner, under the name Usama al-Jaza'eri, on the Afghanistan-Pakistan border with Zubaydah and his force as they were fleeing Afghanistan. The district court's ultimate conclusion that petitioner is lawfully detained is also supported by the court's finding that petitioner made a number of false exculpatory statements.

SECRET//NOFORN

SECRET//NOFORN

Petitioner's main response is to claim that the key evidence regarding Abdul Razzaq and Usama al-Jaza'eri does not refer to him. Petitioner does not dispute that he used the name Abdul Razzaq, however, and the interview with Abdul Razzaq shortly after his capture contained information that clearly identified the subject interviewed as petitioner. The district court thus did not clearly err in finding petitioner's counter explanation to be not credible. Likewise, given Uthman's familiarity with petitioner and other corroborating evidence, the district court was not clearly erroneous in crediting Uthman's statement that petitioner used the name Usama al-Jaza'eri. Although petitioner argues that evidence discovered after the hearing undermines Uthman's reliability, this Court lacks jurisdiction over that challenge. In any event, the district court did not abuse its discretion in declining to grant the writ or order a new hearing on the basis of this evidence because there is more than enough evidence to establish petitioner's lawful detention without Uthman, and Uthman's statements remain reliable.

II. Petitioner's contention that alleged procedural irregularities rendered his hearing unfair is meritless. As explained above, this Court lacks jurisdiction over petitioner's challenge to the extent that it concerns the government's handling of evidence about Uthman discovered after the hearing. In any event, the district court's denial of petitioner's request for a grant of the writ or a new hearing on that basis—and the court's prior denial of petitioner's motion for the same relief on the basis of other alleged procedural irregularities—was not an abuse of discretion. The

SECRET//NOFORN

SECRET//NOFORN

government actions that petitioner challenges were entirely proper. Moreover, for each action challenged, petitioner either failed to seek relief from the district court when the alleged harm could have been remedied, or the district court granted petitioner more than enough relief to accommodate the asserted concerns.

## STANDARD OF REVIEW

This Court reviews the district court's specific factual findings, including determinations "whether evidence is sufficiently reliable to credit," for clear error. *Alsabri v. Obama*, 684 F.3d 1298, 1300-01 (D.C. Cir. 2012) (internal quotation marks omitted). The district court's legal conclusions, including the ultimate question whether petitioner is lawfully detained, are reviewed de novo. *Id.* at 1301. The district court's denials of petitioner's requests under Federal Rule of Civil Procedure 59 for a grant of the writ or a new hearing are reviewed for abuse of discretion. *Peyton v. DiMario*, 287 F.3d 1121, 1125 (D.C. Cir. 2002).

## ARGUMENT

## I.    THE DISTRICT COURT PROPERLY CONCLUDED THAT PETITIONER IS LAWFULLY DETAINED UNDER THE AUMF.

Under the AUMF, Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001),

the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

SECRET//NOFORN

SECRET//NOFORN

Interpreting the AUMF, this Court has held that the government may establish the lawfulness of a petitioner's detention by showing, *inter alia*, that he "is part of the Taliban, al Qaeda, or associated forces." *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010) (internal quotation marks omitted). Congress confirmed this understanding of the AUMF in the National Defense Authorization Act for Fiscal Year 2012, which "affirms . . . the authority of the President" under the AUMF to detain any "person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners." Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562 (2011). A preponderance of the evidence is sufficient to make this showing. *Alsabri*, 684 F.3d at 1309.

This Court has explained that evidence that an individual engaged in fighting, *see Awad v. Obama*, 608 F.3d 1, 10 (D.C. Cir. 2010), or was part of an enemy organization's "formal command structure" is "surely sufficient, but is not necessary to show he is 'part of' the organization." *Bensayah v. Obama*, 610 F.3d 718, 725 (D.C. Cir. 2010); *see also, e.g., Awad*, 608 F.3d at 11; *Uthman v. Obama*, 637 F.3d 400, 403 (D.C. Cir. 2011). Rather, this Court has repeatedly "ma[de] clear" that the determination of whether a person is "part of" an enemy force when captured "must be made on a case-by-case basis by using a functional rather than a formal approach and by focusing upon the actions of the individual in relation to the organization." *Salahi v. Obama*, 625 F.3d 745, 751-52 (D.C. Cir. 2010) (internal quotation marks omitted).

SECRET//NOFORN

This Court has recognized that Abu Zubaydah's force constituted an al-Qaida-associated force. *Barhoumi v. Obama*, 609 F.3d 416, 418, 423, 425 (D.C. Cir. 2010).[9] Here, the district court "ha[d] no difficulty concluding that the Government more than adequately established" that petitioner was part of Zubaydah's force. JA 1220. Although petitioner makes two asides diminishing the significance of Zubaydah (Br. 23 n.11, 68), petitioner does not and cannot challenge the district court's holding that someone who was part of Zubaydah's force when captured is lawfully detained. Indeed, petitioner conceded the point in district court. JA 731-32. Petitioner's appeal instead mounts factual challenges to the district court's ruling that petitioner was part of Zubaydah's force. As we explain below, the district court's factual findings and ultimate conclusion are well supported.

**A.    The district court's well-supported factual findings establish that petitioner was part of Abu Zubaydah's force.**

**1.    Petitioner's capture at the Zubaydah safehouse is sufficient to establish that he was part of Zubaydah's force.**

a. Petitioner admits that he was captured in March 2002 in a safehouse raid together with Abu Zubaydah and a number of others, including the individual this Court found was lawfully detained in *Barhoumi*. *See, e.g.*, JA 1666; JA ▆▆▆ 198; *Barhoumi*, 609 F.3d at 426-27. It is undisputed that petitioner lived at the safehouse for at least eighteen days prior to capture. JA 198, 1666.

---

[9] The evidence in the record establishes Zubaydah's relationship to al-Qaida. *See, e.g.*, ▆▆▆▆ JA 1545, 1547-49, 1620, 1623, 1649, 1745-47, 1906; JA 1697, 1703-04 ▆▆▆▆▆▆; JA 1712, 1715, 1719, 1723-33, 1736-37 (same).

SECRET//NOFORN

The district court found that Zubaydah was "at that very time assembling a force to attack U.S. and Allied forces." JA 1212; *see* JA 1409 ¶ 17, 1427 ¶ 42 (cited by the district court, JA 1212). That finding is well supported by the diary of Zubaydah's close associate, Abu Kamil al-Suri, which recounted that, in the months prior to Zubaydah's capture, Zubaydah was assembling a force for training in the areas of "electronics, computer[s], internet and English language" so as to "prepar[e] and train[] people (cadres) for martyrdom operations and to destroy America soon." JA 1911; *see also* JA 1894, 1910. The evidence further establishes that Zubaydah sought to train the force in explosives. *See* JA 1736 ▮▮▮▮ JA 1600, ▮ JA 1653-56.

The materials seized from the Zubaydah safehouse—an artillery manual and other documents bearing the designation "al Qaida"; electrical components and a ▮▮▮▮ that can be modified for use as a timer IEDs; texts, notes, and diagrams appearing to address electronics, circuitry analysis, explosives, artillery or mortar firing tables, and ambush tactics and techniques; and texts and notes for English studies, JA 284-85, Nos. 23, 29-38, 64, 67-68, 73; JA 287-88, 290-92; JA 1937-39; *see also* JA 1531—demonstrate that Zubaydah's training program was well under way at the time of the safehouse raid. Petitioner contends (Br. 65) that these materials did not relate to martyrdom operations, but the district court did not clearly err in reaching a contrary conclusion, JA 1212 & n.2, given that the materials seized concerned the precise subjects of Zubaydah's martyrdom training program.

SECRET//NOFORN

As ████████████████████, a resident of the safehouse, explained, the
force Zubaydah assembled at the safehouse consisted of "more important or serious
people that were involved with Al-Qaeda." JA 1651; *see also* JA 1736. ████ further
stated that "all the people in the house were Al-Qaeda people or 'jihadis.'" JA 1650-
51. The al-Suri diary confirms that understanding, listing thirteen then-current
"permanent" members of Zubaydah's force, most of whom were at the safehouse
around the time of the raid. *See* JA 1919; *see also* JA 1422-27 ¶ 41 (cited by the district
court, JA 1212).

b. The district court held that petitioner's admitted stay and capture at the
Zubaydah safehouse were, under the facts here, enough to establish that it was more
likely than not that petitioner was part of Zubaydah's force. JA 1214. Relying
extensively on a blog posting, petitioner disputes this conclusion, arguing that
guesthouse stays "'take[] place, in most cases, at an earl[y] phase in the recruitment
process'" and thus do not necessarily reflect an "'associational commitment.'" Br. 72
(quoting blog). This Court, however, has held that even a stay at an al-Qaida
guesthouse functioning as "'a staging area for recruits heading for a military training
camp[] makes it more likely—indeed, very likely—that [the individual] was himself a
recruit.'" *Suleiman v. Obama*, 670 F.3d 1311, 1314 (D.C. Cir. 2012) (quoting *Al-Adahi v.
Obama*, 613 F.3d 1102, 1108 (D.C. Cir. 2010) (second alteration in original)). Indeed,
this Court has repeatedly held that the fact that an individual stayed at an al-Qaida
guesthouse can "constitute[] 'overwhelming' evidence that the United States had

SECRET//NOFORN

SECRET//NOFORN

authority to detain that person." *Al-Adahi*, 613 F.3d at 1109 (quoting *Al-Bihani*, 590

F.3d at 873 n.2); *see also Alsabri*, 684 F.3d at 1302 (staying at safehouses "can be

'powerful' evidence" that a detainee was part of al-Qaida, the Taliban, or an associated

force (quoting *Uthman*, 637 F.3d at 406)); *Almerfedi v. Obama*, 654 F.3d 1, 6 n.7 (D.C.

Cir. 2011); *Al-Madhwani v. Obama*, 642 F.3d 1071, 1075 (D.C. Cir. 2011).

Importantly, the Zubaydah safehouse where petitioner admits he stayed and

was captured was no ordinary guest house. As the district court found, the safehouse

was Zubaydah's headquarters for preparations for future attacks on the U.S. and its

coalition partners, JA 1211-12, and it was inhabited by the "more important or serious

people that were involved with Al-Qaeda," all of whom "were Al-Qaeda people or

'jihadis,'" JA 1650-51. Thus, as the district court explained, petitioner's capture at the

safehouse, "combin[ed] . . . with the obvious and common-sense inference that a

terrorist leader like Abu Zubaydah would not tolerate an unknown and untrusted

stranger to dwell in a modest, two-story guesthouse for two weeks with himself and

ten or so of his senior leadership, while they are preparing for their next operation,"

established that petitioner was part of Zubaydah's force. JA 1217. *See Alsabri*, 684 F.3d

at 1303 (noting that it is "hardly unreasonable to infer that . . . a non-affiliated guest

[would not have been allowed] to stay at [a guesthouse] during a visit by someone as

important to al Qaeda as [Ramsi] bin al-Shibh"); *Khalifh v. Obama*, 2010 WL 2382925,

at *4 (D.D.C. 2010) (unpublished) (similar).

SECRET//NOFORN

SECRET//NOFORN

Claiming that the Zubaydah safehouse was open to the public, petitioner argues (Br. 68) that it is distinguishable from the safehouses at issue in *Alsabri* and other cases. But the only evidence petitioner cites in support of this proposition (Br. 13) is a news article in the *Karachi Dawn* addressing individuals released from *thirteen* raids taking place the night of the Zubaydah safehouse raid. JA 63. As explained above, the Zubaydah safehouse was not a typical guesthouse; it served as the headquarters for terrorist operations by a significant terrorist leader. The district court therefore correctly found that petitioner's weeks-long stay and capture there with Zubaydah established that he was, more likely than not, part of Zubaydah's force. JA 1214, 1217. As we explain below, and as the district court held, JA 1215-20, the determination that petitioner was part of Zubaydah's force is further supported by additional evidence.

## 2. Additional evidence bolsters the conclusion that petitioner was part of Zubaydah's force.

Although the district court correctly held that petitioner's admitted stay and capture with Zubaydah at the Zubaydah safehouse are enough, alone, to establish that petitioner is lawfully detained, the court's conclusion is further supported by evidence establishing that petitioner (1) was identified by the al-Suri diary as a "permanent" member of Zubaydah's force; (2) actively took part in Zubaydah's terrorist training program; (3) went to Afghanistan prior to his stay at the safehouse to fight and then fled with other fighters, including Zubaydah; and (4) made false exculpatory statements.

SECRET//NOFORN

The evidence upon which the district court relied for these findings identified petitioner using two names: Usama al-Jaza'eri and Abdul Razzaq. The district court found that petitioner used these names, and that finding is well supported by photo identifications by fellow safehouse inhabitants involving a photo ████████ which the court found was "unequivocally . . . of the petitioner." JA 1215 n.3. *See* JA 1687 (identification by Muhammed Noor Uthman (ISN 707) ████ as Usama al-Jaza'eri); JA 258 (identification by Uthman ████ as Abdul Razzaq); JA 1672 (identification by ██████████ ████ as Abdul Razzaq); JA 1599 (same); JA 263 (identification by ██████████ of ████ as Abdul Razzaq); JA 1666, 1668 (statement by petitioner that he lived with all of the foregoing).

a.    **The al-Suri diary lists petitioner as a "permanent" member of Zubaydah's force.**

As this Court has recognized, the al-Suri diary contains "a veritable membership list" of the members of Zubaydah's force around the time of the safehouse raid. *Barhoumi*, 609 F.3d at 426. That list appears in an entry dated just a few days before the raid identifying thirteen individuals as current members of Zubaydah's force and noting whether each was "permanent." JA 1919. The district court reasonably found that petitioner was identified in this list as a "permanent" member of Zubaydah's force, JA 1218, because one of the "permanent" members listed is "Abu 'Usamah al-Jaza'iri," one of the names petitioner went by at the safehouse, JA

1919 (stating that other members of Zubaydah's force included petitioner's

housemates Abu Zubaydah (#1); al-Suri (#2); Sufyian Barhoumi (ISN 694) (#8);

Uthman (ISN 707), also known as Akrama, JA 1684 (#10); al-Qahtani (ISN 696), also

known as Hatib, JA 1598, 1777, ▮ (#11); and Ghassan Abdullah al-Sharbi (ISN

682), also known as Abdullah al-Muslim, JA 1688 (#12)).

Thus here, as in *Barhoumi*, the al-Suri diary's identification of petitioner as a

permanent member of Zubaydah's force strongly supports the district court's

conclusion that petitioner is lawfully detained under the AUMF. *See Barhoumi*, 609

F.3d at 425 (holding this evidence is "perhaps the most probative record evidence").

## b. Petitioner participated in the training program at the Zubaydah safehouse.

The district court's conclusion that petitioner is lawfully detained is further

supported by its finding that petitioner was undergoing training in American-accented

English as part of Zubaydah's safehouse training program. JA 1215-17. Petitioner

questions the significance of this finding (Br. 66), but the al-Suri diary explains that

English training was a significant part of the terrorist training program, JA 1910-11,

and such training has played an important role in other terrorist operations, including

the 9/11 attacks, *see* Nat'l Comm'n on Terrorist Attacks Upon the United States, *The

9/11 Commission Report*, at 160, 216, 218, 221, 245 (2004).

The district court's finding regarding petitioner's American-accented English

training is well supported by the record. On numerous occasions, Labed (ISN 703)

stated that petitioner took English language lessons from al-Sharbi (ISN 682),

together with Uthman (ISN 707), ███████ (ISN 696), and one other individual. JA

1676, 1680, 1762. Uthman confirmed that he and petitioner asked al-Sharbi to teach

them English, JA 1688; ████████████████████████████████████████████

And although the district court did not expressly rely on it, ███████ stated that

petitioner "has knowledge of the training taking place in Abu Zubaida's safehouse in

Faisalabad," JA 1782.[10]

███████████████████████████████████████████████████████████████

---

[10] *See supra* note 5. The district court cited some materials relying on statements by █
█████ *see* JA 1212 (relying on JA 1424 ¶ 41), but did not expressly address the
reliability of ███████ statements. Although ███████ has partially recanted some
of his admissions about his activities in the house, alleging that they were the product
of (1) his belief that he would be sent home if he provided information, JA 1787; (2)
his "belie[f that] he would be tortured," JA 1603; or (3) "improper coercive threats
and abuse," JA 1444-47; *cf.* JA 1608, these claims of coercion are not credible. The
government searched reasonably available information at the time it prepared the final
amended return in this case, and did not locate any other evidence that harsh
interrogation tactics were applied to ███████

SECRET//NOFORN

c.  **Prior to his stay at the Zubaydah safehouse, petitioner went to Afghanistan to fight and then fled with other fighters.**

The district court's finding that there was "credible evidence placing the petitioner with Abu Zubaydah's force in various places in Afghanistan prior to his stay at the Faisalabad guesthouse" is well supported by the record. JA 1217.

As an initial matter, the district court found that petitioner "admi[tted]—when he was first interrogated—that he had gone to Afghanistan to fight in the jihad against the U.S. and its Allied forces." JA 1219. That factual finding is well supported by an FBI interview that took place within 48 hours of petitioner's capture with "Abdul Razzaq," one of the names petitioner went by, who admitted that he went to Afghanistan "to fight in the war." JA 1574. The district court credited that interview as accurately representing petitioner's statement. As this Court has held, "the intention to fight" is "compelling evidence" that an individual is part of an enemy force "when, as here, it accompanies additional evidence of conduct consistent with an effectuation of that intent." *Awad,* 608 F.3d at 9.

In addition, the district court properly found that petitioner was at an armed al-Qaida guesthouse in November 2001 in Khowst, Afghanistan, based on a report written by an al-Qaida operative about a fire that took place at the guesthouse. *See* JA 1218-19; JA 1765-69; JA 1807-15. That report identifies "Abu Osama al ((Jazaery))," one of the names petitioner went by, as someone who was present for the fire, and it further identifies him as someone who "attended the bombardment." JA 1767.

"[M]aterial losses" from the fire included a Kalashnikov, an ammunition pouch, and a rocket-propelled grenade pouch. JA 1768; JA 1218 n.9.[11]

Petitioner contends (Br. 64-65) that the district court erred in relying on the fire report after the government withdrew reliance on statements by Musa'ab al Madhwani (ISN 839), but the district court reasonably concluded that petitioner was the "Abu Osama al ((Jazaery))" referenced in the report based on (1) Uthman's identification of petitioner as Usama al-Jaza'eri, JA 1687; (2) the report's statement that "Abu Osama al ((Jazaery))" was an ex-trainee, JA 1767, which is consistent with the al-Suri diary's identification of "'Usamah al-((Jaza'iri))" as a former trainer at Khaldan, JA 1858; and (3) the report's placement of petitioner in Khowst in November 2001, which is consistent with the evidence described below that petitioner, Zubaydah, and others were together in nearby Barmal, Afghanistan, as they were fleeing the U.S. strikes, JA 1684-85; see also JA 1858. Cf. Alsabri, 684 F.3d at 1305.

Finally, as just noted, the district court found that petitioner was fleeing the U.S. strikes in Afghanistan with other fighters, including Zubaydah. JA 1217-18. In the same interview where Uthman (ISN 707) identified petitioner's photo as Usama al-Jaza'eri, Uthman stated that he stayed in Barmal, Afghanistan, with Usama al-Jaza'eri, Zubaydah, and other members of Zubaydah's group as they were fleeing Afghanistan after the strikes. JA 1685. In addition, the al-Suri diary reports that when

---

[11] Petitioner does not contest that the Islamic calendar date on the report, "Thursday 28 Sha'ban," JA 1767, corresponds to November 15, 2001. See JA 1926.

SECRET//NOFORN

the force was on the Afghanistan-Pakistan border in January 2002, it included, *inter alios*, Zubaydah and "the brothers who worked as trainers in [the Khaldan camp] such as . . . 'Usamah al-((Jaza'iri))." JA 1858; *see also* JA 1782 (statement by al-Qahtani (ISN 696) that petitioner "has been to Afghanistan").[12] *See Uthman*, 637 F.3d at 405 (holding that Uthman Abdul Rahim Mohammed Uthman (ISN 27) is lawfully detained in part because of his association with al-Qaida members and travel along a route taken by individuals associated with al-Qaida).

**d.    Petitioner made numerous false exculpatory statements.**

Finally, the district court concluded that petitioner himself "lack[ed] credibility on certain critical points," including his statements in his 2010 affidavit and elsewhere "that he had never been to Afghanistan, and did not know or interact in any way with Abu Zubaydah and his lieutenants in that relatively small guesthouse where they were all captured together." JA 1220; *cf.* JA 198-99. In addition, the district court rejected petitioner's claim that he was not the "Abdul Razzaq" who made incriminating statements in an interview with the FBI within 48 hours of capture, JA 1219, a claim that is plainly false, *see infra* pp. 36-38. Because false exculpatory statements can be "evidence—often strong evidence—of guilt," *Al-Adahi*, 613 F.3d at 1107; *see also Almerfedi*, 654 F.3d at 7; *Uthman*, 637 F.3d at 406, petitioner's false exculpatory statements provide further support for the district court's conclusion that petitioner is lawfully detained.

---

[12] *See supra* note 5.

SECRET//NOFORN

**B.    Petitioner's attacks on the district court's factual findings are meritless.**

Petitioner attempts to undermine the district court's well-supported factual

findings by denying that he is Usama al-Jaza'eri or the "Abdul Razzaq" who made

incriminating statements to the FBI in an interview shortly after his capture. In

addition, petitioner contends that the al-Suri diary is not reliable. These arguments are

meritless.

**1.    The district court did not clearly err in rejecting petitioner's
misidentification arguments.**

**a.    The district court's finding that petitioner is Usama al-Jaza'eri is not
clearly erroneous.**

Although petitioner disputes (Br. 60-63) Uthman's (ISN 707) identification of

him as Usama al-Jaza'eri, the district court was not clearly erroneous in crediting that

identification. JA 1215 & n.3, 1216 & n.6, 1219. As the district court explained, JA

1215 & n.3, Uthman had reason to know petitioner's name and nickname because, as

petitioner admits, they lived together at the safehouse for the entirety of petitioner's

weeks-long stay there. JA 1666 (also noting that petitioner slept in Uthman's room for

several nights). Similarly, the al-Suri diary establishes that Uthman was familiar with

Usama al-Jaza'eri because of their travels together from January to March 2002. *See,*

*e.g.*, JA 1858, 1883, 1884, 1894 (noting instances where Usama al-Jaza'eri and Uthman,

also known as Akrama, JA 1684, were together).

Moreover, the al-Suri diary's identification of Usama al-Jaza'eri as a

"permanent" member of the Zubaydah force in an entry just days before petitioner's

SECRET//NOFORN

capture, combined with the diary's frequent reference to al-Jaza'eri's presence with the force in the months before the raid, JA 1858, 1862, 1883, 1884, 1894, 1919, support the inference that Usama al-Jaza'eri was at the safehouse on the night of the raid and further corroborates Uthman's identification. Finally, Uthman's identification is supported by the fact that "Al-Jazairi" means "The Algerian," JA 1560, and petitioner now claims that he is Algerian, JA 197.

i. Petitioner nonetheless challenges the district court's finding that he is Usama al-Jaza'eri, contending first (Br. 61) that the photo used in Uthman's identification of him by that name            JA 1687—was not of petitioner. The district court did not clearly err in concluding that            which appears in the record at JA 1949-50—is "unequivocally" of petitioner. JA 1215 n.3. In district court, as in this Court (Br. 60 n.28), petitioner's counsel stated that, in her opinion,          did not look like petitioner. The district court correctly rejected this attempt by counsel to testify as to that matter. *See, e.g.,* JA 1053. And, at a different point in the hearing, counsel expressly declined to contest that            is a photograph of petitioner. *See* JA 780-82; *see also* JA 1042.

Petitioner nonetheless argues that another detainee "confirmed" that            "was not of [p]etitioner" in an interview appearing at JA 112-16 (upon which the government has not relied). Br. 61; *see also id.* at 31-32, 34. Petitioner misreads the interview. The detainee being interviewed stated that            was someone he may have seen in Khowst who "might go by the name Osama," and he later stated that a

*different* photo thought to be of petitioner also appeared to be someone named Osama but was "not the same person as photo ███████" JA 112, 114. Even if the detainee was right that the two photos depicted different individuals, the detainee's statement falls far short of establishing that ██████ was not a photo of petitioner, particularly given that several of petitioner's housemates identified ██████ as Abdul Razzaq, the other name petitioner went by when he was at the safehouse. JA 258 (Uthman); JA 263 ███████████████ JA 1672 █████████████ JA 1599 (same).

Petitioner further questions (Br. 62-63) Uthman's identification of ████████ Usama al-Jaza'eri because the report summarizing the identification states that ████████ was "known to investigators as Abdu Razzaq," JA 1687, and petitioner asserts that he was not so known at the time. This argument is contradicted by multiple records establishing that "Abdul Razzaq" was one of the names petitioner was known by around the time of the August 2002 Uthman interview. *See, e.g.*, JA 263-64, 296, 1574; *cf.* JA 603-04.[13]

---

[13] Although petitioner devotes (Br. 30-34) five pages of the Statement of Facts to alleged problems with photo identifications concerning photos other than ████████ petitioner's arguments are beside the point because the district court relied only on the photo identifications using photo ████ and this brief does the same. In any event, the record establishes only one potential issue concerning photo identifications of petitioner: a photo depicting Fahd Umr abd al Majid al Sharif (ISN 215) was discovered in petitioner's file in the spring of 2003. The government, however, corrected that mistake in May 2003 through an interview with al-Qahtani (ISN 696) and a follow-up investigation. JA 1791-92; JA 1799-800; *see also* JA 1944. There is no reason to think that this limited mistake undermined any identifications of petitioner, particularly those identifying him as Abdul Razzaq or a resident of the Zubaydah

Finally, petitioner argues (Br. 61) that he cannot be Usama al-Jaza'eri because another detainee stated, in the course of a photo identification of someone other than petitioner, that "he knew an Abu Usama Al Jaza'iri as an instructor at either al-Farouq or Khaldan camp" who "had blonde hair." JA 269. This isolated statement does not undermine Uthman's identification of petitioner's photo as Usama al-Jaza'eri, given Uthman's familiarity with petitioner based on their weeks-long stay together at the Zubaydah safehouse. In any event, hair color is a mutable characteristic, and thus this detainee's statement is not inconsistent with Uthman's identification.

ii. Petitioner also argues (Br. 61) that Uthman's identification is not credible because of "materials regarding his mental health problems and severe abuse" that surfaced after the conclusion of petitioner's hearing, although petitioner does not identify or cite the specific materials to which he refers. *See also* Br. 28, 41, 46-48, 54. As explained *supra* on page 3, this Court lacks jurisdiction over this challenge because petitioner failed to file a notice of appeal from the district court's decision denying petitioner's motion for a grant of the writ or a new hearing based on the new evidence.

In any event, the district court did not abuse its discretion in declining to reopen the case. The court held that "even if petitioner's allegations were correct— which they are not—petitioner has not shown, and cannot show, that his having the

---

safehouse, given that al Sharif did not go by that name and was captured well before the safehouse raid. *See* JA 1947.

SECRET//NOFORN

documents in question to challenge the credibility of [Uthman] would have changed the outcome of his case." JA 1222. The court explained that it had "essentially concluded to the contrary" in its January 2011 unclassified order, "when [it] stated that[] 'petitioner's presence at [the Faisalabad] guesthouse is enough, *alone*, to find that he was more likely than not a member of Abu Zubaydah's force' and was therefore detainable." JA 1222 (quoting JA 1207-08) (third alteration in original).

The district court's conclusion was not an abuse of discretion because, as explained above, *see supra* pp. 19-23, petitioner's weeks-long stay in the Zubaydah safehouse alone is enough to establish his lawful detention. Moreover, Uthman's statements were not needed to establish the district court's further factual findings that petitioner (1) was actively involved in Zubaydah's training programs, *see supra* pp. 25-26; JA 1676 (statement by Labed (ISN 703) that petitioner took English training); JA 1680 (same); JA 1762 (same); JA 1782 (statement by al-Qahtani (ISN 696) that petitioner had knowledge of training program); (2) admitted to traveling to Afghanistan to fight in the war, *see supra* p. 27; JA 1574; and (3) made a number of false exculpatory statements, *see supra* p. 29. These findings, coupled with petitioner's admitted stay and capture at the Zubaydah safehouse with Zubaydah himself, more than adequately establish petitioner's lawful detention under the AUMF.

Moreover, the two documents filed in Uthman's military commission case that were the focus of petitioner's "supplement," *see* JA 1959-88, do not undermine the reliability of Uthman's critical August 2002 statement identifying petitioner as Usama

SECRET//NOFORN

al-Jaza'eri, JA 1687. In November 2002, Uthman stated that he had *not* been tortured or mistreated during his detention and instead had been "treated . . . well," suggesting that there was no mistreatment during the August 2002 interview that took place just three months earlier. JA 1617. Furthermore, the August 2002 interview was conducted by Special Agent Ali Soufan, JA 1684, who has testified before Congress regarding his successful use of the "Informed Interrogation Approach" and his objections to harsher methods of interrogations. Testimony of Ali Soufan, Senate Judiciary Committee (May 13, 2009).[14]

Moreover, any doubt as to the reliability of Uthman's August 2002 statements regarding petitioner is resolved by the Stipulation of Fact Uthman signed in his military commission case as part of his guilty plea, JA 1514-23. That stipulation, which sets forth facts that Uthman agreed are "true" and "could be proven beyond a reasonable doubt," JA 1514, provides that "[t]he group of terrorist operatives with whom [Uthman] resided [in March 2002] at the safe house in Faisalabad included" Zubaydah, Barhoumi (ISN 694), al-Qahtani (ISN 696), al-Sharbi (ISN 682), al-Suri, Salah, and, most significantly, "Bakush (known to [Uthman] as Abdul Razzaq)." JA 1520-21; *see also* JA 197 (noting that petitioner now identifies himself as "Saeed Bakhouch"). The stipulation further explained that "[f]or several weeks, this group of terrorist operatives used the safe house in Faisalabad as both a hideout and a training

---

[14] This testimony is available by going to http://www.judiciary.senate.gov/hearings/ hearing-search.cfm and searching for "Soufan" witness testimony in 2009.

SECRET//NOFORN

facility," and Uthman, "along with Bakush," was "learning Americanized English from Ghassan al Sharbi." JA 1521. The district court thus did not abuse its discretion in concluding that "it does not . . . appear that the documents in question actually support the substantive proposition for which petitioner cites them." JA 1222.

**b.   The district court did not clearly err in concluding that petitioner was the "Abdul Razzaq" who made incriminating statements in an FBI interview shortly after his capture.**

Petitioner does not dispute that he used the name Abdul Razzaq, at least as of shortly after his capture, and a number of petitioner's former housemates identified petitioner's photo ▊▊ as Abdul Razzaq. JA 263 ▊▊▊▊▊▊ JA 1672 ▊
▊▊▊▊ JA 1599 (same); JA 258 (Uthman (ISN 707). Petitioner nonetheless contends (Br. 14-18, 64) that the district court erred in finding that he was the Abdul Razzaq who admitted that he had gone to Afghanistan to fight in the war in an interview with the FBI within 48 hours of his capture, JA 1219. Petitioner bases this argument on the fact that the interview summary in question indicates that the interviewee—"Abdul Razzaq ▊▊"—was captured not at the Zubaydah safehouse, but at the ▊▊▊▊ house, which is also known in some government documents as the ▊▊ house. *Compare* JA 1574 (summary noting that interviewee captured at ▊ location, which is the ▊▊▊▊ house, JA 1593), *with* JA 1593 (▊ was code used for ▊▊ house, ▊▊

▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊▊

SECRET//NOFORN



. The FBI report was thus mistaken in stating that the

interviewee "Abdul Razzaq ▮▮▮ was captured at the ▮▮▮▮▮▮▮ house, JA

1574.[15] The conclusion that the FBI interview was with petitioner is supported by the

fact that the interviewee stated that he was born in July 1970, JA 1580, which is the

birth month and year that petitioner claims to this very day, JA 197.[16]

    The district court thus did not clearly err in finding it implausible that there was

another "Abdul Razzaq" captured at the ▮▮▮▮▮▮ house the same night as

petitioner who happened to have the same photograph ▮▮ attached to his name

and happened to claim the same birth month and year as petitioner. Petitioner's

suggested version of events "piles coincidence upon coincidence upon coincidence"

---

[15] Petitioner is wrong to suggest (Br. 15) that the interview must have been with
someone from the ▮▮ house because it assertedly took place "immediately following
the raid at the ▮▮ house." The ▮▮ house was raided in the early morning hours of
March 28, 2002, JA 88, and the interview took place almost 48 hours later, JA 1574.
Moreover, the FBI report establishes that the individuals interviewed were captured at
numerous locations. *See, e.g.*, JA 1567 ▮▮, JA 1570 ▮▮, JA 1575 ▮▮; *see also* JA
1593-94 (specifying the locations for each code).

[16] The biographical information the interviewee claimed—his birthday, that he was
from "La Gilat, Libya," JA 1580, that his parents' names were ▮▮ and ▮▮▮ and
that his brother's name was ▮▮▮, JA 1574—also match the story petitioner told
interviewers, fact for fact, during the first two years of his detention. *See, e.g.*, JA 1754;
JA 516-17; *cf.* JA 603. Although petitioner asserted in district court that he was
mistreated during the period when these statements were made, the government
argued that petitioner's claims of mistreatment were not credible. JA 1455-60. The
district court never addressed the credibility of petitioner's mistreatment claims and
did not expressly rely on petitioner's statements made where there were claims of
mistreatment.

SECRET//NOFORN

and is not credible. *Uthman*, 637 F.3d at 407; *see also Latif v. Obama*, 677 F.3d 1175, 1194 (D.C. Cir. 2012); *Barhoumi*, 609 F.3d at 427.[17]

## 2. The district court did not clearly err in finding the al-Suri diary to be reliable.

This Court has already held in *Barhoumi* that the al-Suri diary is reliable based on (1) the place it was recovered—*i.e.*, the safehouse where Zubaydah and petitioner were captured, JA 1857; (2) the fact that the diary displays "first-hand knowledge" of the operations of Zubaydah's force; and (3) the diary's "numerous consistencies" with the record there and with "verifiable real-world events," 609 F.3d at 432; *see also id.* at 427-31. Petitioner nonetheless contends (Br. 56-59) that this case is not controlled by *Barhoumi* because, according to petitioner, the diary was written not by Abu Kamil al-Suri but by ▮▮▮▮▮▮▮▮, who went by the name ▮▮▮▮ JA 1643. The district court fully considered this argument, *see* JA 990-1000, and did not clearly err in rejecting it.

Petitioner does not explain why it matters whether ▮▮▮ was the author of the diary, and the precise identity of the author does not appear to be relevant where, as *Barhoumi* held, the diary has "endogenous and exogenous indicia of reliability." 609

---

[17] Petitioner also contends (Br. 16-17 n.4) that he was not the "Abdul Razzaq" in the FBI interview because the interviewer did not note that the interviewee had any injuries, *see* JA 1574-75; JA 94-95, and yet petitioner's affidavit states that a Pakistani guard "hit [him] very hard in the stomach area with his rifle" as he was being led from the safehouse to the police wagon, resulting in a three-day hospital stay. JA 199. This argument is contradicted by the compelling evidence discussed above and by petitioner's prior statements that his stomach injury and hospital stay took place later. *See* JA 160, 165 (injury in Lahore) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

SECRET//NOFORN

F.3d at 429. In any event, petitioner's argument that ▇▇▇ was the diary author is contradicted by the diary itself. In the author's listing of the members of the Zubaydah force, the author listed "myself, Abu Kamil al-Suri," on one line and ▇▇▇ al-Din al-Muhtassib al-Suri" on another line. JA 1919. In an earlier entry, the author again made the distinction between the author and ▇▇▇ clear, stating that the group then included "myself" *and* ▇▇▇▇▇▇▇▇▇▇" JA 1883; *see also* JA 1858, 1861, 1884, 1894 (referring to ▇▇▇ in the third person).[18]

Moreover, ▇▇▇ stated in an interview that one of his fellow safehouse dwellers was someone named ▇▇▇▇▇▇▇▇▇ (a Syrian)," JA 1647, and at no point did ▇▇▇ suggest that he, too, goes by the name ▇▇▇▇▇▇. Furthermore, ▇▇▇ stated that he "did not have a good relationship with ▇▇▇ because [he] once made fun ▇▇▇▇ for having thinning hair on his head," JA 1660. Significantly, the diary author notes that he himself has thinning hair, JA 1891, underscoring the conclusion that the ▇▇▇ that ▇▇ identified was the author of the diary.[19]

To the extent that petitioner also argues (Br. 58-59) that the diary is unreliable because it includes "the confused reflections of a teenager," that argument fails. This

---

[18] The author also references an "Abu Kamil" on several occasions, but that "Abu Kamil" is almost always discussed in the same breath as the author's parents and brother, suggesting he may be a relative with a similar name. JA 1882-83, 1892, 1895, 1915.

[19] Petitioner also appears to argue (Br. 25-27, 57, 59) that ▇▇ must be the author of the diary because "Al-Suri" means "The Syrian," JA 1562, and ▇▇ is Syrian, whereas petitioner asserts that Abu Kamil is not. But ▇▇ himself stated that the ▇▇ ▇▇ discussed above was Syrian, JA 1647, 1659, and thus this argument does not undermine the other evidence establishing that ▇▇ was not the author of the diary.

SECRET//NOFORN

SECRET//NOFORN

Court in *Barhoumi* was aware of the diary author's occasional personal reflections, and held that do not render the author's description of the activities of Zubaydah's force inaccurate.

## II.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DECLINING TO ORDER A NEW HEARING OR GRANT THE WRIT BASED ON ALLEGED PROCEDURAL IRREGULARITIES.

Petitioner contends (Br. 43-56) that alleged procedural irregularities rendered his hearing unfair. As we explain below, the district court did not abuse its discretion in concluding that a new hearing or a grant of the writ were not warranted, JA 1346.

### A.  The government's handling of potentially exculpatory evidence did not render petitioner's hearing unfair.

Petitioner argues (Br. 44-48, 53-56) that the government failed to provide exculpatory evidence pertaining to two detainees on whose statements it relied. Although petitioner cites (Br. 55-56) criminal-law cases governing the treatment of exculpatory evidence, this Court has held that habeas proceedings are not "'subject to all the protections given to defendants in criminal prosecutions.'" *Al Alwi v. Obama*, 653 F.3d 11, 19 (D.C. Cir. 2011) (quoting *Al-Adahi v. Obama*, 613 F.3d 1102, 1111 n.6 (D.C. Cir. 2010)). Instead, the government's obligations concerning exculpatory information are governed by the district court's case management orders, which this Court has "uph[eld] . . . as 'consistent' with *Boumediene*." *Al-Madhwani v. Obama*, 642 F.3d 1071, 1077 (D.C. Cir. 2011) (quoting *Bensayah v. Obama*, 610 F.3d 718, 724 (D.C. Cir. 2010)). As we explain below, the district court properly concluded that the

SECRET//NOFORN

government complied with the relevant case management orders, JA 1291 ¶ I.E (August 25, 2010, case management order); JA 1268-69 ¶ I.D (prior case management order), *as amended by* JA 1274, 1283-85.

1. Petitioner first complains (Br. 45) that the government withheld exculpatory information concerning Musa'ab al Madhwani (ISN 839). Although the government sought to file three highly classified documents of a potentially exculpatory nature concerning al Madhwani with the court *ex parte* in lieu of any obligation it may otherwise have had to disclose those documents to petitioner's counsel, JA 1489-91, that procedure fully comports with this Court's decisions in *Obaydullah v. Obama*, 688 F.3d 784, 795-96 (D.C. Cir. 2012), and *Khan v. Obama*, 655 F.3d 20, 30-32 (D.C. Cir. 2011); *see also Mousovi v. Obama*, 2013 WL 97355, at *3-7 (D.D.C. 2013). Moreover, any harm flowing from counsel's inability to view the three documents in question has been fully remediated by the government's decision to withdraw reliance on al Madhwani's statements, rendering them irrelevant to the proceedings JA 1305-06. *See Al-Bihani v. Obama*, 590 F.3d 866, 881 (D.C. Cir. 2010).

Petitioner also contends (Br. 45-46) that the government committed "malfeasance" because it assertedly "knew prior to the start of the hearing" that the statements by al Madhwani upon which it relied during the first three days of the hearing "were not credible." The government, however, stood by the reliability of al Madhwani's statements throughout the district court litigation. It withdrew reliance on those statements after the first three days of the hearing not in "acknowledge[ment of]

SECRET//NOFORN

its malfeasance," as petitioner contends (Br. 45-46), but to lay to rest an unnecessary dispute over the discoverability of highly classified information. JA 1306.

Petitioner's related argument (Br. 45) that the government "knew that neither the judge nor [p]etitioner's counsel were aware" during the first three days of the hearing that the *ex parte* motion contained exculpatory information is also meritless. As explained in a declaration submitted in district court, the government believed that it had adequately communicated the exculpatory nature of the *ex parte* filing to the court because the motion itself expressly stated that it concerned potentially exculpatory information, and the government had called the court's law clerk approximately four days before the hearing to emphasize that the court needed to review it. JA 1491, 1493-94. The government later learned that the court did not interpret these communications in the same way, but that does not mean that the government was acting in "bad faith," as petitioner asserts (Br. 45).[20] Moreover, the government took steps after the hearing to ensure that the court would not issue a decision without addressing the *ex parte* filing. JA 1495.

Finally, petitioner's argument (Br. 45) that the government's reliance on al Madhwani's statements during the first three days of the hearing rendered his hearing unfair because it "forced counsel for [p]etitioner . . . to focus on [those] statements and [related] documents" is without merit. Petitioner was granted all of the relief he

---

[20] Petitioner makes the wholly unsupported assertion (Br. 53-54) that the government claimed that its attorneys "could [not] remember" during the hearing that the *ex parte* documents were exculpatory. The government never made such a claim.

SECRET//NOFORN

~~SECRET//NOFORN~~

requested to remediate any potential harm flowing from this circumstance: the court granted his counsel the opportunity to present one hour of supplemental closing arguments about the impact of the government's withdrawal of reliance on al Madhwani's statements. *See* JA 1112-14.[21]

2. Petitioner next argues (Br. 46-48) that the government withheld exculpatory information during the hearing concerning the reliability of Muhammed Noor Uthman (ISN 707). As explained *supra* on page 3, however, this Court lacks jurisdiction over this challenge because petitioner did not file a notice of appeal from the district court's order rejecting this argument, JA 1221-23.

In any event, the district court properly concluded that the government complied with the relevant case management orders because the documents in question were not "reasonably available to the Government" and "do[] not even appear . . . [to] support the substantive proposition[s] for which petitioner cite[d] them." JA 1222. Petitioner's only retort (Br. 47) is that the government should have known about two documents filed in Uthman's military commission case (one of which was dated after the denial of habeas here, *see* JA 1968-88) because two attorneys from the Department of Defense were present for petitioner's hearing. But those attorneys, assigned to assist with petitioner's habeas litigation, did not review military

---

[21] In the event that this Court remands this case to the district court for further proceedings, the government should be allowed to resubmit its *ex parte* motion to the court for consideration in light of *Obaydullah* and *Khan*, which had not been decided when the court made its decisions concerning the government's *ex parte* motion.

commission files for information not otherwise available to them. The government

thus fully complied with the case management orders. *See* JA 1291 § I.E (August 2010

order) (requiring disclosure of "evidence contained in the material reviewed in

developing the return for the petitioner, and in preparation for the hearing for the

petitioner"); JA 1284 § I.D.1 (December 2008 order) (defining "all reasonably

available evidence" that must be disclosed to mean "evidence contained in any

information reviewed by attorneys preparing factual returns for all detainees,"

including "evidence the government discovers while litigating habeas corpus

petitions" filed by military detainees).[22]

    In any event, any harm stemming from the fact that petitioner was not aware of

the documents in question at the time of the trial was remediated later when he asked

the district court to reverse its decision on the basis of the new documents, JA 1951-

88. The district court held that the documents did not undermine its conclusion that

petitioner is lawfully detained under the AUMF, JA 1222, and, as explained *supra* on

pages 33-36, that conclusion was proper.

---

[22] Relatedly, petitioner argues (Br. 46-47) that the government misrepresented at the
hearing that Uthman is reliable and had claimed good treatment. As explained above,
however, the government was not aware of the military-commission documents at the
time of the hearing, and, as explained *supra* on pages 34-36, the government stands by
the reliability of Uthman to this very day.

SECRET//NOFORN

44

## B.    Petitioner's hearing was meaningful and fair.

Petitioner alleges that his hearing was unfair for a variety of other reasons, none

of which has merit.

1. Petitioner first points out (Br. 49) that on September 3, 2010, prior to the

date the government filed its final amended factual return, the government withdrew

reliance on a summary of a March 2006 interview ████████████████████████

████████████ which appears at JA 142-45. *See* JA 1380-82. The government

withdrew reliance on the summary because a tape recording of the interview it

summarized was transcribed in March 2010, and the transcription revealed that the

summary contained some inaccuracies. *See* JA 176.

Petitioner contends that the transcript proves that the government "provided

knowingly false information to the court and counsel in its 'summary,'" Br. 21-22, and

that the summary was "[f]raudulent," Br. 48. But the government withdrew reliance

on the summary after it learned of the issues concerning its completeness and

accuracy, and its reliance on the summary prior to its discovery of those issues was

not inappropriate. In any event, any harm flowing from the government's reliance on

the summary prior to the transcription was fully remediated when the government

withdrew reliance on the document prior to filing its final amended return.[23] *Cf. Al-*

*Bihani*, 590 F.3d at 881.

---

[23] On September 17, 2010, pursuant to a court order, the government disclosed to
petitioner a list of other reports involving the interpreter who participated in the

2. Petitioner next contends (Br. 49) that the "government changed its entire theory" of the case "shortly before the actual hearing," by which petitioner apparently means (Br. 23-24) when the government filed its final amended factual return on September 10, 2010. The final amended factual return did not, however, reflect a sea change in theories. Long before September 2010, the government alleged, relying in part on the al-Suri diary, that petitioner was captured at the Zubaydah safehouse, where Zubaydah was training inhabitants for terrorist operations. *See, e.g.*, JA 1371-79. The government likewise alleged that petitioner was known by the name Usama al-Jaza'eri or a variation thereof and that he was in Afghanistan prior to his stay at the safehouse. JA 1374, 1378.

In any event, the district court's final case management order authorized the government to file an amended factual return, JA 1290, and thus the government was entitled to update its return based on new evidence that had come to light in the year that had passed since it had last supplemented its return. If petitioner needed additional time to file his amended traverse based on the alleged newness of the

---

summary described above. JA 177-78. The district court did not expressly rely on those reports, and this brief has not relied on them. Petitioner contends (Br. 22) that the government should also have disclosed reports involving the same interrogator who participated in the summary above, but the interviewer was ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ and thus there was no need to make any further disclosures.

~~SECRET//NOFORN~~

theories in the government's amended factual return, he could have requested an extension on those grounds, but he did not do so.[24]

After the government filed its final amended return, petitioner sought postponement of the merits hearing from October 2010 based, in part, on the alleged newness of the theory contained in the amended return. JA 1293-95. The district court granted this relief during a status conference on September 21, 2010, rescheduling the hearing for December 2010. Significantly, petitioner subsequently filed a motion seeking to return the hearing to October 2010 based on petitioner's representations that he would be prepared for an earlier hearing date, JA 1297-99, and that motion was denied, JA 1259 (Minute Order of Oct. 4, 2010). Petitioner's representations make clear that he was not prejudiced by any alleged newness of the theories presented in the government's final amended return. *Cf. Al Alwi*, 653 F.3d at 22 (district court denial of continuance may not be disturbed unless petitioner shows "actual prejudice" (internal quotation marks omitted)).

3. Petitioner further contends (Br. 50) that the government engaged in "[g]amesmanship" by providing the court and counsel an exhibit binder on December 10, 2010. Prior to that date, the government had filed its exhibits as unnumbered attachments to other filings. Each exhibit had begun with a page identifying the title of the document, and each set of attachments had been preceded by a list of the titles

---

[24] Petitioner sought additional time for filing his amended traverse, but not on the ground that the final amended return presented a "new theory." JA 1301-03.

of the attached exhibits. *See, e.g.*, JA 1440-42. The December 10 binder collected the exhibits from these past filings upon which the government was actively relying, assigned each exhibit a number, and placed the exhibits in numerical order. An index to the binder identified the number and the title of each exhibit. *See* JA 1462-66.

The government provided this exhibit binder for the court's and counsel's convenience to make it easier to locate the exhibits that the government would be referring to during the merits hearing. Petitioner complains (Br. 50-51) that the numbering system made it difficult for his counsel to locate her notes on the exhibits the government addressed at the hearing, but counsel was not substantially burdened. In the absence of the exhibits binder, the government would have referred to its exhibits by title, and petitioner could easily and quickly determine the title corresponding to each exhibit number by consulting the index to the exhibit binder. Moreover, counsel for the government frequently referenced its exhibits using not only the exhibit number but also the document title. *See, e.g.*, JA 737. In addition, petitioner had three full days prior to the beginning of the merits hearing on December 14, 2010, to organize her files and make necessary notations to account for the exhibit numbers.

In any event, the district court accommodated petitioner's concerns. When counsel raised this issue at the beginning of the merits hearing, the court suggested that the government provide petitioner lists of the documents it would be referring to for each of the disputed factual issues, as designated prior to the hearing, and the

<del>SECRET//NOFORN</del>

court recessed for an hour for lunch and for petitioner's counsel to organize her files, JA 708-10. The government provided petitioner those lists. *See* JA 653-55. When petitioner raised this issue again on the second day of the merits hearing, the court again fully considered petitioner's concerns. JA 887-903. The court determined that there was no need to postpone the hearing scheduled for that day, but it determined, "in an abundance of caution," that it would delay the third day of the merits hearing (closing arguments) by a day in light of petitioner's concerns. JA 902, 956. These accommodations were more than adequate and not an abuse of discretion. *Cf. Al Alwi*, 653 F.3d at 22.[25]

4. Petitioner also argues (Br. 49-50) that the government engaged in "[g]amesmanship" in filing amendments and supplements to its factual return. As previously noted, the government filed its final amended return on September 10, 2010, in accordance with the district court's final case management order, *see* JA 1290. Factual returns consist of two parts: a narrative and supporting exhibits. As the government explained in district court, the "Amended Narrative" filed with the September 2010 amended return was intended to supplant and replace the two prior narratives filed in this case—the initial narrative filed on November 26, 2008, *see* JA 1355-69, and the supplemental narrative filed on July 30, 2009, *see* JA 1371-79. JA

---

[25] Relatedly, petitioner faults (Br. 50-51) the government for opposing his request made the week before the hearing to bring a new attorney on board. The basis for the government's objection, however, was limited and reasonable: the government objected only to the extent that the attorney would participate without filing a notice of appearance. JA 890.

49

SECRET//NOFORN

1453 n.3. The exhibits filed with the amended return, by contrast, supplemented the exhibits previously filed.

Petitioner is therefore wrong (Br. 36, 50) that he was required to respond to four narratives in his amended traverse, and petitioner does not explain why he was harmed by the fact that the amended return did not include as attachments all of the exhibits that had already been filed. Moreover, petitioner was entitled to seek relief from the district court prior to filing his amended traverse if he thought that responding to the amended return was overly burdensome. The only relief petitioner sought on this basis, however, was a postponement in the merits hearing, JA 1293-95. As explained *supra* on page 47, that relief was granted, and petitioner subsequently sought to return the hearing to October 2010 based on the representation that his counsel could be prepared for a hearing at that time. Petitioner therefore suffered no prejudice as a result of the government's September 2010 amended factual return. *Cf. Al Alwi*, 653 F.3d at 22.[26]

---

[26] Contrary to petitioner's assertion (Br. 50), the government did not file a substantively new "amended" return at the hearing. Instead, on December 14, 2010, the government presented the court and counsel with an amended narrative that was identical to the September 2010 amended narrative, except that, for the benefit of the court and opposing counsel, each exhibit citation was supplemented with a citation to the corresponding exhibit number from the government's exhibit binders. *Compare, e.g.*, JA 1409 ¶ 16 (filed Sept. 10, 2010) (citing "Al-Suri Diary,                    at 13-14"), *with* JA 550 ¶ 16 (version of Dec. 14, 2010) (citing "*Ex. 136*, Al-Suri Diary,                    at 13-14" (emphasis added)). There was no substantive change in the narrative, and no exhibits were added to the factual return.

SECRET//NOFORN

5. Petitioner's final contention (Br. 51-53) is that the district court judge "seemed to exhibit an irrational bias against [his] counsel." On that basis, petitioner requests (Br. 73-74 n.32) that the case be assigned to a different judge in the event of any remand. Petitioner cites (Br. 52) a statement by the judge that petitioner's counsel, after complaining about the exhibit numbering, was a "mysterious practitioner of the art of the law." JA 889. That statement hardly establishes bias warranting a new hearing or the assignment of a new judge on any remand.

Although the district court was surprised by petitioner's complaints about the numbering of the government's exhibits, noting that they were "unheard of," JA 901, the court devoted substantial time to understanding counsel's concerns, *see* JA 703-11, 887-903, and it bent over backwards to accommodate those concerns. *See supra* pp. 48-49. Moreover, a reading of the transcript as a whole demonstrates that the district court gave petitioner a full and fair opportunity to present his arguments. The court heard arguments spanning four days, during which it considered over 200 exhibits submitted by petitioner and the government. There was no bias here.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district court.[27]

---

[27] In the event that this Court reverses and remands, the district court should be allowed to consider new evidence submitted by the parties. *See Latif v. Obama*, 677 F.3d 1175, 1176, 1192-93 (D.C. Cir. 2012); *Bensayah*, 610 F.3d at 727.

SECRET//NOFORN

Respectfully submitted,

STUART F. DELERY
    Principal Deputy Assistant
    Attorney General

IAN HEATH GERSHENGORN
    Deputy Assistant Attorney General

ROBERT M. LOEB
SYDNEY FOSTER
    (202) 616-5374
    Attorneys, Appellate Staff
    Civil Division, Room 7528
    U.S. Department of Justice
    950 Pennsylvania Ave., N.W.
    Washington, D.C.  20530

FEBRUARY 2013

SECRET//NOFORN

# CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C), that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,308 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Cir. R. 32(a)(1). I further certify that the foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in Garamond 14-point type.

Sydney Foster
Counsel for Respondents-Appellees

SECRET//NOFORN

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2013, I filed and served the foregoing

Final Brief for Respondents-Appellees by delivering an original and eight paper copies

for the Court, and two paper copies for counsel of record listed below, to the Court

Security Officer.

H. Candace Gorman
Law Office of H. Candace Gorman
220 South Halstead
Suite 200
Chicago, IL 60661


Sydney Foster
Counsel for Respondents-Appellees

SECRET//NOFORN

SECRET//NOFORN

# ADDENDUM

SECRET//NOFORN

## ADDENDUM: TABLE OF CONTENTS

Authorization for Use of Military Force,
Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001) ................................................ Add. 1

National Defense Authorization Act for Fiscal Year 2012,
Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562 (2011) ........................................ Add. 1

**Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(a), 115 Stat. 224, 224 (2001).**

[T]he President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

**National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562 (2011).**

Sec. 1021. Affirmation of Authority of the Armed Forces of the United States to Detain Covered Persons Pursuant to the Authorization for Use of Military Force.

(a) In General – Congress affirms that the authority of the President to use all necessary and appropriate force pursuant to the Authorization for Use of Military Force (Public Law 107-40; 50 U.S.C. 1541 note) includes the authority for the Armed Forces of the United States to detain covered persons (as defined in subsection (b)) pending disposition under the law of war.

(b) Covered Persons – A covered person under this section is any person as follows:

. . .

(2) A person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces.

(c) Disposition Under Law of War – The disposition of a person under the law of war as described in subsection (a) may include the following:

(1) Detention under the law of war without trial until the end of the hostilities authorized by the Authorization for Use of Military Force.

. . . .

SECRET//NOFORN