Page 120

1          THE COURT:  What's the consequence of this? So what if
2     it is? Let's assume you are right and the Government has messed
3     up and they are the same person. What's the consequence?
4          MS. GORMAN:  The consequence is, your Honor, is that
5     ██████████ in his 28 page interrogation says he only just met
6     ██████████ that he was working on writings, historical
7     writings and computer writings on various subjects relating to a
8     famous jihadist, and I think that this diary shows that it is a
9     mixture of fact and fiction and it is not  really a diary per
10    se. It is a young person's fantasy, for lack of a better word.
11    He wants to know ██████████ better. The interrogation shows he
12    doesn't know him all that well, but they also have him traveling
13    with him which shows maybe he is using some of those counter
14    interrogation techniques because even though we know he traveled
15    with ██████████ for some time period, he never mentions that
16    in his interrogation.
17          What he says is he traveled in all those places, but he
18    doesn't mention ██████████ In fact, he mentions ██████████
19    his meeting him for the first time in March of 2002 at the
20    Faisalabad guesthouse. Now we know that can't be true because we
21    know he was in the Lahore guesthouse with ██████████ because
22    one of the stories that he reports on where ██████████
23    supposedly is talking about the original plan for 9/11 using
24    remote controlled planes actually took place at the Lahore
25    house, not at Faisalabad.

JA000994

Page 121

1      THE COURT:  If ████ was al-Suri, how could he know the

2   things that are in the al-Suri diaries that Court of Appeals has

3   held are independently verified by other sources? How could he

4   have known if he had just met him?

5      MS. GORMAN:  I am saying he couldn't have just met him,

6   your Honor, that that's got to be a lie because he says I didn't

7   meet him until he walked into the guesthouse on March 16th or

8   whatever, but in his other interrogation he said that he met him

9   in Lahore.

10      THE COURT:  Okay. Let's go to the next step. If

11   al-Suri -- excuse me -- if ████ is al-Suri and he isn't a new

12   friend of or associate of ██████████ and he has been traveling

13   around with him and he is the one who put together this diary so

14   to speak, what's the consequence of that to whether or not your

15   client is the person identified in the diary as Usama

16   al-Jaza'iri?

17      MS. GORMAN:  Well, your Honor, I think he made up this

18   whole group as some grandiose concept, this Abu Zubaydah group,

19   this gang, this force; and he doesn't even know these

20   individuals well enough to do that. He has picked up on these

21   names. I will just point out a couple --

22      THE COURT:  So the Court of Appeals just got totally

23   hoodwinked?

24      MS. GORMAN:  I don't think it was hoodwinked, your

25   Honor. I don't think there was enough investigation. The

JA000995

UNCLASSIFIED//FOR PUBLIC RELEASE

1    Government has not been very forthcoming about who this person

2    is.

3            THE COURT:  You read the Court of Appeals opinion in

4    Barhoumi?

5            MS. GORMAN:  Yes.

6            THE COURT:  So did I. The Court of Appeals was

7    satisfied --

8            MS. GORMAN:  I understand.

9            THE COURT:  -- as was Judge Collyer that those diaries

10   were sufficiently reliable because of independent corroboration

11   of events that are accounted for in those diaries that they

12   could be relied upon by the Government to hold Barhoumi

13   lawfully as a detainee in the case.

14           Now, for this Court to reject wholesale what the Court

15   of Appeals has said and my colleague Judge Collyer said as it

16   relates to the liability of al-Suri, you better have something

17   real specific, real good and I am not hearing it. I am not

18   hearing it.

19           MS. GORMAN:  Okay. Let me talk about a couple of the

20   issues that I think relate to this person being the same as this

21   teenager that was the computer guy. If you look at pages 49 and

22   54, the writings reflect that this individual ███ al-Suri had

23   severe emotional problems and it is reflected all through the

24   diary. He is talking to himself. He is --

25           THE COURT:  ███ had --

JA000996

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 123

1        MS. GORMAN:  Yes.

2        THE COURT:  ███████  the computer guy?

3        MS. GORMAN:  The writer of the diary, al-Suri.

4        THE COURT:  Wait a minute. Are you conflating the two?

5        MS. GORMAN:  Just as the Government has done with my

6    client being al-Jaza'iri. I mean I think this is the individual

7    but I will backtrack and I will just call him al-Suri.

8        THE COURT:  Slow down. Hold on. What is your basis to

9    believe that ██████ who is was interviewed by the Government as a

10   computer specialist in the guesthouse has psychological

11   problems? He is not in GTMO. What is your basis that ██████ not

12   al-Suri, has psychological problems? What are you relying on?

13       MS. GORMAN:  The fact that his whole interrogation is

14   made up.

15       THE COURT:  What's your basis to contend that

16   everything he said in the interrogation that he was given ██████

17   ████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████ that

19   everything he said in that was false?

20       MS. GORMAN:  Your Honor, first for one thing he has

21   himself traveling to Afghanistan with --

22       THE COURT:  Actually let me stop you right there.

23       MS. GORMAN:  Okay.

24       THE COURT:  I hope you would agree with me, but you

25   might not, that the agents, intelligence officers who

JA000997

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 124

1    interviewed him, if they thought everything he said was false

2    and unreliable, they would have indicated either in the memo or

3    the IR or whatever or somewhere else that that was their

4    assessment. You would agree with me on that, wouldn't you?

5           MS. GORMAN:  I would.

6           THE COURT:  Right. Because it is not in their

7    interest --

8           MS. GORMAN:  No.

9           THE COURT:  -- as professional intelligence officers or

10   law enforcement officers to be circulating in the intelligence

11   community false information. Right?

12          MS. GORMAN:  Correct.

13          THE COURT:  Right. Is there any indication in the

14   records that any intelligence officer or military investigator

15   or FBI, whatever, thought that everything or a large part of

16   what ▮▮▮▮ was saying was false? Is there anything to indicate

17   that?

18          MS. GORMAN:  The only thing that indicates it is that

19   the two interrogations of him contradict each other in I think

20   substantial part.

21          THE COURT:  Well, let me go one step at a time. As a

22   result of the second interrogation, is there anything in the

23   record to indicate that the agents/investigators who conducted

24   that one after comparing it to the first one concluded this is

25   just false, this doesn't make any sense?

JA000998

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 125

1          MS. GORMAN:  No, your Honor. I am not saying that they

2    are doing something improper.

3          THE COURT:  Well, you certainly are implying it.

4          MS. GORMAN:  No, your Honor.  I am not. I am just

5    saying that these two documents do contradict each other and I

6    think that's why they did the second interview. The second

7    interview was a few days later and they are trying to clarify

8    different points and the points they are clarifying are

9    contradicted the first time. So I think they know that there is

10   some confusion going on.

11         THE COURT:  Between now and your closing argument

12   Friday, I will take a look at your written analysis and

13   description of this because we are just not making a lot of

14   headway here orally on this point.

15         MS. GORMAN:  Okay.

16         THE COURT:  You have now been going an hour and a half

17   just about. Do you have anything else?

18         MS. GORMAN:  Your Honor, if I just look through my

19   notes briefly.

20         THE COURT:  Take a look.

21         MS. GORMAN:  Thank you.

22         MS. HUSSEY:  Your Honor, during that brief break, I

23   would like to point out for the record that in Petitioner's

24   Traverse -- I want to point out for the record in her Traverse

25   she argues based on evidence that is not in the record that this

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 126

1    is -- she attempts to conflate these two different people into

2    one utilizing that when you read this section of the Traverse,

3    you will see a book she claims she has read written by an

4    individual named Sheik Abdullah Azam, three books to be specific

5    that she identifies -- The Lofty Mountain, I believe there is

6    Signs of the Merciful Jihad and --

7              THE COURT:  I will look it up.

8              MS. HUSSEY:  But they are not in the record. The books

9    are not in the record and we object to any kind of argument on

10   that basis --

11             THE COURT:  If they are not in the record, if they are

12   not part of the record, then she won't be able to rely on those

13   in her closing argument on Friday. Go ahead.

14             MS. GORMAN:  Your Honor, the last document I would like

15   to look at is ██████████████

16             THE COURT:  All right. ██████

17             MS. GORMAN:  This is a document that was recently given

18   to me in a less redacted form by the Government.

19             THE COURT: ████ This is detainee ████ right, not

20   Government ██████

21             MS. GORMAN:  No, this is Plaintiff's 71.

22             THE COURT:  All right.

23             MS. GORMAN:  Your Honor, this ████████████████████

24   ████████████████████████████████████████████████

25   ████████████████████████████████████████

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 127

1  ████████████████

2     THE COURT:  What?

3     MS. GORMAN: ████████████████

4  ████████████████

5     THE COURT:  All right.

6     MS. GORMAN:  And it is ████████████

7  ████████████████

8  ████████████████

9  ████████████████

10 ████████████████

11 ████████████████

12 ████████████████

13 ████████████████

14     THE COURT:  Let's get a couple things clear. What's the

15  date of this document that it was created? It is ██████ We know

16  that.

17     MS. GORMAN:  Correct, your Honor. ████████████

18 ████████████████

19     THE COURT:  That's when it was --

20     MS. GORMAN:  This was ████████████

21     THE COURT:  Okay. So ████████

22     MS. GORMAN:  Yes.

23     THE COURT:  It was ████████████

24     MS. GORMAN: ████████████████████

25 ████████

JA001001

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 128



```
 1        THE COURT:
 2        MS. GORMAN:
 3        THE COURT:
 4        MS. GORMAN:
 5        THE COURT:  All right.                    Do you
 6    remember?
 7        MS. GORMAN:  I don't believe
 8        THE COURT:  Okay. But your point is, well,
 9
10
11        MS. GORMAN:  Correct, your Honor,
12
13
14        THE COURT:                do you remember?
15        MS. GORMAN:  I am looking at -- I don't see
16        THE COURT:
17
18        MS. GORMAN:  They don't
19
20
21
22
23
24        THE COURT:  All right. That's your last one?
25        MS. GORMAN:  Yes.
```

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 129

1        THE COURT:  We are going to take a ten-minute break for

2    Patty who has been working awfully hard here and when we come

3    back, I am going to give the Government about ten minutes,

4    that's about it, for whatever rebuttal for what's just been

5    said. Then we will schedule the closing arguments, so to speak,

6    for Friday. We should be able to break at that point. So

7    hopefully by about 4 o'clock or so we will be done.

8        MS. GORMAN:  Thank you, your Honor.

9        MS. HUSSEY:  Your Honor, if I could just point out for

10    the Court's knowledge, a lot of the arguments that Petitioner's

11    counsel just raised here in response to issue number three

12    really pertain to the Respondents' issue number four that we are

13    not planning to address at the Merits Hearing. We did fully

14    brief that.

15        THE COURT:  You will be allowed to, both sides will be

16    allowed if they wish to discuss issue four on Friday.  That's up

17    to you decide how much of your time to apportion for that

18    purpose. You may -- I mean obviously it is in the pleadings so I

19    have got each side's perspective on that issue, but if you want

20    to put ten minutes in or whatever, that's up to you to make your

21    own decision as advocates how you want to apportion your time

22    there.

23        But you know -- I think by now as a result of the

24    dialogue we have been engaged in over the last two days now both

25    sides I think have a clearer, I hope it is a clearer sense of

JA001003

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 130

1    what's important and what's not or what's less important and

2    what's really not important and so that will hopefully help you

3    focus and streamline your arguments as to what you think -- what

4    you think individually is really important, what's a little less

5    important and what's really not, it is kind of peripheral stuff.

6    So we will see you in about ten minutes or so.

7         (Recess.)

8         MS. HUSSEY:  All right.  With ten minutes, I am just

9    going to dive right in and move fast.

10        THE COURT:  That's good.  Remember you get to do

11   closings Friday too so it is not like you don't get another bite

12   at this apple. Both sides do.

13        MS. HUSSEY:  Yes, your Honor. Petitioner claimed just a

14   minute ago that her client is not the Abdul Razak that Special

15   Agent ████████ interviewed on April 1st, 2002. That's not

16   true. We can prove that's not true in fact. If we could direct

17   the Court to Petitioner's Exhibit No. 23. I not sure if you have

18   it front of you but I can pass it up.

19        THE COURT:  Petitioner's exhibit?

20        MS. HUSSEY:  Petitioner's Exhibit 23. This is the

21   Petitioner's declaration. It is not signed but it was filed in

22   the -- as an attachment to the Traverse.

23        THE COURT:  Okay. I have got that right here.  Go

24   ahead. 23? Go ahead. I will get to it.

25        MS. HUSSEY:  The second bullet on that page, on the he

JA001004

Page 131

1    very first page of this declaration, the Petitioner says that

2    his date of birth is July 1970. Right? If we could pull up our

3    own Exhibit 23, it is ironic that they are the same numbers but

4    different binders, this is the counterterrorism report dated

5    April 1st, 2002, where you will find Special Agent ███████

6    ███████ interview of the Petitioner.

7            Now, as I mentioned before during Petitioner's

8    counsel's presentation, her exhibit of this report is not

9    complete. It doesn't contain the last few pages of the report

10   that detail the personal identifying information that is

11   associated with the 11 people that Special Agent ███████████

12   interviewed.

13           If we could go to page 16 of this document, you will

14   see the Petitioner's personal identifying information as he

15   reported to ████████████ listed specifically. He listed as the

16   second subject on that page Razak Abdul.

17           THE COURT: Yes.

18           MS. HUSSEY: Race is A.  I believe that stand for

19   Arab.  Sex is male. Date of birth July 1970. Now, in order for

20   Petitioner's story or claims here to be true, this mystery Abdul

21   Razak, the guy that was accidentally confused with her client,

22   has to have have known what the Petitioner's birth date was and

23   given it falsely to ███████████ or by some coincidence they

24   have to have the same birth month and year. But it is more than

25   that.

JA001005

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 132

1      As you will see here, the place of birth is listed as

2    Lajalat, Libya. If you go to the actual interrogation report of

3    the Petitioner which is on pages 10 and 11 of this document, you

4    will see he gives the place of birth is Lajalat, Libya. He talks

5    about his mother's name and his father's name. He gives a story.

6    It is not a huge story, but these personal identifying details,

7    they are the same details that he provides consistently

8    throughout the first 2 years that he is detained a GTMO. The

9    family story doesn't change.

10      Now, his story about his travels whether or not he went

11    into Afghanistan, what he was doing there, how he ended up at

12    the Faisalabad house, that consistently changes and it

13    consistently changes in a way that minimizes his own inculpatory

14    information. He is trying to back away from anything that gets

15    him into trouble.

16      But these personal identifying details, they stay the

17    same throughout the entire Lybian cover story. The first 2 years

18    that he is at GTMO he repeats them time and time again.

19      Now turn back to Petitioner's Exhibit No. 23 and if you

20    read that declaration, you will see that he swears supposedly

21    under oath that he tells the truth about every detail to every

22    interrogator over the entire course that he is detained except

23    for his name an his nationality.

24      Now, not only can we show that he -- that is not true,

25    he consistently changes his story about where he was and how he

JA001006

Page 133

1    ended up at the guesthouse. We can also show that the Petitioner

2    who claims he told everybody the truth all the time is still or

3    for some reason is still consistent, I don't know if it is true,

4    but consistent about his birth date. He is also consistent

5    throughout the first cover story about those family details.

6           Now, to believe that this is a different Abdul Razak,

7    that somehow some other individual got put into this room with

8    Special Agent ████ and he gave a name that the Petitioner

9    continued to use for two years and he gave a birth date that the

10   Petitioner still to this day continues to use and he gave family

11   identifying details that the Petitioner used for two years is

12   fantasy. It is Respondents' position that there is no doubt that

13   this interview that ████████ conducted is an interview of

14   the Petitioner, and in this interview he admits within 48 hours

15   of capture that he went to Afghanistan to fight.

16          He also in this interview changes his story as he sits

17   in front of Special Agent ██████ That's shown by the interview

18   itself and also by the ████ declaration which Respondents have

19   put into evidence.

20          The second piece of fancy that Petitioner is arguing

21   here related to this issue has to do with the al-Suri diary.

22   This two ████ argument that she is making, two ████ is

23   really one really is what she is saying, two different

24   individuals; a diarist and a computer specialist are one guy

25   doesn't make any sense. We outlined this specifically in our

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 134

1   response that was filed on November 18th. So the Court for

2   details can refer to that, but suffice it to say ████████

3   ██████████████████████████ the computer specialist,

4   refers in several different locations to ████ a/k/a Kamil. He

5   refers to him, provides details about the fact that he thinks he

6   is good friends with Abu Zubaydah. He provides details about the

7   fact that he was at the Faisalabad safe house and he identifies

8   himself separately by referring to him -- to that other person

9   in the third person.

10          Abu-Kamil al-Suri does the same thing when on page six

11   of the diary he refers to the computer specialist in the third

12   person. His name for him is Salah al-Din al-Muhtassib, but

13   that's accounted for by the fact that the ████ computer

14   specialist in his 302s admits he went by the name ████ So to

15   believe that these two different people are one is complete

16   fantasy.

17          The final argument I will make in response to her

18   al-Suri diary challenge is Petitioner's counsel argued that the

19   diary says it was captured as part of the Abu Zubaydah network.

20   That is true. Generally on like page one it is identified very

21   broadly, but on page five of the diary in the first paragraph

22   close to the first line of the first paragraph, it says that the

23   al-Suri diary was seized at the Abu Zubaydah -- at the same

24   house Abu Zubaydah was captured at. There is no question on that

25   point.

JA001008

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 135

1          Now, Petitioner's counsel also asserts an argument or

2     asserted an argument a moment ago that the IDs -- either the

3     Petitioner's own admissions about who was in the house with him

4     or the IDs, the numerous IDs we have seen from third party

5     witnesses that placed the Petitioner in the house with Abu

6     Zubaydah must be wrong. They must have gotten to know the

7     Petitioner by the name Abdul Razak in jail because they were all

8     in Pakistani custody together. That is also fancy because the

9     Petitioner specifically as we saw in exhibit I believe it was 57

10    identifies those individuals specifically as captured with him

11    at the Faisalabad house. That is after he has said there was no

12    problem with any of his statements. It is after he has admitted

13    and there is no controversy that he is supposedly telling the

14    truth. So he admits that they were from the house together.

15    Second, almost none --

16          THE COURT:  When was that interview?

17          MS. HUSSEY:  December 13th I believe 2004.

18          THE COURT:  So that's the one where he lists the people

19    who were there and in a block, it is like in a block form on the

20    document.

21          MS. HUSSEY:  Yes, your Honor.

22          THE COURT:  That's, like you said, that's at a point in

23    time where he is no longer raising questions about the accuracy

24    of what he says?

25          MS. HUSSEY:  Yes, your Honor. That is true.

JA001009

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 136

1  Additionally, 707, ████ and ████ the computer specialist all

2  corroborate each other by identifying the Petitioner at the

3  house where Abu Zubaydah and the Petitioner and others were

4  captured. There is no question that all of those identifications

5  refer to him as either Usama al-Jaza'iri or Abdul Razak and

6  there is no indication that they only learned his name was Abdul

7  Razak in jail. There is no indication there.

8       In fact, if the Court refers to Exhibit 35 in the

9  Government's binder, you will see that ████ specifically says

10 that he did not see the Petitioner at all while he was in jail.

11 ████ identifies him as Abdul Razak.

12      The Petitioner's arguments that Abdul Razak is a name

13 he only took after he was captured are nonsense and should be

14 disregarded by the Court as such. Finally, the Petitioner

15 attempts to undermine photo ████ with this interview that she

16 has put forward of ISN ████ It is Exhibit 8 in Petitioner's

17 binder and because photo ████ as I said earlier is unrebutted

18 and there has been nothing to challenge it, I think we should

19 talk about what this interview actually says.

20      THE COURT:  This is defense Exhibit 8, detainee

21 Exhibit 8?

22      MS. HUSSEY:  The Respondents in this case are not

23 relying on ISN ████ so you will not find an ████ interrogation

24 report in our exhibit binders.

25      THE COURT:  All right. It is an FBI document, a 302.

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001010

Page 137

1          MS. HUSSEY:  Yes. Petitioner's binder that we put

2     together is falling apart a little bit. This is again an FD 302

3     of ISN ▮▮▮ and I don't have this loaded into our computer

4     system; but as you will see in the first paragraph, it is an FD

5     302 interview report dated, the report itself is dated

6     11/6/2002.

7          THE COURT:  Right.

8          MS. HUSSEY:  It was conducted by a Special Agent for

9     NCIS. The name is not there but there is also a contract

10    linguist. Now, Petitioner points out that right here ▮▮▮ is

11    shown and ▮▮ who is known as ▮▮▮▮▮▮ thinks -- identifies

12    that picture as he thinks he saw this person in Khost and

13    identified him as possibly going by the name Usama. That's

14    consistent with what we have presented from ISN 839 where ISN

15    839 says that's Usama al-Libi or al-Jaza'iri and I saw him, 839

16    specifically says, in a valley outside of Khost. But that's the

17    same basic premise, different detainee.

18         Then you go to page three of this report and there what

19    you have is ISN 695. I think it is on the screen right here

20    where my pen mark is another photo of the Petitioner is shown to

21    ▮▮▮ and it is ISN -- it is labeled ISN 695. Here ▮▮▮ says I

22    also, you know, he also saw him at the Afghanistan/Pakistan

23    border and said he thought his name was Usama. He also saw him

24    at the Afghan/Pakistan border from earlier in this

25    interrogation, a reference to that, but he thought his name was

JA001011

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 138

1   Usama. Parenthetical:  He is the not the same person as photo
2   ▓▓▓▓  see above.
3          THE COURT: ▓▓▓▓
4          MS. HUSSEY: ▓▓▓▓▓  I apologize for misspeaking. He is
5   not the same person as photo ▓▓▓▓  see above, whom ▓▓▓▓▓▓
6   said was also named Usama and whom he saw in Khost.
7          When shown both pictures side by side, ▓▓▓▓▓▓said
8   he thought they were two different people but both went by
9   Usama. So what we are seeing here is ▓▓▓▓ is a picture of the
10  Petitioner, we know that, and a picture, a different picture of
11  685 which we have not been able to identify specifically what
12  other picture of 685 was shown to him.
13         THE COURT:  Could it be the one that we have seen
14  before that's ISN 215?
15         MS. HUSSEY:  We don't know what the picture is so in
16  theory it is possible, although I would note for the record that
17  this is  separated by years from that photo mix up question.
18  Well, more than one year because the photo mix up is
19  specifically on May 7, 2003, and I can talk about that to
20  clarify that here. But he also might have been looking at two
21  different pictures of 685 which looked slightly different
22  because of time lapse, because of different hair, because of
23  different clothes. We don't know what other picture he was
24  looking at.
25         THE COURT:  No.

JA001012

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 139

1        MS. HUSSEY:  But what we do know is that no matter what

2    he says they are both Usama and they are both in Afghanistan. So

3    if anything this corroborates the fact that the Petitioner who

4    we know is ███ was going by the name Usama and he was in the

5    Khost area of Afghanistan.

6        MS. GORMAN:  Your Honor, I am going to object because

7    counsel said they are not relying on what he said about my

8    client. They are not relying on ███ and in fact there is a

9    reason why they are fought relying and so this argument that

10   they are making that this is corroborating what they -- what

11   someone else said is improper given the fact that they are not

12   using this for that identification purpose. There is a reason

13   why because of this detainee.

14       THE COURT:  All right.

15       MS. HUSSEY:  We are not relying on this, your Honor,

16   and I am not suggesting that you rely on ███ here. What I am

17   doing is pointing out that Petitioner's argument that this

18   interview somehow undermines photo ███ is wrong and, in fact,

19   if anything, it shows that a different detainee at a different

20   time identified him in a similar manner as 839 did and 707 did.

21       MS. GORMAN:  Your Honor, I am going to object again.

22   They are not relying on it for that purpose and yet she is going

23   to be arguing --

24       THE COURT:  Wait a second. Hold on. Ms. Gorman, you are

25   relying on it as part of your case.

JA001013

Page 140

1          MS. GORMAN:  I am relying on it as showing two

2     different pictures, your Honor.

3          THE COURT:  I understand that, but the point is you are

4     relying on it to make your case. The Government has a right to

5     try to challenge just like you have the right to challenge what

6     they are relying on to make their case, they have a right to

7     challenge what you are relying on to make your case. So she is

8     not offering it for the purpose of making her case. She is

9     offering her argument for the purpose of undercutting your use

10    of it to make your case and that's appropriate.

11         MS. GORMAN:  I believe that's appropriate, your Honor,

12    but I think she took it one step further to say now that he is

13    corroborating somebody else and seeing my client in

14    Afghanistan --

15         THE COURT:  I didn't hear that. I heard this argument

16    limited to the purpose of raising doubt as to the reliability of

17    this exhibit by you to make your point.

18         MS. GORMAN:  Okay. Thank you, your Honor.

19         THE COURT:  That's the only purpose for which I am

20    taking it.

21         MS. HUSSEY:  That is the only purpose for which we are

22    offering it, your Honor, but -- so that I believe concludes my

23    points on ISN ████  There were other points that Petitioner

24    brought up in that argument that we contest but we will reserve

25    those points for a later time.

JA001014

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 141

1          THE COURT:  You can make those on Friday. All right. As

2    I indicated earlier, I have a funeral that I must attend at noon

3    on Friday. I am anticipating there will be a reception at the

4    home of the deceased sometime thereafter. I think the earliest I

5    can get here is about comfortably 2:15 or so, but we should be

6    able to go at 2:30 for two hours. If we need to spill over

7    another half hour or so, that should be plenty.

8          I ask the counsel to try to craft whatever arguments

9    they have to go for about an hour. There is no reason why after

10   all the discussion we have had here and it has been substantial,

11   almost two full days which is longer than any detainee hearing I

12   have held in toto other than Boumediene which, of course, was

13   six detainees so that was a massive undertaking.

14         So I would ask you to try to craft your closing

15   argument to being about an hour each. The Government I could see

16   giving you a brief rebuttal afterwards because you have the

17   burden of proof so 10 minutes, 15 minutes, something like that,

18   but that's about it.

19         So I think if we try to keep it within those limits, we

20   can get this done by 5 o'clock on Friday and so I hope that will

21   be the case. Now, we won't be spending any time Friday on any

22   arguments or issues relating to adding things to the record or

23   whatever because it is already done. It is done. The record is

24   done. I admitted everything that the detainee wanted other than

25   80. I think 80 is not appropriate. I don't think it is relevant.

JA001015

Page 142

1   I don't think it is germane to the issues before the Court.

2        You have heard my points that I have made with both

3   sides as to my efforts while we were going through this to try

4   to focus and narrow what has to be resolved as opposed to what

5   doesn't have to be resolved. I mean essentially the case turns

6   from the detainee's point of view, of course, on whether or not

7   it was a mistaken identity case. To a large extent that is what

8   this case is about. I am not suggesting it is only about that,

9   but to a large extent that's what it is about; and obviously you

10  are welcome to make any and all arguments that you think are

11  consistent with that as well as any others you feel you need to

12  make on those lines.

13       The Government has the burden of proof so they need to

14  structure their arguments a little bit differently, but I am not

15  telling you how to do it either.  I am not telling either side

16  how to do their argument, but I think we have narrowed it from

17  the point of view of figuring out what exactly is it that's got

18  to be shown.  The Government has stated today on the record that

19  they believe it is enough if they can prove by a preponderance

20  of the evidence that he was there in that house with Abu

21  Zubaydah and his group doing the things they say he was doing,

22  that's enough to hold him as an associated -- as part of an

23  associated force with al-Qaeda. Okay, fine.

24       Now, they say there is other things. They say there is

25  the travel path that he took. They say that there is indications

JA001016

Page 143

1  of his involvement in the Kaldan Camp and use of various

2  techniques, and you are welcome to argue those if you want to.

3  We didn't get into in it this these Merits Hearing because the

4  briefs address all that pretty much in detail and I have heard

5  that in most of my other cases about those kinds of issues,

6  tactics and techniques for dealing with interrogation and

7  dealing with identity and things like this.

8      So those are very familiar  to me. I have heard those

9  in many other cases and I am quite familiar with how those

10  arguments go and what the Government's beliefs are and positions

11  are with regard to that and so that's, again if you want the

12  relate it to these facts, you are welcome to do that; but you

13  might not need to spend a lot of time on that. I think obviously

14  your time is best spent on the focused issues that we really

15  need to resolve.

16      So again I am not telling you how to make your

17  arguments. That's up to you. You are experienced counsel and you

18  know how to do that. Let me just leave it at that. And Mr.

19  Cockrell will make sure the courtroom is available and open to

20  you to get set up.  Certainly we will have it open for you no

21  later than two and you will be able to get in here and actually

22  if you need to come a little earlier, just check in with Mr.

23  Cockrell. I will be at the funeral. But if you want to get here

24  at 1:30 even and get set up, that's fine, but  my guess is we

25  won't get going until around 2:30 or so. I think we should be

UNCLASSIFIED//FOR PUBLIC RELEASE

Page 144

1    able to get this done by no later than five. That's my hope. So

2    you have got extra time, counsel. Use it wisely and we will see

3    you in two days.

4                (Whereupon, at 4:14 p.m., the proceedings were

5    concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA001018

Page 145

1                C E R T I F I C A T E.

2          I, Patty A. Gels, certify that the foregoing is a

3     correct transcript from the record of proceedings in the

4     above-entitled matter.

5

6

7

8     _____

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA001019

UNCLASSIFIED//FOR PUBLIC RELEASE

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDUL RAZAK ALI,            :    CV10-1020 (RJL)
                            :
        Plaintiff,    :    December 17, 2010
                            :
                     :    3:15 p.m.
v.                          :
                            :
BARACK OBAMA, ET AL.,       :
                            :
        Defendants.    :
. . . . . . . . . . . . . . . .


DAY 3
TRANSCRIPT OF MERITS HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiff:   H. CANDACE GORMAN
                     220 S. Halsted Street
                     Chicago, Illinois 60661


For the Defendants:    OLIVIA HUSSEY
                       ANN NASH
                       SCOTT LEVIN
                       U.S. Department of Justice
                       20 Massachusetts Avenue, NW
                       Washington, DC

Also Present:    Susan Harrington
                 Adam Pearlman
                 Mike Vozzo
                 Phil Giarruputo
                 Dawn Miller


JA001020

3

1        PROCEEDINGS

2        COURTROOM DEPUTY: Calling civil case 10-1020 Abdul

3   Razak Ali versus Barack Obama, et al. Would counsel please come

4   forward and identify yourself for the record?

5        MS. GORMAN: Good afternoon, your Honor, Candace Gorman

6   for the Petitioner.

7        THE COURT: Welcome back.

8        MS. HUSSEY: Good afternoon, your Honor, Olivia Hussey,

9   Ann Nash and Scott Levin for the Respondents.

10       THE COURT: Welcome back. All right, counsel. We are

11   here for closing arguments, so to speak. I mean obviously I have

12   heard a lot of arguments already, but this is just kind of an

13   opportunity for each side to sum up their thoughts with regard

14   to the record and in the case of the Government, whether the

15   record establishes by a preponderance of the evidence that the

16   detainee is being lawfully detained; for the defense, whether

17   the Government has failed to do that.

18       So, as you know, I will hear from the Government first

19   and last. Try to apportion it to about two hours total so the

20   Government can split its time because they get to go last. I

21   will hear from the Government first and then I will hear from

22   the detainee.

23       MS. HUSSEY: May it please the Court, counsel, the

24   evidence through this Merits Hearing has shown that the

25   Petitioner was in Afghanistan by late October, early

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

4

1    November 2001, that he escaped to Afghanistan and ended up in a

2    guesthouse in Faisalabad, Pakistan with Abu Zubaydah; and that

3    he stayed at this house with Abu Zubaydah for over two weeks

4    where Zubaydah was organizing  a terrorist cell to attack

5    American forces with explosive devices.

6         Now, Petitioner through this hearing has conceded two

7    things. The first is that the Petitioner if he is Usama

8    al-Jaza'iri is detainable, you know, if he is the name that is

9    in the al-Suri diary and also conceded that he resided with and

10   was captured with Abu Zubaydah.

11        Now, case law tells us that he is detainable if he was

12   present at a house with Abu Zubaydah when Zubaydah was

13   organizing a terrorist cell. We spoke the other day about Judge

14   Roberts' decision in the Khalid case where Judge Robertson found

15   that presence at a house with al-Qaeda and Taliban leaders

16   showed membership in al-Qaeda and the Taliban.

17        We didn't discuss but I would like to bring to the

18   Court's attention the Judge Bates' decision in Khan versus

19   Obama. In that case, Judge Bates found that membership and

20   involvement with an associated terrorist force was enough to

21   detain. Now, here our case falls squarely in line with the D.C.

22   Circuit's decision Barhoumi. That case also found that

23   membership in specifically Abu Zubaydah's associated force is

24   enough to detain under the AUMF.

25        So the real questions that the Court is facing --

JA001022

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

5

1      THE COURT:  It says an associated force, was part of an

2  associated force?

3      MS. HUSSEY:  Yes, your Honor.

4      THE COURT:  As opposed to he is a card carrying member

5  of al-Qaeda?

6      MS. HUSSEY:  Yes, your Honor.

7      THE COURT:  All right.

8      MS. HUSSEY:  So the real questions for the Court here

9  with this case are kind of two-fold. The first is is the

10  Petitioner Usama al-Jaza'iri and the second is was Abu Zubaydah

11  organizing and training his force at this house in Faisalabad

12  that the Petitioner was captured at.

13      The answer, as your Honor will see, is yes to both of

14  those questions. The evidence has shown that the person that now

15  calls himself Saeed Bakoush was known to his friends, those that

16  he traveled with and were captured with as either Usama

17  al-Jaza'iri or al-Libi or Abdul Razak. We see that purely

18  through the various interrogation reports or interview reports

19  where different people look at photograph

20      Now, as the Court has seen photograph       is not the

21  only photograph that was used in interviews where the Petitioner

22  was identified, but it is a photo that was used in four

23  different interviews that the Government has presented for the

24  Court's consideration.

25      Three different witnesses are the sources of those four

JA001023

6

1  different interviews. Specifically in Exhibit 29, ISN███ this

2  is an FD 302 dated August 6, 2002 --

3          THE COURT:  I will assume any reference to exhibits

4  that you make are to Government exhibits and I will assume any

5  reference to detainee's counsel makes will be to detainee's

6  exhibits unless you stipulate or I should say specify otherwise.

7          MS. HUSSEY:  Yes, your Honor.

8          THE COURT:  All right.

9          MS. HUSSEY:  This is Government's exhibit, but

10  Exhibit 29 where ISN███ looks at photo███ and identifies him

11  as Abdul Razak. The same thing can be seen from a different date

12  interview in Exhibit 59. ISN███ again looks at a picture of the

13  Petitioner and says that's Abdul Razak.

14          In Exhibit 33, ISN███ a different detainee,

15  identifies a photo███ as Abdul Razak from the guesthouse with

16  ███████ and in Exhibit 68 ISN 707 on August 11, 2002, looks at

17  photo███ and says that is Usama al-Jaza'iri.

18          THE COURT:  So that's Exhibit 33 was -- which ISN was

19  that?

20          MS. HUSSEY:  That was ███

21          THE COURT:  ███ and he said Abdul Razak.

22          MS. HUSSEY:  Yes.

23          THE COURT:  707 said, no -- not no, but I know this

24  person as Usama al-Jaza'iri?

25          MS. HUSSEY:  Yes. Actually your Honor has heard from

JA001024

UNCLASSIFIED//FOR PUBLIC RELEASE

7

1    Petitioner, one of Petitioner's exhibits that ISN 707 actually

2    has identified the Petitioner with both of his kunyas, Abdul

3    Razak and Usama al-Jaza'iri showing that he knew both names that

4    the Petitioner was using.

5        THE COURT:  What about this argument that Petitioner

6    made earlier that, well, once they got to Guantanamo they all

7    knew his name was Abdul Razak because that was the name he was

8    using so that doesn't prove that they knew it before he got to

9    Guantanamo that he was known as Abdul Razak?

10       MS. HUSSEY:  Well, your Honor, Respondents would submit

11   that there is no evidence supporting that and, in fact, all of

12   these witnesses identify him as from the house with Zubaydah as

13   Abdul Razak. So they don't distinguish that they learned his

14   name at a different point in time. There is no evidence

15   supporting that.

16       In fact, ISN ████ has said specifically and the Court

17   can find this in Exhibit 35 that he did not speak to Abdul Razak

18   in prison and he identified him based on their mutual presence

19   at the Zubaydah house and, again, ███ uses the name Abdul Razak.

20       So there is no support for the argument that he wasn't

21   using this name until after capture, but specifically

22   Exhibit 68, which is an exhibit we have talked about at length

23   in this case where ISN 707 looks at picture ████ and identifies

24   him as Usama al-Jaza'iri. We know that that specific

25   interrogation report is reliable for several reasons.

JA001025

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

8

1      The first is it is based on ISN 707's several points of

2    knowledge and experience with the Petitioner. We have heard that

3    both 707 and the Petitioner have been associated by different

4    sources with Kaldan training camp. We also know that ISN 707

5    identifies the Petitioner as traveling out of Afghanistan with

6    his group. Specifically in this same interrogation report

7    Exhibit 68, ISN 707-case Usama al-Jaza'iri was with my group at

8    a school in Afghanistan along the route that they were leaving

9    Afghanistan.

10      THE COURT: So he IDs him, if it is be believed, he IDs

11   him both in Afghanistan and in Pakistan?

12      MS. HUSSEY: Yes, your Honor.

13      THE COURT: All right.

14      MS. HUSSEY: And then finally, of course, ISN 707 has a

15   point of knowledge about the Petitioner because they were both

16   residing at this house with Zubaydah in Faisalabad. Now, this

17   707 identification is also reliable because we have the photo.

18   We have seen photo⬛⬛⬛ here in court through the Merits

19   Hearing and it is in Respondent's exhibits submitted to this

20   Court. Petitioner has not materially challenged anything about

21   the Government's case that this photo is the Petitioner.

22      Next we know that this is a reliable interrogation

23   because FBI Special Agent⬛⬛⬛⬛ who is the interrogator

24   that interviewed 707 is fluent in Arabic. Specifically as can be

25   seen by Government's Exhibit 146,⬛⬛⬛⬛ native language

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

9

1    the Arabic.

2        Finally, this Court can rely upon this interrogation on

3    its own because ISN 707 has never alleged any kind of

4    mistreatment or abuse that would call his identification into

5    question. In fact, in November just a few months after he made

6    this identification, he said he was surprised because he had

7    been treated so nicely by the Americans. He expected

8    mistreatment and was not treated in that way.

9        THE COURT:  There is no indication in the record that I

10    can recall that any other interrogators or any other personnel

11    for the U.S. or U.S. forces found him to be, that is 707, found

12    him to be unreliable, unbelievable, or in some way a liar or

13    anything like that?

14        MS. HUSSEY:  That's correct, your Honor.

15        THE COURT:  Or having any kind of psychological

16    problems or psychiatric conditions or anything like that?

17        MS. HUSSEY:  That is also correct. There is no evidence

18    in the record of any psychiatric problems with ISN 707.

19        Now, beyond just the face of Exhibit 68, the Court can

20    take comfort in relying on that interrogation because it is

21    corroborated. It is corroborated in several different ways. The

22    first is that ISN 839 positively identifies a picture of the

23    Petitioner as Usama. He says it is Usama either al-Libi or

24    al-Jaza'iri which as we have heard means he is either Lybian or

25    he is Algerian.

JA001027

UNCLASSIFIED//FOR PUBLIC RELEASE

10

1       Now, the report at Exhibit 111 is clear. It

2    identifies -- the interrogator that prepared that report

3    identifies that he showed the picture of ISN 685, which is the

4    Petitioner, to ISN 839 who was the source of that report.

5       ISN 839 also in this exhibit explains his knowledge of

6    the Petitioner by saying that he knew him from a valley outside

7    of Khost and that the Petitioner traveled with him up to Zormat,

8    Afghanistan. He says this happened in November of 2001. So we

9    know that ISN 839 has a basis of knowledge for this

10    identification.

11       And finally we saw that this June 2004 statement is

12    reliable and it is not affected by any allegations of

13    mistreatment or abuse that ISN 839 has made. We talked about the

14    fact that ISN 839 made specific allegations of mistreatment and

15    abuse both pre-Guantanamo and in 2002, 2003 at Guantanamo. He

16    made those allegations in his own habeas proceeding in front of

17    Judge Hogan.

18       THE COURT:  839?

19       MS. HUSSEY:  839 did. ISN 839 specifically named an

20    interrogator named ███████ as the interrogator that mistreated him

21    at Guantanamo and as the Court will see while it wasn't -- while

22    that allegation was not rebutted in Judge Hogan's case, ISN

23    839's own case, we have here presented as Government's

24    Exhibit 150 a declaration from that interrogator ███████

25    ████████████████ rebutting those allegations and

UNCLASSIFIED//FOR PUBLIC RELEASE

11

1    establishing that she in fact did not mistreat or abuse ISN 839

2    at any point during any of her interrogations.

3        In addition, Judge Hogan in that case where he didn't

4    have ████████████████ declaration in front of him,

5    even in that case he found -- and Judge Hogan chose not to rely,

6    he threw out all the interrogation reports at issue in that case

7    for many, you know, for many years and chose instead to rely on

8    839's statements from his CSRT and his ARB proceedings. It is

9    worth noting that Judge Hogan -- while Judge Hogan didn't

10   conduct an individualized attenuation analysis for the

11   interrogation reports, he did do an attenuation analysis for the

12   September 2004 C Cert testimony; and in that analysis he found

13   that by September of 2004 ISN 839's allegations had any coercive

14   circumstances that had been alleged were removed months if not

15   years earlier.

16       Now, Respondents submit that if you do, if the Court

17   does an attenuation analysis regarding the June 2004 statements

18   that we have submitted here, Exhibit 111 is June 2004, this

19   Court could find the same thing that the coercive circumstances

20   had been removed months if not years before especially in light

21   of ████████████ declaration rebutting the allegations.

22       But ISN 839 is not the only way that the 707 identification

23   is corroborated. In fact, the al-Jaza'iri or al-Libi portion of

24   this kunya, this alias, is corroborated by the Petitioner

25   himself because we have seen that while he was detained, he

JA001029

UNCLASSIFIED//FOR PUBLIC RELEASE

12

1    switched his cover story between being Lybian and Algerian. So

2    these witnesses had to have some basis of knowledge to know that

3    he is either Algerian or Lybian in order to identify him with

4    this kunya in that way.

5         And finally ISN 707's identification of the Petitioner

6    as Usama al-Jaza'iri is corroborated by the al-Suri diary

7    itself. If we could pull up Exhibit 136, page 67 this is the

8    al-Suri diary; and on page 67 of this of this, you will find a

9    permanent membership list you could say. Those individuals are

10   listed that are permanent members of Abu Zubaydah's force.

11        Now, this entry is dated March 26, 2002. It is just two

12   days before the Petitioner was captured with Zubaydah on

13   March 28th. We know the Petitioner was captured there on that

14   date because he has admitted that he was captured with Zubaydah,

15   but the interesting thing is that the al-Suri diary identifies

16   the Petitioner at number nine but also identifies as part of

17   this group Abu Zubaydah who is number one, Ubayduh al-Jaza'iri

18   who is number eight, that's Barhoumi.  Ghassan al-Sharbi is

19   identified as number 12 on the list, Abdullah al-Muslim.  And if

20   you look to the Thinker's demonstrative, you will see the

21   sourcing.  This is one of his kunyas.

22        ISN 696 is identified as number 11 on this list, Hatib.

23   707 is identified on this list at number ten, Akrama al-Sudani.

24   These individuals who are identified by Abu Kamil al-Suri as in

25   the house on March 26, 2002, with Petitioner are also -- these

JA001030

13

1    same highlighted individuals are also identified by the

2    Petitioner as captured with him in this house two days after

3    al-Suri wrote this entry.

4        Petitioner identified ISN 694 Barhoumi, ISN 682

5    Abdullah al-Muslim on this list. He knew him by the name Ghassan

6    al-Sharbi. ISN 696 who he knew as Jabran but the name on this

7    list is Hatib and ISN 707 who is on this list as Sheik Akrama,

8    or Akrama al-Sudani who the Petitioner identified as Samir.

9        Now, you might say how do we know that this matches up?

10   But if you look at Government's Exhibit 57, you will see that

11   not only did Petitioner identify these individuals as captured

12   with him and Zubaydah at the house in Faisalabad, he identified

13   them by photo.

14       So we know without question that Petitioner was

15   captured with these individuals that are also listed on the

16   Kamil al-Suri page 67 permanent membership list in Zubaydah's

17   force.

18       Now, we have presented evidence in this Merits Hearing

19   about the Petitioner 's membership, long-standing membership in

20   the Zubaydah force and how as of January, 2002, he is identified

21   as with Zubaydah's group on page six of the al-Suri diary; and

22   then he travels as al-Suri tells it with the group off and on as

23   they break into small groups. He might be in a different

24   guesthouse for the night, but he is traveling with the group

25   along the same route that the group travels.

JA001031

UNCLASSIFIED//FOR PUBLIC RELEASE

14

1    If we could put up demonstrative number two, we will

2    see that this route starts outside of -- or in Khost,

3    Afghanistan.

4        THE COURT:  So this is the second issue?

5        MS. HUSSEY:  This would be the second issue, your

6    Honor, yes. And generally how it fits into a consistent story.

7    So it is the second issue, but again this travel pattern fits

8    consistently with all the evidence in the case.

9        The Petitioner is identified in November, 2001 at a

10   guesthouse where a fire breaks out in Khost. He is at that

11   guesthouse with other Kaldan trainers and trainees.

12       MS. GORMAN:  Your Honor, I am going to object to the

13   characterization of the Petitioner. What we have is an

14   identification of the name Usama al-Jaza'iri at that house.

15       THE COURT:  But she is advocating it. I know what she

16   means. That's what she is contending. That's fine.

17       MS. GORMAN:  Thank you.

18       THE COURT:  Go ahead.

19       MS. HUSSEY:  From Khost, from that guesthouse where

20   they save all those weapons, the stinger, the Sam 7, the ammo

21   pouch containing rocket propelled grenades, he goes to a valley

22   outside of Khost where ISN 839 sees him and photo IDs him. Then

23   he travels up to Zurmat. From Zurmat he goes out of Afghanistan

24   at least by Bermal because, your Honor, Bermal, Afghanistan is

25   where ISN 707 identifies him in Exhibit 68.

JA001032

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

15

1     The group then travels out into Pakistan via Bannu,

2     Lahore and then finally into Faisalabad. So we know that his

3     membership in this force is at least several months long if not

4     longer, but we also know because he has admitted that he ended

5     up in March at a guesthouse in Faisalabad with Zubaydah and

6     other members of this force. Presence at this guesthouse with

7     Zubaydah, a known and committed jihadist who was one of the most

8     wanted men on the planet at this time, while Abu Zubaydah was

9     organizing a terrorist cell that was training and preparing its

10     force to conduct martyrdom operations against the United States,

11     those two things lend powerful support to the fact that

12     Petitioner was a member of Abu Zubaydah's force.

13     Without such an understanding that he was one of them,

14     Petitioner never would have been allowed to be around so many

15     terrorist leaders, trainers and specialists for any amount of

16     time much less the two weeks that he has admitted being at that

17     house.

18     THE COURT: So basically, if I understand you, you are

19     arguing kind of effectively that his being allowed to spend the

20     time he did in that guesthouse with these folks of this nature

21     kind of suggests or corroborates that he must have traveled with

22     them for a period of time before that because otherwise it

23     doesn't make sense that they would allow him to be with them

24     under those circumstances?

25     MS. HUSSEY: Yes, your Honor. Not only must he have

JA001033

UNCLASSIFIED//FOR PUBLIC RELEASE

16

1    traveled with them, he must have some familiarity with them. He

2    husband part of their group.

3         THE COURT:  To earn their trust in some way?

4         MS. HUSSEY:  Precisely, your Honor, especially because

5    as we saw from the evidence this guesthouse wasn't just a house

6    where people were staying. This guesthouse was more like a

7    training camp, a training camp where Abu Zubaydah was beginning

8    to form and train and develop this new force that he would use

9    to attack America.

10        Now, the Petitioner is one of them, not only because he

11   traveled which he did and not only because he was present at the

12   house which he was, but also because he took part in the

13   training that was happening at that house. We heard from

14   multiple witnesses that the Petitioner took part in█

15   ███████████████████ English classes that were

16   being taught by ISN 682. Now, ███████████ English might

17   not sound like it is all that inculpatory on its face, but those

18   lessons, this training program has to be viewed through the

19   larger lens of the entire training program which, as we saw,

20   consisted of electronics, explosives, English language lessons,

21   yes, and computer lessons.

22        Further, the Petitioner even though these English

23   lessons would be, you know, could be viewed innocuously, the

24   Petitioner has consistently denied taking these ███████

25   ██████ English classes.  And we know from the D.C. Circuit's

JA001034

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

17

1   decision in Adahi versus Obama that false exculpatory statements

2   are evidence, often strong evidence of guilt.

3        Now, your Honor, Petitioners put on a case thus far in

4   this Merits Hearing that involves several things that you would

5   have to believe, several leaps of faith that this Court would

6   have to make and it is Respondent's position that these leaps of

7   faith don't make any sense.

8        Specifically the Court would have to believe that ISN

9   707, ISN 839, ISN███ ISN 696, and███ the computer expert in

10  the house, all looked at pictures of the Petitioner and

11  misidentified them on different occasions with different

12  interrogators and different circumstances. She also -- or

13  Petitioner also asks the Court to believe that there are two

14  different mystery guys that the Petitioner is confused with

15  throughout this pattern. There is a mystery Usama al-Jaza'iri

16  who people confuse with the Petitioner in photo IDs who also

17  claims to be Lybian and/or Algerian and who was also at the

18  house in Faisalabad with Zubaydah and the Petitioner; but there

19  is also according to Petitioner a mystery Abdul Razak, a person

20  who people confuse with the Petitioner in photo identifications

21  who was captured on the exact same day, March 28, 2002, who has

22  the same birthday as the Petitioner, and who has the same family

23  details in his cover story that the Petitioner used in his cover

24  story at Guantanamo for two years to include the same mother's

25  name,███, the same father's name███ and the same younger

JA001035

UNCLASSIFIED//FOR PUBLIC RELEASE

18

1   brother ███████

2        Now, this mystery Usama al-Jaza'iri supposedly looks

3   like the Petitioner. He can be, according to Petitioner,

4   confused with him. This mystery Abdul Razak also supposedly can

5   be confused in photo IDs with the Petitioner so they look alike

6   which means that these two mystery guys must look like each

7   other. So we have really got, according to Petitioner, three

8   guys traveling along the same route staying in the same

9   guesthouse as Zubaydah and the Petitioner who all look alike but

10  yet none of the other individuals in that house say anything

11  about triplets or even twins or even two guys that kind of look

12  like each other. None of that is anywhere in this record.

13       Petitioner also asks you to believe that he didn't go

14  to Afghanistan even though within 48 hours after capture he told

15  Special Agent ███████ that he went to Afghanistan to fight,

16  even though several different sources identified the Petitioner

17  in Afghanistan.

18       THE COURT:  What exhibit is that one?

19       MS. HUSSEY:  Your Honor --

20       THE COURT:  He told ███ that he had gone there to

21  fight.

22       MS. HUSSEY:  Your Honor, I believe that that's -- let

23  me confirm it, not give you my belief. I believe it is

24  Government Exhibit 23, your Honor.

25       THE COURT:  23.

JA001036

UNCLASSIFIED//FOR PUBLIC RELEASE

19

1       MS. HUSSEY: It is entitled FBI Counterterrorism Report

2   dated April 1st, 2002, and the Petitioner's interview can be

3   seen starting on page ten and his identifying details, the

4   personal details that he provided to Special Agent ████

5   including his birthday can be seen towards the end of that

6   exhibit.

7       THE COURT:  Okay. In addition to Special Agent ████

8   ████ interview of the Petitioner, several different sources

9   place him in Afghanistan including ISN 707 who says he was at a

10  school with him in Afghanistan on the way -- 707 was traveling

11  out of Afghanistan. ISN 839 puts him in Afghanistan in a valley

12  outside of Khost and travelling with him up to Zormat.

13      In addition, his name appears, Petitioner, as Usama

14  al-Jaza'iri appears on the fire Incident Report written by Abu

15  al-Farage. He is on that report with other trainees and trainers

16  from Kaldan someplace we know he has been because Abu-Kamil

17  al-Suri identifies him as a former trainer at Kaldan Camp.

18      Finally, ISN 696 identifies him as having been to

19  Afghanistan. Now, when the al-Suri diary picks up the very first

20  entry in the al-Suri diary that's dated January 24, 2002 --

21      THE COURT:  Go back a second. Who was it that said he

22  was a former trainer there at Kaldan?

23      MS. HUSSEY:  Abu-Kamil al-Suri page six of the diary

24  identifies the Petitioner by his name Usama al-Jaza'iri and says

25  he is a former trainer at Kaldan.

JA001037

UNCLASSIFIED//FOR PUBLIC RELEASE

20

1      THE COURT:  All right.

2      MS. HUSSEY:  In that exact same entry on page six of

3   the al-Suri diary, you see that the group, Zubaydah is with the

4   group, Abdul Bari al-Filastini who is the trainer that trains

5   people on Casio watches as timing devices and IEDs, he is with

6   the group. Several other individuals who are later at the

7   guesthouse are with the group in this page six entry of the

8   al-Suri diary. That's dated January 24, 2002, and at that time

9   they are right at the border of Afghanistan and Pakistan but on

10   the Pakistan side.

11      So inferentially or circumstantially you can see that

12   Abu-Kamil al-Suri kind of puts him exiting Afghanistan.

13      Now, you also have to believe according to Petitioner's

14   arguments that the al-Suri diary isn't reliable despite the fact

15   that the D.C. Circuit specifically reviewed it for reliability

16   and found that it could be relied upon in part because it was

17   verified by real world events.

18      And finally, your Honor, Petitioner asks you to believe

19   that Zubaydah's active cell, this force that he is pulling

20   together and training for martyrdom operations would allow a

21   complete stranger into their midst while they are training and

22   preparing without any checks on him or understanding of who he

23   is and they would allow him to just hang out, just be present at

24   this guesthouse around them despite the fact that at the time

25   Abu Zubaydah was one of the most wanted people on the face of

JA001038

21

1   the planet.

2       Now, we submit, your Honor, that there is a much

3   simpler answer here, one that's supported by the evidence and

4   that is that Petitioner was an active permanent member of Abu

5   Zubaydah's force who is even to this very day engaged in a

6   concerted effort to mislead the Court and hide his true

7   activities from us, his enemy.

8       Your Honor, I would like to reserve any remaining time

9   I have for rebuttal.

10      THE COURT:  You have got about 15, 18 minutes. That's

11  fine. Thank you. Ms. Gorman.

12      MS. GORMAN:  Thank you, your Honor.  May it please the

13  Court and my honorable colleagues from the DOJ, your Honor,

14  first I would like to address the two cases that counsel brought

15  up, the Barhoumi case and the Khalid case. In Barhoumi, the

16  Circuit Court found him detainable because he was in the same

17  house as Abu Zubaydah but also because he admitted that he went

18  by the nickname that was in the diary.  The nickname was found

19  and indicated him as permanent member of the diary, that he

20  admitted training at Kaldan and that he had trained in mind

21  diffusion and the diary also listed him as an explosive expert

22  so there was that corroboration there.

23      In Khalid, Judge Robertson looked at the detainee in

24  that situation and found that --

25      THE COURT:  Roberts or Robertson.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

22

1    MS. GORMAN:  Robertson.

2    THE COURT:  Robertson.  All right.

3    MS. GORMAN:  Found that he was a member of the LIFG,

4    the Lybian independence group which was associated with the

5    al-Qaeda. He had admitted that he trained at various camps in

6    Afghanistan and that he had become an explosives trainer at al

7    Farouq, that he lost a leg while triggering a mine working for

8    the Taliban and that he stayed at al-Qaeda guesthouses in

9    Afghanistan.  And the Court, Judge Robertson found putting all

10   those together was enough to make him detainable.

11       Your Honor, I want to focus my closing remarks on two

12   main issues. First, I want to focus on the identifications of

13   Petitioner including the allegation that he used the alias Usama

14   al-Jaza'iri and that he was an Afghanistan and then I want to

15   look at the issues surrounding the guesthouse that he was in at

16   the time of the arrest.

17       THE COURT:  All right.

18       MS. GORMAN:  The Government bases its most serious

19   accusations on photo identifications of the Petitioner by other

20   detainees. As we discussed during the course of the hearing, the

21   Government has claimed that Petitioner's identification number

22   when he was at Bagram was ▮▮▮ When he went to Guantanamo, it

23   was 685. Unfortunately for Petitioner the individual whose

24   picture was being used as him who had the identification number

25   ▮▮▮ before him was a well known jihadist, for lack of a better

JA001040

UNCLASSIFIED//FOR PUBLIC RELEASE

23

1    word. This is ISN 215. If you -- this is a Saudi individual. If

2    you will look at my Exhibit 14, Petitioner's Exhibit 14, we know

3    that this individual traveled to Afghanistan.  Back in 2002 is

4    when he first arrived in Afghanistan and he went there to fight

5    with the Taliban, that he admitted training at Kaldan, that he

6    admitted training at Farouq.

7           THE COURT:  You mean Kaldan Camp?

8           MS. GORMAN:  Kaldan Camp.

9           THE COURT:  All right. So he trained at Kaldan.

10          MS. GORMAN:  And at Farouq.

11          THE COURT:  And at Farouq.

12          MS. GORMAN:  That he was on the front lines, fighting

13   on the front lines, that he had been in Tora Bora during the

14   U.S. air campaign, that he was arrested at the Pakistani border

15   and was accused of having a Casio watch and this individual was

16   detained approximately January of 2002.

17          When he was detained, he was picked in a mosque close

18   to the border of Pakistan and, while he was being transported,

19   there was a fire fight that broke out in the buses where the men

20   were being transported and six Pakistani police were killed.

21          This individual was released from Guantanamo in 2007

22   and sent back to Saudi Arabia, but this is the individual whose

23   picture was being shown as my client's for a time period that we

24   don't know exactly how long. We know up at least until 2003 at

25   some points that picture was being used. So this is a bad guy

UNCLASSIFIED//FOR PUBLIC RELEASE

24

1    and he was for some reason released, but anyway he was in all of

2    these places that my client has been accused of being.

3         We also know, and this is in the traverse, that

4    Petitioner's ISN 685 and his photo were identified with a

5    different detainee's name at Guantanamo, and this is

6    Petitioner's Exhibit 10 where the photo of and ISN of Petitioner

7    was used with the name of ███████ ███████ was another person

8    that was at the Faisalabad house. He had ISN number ███

9         So we know that there is a few problems going on with

10    photos and actually in the traverse, I go through a lot more

11    just to show that there is general confusion with the photo

12    identifications.

13         THE COURT:  But I don't recall any confusion as it

14    relates to people who were presented with ███████

15         MS. GORMAN:  Correct, your Honor.

16         THE COURT:  Those are different.

17         MS. GORMAN:  Right. We don't know which photos were

18    used in a lot of these and that's the problem. They don't

19    identify the photos that are being used in a lot of these

20    identifications.

21         THE COURT:  But in the ones that the Government is

22    relying on, they identified in the document the photo that was

23    being used. It says ███████

24         MS. GORMAN:  In some of the identifications that the

25    Plaintiff -- I mean that the Government is relying on, not in

JA001042

UNCLASSIFIED//FOR PUBLIC RELEASE

25

1  all of them. For example, with 696 who identifies my client as

2  being in Afghanistan and as having knowledge of what was going

3  on at the house, that was the picture of ███ That was the one

4  from Bagram and that's clear. Actually it is that individual who

5  later says this isn't the person I was talking about before.

6  This is a different photo. So, no, it is not --

7      MS. HUSSEY:  Objection. I think that mischaracterizes

8  the evidence.

9      THE COURT:  You will get a chance to respond. I think

10  we went through that during the issue section and the Government

11  explained that at least their understanding of what was going on

12  there, why that was a mix up of some kind.

13      MS. GORMAN:  Their explanation is that, yes, there was

14  a mix up. I mean we have the documents from the Government

15  showing that they did realize that there was this mix up, that

16  photo ███ was actually being used as my client's prison file

17  folder photo; and that was discovered in 2003 and it was not his

18  picture on the folder.  It was the picture of ISN 215 who had

19  previously had that same Bagram number.

20      So we know that that photo identification problem was

21  going on at least through 2003 when it was maybe corrected

22  although there is nothing in the record to say when it was

23  actually corrected.

24      THE COURT:  Well, it was realized at one point.

25      MS. GORMAN:  It was.

JA001043

26

1      THE COURT:  The record reflects the acknowledgment that

2 they realized that there was this mix up going on and I think

3 there was a date  attributed to that realization sometime in

4 late '02, early '03.

5      MS. GORMAN:  It was in mid '03 when one detainee said

6 this is not ISN -- this is not Abdul Razak. This is someone

7 else. This is not the same picture I was shown before and at

8 that time they went and looked at the folder, and that's when

9 they realized this problem was going on that the wrong

10 picture --

11      THE COURT:  I think the record reflects that sometimes

12 the folders have more than one picture in them.

13      MS. GORMAN:  Correct.

14      THE COURT:  And that's why I guess at some point they

15 decided to number the pictures or give them a way to identify

16 which picture was being presented to the witness to fit his or

17 her identification. There was no hers here, but his

18 identification. So I believe in the one that you were just

19 alluding to a minute ago when they realized  the mistake had

20 occurred, that the record as I recall that document doesn't

21 indicate when the person made that ID which one exactly it was,

22 which photograph it exactly was.

23      MS. GORMAN:  Which photo was the correct one of the

24 Petitioner?

25      THE COURT:  Well, what the ID number of the photo was.

JA001044

27

1  MS. GORMAN: There was no ID number. There was just --

2  it was in the record that they determined that it was ISN 215's

3  picture who also had the ▇▇ and they gave me that photograph to

4  show that ISN 215 was being -- his photo was the one being used

5  with the Bagram ID number ▇▇ that was in my client's folder.

6  THE COURT: I will have to go back and look at that.

7  MS. GORMAN: Your Honor, I would also suggest to the

8  Court that there were a lot of translations problems going on at

9  this same time and Exhibit 20 is one of my exhibits. I don't

10  know if you want me to actually read some of the exchange, but

11  it is actually an interrogation of my client that's in a

12  different form, format than most of the interrogations in that

13  there is actually the question being asked and the answer being

14  given. So you can see --

15  THE COURT: Explain, if you will, help me recall, I

16  can't recall what this translation issue was about. I don't

17  remember that coming up in the last two days of hearings.

18  MS. GORMAN: No. It is my traverse, your Honor, but I

19  am just bringing this up as also an additional problem. In fact,

20  this additional problem also has led to allegations by the

21  Government that my client was changing his story and changing

22  his name, and I would like to point out to you two exhibits that

23  I think are important on this issue. One is ▇▇▇▇▇▇ and the

24  other is Exhibit 73.

25  THE COURT: The Petitioner exhibits, right?

JA001045

UNCLASSIFIED//FOR PUBLIC RELEASE

28

1     MS. GORMAN: Yes, your Honor. I am going to look at

2     ████ first

3

4

5

6

7

8

9     I am sorry. I grabbed the wrong second exhibit. The

10     ████ interrogation of the Plaintiff, of the Petitioner is

11     Exhibit 73 and in Exhibit 73 on the first page, they add the

12     name Abdul al-Rahman in handwriting next to his name and then

13     they accuse him of changing his name again. So we see how this

14     problem occurred. We know there is some kind of translation

15     problem. ████

16     ████ they add that as

17     part of his name ████.

18     So I just suggest to the Court that some of these

19     problems of my client being accused of changing his identity,

20     changing his name are actually problems with translations.

21     THE COURT: All right.

22     MS. GORMAN: Petitioner has consistently stated that he

23     did not know anyone at the guesthouse until he arrived there.

24     For the most part he said they prayed and ate together but

25     otherwise stayed by themselves. He was there approximately

JA001046

29

1   16 days and he testified that ▮▮▮▮▮ came during the last

2   week, that he knew him as ▮▮▮▮ He didn't ever see him before

3   but that's how he was introduced, and he did not see him the

4   last five days before the raid. He testified that ▮▮▮▮ ate and

5   prayed with the others but otherwise kept to himself and

6   Petitioner also stated, and this is important, that he used his

7   true name at the house. And this all comes from Government

8   Exhibit No. 27.

9       Petitioner reiterated that he never saw anything and

10   that no one ever said anything about terrorist activities

11   harming people or anything else that would indicate that any of

12   the individuals at the house were involved in illegal

13   activities.

14       THE COURT: Is there anything to corroborate that?

15   That's his story. Is there anything to corroborate that that's

16   what happened?

17       MS. GORMAN: Well, your Honor, I can corroborate that

18   many of the men at the house knew that he was Algerian and later

19   in my notes -- I can't find it now -- but I was going to get to

20   that because I think that's an important part.

21       THE COURT: We will wait to see what you say.

22       MS. GORMAN: Thank you. He stated that he did not talk

23   with a lot of individuals in the house and that the doctor, the

24   doctor that was shot and killed, was really the only person who

25   seemed to talk to everybody and that information all comes from

JA001047

UNCLASSIFIED//FOR PUBLIC RELEASE

30

1   Petitioner's Exhibit 32 and Government Exhibits 26 through 28.

2       Just to make clear, your Honor, my client does not

3   dispute that he was in this house. What he disputes is being

4   involved in illegal activities in that house or anywhere else,

5   of knowing of any illegal activities in that house or anywhere

6   else. So I would like to move on to the nickname because I think

7   that is the pivotal point in this case.

8       THE COURT:  You mean al-Jaza'iri?

9       MS. GORMAN:  Correct, your Honor, the nickname of Osama

10   al-Jaza'iri because my client did not use that nickname, and I

11   don't think the Government's evidence is sufficient to show that

12   it was his name. As the Government admits, he has consistently

13   denied using that nickname. The Government admits this in

14   footnote nine of the Amended Return. Because the Government

15   admits this, I am not going to go through all the many places

16   where he denies having this kunya, nickname; but I do want to

17   point out one of those many places to you.



18

19

20

21

22

23

24       So he has always denied it. They are always trying to

25   use this name with him and he doesn't know why they are even

UNCLASSIFIED//FOR PUBLIC RELEASE

31

1    trying to use this name because it is not a name that he has

2    ever used.

3        The Government claims that two individuals have

4    identified the Petitioner as using that nickname or one

5    individual using that nickname and another using a variation of

6    that nickname. The first individual who the Government claims

7    provided this nickname information was ISN 839. The Government

8    claims that 839 IDed a photo ostensibly of Petitioner and said

9    that he was known as either Usama al-Libi or al-Jaza'iri.

10       That's Exhibit 9 and it is important for the Court to

11   note that the photo is not identified for that identification.

12   We don't know what photo was used when ISN 839 made that photo

13   identification. There is no identifying marks about what photo

14   was used.

15       THE COURT:  What was the Exhibit No. the Government

16   used to establish that point?

17       MS. GORMAN:  This is -- it is Plaintiff's Exhibit 9,

18   this interrogation. It is Government's Exhibit 111. They are

19   both the same document, your Honor. It is the identification

20   supposedly by this guy but without any indication of what photo

21   was used.

22       THE COURT:  What was the date of that one?

23       MS. GORMAN:  Excuse me. ▮▮▮▮▮▮▮▮

24       THE COURT:  By that date, they had resolved this issue

25   about the confusion, had they not, with the earlier photograph

JA001049

UNCLASSIFIED//FOR PUBLIC RELEASE

32

1    from Bagram of 204?

2         MS. GORMAN:  Your Honor, they don't talk about any

3    picture. Actually this is relating back to an identification

4    that he did back in 2003 and if the Court will bear with me, I

5    will show that in just a minute because in this interrogation █

6    ████████████████, the Petitioner -- I mean the ISN 839

7    actually is reiterating word for word exactly what he said at an

8    interrogation from 2003 with no variation. So if I can further

9    explain that to the Court.

10        THE COURT:  All right. Go right ahead.

11        MS. GORMAN:  First -- actually I am going to pull the

12   document out -- first I would like to point out in Exhibit 9,

13   which is this interrogation of ISN 839 that at the beginning the

14   approach used section of the SIR, the interrogator is telling

15   the individual that, this is a quote, simply regurgitating only

16   what he told previous interrogators in avoiding new topics by

17   claiming that he has a bad memory does not, end of quotes, did

18   not qualify his cooperation.

19        So, in other words, they were saying you can't just

20   keep saying the same thing you have said before. You have got to

21   do something more. Then they note in paragraph three that in

22   previous interrogations, Mudwani emphatically claimed that he

23   could not remember the same individuals.

24        Then in paragraph six C, we have the identification

25   supposedly of the Petitioner. It just says U.S. 9 L Y 000685 D

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001050

33

1    P. That's the identification for my client. Mudwani identified

2    him as Usama last name unknown al-Libi or al-Jaza'iri.

3        THE COURT: But that was in June of '04, right?

4        MS. GORMAN: This is in June of '04, but I will show

5    you that it is really an exact regurgitation of what he said

6    in '03 which is what the interrogators are complaining about.

7        THE COURT: Was there another interview in '03?

8        MS. GORMAN: Yes, there was. And that was at a time --

9    it was actually an interview that Judge Hogan specifically would

10   not allow in the record because of the abuse that was going on.

11       THE COURT: If they had resolved this issue, again I

12   said if, but if they had resolved the issue of the confusion

13   that was being caused by the earlier photograph by the summer of

14   '04, then would it not be a reasonable inference or the most

15   likely inference that the file folder photo that they used was

16   the correct one, i.e.,         as opposed to the earlier one 204

17   that had been used at Bagram?

18       MS. GORMAN: There is no indication, your Honor, of

19   what photo was used or when a photo was used or if a photo was

20   used. It just doesn't say that, your Honor. I don't think we can

21   make the assumption that a proper photo was used or even that a

22   photo was used or if he is not just regurgitating what he said

23   before about individuals without a photo being shown. Most of

24   the time they say a photo was shown. This interrogation doesn't

25   even say a photo was shown.

JA001051

UNCLASSIFIED//FOR PUBLIC RELEASE

34

1        THE COURT:  I thought the mix up had gotten solved in

2    May of '03 when ISN 696 was being shown the two photos and they

3    went and checked the photo against the ████████ and

4    determined that there was a mistake there with regard to that

5    ISN 215 photo.

6        MS. GORMAN:  They did determine that, but there is no

7    indication in the record as there are with other photo

8    identification issues with other detainees and I go through that

9    in my Amended Traverse because I have all those documents.  They

10   were tendered to me as exculpatory and in other photo

11   identification issues, there is actually a notation made to the

12   record to the authorities to correct this.

13       There was no such indication made at that time or at

14   any other time until two weeks ago when they, the Government,

15   gave me a notice that this was rectified but with no date in it.

16   We don't know when the photo files were actually corrected. We

17   just know it was drawn to their attention in the summer of '03

18   but we don't know when they actually corrected it.

19       THE COURT:  We do know for sure though that ████ is

20   fine. That we do know. There is no question about that.

21       MS. GORMAN:  We know that that's the Court's position

22   and the Government's position.

23       THE WITNESS:   Well, you have not contradicted that.

24   You have introduced no evidence that indicates that that's not

25   your client's photo and based on the record as I understand it

JA001052

UNCLASSIFIED//FOR PUBLIC RELEASE

35

1    so far, there is absolutely no reason to question that the

2    photo -- that the detainee in photograph ██████ is your client.

3    There is no reason to doubt it.

4        MS. GORMAN:  I understand that, your Honor. I am just

5    not willing to say it is because I look at it and I know it is a

6    photo from ten years ago or probably from a long time ago, I

7    look at it and I can't identify it.

8        MS. HUSSEY:  Objection. It is inappropriate for counsel

9    to be testifying about evidence in this case herself.

10       THE COURT:  Yes. The most she can do is make arguments.

11   That's fine. She can always make arguments, but all I am saying

12   is based on the record as I have heard it so far there is no

13   reason to doubt that that's accurate, that that photograph is an

14   accurate picture of your client.

15       MS. GORMAN:  But getting back to this identification

16   from ISN 839, no photo is shown, no photo is indicated and it is

17   not even indicated whether or not a photo was shown to this

18   individual at this time. I can read you the full quote if you

19   would like.

20       THE COURT:  You don't have to do that.

21       MS. GORMAN:  But I would like to read one part of it

22   anyway because we had a discussion about this on Wednesday. This

23   ISN 839 said that the person that he identified as 685 had

24   traveled with him immediately following the withdrawal from

25   Kabul. He said Usama was with Mudwani's group from the valley.

*JA001053*

UNCLASSIFIED//FOR PUBLIC RELEASE

36

1    He stayed in the Paktia Province of Afghanistan until the group

2    arrived in Zurmat. Then there is a detainee comment and it says

3    detainee comment:  This is not the same Usama I talked about

4    before.

5         Now, we talked about this the other day and there is an

6    IIR that's referenced here and the Government presented that IIR

7    and said this doesn't have anything to do with my client, this

8    reference here; and since then I have had more time to review

9    this IIR that's referenced, and I would like to discuss that

10   with the Court.

11        THE COURT:  What's the Exhibit No. Of that one?

12        MS. GORMAN:  It is Government Exhibit No. 93.

13        THE COURT:  Government exhibit?

14        MS. GORMAN:  Government exhibit.

15        THE COURT:  All right. Go ahead.

16        MS. GORMAN:  So your Honor, ISN 839 is saying this

17   person is not the same Usama that I talked about before and then

18   they reference this document Exhibit 93. In Exhibit 93 if you

19   turn to page 4, Exhibit 93 is ISN's 839's description of his

20   travels through Afghanistan to get to Pakistan. It is a six page

21   description of where he went and who he was with.

22        And if you read this document, you will see that my

23   client is not named in this document anywhere. He is not named

24   as someone that he traveled with. He is not named as someone

25   that he was saw in Afghanistan or anywhere else. My client is

JA001054

37

1   just not named in this document, but there is an Usama that's
2   named in this document. This is on page four, letter I. You can
3   see the exhibits are divided up by letters.
4       THE COURT: He is the Yemeni.
5       MS. GORMAN: He is the Yemeni. This is the Usama that
6   he was talking about as being with him going on this trip. There
7   is no indication that he ever indicated my client was the one
8   that he was talking about.
9       Now, the Government tried to argue that this IIR is
10  just referring to the trip itself and not to his saying this
11  isn't the same Usama I talked about before, but I think in the
12  context of this paragraph, it can only mean that. He is being
13  shown a picture of ISN or something to indicate that it is ISN
14  685, my client, and he is saying this isn't the same person I
15  was talking about before. And the Government refers us back to
16  Exhibit 93 which is his description of his travels through
17  Afghanistan and there is no one named Usama al-Jaza'iri or Usama
18  al-Libi. There is only Usama Yemeni, al-Yemeni.
19      I think that's an important issue, your Honor, because
20  also Exhibit 93 -- I am sorry -- I lost my train of thought on
21  that, but I think that is the important part, your Honor, that
22  this man never identified my client as being there and he is
23  trying to correct it in Exhibit 9 or the Government's
24  Exhibit 111.
25      I would also like the Court to look at one other issue

JA001055

UNCLASSIFIED//FOR PUBLIC RELEASE

38

1   and that's the week before Exhibit 9.  The interrogation took

2   place ██████████. The week before that interrogation there

3   was another interrogation of ISN 839 and that's Plaintiff's --

4   Petitioner's Exhibit 46.

5          In Petitioner's Exhibit 46, ISN 839 is being called on

6   the carpet by the interrogators because he is not cooperating

7   with identifying pictures. This is ████████ one week

8   before this identification supposedly of Petitioner, but I think

9   it is an identification where he is trying to clarify it is not

10   my client. But on █████ Mudwani was advised that his

11   position in camp could be endangered by a lack of cooperation.

12          So this is I think an actual threat to him that he

13   better start towing the line because otherwise they are going to

14   take away his conditions.  They are going to move him somewhere

15   not as well. They are going to ruin his conditions. They are

16   going to take things away from him if he doesn't start

17   cooperating.

18          So I think putting that into the context of this

19   interrogation █████ makes everything about what Mr.

20   Mudwani is saying to be incredible if not less than reliable. I

21   would also suggest to this Court that Judge Hogan did say that

22   anything -- that he was not relying on anything until September

23   2004, and that's -- the Government admits this in their footnote

24   24. They are just trying to push that date back a little bit so

25   they can try to get this in.

*JA001056*

UNCLASSIFIED//FOR PUBLIC RELEASE

39

1      I don't think the interrogation is reliable for the

2    reasons I have already stated. I don't think it is reliable for

3    any purpose except I don't even think it says what the

4    Government says it says. I think Mr. Mudwani is trying to

5    clarify that he wasn't talking about my client and I think

6    that's clear if you read the actual description of his travels

7    in Afghanistan where he is talking about a different Usama.

8       One last thing on ISN 839 and that's that I know I told

9    you that one Judge at least found him not to be credible because

10   of his psychosis that the military had -- the medical staff had

11   diagnosed him with; and I didn't know which Judge it was. It is

12   Judge Kessler in the case of 05-1678. I don't believe that's a

13   reported position, a reported case, but it was from May of 2009.

14   I also discuss a lot more about 839 in my Amended Traverse, but

15   I would like to move on to ISN 707.

16      THE COURT:  Um-hmm.

17      MS. GORMAN:  ISN 707 gives detailed descriptions for --

18   I am sorry. ISN 707  admitted as the Kaldan trainer. He is

19   actually the commander of Kaldan. He ran the day-to-day

20   operations for the last five years until it closed.

21      THE COURT:  You mean Kaldan.

22      MS. GORMAN:  Kaldan. I am sorry. I have a different way

23   of pronouncing it from how I have heard it pronounced, but I

24   will try to remember to call it Kaldan so we know we are talking

25   about the same camp. He was the one that ran this camp for the

JA001057

40

1   last five years. It closed in 2000, early 2000, late 1999.

2       In Exhibit 43 as the Government has pointed out he

3   identified many individuals. He identified more than 60

4   individuals. He looked at more than 60 photos, and in the course

5   of those 60 photos he looked at a photo of my client and

6   referred to him as Usama al-Jaza'iri. That's on page five of

7   Exhibit 43.

8       And he describes him not as a trainer from Kaldan, not

9   as someone he saw in Afghanistan but as a driver in Algeria. I

10   ask the Court to look at that exhibit because it is an important

11   exhibit because ISN 707 he doesn't hold back. He describes

12   everybody and how he knows them. He describes where he knows

13   them from. He describes the people that worked for al-Qaeda. He

14   describes the people who worked for the Taliban. He describes

15   the people who were at his training camp or that he knows were

16   at another training camp. He gets to my client.  For some reason

17   he uses this kunya, this nickname, but he doesn't describe him

18   as someone he traveled with. He doesn't describe him as someone

19   he has ever seen before. He just describes him as a driver from

20   Algeria. And I want to point out to the Court that that's the

21   only time he ever used that nickname when referring to my

22   client. There are a lot of interrogations with ISN 707, but

23   probably the one most important one is the one one month later

24   which was dated ▮▮▮▮▮▮▮

25       Again, he was given a photo array and -- I mean it is 5

JA001058

41

1    or 6 pages of photos one after the other. At first he was asked
2    to list everybody he knew from Camp Kaldan, and he lists about
3    15 individuals, different ISNs. These are all people from
4    Guantanamo. He is not holding back. He is saying who he knows
5    and where he knows them from, how long they trained there,
6    et cetera. He doesn't mention my client as one of those
7    individuals and he doesn't mention my client as having the
8    kunya, the nickname of Usama al-Jaza'iri.
9          Instead my client falls under a list that starts at the
10   bottom of page two, Uthman, that's ISN 707 advised that he knew
11   the following individuals from his time in prison in Pakistan
12   and then he looks at the photo███ and says that's Abdul Razak.
13   He is on the list of people he knows from prison. He doesn't
14   have that nickname any more.
15         And I will say to the Court that there are lots of
16   exhibits in evidence here. Petitioner's Exhibits 44 and 45 but
17   then Defendant has a lot of exhibits relating to ISN 707. 36
18   through 43, 81, 85, 88, 89, 117 through 119███. Those are
19   all interrogations of ISN 707. Many of those he identifies
20   people, talks about his training time at Kaldan, talks about
21   people he knew there, identifies them by photo.  Never again
22   does he identify my client as having that nickname or of him
23   knowing him from anywhere other than prison, meeting him at
24   prison. He doesn't even remember him from the guesthouse.
25         I think that's an important part, your Honor, because a

JA001059

UNCLASSIFIED//FOR PUBLIC RELEASE

42

1    lot of these people from this guesthouse don't remember each

2    other originally from the guesthouse because they didn't really

3    have much contact with each other. They sat in their rooms or

4    sat and read, but they didn't, you know, remember each other

5    from there.

6        So I think it is important that he one month later does

7    not use that nickname. I think the only explanation I can give

8    and, of course, we will never know why he used that nickname the

9    first time is that he was somehow confused. He is looking at all

10   these photos, more than 60 photos, but when he is asked to break

11   it up in a different way -- now this is someone who supposedly

12   traveled with my client. If you believe that kunya, if what the

13   Government is saying, that's my kunya, that's my client's kunya,

14   that's his nickname, then 707 traveled with him because 707 says

15   he traveled with the person with this name Usama al-Jaza'iri.

16       He never describes my client as someone he traveled

17   with. He never describes him as someone he saw in Afghanistan.

18   He never describes him as someone he saw at Kaldan.

19       He just -- the one time he described him as a driver in

20   Algeria. There is no indication my client ever even drove

21   nevertheless was the driver and then the next time he identified

22   him as someone he met in prison and never lists him as anything

23   else again.

24       There is one last -- actually a couple other important

25   pieces of evidence about this nickname, but one that's important

JA001060

UNCLASSIFIED//FOR PUBLIC RELEASE

43

1    is Exhibit 50, Plaintiff's, Petitioner's Exhibit 50. I discussed

2    this in the course of the hearing but just to remind the Court,

3    this is an interrogation of ISN 215. As I stated, ISN 215

4    coincidentally was the individual whose wrong photo was on my

5    client's, as my client.

6          This interrogation in Exhibit 50 is just before he is

7    leaving to go back to Saudi Arabia apparently because it is in

8    2007 and we know he left in 2007. The interrogator showed ISN

9    215 a picture of Abu Bakr Mohammed Boulghiti and asked him if he

10    had ever seen this individual before. ISN 215 looked at the

11    picture for about 30 seconds before stating that he did not

12    recognize the individual. This is on the first page paragraph

13    six B. The interrogator asked if he may have seen this

14    individual at the Abu Suhayb guesthouse.  ISN 215 stated that

15    the Abu Suhayb guesthouse was actually the Al-Ansar guesthouse

16    where he used to work.

17          He stated he met hundreds of fighters while working

18    there and found it difficult to remember specific individuals

19    who passed through especially after six years.

20          ISN 215 asked who the picture individual was known as

21    and the interrogator said that he went by either Abu Yassar

22    al-Jaza'iri, Abu Hamza, Fayiz, Abu Osama. It says and Imal, but

23    I think it is supposed to mean or -- ISN 215 said he knew an Abu

24    Usama al-Jaza'iri as an instructor at either al Farouq or Kaldan

25    because we know he trained at both.

JA001061

UNCLASSIFIED//FOR PUBLIC RELEASE

44

1     He said Abu Usama al-Jaza'iri had blonde hair and

2    looked nothing like the individual in the picture.

3     So not only is there no reliable evidence that my

4    client went by this name of Usama al-Jaza'iri, but we actually

5    have a description by a man who trained at Kaldan and who was

6    familiar with the person who used that name and he describes

7    that individual quite different looking than my client as having

8    blonde hair. And I think this exhibit also clarifies who the

9    Government thought was using this name and it wasn't my client.

10   It I was ISN 695 Abu Bakr Mohammed.

11    Next, your Honor, we have &#9608;&#9608;&#9608;&#9608;&#9608;&#9608; we

12   know because of ISN 707, that he traveled along with ISN 707 and

13   that they traveled in some parts of Afghanistan and Pakistan

14   together. ISN 43 -- I mean ISN 707 states that in Exhibit 43. He

15   describes &#9608;&#9608;&#9608; as one of the people he traveled with. So

16   we know &#9608;&#9608;&#9608; is familiar with the person known as Usama

17   al-Jaza'iri. Even if he doesn't know him by that name, he

18   certainly knows he is someone that he traveled with.

19    The Government made a big deal about the fact that &#9608;&#9608;

20   &#9608;&#9608; was new and he might not know my client by that

21   description, by that nickname, but he certainly would know what

22   he looked like. He certainly would know that they traveled

23   together even if he knew him under a different name but &#9608;&#9608;

24   &#9608;&#9608; when asked to describe my client, Petitioner 685, he

25   describes him as a quiet type, someone that people don't know

UNCLASSIFIED//FOR PUBLIC RELEASE

45

1    much about, someone who might have been a low level fighter on

2    the front or maybe he was just new to Afghanistan. He doesn't

3    know. He is just kind of summarizing, but he does say no one

4    knows much about him and he was a quiet type.

5         Your Honor, if this was a person that he had traveled

6    with, if this was a person that he knew in Afghanistan, that he

7    was traveling with in Afghanistan, certainly he would have said

8    this as he did with other people that he was obviously training

9    with -- I mean traveling with.

10        THE COURT:  Was he given a photograph?

11        MS. GORMAN:  I think he was asked to identify the

12    people in the guesthouse.

13        THE COURT:  So he wasn't presented with ██████

14        MS. GORMAN:  I am not sure. I can look at the exhibit

15    just to find out. Thank you.

16      (Pause.)

17        MS. GORMAN:  No.  He appears to have been given a

18    different photograph. He was given a photograph. It is ███ but

19    he -- and this Exhibit 57 he describes him as a quiet type,

20    someone he knew from the guesthouse. And then in Exhibit 69, the

21    other interrogation, he describes him as an Algerian. That's

22    where I wanted to get into and I will get into this more.

23        Some of these individuals who recognized the Petitioner

24    from the house do describe him as an Algerian. No one knew much

25    about Al Razak is what he says. He was thought to have been

JA001063

UNCLASSIFIED//FOR PUBLIC RELEASE

46

1  maybe a low level front line fighter or new to Afghanistan. He

2  is just speculating as know, but what he is saying is we don't

3  know anything about him.

4      THE COURT: Why don't we turn to the guesthouse issue

5  then right now. You have been going 45 minutes, and we haven't

6  even talked about it.

7      MS. GORMAN: Just one last individual that was an at

8  the guesthouse, ISN 703. He said that he is familiar with

9  Petitioner from being at the guesthouse and never heard anyone

10  refer to him as Osama. I would like to address the being in

11  Afghanistan issue too because --

12      THE COURT: You already got that in your briefs. Let's

13  focus on the guesthouse.

14      MS. GORMAN: The one thing I didn't have in my briefs

15  because the Government didn't give me the document until this

16  week was that when ISN 696 identified my client as someone he

17  saw in Afghanistan and someone that he knew -- that someone that

18  knew what was going on in the house, he also called my client

19  Morad and now we know that Morad was an individual at the

20  guesthouse. It was not my client. He was a Moroccan. That comes

21  from Exhibit 78 that the Government just gave me █████████

22  ████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████

24      Guesthouse. First is I went through on Wednesday, there

25  was a lot of confusion. Exhibit 2 is the FBI report the day --

JA001064

UNCLASSIFIED//FOR PUBLIC RELEASE

47

1   the morning after the raid. In this report, they list my client

2   or the person they claim as my client Razak, Abdul Razak as

3   being in the ███ house and they identify a story going along

4   with that individual who said he was Afghanistan. Then he

5   recanted and said, no, I wasn't.

6       I think one of the important things is what happened on

7   Wednesday when the Government did their rebuttal at the end of

8   the day and they claimed that my client was lying and that proof

9   of that was at the back of this document that I didn't have the

10  back of which was my Exhibit 2, their Exhibit 23. So I am now

11  using their Exhibit 23.

12      And what the Government says is that the person that

13  was arrested that night at the ███ house had to be my client

14  because he had the same birthday. Well, he didn't have the same

15  birthday. That's the first point. In that Exhibit 23 on page 16,

16  they list the month and year so, yes, this person was born in

17  July and was born in July of 1970 but there is no date listed.

18  Okay. That's a coincidence. I don't think it is that much of a

19  coincidence, but, you know, it is not like it was the same day

20  of the month. They don't have a day of the month.

21      The Government also claims that they had the same

22  parent names and that's just completely false. They didn't have

23  the same parent names. I am going to have the Court look at

24  Exhibit 16 which is my client's interview ████████

25  ██████████████████████████

JA001065

UNCLASSIFIED//FOR PUBLIC RELEASE

48

1    ███████████████████████████ that

2    took place and we have the transcript from that meeting.

3         And my client gave his correct birth date of July

4    19th -- I am sorry -- July 17th. That's on page three. He

5    listed his father's name as ████████. That's on page

6    four. He lists his mother's name as ██████ say had a.

7    That's on page five and he lists his six siblings or he talks

8    about his six siblings, three brothers and three sisters.  Two

9    of his sisters are older than him and that's on page five.

10        Now, the individual that was arrested at the guesthouse

11   under the name of Abdul Razak had the same birth month and year

12   but different parent names and one brother who was about ten

13   years old that person claimed. The fact that that information

14   followed my client just like that information about being in

15   Afghanistan and was used against him is part of what we are

16   complaining about; that once they attached that individual to my

17   client, then history went with my client, but I will tell you

18   the Government made it sound like he was doing a really good job

19   of adopting that history, that he could keep up with the two

20   names of the parents ██ and I believe it was ██████

21        But I will tell you, your Honor, for one thing I am

22   sure that the information just like the Afghanistan information

23   was following my client, but he was not all that clever of a guy

24   and he was not actually able to keep that story straight of who

25   his family members were from this name that he adopted because

JA001066

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

49

1   of this confusion.

2        I would suggest to the Court that in some of the

3   documents that are attached in Government's exhibits including

4   Exhibit 83 he confuses the brother.  The brother that was listed

5   as being under ten years old is now 15 years old. What I am

6   trying to explain to the Court is that there was a lot of

7   confusion. My client was not interrogated for almost another

8   month until [        ] is the first report of him because of his

9   stay at the hospital and the person of the FBI that interviewed

10   this person named Abdul Razak said he knows that the person

11   didn't have any problems. He wasn't injured in any way so it

12   couldn't have been my client.

13        We also know that most importantly



24        And for the Government to go through all of these hoops

25   to try and prove that somehow this could be my client just

JA001067

50

1   doesn't make any sense and it doesn't make any sense that my

2   client would ██████████████████████████████████████████

3   ████████████████████████████████████████████████████████

4   ██████████████████████████████████████████████ It just

5   doesn't make any sense.

6       Your Honor, also I would like to talk about that part

7   of the house where I know I talked about it and I am sure the

8   Court remembers but the Government documents confirm that if

9   there was any illegal electronics going on or anything untoward

10   going on, there was no evidence of that in the records that were

11   retained.

12       We have some books, electronic books. We also know we

13   have two electronic engineers that were there so I guess it is

14   not that surprising that there would be books, but there was no

15   explosives or anything like that. There is no indication from

16   any of the detainees that were in that house that anything like

17   that was going on at least visibly. There is certainly no

18   indication my client ever saw anything going on.

19       He has consistently maintained that he never saw

20   anything going on there and the Government has not presented

21   anything to suggest that he did except for the identification of

22   ISN 696. That's the identification that he made in Bagram

23   looking at picture ██ and he calls the person Morad and says

24   that he knew what was going on and he was in Afghanistan and we

25   know that it wasn't my client. He wasn't in that picture and we

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

51

1    know Morad is an individual that's totally separated from my

2    client.

3          I want to, skipping through, I wanted to address the

4    part just briefly about all of the individuals who knew him as

5    an Algerian at the guesthouse originally so if the Court will

6    just give me one second, I will end it with that.

7    (Pause.)

8          MS. GORMAN:  So several of the detainees at the

9    guesthouse knew that my client was Algerian and I think this

10    also corroborates what he said in that Government document which

11    is Government's Exhibit 27 when he said he always used his right

12    identity at that house. Particularly ISN█ in Exhibit 48

13    identifies my client as an Algerian he knew at the house. █

14    as I said just a little while ago, in Exhibit 69 identifies

15    himself as an Algerian at the house. That's on page 28.

16          ISN 695 identifies him as an Algerian. That's

17    Exhibit 54 and ISN█ also identified him as and Algerian and

18    that's Exhibit 67. I don't think it is that surprising that the

19    individuals wouldn't remember what name he was going by at the

20    house because the evidence is that no one really spoke to each

21    other so the fact that he was using his correct name at the

22    house and no one remembered that when they are being told this

23    is what his name is --

24          THE COURT:  If al-Jaza'iri means the Algerian and these

25    people remember him as an Algerian, isn't that corroborative of

JA001069

52

1    the fact that he used the name al-Jaza'iri?

2        MS. GORMAN:  There is no indication that he used that

3    name and all there is is an indication that people know that he

4    is Algerian just like they know some people are Sudanese, some

5    people are Lybian. The fact that they remember him as being an

6    Algerian, nobody identifies him with that name except for the

7    two.

8        THE COURT:  Hold on. You are conflating two ideas.

9    Someone might not be able to remember someone's name, but they

10    may be able to remember someone's ethnic profile.

11        MS. GORMAN:  Correct.

12        THE COURT:  You know, that guy over there I think he is

13    Italian but I don't remember his name. It is an Italian name but

14    I can't remember that. Okay. So a person could have a faulty or

15    incomplete memory as to someone's name but still remember their

16    ethic background.

17        MS. GORMAN:  Correct.

18        THE COURT:  Whatever. In this instance here, it sounds

19    like a number of the detainees remember your client's ethic

20    background but not his name but what they remember as his ethnic

21    background, i.e., Algerian is consistent with the name

22    al-Jaza'iri.

23        MS. GORMAN:  But it is not consistent with the name

24    Osama Abu al-Jaza'iri and actually two of these individuals --

25        THE COURT:  It isn't?

JA001070

53

1    MS. GORMAN: No, your Honor. That's a separate kunya.

2    THE COURT: It means the Algerian.

3    MS. GORMAN: It means -- the Algerian is just the Al

4    Jaza'iri part. The other part is different from that. So it

5    could have been as we know Abu Osama al-Libi. It is a different

6    kunya associated with the name of the country. And I will tell

7    you two of these individuals who remember him as being Algerian

8    are also Algerians so it is not that surprising that they would

9    remember that he is Algerian too. It doesn't mean if someone

10   remembers that they are Algerian that they all of a sudden

11   become Osama Abu al-Jaza'iri.

12   THE COURT: Let's put it this way. It is not

13   inconsistent with him using the name al-Jaza'iri. If they

14   remembered him as being Soviet, Russian, someone from Eastern

15   Europe that's one thing; but if they remember him as Algerian,

16   that's not inconsistent with someone using the name al-Jaza'iri.

17   MS. GORMAN: Al-Jaza'iri is just a description of the

18   country. It is the actual kunya Abu Osama al-Jaza'iri that's the

19   important part of this name. It is not just that he is

20   al-Jaza'iri. Yes, he is Algerian. There is on question about

21   it, but did he use this name? No, he didn't. The person that did

22   use this name was a trainer at Kaldan who was a blonde haired

23   person who everyone knows was a trainer at Kaldan and it was not

24   my client. And no one identifies my client as being the one

25   traveling around with them using that name.

JA001071

54

1        THE COURT:  Okay. Do you have anything else?

2        MS. GORMAN:  Thank you, your Honor.

3        THE COURT:  You are welcome.  Ms. Hussey, what about

4    this blonde fellow?

5        MS. HUSSEY:  Yes, your Honor. I would actually love to

6    turn the Court's attention to that.

7        THE COURT:  That exhibit.

8        MS. HUSSEY:  That exhibit, yes.

9        THE COURT:  Remind me what that number is, please.

10       MS. HUSSEY:  A moment of the Court's indulgence, I have

11    to remind myself.

12       MS. GORMAN:  It is Petitioner's 50.

13       MS. HUSSEY:  It is Petitioners Exhibit 50.

14       THE COURT:  Let me pull that up. All right.  I have got

15    50.

16       MS. HUSSEY:  All right. So this is an interrogation

17    report of ISN 215 that's dated June 28, 2007. ISN 215 for the

18    Court's knowledge was arrested crossing the Afghan/Pakistan

19    border in December or January, 2001 or 2002. He was transferred

20    to Guantanamo Bay by January, at some point in January of 2002.

21       Now, this interrogation report which is dated 2007 is

22    many years after ISN 215 is captured. The paragraph that

23    Petitioner's counsel keeps pointing to has ISN 215 being shown a

24    different person's picture, a completely unrelated person's

25    picture and asked what this guy's name is. The interrogator, you

JA001072

55

1    know, is --

2        THE COURT: Can you tell what picture he is being

3    shown?

4        MS. HUSSEY: Well, I believe it is a picture of this

5    individual named Abu Baker Mohammed Boulghiti, but I don't

6    believe that Boulghiti whose name I am sure I am mispronouncing.

7    It is spelled B O U L G H I T I. ███████████

8    ████████████████████████

9        THE COURT: All right. So the author of this report is

10   military intelligence?

11       MS. HUSSEY: I can't tell from the face of the report

12   if it is a military intelligence officer or just in general a

13   military contracted interrogator.

14       THE COURT: Okay.

15       MS. HUSSEY: But you do know that it is an interrogator

16   that's employed or paid by the Department of Defense.

17       THE COURT: Right.

18       MS. HUSSEY: The interrogator code is listed in

19   paragraph one. After the word summary, you see the

20   parenthetical that says ████ A parenthetical. That's the

21   interrogator's code.

22       Now, Respondents are not suggesting that there is

23   anything wrong with this interrogation. In fact, if you read

24   paragraph six B, it shows that ISN 215 is being asked about an

25   entirely unrelated individual. He says I don't know that guy. I

JA001073

56

1    don't know him. I don't know his name. And he says specifically

2    that he worked at this particular guesthouse. It is called the

3    Abu Suhayb guesthouse. Well, I apologize. To correct the record,

4    it says he knows the guy in the photo in a limited capacity but

5    he doesn't remember any details about him.

6        He says that 215 when he was working at this

7    guesthouse, the Abu Suhayb guesthouse which was actually the

8    Al-Ansar guesthouse, he met hundreds of fighters while working

9    there and found it difficult to remember specific individuals

10   who passed through, especially after six years.

11       So right off the bat Respondents would point out that

12   he is identifying -- his memory in identifying people has faded.

13   Then he is asked, you know, who the individual -- what was this

14   guy's name. He says I don't know. The interrogator says he went

15   by and lists several names. One of the names if --

16       THE COURT:  Let me stop you right there a second.

17       MS. HUSSEY:  Yes, your Honor.

18       THE COURT:  The interrogator is stating that he went by

19   the name, he lists some names.

20       MS. HUSSEY:  Yes.

21       THE COURT:  Who is the he in the he went by?

22       MS. HUSSEY:  I believe it is Abu Bakr Mohammed

23   Boulghiti --

24       THE COURT:  Right.

25       MS. HUSSEY:  -- the individual whose picture is in

JA001074

57

1   front of 215.

2           THE COURT: So why -- I am trying to understand how it

3   is possible that the interrogator would be saying to this 215

4   that the person in the picture that the interrogator has

5   identified as Boulghiti also used the name Abu Yasir

6   al-Jaza'iri, Abu Hamza, Fayiz and Abu Usama Imma'il. Are those

7   just other aliases that this person must be using?

8           MS. HUSSEY: Yes, your Honor. I think based on reading

9   the paragraph, these would be other names that this Boulghiti

10  went by.

11          THE COURT: Okay.

12          MS. HUSSEY: And the witness, the source here as ISN

13  215 says he knew an Abu Osama al-Jaza'iri as an instructor at

14  either al Farouq or Kaldan. He says Abu Usama al-Jaza'iri had

15  blonde hair and looks nothing like the individual in the

16  photograph. So he looks nothing like Boulghiti.

17          I would suggest that he is kind of speaking off the

18  cuff, and he gives as the only characteristic here to tie down

19  to an Usama al-Jaza'iri, he gives blonde hair and the fact that

20  he was either an instructor at Kaldan or at al Farouq. He can't

21  remember.

22          Now, first of all, he is not looking at a picture of

23  anyone in particular and saying oh, yes, that's Usama

24  al-Jaza'iri. It is not something that you can rely upon to tie

25  to any particular individual because of that. But the second

JA001075

UNCLASSIFIED//FOR PUBLIC RELEASE

58

1    thing is he is saying he had blonde hair. This is a

2    characteristic that's changeable. I am not suggesting that he

3    did or he didn't, but the only kind of hook characteristic that

4    215 is providing here is one that, you know, can readily be

5    changeable. Hair can be cut. It can be shaved completely off or

6    it can be dyed.

7        THE COURT: It was bleached by the sun.

8        MS. HUSSEY: Sometimes it is even bleached by the sun,

9    your Honor. So I would suggest that this interrogation report

10    does not in any way undermine any of the identifications that

11    the Government has presented here for Usama al-Jaza'iri which

12    are photo identifications of the Petitioner and individuals with

13    knowledge of the Petitioner saying that this is the name he went

14    by.

15

16        THE COURT: Go ahead.

17        MS. HUSSEY: Petitioner's counsel also attempts to

18    muddy the waters of the photo IDs that Respondents have put

19    forward here today by pointing to a photo mix up that happened

20    specifically that was identified in May of 2003, May 7th I

21    believe of 2003.

22        THE COURT: Yes, that's when 696 was being shown two

23    photos.

24        MS. HUSSEY: Yes, your Honor. Now, I would like to

25    correct the record on one thing which is that Petitioner's

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

59

1    exhibit that she has been pointing the Court to for this photo

2    mix up doesn't contain the two pictures; but if you turn to

3    Exhibit 110, Government's Exhibit 110 you will see that this

4    interrogation report actually involved two different pictures

5    that were shown to ISN 696.

6         One of them is a picture of 215. That's the picture

7    that Petitioner's counsel keeps putting up here and showing the

8    Court. The other one is a picture of 685, the Petitioner.

9         THE COURT: This is 110 you said?

10        MS. HUSSEY: Yes, your Honor, 110. Now what consists of

11   Exhibit 110 here is the actual interrogation report and then

12   behind the interrogation report, the Court will find the picture

13   of ISN 685 that was used in this interrogation report and then

14   behind that you will see the picture of ISN 215 that was used in

15   this interrogation report.

16        THE COURT: They don't look alike.

17        MS. HUSSEY: So there is two things to note from this

18   interrogation report right off the bat. The first is that the

19   picture that was used for 685, the Petitioner here, is not photo

20   ███.

21        THE COURT: Is not?

22        MS. HUSSEY: Is not. So we can definitively say that

23   this photo mix up problem does not involve ISN -- or photo

24   ███ The second thing that is important to note from here is

25   that ISN 696 is being asked to look at these two different

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

60

1    people, two different pictures to clarify a request from another

2    team; and we would submit to you that ISN 685 team identified a

3    problem and asked the 696 team to clarify it.

4         MS. GORMAN:  I am going to object, your Honor. There is

5    no indication of that in the record.

6         MS. HUSSEY:  In fact, there is an indication of that in

7    the record that can be found in Petitioner's own exhibits which,

8    if the Court will give me a moment, I can point you to.  The

9    report, just to tell the Court where I am headed here, the

10    report that Petitioner's counsel showed the Court yesterday that

11    had it was basically a summary of activity at Guantanamo Bay and

12    it said that the Petitioner ISN 685 was scheduled to be

13    interrogated on ▇ I believe it was ▇▇▇▇

14         Then if you flip back a few pages, you see the wrong

15    picture of ISN 685 and a blurb that is actually an accurate

16    blurb for the Petitioner.

17         Now, he was scheduled to be interrogated ▇▇▇▇▇

18    ▇ and actually that interrogation report is in Respondent's

19    exhibits here in this case. So we submit that the interrogators

20    in April of 2003 noticed that there was a problem with the ASP.

21    It is Analyst Support Package photo of the Petitioner. That

22    problem is specifically identified here in Government's

23    Exhibit 110.

24         In this interrogation report, it says specifically if

25    you look on the first page detainee -- this is the first

2

JA001078

UNCLASSIFIED//FOR PUBLIC RELEASE

61

1    paragraph towards the bottom, and it is a sentence, if we could

2    highlight, I believe it is paragraph seven is the number on it.

3    When I say the first paragraph towards the bottom, I actually

4    mean the last paragraph on this page.

5          THE COURT: The sentence that starts: Detainee was then

6    shown two photos?

7          MS. HUSSEY: Yes, your Honor. Detainee was then shown

8    two photos and asked if he knew either of the men. Detainee

9    looked at the pictures sideways glanced at -- ███ is the

10   indication for the interrogator in this instance -- sideways

11   glanced a███ as if thinking that this was a test question to

12   see if he was truthful. Indeed it was asked because another team

13   had some question as to the nationality and ASP picture -- that

14   stands for Analyst Support Package picture -- of one of their

15   detainees that they were preparing to work.

16         Detainee looked at the pictures, then pointed to the

17   one on the right and stated that is Abdul Razak al-Libi.

18   Detainee was actually captured with al-Libi yet there were

19   others that he was captured with that we had seen pictures of

20   without identifying. The picture identified by the detainee was

21   not the one in the folder for the detainee listed as al-Libi,

22   ISN 685.

23         Now, skipping down to the very last two, three

24   sentences of this same paragraph, this portion that begins at

25   very end of a sentence ███, an analyst, checked detainee's

UNCLASSIFIED//FOR PUBLIC RELEASE

62

1    photo identification of Abdul Razak al-Libi by going to the

2    guard cell and requesting to see the wrist band and cell block

3    ▮▮▮▮▮ for 685. The photos on these items much more

4    closely matched the photo detainee identified as al-Libi than

5    the photo on the ASP from 685.

6         Further research seems to indicate that the photo in

7    685's folder is actually 215.

8         THE COURT:  What's the date of that?

9         MS. HUSSEY:  The date of this is May 7, 2003.

10        THE COURT:  So it looks pretty clear that by that date

11   they have figured out there is a problem and they are correcting

12   it.

13        MS. HUSSEY:  Yes, your Honor. So they corrected it as

14   of May 7, 2003. Now, just for the record, a problem with the ASP

15   picture or Analyst Support Package picture does not mean that

16   every picture used for the Petitioner was tainted. In fact, the

17   Court is absolutely correct when it said a few moments ago that

18   there are often multiple pictures of a detainee in a folder.

19        THE COURT:  Right.

20        MS. HUSSEY:  Now, Petitioner wants you to take this

21   discrete photo mix up issue and impute it to every other photo

22   identification in this case but that's just not reasonable.

23   First of all, as the Court just noted, this problem was

24   identified and corrected May 7th of 2003. So the ▮▮▮▮▮

25   identification where 839 says that picture of 685 is Usama

JA001080

UNCLASSIFIED//FOR PUBLIC RELEASE

63

1    either al-Libi or al-Jaza'iri who I saw in Afghanistan, that's

2    not affected.

3        In addition, none of the 696 identifications are

4    impacted. In fact, if the Court looks at all of the 696

5    interrogations in this case where he identifies people and the

6    Petitioner's picture is put in front of him, he consistently

7    identifies him as Abdul Razak, sometimes he says the Lybian,

8    from the Faisalabad guesthouse with Abu Zubaydah.

9        Now, specifically Petitioner wants you to believe that

10    the ████████, interrogation of 696 was impacted by this.

11    This is the Bagram interrogation that Petitioner's counsel keeps

12    referencing. That is our Exhibit 107.

13        Now, we know that MP numbers, as we discussed during

14    this merits hearing, MP are numbers assigned at Bagram and they

15    are assigned and recycled, but no detainee is ever given a

16    duplicate number of another detainee at Bagram that's there at

17    the same time.

18        So ISN 215 as the evidence in the record shows was at

19    Bagram in December or January, 2001 to 2002. He was transferred

20    to Gitmo in January of 2002 which is three months before the

21    Petitioner was ever even captured.

22        Now, the Government has produced evidence in this case

23    and that can be found at Exhibit 97, this is 685, the

24    Petitioner's knowledgeability brief. That document shows that

25    the Petitioner's MP number while he was at Bagram was ████ ISN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

64

1    696 who was captured with the Petitioner and also at Bagram at

2    the same time his MP number is ███ That's also shown in the

3    Government's evidence because we submitted at Exhibit 98, 696's

4    knowledgeability brief showing his MP number when he was at

5    Bagram was ███

6        So now I would ask the Court to turn to Exhibit 107. It

7    is Government's Exhibit 107. This is an  interrogation of ISN

8    696 when he is at Bagram ████████. On the second page

9    of this exhibit he is shown a photo log of individuals from the

10   Bagram photograph log. It is called specifically here on page

11   two, it begins with the fourth bullet down on page two for the

12   Court's reference.

13       THE COURT:  This is 107?

14       MS. HUSSEY:  107, yes.

15       THE COURT:  My page two has the number nine in the

16   lower right corner.

17       MS. HUSSEY:  Oh, I apologize. It is the second page of

18   the report which would be page nine -- or page -- it has a page

19   nine indication but it is not page nine of our exhibit. I

20   apologize. The fourth bullet down says ███ identified the

21   following individuals from the Bagram detention photograph log.

22   And then a few bullets down you see a bullet that begins ███

23   That's the Petitioner's MP number when he was at Bagram.

24       He looks at that picture and he says that's Abdul Razak

25   a/k/a Morad. He has knowledge of the training taking place in

JA001082

65

1    Abu Zubaydah's safe house in Faisalabad and he has been to

2    Afghanistan. Now, here we have several points of reference that

3    tell us that this is the right picture of the Petitioner. First

4    of all, it is the same name he uses for him consistently

5    throughout his entire time, 696's entire time in detention,

6    Abdul Razak. It is right there. Second, it says he has

7    knowledge of the training taking place in Abu Zubaydah's safe

8    house in Faisalabad.

9        We know that 696 was in that safe house in Faisalabad

10   with the Petitioner and Abu Zubaydah. 215, 215 had been arrested

11   in December, transferred to Guantanamo Bay in January, there is

12   no way that he was in Abu Zubaydah's safe house in Faisalabad

13   with the Petitioner and 696.

14       So that's another reason we know. And third he says he

15   has been to Afghanistan and that also is consistent with the

16   other evidence we have in this case showing that the Petitioner

17   admitted in that very first interrogation that he had been to

18   Afghanistan and other sources have placed him in Afghanistan in

19   October and November of 2001.

20       THE COURT: Where did this interrogation 107 take

21   place?

22       MS. HUSSEY: This took place at Bagram.

23       THE COURT: So this is in June of '02?

24       MS. HUSSEY: June of '02, yes, your Honor.

25       THE COURT: That's around the same time -- has the

JA001083

UNCLASSIFIED//FOR PUBLIC RELEASE

66

1    Petitioner left yet for GTMO at that point?

2        MS. HUSSEY:  Actually Petitioner I believe arrived at

3    GTMO June ███ of 2002.

4        THE COURT:  So how specific is the date on this one?

5        MS. HUSSEY:  The date on this Exhibit 107 is June 17,

6    2002.

7        THE COURT:  So they were at Bagram at the same time?

8        MS. HUSSEY:  I don't know the exact dates that ISN 696

9    got to and left Bagram; but, yes, they were arrested at the same

10    time and they generally traveled the same route to GTMO I

11    believe.

12        THE COURT:  This establishes that Abdul Razak was the

13    name he was known by, was one of the names he was known by at

14    least before he ever went to GTMO?

15        MS. HUSSEY:  Yes, your Honor. This in fact is one of

16    many pieces of evidence Respondents have put before the Court

17    showing that he went by the name Abdul Razak before he was

18    captured. Now, we rely on ISN 696 generally to corroborate

19    Petitioner's presence in Lahore and his travel to and presence

20    at the Faisalabad guesthouse with Abu Zubaydah as well as to

21    corroborate Petitioner's knowledge of the training that was

22    happening at the house.

23        ISN 696 admitted in 2002 to his activities in the house

24    and we have discussed that during the merits hearing.

25        THE COURT:  He has never recanted this testimony, has

JA001084

UNCLASSIFIED//FOR PUBLIC RELEASE

67

1    he?

2        MS. HUSSEY:  He has never recanted his identification of

3    the Petitioner, but he has gone back and forth a little bit on

4    his admissions regarding ███████████████████ his

5    writing manuals.

6        THE COURT:  On his own activity or on the Petitioner's?

7        MS. HUSSEY:  His own activity.

8        THE COURT:  Oh.

9        MS. HUSSEY:  Now, you will see that -- and we did

10   detail this the both our Amended Factual Return filed September

11   10, 2010 and have discussed this kind of generally throughout

12   the Merits Hearing, but to specifically walk through ISN ███

13   credibility and reliability here, I would point the Court to

14   Exhibits 30, Exhibits 108 and Exhibit 31.

15       Now, in Exhibit 30 which is dated December 12, 2002,

16   ISN ███ refuses to talk about others and he denies knowing how

17   to build a circuit but he admits he is an engineer. In

18   Exhibit 108, ISN 696 denies receiving or providing training

19   while at the Faisalabad guesthouse, but he admits that the

20   residents talked about engineering over dinner.

21       Exhibit 31 which is dated May 13, 2003, ISN ███ denies

22   knowledge of explosives at the house, denies writing any manuals

23   or notes but admits he read notes that explained how a person

24   could get electricity to work inside a circuit and that he saw

25   electronic bags at the house. Now, again ISN ███ has never

JA001085

UNCLASSIFIED//FOR PUBLIC RELEASE

68

1    recanted his identification of the Petitioner as Abdul Razak

2    from the house, but why does he go back and forth? Respondents

3    submit that a review of his interrogation reports show that he

4    goes back and forth about admitting or recanting his own

5    personal activities at the house for strategic reasons.

6        He claims he was never actually mistreated but he

7    believed he would be mistreated if he didn't say -- tell about

8    all his activities.

9        Now, Respondents have provided the Court with the

10    interrogation reports where ISN 696 consistently identifies the

11    Petitioner as Abdul Razak. You can find those -- that evidence

12    at Exhibits 59, 107, 108, 109, and 116. But more importantly you

13    can find at Exhibit 50 ISN 696's 2008 ARB statement.

14        THE COURT: Exhibit 15?

15        MS. HUSSEY: Exhibit 50, your Honor.

16        THE COURT: Okay.

17        MS. HUSSEY: In this 2008 ARB statement, ISN 696 is

18    presented with an unclassified summary of the evidence against

19    him which includes the evidence about his bomb making, the

20    evidence about him writing manuals and participating in this

21    training program that Zubaydah had at the house, and he admits

22    that the entire unclassified summary is true.

23        He boasts, specifically, he boasts that he knows how to

24    make explosives without training and ISN 696 said that he wrote

25    manuals on the use of explosives. Respondents submit that ISN

JA001086

UNCLASSIFIED//FOR PUBLIC RELEASE

69

1    696 is reliable here, a hundred percent reliable on his

2    identification of the Petitioner because that has not changed.

3    Respondents also submit that he can be relied upon in his

4    admissions against himself regarding his activities at the house

5    even though he has gone back and forth in those statements

6    because, first of all, he admitted early on to his activities

7    and second of all he has reaffirmed those admissions in 2008.

8         Now, this Court should be aware and we cite it in our

9    Amended Factual Return that Judge Kessler faced a question in

10   the Ahmed decision regarding specifically this ISN 696 SIR from

11   June 12, 2002.

12        In that case, the Government was using that to show

13   that 696 had identified a different detainee Esbolah which is

14   one of the names he went by. In that case this report, the June

15   of 2002 report, was the only report identifying the detainee as

16   a trainer. The witness ISN 696 did not identify that other

17   Petitioner Ahmed with any training or didn't describe any

18   details around that identification and there was no other

19   identification by 696 in that record.

20        Judge Kessler decided that that identification alone,

21   the June 12, 2002 identification alone was not sufficient to be

22   relied upon in that case but Respondents here assert that it is

23   sufficient in collection, as a collection of all of ISN 696's

24   interviews and that this case is distinguishable because the

25   report is corroborated by numerous other reports as well as

JA001087

UNCLASSIFIED//FOR PUBLIC RELEASE

70

1   Petitioner's own admissions.

2       The idea of Petitioner in that report, the June of 2002

3   report, gives specifics. It says he saw him at Abu Zubaydah's

4   house and that he had knowledge of the training and ISN 696

5   consistently identifies the Petitioner in the same way with the

6   same name.

7       Now, Petitioner's counsel has also attempted to attack

8   the ISN 839 identification of the Petitioner in Exhibit 111.

9   Specifically Petitioner's counsel argues that Exhibit 111

10   doesn't have ISN 839 looking at a picture of the Petitioner and

11   identifying him specifically but this is just wrong. It is wrong

12   on the face of the report. First of all, if you pull up

13   Exhibit 111 --

14       THE COURT:  I have got it.

15       MS. HUSSEY:  -- the second page of the report,

16   paragraph six shows at the very beginning it says summary of

17   information ensure any intelligence results in an IIR. Then it

18   says: The topic of this interrogation was photographs of some of

19   the GTMO detainees that Mudwani was associated with as he fled

20   Afghanistan in late 2001. That reference is  IRR 6034107704.

21   That's an IIR that's encapsulates this same information.

22       Now, these are all photos that are being shown. They

23   are showing him photos to clarify these individuals that he fled

24   Afghanistan with.  Under C, it has the Petitioner's in this case

25   ISN specifically identified and then it says Mudwani identified

JA001088

71

1    him as Usama last name unknown al-Libi al-Jaza'iri.

2        Now, we have been over this a lot times already in this

3    Merits Hearing. I don't need to read this specifically, but this

4    identification provides specifics about 685, the Petitioner in

5    this case. It doesn't say I didn't know him. It doesn't say, oh,

6    I saw him once, but I never learned his name. ISN 839 felt free

7    to say something like that because under D, the very next number

8    for 728, he says to the interrogator he could not provide a name

9    for this individual. In fact, the detainee comment there is no,

10    I am serious, I really don't remember his name. So 839 felt free

11    to say something like that to the interrogators, but he doesn't.

12        In C he specifically identifies the Petitioner with

13    detail and then in the detainee comment he says this is not the

14    same guy I told you about earlier. Petitioner wants the Court to

15    believe this is confusing but this is not confusing. This is a

16    specific reference saying don't confuse Usama al-Jaza'iri with

17    Usama al-Yemeni, I told you about him earlier.

18        And I submit that if the Court turns to that other

19    interrogation, this IIR that is specifically identified as

20    6034121504 you will see that Usama al-Yemeni isn't identified

21    the same way. He is not in the valley outside of Khost.

22    Petitioner identifies him as leaving a guesthouse in Kabul with

23    him. That's very different. This is not confusing. This is very

24    clear.

25        Now, Petitioner also wants you to believe that the ISN

UNCLASSIFIED//FOR PUBLIC RELEASE

72

1    707 identifications of the Petitioner should be hazy or the

2    Court should discount them because ISN 707 doesn't identify the

3    Petitioner the exact same way with 100 percent of the

4    information he knows about him every single time he sees his

5    picture. But that's not how these things work.

6         We know that when a witness is shown a picture, he

7    identifies him by the name he knows and the information that

8    comes to his mind. If the interrogator doesn't press further,

9    doesn't ask him more questions, he might not give the full sum

10    of knowledge that he knows about someone.

11         What we have seen from the ISN 707 interrogations

12    showing him picture ███████ is that 707 knew the Petitioner well

13    enough to know him by both Usama al-Jaza'iri and Abdul Razak.

14    The Petitioner felt so comfortable with 707 he shared both of

15    his aliases. That doesn't undermine the Respondent's evidence.

16    That supports Respondent's evidence.

17         Now, the final point that I will make in this rebuttal

18    is related to the Petitioner's credibility. He has claimed that

19    a different Abdul Razak, a mystery second Abdul Razak was the

20    one that Special Agent ███████ interviewed on April 1st,

21    2002. That's not the case. As Respondents have shown, Special

22    Agent ███████ recorded his personal identifying details and his

23    birth date, his birth month is the same as the birth month and

24    year that the Petitioner still gives to this day, the same month

25    and year that he has provided in his declaration just a few

JA001090

73

1    weeks ago.

2        Now, Petitioner's counsel says that's just a

3    coincidence, but Respondents submit that it is too much of a

4    coincidence to be a coincidence. It doesn't make any sense. And

5    the Petitioner in this case has shown a concerted effort, he has

6    taken steps to constantly back away from any statement he has

7    ever made that's inculpatory to constantly try to hide from the

8    Court the truth in this instance.

9        That can be seen specifically related to this case in a

10   few exhibits. The first is Petitioner's Exhibit 16. I would ask

11   the Court to take a minute and turn there with me.

12       Now, this is a transcript of an audio recorded

13   interview between the detainee, Petitioner in this case, and █

14   ███████████. This interview happened after the

15   Petitioner claims that he felt free enough to change his name to

16   Saeed Bakoush and his nationality to Algerian. It occurred in

17   March of 2006 and, if the Court would turn to page 14 and 15

18   with me, you will see that here he describes the arrest the

19   night that he was captured at the Abu Zubaydah safe house.

20       At the very bottom of page 14, he starts by describing

21   the house a little bit. He says:  Then there was the first floor

22   and the terrace.  The Pakistanis sleep on the terrace. Then I

23   was the first one to be taken out. They took me out and made me

24   sit in the kitchen. Then they started going into the other rooms

25   and bringing out the other people. We were sitting when we heard

JA001091

74

1    gunfire upstairs. We did not have any guns. The room --

2    translator comment means house as well -- I was in did not have

3    any guns. Then when it was over, they took us and put us in

4    trucks. We asked the Pakistanis what happened upstairs and they

5    told us that someone got in trouble with the police so they shot

6    them. One was killed, the doctor. He died on the terrace and two

7    were injured. We have not seen them since. Us, they took us to

8    Lahore in the morning, police station, interrogation bureau for

9    two days then to Islamabad, the big jail. We stayed in the big

10    jail for about three months.

11        Now, as the Court will notice this is the Petitioner

12    talking about his arrest at the March -- at the Abu Zubaydah

13    guesthouse in Faisalabad. He doesn't mention being hit in the

14    stomach with a rifle butt in that initial description of what

15    happened to him. He says where he was taken in the kitchen and

16    then he identified that, you know, after he was captured the

17    next morning he went to Lahore. Describes generally where he

18    stayed in custody.

19        Now, if the Court would turn to page 20 of this exact

20    same exhibit, ▓▓▓▓▓▓▓▓▓▓ later says:  You did not

21    say you were Algerian. Why? They are basically asking him at

22    this point why did you lie? The detainee says, okay, at the

23    beginning when we were in Lahore at the embassies when we

24    entered the soldiers started beating us. One hit me in my belly

25    and they took me to the military hospital in Lahore. There was

JA001092

UNCLASSIFIED//FOR PUBLIC RELEASE

75

1   blood everywhere. They took me to the military hospital where I
2   stayed for three days. The embassies would come and talk to me
3   in Arabic. One is not happy with what is going on and the other
4   tells me to hang in there. They all tried to console me. Then
5   one asked me where I was from, and I told him that I was
6   Algerian. There were Lybians there and some people were able to
7   go back and then go home so he told me to say that I was, and
8   ▮▮▮▮▮▮▮▮▮▮ says Lybian, and he says yes.
9       So here the thing to note is when asked why he lied
10  about his nationality, that's the first time he says that he was
11  hit in the stomach with a rifle butt. The second thing to note
12  is he says he didn't get hit in the stomach with the rifle butt
13  until he was in Lahore which is the day after he was captured at
14  the earliest.
15      The final thing to note is that he was told by an
16  Embassy official to claim he was Lybian. This story changes in
17  his declaration that was just filed a few weeks ago. That can be
18  found at Petitioner's Exhibit 23, specifically on page three of
19  the Petitioner's declaration which for the record and for the
20  Court's consideration for reliability purposes, this declaration
21  is not signed by the Petitioner himself. There is an electronic
22  signature indicated for the Petitioner and then there is an
23  affirmation or a description by his attorney of the situation,
24  why basically she claims she couldn't get his signature. But
25  then there is not even a signature by Ms. Gorman herself at the

JA001093

UNCLASSIFIED//FOR PUBLIC RELEASE

76

1   bottom of this.

2          MS. GORMAN:  Objection, your Honor. The original does

3   have a signature.

4          MS. HUSSEY:  Well, for reliability purposes I would

5   point out that this was drafted by Ms. Gorman herself and there

6   is no indication in the record that there was ever an Arabic

7   version provided to the Petitioner. But, nonetheless, let's take

8   it at its face value.

9          On page three, the Petitioner describes the police raid

10  at this guesthouse and now keep in mind this is only a few weeks

11  from today, a few weeks ago that he submitted this declaration.

12  When the police raided the guesthouse where I was staying, I did

13  not attempt to flee nor did I resist in any way. However, when I

14  was being led to the police wagon, I tripped and one of the

15  Pakistani police turned and hit me very hard in the stomach area

16  with his rifle. I was in great pain. The Pakistani police

17  brought me to an ████████ building in Lahore.

18          Well, actually I will pause there for just a moment.

19  This has the Petitioner saying that the rifle butt incident, he

20  was hit with the rifle on scene at the Faisalabad guesthouse,

21  not in Lahore like he told ████████.

22          He continues to say:  The Pakistani police brought me

23  to an ████████ building in Lahore where I was briefly

24  interrogated by a ████████ man that spoke Arabic.

25  I correctly identified myself and country of origin. I was in

JA001094

UNCLASSIFIED//FOR PUBLIC RELEASE

77

1    terrible pain from my injury and do not remember much about this

2    short interview, but I do know that I was not interviewed by any

3    English speaking person at that time. The man who was

4    interviewing me could see I was in great pain and when I started

5    to throw up blood, he had me taken to the hospital. On the way

6    to the hospital, the ▊▊▊▊▊ officer who was driving me to

7    the hospital told me I should pretend to be Lybian because the

8    Lybians were all being sent home.

9        Now, here not only does he move up the rifle butt

10   incident in his timeline of events so that he is hit with the

11   rifle butt on the scene of capture at the Faisalabad house, he

12   also changes his story to say he was told to claim he was Lybian

13   by an ▊▊▊▊▊ officer, not an embassy official and finally

14   that he should pretend to be -- that the idea that he should

15   pretend to be Lybian was given to him on the way to the

16   hospital, not after he had been at the hospital for a little

17   bit.

18       Now, I submit to the Court that there is a reason for

19   this changed story and the reason for this changed story can be

20   found right there in that same paragraph. It is that the

21   Petitioner has to find a way to avoid him being interviewed, his

22   own interview by Special Agent ▊▊▊▊▊ because in the

23   version of this story he told ▊▊▊▊▊▊▊▊

24   ▊▊▊▊ he doesn't get hit with the rifle butt until a few

25   days later when he is in Lahore, at least a day. That's the

JA001095

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

78

1   earliest in that timeline he could have been hit with the rifle

2   butt. That would be after Special Agent [redacted] interviewed

3   the Petitioner and noted, as [redacted]

4   [redacted] noted or -- I am sorry -- did not note any injury, any

5   pain, any complaints of abuse or mistreatment.

6       Additionally, [redacted] notes the Petitioner says he

7   went to Afghanistan to fight. Well, the Petitioner wouldn't want

8   that admission to hold true and finally [redacted] identifies

9   right there in that same interview that the Petitioner is

10  already employing counter interrogation techniques by trying to

11  change his story when he realizes or recognizes how inculpatory

12  that I went to Afghanistan to fight admission really is.

13      So what we have here is a Petitioner who has shown a

14  concerted effort to change his story in order to avoid

15  inculpatory evidence. He has done it consistently throughout the

16  entire time he was in detention and he has even done it right

17  here in front of this very Court.

18      Your Honor, it is the Government's position that the

19  Petitioner has been engaged in these counter interrogation

20  techniques for years and that what he is trying to do is hide

21  what the facts that the evidence actually shows which is that he

22  has a long-standing relationship with Abu Zubaydah, that in

23  November and -- October and November of 2001, he was in

24  Afghanistan, he fled Afghanistan along the same route as

25  Zubaydah and he ended up in the same house as Zubaydah and other

JA001096

UNCLASSIFIED//FOR PUBLIC RELEASE

79

1    members of the force where they were training and preparing for

2    martyrdom operations.

3        Your Honor, the evidence in this case is consistent.

4    The evidence in this case is clear. And the Petitioner based on

5    that evidence is detainable under the AUMF. Thank you. I have

6    nothing further.

7        THE COURT:  Thank you.  All right. Counsel. We went a

8    little longer than two-and-a-half hours. Thank you for your

9    preparation and your presentations. I will say that in light of

10   the two-day delay to get to summations the chances of me having

11   my unclassified opinion by next Thursday are essentially gone.

12   That's not going to happen. There is no scenario that I can

13   envision with my other responsibilities between now and next

14   Thursday getting that opinion out. So realistically it will

15   probably be in the first week of the new year, sometime in the

16   week of January 3rd.  I will hope to have it by the middle to

17   the end of that week.

18       So Mr. Cockrell will inform you of when I am planning

19   to schedule the public session where I will announce the

20   decision over the telephone and in the open courtroom for the

21   benefit of the detainee and the counsel, of course, and you will

22   hear from him at some point after the new year as to when I am

23   thinking of scheduling that. Thank you for your hard work. I

24   have much to review and have good holidays.

25       (Whereupon, at 5:35 p.m., the proceedings were

UNCLASSIFIED//FOR PUBLIC RELEASE

80

1    concluded.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JA001098

81

1          CERTIFICATE

2          I, Patty A. Gels, do certify that the foregoing is a

3    correct transcript of proceedings in the above-entitled matter.

4

5

6

7

8

JA001099

UNCLASSIFIED//FOR PUBLIC RELEASE

```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2

 3   ABDAL RAZAK ALI,           :   Civil Action
                                :   No. 1:10-cv-01020-RJL
 4             Petitioner,      :
                                :
 5   v.                         :   December 28, 2010
                                :   3:10 p.m.
 6   BARACK H. OBAMA, et al.,   :
                                :   Washington, D.C.
 7             Respondents.     :
     . . . . . . . . . . . . . . . . . . . . . . . . . . . :

 8

 9                    TRANSCRIPT OF PROCEEDINGS
10            BEFORE THE HONORABLE RICHARD J. LEON,
                UNITED STATES DISTRICT COURT JUDGE
11

12   APPEARANCES:

13   For the Petitioner:     H. Candace Gorman
                             Law Office of H. Candace Gorman
14                           220 South Halsted
                             Suite 200
15                           Chicago, IL 60661
                             (312) 427-2313
16

17   For the Respondents:    Scott D. Levin
                             U.S. Department of Justice
18                           Civil Division, Federal Programs
                             20 Massachusetts Avenue, NW
19                           Suite 5132
                             Washington, D.C. 20530
20                           (202) 305-0568

21                           Ann E. Nash
                             U.S. Department of Justice
22                           Civil Division, Federal Programs Branch
                             20 Massachusetts Avenue, NW
23                           Washington, D.C. 20530
                             (202) 353-8776

24

25
```

JA001100

1

```
 1  APPEARANCES (Cont.):

 2  For the Respondents:        James J. Gilligan
                                U.S. Department of Justice
 3                              P.O. Box 883
                                Washington, D.C. 20044
 4                              (202) 514-3358

 5

 6  Court Reporter:             Lisa Schwam, CSR, CRR, RMR
                                Official Court Reporter
 7                              Room 4704-A, U.S. Courthouse
                                Washington, D.C.   20001
 8                              (202) 354-3238
                                LisaSchwam@aol.com
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  Proceedings reported by machine shorthand, transcript
    produced by computer-aided transcription.
```

JA001101

2

                        P R O C E E D I N G S

1
2       THE DEPUTY CLERK:  Civil case 10-1020, Ali v. Bush.

3       THE COURT:  All right.

4       THE DEPUTY CLERK:  Will counsel please identify

5  themselves for the record and who they represent.

6       For the Petitioner, please.

7       MS. GORMAN:  Candace Gorman for the Petitioner.

8       THE COURT:  For the Government.

9       MR. LEVIN:  For Respondents, your Honor, Scott Levin,

10  Ann Nash and Jim Gilligan.

11       THE COURT:  All Department of Justice.

12       MR. LEVIN:  Yes, I'm sorry.  All Department of Justice.

13  Ms. Olivia Hussey was unable to make the call.  She is out of

14  town.

15       THE COURT:  Speak as loudly as you can because these

16  phones aren't exactly what you call state of the art, all right.

17       Can you all hear me?

18       MS. GORMAN:  Yes, your Honor.

19       THE COURT:  Very good.  All right.

20       I informed the Government last Thursday when I had that

21  ex-parte hearing with them that -- Ms. Gorman, you have now

22  received an official filing announcing that it occurred on the

23  27th -- I informed them that I would follow up with a conference

24  call with the parties in the case to bring them up to speed on

25  where we stood and how I was inclined to proceed towards the

3

UNCLASSIFIED//FOR PUBLIC RELEASE

1  resolution of this matter.

2         Now, Mr. Levin filed a document yesterday entitled

3  "Respondents' Notice of Withdrawal of Reliance on Statements by

4  Third-Party Detainee." And that document, I'm disappointed to

5  say, leaves, I think, a misimpression in the minds of the

6  readers as to exactly what happened here. So I intend to

7  correct that, at least initially on this record, and then as to

8  what I do in the future, I haven't decided yet.

9         So let me make this very clear because this document is

10  not clear about this situation. This document is written in

11  such a way as to give the impression that when the Government

12  filed its document on December 6, 2010, filed an ex-parte

13  motion, that there was some way, shape or form of notice to this

14  Court that the purpose of that motion when it was filed was to

15  deal with possible evidence that was arguably discoverable as

16  exculpatory evidence under paragraph E of the Court's case

17  management order.

18         I want to make it very crystal clear. When that

19  ex-parte filing was filed by the Department of Justice on

20  December 6th, this Court had no, zero, idea whatsoever that that

21  was the purpose in any way, shape or form of that motion.

22  Indeed, I informed the parties on the record -- and I do not

23  have the transcript -- at the commencement of or shortly prior

24  to -- I can't remember off the top of my head -- the merits

25  hearing in this case, I informed the parties, while assembled in

JA001103                                                                    4

UNCLASSIFIED//FOR PUBLIC RELEASE

1    my courtroom, that I had not looked at and did not intend to

2    look at that ex-parte filing because it was my practice not to

3    do so until such time as it became absolutely necessary to look

4    at it, especially when it contained information classified at a

5    higher level than secret.  I informed the parties of that.  And

6    the parties -- and the Government at no time in response to

7    learning that this Court had not looked at and would not look at

8    it unless and until such time as it became a necessary document

9    for the Government to rely upon in its case, the Government at

10   no time told me, informed me, that it concerned what could be

11   discoverable as exculpatory evidence relating to this case.  And

12   so the case went forward on a merits hearing.

13         And during the course of that merits hearing, the

14   evidence the Government sought to rely upon that this

15   potentially exculpatory evidence related to was introduced by

16   the Government and relied upon by the Government, and the

17   Government at no point in time mentioned the fact that it might

18   have exculpatory evidence relating to the source of that

19   evidence and the fact that that potentially exculpatory evidence

20   went into the credibility of this particular witness.

21         I knew nothing about it.  It was not until last

22   Thursday morning when this Court announced that it was going to

23   schedule its hearing for the issuance of its unclassified

24   opinion, it was only on that day that this Court was informed,

25   through its law clerk, I might add, that that ex-parte motion

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1  concerned possible exculpatory evidence relating to the

2  Government's case.

3      As a result of learning that -- and I will, admittedly,

4  say, the Court was shocked to learn that -- I immediately

5  scheduled an ex-parte hearing and called in not only Government

6  counsel, but I told Government counsel to bring with him a

7  person from his client agency who was knowledgeable about this

8  information so that I could get some clarity possibly as to

9  whether or not this information was of such a nature, such a

10  magnitude, as to put in question the national security of the

11  United States.

12      Now, I scheduled that hearing last Thursday, and during

13  the course of that hearing -- and, of course, this document that

14  was filed yesterday does not reveal -- doesn't even link in any

15  way, shape or form the lack of the Court being notified about

16  this issue with the necessity to hold the hearing on the 24th.

17  None whatsoever. I should say the 23rd. Actually, the date's

18  even wrong here. The hearing was on the Thursday, which was the

19  23rd. So the date on this document that was filed yesterday is

20  erroneous. It says December 22nd.

21      So at the hearing on the 23rd, the Court listened to

22  the Government's explanation for why it was -- and I might note

23  for Ms. Gorman's benefit, since she wasn't there, I specifically

24  did not want to know what was in that ex-parte motion in terms

25  of the content of it. I did not want to hear it until such time

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1    as I might have to hear it.  And I still to this day don't know

2    anything about it other than what I'm about to tell you.  I

3    wanted to know how it was possible I was being informed this

4    late in the game, a week after the merits hearing was over,

5    after I had spent a whole weekend and all that week drafting my

6    opinion, how it was possible that I was learning this at this

7    11th hour.

8         And I was given, I don't know, something of an

9    explanation for that as to what the Government's position was.

10   I made it very clear to the Government when they told me that

11   this was exculpatory in nature as it related to this particular

12   witness, that as far as I'm concerned, and it has been my

13   position since day one in the Boumediene case, that a lawyer --

14   if the Government's relying on evidence and if there is anything

15   exculpatory related to this evidence, that the lawyer

16   representing that detainee has a right to know -- excuse me, a

17   need to know -- a need to know that evidence.

18        And that therefore, the only question was whether or

19   not the Government was prepared to share that information with

20   Ms. Gorman or not.  And if they could convince me that it was of

21   such a nature that they could not share it with her, whether or

22   not it directly affected the national security of the United

23   States and I would, therefore, allow them to use it and rely

24   upon it notwithstanding that information, whatever the

25   information is.

JAQ01106

7

```
1          So I told them that, basically, their choice was as
2    follows:  They could withdraw reliance on this evidence, and I
3    was assured that it related only to one of the witnesses, and it
4    related to possible credibility of his statements.  And I
5    believe the witness is a witness who the Government has
6    identified by referencing Government Exhibits 52, 92, 93, 111
7    and 112, they could withdraw reliance on that witness or if they
8    weren't going to withdraw reliance and we were going to go
9    forward, then we would have a hearing today at which they would
10   have to present representatives of the Government from their
11   client agency who could demonstrate to my satisfaction -- if
12   they weren't willing to turn it over to Ms. Gorman, they'd have
13   to satisfy me that they should still be able to rely upon it
14   notwithstanding her need to know because the national security
15   of the United States would be endangered by sharing it with her.
16          I gave the Government until noon on Friday to give me
17   their decision.  I got a fax about 12 o'clock -- roughly, 11:45,
18   something like that -- on Friday afternoon, the 24th, informing
19   me that the Government had decided to withdraw its reliance on
20   the testimony of this one particular witness and that the
21   Government, as a result of doing that, didn't believe it would
22   be necessary to have the hearing that I told them we would have
23   to have if they were going to continue with the reliance.  And
24   they're right and, in fact, we haven't had that hearing today,
25   and we aren't going to have that hearing.
```

JA001107

8

1    So the Government has withdrawn its reliance on this

2  witness and, as far as I'm concerned, this witness' evidence as

3  it relates to this detainee will be stricken from the record.

4  It will not be part of the record of this case.  And I'm going

5  to treat it as stricken from the record.

6    Now, today I get, in addition to the Government's

7  document, a motion to withhold ruling from Ms. Gorman in which

8  she indicates that the Government counsel would not tell her the

9  ISN number of the individual.  I must tell you, I was actually

10  stunned to see that from so many perspectives.  It made no

11  sense.

12    And I don't know, Ms. Gorman, if you are anywhere near

13  your office.  I don't know if you're in the same state as your

14  office or not.

15    MS. GORMAN:  No, I'm not, your Honor.

16    THE COURT:  Well, I kind of figured that might be the

17  case, frankly, because the reference to the exhibits I think

18  would pretty quickly give you indication as to who that

19  individual is.

20    Whoa, whoa.  One at a time.

21    MS. GORMAN:  The only place I would be able to see

22  those exhibits is actually in a secure facility.  That's the

23  only place where the exhibit list and the exhibits are kept

24  because it's all considered classified.

25    THE COURT:  Right.  I know that, but I thought

9

JA001108

UNCLASSIFIED//FOR PUBLIC RELEASE

1    particularly one of the exhibits, 111, in particular, was so

2    prominently used during the hearings that you might have

3    recalled who this ISN is and who this witness is, who this

4    detainee is.  It also was a detainee for whom the Government

5    referenced that there were other issues regarding his

6    credibility and reliability and went through some other steps to

7    try to bolster his credibility.

8         MS. GORMAN:  Your Honor, just so you know, the

9    Government attorney, after I filed my motion, was kind enough to

10   send me the ISN.

11        THE COURT:  Okay, fine, because ISN numbers are not --

12   as far as I know, they are not classified.  They are in

13   published opinions of the Court.  Not only my opinion, but Court

14   of Appeals' opinion.

15        MR. LEVIN:  If I may just add, we were surprised that

16   counsel made that representation.  We have never represented to

17   her that we were going to refuse to provide her with that

18   number.  She sent us an e-mail yesterday around 6:00, 6:30,

19   after both had left.  We shot her a reply e-mail this morning

20   with the ISN number.

21        We never made any representation to counsel that we

22   were refusing to withhold the ISN number of that detainee and in

23   our response to her e-mail asking for it, provided it.

24        THE COURT:  All right.

25        MS. GORMAN:  Your Honor, I just want to clarify that

                                                              10

                        JA001109

UNCLASSIFIED//FOR PUBLIC RELEASE

1    because I sent an e-mail as soon as I got the Government's
2    notice asking for the ISN number because they said in the motion
3    that it was protected, but they didn't tell me what the number
4    was.  And I never got any response until after I filed my
5    motions later this morning.
6            THE COURT:  Look, let me just take a step back here for
7    a minute here and state the obvious.  This is not a secure line,
8    and we're not on a classified hearing so we don't really -- we
9    really can't, but we don't really need to even go into the
10   specifics of this particular ISN's testimony because, frankly,
11   all of us know it very well.  The hearing was just 10 days ago,
12   12 days ago; it's very fresh in all of our minds.
13           And this particular witness' testimony was very limited
14   and very specific as it related to your client, Ms. Gorman.
15   Certainly, my recollection of his value to the Government's case
16   was very targeted and very specific and it was, frankly, of an
17   identification quality more than anything else.
18           The Government has --
19           MS. GORMAN:  It was actually two parts, your Honor.  It
20   was not just identification of my client, but it also was
21   placing them in the camp.
22           THE COURT:  When I say "identification," not only of
23   who he was, but where he was.  I was conflating them.  Okay,
24   fine.
25           But my point is, his contribution to the Government's

11

UNCLASSIFIED//FOR PUBLIC RELEASE

1    case was so specific and targeted that I think it's pretty

2    obvious, for lack of a better word, as to how -- what the effect

3    would be or the impact would be of his testimony being stricken

4    from the record.  It's now a case that includes one less

5    identification of the detainee and one less identification of

6    his being in a certain location at a certain time.  And it

7    leaves the ultimate question still much before the Court, which

8    is, you know, notwithstanding that, you know, did the Government

9    prove by a preponderance of the evidence it is more likely than

10   not that your client was part of that associated force.

11        So I think from a "reaching a decision" point of view,

12   from the Court's point of view, it doesn't have a great impact

13   on my ability to analyze the case.  And for that reason, I don't

14   see any reason why it should impact my ability to redraft --

15   I've already started redrafting, even though I was in bed the

16   last two days sick -- I've already started the reworking the

17   opinion to deal with that, and I don't see any reason to delay

18   the proceedings any further.  But in an abundance of caution, I

19   figured I'd give you all a chance to throw your two cents' worth

20   in on that.

21        MS. GORMAN:  Thank you, your Honor.  First, just to

22   remind the Court, it was at the pretrial conference where we

23   talked about that ex-parte document because I was concerned

24   about the fact that it had been filed and I wasn't being allowed

25   to see it.  And it was at the pretrial conference when you told

12

UNCLASSIFIED//FOR PUBLIC RELEASE

1    us -- told me -- to all of us that you would not be reviewing

2    that document.  So just if you're looking and trying to find it

3    in the record, that's where you would find it.

4         THE COURT:  Thank you for that, and I'll make it a

5    point to look for that.

6         MS. GORMAN:  Your Honor, as far as what the effects of

7    this is, you know, the Government's whole theory is this mosaic

8    theory.  You have to look at everything as a whole in the big

9    picture.  And I addressed the case with this same big picture in

10   mind trying to show the gaping hole.

11        Now there's, of course, a very gaping hole -- one of

12   the three witnesses is now withdrawn -- but I would sure like to

13   have the opportunity to address to the Court, either orally or

14   in a written, very short motion, what I think the effect of this

15   is on my client's case.

16        THE COURT:  What do you mean, "a motion"?

17        MS. GORMAN:  I mean, some kind of document to the Court

18   just explaining what I think the effect of this withdrawal may

19   be to the case and where that leads the case in terms of their

20   mosaic theory and in terms of having operating evidence for what

21   they're alleging.

22        THE COURT:  Well, why wouldn't it be just as simple as

23   my striking it from their final arguments and their presentation

24   and then me just evaluating it based on that?

25        MS. GORMAN:  Your Honor, my whole closing and a lot of

13

JA001112

UNCLASSIFIED//FOR PUBLIC RELEASE

1  the evidence that I was putting forth was a combination of what

2  this witness was saying and the other witnesses and showing how

3  unlikely this is.  I just don't think it gives a fair

4  perspective to my client's case to just try to knob off the one

5  witness and try to look at this mosaic picture with now these

6  gapes and holes all over the place.

7      And this is the theory that the Court -- that the

8  Government chose to present its case.  And I, too, am just

9  astounded that they had exculpatory evidence that they did not

10  share with me and did not bring up until after this hearing.  I

11  surely would have framed my whole case differently if this

12  person was not involved.  I sure would have put more emphasis on

13  the other two people and their credibility instead of stretching

14  it to the third person and trying to explain this whole big

15  picture instead of what's really a much smaller picture.

16      And I just don't think it gives my client a fair

17  opportunity to just say, well, we'll just knob this one off and

18  look at the picture with that person missing.  I think it should

19  be put in some perspective in a brief or orally before the

20  Court.

21      THE COURT:  If you're going to do it orally, when would

22  you be available?

23      MS. GORMAN:  I could be there Tuesday, your Honor, so I

24  could have Monday to review everything in a secure facility and

25  put it together.  I could do it any day, but any day after

14

JA001113

UNCLASSIFIED//FOR PUBLIC RELEASE

1   Monday would be preferable.

2           THE COURT:  So Tuesday the 4th, right, is what you're

3   saying?

4           MS. GORMAN:  Correct.

5           THE COURT:  How long do you think you'd need?  Half

6   hour?

7           MS. GORMAN:  One hour max.  Probably not even a full

8   hour.

9           THE COURT:  All right.  So if we started at -- well, of

10  course, the Government would, obviously, be entitled to a right

11  to respond so I'll have to figure two hours.  So let's say we

12  started at 3:00.

13          MS. GORMAN:  That's perfect, your Honor.

14          THE COURT:  You could start at 3:00?

15          MS. GORMAN:  Yes.

16          THE COURT:  All right.  Mr. Levin, will Ms. Hussey be

17  back by the 4th?

18          MR. LEVIN:  I believe she will be, your Honor.  I don't

19  have my calendar in front of me.  I know she was scheduled to

20  come back after the holiday.  I just do not recall if it was the

21  3rd or the 4th.  But we could, obviously, make appropriate

22  arrangements, and I will be sure to give her a call right after

23  we get off the phone here.

24          THE COURT:  All right.  So to make sure we're all on

25  the same page here, the purpose of this hearing is a very

1    focused and limited purpose.  It is an opportunity for detainee

2    counsel to present her arguments as to how this witness'

3    testimony being stricken from the record affects the detainee's

4    position with regard to whether the Government has met its case

5    under the standards set forth in the case management order.

6         The Government will be entitled, after she makes that

7    argument, to do a response, and they can have the same amount of

8    time.  If she takes an hour, they can have an hour to make their

9    responses to how, if at all, this witness being stricken from

10   the record affects their position as to how they established

11   their case consistent with the standard under the case

12   management order.

13         Are we all on the same page?

14         MS. GORMAN:  Yes, your Honor.

15         MR. LEVIN:  Yes, your Honor.

16         THE COURT:  Everybody understands where we are.  Okay.

17   So we'll do that from 3:00 to 5:00.  Hopefully we won't go much

18   past 5:00.  And depending upon how that all goes, I'll set a new

19   hearing date instead of this Thursday for the issuance of my

20   unclassified opinion.

21         MS. GORMAN:  Thank you, your Honor.

22         THE COURT:  All right.

23         MR. LEVIN:  Thank you.  Just on a logistical note, that

24   will probably have to be a closed hearing so the CSOs will have

25   to be made aware of that.

`6

UNCLASSIFIED//FOR PUBLIC RELEASE

1      THE COURT:  We'll let them know.

2      MR. LEVIN:  Thank you, your Honor.

3      THE COURT:  We'll let them know.  As soon as we're done

4   with this call, we'll give them a ring because we have to call

5   and cancel the hearing for this Thursday, the 30th.

6      MS. GORMAN:  Your Honor, I was not able to get a

7   translator for that hearing so they already know.

8      THE COURT:  That's another thing.  Make sure -- how

9   much notice do you need to give these folks, Ms. Gorman?

10      MS. GORMAN:  Usually I could have done it in a short

11   time.  Just because of the holidays, the translator I would have

12   used was out of the country.

13      THE COURT:  Okay.  I will try to have that done, best

14   case scenario, the 6th, and probably worse case scenario, the

15   10th of January.  So you might as well get in touch with them

16   and let them know that we might need their services as early as

17   the 6th or maybe as late as the 10th so that they can start

18   thinking about what their travel schedule is and that kind of

19   stuff like that.

20      Because they would come to Washington, right?

21      MS. GORMAN:  Some from Washington.

22      THE COURT:  One is in town?

23      MS. GORMAN:  He just wasn't in town this week.

24      THE COURT:  All right.  And then we can confirm that on

25   the 4th as to which date it's likely to be.

17

UNCLASSIFIED//FOR PUBLIC RELEASE

1          MS. GORMAN:  Okay.

2          THE COURT:  All right.  Any other questions?

3          MS. GORMAN:  I think that covers it.

4          THE COURT:  Okay.  Very good.  All right.

5     Counsel, we'll see you on the 4th at 3 o'clock.

6          MR. LEVIN:  Thank you, your Honor.

7          MS. GORMAN:  Thank you, your Honor.

8          THE COURT:  All right.  Take care.  Happy New Year.

9     (Recess was taken at 3:30 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

18

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

1

CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Lisa S. Schwam, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9    _____          _1_/_11_/_11___

10   SIGNATURE OF COURT REPORTER              DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

19

JA001118

UNCLASSIFIED//FOR PUBLIC RELEASE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


ABDUL RAZAK ALI,          :      CV10-1020 (RJL)
                          :
        Plaintiff,    :    January 4, 2011
                          :
                          :    3:15 p.m.
v.                        :
                          :
BARACK OBAMA, ET AL.,         :
                          :
        Defendants.    :
. . . . . . . . . . . . . . . . .


DAY 4
TRANSCRIPT OF MERITS HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiff:      H. CANDACE GORMAN
                        220 S. Halsted Street
                        Chicago, Illinois 60661


For the Defendants:      OLIVIA HUSSEY
                         ANN NASH
                         SCOTT LEVIN
                         TOM GILLICE
                         JIM GILLIGAN
                         U.S. Department of Justice
                         20 Massachusetts Avenue, NW
                         Washington, DC

Also Present:      Susan Harrington
                   Adam Pearlman
                   Mike Vozzo

JA001119

2

Court Reporter:          PATTY ARTRIP GELS, RMR
                         Official Court Reporter
                         Room 4700-A, U.S. Courthouse
                         Washington, D.C. 20001
                         (202) 962-0200

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

JA001120

3

1          PROCEEDINGS

2          COURTROOM DEPUTY: Calling civil case 10-1020 Abdul

3    Razak Ali versus Barack Obama, et al. Would counsel please come

4    forward and identify yourself for the record?

5          MS. GORMAN: Good afternoon, your Honor, Candice Gorman

6    for the Petitioner.

7          THE COURT: Welcome back.

8          MS. GORMAN: Thank you.

9          MS. HUSSEY: Good afternoon, your Honor, Olivia Hussey

10   for Respondents along with my co-counsel Ann Nash, Scott Levin,

11   Tom Gillice and Jim Gilligan is here as well.

12         THE COURT: They are all from the Justice Department?

13         MS. HUSSEY: Yes, your Honor.

14         THE COURT: Who are all those other folks?

15         MS. HUSSEY: The other folks are from our clients'

16   General Counsel's Office.

17         THE COURT: What's their names?

18         MS. HUSSEY: In the first bench right there is Adam

19   Pearlman and then in the row -- well, actually from the Justice

20   Department sitting in the first row is Sean Harrington. He is a

21   paralegal for our office. And then Mike Vozzo is next to him.

22         THE COURT: DOD?

23         MS. HUSSEY: DOD, yes.

24         THE COURT: And there is a third person.

25         MS. HUSSEY: That's Tom Gillice. I introduce him. He is

JA001121

4

1    from the Department of Justice noticed counsel.

2        THE COURT:  All right. Thank you, Ms. Hussey. Well,

3    counsel, we are here to give detainee's counsel an opportunity

4    to present a reformulated argument that takes into account the

5    Government's decision to withdraw reliance on the testimony --

6    not testimony -- but evidence relating to one of the detainees,

7    witnesses that they relied on in the Merits Hearing that the

8    Court held prior to the end of the year.

9        So I think the parties are all well versed in the facts

10   of the case and based on a telephonic conversation I had with

11   all the parties last week on the occasion of setting this date

12   for this hearing, detainee's counsel thought an hour would be an

13   adequate amount of the time to present whatever argument or

14   arguments that she may have. I informed the Government's counsel

15   that they would be given a similar amount of time to respond.

16       So, Ms. Gorman, you may proceed.

17       MS. GORMAN:  Thank you, your Honor.  Your Honor, I want

18   to say that I consider my pro bono service in this case to be in

19   keeping with the finest traditions of the legal profession. I am

20   stunned, I am absolutely stunned that I am back here today under

21   this situation that brings me back here today. The fact that the

22   Government knew at the final pretrial conference and all through

23   this hearing that there was a witness that they could not rely

24   on and that they had exculpatory evidence that they were not

25   giving to me goes beyond the pale.

JA001122

5

1          With the withdrawal of ISN 839, the Government cannot

2     show by a preponderance of the evidence that the alias Usama

3     al-Jaza'iri was used by Petitioner and without that piece of the

4     mosaic, the Government's point number one, and I am referring to

5     the outline that we used for the hearing that was presented by

6     the Government, I have a copy of that that I can put on here if

7     the Court would like.

8          THE COURT: If you would like.

9          MS. GORMAN: As this Court knows, Petitioner has

10     repeatedly denied using the nickname Usama al-Jaza'iri. After we

11     get rid of ISN 839, which we have now done, the only individual

12     to tie my client to that name is ISN 707. ISN 707 is an

13     individual as the Court knows who was the commander of the

14     Kaldan camp until it closed in 1999 or 2000.

15          In fact, ISN 707 is the one who when Plaintiffs's

16     Exhibit 43 identified more than 60 individuals and in the course

17     of that identification identified one individual as Usama

18     al-Jaza'iri. Again that's Exhibit 43 at page five.

19          He described him as a driver in Algeria. First, it is

20     important for this Court to note that ISN 707 gives detailed

21     descriptions of the men he identifies. Many of them he

22     identifies as al-Qaeda members. Many he identifies as trainers

23     or trainees at Kaldan, and he never identifies my client as

24     being anything. The only thing he identifies is this person who

25     the Government says is my client as being a driver in Algeria.

JA001123

6

1      Even more importantly, though, your Honor --

2      THE COURT:  Well, 707 did identify your client from the

3      ███ photo book.

4      MS. GORMAN:  I would like to get into that now, your

5      Honor.

6      THE COURT:  Okay.

7      MS. GORMAN:  Because the note from the interrogator at

8      the time of this identification in Exhibit 43 notes that the

9      person is referred -- is known to interrogators as Abdul Razak.

10     THE COURT:  Is this Government Exhibit 43 or

11     Petitioner?

12     MS. GORMAN:  43. Same exhibit.

13     THE COURT:  Government.  All right.

14     MS. GORMAN:  Although the Government has tried to claim

15     that that name is associated with Petitioner, it is not, and the

16     proof is in the Government's own documents. I am going to refer

17     the Court to Government Exhibit No. 97. Government Exhibit

18     No. 97 is the knowledgeability brief that accompanied my client

19     from Afghanistan to Guantanamo. It is dated June 18, 2002. 2002.

20     It sounds like the microphone went off. Sorry.

21     THE COURT:  2002?

22     MS. GORMAN:  2002. My client left Afghanistan ███████

23     ████ and arrived at Guantanamo ██████████ That document,

24     and I am looking at paragraph six B, paragraph six B lists the

25     Petitioner's name as he landed at Guantanamo as Abdul Al Razak R

JA001124

8

1     So first we have the FBI records interviewing an

2   individual from the ▆▆ House immediately after the raid and we

3   have the FBI affidavit because the Government went back to get

4   an affidavit from this FBI Agent, but he couldn't say much. All

5   he could say was I rely on my notes. That's Exhibit 3,

6   Petitioner's Exhibit 3. I rely on my notes and my notes say this

7   person was at ▆▆ and that's all I know. I have no independent

8   recollection.

9     The FBI's affidavit also makes clear that he doesn't

10   know how that individual was linked to being my client, that

11   that was done by unknown others after the time that he was

12   involved. So all he knows is he interviewed a man named Abdul

13   Razak and later some unknown people said that that was my

14   client, ISN 865.

15     Now, the fact that the military officials understood

16   that Abdul Razak was not the same individual as my client as I

17   said was confirmed in the records that came with my client.

18   That's Government Exhibit 97. So it is not only clear that ISN

19   707 was not referring to Petitioner in Exhibit 43 when he

20   identified some person as being you Usuma al-Jaza'iri, but that

21   the person he was referring to was a known individual and that

22   was Abdul Razak which is what the interrogator said at that very

23   time was how they knew that individual.

24     Finally, ISN 707 stated in another interrogation that

25   there were no trainers from Kaldan at Guantanamo yet the name

JA001126

9

1    Usama al-Jaza'iri is alleged to have been a trainer at Kaldan.

2    And I would like this Court to note this was in Exhibit 13. I

3    would like this Court to note as I said earlier ISN 707 was not

4    shy. He said who he knew what they were doing. He has lists of

5    people who he said they are here, they are at Kaldan, they are

6    at Afghanistan, they traveled with these people. He never lists

7    Petitioner, my client, as being any of those people. He never

8    listed him as someone he traveled with. He never listed him as

9    anyone he knew.

10        All he lists is one time an individual named Abdul

11    Razak as someone that went by the name Usama al-Jaza'iri and

12    that that person was a driver in Algeria. My client was not a

13    driver in Algeria. This was clearly a mistake.

14        THE COURT: But now he was at the same guesthouse with

15    Abu Zubaydah.

16        MS. GORMAN: Correct.

17        THE COURT: Right. And --

18        MS. GORMAN: I am sorry. You were talking about 707 or

19    my client or both because they both were?

20        THE COURT: 707.

21        MS. GORMAN: Yes.

22        THE COURT: So 707 was captured at the same guesthouse

23    as your client and your client identified him from a photo as

24    having been at that guesthouse and vice versa. He identified

25    your client as having been at the guesthouse from a photo book,

JAQ01127

10

1    the ███ photo book as Abdul Razak.

2    MS. GORMAN: No. I am saying that's not my client, your

3    Honor, and we know that. What he identified in Exhibit 43 was a

4    man he called Usama al-Jaza'iri and the interrogator made a note

5    following that identification saying that that individual's name

6    was Abdul Razak. That's how the interrogator knew that name. I

7    am saying that name is not my client.

8    THE COURT: So your position is that there is no where

9    in the record any identification by 707 of your client as Abdul

10   Razak?

11   MS. GORMAN: Correct. And there is no identification of

12   anyone saying my client is Abdul Razak except the Government

13   ███████████████████████████████████

14   ███████████████████████████████████

15   ███████████████████████████████████

16   ███████████████████████████████████

17   ███████████████████████████████████

18   ███ we have no identification of my client.

19   THE COURT: Your client identified 707 as having been

20   in that guesthouse with him and ███████████

21   MS. GORMAN: Correct.

22   THE COURT: So clearly your client knew who 707 was,

23   and there is no reason to think that 707 didn't know who your

24   client was since he spent two weeks with him at the same place.

25   MS. GORMAN: There is no reason to think that my client

1    was being identified by 707 when he was shown those pictures. He

2    identified the person by that picture under two separate names

3    neither which were my client's. He identified them -- I am

4    sorry -- he only identified him under one name Usama al-Jaza'iri

5    and then the interrogator notes:  It is known by us as Abdul

6    Razak. I am saying that they were not -- they did not know my

7    client as Abdul Razak. That's what I am saying, your Honor, so

8    that that identification had nothing to do with my client.

9         THE COURT:  Well, other people identified him as Abdul

10   Razak.

11        MS. GORMAN:  The Government has, your Honor, and that's

12   why Government Exhibit 97 is so important because he was not

13   identified by that name while he was in Afghanistan and he was

14   not identified by that name when he came to Guantanamo. It was

15   sometime later when some confusion arised that he became known

16   as Abdul Razak by the Government.

17        THE COURT:  Well, maybe I misunderstood, but I thought

18   the significance of the evidence that the Government is no

19   longer relying upon is that it was the identification of your

20   client as Usama al-Jaza'iri.

21        MS. GORMAN:  Correct.

22        THE COURT:  That was significant for two reasons. One,

23   because it placed him in Afghanistan and, two, because it

24   corroborated the references to al-Jaza'iri that are in the

25   diary, the al-Suri diary.

JA001129

12

1     MS. GORMAN:  Correct.

2     THE COURT:  That is the significance principally if not

3     overwhelmingly of the evidence that no longer exists as part of

4     the record in this case, not as to whether or not your client

5     was in that guesthouse for two weeks with Abu Zubaydah and his

6     senior folks over in Pakistan. The significance relates to the

7     other piece of the puzzle so to speak or mosaic, if you prefer,

8     the Afghanistan piece of the mosaic and the tie-in between your

9     client not only in Afghanistan  but the al-Suri diary. That's

10     the significance potentially to the Government of no longer

11     having that piece of evidence.

12     MS. GORMAN:  Yes, your Honor, and what they tried to do

13     in the hearing was to corroborate 839 with 707, and I am trying

14     to point out to the Court that that corroboration does not exist

15     because whatever 707 says is confused and contradictory and

16     doesn't relate to my client so there is no corroborating

17     evidence from that one interrogation of ISN 707 to my client

18     having that nickname.

19     THE COURT:  Well, the Government contends as I recall

20     it that your client used a number of aliases which is not

21     uncommon, I might add, and in general, speaking in general, it

22     is not uncommon for people to use more than one alias, and the

23     Government's position is, well, he used more of the alias, one

24     of the alias he used was Razak, Abdul Razak. The other was Usama

25     al-Jaza'iri. It just so happens that 707 was the only person

JA001130

13

1   that the record reflects knew him by both names. That's the

2   Government's position.

3        So I guess the question becomes, well, why is that not

4   possible? Why is that not borne out by the record here that 707

5   knew him by both names?  You are saying it can't be because in

6   the interview that's relied upon in which he identifies him as

7   al-Jaza'iri, he doesn't also in the same interview say I also

8   know him by the name Abdul Razak, and so you think that raises a

9   sufficient doubt as to his identification of him as Usama

10  al-Jaza'iri because he doesn't mention both names.

11       MS. GORMAN:  No, your Honor. I think it is significant

12  that 707 doesn't identify my client, but I also think it is

13  significant --

14       THE COURT:  No, he identifies him. There is no

15  question he has identified him. There is no question that he was

16  presented with the photograph          there is no question he was

17  given that photograph and there does not seem to be any question

18  that your client is in that picture.  At least not to me, there

19  is no doubt.

20       MS. GORMAN:  Well, then I am not making my point

21  because my point is that in that identification the Government

22  says the person he is referring to in this picture is a person

23  that we refer to as Abdul Razak; and what I am saying is that

24  was not what he was known as by the Government up until that

25  time. He was not known as that name, but there was a different

JA001131

14

1   individual that was known by that name and that's what I am

2   saying is what the confusion is.

3        My client was known by a different name by the

4   Government at that time and so when the interrogator says he

5   identified this picture as being Usama al-Jaza'iri and then in

6   parentheses the interrogators know him as Abdul Razak, I am

7   saying that the interrogators inserted the wrong name and either

8   that's the wrong picture or it is the wrong name, but we know my

9   client did not go by that name until the Government mixed up his

10  names again while he was at Guantanamo.

11       And we know that there was a man that 707 knew by the

12  name of Abdul Razak and it was not my client

13       ███████ and he was arrested that same night.

14       THE COURT:  What about the other people who identified

15  him as Abdul Razak -- 703, 696?

16       MS. GORMAN:  No.

17       THE COURT:  They identified that ██████ picture as Abdul

18  Razak.

19       MS. GORMAN:  And what we have with 696, and I will go

20  into 696, it is a different mistake. I suggest to the Court I am

21  not casting aspersions on the military. There is a war going

22  on. The fact that he was taken into the war zone is not his

23  fault. He was in Pakistan in a guesthouse, but there is a war

24  going on. I suggest to this Court that there was a lot of

25  confusion about who was who and what was what.

JA001132

15

1        But when 696 looks at the picture supposedly of my

2    client that says identification number ██ on it and we know

3    that there was a mix up with identification ██ and my client,

4    he identifies the picture as Morad, Morad Razak something. I

5    will look up exactly how he -- Morad -- Abdul Razak a/k/a Morad.

6        And then we know from another identification that there

7    was -- and he said in relation to that picture which is noted as

8    being photo identification ██ which is the one we know there

9    are mistakes with, and he said this is someone who was -- has

10    knowledge of training taking place in Abu Zubaydah's safe house

11    in Faisalabad and has been to Afghanistan. No one else has ever

12    identified my client as going by the name Morad but it as

13    discussed above, there was an individual by the name of Morad at

14    that guesthouse and the document that was given to me by the

15    Government at the time of the hearing confirmed that 696 later

16    said Morad was a person he knew from the guesthouse who left

17    more than a week earlier. That's my Exhibit 78 at paragraph

18    nine.

19        I am suggesting to this Court that there is a lot of

20    mistakes going on and that my client is in the middle of those

21    mistakes. The picture that was shown to Mr. 696, ISN 696 was on

22    ██████████ the day after my client left Guantanamo, and we know

23    from the documents from the Government at the time my client

24    arrived at Guantanamo ████████████ that they only knew my client

25    by two names, Abdul Razak, R A Z A K --

JA001133

16

1  THE COURT: You are not suggesting that those are two

2  different people, are you?

3  MS. GORMAN: I am suggesting that, your Honor.

4  THE COURT: Abdul R A Z A K is a different person than

5  Abdul R A Z A K?

6  MS. GORMAN: R A Z Z A Q. Yes, I am suggesting they

7  are two different people

8  ███████████████ and we know that from ISN 707.

9  And I am sorry that these names are all close and confusing, but

10  that's the way it is and that's what the documents show.

11  So we can --

12  THE COURT: It remains to be seen whether that's what

13  the documents show, Ms. Gorman. I mean --

14  MS. GORMAN: Your Honor, like we are going to rely on

15  ISN 707. Are we just going to pick and choose which things we

16  rely on because ISN 707 says he was in a jail cell with

17  ████████ Abdul R A Z Z A Q, ███████████

18  ███████████ We also know from the FBI report that

19  there was a person in the ███ House at the time of the raid

20  named Abdul R A Z Z A Q.

21  THE COURT: What is the cite to that?

22  MS. GORMAN: The Government report -- I am sorry.

23  THE COURT: The FBI report you just referred to.

24  MS. GORMAN: Yes. I am just trying to -- ISN

25  identification of the person that was in the guesthouse at

JA001134

17

1　　███ -- I am sorry, your Honor. I just flipped that page and now

2　　I have to find it. One moment.

3　　(Pause.) That's ██████

4　　　　THE COURT: Government Exhibit ███

5　　　　MS. GORMAN: Petitioner's exhibit.

6　　　　THE COURT: Petitioner's ███

7　　　　MS. GORMAN: All of my exhibits I am using are my

8　　exhibits unless I say otherwise, I will be using Petitioner's.

9　　It is on the last page.

10　　　　THE COURT: Okay.

11　　　　MS. GORMAN: ████████████

12　　████████████████████████

13　　████████████████

14　　　　THE COURT: ████████████

15　　　　MS. GORMAN: ████████

16　　　　THE COURT: Okay. Now, I remember during the Merits

17　　Hearing it was noted by both sides, not just the Government, by

18　　both sides that there had been some confusion in the FBI reports

19　　in connection with the description of who was seized where on

20　　the night in question of the raid.

21　　　　MS. GORMAN: Correct.

22　　　　THE COURT: And that there had been a mistake made by

23　　the Bureau's people with regard to which house of the two that

24　　your client was in.

25　　　　MS. GORMAN: Correct.

JA001135

18

1      THE COURT:  There seems to be no question, zero, on

2  this record that your client was not in Issa, but was in the

3  other house with Abu Zubaydah.

4      MS. GORMAN:  Correct.

5      THE COURT:  There is just no question about it.

6      MS. GORMAN:  That's correct.

7      THE COURT:  He himself has admitted it. Okay. So let's

8  put that issue aside.

9      MS. GORMAN:  Correct.

10     THE COURT:  There is also no issue apparently that I

11  can think of or see that 707 was in that same house with your

12  client as was 703 Barhoumi, he was there too as was 696.

13     MS. GORMAN:  I don't believe 703 is Barhoumi. I believe

14  that's a different individual. I might be wrong, but --

15     THE COURT:  Maybe I got that wrong. Let me double-check

16  here.

17     MS. HUSSEY:  Just to clarify for the record --

18     THE COURT:  What was Barhoumi's ISN number, please?

19     MS. HUSSEY:  694.

20     THE COURT:  694, all right. So 703, 707, 696 were all

21  in that same house --

22     MS. GORMAN:  Correct.

23     THE COURT:  -- with your client and Abu Zubaydah.

24     MS. GORMAN:  And others, your Honor.

25     THE COURT:  Yes, and others.

JA001136

19

1        MS. GORMAN:  Some were released.

2        THE COURT:  I am not saying there weren't others there,

3    but I am just saying they were there too. All right. So we have

4    a situation where your client was there notwithstanding this

5    confusion in the reports.

6        MS. GORMAN:  Correct.

7        THE COURT:  He has acknowledged it. Others have

8    acknowledged that he was there, i.e., these other people that I

9    have just gone over, 707, 703, 696 with photo identifications of

10   him.

11        Now, there may be some confusion, at least I think you

12   think there is some confusion, as to what name they knew him by

13   when he was in that house.

14        MS. GORMAN:  No, your Honor. That's not what I think

15   the confusion is. I think the confusion is that when 707

16   identifies a person that he says was Usama al-Jaza'iri, he was

17   not referring to my client.

18        THE COURT:  I want to break this into parts.

19        MS. GORMAN:  Correct.

20        THE COURT:  The first part I want to be crystal clear

21   on to the extent I can be is who was in that house with Abu

22   Zubaydah. Okay?

23        MS. GORMAN:  Okay.

24        THE COURT:  We all know, we all agree he wasn't in

25   Issa.  Neither Abu Zubaydah was in Issa or was your client.

JA001137

20

1          MS. GORMAN:  Correct.

2          THE COURT:  We all agree on that. Everyone is on the

3    same page. We also all agree that in that same house was 696,

4    707, 703 and Barhoumi -- what's his number again?

5          MS. HUSSEY:  694.

6          THE COURT:  694 Barhoumi. Okay. So we know all of those

7    people were in that house too.

8          MS. GORMAN:  Correct.

9          THE COURT:  And Abu Zubaydah was in that house too for

10    a whole couple of weeks. Now --

11          MS. GORMAN:  Actually, your Honor, I believe the

12    testimony was that Mr. Abu Zubaydah --

13          THE COURT:  He was only there one of the two weeks.

14          MS. GORMAN:  -- just arrived that week and my client

15    testified he was gone after two days but somehow was there that

16    last day and he didn't even know he was there.

17          THE COURT:  Right. But there is conflicting testimony

18    as to how long Abu Zubaydah was there, but one approach, one

19    position was he was there a week of the two weeks. The other was

20    he was there a couple days out of the two weeks, but in any

21    event, he was there when everyone was caught.

22          MS. GORMAN:  I would also like to correct, your Honor,

23    about the 707 identification because you said we all agree that

24    707 identified my client and that's what I am contesting here.

25          THE COURT:  Well, according to my notes here,

JA001138

21

1    Government Exhibit 37 was on one occasion when he was shown

2    ███████ and I believe there was one other occasion, I don't have

3    the exhibit in front of me here, but where he was presented with

4    a picture from the ███ photo book. Maybe Ms. Hussey will have

5    that --

6        MS. GORMAN:  I have that identification for you, your

7    Honor.

8        THE COURT:  Yes. So he was, ███████████ I believe it

9    was, he was shown the ███ identification book. That's 707 is.

10       MS. GORMAN:  That was in August, ████████ he was

11   shown exhibit, Petitioner's Exhibit 43 in which he identified an

12   individual as being called Usama al-Jaza'iri. One month later in

13   September of 2002 he identified him again but not by going by

14   that name. And I am saying both of those identifications are not

15   my client; but even if they were my client, your Honor, he never

16   identified that individual as going by that name Usama

17   al-Jaza'iri again, and that's my point is that that is not a

18   reliable identification.

19       He identified -- even if that was my client, which I

20   contest, but even if it was my client, he identified him on one

21   occasion as going by that nickname and never again and we have

22   in the record multiple identification sessions with this

23   detainee 707. He only identifies the person that the Government

24   claims is my client on one additional occasion, and on that

25   occasion he identifies him as someone he only met at prison.

JA001139

22

1      THE COURT:  But the significance of that identification

2      only relates to your client having -- whether or not your client

3      was in Afghanistan and whether or not your client is the person

4      being referred to in the al-Suri diary as Usama al-Jaza'iri.

5      MS. GORMAN:  That's a significant identification. If

6      that were true, my client would be out of the box.

7      THE COURT: Why?

8      MS. GORMAN: Because if he was the person in that

9      al-Suri diary, I think the Appellate Court has already said that

10      that's someone who was detainable if we use the Barhoumi case as

11      an exhibit.

12      THE COURT:  If the Government shows by a preponderance

13      of the evidence in this Court's judgment that he was in that

14      guesthouse with Abu Zubaydah, that's enough.

15      MS. GORMAN:  Okay. That's fine, your Honor.

16      THE COURT:  That's enough.

17      MS. GORMAN:  That's fine, and if the Court wants to

18      find that, of course, that's the Court's prerogative; but I want

19      to make the record clear at least from my perspective for my

20      client that my client was not Usama al-Jaza'iri and I think

21      that's an important part for my client to go forward because

22      being in a guesthouse that was a mistake and I think he has a

23      good argument that it was a mistake he was even there is one

24      thing that could let him go back to his home country and not be

25      imprisoned but being Usama al-Jaza'iri is an important part of

JA001140

23

1    my defense of my client because he is not that individual.

2        And they have withdrawn reliance on 839 and they were

3    using two individuals to buttress this claim. 839 was the one

4    who said I have seen him all over the place, and 707 is the one

5    who on one occasion said this guy in this picture went by this

6    name and when he looked at that same picture and whether or not

7    it was my client or not, he contradicts himself the next time by

8    saying I only know this guy from prison. This is someone who was

9    not shy about saying what was what and who was who and he was

10    naming names about al-Qaeda, about the Taliban, about who was

11    taking training wherever.

12        He never identifies my client as someone who was taking

13    training, that had been a trainer or anything else and so I can

14    only make one thing clear. It is that my client is not Usama

15    al-Jaza'iri.

16        THE COURT:  Well, what if Mr. 707 identified your

17    client by both names?

18        MS. GORMAN:  Well, then the second interview he

19    identified him only by the one name and I would say that that

20    would have been a clarification that it was a mistake the first

21    time. And that's Exhibit 44. One month after that first

22    identification --

23        THE COURT:  44?  Government 44?

24        MS. GORMAN:  Petitioner's.

25        THE COURT:  What's the Government equivalent of that?

JA001141

24

1        MS. HUSSEY: Your Honor, the Government does not have

2    an equivalent for Petitioner's Exhibit 44. It is an interview of

3    707 in September of 2002 where he looks at picture       and

4    says it is Abdul Razak.

5        MS. GORMAN: And that he only met him in prison.

6        THE COURT: September of '02.

7        MS. GORMAN: One month after the first identification,

8    your Honor.

9        THE COURT: Well, I think there was one before that.

10       MS. GORMAN: No, there is only two from 707, August and

11   September. Petitioner's Exhibit 43 and Petitioner's Exhibit 44.

12       THE COURT: All right. Well, the one where he

13   identified him as Usama al-Jaza'iri was Government 37.

14       MS. GORMAN: Petitioner's 43.

15       THE COURT: All right. Petitioner's 43. So it is the

16   same exhibit, just a different number? Right?

17       MS. GORMAN: The Government chose not to put into the

18   evidence Exhibit No. 44, Petitioner's Exhibit 44; but that's the

19   interrogation of ISN 707 the following month in which he is

20   shown the exact same picture and he identifies him as someone he

21   only met at prison. He does not identify him with a nickname. He

22   does not identify him as a driver in Algeria. He does not

23   identify him as someone he traveled with or someone who trained

24   at Kaldan. He doesn't describe him in any other way except

25   someone that he remembers from prison.

JA001142

25

1          THE COURT:  Now, had your client identified him, that

2     is 707, as having been in the same guesthouse with him and Abdul

3     Razak?

4          MS. GORMAN:  I believe so, your Honor, but I don't know

5     an exhibit number. He listed various times in interrogations the

6     people that were in the guesthouse that he was at.

7          THE COURT:  Well, if your client identified him as

8     having been in the same guesthouse as Abdul Razak with him, then

9     obviously his statement to the effect that he only met him in

10     prison was false.

11          MS. GORMAN:  Well, obviously it was a mistake or he

12     didn't remember him from there because my client just sat back

13     quietly and so did 707 as far as I can see. But obviously 707

14     did not remember my client from the guesthouse and only

15     remembered him from prison and that's if that name is actually

16     my client because, as I said, the Government does not show that

17     name up until that point as being a name that they associated

18     with my client.

19          So what do we do? Do we pick and choose which

20     interrogations of 707 we are going to believe? We like the one

21     that shows that he is Abu Usama al-Jaza'iri even though he never

22     repeats it and in the record I have shown that he has had

23     something like 7 or 8 interrogations that are in the record both

24     in Plaintiff's Exhibits and in Government's exhibits he never

25     once again ever asserts that my client was al-Jaza'iri, never

26

1    again. So we have one lone exhibit and what I am saying is that

2    does not meet the standard of a preponderance of the evidence

3    that my client used that name.

4        The Government's next contention was that Petitioner

5    was in Afghanistan after September 11th. However, again without

6    the alias which I don't think would withstand the preponderance

7    of the evidence, without the alias the only person they have

8    placing my client in Afghanistan is 696 and again that's one

9    interrogation from June of 2002 while he is at Bagram where he

10   looks at a picture that's identified for the record as Bagram ID

11   number ███ and he says this is Abdul Razak and I know him as          2

12   a/k/a Morad.  Well, we know my client didn't go by Morad and he

13   also said that this was someone that was in the guesthouse and

14   that he knew what was going on.

15       Well, we know that there was a person named Morad at

16   the guesthouse. Exhibit 97 -- I am sorry -- that's the one that

17   goes to my client's name. Exhibit 78 which was an exhibit given

18   to me at the time of the hearing in paragraph nine, 696 confirms

19   that there was an individual at the guesthouse named Morad who

20   left one week prior to the raid; ███████████████████████

21   ███████████████████████████████████████████████

22   ███████████████████████████████████████████████

23   ███████████████████████████████████

24       So now we have 696 -- I also want to say to the Court

25   that 696 is the individual who also realized the photo mistake

JA001144

27

1   with my client that the photo that's been identified as the

2   Bagram ID███was not actually my client but was another

3   individual. Those are in Exhibits 5 and 6, Petitioner's Exhibits

4   5 and 6.

5       In that identification he says this isn't the person I

6   was shown before but anyway it is not Petitioner. So we have a

7   lot of mistakes going on. You are right. There is no mistake my

8   client was in that house, but there are mistakes tying him to

9   Afghanistan and tying him to this nickname.

10      I would also like to point out that ISN███ later

11  disavowed the identifications he made while at Bagram and just

12  to let you know what the Government's own feeling about███ is,

13  I point you to Government Exhibit No. 49. It is a long exhibit

14  without page numbers so you have to count the pages, but it was

15  pages 6 and 7, the bottom of six, the top of seven.

16      And what the Government says about███ interrogations

17  and information from Bagram is that it should be noted that much

18  of the information furnished by████████████ was

19  contradictory in nature and his credibility was in question by

20  the interviewers. So that's the person that ties my client to

21  Afghanistan.

22      I would like to talk about point three. Yes, my client

23  was present in the house. We have gone through a great deal of

24  talk about how he happened to get there and we also talked a lot

25  about the fact that nobody knew him and my client did not know

JA001145

29

1      Actually if you look at those reports, there is three

2   separate reports all in the group Exhibit 56 where the FBI is

3   going back to look at the evidence and what they determine was

4   if there was any of this stuff, it had not been preserved.

5      So that leaves us with the English lesson, your Honor,

6   the other accusation the Government says that my client took

7   English lessons and the fact that he denies it shows that he

8   should be held forever or indefinitely anyway. The only evidence

9   in this regard is ISN███ who was in the house. ISN███ says he

10  saw Petitioner writing English words on a blackboard.

11     I say to this Court that ISN███ was either incorrect

12  or lying when he claimed the Petitioner was taking those lessons

13  and I will explain why. ISN███ statement that Petitioner was

14  receiving English lessons is based on the fact that he said,

15  first, he said on one occasion, yes, I am writing on a

16  blackboard and on another occasion he said, well, he was present

17  in the same room. Then we find out that ISN███ was only in the

18  room when an English lesson was taking place on one occasion.

19     And I say that 703 is not credible because the

20  Government says he is not credible, that he is an admitted drug

21  dealer ███████████████████████████████████

22  ███████████████████████████████

23     Now, as this Court knows there is nothing sinister

24  about taking English lessons and there is no reason to think

25  that Petitioner who was barely -- who at that time was barely

JA001147

31

1    earlier, but I want to also point out

2

3

4        I would like to address the fourth point, the

5    Petitioner has knowledge of counter interrogation techniques. I

6    am only going to address this briefly.  I know the Court didn't

7    want to spend much time on it at the hearing, but because there

8    is no evidence tying my client with any terrorist organization

9    but only being in this house where other people were possibly

10    terrorists, no one has been confirmed to be a terrorist yet, but

11    they are possibly terrorists but there are also other people who

12    were released from this house very early on because they weren't

13    Arab.

14        Again, I will point to Exhibit No. 1 which is the

15    newspaper report from Pakistan at the time which confirmed that

16    more than 30 of the people arrested that night were already

17    released within one day. Because there is no evidence tying my

18    client to any terrorist activity, there is no evidence that he

19    has learned anything about counter interrogation techniques. He

20    just wanted to go home. He was in Pakistan at a bad time. He

21    just wanted to get back to Algeria.

22        And we talked about why he changed his identity to

23    being a Lybian because he thought he would get out of Pakistani

24    hands. He wasn't in U.S. hands at that time. He was in Pakistani

25    hands and he wanted to get back to Algeria. He thought this was

JA001149

34

1      more, your Honor.

2          THE COURT:  Thank you.

3          MS. GORMAN:  Thank you.

4          THE COURT:  Ms. Hussey.

5          MS. HUSSEY:  Good afternoon, your Honor.

6          THE COURT:  Good afternoon.

7          MS. HUSSEY:  Petitioner's counsel just argued for about

8      an hour addressing specifically the impact of our withdrawal of

9      ISN 839 and what else is left or from her perspective not left.

10     Yet nothing that she just said, no argument just made hasn't

11     already been raised by Petitioner's counsel in the Merits

12     Hearing and in her Amended Traverse. There is nothing new that

13     the Court just heard that it hadn't heard before.

14          Counsel's argument that, while I wasn't on this phone

15     call, counsel's argument that she was unable to address all of

16     her arguments because she spent time on ISN 839 and was

17     prejudiced in some way because ISN 839 was part of the

18     Government's case is wholly without merit and the argument here

19     today for the past hour has shown that because again she has

20     discussed nothing new.

21          THE COURT:  Well, now, let's see if we can agree on a

22     few things here. First of all, I assume you would agree that it

23     is only 839 that corroborated 707's identification of her client

24     with the use of the name al-Jaza'iri?

25          MS. HUSSEY:  Well, your Honor, I would agree that ISN

JA001152

35

1    839 is the only other photo identification that the Government

2    put forward to corroborate ISN 707's positive photo

3    identification of the Petitioner as Usama al-Jaza'iri. However,

4    that does not mean that ISN 707's identification is not

5    corroborated. In fact, ISN 707's photo identification of the

6    Petitioner positive in ▮▮▮ is corroborated in several

7    different ways.

8        First, we have the photo. We know that ▮▮▮ the

9    specific picture used in that identification, is the

10   Petitioner's picture. Now, Petitioner's counsel just misstated

11   the evidence a few moments ago when she said that there were no

12   other identifications of her client and ▮▮▮. Specifically

13   there are four different interviews that the Government has put

14   forward, five different interviews in this case if you include

15   Petitioner's exhibit, and three different witnesses who all look

16   at this picture ▮▮▮ and identify it as a guy from the Abu

17   Zubaydah guesthouse who was either Abdul Razak, some of them say

18   he was Abdul Razak and 707 says both Abdul Razak and Usama

19   al-Jaza'iri.

20       Now, the fact that we have the picture that several

21   different people have looked at it and that they have all

22   identified it with one of the Petitioner's kunyas, kunyas that

23   we know he has used shows -- corroborates that 707 photo

24   identification ▮▮▮▮▮▮▮

25       THE COURT:  Let's drill down a little more specifically

JA001153

36

1    on that. So she says, Ms. Gorman says, okay, look, he identifies

2    my client in the first instance, that is 707, in the first

3    instance identifies him in Exhibit 44 which the Government chose

4    not to use, all right, as Abdul Razak. I mean the second

5    instance of Abdul Razak. In the first instance it is Usama

6    al-Jaza'iri. When he identified him as Abdul Razak in the second

7    instance which was in I think September --

8        MS. HUSSEY: Yes, your Honor.

9        THE COURT: -- of '02 so a relatively short time after

10    he had identified him as al-Jaza'iri which I think was in

11    August, at that point he could have, 707, could have said or

12    somehow noted that he had already identified him by another name

13    but he didn't. He chose not to. She is contending that, well,

14    you know, that just shows that there is confusion here and that

15    there is a mistake here on his part as to who it was in that

16    picture or what the name was of the person in that picture.

17    What's wrong with that argument?

18        MS. HUSSEY: Well, two things are wrong with that

19    argument. The first is that he is looking at the exact same

20    picture within a month and identifying another one of his

21    aliases. In fact, that doesn't show confusion on 707's part.

22    That shows he knew him better. He knew him well enough to know

23    the two different names that the Petitioner uses.

24        The second problem with that argument is Petitioner has

25    told the Court that that interrogation has 707 saying he only

JA001154

37

1    knew him from prison but that only word, that's not in that

2    interrogation report anywhere. In fact, 707 in that instance

3    looks at ▆▆▆▆ and says that is Abdul Razak and says I met

4    him -- I knew him from Pakistani prison. Well, we know that they

5    were arrested together. They were in prison together. So that's

6    another point of commonality. Just because ISN 707 doesn't give

7    the full sum of his knowledge of the Petitioner in every single

8    identification does not make those identifications conflict.

9        In fact, it is a stretch to argue that these two

10   different interrogations conflict at all. What we know is that

11   ISN 707 in the interrogation where he identified the Petitioner

12   via ▆▆▆▆ as Usama al-Jaza'iri had what could be termed some

13   unique circumstances. The first one is that ISN 707 was being

14   interrogated by Special Agent ▆▆▆▆ who we talked about at

15   the Merits Hearing. Special Agent ▆▆▆▆ the Government has

16   shown through Exhibit 146 is a native Arabic speaker. He scored

17   the highest score one can possibly score on the FBI's Arabic

18   language test.

19       So we know that from the interrogation where ISN 707

20   identifies the Petitioner as Usama al-Jaza'iri, the likelihood

21   that there was confusion is small. In fact, it is very small. We

22   also know that ISN 707 has never said, oh, wait, when I

23   identified it as Usama al-Jaza'iri, I was wrong. He has never

24   recanted. He has never conflicted. He has never backed off his

25   identification of the Petitioner in any way.

JA001155

38

1      Petitioner's counsel pointed the Court to an exhibit

2   claiming that that exhibit had 707 saying he had never seen any

3   Kaldan trainers while he was at GTMO. Well, there is a few

4   problems with that. The first is we don't know for certain --

5   there is no evidence in the record that ISN 707 and the

6   Petitioner have seen each other at GTMO so on the face of it,

7   Petitioner's counsel pointing to that piece of evidence as

8   something that undermines it doesn't hold water.

9      But on top of that we also know that ISN 707 identified

10   ██████ and he has identified ██████ as present at that house

11   with him. He has identified ██████ as knowing him by different

12   kunyas. Now, he has never said ██████ was not a trainer at

13   Kaldan, but in every interview where he identifies ██████

14   that's in the record, he doesn't say each and every time

15   ██████ was a trainer at Kaldan. Sometimes he just gives his

16   alias. Sometimes he gives other pieces of information. Again,

17   that's an example of other -- another piece of evidence in the

18   record where 707 doesn't give the full sum of his knowledge

19   every single time he is asked a question.

20      It is Respondents' position that that's not

21   unreasonable. If fact, that's very reasonable and probably

22   happens more often than not.

23      Now, the ISN 707 photo identification of the Petitioner

24   as Usama al-Jaza'iri is corroborated in other ways. The first is

25   that the Petitioner himself corroborates the al-Jaza'iri part of

JA001156

39

1    that identification because we know in fact to this day starting

2    in 2004, November of 2004 to this day, the Petitioner has

3    claimed to be Algerian. Al-Jaza'iri as we know from Government's

4    Exhibit 20 which is a declaration on names and aliases,

5    al-Jaza'iri means Algerian.

6         On top of that, the al-Suri diary at page 67 it

7    circumstantial corroborates the 707 identification because the

8    Petitioner's known alias Usama al-Jaza'iri is listed on that

9    list --

10        MS. GORMAN:  I am going to object, your Honor. It is

11   not his known alias.

12        THE COURT:  Well, this is her argument. She can make

13   her argument. That's all. Go ahead.

14        MS. HUSSEY:  The Petitioner's known alias is listed on

15   page 67 of the al-Suri diary in the permanent membership list.

16   Barhoumi is also there. Abu Zubaydah is there. A few others are

17   there. We discussed it at the Merits Hearing at length and this

18   is Exhibit 136 for the Court's reference.

19        Now, this entry with the permanent membership list is

20   dated March 26, 2002; and as the Court heard at the Merits

21   Hearing, that was two days before the Petitioner was captured at

22   the house with Abu Zubaydah along with several other members who

23   are also on that list. So the fact that Petitioner's alias Usama

24   al-Jaza'iri shows up on that list as at the house on March 26th

25   and then he is captured at that same house on March 28th with

JA001157

40

1    those same people corroborates the Usama al-Jaza'iri

2    identification 707 gives.

3            THE COURT:  So even though it doesn't say he is

4    al-Jaza'iri and Abdul Razak, it is not necessary that it says

5    that?

6            MS. HUSSEY:  Well, circumstantially it bolsters the

7    fact that he was going by that name at that time and at least

8    Abu Kamil al-Suri who was the diarist authoring that entry knew

9    him by that name. Because 707 who was also there at that house

10   at that same time and captured with the Petitioner knew him by

11   that name and used a photo that we know is the Petitioner to

12   identify him by that name, the two together corroborate each

13   other.

14          On top of that, we have seen that the Petitioner

15   himself identifies that he was captured at that house two days

16   after the al-Suri diary entry with several of the people that

17   are also on the al-Suri diary entry.

18          So he himself places himself, he places himself at that

19   house with those people two days before capture. Again, that

20   corroborates the evidence that he is part of that group going by

21   the name Usama al-Jaza'iri at that house.

22          Now, the Petitioner's admission and identification of

23   who he was captured with we discussed at the hearing but for the

24   Court's reference, that's Government's Exhibit 57; and the

25   important thing to note about that interview with the Petitioner

JA001158

41

1    is the date of it is December 13, 2004, which is after the

2    Petitioner himself claims he told the truth. There is no

3    argument before this Court either on the papers or at the Merits

4    Hearing saying that this date, December 13, 2004, was affected

5    by any of the claims Petitioner has raised saying he was I guess

6    induced into lying about his name and his nationality.

7         So this interrogation comes after that and in his

8    declaration which is Petitioner's Exhibit 23, he says that by

9    November of 2004 he felt safe, he was telling the truth and

10   everything from then on can be believed. So again the Petitioner

11   himself corroborates the 707 identification.

12        Now, issue one, two, three and four I guess which

13   tracks with the issue list that the Government provided the

14   Court at the Pretrial hearing, when you look at those issues

15   that were presented by the Government, ISN 839 who is the

16   witness we have withdrawn only impacted issues one and issue

17   two. Petitioner's counsel would have you believe that issue

18   three which is that the Petitioner was residing at the

19   Faisalabad guesthouse with Abu Zubaydah and captured there was

20   somehow impacted by 839, but it is beyond dispute that ISN 839

21   did not form a single part of evidence related to issue three.

22        THE COURT:  I agree with that.

23        MS. HUSSEY:  The same goes for issue number four which

24   is entirely discussing the Petitioner's own shifting accounts

25   and how he has consistently backed away from anything

JA001159

42

1  inculpatory ███████████████████

2      Now, issue two, issues one and two are the two issues

3  that 839 was used to support by the Government. Issue one is the

4  kunya. We have just discussed that, ISN 707's identification of

5  the Petitioner. Issue two which is the Petitioner's presence in

6  Afghanistan and flight into Pakistan along the same route as Abu

7  Zubaydah and his force did rely on ISN 839 in part.

8      However, ISN 839 was merely corroborative of the other

9  evidence that we have in the case. Specifically still in the

10  case is the Petitioner's admission that he went to Afghanistan

11  to fight. That admission can be found in Government's Exhibit 23

12  which is an FBI counterterrorism report dated April 1st, 2002,

13  where Special Agent ██████████ interviewed the Petitioner

14  within 48 hours of capture.

15      Now, Petitioner's counsel has made much hay claiming

16  that this interrogation, which begins on page ten, that this

17  interrogation must be of another mysterious secret Abdul Razak

18  who has been confused with the Petitioner. However, it is not

19  just believable and as the Court heard in the Merits Hearing, it

20  can be easily proven because in the last few pages of this

21  report, ██████████ recorded the personal identifying

22  information of the Petitioner in here including the month and

23  year of birth which was July of 1970.

24      That's the information that the Petitioner gave when he

25  was arrested and that's information July of 1970 that the

JA001160

43

1    Petitioner still maintains to be true so even though he has

2    changed his name and he has changed his nationality and he has

3    changed the story about whether he went to Afghanistan to fight

4    as he initially claimed or not, he has never changed that birth

5    date. So in order to believe Petitioner's counsel in this

6    instance that this is not the Petitioner, you would have to

7    believe that there is not only a mystery Abdul Razak, but that

8    that mystery Abdul Razak somehow found out what the Petitioner's

9    birth month and birth year was and gave that information to

10    Special Agent

11        Your Honor, that's just not believable. That's also not

12    believable because the Petitioner was going by the name Abdul

13    Razak when he was at that guesthouse in Faisalabad. We know

14    that. We know that because several different third party

15    witnesses have identified him as using the name Abdul Razak.

16    Those witnesses are    707, and    Now, they can be found

17    for the Court's reference at Exhibit 29 where ISN    says he

18    looks at a picture and says he is Abdul Razak; Exhibit 59 ISN

19    696 on a different occasion looks at a picture and says he is

20    Abdul Razak; Exhibit 33 where    looks at a picture and

21    identifies him as Abdul Razak; Exhibit 68 and for the Court's

22    own reference, Exhibit 68 and Exhibit 37, those are the same

23    interview but one is an FM 40 and one is a FD 302, so two

24    different formats of the interview, but those two exhibits are

25    both the interview of ISN 707 on August 11, 2002; and then

JA001161

44

1    finally Petitioner's Exhibit 44 which we have discussed where

2    707 identifies him as Abdul Razak.

3         Petitioner's counsel claims that there must have been

4    some error, there must be another mystery Abdul Razak because

5    the spellings are slightly different, but as the Government has

6    shown by Exhibit 20 on a declaration on names and aliases,

7    transliteration is the word for translation of Arabic words and

8    names into English and how the sounds are sometimes translated

9    using different spellings. So Abdul Razak might be spelled with

10   two Z's and a Q in one instance or it might be spelled with one

11   Z and a K in another instance, but that doesn't mean it is a

12   different name. It is the same sound being written down in a

13   different way.

14        Now, Petitioner's counsel pointed you to Government's

15   Exhibit 97 as what she called proof that the Petitioner was not

16   this mystery Abdul Razak, but if you look at Government's

17   Exhibit 97, which is a knowledgeability brief dated the same

18   time period within a day or two when the Petitioner got to GTMO,

19   you will see on the first page, paragraph one A says the

20   Petitioner's name is Abdul Al Razak. If you scroll down, you see

21   that his -- one C shows that his ISN number is 685. And as will

22   be relevant in just a few moments, one E shows that his MP

23   number, that's the number used at Bagram to track individuals is

24   ████████████

25        Now, Petitioner's counsel claims that a comment that's

JA001162

45

1    written in paragraph six B undermines the entire claim that the

2    Petitioner used the name Abdul Razak. That's not what this says.

3    In fact, it says that a document referred to as JTF170KB on that

4    document the source name deviates from the name that appears on

5    documents forwarded to JIF South from Afghanistan. Line one A on

6    this JTF170KB, that's stands for knowledgeability brief,

7    reflects the name as given by the Detainee to the interviewer at

8    Guantanamo detention facility.

9        Now, line one A on this form as we just looked at says

10   Abdul Al Razak. Again, when the Petitioner arrived at

11   Guantanamo, he was using that name. In fact, I would say that

12   this doesn't conflict with the premise that the Petitioner was

13   using the name. In fact, what it shows is that Petitioner

14   corrected someone and said on that other document, I am referred

15   to that way, but my name is actually Abdul Razak. So we have got

16   third party witnesses, multiple third party witnesses

17   identifying him as Abdul Razak. We have got himself identifying,

18   self-identifying that way and then on top of that we know for

19   certain that the Petitioner, that at least one of these third

20   party witnesses, ISN 707, he didn't see the Petitioner in jail

21   at all. So he only knew him from the house in Faisalabad and he

22   identified him in a picture as Abdul Razak.

23       So again the claim that Petitioner has put forward that

24   he only took up this name after capture is not true. The

25   evidence doesn't support it.

JA001163

46

1       Now, the Petitioner admitted within 48 hours of capture

2    in that ▇▇▇▇▇▇ interview that he went to Afghanistan to

3    fight. That's Exhibit 23. We also put him in Afghanistan via a

4    fire incident document that can be found at Exhibit 94 --

5       MS. GORMAN: I am going to object, your Honor. That

6    document was only corroborated through 839 and must be withdrawn

7    at this point.

8       MS. HUSSEY: Your Honor, that document is not

9    withdrawn.

10      THE COURT: I don't think I get your argument on that

11   at all, Ms. Gorman. That document stands alone.

12      MS. GORMAN: No, it doesn't, your Honor. Excuse me. I

13   have to get to the microphone. That document was only used to

14   corroborate 839. It had no year attached it to. The Government

15   asked the Court to make the leap that because they talked about

16   Abu Usama and then in double parentheses al-Jaza'iri, even

17   though it had no year attached to it that it was in Khost which

18   is where 839 saw him and so that you tried to use that document

19   to corroborate what 839 was saying about my client being in

20   Khost at that time. There was nothing else corroborative about

21   it.

22      THE COURT: It wasn't written by -- it wasn't an

23   interview, for example --

24      MS. GORMAN: No.

25      THE COURT: -- of the person who was struck 839. It

JA001164

47

1    wasn't an interview of him. It wasn't a statement by him. So

2    if he wasn't the source of it, why isn't it a stand-alone

3    acceptable piece of evidence for the Government to rely upon?

4         MS. GORMAN: Because the only way they could get that

5    document in was by saying --

6         THE COURT: Oh, no. It is in. This isn't a trial.

7         MS. GORMAN: The only weight they can give that

8    document -- and that should have been withdrawn, your Honor,

9    because the only corroborative evidence for using that document

10   was the fact that 839 said I saw him in Khost at this time. They

11   had this report, this fire Incident Report that doesn't even

12   have a year attached to it and they said it must be from this

13   same time when 839 saw him.

14        THE COURT: But, Ms. Gorman, my recollection of that

15   exhibit was it was a listing made up by a third party, not by

16   839.

17        MS. GORMAN: Correct.

18        THE COURT: And not by 707 I might add either.

19        MS. GORMAN: Correct.

20        THE COURT: A third party listed who was present at a

21   particular place when a particular fire occurred and in that

22   list was this person using the name al-Jaza'iri, Osama Jaza'iri.

23   Not Abdul Razak, al-Jaza'iri.

24        MS. GORMAN: Correct.

25        THE COURT: So its value in theory anyway is dependent

JA001165

48

1    upon the Government's ability to link your client to the name

2    al-Jaza'iri. If they succeed, that's one thing. If they don't

3    succeed, it is another. If I were to conclude that you are

4    correct and they haven't established by a preponderance of the

5    evidence in the absence of 839 that your client used the name

6    al-Jaza'iri or is identified as al-Jaza'iri, then the value of

7    that fire report is essentially of no value.

8         On the other hand, if they were to convince me that

9    they have established by a preponderance of the evidence that

10    your client was identified using that name Usama al-Jaza'iri,

11    then it has value because it places him in Afghanistan.

12         MS. GORMAN:  At an unknown time, your Honor. That's the

13    key. They were using it to corroborate 839 because 839 said he

14    was in Khost near Ramadan and this document talks about a fire

15    in Khost but no year -- prior to Ramadan and no year attributed

16    to it. The only way they could get that document in was to use

17    it as corroborative for 839 who said he was in Khost during that

18    time, during that year.

19         THE COURT:  Let me stop you there for a second. First

20    of all, it is in so the only question now is whether it should

21    be stricken as a part of the Court's decision to strike 839's

22    testimony. That's the only issue --

23         MS. GORMAN:  Correct, your Honor.

24         THE COURT:  -- on the table. And as I said a minute

25    ago, I don't see how the two are related frankly. It is a

JA001166

49

1    question principally of what value if any it has, what value if

2    any to the Government's case does this report have now under

3    these circumstances. Now, you say it has no date, it has no

4    reference point in time, whatever. I am sure Ms. Hussey will

5    have a different opinion on that, but I haven't heard it yet,

6    but it would seem to me that whether or not it is automatically

7    stricken as a result of 839 being stricken is not likely to

8    occur.

9        MS. GORMAN:  Well, your Honor, I would just say again

10   that the only way they were able to get this document before

11   into the record was because 839 placed someone named Abu al-Libi

12   or al-Jaza'iri in Khost at Ramadan and they had a record from

13   before Ramadan with no year in it with a person with a similar

14   name and so that's how they got that into the record. I am

15   saying without 839's testimony, that document should not stand.

16       THE COURT:  Let me hear what Ms. Hussey has got to say

17   about the date issues for starters.

18       MS. HUSSEY:  Yes, your Honor. Yet again Petitioner's

19   counsel is misstating the evidence. The fire incident document

20   is a document that was seized by Allied Forces. It is a document

21   that is seen in two different exhibit numbers. The first is

22   Exhibit 94. The second is Exhibit 120. One is the actual

23   translation, raw translation of the document and the title is

24   AFGP and then there is some numbers after it.

25       The other is an IIR which is an intelligence report

JA001167

50

1    based on the document itself.

2         Now, we do know the likely date of this document

3    because we know it was seized in 2002. That says it, right?  The

4    Allied Forces seized it in 2002 and it says on the face of the

5    document it is dated 28th of Shaban. Shaban is an Islamic

6    calendar month, 28th of Shaban. We have also produced for the

7    Court Exhibit 137 which is some calendar conversion pages. This

8    calendar conversion tool is publicly available, and we included

9    this in our Factual Return so there should be no question with

10   Petitioner's counsel.

11        These calendar conversion pages show you that the 28th

12   of Shaban -- it basically goes through ten years of the 28th of

13   Shaban and tells you what the dates were. Now, the document as

14   seized -- I should have included the full date. It says

15   Thursday, the 28th of Shaban. The 28th of Shaban only occurred

16   twice in the decade prior to it being captured. Once was I

17   believe in 1994 and I would have to flip through to know for

18   certain but the Thursday, 28th of Shaban occurred either in 1992

19   or 1994 but it also occurred on November 15, 2001.

20        So it is Respondents' position that this document is in

21   fact dated. It is dated the Thursday, the 28th of Shaban and we

22   know because it was seized in 2001 and it describes a fire in a

23   guesthouse where fighters were holding weapons and were

24   discussing issues of bombardments and different trainings.

25   Respondents' position is that it is clear that this document had

JA001168

51

1    to have been dated November 15th of the year 2001.

2         Now, the Petitioner's name is listed in this document

3    as Usama al-Jaza'iri. When Petitioner's counsel says that there

4    is double parentheses around al-Jaza'iri, she implies that that

5    means the al-Jaza'iri is a guess. No, that's not what the double

6    parentheses indicate. The double parentheses are used by

7    translators to indicate some sort of tracking.

8         Now here al-Jaza'iri is on the document itself. It

9    means Usama al-Jaza'iri. The double parentheses were inserted by

10   the translator for tracking purposes. The translator herself has

11   a note right after the Petitioner's name that says:  Based on

12   the Usama al-Jaza'iri listing that he believes this person is

13   Algerian. That all matches up.

14        Now, the Petitioner is also listed as a former trainee

15   on the face of this document and it says that he attended the

16   bombardment. As we discussed a minute ago, this document is from

17   a fire incident, it is a report of fire incident that happened

18   in the Khost area. The other guys in the house are listed. They

19   have designations as trainees or trainers and there is at least

20   one guy on this document that on the face of the document alone

21   is listed as from Kaldan.

22        We know that the last guy listed in the names on the

23   document Muhammad al-Jaza'iri, he was also a former trainer at

24   Kaldan because ISN 707 in that same interview found at Exhibits

25   37 and 68 identifies Muhammad al-Jaza'iri as a trainer from

JA001169

52

1   Kaldan in military tactics.

2        So this fire incident document on its face alone puts

3   the Petitioner in Afghanistan, the Khost area when he himself

4   claimed he had been there, he went there in that ▮▮▮▮▮

5   interview, it puts him in Afghanistan. It puts him with Kaldan

6   trainers and trainees which the al-Suri diary also identifies

7   the Petitioner as a former trainer at Kaldan. So that's another

8   point of corroboration. And --

9        THE COURT:  What did you say 707 says -- 707 IDs

10  al-Jaza'iri as a trainer at Kaldan. What exhibit was that?

11       MS. HUSSEY:  707 identifies Muhammad al-Jaza'iri as a

12  trainer at Kaldan. That's in Exhibit 37 and 68. Those are the

13  two exhibits that are the one interview in two formats. So this

14  fire incident document shows the Petitioner -- Mr. Levin has

15  asked me to clarify. The fire incident document is dated, the

16  document itself is dated the Thursday the 28th of Shaban. That's

17  not the date it was captured. That's the date it was written

18  according to the face of it. It shows it right here.  It says

19  accident date Thursday 28 Shaban Hijri calendar. That's the date

20  of the accident. Let me say that, but if you look up in the

21  second paragraph, it says this is a report about a fire accident

22  that took place in a guesthouse called Khost on Thursday 28 of

23  Shaban at six in the evening.

24       So I apologize. This report wasn't written on the 28th

25  of Shaban. The fire actually took place on the 28th of Shaban

53

1   which I apologize for being confused a little bit on that, but

2   that's how we know that the Petitioner who is listed as present

3   for the fire was in Khost on the 28th of Shaban which is

4   November 15, 2001.

5       So again this fire incident document places the

6   Petitioner there. If you scroll down a little bit in the

7   personnel list, he is listed as number four, Abu Usama

8   al-Jaza'iri and then you see the translator comment I talked to

9   you about a moment ago. Then the notation that's on the face of

10  the document it says ex-trainee, attended the bombardment.

11      The final point of corroboration -- so we have got the

12  date Petitioner is in Afghanistan.  We have got the Petitioner's

13  name Usama al-Jaza'iri and we have got the Kaldan connection

14  with others on this list, but the final thing is it lists him as

15  an ex-trainee and we know from the al-Suri diary on page six

16  that the Petitioner Usama al-Jaza'iri is a former trainer as

17  well. It is Respondents' position that these two things

18  corroborate each other because most trainers were once trainees.

19  So it is identifying him here as an ex-trainee who attended the

20  bombardment in fact dovetails and corroborates the other

21  evidence in this case.

22      Now, again, that still isn't the full sum of the

23  Government's evidence that the Petitioner was in Afghanistan

24  because ISN 707 in the same interview where he identifies ███

25  as Usama al-Jaza'iri, he says 707 himself was with the

J4001171

54

1    Petitioner in Afghanistan. Specifically in Exhibit 68 on the

2    second page of the interrogation report starting at the very

3    top, he is describing just to provide some context on the first

4    page, if the Court read the first page, you will see that he is

5    describing what he did after the American air strikes began in

6    Afghanistan.

7         On the second beige he says that along his route, he

8    stayed -- this is the second line on the second page -- Akrama

9    that's 707 stated he stayed at the tent approximately 4 to

10   5 days before he and the others evacuated to Bermal,

11   Afghanistan. Akrama stated in Bermal, Afghanistan he stayed at a

12   local school where he joined the following individuals: ▉▉

13   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

14   ▉▉▉▉▉▉▉▉▉▉▉▉ , and here is the Petitioner's

15   kunya, Usama al-Jaza'iri and ▉▉▉▉▉▉▉▉▉

16        So in that paragraph the Petitioner just places -- or

17   707 places the Petitioner in Bermal, Afghanistan with the group

18   that 707 is traveling with fleeing Afghanistan. You see 707 is

19   the one talking. He is there. ▉▉▉▉▉ is there. The other

20   notable people that are there that the Court will find on that

21   Thinker's demonstrative we discussed at the Merits Hearing who

22   were also captured or present at the house in Faisalabad where

23   the Petitioner and ▉▉▉▉ were captured, there is a ▉▉▉

24   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

25   ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ and these are all

55

1    names that also show up in the house in Faisalabad where the

2    Petitioner is captured.

3        This is the group.  They are traveling together but 707

4    goes on. He says in the third paragraph:  Akrama remembered

5    hearing while in Bermal, Afghanistan of Saif al-alade leaving

6    Afghanistan for the tribal areas. The second sentence in this

7    third paragraph is where the important stuff begins. Akrama

8    stated after Bermal, Afghanistan the group from the school,

9    again that includes the Petitioner, evacuated the town to Bannu,

10   Afghanistan. Akrama stated Afghani individuals (no further -- or

11   NFI which I believe stands for no further information) helped

12   with the evacuation process. Akrama stated in Bannu, Afghanistan

13   the group was distributed into two guesthouses.

14       Now, this is important for two reasons. It shows that

15   the Petitioner is at a school in Afghanistan with 707. It shows

16   that the group from the school including the Petitioner and 707

17   fled to Bannu, Afghanistan together and then it says that the

18   group was distributed into two guesthouses. This matches the

19   method of travel that's described in the al-Suri diary when

20   Abu-Kamil al-Suri describes that the group broke into smaller

21   groups in order to travel, these are my words, but in a

22   stealthier fashion you could say, covertly.

23       Again, through the rest of this page, ISN 707 discusses

24   how he basically gets from those points in Afghanistan where he

25   is with the Petitioner to the house in Faisalabad, Pakistan

JA001173

56

1    where he is again with the Petitioner. The Petitioner shows up

2    in two other places in this same interrogation. The next one is

3    on page four, and this is the one we have discussed at length.

4    This is 707 identifying the Petitioner ███████ as Usama

5    al-Jaza'iri.

6        The point I will make relevant to the travels here is

7    you will see no one else in this interrogation report is

8    identified as using the name Usama al-Jaza'iri and reading the

9    report in total, there is no question that the Usama al-Jaza'iri

10    he is referring to on page two is the same Usama al-Jaza'iri he

11    photo identifies the Petitioner's photo on page four.

12        Finally, I will point the Court to page five of this

13    same report. On page 5, 707 identifies the Petitioner as with

14    him.  The two of them are at the house in Faisalabad and they

15    asked ISN███ identified here the paragraph begins photograph

16    ██████████████████ which is one of the names███ goes by

17    and he is on the Thinker's demonstrative as well. If you slip

18    down to the second-to-the-last sentence in that paragraph, it

19    says:  Akrama stated he and Usama al-Jaza'iri, that's the

20    Petitioner, asked Abdullah to teach them English.

21        So when Petitioner's counsel a few moments ago said no

22    one but███ identified the Petitioner as seeking and taking

23    English classes, that was wrong. 707 identifies him as taking

24    English classes at the Faisalabad house with him.

25        Now, 707 identifies the same group of characters as

57

1    they travel from Afghanistan to Pakistan and the last point I

2    will make on this issue two question of whether we have any

3    other evidence outside of 839 showing the Petitioner is in

4    Afghanistan is that 707 not only puts the Petitioner in

5    Afghanistan at the border fleeing, he puts him with the group

6    with Abu Zubaydah and he puts him with several of the same group

7    members that the Kamil al-Suri, Abu-Kamil al-Suri diary picks up

8    and identifies at the very beginning of the diary.

9          Specifically if you go to page six of the al-Suri

10   diary, which is Exhibit 136, on page six of the al-Suri diary,

11   Abu-Kamil al-Suri is identifying the people that are traveling

12   in his group. If we could highlight the first maybe ten lines of

13   this exhibit -- of this page you will see that right here when

14   Abu-Kamil al-Suri picks up with them, they are at a stream

15   located in Pakistan near the Afghan/Pakistan border. It was

16   Abu-Kamil al-Suri writes it was Usama al-Filastini, Tariq,

17   Asaad, Abu al- Bari,  Abu Uns, Shaykh Akrama who we know to be

18   707, the commander of Kaldan military camp and the brothers who

19   worked as trainers in the same camp such as Ashur al-Jaza'iri,

20   Usama al-Jaza'iri, Abd al-Bari Al Filastini, the one who --

21   there is an illegible notation -- brother Salah al-Din

22   al-Muhtassib and it continues.

23          The important point here is two-fold. The first is this

24   is the same time near the same location that 707 puts the group

25   as traveling together. 707 identifies them in the border areas

JA001175

58

1    escaping Afghanistan. Abu Kamil al-Suri puts many of these very

2    same people as still traveling together on the Pakistani side of

3    the border at this precise same time. This entry is dated in

4    January of 2002.

5        Now, the names that are the same Tariq, we know that

6    that's Abu Zubaydah because Abu Kamil al-Suri identifies Abu

7    Zubaydah in his diary as Abu Zubaydah, Tariq and as my friend.

8    Abd al-Bari, that's a name we just saw from 707 and it is on the

9    Thinker's demonstrative. Uns and then Shaykh Akrama, that's 707

10   himself and then the other note is the three trainers that are

11   identified here in this section, Ashur al-Jaza'iri, the

12   Petitioner and Abd al-Bari al-Filastini, those people were all

13   at the guesthouse in Faisalabad with Abu Zubaydah and Ashur

14   al-Jaza'iri and al-Bari al-Filastini were both trainers we know

15   from other sources at Kaldan.

16       So Abu Kamil al-Suri is getting this right. This is

17   corroborated, and it corroborates 707's identification.

18       THE COURT: But your position would still be,

19   nonetheless, would it not, that it is not necessary for the

20   Government to demonstrate that this Petitioner was in

21   Afghanistan, that he was at the fire incident, that he traveled

22   with them in Afghanistan? It is enough alone if he was in that

23   guesthouse with Abu Zubaydah and his lieutenants and his senior

24   types for a two-week period prior to his capture, that's more

25   than enough for the Government to show by a preponderance of the

JA001176

59

1    evidence that he was a part of this associated force? Isn't that

2    your position?

3         MS. HUSSEY: That is our position.

4         THE COURT: Yes. So this is all gravy. This is not

5    something you need to demonstrate. Obviously it strengthens your

6    case. It is your position that it is true, but it is not

7    something you have to demonstrate in order to make your case as

8    to the lawfulness of his detention.

9         MS. HUSSEY: Your Honor, there is no question that

10   Petitioner's presence at the guesthouse in Faisalabad where Abu

11   Zubaydah was gathering his force and training them for martyrdom

12   operations, that evidence is sufficient to detain; but

13   Respondents also submit to the Court that all of this evidence

14   dovetails together and it makes perfect sense contrary to

15   Petitioner's claims which don't make sense.

16        So while it is not necessary standing alone, it tells a

17   consistent story.

18        THE COURT: Now, what was found in that guesthouse? Ms.

19   Gorman says, well, it was just some propaganda and there was

20   some -- I don't think she even conceded that there were some

21   ▉▉▉▉▉▉▉▉▉ in there. My recollection of the evidence was

22   that there were ▉▉▉▉▉▉ in there.

23        MS. HUSSEY: There were definitely electronic

24   components, your Honor. The Court -- if the Court would turn --

25   well, the Court doesn't have to turn I guess for this purpose,

JA001177

60

1    but as the Court will recall, we walked through in issue number

2    three Government's Exhibits 69 through 73. Those are reports of

3    the evidence that was seized at the house. There is also a log

4    of the evidence and pictures of the evidence that's from that

5    log.

6            And you can see in the log and the photos that the

7    numbers that the evidence is given matches up. And what the

8    Court -- what we showed at the Merits Hearing regarding that

9    evidence is that there were ███████████████████████████

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15           THE COURT: This is the type of watch used for IEDs

16   apparently?

17           MS. HUSSEY: Yes, your Honor. As Exhibit I believe it

18   is 4 ██████████████████████████████

19   ████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████

23           THE COURT: Yes.

24           MS. HUSSEY: As the Court will recall, one of the

25   individuals identified as at the house, Abd al-Bari

JA001178

61

1    al-Filastini, he is identified in that Casio watch declaration

2    of Exhibit 4 as an individual known to have trained people,

3    trained al-Qaeda trainees on the use of that specific type of

4    watch in IEDs. So his presence also corroborates the fact that

5    they were doing that. They were using the watch and planning to

6    train on and build IEDs.

7        THE COURT: Yes.

8        MS. HUSSEY: But more broadly we know that they were

9    planning to conduct martyrdom operations and the Court heard

10   that from Abu Zubaydah's diary, heard that from Abu-Kamil

11   al-Suri's diary, and heard evidence of that from ▮▮▮▮▮▮▮▮

12   FD 302s, that's the computer specialist. If the Court will

13   recall, I believe it is on page 19, ▮▮▮▮▮▮▮ begins a

14   discussion about how he was assigned the task of going into the

15   market in Faisalabad while he was staying at the house with the

16   Petitioner, of going into the market in Faisalabad to purchase

17   various electronic components which included ▮▮▮▮▮▮▮▮

18   included -- he was asked to buy ▮▮▮▮▮▮▮ He was unable

19   to find those ▮▮▮▮▮▮▮, but he was asked to do it. And

20   other like an ▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮ Various pieces of evidence that while they

22   might not have been seized at the house at the moment of

23   capture, we know that the housemates, these residents Abu

24   Zubaydah was training and preparing, they were trying to get

25   their hands on.

62

1     They were teaching people how to use these things and

2     they were recording in diagrams and in manuals so that others

3     could learn how to use these items for IEDs and other types of

4     martyrdom operations.

5     So the physical evidence contrary to Petitioner's

6     counsel's claims does in fact corroborate the evidence via

7     testimony, the interrogation reports where ISN 696, ▓▓▓▓▓▓

8     the computer specialist and others discuss these training

9     courses that were happening at the house.

10     And the Petitioner we know from several different

11     sources as I discussed a moment ago was taking the English

12     language lessons which were part of that course. Abu-Kamil

13     al-Suri describes in his diary that it was part -- the English

14     language lessons were part of Zubaydah's training program. The

15     Petitioner was taking those classes and he had consistently, it

16     is one of the few things he has consistently denied -- or

17     consistently  said, he has consistently denied taking English

18     classes which we know from the D.C. Circuit in al-Adahi false

19     exculpatory statements are often evidence, strong evidence of

20     guilt.

21     So it is the Respondents' position that not only was

22     there evidence, there is a lot of evidence about what was

23     happening at that guesthouse in Faisalabad.

24     Now, with the Court's permission, I would like to

25     provide a brief response, an initial response to a Motion that

63

1   Petitioner filed yesterday. I am not sure if the Court is aware

2   of this Motion.

3       THE COURT: We are not here for that today.

4       MS. HUSSEY: Okay.

5       THE COURT: If you want to respond to it in writing,

6   you can. It doesn't have anything to do with the merits.

7       MS. HUSSEY: Petitioner's counsel has moved for a new

8   Merits Hearing in this case.

9       THE COURT: Oh, please.

10      MS. HUSSEY: And just for the Court's --

11      THE COURT: There is not going to be any new Merits

12  Hearing. It is not necessary.

13      MS. HUSSEY: Respondents also agree it is not

14  necessary. Unless the Court has any further questions --

15      THE COURT: If you want to for the purpose of the

16  record submit your opposition to it, go right ahead and do it;

17  but based on everything I have heard today the purpose of this

18  exercise today was to give detainee counsel an opportunity to

19  reformulate, reconstitute her final argument in light of this

20  development, i.e., striking 839. Fine. She has done that.

21      Now, there is nothing I have heard today, nothing from

22  Petitioner or from the Government for that matter that would

23  lead this Court to see any necessity whatsoever to have a new

24  Merits Hearing in this case. None whatsoever. The 839 testimony

25  was relatively narrow, relatively focused, relatively targeted.

JA001181

64

1    Its principal value was of a corroborating nature and it related

2    to essentially one or two factual elements. One, the

3    Petitioner's presence in Afghanistan during a particular period

4    of time and, two, identifying the Petitioner as having used a

5    particular name at a particular time and corroborating 707's

6    contention that the Petitioner used this name Usama al-Jaza'iri.

7    That's it.

8        It is a relatively narrow focused targeted value to the

9    Government's case. It has -- if it were the only evidence, which

10   it wasn't, linking the detainee to the name, then it would, of

11   course, take a greater significance on because it is that use of

12   that name that links the detainee to the al-Suri diary and

13   that's a separate issue. But its principal value is

14   corroborative of 707's testimony, and I just don't see why based

15   on everything I have heard there is any need whatsoever for any

16   new hearing. I am not here for that purpose today.

17       If the Government would like a fair opportunity to

18   present any of its opposition to it, feel free to do so to

19   complete the record; but, again, based on what I have heard and

20   seen, I don't see any basis for a need for a new Merits Hearing

21   in this case whatever. In fact, it would be waste of time.

22       MS. HUSSEY:  Respondents agree wholeheartedly that it

23   would be a waste of time and there is no need. Well, my argument

24   would be pretty much in line with what the Court just said. So

25   again purely to say kind of one thing on the record that the

JA001182

65

1    Petitioner's counsel has moved for a new Merits Hearing and for

2    sanctions because of this 839 withdrawal, and it is the

3    Respondents' position that that is not necessary for exactly the

4    reasons the Court just articulated and in addition even if out

5    of an abundance of caution even if there were any harm caused by

6    ISN  839 withdrawal, that harm has now been cued because the

7    Petitioner has been given the opportunity to respond.

8        THE COURT:  The problem that failure to bring to the

9    Court's attention has not been cured by this situation here

10   today and that's a systemic problem with the way the Department

11   of Justice has handled this case, and it is a systemic problem

12   as it relates to my understanding as to your clients'

13   willingness to allow your co-counsel to refer to the information

14   contained in that ex parte pleading as possibly exculpatory

15   under the CMO.

16       It is my understanding until such time as it is

17   corrected that it was not until a week after the hearing had

18   closed and a matter of days before the Court announced its

19   opinion in this case that your client, █████████████████████

20   █████████ would permit your co-counsel, Mr. Levin, to inform this

21   Court that it believed that the information contained in that

22   ex parte filing was potentially exculpatory.

23       If that's true, and I will get to the time bottom of

24   that at later time in a separate proceeding, if that's true,

25   that raises fundamental questions about █████████████████████

66

1      what's going on at the Department of Justice because it

2    is the obligation of the Department of Justice,

3    under the Case Management Order to bring to this Court's

4    attention,           information that may meet the

5    requirements of the exculpatory clause in the Case Management

6    Order.

7         As far as I am concerned, there is no good excuse, none

8    for the Department of Justice to sit silent when this Court

9    informed the Department of Justice that it was not going to

10   review that material because it was not its practice to review

11   that material until such time as it was absolutely necessary for

12   the Government to rely upon it in its case.

13        And as bad as it was for the Government not to bring

14   that to my attention at the time, it was even worse for the

15   Government not to bring it to my attention during the hearing,

16   the Merits Hearing, at those points where it was relying upon

17   839's testimony to make its case knowing full well that it had

18   in its possession information that may undercut the credibility

19   and reliability of 839's testimony. That is incredible. I will

20   deal with that when this case is done separately.

21        As I indicated to Mr. Levin at the time, you weren't

22   present, Ms. Hussey, I will deal with this with not only you all

23   but with Mr. West, the Assistant Attorney General, and possibly

24   the Attorney General himself either in a letter form or a report

25   form or whatever. I haven't figured that part out yet.

67

1     MS. HUSSEY: Yes, your Honor. And we apologize for the

2     miscommunication that happened and for the situation as it

3     developed and the timing of it, but specifically when I said

4     that any harm that would have occurred had been cured, I did not

5     mean to infer or include kind of the broader scope. I am tying

6     that specifically to this Merits Hearing proceeding and it is

7     Respondents' position that the withdrawal of ISN 839 cures any

8     harm that was done here for this Merits Hearing and it is also

9     Respondents' position that as it relates --

10     THE COURT: Well, indeed if the Government had not

11     withdrawn it, there was still a chance this Court would have

12     stricken it anyway as a sanction for having failed to bring it

13     to my attention when they should have before the hearing began

14     and at no later than certainly during the hearing itself. The

15     Court retains the option of striking it on its own. It had

16     entertained the possibility of a hearing the following week ▮▮▮

17     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to demonstrate to the Court's

18     satisfaction that notwithstanding detainee's counsel's need to

19     know that the Government should still nonetheless be able to

20     rely upon it because it would jeopardize the national security

21     for it not to be able to -- for it to have to share it with the

22     detainee's counsel.

23     We never reached that point. We didn't have to because

24     the Government made its own decision that it would withdraw

25     reliance on it. That's fine. The Government had a choice. It

JA001185

68

1  made a choice and I respect the fact that it made that choice,

2  but that doesn't mean this Court didn't retain the option and it

3  did to strike it anyway as a sanction for the Government's

4  failure to bring it to this Court's attention. I didn't have to

5  end up doing that.

6      MS. HUSSEY: Yes, your Honor. And again any harm caused

7  to the Merits Hearing by the reliance is withdrawn by the

8  withdrawal of reliance you could say, but in addition any harm

9  or inability or prejudice that came in the argument at the

10  Merits Hearing as Petitioner's counsel asserts in her Motion has

11  been cured by the fact that the Court out of an abundance of

12  caution has given Petitioner's counsel additional time to

13  address how the case -- how the case is impacted by the

14  withdrawal of 839 here in this proceeding.

15      So again to respond specifically to the question of

16  whether a new Merits Hearing is necessary, it is Respondents'

17  position that it is not necessary because any harm that possibly

18  occurred here has now been specifically for this Merits Hearing

19  cured and the Court can take the evidence it has before it and

20  has the ability to carve out ISN 839 and make a determination

21  based on the evidence it has before it for this Merits Hearing's

22  purposes.

23      THE COURT: That's fine. Thank you. Ms. Gorman.

24      MS. HUSSEY: Thank you, your Honor.

25      MS. GORMAN: Thank you. Your Honor, since they brought

JA001186

69

1    up the document that I have still not seen, I just want to

2    address to the Court the fact that I do not believe that this is

3    all cured.

4        THE COURT:  What document you have not seen?

5        MS. GORMAN:  The one I have never seen, the exculpatory

6    document.

7        THE COURT:  The ex parte?

8        MS. GORMAN:  Ex parte document.

9        THE COURT: I have never seen it either.

10       MS. GORMAN:  I know, your Honor, but your Case

11   Management Order and your talk to us at the pretrial conference

12   made it clear that if it is exculpatory, I am allowed to see it

13   and I don't know the full scope of this document. I know it goes

14   to the heart of 839.

15       THE COURT:  No. You just misstated something there, Ms.

16   Gorman. I never said at any time if it is exculpatory --

17       MS. GORMAN:  The Government did.

18       THE COURT:  No. At the pre-hearing conference we

19   weren't on the record.

20       MS. GORMAN:  I understand that.

21       THE COURT:  What you are misstating or misrecollecting

22   is what I said. If they need to rely upon it, it is my position

23   and has been since Boumediene that the detainee's counsel has a

24   need to know. Don't confuse those two things. They have a need

25   to know if it is something that the Government seeks to rely

JAQ01187

71

1    limited purpose. I am not speaking to Mr. Levin right now. You

2    can have a seat, Mr. Levin. I am speaking to you for a very

3    limited purpose. Did you or your co-counsel at any time during

4    the pre-hearing conference or during the Merits Hearing at any

5    time ever inform this Court on the record that the ex parte

6    filing related to potentially exculpatory material? I think the

7    answer is clearly no.

8         MS. HUSSEY:  Well, I think the answer is -- well,

9    really there is two parts to the answer. The first is, no, we

10   never brought it up at the pre-hearing conference. We never said

11   that word exculpatory and --

12        THE COURT:  Or during the Merits Hearing.

13        MS. HUSSEY:  Or during the Merits Hearing, we never

14   brought it up and said the word exculpatory. However, in the

15   ex parte Motion on its face --

16        THE COURT:  I did not open it.

17        MS. HUSSEY:  I understand that, your Honor, and I am

18   not attempting to excuse this in any way. We --

19        THE COURT:  And I might add it was in a sealed envelope

20   that was marked at the top secret level and the Court knows well

21   enough from Boumediene and all that I have had in between, I

22   don't open those kind of documents unless and until I have no

23   other choice but to do so.

24        MS. HUSSEY:  Your Honor, we understand that there

25   was -- there is no question that there was a miscommunication

72

1    about how we needed to communicate to you that the ex parte

2    Motion pertained to some exculpatory information. We were under

3    the impression or we were operating with the procedure that we

4    at the time with good faith belief thought was sufficient to

5    provide the Court with an ex parte filing saying it was

6    exculpatory and asked the Court to excuse us in those instances

7    from the otherwise applicable exculpatory obligations.

8        And if the Court would recall, we did discuss the fact

9    that an ex parte Motion had been filed. The miscommunication

10   came I believe that Mr. Levin didn't at -- we didn't at the

11   pre-hearing conference or in the Merits Hearing or in I guess

12   some communications that happened between Mr. Levin and the

13   Court explicitly say it was exculpatory.

14       THE COURT: All you or Mr. Levin  had to say in this

15   courtroom was, your Honor, you need to look at the ex parte

16   application because it may contain exculpatory information. No

17   one ever said that. I specifically told you all I have not

18   opened it. I have not looked at it and I don't. It is not my

19   practice to do so until such time as it may be necessary.

20       There is a big difference between submitting stuff

21   because of a failure on the part of the Government to comply

22   with its Case Management Order responsibilities for discovery

23   and submitting stuff that you may want to use and rely upon in

24   your Merits Hearing for part of your case. There is a big

25   difference, and this is the first and only time since I have

75

1  kind of situations; but there is no excuse that I can think of

2  for not informing this Court immediately when it told you I

3  wasn't reviewing it, looking at it, that this problem, the

4  ex parte application related to was your case management

5  obligation to produce exculpatory material in advance of the

6  hearing. None. None. We will deal with that later, not today.

7  Ms. Gorman, do you have anything else on this issue?

8      MS. GORMAN: I do. I do, your Honor. For the record, I

9  just want to state that I believe I am entitled to see that

10  document because it is exculpatory and because it is such a

11  strong document, obviously they took away reliance on 839, I

12  don't know how much further it goes and to what other issues it

13  goes to. For that reason I think I am entitled to see it. Thank

14  you.

15      THE COURT: Very good. Do you have anything else, Ms.

16  Hussey?

17      MS. HUSSEY: Yes, your Honor. Again, it is Respondents'

18  position that because we withdrew ISN 839 and this document only

19  related to the credibility of ISN 839 there is no ongoing

20  obligation to produce the material, that's first; and, second,

21  there is no ongoing harm that in any way would prevent the Court

22  from determining the detention authority of the United States in

23  this case.

24      THE COURT: And I agree with that. Based on what I have

25  seen and heard, I agree with that. So the other issue we will

76

1  deal with that later at a different time. There is no reason for

2  us to be getting into that today. As far as I am concerned, this

3  case is now at a stage where I can review the material, review

4  the arguments, and reach a final decision. My hope and

5  expectation is to have a hearing next week where I announce my

6  decision. My tentative game plan is to have it next Tuesday, the

7  11th.

8       So if I were in Ms. Gorman's shoes, I would be getting

9  my translator available for the 11th for that morning. If it

10  turns out that that's not going to be doable, I will let you

11  know all know, but I would plan on having a hearing next Tuesday

12  morning the 11th right here in this courtroom, translator,

13  communication, Guantanamo.

14       So that's my tentative game plan schedule wise right

15  now. Okay?

16       MS. GORMAN:  Thank you.

17       MS. HUSSEY:  Thank you.

18       THE COURT:  We will stand in recess.

19       (Whereupon, at 6:22 p.m., the proceedings were

20  concluded.)

21

22

23

24

25

JA001194

77

1           CERTIFICATE

2           I, Patty A. Gels, certify that the foregoing is a

3     correct transcript from the record of proceedings in the

4     above-entitle matter.

5

6

7

8           _____

9

JA001195

UNCLASSIFIED//FOR PUBLIC RELEASE

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ABDUL RAZAK ALI,        )
                                    )
           Petitioner,     )
                                    )
     v.               )  Civil Case No.  10-1020 (RJL)
                                    )
BARACK H. OBAMA,[1] *et al.*,   )
                                    )
           Respondents.   )

## MEMORANDUM ORDER
(January _11_, 2011)

Petitioner Abdul Razak Ali, who now claims his name to be Saeed Bakhouche (hereafter "petitioner," "Bakhouche," or "Razak"), is an Algerian detainee being held at the U.S. Naval Base at Guantanamo Bay, Cuba. He alleges that he is being unlawfully detained by President Barack H. Obama, Secretary of Defense Robert M. Gates, and various others in the relevant chain of command (collectively, "Respondents" or the "Government"). On December 14, 2010, this Court commenced a habeas corpus hearing for Bakhouche. That morning, counsel for both parties made unclassified opening statements in a public hearing. Petitioner listened to a live translation of the opening statements via a telephone transmission to Guantanamo Bay, Cuba.

---

[1]    Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the court will automatically substitute that officer's successor. Accordingly, the Court substitutes Barack H. Obama for George W. Bush.

1

JA001196

UNCLASSIFIED//FOR PUBLIC RELEASE

Thereafter, the Court went into a closed-door session to hear each side present an opening statement that included relevant classified information. Upon completion of their statements, each side presented its evidence, most of which included classified material, and arguments regarding various material issues of fact in dispute between the parties. Because these presentations were not completed by the end of the day on December 14, 2010, the Court reconvened the following day. Once again, presentations and arguments relating to various classified materials consumed most of this day and the Court, as a result, scheduled closing arguments two days later, on December 17, 2010. After hearing each side's closing arguments, the Court informed the parties that it would hold a public hearing in the near future to announce its decision. A classified version of this opinion setting forth in greater particularity the factual basis of the Court's ruling will be distributed in the upcoming weeks and issued through the Court Security Office, together with the final judgment.

Before stating the Court's ruling, a brief statement of the relevant factual and procedural background of the case is appropriate.

## BACKGROUND

Petitioner is a forty-year old Algerian citizen who was captured on March 28, 2002, by Pakistani forces in a raid at a guesthouse in Faisalabad, Pakistan. He was caught together with a well known Al Qaeda facilitator: Abu Zubaydah. Indeed, Abu Zubaydah was at that very time assembling a force to attack U.S. and Allied forces. Captured along with the petitioner and Abu Zubaydah were a bevy of Abu Zubaydah's senior leadership, including instructors in engineering, small arms, English language

2

JA001197

(with an American accent), and various electrical circuitry specialists. Also found at the

guesthouse were pro-al Qaeda literature, electrical components, and at least one device

typically used to assemble remote bombing devices (*i.e.*, improvised explosive devices or

"IED"s). Petitioner was transported to Bagram Air Force Base for questioning, where he

was held before being transferred to the U.S. Naval Base in Guantanamo Bay, Cuba, in

June 2002.

In the aftermath of the Supreme Court's decision in *Rasul v. Bush*, 124 S. Ct.

2686, 2691-92 (2004) (holding that 28 U.S.C § 2241 extended statutory habeas corpus

jurisdiction to Guantanamo), petitioner filed this habeas corpus petition in this Court on

December 21, 2005. (Pet. For Writ of Habeas Corpus [Dkt. #1].) The case was

originally assigned to my colleague, Judge Reggie B. Walton. As with hundreds of other

petitions filed around that time, no action was taken until the Supreme Court ruled on

June 12, 2008, in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), that Guantanamo

detainees are "entitled to the privilege of habeas corpus to challenge the legality of their

detention." (*Id.* at 2262.)

Pursuant to an agreement between most of the judges of this Court, Judge Walton

agreed to have Judge Thomas F. Hogan formulate the initial Case Management Order

("CMO") which would define the procedural process (*i.e.*, including the burden of proof,

standard of proof, and definition of enemy combatant) that would guide the litigation of

these detainee cases.[2] On November 6, 2008, Judge Hogan issued a consolidated Case

---

[2]    I chose not to reassign the habeas cases originally on my docket to Judge Hogan
for this purpose. Instead, I issued my own CMO on August 27, 2008, that I used in the various

3

JA001198

UNCLASSIFIED//FOR PUBLIC RELEASE

Management Order for all of the judges who had transferred their cases to him for this procedural purpose. (Case Mgm't Order, Nov. 6, 2008 [Dkt. #689].) That CMO was amended several times thereafter by both Judge Walton (*i.e.*, on November 12, 2008 (Order, Nov. 12, 2008 [Dkt. #695]) and December 19, 2008 (Order, Dec. 19, 2008 [Dkt. #797])) and by Judge Hogan on December 16, 2008 (Order, Dec. 16, 2008 [Dkt. #784]). Ultimately, petitioner filed a Motion for an Expedited Judgment in his case on January 16, 2009. (Notice of Filing Mot. for Expedited J., Jan. 16, 2009 [Dkt. #902].) Judge Walton issued a further supplemental Case Management Order thereafter on February 19, 2009 (Supp. Case Mgm't Order, Feb. 19, 2009 [Dkt. #1011]), which he amended on March 27, 2009 (Order, Mar. 27, 2009 [Dkt. #1101]).

On April 21, 2009, Judge Walton transferred this case to Chief Judge Lamberth for reasons of judicial economy. (Order, Apr. 21, 2009 [Dkt. #1153].) On May 28, 2009, petitioner filed a Renewed Motion for Expedited Judgment. (Order Memorializing Oral Rulings, May 28, 2009 [Dkt. #1190].) The Government filed its Factual Return on July 29, 2009. (Notice of Pub. Filing of Factual Return, July 29, 2009 [Dkt. #1282].) Again on August 28, 2009, petitioner filed a Renewed Motion for Expedited Judgment. (*See* Memo. and Op., Nov. 19, 2009, at n.1 [Dkt. #1337].) On September 24, 2009, Chief Judge Lamberth denied petitioner's motion. (*Id.*)

---

habeas proceedings assigned to me. That CMO, among other things, placed the burden of proof on the Government, set the standard of proof as a preponderance of the evidence, provided discovery rights for detainees (including a right to "exculpatory" materials), and formulated the procedural processes that would guide the hearings in my Court. In addition, it set forth the definition of "enemy combatant" that the Government's evidence would have to satisfy. (*See Boumediene v. Bush*, No. 04-1166, Case Mgm't Order, Aug. 27, 2008 [Dkt. #142].) This procedural framework was ultimately blessed by our Circuit Court this past June in *Al-Bihani v. Obama*, 590 F.3d 866, 869-70 (D.C. Cir. 2010).

4

JA001199

UNCLASSIFIED//FOR PUBLIC RELEASE

On October 5, 2009, petitioner filed his Traverse in this case and filed motions

seeking certain discovery. (Notice of Filing Traverse, Oct. 5, 2009 [Dkt. #1317].) While

this discovery process was still pending, however, petitioner moved to recuse Chief Judge

Lamberth on January 29, 2010, based on public comments he had made regarding the

role of the legislature in deciding issues related to detention cases. (Mot. for Recusal,

Jan. 29, 2010 [Dkt. #1361].) On June 6, 2010, Judge Lamberth issued an order recusing

himself from the case. (Order, June 6, 2010 [Dkt. #1418].) On June 16, 2010, the case

was randomly reassigned to this Court. (Reassgm't of Civil Case, June 16, 2010 [Dkt.

#1419].) On August 4, 2010, I scheduled an initial status conference in this case for

August 19, 2010. (Minute Entry, Aug. 4, 2010.)

On August 19, this Court met with the parties and inquired into the state of the

record and remaining discovery issues, and to set a date for the merits hearing. (Minute

Entry, Aug. 19, 2010.) Six days later, on August 25, 2010, I issued a CMO in this case.

(Case Mgm't Order, Aug. 25, 2010 [Dkt. #1423].) That order was virtually identical to

the CMO I had issued on August 27, 2008, in *Boumediene v. Bush*, No. 04-cv-1166, and

that I had used in the six other habeas merits hearings I held in the eight months that

followed the *Boumediene* hearing. (No. 04-cv-1166, Case Mgm't Order, Aug. 27, 2008

[Dkt. #142].) It was also virtually identical to the CMO I had issued just a few weeks

earlier, on August 4, 2010, in *Obaydullah v. Obama*. (No. 08-cv-1173, Case Mgm't

Order, Aug. 4, 2010 [Dkt. #77].)

On August 26, 2010, I held a discovery hearing to address certain pending

discovery requests by the petitioner. (Minute Entry, Aug. 26, 2010.) On September 10,

5

JA001200

UNCLASSIFIED//FOR PUBLIC RELEASE

2010, I held a follow-up status conference to address those discovery issues further and to schedule the merits hearing in this case for October 4 and 5, 2010. (Minute Entry, Sept. 10, 2010.) On September 15, 2010, however, petitioner's counsel requested a continuance of the merits hearing to enable her to meet once again with her client in Cuba. (Mot. to Reschedule Habeas Hr'g, Sept. 15, 2010 [Dkt. #1428].) On September 21, 2010, I granted her request and converted the October 4, 2010 hearing into a status hearing. (Minute Entry, Sept. 21, 2010.) On October 4, 2010, I rescheduled the merits hearing for December 14 and 15, 2010, and gave petitioner until November 5, 2010, to amend his Traverse. (Minute Entry, Oct. 4, 2010.) On November 18, 2010, the Government filed its response to the Amended Traverse. (Notice of Filing Resp. to Pet.'s Amended Traverse, Nov. 18, 2010 [Dkt. #1443].)

On December 7, 2010, I held a pre-hearing conference with counsel in an effort to narrow the factual issues to be covered at the merits hearing. (*See* Minute Entry, Oct. 4, 2010.) At that hearing I informed detainee's counsel that I had received a notice of an *ex parte* filing from the Government the previous day that was classified at the top secret level. (*See* Notice of Classified *Ex Parte* Filing, Dec. 6, 2010 [Dkt. #1444].) In addition, I informed the parties that it had been my practice in all of my previous habeas cases to refrain from reviewing such filings until such time as I had a need to do so. Indeed, I informed counsel for both parties that because detainee counsel, in my judgment, has a "need to know" any evidence being relied upon by the Government to sustain petitioner's ongoing detention, the Government would only be permitted to keep this evidence from detainee counsel if doing otherwise would endanger our national

6

JA001201

UNCLASSIFIED//FOR PUBLIC RELEASE

security. Accordingly, unless and until the Government needed to rely on the information contained in the *ex parte* filing in either its case-in-chief or rebuttal case, the Court would *not* review it or conduct the type of hearing that using it would necessitate. Neither side noted any concern regarding this approach. Moreover, at no time during the merits hearing held on December 14, 15, and 17, did the Government either inform the Court that its *ex parte* filing related to its pretrial discovery obligations or express any need or intent to rely upon the evidence contained in the *ex parte* filing.

On December 22, 2010, the Court informed the parties that it would announce its unclassified opinion in open court on December 30, 2010. On December 23, 2010, however, counsel for the Department of Justice informed the Court's staff *for the first time* that it had just received permission from its client to inform the Court via telephone that the *ex parte* pleading it had previously filed concerned potentially exculpatory information that the Government had not turned over to detainee counsel because it was classified at a higher classification level than detainee counsel was authorized to view. As a result, I immediately held an *ex parte* hearing that afternoon with Government counsel to inquire into the circumstances surrounding the Government's failure to previously inform me of this fact and to obtain some sense as to the nature of this "exculpatory" material. I specifically cautioned counsel, however, not to reveal at this point the substance of the material contained in its *ex parte* filing. At that hearing, Department of Justice counsel apologized for failing to inform the Court directly of the exculpatory nature of its *ex parte* filing. In addition, he informed the Court that the nature of the exculpatory evidence was such that it related *only* to the credibility and

7

JA001202

UNCLASSIFIED//FOR PUBLIC RELEASE

reliability of one particular identification witness that the Government was relying upon in its case-in-chief. In response, the Court informed the Government counsel that in its judgment, detainee counsel has a need to know and a right to review exculpatory material that relates to the credibility and reliability of any witness whose statements are being relied upon by the Government. Accordingly, in order to legally justify *not* providing such information to detainee counsel, the Government would have to satisfy the Court that providing such information to detainee counsel for use in a closed proceeding would somehow endanger the national security of the United States. As such, the Government, in essence, had to decide whether it wished to continue relying on the statements of this witness. If so, the Court would hold an *ex parte* hearing on December 28, 2010, to address the national security implications of revealing this exculpatory information to detainee counsel. If not, the Court would hold a conference call that same day to inform detainee counsel of these developments, and of the Government's withdrawal of reliance on this particular witness.

On December 24, 2010, Government counsel notified the Court via facsimile that it had decided to withdraw all reliance on the witness in question, thereby obviating the necessity of an *ex parte* hearing on December 28, 2010. As a consequence, the Court had no need to open and review the materials in the *ex parte* application. Three days later, the Government filed a public pleading in advance of the scheduled telephone call in which it notified detainee counsel of its intention to withdraw its reliance on the statements of this particular witness. (*See* Resp.'s Notice of Withdrawal of Reliance on Statements by Third-Party Detainee, Dec. 27, 2010 [Dkt. #1445].) Unfortunately, the

8

JA001203

Government's filing did *not* give a complete and accurate description of the events

preceding that decision. Nevertheless, the Court held the conference call with counsel for

both sides on December 28, 2010, to correct the record for the benefit of detainee's

counsel and to address those events. On that occasion, detainee counsel requested an

opportunity to reformulate and re-present her closing argument in light of the removal of

the evidence from the Government's case. (*See also* Pet.'s Mot. to Withhold Ruling,

Dec. 28, 2010 [Dkt. #1446].) The Court granted her request and set a hearing for January

4, 2011. (Minute Entry, Jan. 4, 2011.) On that day, counsel for both sides presented

hour-long supplemental closing arguments to the Court based on the amended record.

After a careful review of the Factual Return and Traverse, in all of their amended

forms, and after three days of hearings on the factual issues in dispute and the arguments

of counsel, the following is the Court's ruling on Bakhouche's petition.

## LEGAL STANDARD

Under this Court's CMO, the Government bears the burden of proving the

lawfulness of the petitioner's detention by a preponderance of the evidence. In the

*Boumediene* cases, and in six subsequent habeas merits hearings, the Court adopted the

following definition of "enemy combatant" to delineate those who could be detained

lawfully:

> An "enemy combatant" is an individual who was part of or
> supporting Taliban or al Qaeda forces, or associated forces
> that are engaged in hostilities against the United States or its
> coalition partners. This includes any person who has
> committed a belligerent act or has directly supported
> hostilities in aid of enemy armed forces.

9

*Boumediene v. Bush,* 583 F. Supp. 2d 133, 135 (D.D.C. 2008).  In the aftermath of the change in administrations in January 2009, however, the Government for reasons unknown to this Court, now eschews the use of the phrase "enemy combatant" and simply argues instead that petitioner Bakhouche is the type of individual that is detainable under the AUMF because he was "part of" an "associated force" (*i.e.,* Abu Zubaydah's force) engaged in hostilities against the United States or its Allied forces. Either way, the petitioner's status ultimately depends on his relationship, if any, with Abu Zubaydah's force.  Fortunately, there is no real discrepancy between these two standards in that regard, and therefore choosing between them is *not* necessary to a ruling on the petition in this case.

### ANALYSIS

The Government contends that the petitioner was a member of Abu Zubaydah's force that was reorganizing at a guesthouse in Faisalabad, Pakistan, and preparing for future operations against U.S. and Allied forces.  In particular, the Government contends that the petitioner: (1) lived with Abu Zubaydah and a cadre of his lieutenants during a two week period; (2) previously traveled with Abu Zubaydah's force through Afghanistan and ultimately fled with them through Afghanistan to Pakistan; and (3) took an English course (with an American accent) when he was staying at Abu Zubaydah's guesthouse.

Petitioner, not surprisingly, disagrees.  Although he acknowledges being captured in the same guesthouse as Abu Zubaydah, he denies: (1) ever being in Afghanistan, let alone being with Abu Zubaydah's force there; (2) ever taking an English course from

10

JA001205

Abu Zubaydah's trainers at the guesthouse; and (3) ever being a member, permanent or

otherwise, of Abu Zubaydah's force. In essence, he claims that the Government has

mistakenly identified him as a member of Abu Zubaydah's force, who traveled with Abu

Zubaydah in Afghanistan and fled with him to Pakistan before gathering at this particular

guesthouse to start preparing for their next offensive against U.S. and Allied forces.

Upon reviewing the Return, the Traverse, and the oral argument during the merits

hearing, I disagree with the petitioner's contention and conclude for the following

reasons that the Government has more than adequately established that it is more likely

than not that petitioner Bakhouche was, in fact, a member of Abu Zubaydah's force and

is therefore detainable under the AUMF.

At the outset it is worth noting that our Circuit Court has *unequivocally* recognized

that Abu Zubaydah and his band of followers have well established ties to al Qaeda and

the Taliban and thus constitute an "associated force" under the AUMF. *See Barhoumi v.*

*Obama*, 609 F.3d 416, 420 (D.C. Cir. 2010) (affirming the district court's conclusion that

Barhoumi was part of "Abu Zubaydah's militia – an 'associated force that was engaged

in hostilities against the United States or its coalition partners'" and affirming denial of

petitioner Barhoumi's writ); *Al Harbi v. Obama*, No. 05-02479, 2010 WL 2398883, at

*14 (D.D.C. May 13, 2010) ("There appears to be no dispute that Abu Zubaydah was an

al Qaeda operative and that Al Qaeda-related activities took place in his [Faisalabad]

house."). Thus, a member of Abu Zubaydah's force is, by definition, detainable under

the AUMF. Indeed, petitioner does not dispute this, focusing instead on whether he was

actually a member of Abu Zubaydah's force.

11

JA001206

UNCLASSIFIED//FOR PUBLIC RELEASE

The Government, of course, does not rely exclusively on petitioner's capture in the same guesthouse as Abu Zubaydah – although the Government contends, and the Court acknowledges, that that *alone* is enough to warrant petitioner's detention under the AUMF. *See Khalifh v. Obama*, No. 05-1189, at 12 (D.D.C. May 29, 2010) ("Whatever interaction [petitioner] might have had with the top terrorists he met, whether it was limited or extended, his presence with them at [a] guesthouse is quite powerful support to the inference that he was considered a member of al Qaeda (and/or associated forces) at the time. Without such an understanding, he would not have been permitted to be around so many terrorists for any amount of time."). Instead, the Government directs this Court to what petitioner was doing *while* he was at the guesthouse with Abu Zubaydah and his senior leadership, and what he was doing *before* he arrived at that guesthouse.

As to the former, the Government sets forth credible accounts by fellow guesthouse dwellers who not only positively identified the petitioner by one of the various names he was using at that time – *i.e.*, Abdul Razak – but who also credibly account for petitioner participating in one of Abu Zubaydah's various training programs while he was staying in the guesthouse (*i.e.*, taking a class in English). Combining this evidence with the obvious and common-sense inference that a terrorist leader like Abu Zubaydah would not tolerate an unknown and untrusted stranger to dwell in a modest, two-story guesthouse for two weeks with himself and ten or so of his senior leadership, while they are preparing for their next operation against U.S. and Allied forces, the Court cannot help but conclude that petitioner's presence at this guesthouse is enough, *alone*, to

12

JA001207

UNCLASSIFIED//FOR PUBLIC RELEASE

find that he was more likely than not a member of Abu Zubaydah's force. But, there is more!

The Government also introduced credible evidence placing petitioner with Abu Zubaydah's force in various places in Afghanistan prior to his stay at the Faisalabad guesthouse. For example, one of his fellow detainees – who was also captured in the guesthouse – positively identified petitioner's photo by both of the names he was using at that time (*i.e.*, Abdul Razak and Usama al Jaza'iri) and recalled petitioner being in a particular location in Afghanistan prior to their arrival in Pakistan. His statements were corroborated by a contemporaneous diary propounded by one of Abu Zubaydah's close friends (the "al Suri diary") which not only listed petitioner – under the same name Usama al Jaza'iri – as a *permanent* member of Abu Zubaydah's group, but also placed him in at least one of the same locations in which this eyewitness identified him. Indeed, our Court of Appeals, in a recent case involving another detainee who was captured the same day in the same guesthouse as petitioner, found this very diary to be a credible source as to that other detainee's membership in Abu Zubaydah's force. *Barhoumi*, 609 F.3d at 432. In addition, petitioner was cited by that same name in a separate report listing the survivors of a fire in a different location in Afghanistan. In sum, the Government proffered more than enough credible evidence for this Court to conclude that it is more likely than not that petitioner was, indeed, a member of Abu Zubaydah's force. That conclusion, I might add, is corroborated further by petitioner's own admission – when he was first interrogated – that he had gone to Afghanistan to fight in the jihad against the U.S. and its Allied forces.

13

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Bakhouche, of course, vigorously denies the accuracy of the numerous photo identifications of him as Abdul Razak, and especially the one photo identification of him as Usama al Jaza'iri.  In particular, he denies being the "Usama al Jaza'iri" referred to in the al Suri diary and the fire incident report and denies being a member, much less a permanent member, of Abu Zubaydah's force who traveled with them for a protracted period in Afghanistan.  To the extent I can be specific in discussing the shortcomings of his position in this unclassified opinion, suffice it to say that while his challenge to the reliability of certain photo identifications might be more compelling if these witnesses had only seen him on one particular occasion in either Pakistan or Afghanistan, it is particularly undercut by petitioner's own admission that he had stayed at the Abu Zubaydah guesthouse with not only the witness who identified him as Usama al Jaza'iri, but also with a number of the other witnesses who identified him as Abdul Razak. Simply put, Bakhouche's effort to undermine the reliability of the Government's evidence linking him to the Abu Zubaydah group *prior* to his capture at the guesthouse is inherently flawed and undermined by his own lack of credibility on certain critical points. In particular, Bakhouche's stubborn insistence that he had never been to Afghanistan, and did not know or interact in any way with Abu Zubaydah and his lieutenants in that relatively small guesthouse, was wholly incredible.

As such, the Court has no difficultly concluding that the Government more than adequately established that it is more probable than not that the petitioner was in fact a member of Abu Zubaydah's force that had gathered in that Faisalabad guesthouse to prepare for future attacks against U.S. and Allied forces.  Accordingly, petitioner

14

JA001209

UNCLASSIFIED//FOR PUBLIC RELEASE

Bakhouche is being lawfully detained under the AUMF and this Court must, and will

therefore, DENY his petition for a writ of habeas corpus.

## CONCLUSION

For all of the foregoing reasons, and for the reasons that will be set forth in greater

particularity in the forthcoming classified version of this opinion, it is hereby

**ORDERED** that petitioner Abdul Razak Ali's, a.k.a. Saeed Bakhouche's, petition

for a writ of habeas corpus is **DENIED**.

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

15

SECRET

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FILED WITH THE
COURT SECURITY OFFICER
CSO: _Charles T.S._
DATE: _3/1/2011_

ABDUL RAZAK ALI, )
)
    Petitioner, )
)
    v. )   Civil Case No. 10-1020 (RJL)
)
BARACK H. OBAMA,[1] et al., )
)
    Respondents. )

## CLASSIFIED MEMORANDUM OPINION
(February **28** 2011)

For the reasons set forth on the record at the public hearing held on January 11,

2011, and for the following reasons, the Court DENIES petitioner Ali's petition for a writ

of habeas corpus.

## BACKGROUND

Petitioner Abdul Razak Ali, who now claims his name to be Saeed Bakhouche

(hereafter "petitioner," "Bakhouche," or "Razak"), is a forty-year old Algerian citizen

who was captured on March 28, 2002, by Pakistani forces in a raid at a guesthouse in

Faisalabad, Pakistan. (Gov't Amended Narrative Regarding Petitioner Abdal Razak Ali

(ISN 685)), Sept. 10, 2010, ¶¶ 49, 50 (hereafter "Am. Narr.").) He was caught together

with a well known Al Qaeda facilitator: Abu Zubaydah. (Id.) Indeed, Abu Zubaydah

---

[1]    Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the court will automatically substitute that officer's successor. Accordingly, the Court substitutes Barack H. Obama for George W. Bush.

1

SECRET

SECRET

was at that very time assembling a force to attack U.S. and Allied forces. (Am. Narr. ¶¶ 17, 42.) Captured along with the petitioner and Abu Zubaydah were a bevy of Abu Zubaydah's senior leadership (Am. Narr. ¶ 41), including instructors in engineering, small arms, English language (with an American accent), bomb-making, and electrical circuitry. ▆▆▆▆▆▆▆ Am. Narr. ¶ 41.) Also found at the guesthouse were pro-al Qaeda literature,[2] electrical components, electrical schematics and diagrams (in both Arabic and English), notes on circuitry, and at least one item – ▆▆▆▆▆▆▆▆ typically used as a timer for remote bombing devices (*i.e.*, improvised explosive devices or "IED"s). (*See* Gov't Exs. 4, 69-73.) Petitioner was transported to Bagram Air Force Base for questioning (*see* Gov't Ex. 99), where he was held until his transfer to the U.S. Naval Base in Guantanamo Bay, Cuba, in June 2002. (Classified Hr'g Tr., Dec. 17, 2010, at 66:2-6.)

## ANALYSIS

The Government contends that the petitioner was a member of Abu Zubaydah's force that was reorganizing at that guesthouse in Faisalabad, Pakistan, and preparing for future operations against U.S. and Allied forces. (Am. Narr. ¶ 17.) In particular, the Government contends that the petitioner: (1) lived with Abu Zubaydah and a cadre of his lieutenants during a two week period (Am. Narr. ¶ 41); (2) previously traveled with Abu Zubaydah's force through Afghanistan and ultimately fled with them through Afghanistan to Pakistan (Am. Narr. ¶¶ 29-32, 35, 37-40); and (3) took an English course

---

[2]     Among the evidence the Government offered was a photographic catalog of items recovered from the Faisalabad guesthouse, including an artillery manual with "al Qaida" written on the cover in Arabic. (*See* Gov't Ex. 70, at Nos. 67-68.)

2

SECRET

SECRET

(with an American accent) while he was staying at Abu Zubaydah's guesthouse (Gov't

Exs. 64 at 1; 65 at 1; 68 at 5; ███ Classified Hr'g Tr., Dec. 17, 2010, at 16:10-21.)

As a result, the Government argues that petitioner Bakhouche is the type of individual

that is detainable under the AUMF because he was "part of" an "associated force" (*i.e.*,

Abu Zubaydah's force) engaged in hostilities against the United States or its Allied

forces.

Petitioner, not surprisingly, disagrees. Although he acknowledges being captured

in the same guesthouse as Abu Zubaydah, he denies: (1) ever being in Afghanistan, let

alone being with Abu Zubaydah's force there (Pet.'s Am. Traverse, Nov. 8, 2010, at 52,

58); (2) ever taking an English course from Abu Zubaydah's trainers at the guesthouse

(Gov't Exs. 27 at 2; 28 at 2; 56 at 1); and (3) ever being a member, permanent or

otherwise, of Abu Zubaydah's force (*see* Pet.'s Am. Traverse, Nov. 8, 2010, at 25, 27,

51, 58). In essence, he claims that the Government has mistakenly identified him as a

member of Abu Zubaydah's force, who traveled with Abu Zubaydah in Afghanistan and

fled with him to Pakistan before gathering at this particular guesthouse to start preparing

for their next offensive against U.S. and Allied forces. Upon reviewing the Return, the

Traverse, and the oral argument during the merits hearing, I disagree with the petitioner's

contention and conclude for the following reasons that the Government has more than

adequately established that it is more likely than not that petitioner Bakhouche was, in

fact, a member of Abu Zubaydah's force and is therefore detainable under the AUMF.

3                                JA001213

SECRET

SECRET

At the outset, it is worth noting that our Circuit Court has *unequivocally* recognized that Abu Zubaydah and his band of followers have well established ties to al Qaeda and the Taliban and thus constitute an "associated force" under the AUMF. *See Barhoumi v. Obama*, 609 F.3d 416, 420 (D.C. Cir. 2010) (affirming the district court's conclusion that Barhoumi was part of "[Abu] Zubaydah's militia – an 'associated force that was engaged in hostilities against the United States or its coalition partners'" and affirming denial of petitioner Barhoumi's writ); *see also Al Harbi v. Obama*, No. 05-02479, 2010 WL 2398883, at *14 (D.D.C. May 13, 2010) ("There appears to be no dispute that Abu Zubaydah was an al Qaeda operative and that Al Qaeda-related activities took place in his [Faisalabad] house."). Thus, a member of Abu Zubaydah's force is, by definition, detainable under the AUMF. Indeed, petitioner does not dispute this, and petitioner's counsel readily admits the same. (Classified Hr'g Tr., Dec. 14, 2010, at 30:3-7.) Instead of challenging the lawfulness of detaining a member of Abu Zubaydah's force, petitioner instead focuses on whether he was *actually* a member of Abu Zubaydah's force.

The Government, of course, does not rely exclusively on petitioner's capture in the same guesthouse as Abu Zubaydah – although the Government contends, and the Court agrees, that that *alone* is enough to warrant petitioner's detention under the AUMF. *See Khalifh v. Obama*, No. 05-1189, WL 2382925 at *4 (D.D.C. May 29, 2010) ("Whatever interaction [petitioner] might have had with the top terrorists he met, whether it was limited or extended, his presence with them at [a] guesthouse is quite powerful support to

4

JA001214

SECRET

the inference that he was considered a member of al Qaida (and/or associated forces) at the time. Without such an understanding, he would not have been permitted to be around so many terrorists for any amount of time."). Instead, the Government directs this Court to what petitioner was doing *while* he was at the guesthouse with Abu Zubaydah and his senior leadership, and what he was doing *before* he arrived at that guesthouse.

As to the former, the Government sets forth credible accounts by fellow guesthouse-dwellers who not only positively identified the petitioner by one or more of the various names he was using at that time – *i.e.*, Abdul Razak or Usama al Jaza'iri[3] – but who also credibly account for petitioner participating in one of Abu Zubaydah's various training programs while he was staying in the guesthouse (*i.e.*, taking a class in English). Specifically, ISN 703 identified the petitioner as Abdul Razak and stated that he witnessed him receiving English-language classes from another guesthouse member, Ghassan Abdulla al-Sharbi (ISN 682) (Gov't Ex. 64 at 1), a "permanent member" of Abu Zubaydah's force (Gov't Ex. 136 at 67, No. 12) who was also detained in the March 2002

---

[3]     At one point during the habeas petition merits hearing, petitioner's counsel even contended that her client was not the same Abdul Razak that his fellow Abu Zubaydah guesthouse-lodgers had identified by that very name. Unfortunately for petitioner, the Government was able to produce a copy of the exact photograph (number ████) that was shown to those detainees. That photograph, as it turns out, is unequivocally a photo of the petitioner. (*See* Classified Hr'g Tr., Dec. 17, 2010, at 24:13-15.) Moreover, one of those detainees (ISN 707) also identified the petitioner by a second name that he used during that time period: Usama al Jaza'iri. (*See* Gov't Ex. 37; Gov't Ex. 68; Pet.'s Ex. 43.) Considering that these fellow guesthouse lodgers were people that the petitioner independently identified as living with him at the time of their capture, it is hard, to say the least, to accredit petitioner's "misidentification" argument.

5

SECRET                                        JA001215

SECRET

raid.[4] ████████████████████████████████████████

████████████████████████████████████ a contemporaneous diary

propounded by one of Abu Zubaydah's close friends (the "al Suri Diary")[5] explained that

English lessons were an important aspect of Abu Zubaydah's training program. (Gov't

Ex. 136 at 58 ("Soon our program will begin specializing in electronics, English

language, computer and internet").) Another credible source, ISN 707,[6] who was also

captured in the guesthouse, identified the petitioner as Usama Al-Jaza'iri and stated that

---

[4]    In a later interview, ISN 703 once again stated that Abdul Razak was present for English classes. (Gov't Ex. 65 at 1.)

[5]    Our Court of Appeals, in a recent case involving another detainee, found this very diary to be a credible source as to that other detainee's membership in Abu Zubaydah's force. *Barhoumi v. Obama*, 609 F.3d 416, 432 (D.C. Cir. 2010).

[6]    The Government contends, and I agree, that ISN 707 is credible with respect to his photo identifications of the petitioner as Abdul Razak and Usama al Jaza'iri, and as to his statements regarding the petitioner taking English lessons while they were staying together at the Faisalabad guesthouse. How so? First of all, with respect to ISN 707's identification of petitioner as Abdul Razak in photograph ████ that identification was made on multiple occasions and was corroborated independently by a number of the other detainees who were staying at the same guesthouse. As to his knowledge of petitioner's other nickname ("kunya"), Usama al Jaza'iri, that too is not only credible but is consistent with the Government's other evidence. In particular, it is well established that detainees like the petitioner frequently have more than one kunya, and since the petitioner by his own admission is an Algerian, having a kunya ("al Jaza'iri") that means "the Algerian" is perfectly appropriate. (*See* Gov't Ex. 20.) Moreover, ISN 707's multiple identifications of the petitioner on a number of separate occasions as a fellow guesthouse-dweller is consistent with the al Suri Diary's listing of the petitioner by the name Usama al Jaza'iri as a permanent member of Abu Zubaydah's force. (Gov't Ex. 136 at 67.) All in all, absent any basis to believe that ISN 707 would falsely represent his identification of petitioner, the Court is satisfied with ISN 707's credibility as to this particular point. As for his taking the English classes offered in the guesthouse, once again this statement by ISN 707 is independently corroborated by at least one other guesthouse-dweller, ISN 703, and is perfectly consistent with petitioner being at that guesthouse at that time.

6

SECRET

JA001216

SECRET

they actively sought English lessons together. (Gov't Ex. 68 at 5; Classified Hr'g Tr.,

Dec. 15, 2010, at 67:15-17.)[7] Thus, combining this evidence with the obvious and

common-sense inference that a terrorist leader like Abu Zubaydah would not tolerate an

unknown and untrusted stranger to dwell in a modest, two-story guesthouse for two

weeks with himself and ten or so of his senior leadership, while they are preparing for

their next operation against U.S. and Allied forces, the Court cannot help but conclude

that petitioner's presence at this guesthouse is enough, *alone*, to find that he was more

likely than not a member of Abu Zubaydah's force. But, there is more!

The Government also introduced credible evidence placing the petitioner with Abu

Zubaydah's force in various places in Afghanistan prior to his stay at the Faisalabad

guesthouse. For example, ISN 707, the detainee who positively identified petitioner's

photo by both of the names he was using at that time (*i.e.*, Abdul Razak and Usama al

Jaza'iri) (*see* Gov't Ex. 37 at 5; Gov't Ex. 68 at 4; Pet.'s Ex. 43), placed Usama al

Jaza'iri in Barmal, Afghanistan, prior to their arrival in Pakistan. (Gov't Ex. 68 at 2.)

Specifically, ISN 707 described the route he and a group of comrades took while fleeing

Afghanistan to avoid American air strikes. (*Id.* at 1-2.) Moreover, ISN 707 admitted to

taking shelter with the petitioner at a local school in Afghanistan, together with Abu

Zubaydah himself and several of the other detainees captured later at the Faisalabad

guesthouse. (*Id.* at 2.) According to ISN 707, that group eventually evacuated Barmal

---

[7]      Notwithstanding accounts from multiple guesthouse-dwellers – and
corroboration from the al Suri Diary – petitioner denies that he ever took English lessons,
much less for sinister purposes. (*See, e.g.*, Gov't Ex. 65 at 1; Pet.'s Ex. 23.) These
blanket denials, however, are easily overcome by the overwhelming and persuasive
evidence offered by men who knew petitioner and dwelled with him in the guesthouse.

7

JA001217

SECRET

SECRET

and traveled together to Bannu, Afghanistan, before being "distributed into two guesthouses." (*Id.*) Moreover, ISN 707's statements do not stand alone. They are corroborated by the al Suri Diary, which not only lists the petitioner – under the same name Usama al Jaza'iri – as a *permanent* member of Abu Zubaydah's group, but effectively[8] places him on the Afghanistan-Pakistan border in January 2002 with a group of the very same people ISN 707 described as fleeing together from Afghanistan, only to be captured together later in the Faisalabad guesthouse. (*See* Gov't Ex. 136, at 6, 67.)

Finally, petitioner is cited by his name "Usama al Jaza'iri" in an enemy report listing the survivors of a fire at a guesthouse barracks in Khowst, Afghanistan, in 2001. (Gov't Ex. 94; Gov't Ex. 120.) The Government contends that the report was written contemporaneously by a member of al Qaeda, the Taliban, or an associated force who was in the guesthouse barracks at the time of the fire and who reported the accident to another member of the same associated force. (Classified Hr'g Tr., Dec. 14, 2010, at 113:3-115:7.) Indeed, the incident report,[9] which was later seized by Allied Forces in Kabul in 2002, is dated "Thursday, the 28th of Shaban," an Islamic calendar month

---

[8]    Although the diary does not specifically list petitioner, by name, as being with the group at that location, it effectively refers to petitioner by characterizing certain group members by their relationships with Usama al-Jaza'iri. (*See* Gov't Ex. 136 at 6 (describing "the brothers who worked as trainers in the same camp such as Ashur al-Jaza'iri, Usamah al-Jaza'iri, [and] Abd al-Bari al-Filistani").)

[9]    Also contained in the report is a list of "material losses" from the fire, which includes a Kalashnikov, an ammunition pouch, and a [rocket-propelled grenade]. (Gov't Ex. 94 at 3.)

8

JA001218

SECRET

which – when converted to a Western calendar – would be November 15, 2001. (*See* Gov't Ex. 137; Classified Hr'g Tr., Jan. 11, 2011, at 50:2-51:2.)

In sum, the Government proffered more than enough credible evidence for this Court to conclude that it is more likely than not that petitioner was, indeed, a member of Abu Zubaydah's force. That conclusion, I might add, is corroborated further by petitioner's own admission – when he was first interrogated – that he had gone to Afghanistan to fight in the jihad against the U.S. and its Allied forces. (Gov't Ex. 23 at 10.)

Bakhouche, of course, vigorously denies the accuracy of the various photo identifications of him as Abdul Razak, and especially the one photo identification of him as Usama al Jaza'iri. In particular, he denies being the "Usama al Jaza'iri" referred to in the al Suri Diary and the fire incident report and denies being a member, much less a permanent member, of Abu Zubaydah's force who traveled with them for a protracted period in Afghanistan. Notwithstanding petitioner's protestations to the contrary, the evidence introduced clearly rebuts his position. Indeed, while his challenge to the reliability of certain photo identifications might be more compelling if these witnesses had only seen him on one specific occasion in either Pakistan or Afghanistan, it is particularly undercut by petitioner's own admission that he had stayed at the Abu Zubaydah guesthouse with not only the witness who identified him as Usama al Jaza'iri, but also with a number of the other witnesses who identified him as Abdul Razak. Simply put, Bakhouche's effort to undermine the reliability of the Government's

JA001219

SECRET

evidence linking him to the Abu Zubaydah group *prior* to his capture at the guesthouse is inherently flawed and undermined by his own lack of credibility on certain critical points. In particular, Bakhouche's stubborn insistence that he had never been to Afghanistan, and did not know or interact in any way with Abu Zubaydah and his lieutenants in that relatively small guesthouse where they were all captured together, was *wholly* incredible.

As such, the Court has no difficultly concluding that the Government more than adequately established that it is more probable than not that the petitioner was in fact a member of Abu Zubaydah's force that had gathered in that Faisalabad guesthouse to prepare for future attacks against U.S. and Allied forces.  Accordingly, petitioner Bakhouche is being lawfully detained under the AUMF and this Court must, and will therefore, DENY his petition for a writ of habeas corpus.

## CONCLUSION

For all of the foregoing reasons, it is hereby **ORDERED** that petitioner Abdul Razak Ali's, a.k.a. Saeed Bakhouche's, petition for a writ of habeas corpus is **DENIED**.

SO ORDERED.

RICHARD J. LEON
United States District Judge

10

JA001220

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ABDUL RAZAK ALI,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| v. | ) | **Civil Case No. 10-1020 (RJL)** |
| | ) | |
| **BARACK H. OBAMA,**[1] *et al.,* | ) | |
| | ) | |
| **Respondents.** | ) | |

## MEMORANDUM ORDER
(May 17, 2011) [#1468]

Before the Court is petitioner's Supplement to Motion (and Renewed Motion) For

Entry of the Writ Or, In the Alternative, a New Hearing and For Sanctions ("Supp.

Mot.") [Dkt. #1468]. Petitioner essentially seeks two forms of relief. First, he asks this

Court to grant a new merits hearing based on his allegation that the Government failed to

provide him, prior to the merits hearing, certain exculpatory information regarding the

reliability of a particular detainee who was caught with petitioner and who corroborated

petitioner's presence in Afghanistan. Supp. Mot. at 1-2, 6. Second, petitioner asks this

Court to levy sanctions against the Government for its alleged failure to comply with this

Court's Case Management Order ("CMO") [Dkt. #1423]. Supp. Mot. at 6.

---

[1]     Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a
party to an action in his official capacity ceases to hold office, the court will automatically
substitute that officer's successor. Accordingly, the Court substitutes Barack H. Obama for
George W. Bush.

1

JA001221

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102    Document #1443998    Filed: 06/11/2013    Page 221 of 877
Case 1:10-cv-01020-RJL    Document 1496    Filed 05/18/11    Page 2 of 3

First, with respect to petitioner's request for a new merits hearing, even if petitioner's allegations were correct – which they are not – petitioner has not shown, and cannot show, that his having the documents in question to challenge the credibility of that particular detainee would have changed the outcome of his case. Indeed, I essentially concluded to the contrary in my January 11, 2011 Unclassified Memorandum Opinion ("Unclassified Memo. Op."), when I stated that: "petitioner's presence at [the Faisalabad] guesthouse is enough, *alone*, to find that he was more likely than not a member of Abu Zubaydah's force" and was therefore detainable. Unclassified Memo. Op. at 12-13 (emphasis in original) [Dkt. #1448]. Thus, Petitioner has not carried the burden required to re-open his case and his motion is **DENIED.**

Finally, petitioner's request for sanctions is also **DENIED.** Upon review of the classified response to petitioner's motion, *see* Notice of Filing Respondent's Opp'n, Apr. 4, 2011 [Dkt. #1480], I find no basis to conclude that the documents petitioner alleges were withheld were, in fact, reasonably available to the Government. Furthermore, it does not even appear that the documents in question actually support the substantive proposition for which petitioner cites them. In short, petitioner has not shown that the Government failed its discovery obligations under the CMO, let alone proven the bad faith required to impose sanctions.

Accordingly, for all of the foregoing reasons, it is hereby

2

JA001222

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102     Document #1443998     Filed: 06/11/2013     Page 222 of 877
Case 1:10-cv-01020-RJL     Document 1496     Filed 05/18/11     Page 3 of 3

**ORDERED** that petitioner Abdul Razak Ali's, a.k.a. Saeed Bakhouche's,

Supplement to Motion (and Renewed Motion) For Entry of the Writ Or, In the

Alternative, a New Hearing and for Sanctions [Dkt. #1468], is **DENIED**.

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

JA001223

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102    Document #1443998    Filed: 06/11/2013    Page 223 of 877
Case 1:10-cv-01020-RJL   Document 1500   Filed 06/12/12   Page 1 of 3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDUL RAZAK ALI,                    )
                                    )
   Petitioner,      )
                                    )
  v.                      )   Civil Case No.  10-1020 (RJL)
                                    )
BARACK H. OBAMA,[1] *et al.*,       )
                                    )
   Respondents.      )

## MEMORANDUM ORDER
(June _11_, 2012) [#1487]

On January 11, 2011, this Court denied petitioner's petition for a writ of habeas

corpus, Mem. Order [Dkt. #1448], and issued its final judgment on March 9, 2011,

Final J. [Dkt. #1472].  Thereafter, petitioner filed two additional motions requesting a

new merits hearing and sanctions, [Dkt. ##1447, 1451], as well as two supplements to

those motions, [Dkt. ##1468, 1487].  The Court denied both motions.  *See* Order [Dkt.

#1474] (Mar. 11, 2011) (denying Dkt. #1447); Min. Order (Mar. 11, 2011) (denying Dkt.

#1451).  On March 8, 2011, petitioner filed his Notice of Appeal [Dkt. ##1471, 1485] to

this Court's final judgment.[2]  On May 9, 2011, however, petitioner filed a motion with

our Court of Appeals requesting that it hold petitioner's appeal in abeyance pending this

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a
party to an action in his official capacity ceases to hold office, the court will
automatically substitute that officer's successor.  Accordingly, the Court substitutes
Barack H. Obama for George W. Bush.

[2] Petitioner filed an additional Notice of Appeal on May 2, 2011.  [Dkt. #1489].

JA001224

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102    Document #1443998    Filed: 06/11/2013    Page 224 of 877
Case 1:10-cv-01020-RJL    Document 1500    Filed 06/12/12    Page 2 of 3

Court's determination of his pending "Rule 60(b) motion[s]." Unopposed Mot. to Stay

Appeal Pending Resolution of Appellant's Rule 60(b) Mot., *Ali v. Obama*, No. 11-5102

(D.C. Cir.), filed May 9, 2011 [Dkt. #1306982]. Our Circuit Court granted that motion

on May 13, 2011, *Ali v. Obama*, No. 11-5102, slip op. at 1 (D.C. Cir. May 13, 2011)

(citing Fed. R. App. P. 12.1), and on May 17, 2011, this Court denied petitioner's first

supplemental motion [Dkt. #1468], finding petitioner had failed to "carr[y] the burden

required to re-open his case." Mem. Order [Dkt. #1496] at 2.[3]

Currently before the Court is petitioner's Second Supplement to Motion (and

Renewed Motion) For Entry of the Writ Or, In the Alternative, a New Hearing and For

Sanctions ("2d Supp. Mot.") [Dkt. #1487]. Petitioner now asks this Court to grant a new

merits hearing, based on two new "facts": (1) a recently published photograph, which

"the government . . . contends" is of petitioner, that he claims "is not of the same person

shown to this Court at the hearing as being the petitioner," 2d Supp. Mot. at 1; and (2) the

statement of a former prosecutor with the Office of Military Commissions who admits

"that photo identifications of detainees by other detainees w[ere] often rigged," *id.* at 2.

The Government opposes the motion claiming in essence that the petitioner's arguments,

even if true, do not meet the standard necessary to warrant reopening his merits hearing.

The Court has reviewed the pleadings and the record herein, and I find no reason

to depart from my previous decisions. Accordingly, it is hereby

---

[3] Petitioner filed a motion to clarify the Court's May 17, 2011 ruling [Dkt. #1498], which the Court denied by Minute Order on October 4, 2011.

2

*JA001225*

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102     Document #1443998     Filed: 06/11/2013     Page 225 of 877
Case 1:10-cv-01020-RJL    Document 1500    Filed 06/12/12    Page 3 of 3

**ORDERED** that petitioner Abdul Razak Ali's, a.k.a. Saeed Bakhouche's, Second

Supplement to Motion (and Renewed Motion) For Entry of the Writ Or, In the

Alternative, a New Hearing and for Sanctions [Dkt. #1487], is **DENIED.**

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

JA001226

**. Candace Gorman**

| | |
|---|---|
| )m: | DCD_ECFNotice@dcd.uscourts.gov |
| ent: | Tuesday, October 04, 2011 5:23 PM |
| o: | DCD_ECFNotice@dcd.uscourts.gov |
| Subject: | Activity in Case 1:10-cv-01020-RJL ABDAL RAZAK ALI V. BARACK H. OBAMA, ET AL. Order on Motion for Miscellaneous Relief |

This is an automatic e-mail message generated by the CM/ECF system. Please **DO NOT RESPOND to** his e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits ttorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of ll documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first iewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not pply.

**U.S. District Court**

**District of Columbia**

**otice of Electronic Filing**

he following transaction was entered on 10/4/2011 at 5:23 PM and filed on 10/4/2011
ase Name:        ABDAL RAZAK ALI V. BARACK H. OBAMA, ET AL.
Case Number:     1:10-cv-01020-RJL
iler:
Document Number: No document attached

ocket Text:
MINUTE ORDER denying [1498] Motion for Clarification of Court Order Dated May 17, 2011. It s hereby ORDERED that the motion is DENIED. Signed by Judge Richard J. Leon on 10/4/11. crjl2)

10-cv-01020-RJL Notice has been electronically mailed to:

ames J. Gilligan james.gilligan@usdoj.gov

Terry Marcus Henry terry.henry@usdoj.gov

harlotte A. Abel charlotte.abel@usdoj.gov

arolyn Gail Mark carolyn.mark@usdoj.gov

avid Hugh White david.white2@usdoj.gov

eith Simmons keith.simmons2@usdoj.gov

JA001227

1

# Google maps

To see all the details that are visible on the screen, use the "Print" link next to the map.

Get Directions  My Maps                    RSS  Edit    Print    Send    Link



@2010 Google - Map data @2010 AND, Google -

**Tracking 839**
0 views - Unlisted

UNCLASSIFIED//FOR PUBLIC RELEASE

Case: 1:10-cv-01020-RJL   As of: 01/25/2013 08:27 AM EST   1 of 212

APPEAL,GITMO,HABEAS,TYPE−G

## U.S. District Court
### District of Columbia (Washington, DC)
### CIVIL DOCKET FOR CASE #: 1:10−cv−01020−RJL

ABDAL RAZAK ALI V. BARACK H. OBAMA, ET AL.
Assigned to: Judge Richard J. Leon
Case in other court:  07−05039
                      07−05040
                      USCA−DC, 07−05043
                      07−05050
                      07−05051
                      08−05149
                      08−05322
                      08−05515
                      08−05516
                      08−05517
                      08−05518
                      11−05102
Cause: 05:702 Administrative Procedure Act

Date Filed: 06/17/2010
Jury Demand: None
Nature of Suit: 530 Prisoner Petition:
General (Habeas Corpus)
Jurisdiction: U.S. Government Defendant

**Petitioner**

**ABDUL RAZAK ALI**
*Detainee*

represented by **H. Candace Gorman**
LAW OFFICE OF H. CANDACE
GORMAN
220 South Halsted
Suite 200
Chicago, IL 60661
(312) 427−2313
Fax: (312) 427−9552
Email: hcgorman@igc.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shayana Devendra Kadidal**
CENTER FOR CONSITITUTIONAL
RIGHTS
666 Broadway
7th Floor
New York, NY 10012−2317
(212) 614−6438
Fax: (212) 614−6499
Email: kadidal@ccrjustice.org

V.

**Respondent**

**MIKE BUMGARNER**
*Army Col. Commander, Joint Detention*
*Operations Group, JTF − GTMO*

represented by **Andrew Sparks**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Washington, DC 20001
(202) 305−8002
Fax: (202) 305−2685
Email: andrew.sparks@usdoj.gov
*TERMINATED: 02/27/2009*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew I. Warden**

JA001229

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

U.S. DEPARTMENT OF JUSTICE,
CIVIL DIVISION
Federal Programs Branch
1100 L Street, NW
Suite 7234
Washington, DC 20530
(202) 616-5084
Fax: (202) 616-8460
Email: andrew.warden@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Blanche L. Bruce**
U.S. ATTORNEY'S OFFICE
Judiciary Center Building
555 Fourth Street, NW
Washington, DC 20530
(202) 307-6078
Email: blanche.bruce@usdoj.gov
*LEAD ATTORNEY*

**Carolyn Gail Mark**
U.S. DEPARTMENT OF JUSTICE
Civil Division
601 D Street, NW
Room 9916
Washington, DC 20004
(202) 307-0256
Email: carolyn.mark@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charlotte A. Abel**
UNITED STATES ATTORNEY'S
OFFICE
501 Third Street, NW
4th Floor
Washington, DC 20001
(202) 307-2332
Fax: (202) 514-8780
Email: charlotte.abel@usdoj.gov
*LEAD ATTORNEY*

**James J. Gilligan**
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION, FEDERAL
PROGRAMS BRANCH
20 Massachusetts Avenue, NW
Room 5138
Washington, DC 20001
(202) 514-3358
Fax: (202) 616-8470
Email: james.gilligan@usdoj.gov
*LEAD ATTORNEY*

**James Ross Smart**
MCELROYH, DEUTSCH, MULVANEY
&CARPENTER, LLP
30 Jelliff Lane
Southport, CT 06890
(203) 259-0251
Email: jsmart@mdmc-law.com
*TERMINATED: 02/13/2009*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

JA001230

UNCLASSIFIED//FOR PUBLIC RELEASE

**Jane L. Westby**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Suite 5115
Washington, DC 20530
(202)
Email: jane.westby2@usdoj.gov
*TERMINATED: 02/25/2009*
*LEAD ATTORNEY*

**John P. Lohrer**
U.S. DEPARTMENT OF JUSTICE
Antitrust Division
450 Fifth Street, NW
Washington, DC 20005
(202) 616−5125
Fax: (202) 307−5802
Email: john.lohrer@usdoj.gov
*LEAD ATTORNEY*

**John Edward Wallace**
U.S. DEPARTMENT OF JUSTICE
Federal Programs
20 Massachusetts Avenue, NW
Fifth Floor
Washington, DC 20530
(202) 305−9909
Email: john.wallace2@usdoj.gov
*LEAD ATTORNEY*

**Judry Laeb Subar**
UNITED STATES DEPARTMENT OF
JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Room 7342
Washington, DC 20530
(202) 514−3969
Fax: (202) 616−8470
Email: judry.subar@usdoj.gov
*TERMINATED: 10/27/2008*
*LEAD ATTORNEY*

**Nancy Naseem Safavi**
U.S. DEPARTMENT OF JUSTICE
Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 305−3306
Fax: (202) 305−2685
Email: nancy.safavi@usdoj.gov
*TERMINATED: 09/27/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Olivia Hussey Scott**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Suite 5132
Washington, DC 20001
(202) 305−8491
Email: olivia.hussey.scott2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Preeya M. Noronha**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Room 7226
Washington, DC 20530
(202) 514-3338
Fax: (202) 616-8202
Email: preeya.noronha@usdoj.gov
*TERMINATED: 12/21/2006*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachelle C. Williams**
U.S. DEPARMENT OF JUSTICE
20 Massachusetts Avenue, NW
Room 8331
Washington, DC 20530
(202) 305-8782
Fax: 202-307-2185
Email: rachelle.c.williams@usdoj.gov
*LEAD ATTORNEY*

**Sarah Maloney**
U.S. DEPARMENT OF JUSTICE
Civil Division
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
(202) 305-4193
Email: sarah.maloney2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean W. O'Donnell , Jr.**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Room 7338
Washington, DC 20530
(202) 305-4880
Email: sean.o'donnell@usdoj.gov
*LEAD ATTORNEY*

**Stephen McCoy Elliott**
U.S. DEPARMENT OF JUSTICE
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
(202) 305-8177
Email: stephen.elliott@usdoj.gov
*LEAD ATTORNEY*

**Steve Ray Matheny**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 305-9284
Email: steve.matheny2@usdoj.gov
*TERMINATED: 09/24/2010*
*LEAD ATTORNEY*

**Terry Marcus Henry**
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION

JA001231

UNCLASSIFIED//FOR PUBLIC RELEASE

P.O. Box 883
20 Massachusetts Avenue, NW
Washington, DC 20044
(202) 514–4107
Fax: (202) 616–8470
Email: terry.henry@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Kenneth Haas**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Washington, DC
(202) 307–3937
Fax: (202) 616–8470
Email: alexander.haas@usdoj.gov

**Ann E. Nash**
U.S. DEPARTMENT OF JUSTICE
Tax Division
P.O. Box 227
Washington, DC 20044
(202) 307–6489
Email: ann.e.nash@usdoj.gov
*TERMINATED: 03/24/2011*
*ATTORNEY TO BE NOTICED*

**Brent I. Anderson**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Suite 5100
Washington, DC 20530
(202) 305–8744
Fax: (202) 305–2685
Email: brent.anderson2@usdoj.gov
*TERMINATED: 03/27/2009*

**Corey Jason Smith**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, nw
Suite 5100
Washington, DC 20530
(202) 305–3101
Fax: (202) 305–2685
Email: Corey.Smith3@usdoj.gov
*TERMINATED: 04/09/2009*

**Dalin Riley Holyoak**
U.S. DEPARTMENT OF JUSTICE
Office of Immigration
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
(202) 503–4645
Fax: (202) 305–4829
Email: dalin.holyoak@usdoj.gov

**David J. Stander**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Room 5112
Washington, DC 20530
(240) 643–2723
Email: david.stander@usdoj.gov

JA001232

UNCLASSIFIED//FOR PUBLIC RELEASE

*TERMINATED: 03/27/2009*

**David Hugh White**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Room 7119
Washington, DC 23050
(202) 514−3146
Fax: (202) 616−8470
Email: david.white2@usdoj.gov

**Flor M. Suarez**
U.S. DEPARMENT OF JUSTICE
Office of Immigration Litigation
450 Fifth Street, NW
Room 6102
Washington, DC 20530
(202) 305−1062
Fax: (202) 305−7000
Email: flor.suarez@usdoj.gov
*TERMINATED: 02/28/2009*
*ATTORNEY TO BE NOTICED*

**James Edward Cox , Jr.**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Room 5107
Washington, DC 20529
(202) 305−8629
Email: jim.cox2@usdoj.gov
*TERMINATED: 04/06/2009*

**James C. Luh**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 514−4938
Email: james.luh@usdoj.gov
*TERMINATED: 10/30/2009*

**James J. Schwartz**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Washington, DC 20001
(202) 616−8267
Fax: (202) 616−8202
Email: james.schwartz@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Jean Lin**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Suite 7218
Washington, DC 20530
(202) 514−3716
Fax: (202) 616−8470
Email: jean.lin@usdoj.gov
*TERMINATED: 10/09/2009*

**Jeffrey P. LaVicka**
U.S. DEPARTMENT OF JUSTICE
425 West Capitol
Suite 500
Little Rock, AR 722

JA001233

(501) 340−2600
Email: jeff.lavicka2@usdoj.gov
*TERMINATED: 05/28/2009*
*ATTORNEY TO BE NOTICED*

**John Kevin Henebery**
U.S. DEPARTMENT OF JUSTICE
601 D Street
Room 9008
Washington,, DC 20004
(202) 305−7726
Fax: (202) 616−3085
Email: john.henebery@usdoj.gov
*TERMINATED: 03/17/2009*

**Joseph Charles Folio , III**
U.S. DEPARTMENT OF JUSTICE
Civil Division
20 Massachusetts Avenue, NW
Room 7218
Washington, DC 20530
(202) 305−4968
Fax: (202) 616−8470
Email: Joseph.Folio@usdoj.gov

**Julia A. Berman**
U.S. DEPARTMENT OF JUSTICE
Federal Programs Branch
1100 L Street, NW
# 7238
Washington, DC 20530
(202) 616−8480
Email: julia.berman@usdoj.gov

**Kathryn Celia Davis**
U.S. DEPARTMENT OF JUSTICE
Federal Programs Branch
20 Massachusetts Avenue, NW
Room 7221
Washington, DC 20001
(202) 616−8298
Fax: (202) 616−8470
Email: Kathryn.C.Davis@usdoj.gov

**Keith Simmons**
U.S. DEPARTMENT OF JUSTICE
Civil Division
20 Massachusetts Avenue, NW
Federal Programs Branch
Washington, DC 20530
(202) 305−9203
Email: keith.simmons2@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Kristina Ann Wolfe**
US DEPARTMENT OF JUSTICE
Civil Division
20 Massachusetts Avenue, N.W.
Suite 5100
Washington, DC 20530
(202) 353−4519
Email: kristina.wolfe@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Martin Morris Shoemaker**

JA001234

U.S. DEPARTMENT OF JUSTICE, TAX
DIVISION
P.O. Box 7238
Washington, DC 20044
(202) 514-6491
Email: martin.m.shoemaker@usdoj.gov
*TERMINATED: 07/01/2009*

**Mary Elizabeth Carney**
U.S. DEPARTMENT OF JUSTICE
CIV/ Federal Programs
20 Massachusetts Avenue, NW
5th Floor
Washington, DC 20001
(202) 305-4281
Email: mary.carney2@usdoj.gov

**Nicholas Andrew Oldham**
United States Attorney's Office
Northern District of Georgia
75 Spring St., S.W.
Suite 600
Atlanta, GA 30303
(404) 581-6247
Email: Nicholas.Oldham@usdoj.gov
*TERMINATED: 03/19/2009*

**Norman Christopher Hardee**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Room 7305
Washington, DC 20001
(202) 305-8645
Fax: (202) 616-8460
Email: Christopher.Hardee@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Patrick D. Davis**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Room 7226
Washington, DC 20530
(202) 305-0879
Fax: (202) 616-8470
Email: patrick.davis2@usdoj.gov

**Paul Edward Ahern**
U.S. Department of Justice
National Security Division
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 305-0633
Fax: (202) 616-8470
Email: paul.ahern@usdoj.gov
*TERMINATED: 08/03/2009*

**Paul A. Dean**
U.S. DEPARTMENT OF JUSTICE
Federal Programs Branch
20 Massachusetts Avenue, NW
Room 5134
Washington, DC 20044
(202) 514-1280

JA001235

Email: paul.dean@usdoj.gov

**Robert J. Prince**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Suite 5106
Washington, DC 20001
(202) 305-3654
Email: robert.prince@usdoj.gov

**Scott Robert Belhorn**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Washington, DC 20001
(202) 305-8782
Email: scott.r.belhorn@usdoj.gov
*TERMINATED: 02/27/2009*

**Scott Douglas Levin**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Washington, DC 20530
(202) 305-0568
Email: Scott.Levin2@usdoj.gov

**Scott Michael Marconda**
U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Avenue, NW
Room 5130
Washington, DC 20530
(202) 305-0169
Email: scott.marconda@usdoj.gov
*TERMINATED: 01/22/2009*

**Sherry Denise Soanes**
U.S. DEPARTMENT OF JUSTICE
Office of Immigration Litigation/District
Court Section
450 4th Street, N.W.
#6020
Washington, DC 20001
(202) 532-4108
Fax: (202) 305-7000
Email: sherry.soanes@usdoj.gov
*TERMINATED: 10/28/2009*

**Thomas A. Gillice**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530
(202) 252-1791
Fax: (202) 252-7714
Email: thomas.gillice@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Timothy Allen Bass**
U.S. Dept. of Justice
Federal Programs Branch
20 Massachusetts Ave.
Washington, DC 20001
202-305-7527
Fax: 202-616-8470
Email: timothy.bass2@usdoj.gov

JA001236

**Respondent**

**GEORGE WALKER BUSH**
*President of the United States*
*TERMINATED: 01/20/2009*

represented by **Andrew Sparks**
(See above for address)
*TERMINATED: 02/27/2009*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew I. Warden**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ann E. Nash**
(See above for address)
*TERMINATED: 03/24/2011*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Blanche L. Bruce**
(See above for address)
*LEAD ATTORNEY*

**Carolyn Gail Mark**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charlotte A. Abel**
(See above for address)
*LEAD ATTORNEY*

**James J. Gilligan**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jane L. Westby**
(See above for address)
*TERMINATED: 02/25/2009*
*LEAD ATTORNEY*

**John P. Lohrer**
(See above for address)
*LEAD ATTORNEY*

**John Edward Wallace**
(See above for address)
*LEAD ATTORNEY*

**Judry Laeb Subar**
(See above for address)
*TERMINATED: 10/27/2008*
*LEAD ATTORNEY*

**Nancy Naseem Safavi**
(See above for address)
*TERMINATED: 09/27/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Olivia Hussey Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE N·*

JA001237

UNCLASSIFIED//FOR PUBLIC RELEASE

**Preeya M. Noronha**
(See above for address)
*TERMINATED: 12/21/2006*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean W. O'Donnell , Jr.**
(See above for address)
*LEAD ATTORNEY*

**Stephen McCoy Elliott**
(See above for address)
*LEAD ATTORNEY*

**Steve Ray Matheny**
(See above for address)
*TERMINATED: 09/24/2010*
*LEAD ATTORNEY*

**Terry Marcus Henry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Kenneth Haas**
(See above for address)

**Brent I. Anderson**
(See above for address)
*TERMINATED: 03/27/2009*

**Corey Jason Smith**
(See above for address)
*TERMINATED: 04/09/2009*

**David Farnham**
US DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Suite 6150
Washington, DC 20530
(202) 305–4693
Email: david.farnham2@usdoj.gov
*TERMINATED: 01/21/2009*

**David J. Stander**
(See above for address)
*TERMINATED: 03/27/2009*

**David Hugh White**
(See above for address)

**Flor M. Suarez**
(See above for address)
*TERMINATED: 02/28/2009*
*ATTORNEY TO BE NOTICED*

**James Edward Cox , Jr.**
(See above for address)
*TERMINATED: 04/06/2009*

**James C. Luh**
(See above for address)
*TERMINATED: 10/30/2009*

JA001238

UNCLASSIFIED//FOR PUBLIC RELEASE

**James J. Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Ross Smart**
(See above for address)
*TERMINATED: 02/13/2009*
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*TERMINATED: 10/09/2009*

**Jeffrey P. LaVicka**
(See above for address)
*TERMINATED: 05/28/2009*
*ATTORNEY TO BE NOTICED*

**John Kevin Henebery**
(See above for address)
*TERMINATED: 03/17/2009*

**Joseph Charles Folio , III**
(See above for address)

**Julia A. Berman**
(See above for address)

**Kathryn Celia Davis**
(See above for address)

**Kristina Ann Wolfe**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Martin Morris Shoemaker**
(See above for address)
*TERMINATED: 07/01/2009*

**Mary Elizabeth Carney**
(See above for address)

**Nicholas Andrew Oldham**
(See above for address)
*TERMINATED: 03/19/2009*

**Norman Christopher Hardee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick D. Davis**
(See above for address)

**Paul Edward Ahern**
(See above for address)
*TERMINATED: 08/03/2009*

**Paul A. Dean**
(See above for address)

**Robert J. Branman**
DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Room 4635
Washington, DC 20004

JA001239

(202) 305−9410
Fax: (202) 305−2685
Email: robert.branman@usdoj.gov
*TERMINATED: 10/08/2009*

**Robert J. Prince**
(See above for address)

**Scott Robert Belhorn**
(See above for address)
*TERMINATED: 02/27/2009*

**Scott Douglas Levin**
(See above for address)

**Scott Michael Marconda**
(See above for address)
*TERMINATED: 01/22/2009*

**Sherry Denise Soanes**
(See above for address)
*TERMINATED: 10/28/2009*

**Timothy Allen Bass**
(See above for address)

**Respondent**

**JAY HOOD**                              represented by   **Andrew Sparks**
*Army Brig. Gen. Commander, Joint Task*                (See above for address)
*Force − GTMO*                                          *TERMINATED: 02/27/2009*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Andrew I. Warden**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Ann E. Nash**
                                                        (See above for address)
                                                        *TERMINATED: 03/24/2011*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Blanche L. Bruce**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*

                                                        **Carolyn Gail Mark**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Charlotte A. Abel**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*

                                                        **James J. Gilligan**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*

                                                        **James Ross Smart**
                                                        (See above for address)
                                                        *TERMINATED: 02/13/2009*

JA001240

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jane L. Westby**
(See above for address)
*TERMINATED: 02/25/2009*
*LEAD ATTORNEY*

**John P. Lohrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Edward Wallace**
(See above for address)
*LEAD ATTORNEY*

**Judry Laeb Subar**
(See above for address)
*TERMINATED: 10/27/2008*
*LEAD ATTORNEY*

**Nancy Naseem Safavi**
(See above for address)
*TERMINATED: 09/27/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Olivia Hussey Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachelle C. Williams**
(See above for address)
*LEAD ATTORNEY*

**Sean W. O'Donnell , Jr.**
(See above for address)
*LEAD ATTORNEY*

**Stephen McCoy Elliott**
(See above for address)
*LEAD ATTORNEY*

**Steve Ray Matheny**
(See above for address)
*TERMINATED: 09/24/2010*
*LEAD ATTORNEY*

**Terry Marcus Henry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Kenneth Haas**
(See above for address)

**Brent I. Anderson**
(See above for address)
*TERMINATED: 03/27/2009*

**Corey Jason Smith**
(See above for address)
*TERMINATED: 04/09/2009*

JA001241

**Dalin Riley Holyoak**
(See above for address)

**David J. Stander**
(See above for address)
*TERMINATED: 03/27/2009*

**David Hugh White**
(See above for address)

**Flor M. Suarez**
(See above for address)
*TERMINATED: 02/28/2009*
*ATTORNEY TO BE NOTICED*

**James Edward Cox , Jr.**
(See above for address)
*TERMINATED: 04/06/2009*

**James C. Luh**
(See above for address)
*TERMINATED: 10/30/2009*

**James J. Schwartz**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*TERMINATED: 10/09/2009*

**Jeffrey P. LaVicka**
(See above for address)
*TERMINATED: 05/28/2009*
*ATTORNEY TO BE NOTICED*

**John Kevin Henebery**
(See above for address)
*TERMINATED: 03/17/2009*

**Joseph Charles Folio , III**
(See above for address)

**Julia A. Berman**
(See above for address)

**Kathryn Celia Davis**
(See above for address)

**Keith Simmons**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristina Ann Wolfe**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Martin Morris Shoemaker**
(See above for address)
*TERMINATED: 07/01/2009*

**Nicholas Andrew Oldham**
(See above for address)
*TERMINATED: 03/19/2009*

JA001242

**Norman Christopher Hardee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick D. Davis**
(See above for address)

**Paul Edward Ahern**
(See above for address)
*TERMINATED: 08/03/2009*

**Paul A. Dean**
(See above for address)

**Robert J. Prince**
(See above for address)

**Scott Robert Belhorn**
(See above for address)
*TERMINATED: 02/27/2009*

**Scott Douglas Levin**
(See above for address)

**Scott Michael Marconda**
(See above for address)
*TERMINATED: 01/22/2009*

**Sherry Denise Soanes**
(See above for address)
*TERMINATED: 10/28/2009*

**Timothy Allen Bass**
(See above for address)

**Respondent**

**DONALD RUMSFELD**                    represented by   **Andrew Sparks**
*Secretary, United States Department of*                (See above for address)
*Defense*                                               *TERMINATED: 02/27/2009*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Andrew I. Warden**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Ann E. Nash**
                                                        (See above for address)
                                                        *TERMINATED: 03/24/2011*
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Blanche L. Bruce**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*

                                                        **Carolyn Gail Mark**
                                                        (See above for address)
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

                                                        **Charlotte A. Abel**

JA001243

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James J. Gilligan**
(See above for address)
*LEAD ATTORNEY*

**James Ross Smart**
(See above for address)
*TERMINATED: 02/13/2009*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jane L. Westby**
(See above for address)
*TERMINATED: 02/25/2009*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Hunter Bennett**
U.S. DEPARTMENT OF JUSTICE
Commercial Litigation Branch, National
Courts Section
PO Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616–2279
Email: j.hunter.bennett@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John P. Lohrer**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Edward Wallace**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Judry Laeb Subar**
(See above for address)
*TERMINATED: 10/27/2008*
*LEAD ATTORNEY*

**Nancy Naseem Safavi**
(See above for address)
*TERMINATED: 09/27/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Olivia Hussey Scott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Preeya M. Noronha**
(See above for address)
*TERMINATED: 12/21/2006*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachelle C. Williams**

JA001244

(See above for address)
*LEAD ATTORNEY*

**Sarah Maloney**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean W. O'Donnell , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen McCoy Elliott**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steve Ray Matheny**
(See above for address)
*TERMINATED: 09/24/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Terry Marcus Henry**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Kenneth Haas**
(See above for address)

**Brent I. Anderson**
(See above for address)
*TERMINATED: 03/27/2009*

**Corey Jason Smith**
(See above for address)
*TERMINATED: 04/09/2009*

**Dalin Riley Holyoak**
(See above for address)

**David J. Stander**
(See above for address)
*TERMINATED: 03/27/2009*

**David Hugh White**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Flor M. Suarez**
(See above for address)
*TERMINATED: 02/28/2009*
*ATTORNEY TO BE NOTICED*

**James Edward Cox , Jr.**
(See above for address)
*TERMINATED: 04/06/2009*

**James C. Luh**
(See above for address)
*TERMINATED: 10/30/2009*

**James J. Schwartz**

JA001245

(See above for address)
*ATTORNEY TO BE NOTICED*

**Jean Lin**
(See above for address)
*TERMINATED: 10/09/2009*
*ATTORNEY TO BE NOTICED*

**Jeffrey P. LaVicka**
(See above for address)
*TERMINATED: 05/28/2009*
*ATTORNEY TO BE NOTICED*

**John Kevin Henebery**
(See above for address)
*TERMINATED: 03/17/2009*

**Joseph Charles Folio , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Julia A. Berman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathryn Celia Davis**
(See above for address)

**Keith Simmons**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristina Ann Wolfe**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Martin Morris Shoemaker**
(See above for address)
*TERMINATED: 07/01/2009*

**Mary Elizabeth Carney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Andrew Oldham**
(See above for address)
*TERMINATED: 03/19/2009*

**Norman Christopher Hardee**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Patrick D. Davis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul Edward Ahern**
(See above for address)
*TERMINATED: 08/03/2009*

**Paul A. Dean**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert J. Prince**

JA001246

(See above for address)

**Scott Robert Belhorn**
(See above for address)
*TERMINATED: 02/27/2009*

**Scott Douglas Levin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott Michael Marconda**
(See above for address)
*TERMINATED: 01/22/2009*

**Sherry Denise Soanes**
(See above for address)
*TERMINATED: 10/28/2009*

**Respondent**

**BARACK HUSSEIN OBAMA, II**          represented by   **Ann E. Nash**
*President*                                            (See above for address)
                                                       *TERMINATED: 03/24/2011*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Charlotte A. Abel**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **James J. Gilligan**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jean Lin**
                                                       (See above for address)
                                                       *TERMINATED: 10/09/2009*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **John Hunter Bennett**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **John P. Lohrer**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Kristina Ann Wolfe**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Nancy Naseem Safavi**
                                                       (See above for address)
                                                       *TERMINATED: 09/27/2010*
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Olivia Hussey Scott**
                                                       (See above for address)

JA001247

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rachelle C. Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean W. O'Donnell , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steve Ray Matheny**
(See above for address)
*TERMINATED: 09/24/2010*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dalin Riley Holyoak**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David Hugh White**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeffrey P. LaVicka**
(See above for address)
*TERMINATED: 05/28/2009*
*ATTORNEY TO BE NOTICED*

**Julia A. Berman**
(See above for address)

**Keith Simmons**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Paul A. Dean**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert J. Branman**
(See above for address)
*TERMINATED: 10/08/2009*

**Sarah Maloney**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sherry Denise Soanes**
(See above for address)
*TERMINATED: 10/28/2009*

**Thomas A. Gillice**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/21/2005 | 1 | PETITION for Writ of Habeas Corpus (Filing fee $ 5.) filed by SOFAINE MOHAMMED BERHOUMI, MOHAMMED ABDULLAH TAHA MATTAN, ABDUL SALAM DEIFF, OMAR DOE, ABDUL HAQ, ABD AL ZAHER, ABU |

JA001248

| | | |
|---|---|---|
| | | RAHAN, NAJEEB DOE, SAD AL GAHTANI, AMER MOHAMMON, FAHD AL FAWZAN, RASHED AL QAMDI, BANDAR AL SHAIBANI, MARSHAL DOE, KHALD AL BARKATI, ABDULAL AL THANI, ABU AHMED AL JOFI, ABU RAD AL JOFI, ABDULAL DOE, SAD AL MATERI, BOUCETTA FIHI, SEED FARHA, SALEH DOE, MAGED DOE, ZEYAD AL GASSMY, ADEL HASSAN, HAMAD DOE, AMIR DOE, ABU AHMED, WALEED DOE, SAMIR DOE, ELHAM BATAIF, YAGOOB AL SOURY, ABDUL RHMAN, ZAKER CHAN, SADER DOE, ALI AL KAZMI, KHADER DOE, MOSHEN DOE, ABDUL RAHMAN, FAHD DOE, JAMIL EL–BANNA, MSTAFA AL SHAMILI, OSAMA DOE, MOHAMED HMADI, FAHMI DOE, ESAM DOE. (Attachments: #_1 Affidavit #_2 Affidavit)(td, ) (Entered: 12/21/2005) |
| 12/21/2005 | | THIS CASE is an outgrowth of CA 09–745, and was created by an Order in that case by Chief Judge Royce c. Lamberth, filed on June 16, 2010. (zjeb, ) (Entered: 06/21/2010) |
| 12/27/2005 | 2 | NOTICE of Appearance by Gitanjali Gutierrez on behalf of ALL PETITIONERS, SOFAINE MOHAMMED BERHOUMI, ABIN ALHAMED ABID ALSALLAM ALKESAWI, MOHAMMED ABDULLAH TAHA MATTAN, BISHER AL–RAWI, ABDUL SALAM DEIFF, OMAR DOE, ABDUL HAQ, ABD AL ZAHER, ABU RAHAN, NAJEEB DOE, SAD AL GAHTANI, AMER MOHAMMON, FAHD AL FAWZAN, RASHED AL QAMDI, BANDAR AL SHAIBANI, MARSHAL DOE, KHALD AL BARKATI, ABDULAL AL THANI, ABU AHMED AL JOFI, ABU RAD AL JOFI, ABDULAL DOE, SAD AL MATERI, BOUCETTA FIHI, SEED FARHA, SALEH DOE, MAGED DOE, ZEYAD AL GASSMY, ADEL HASSAN, HAMAD DOE, AMIR DOE, ABU AHMED, WALEED DOE, SAMIR DOE, ELHAM BATAIF, YAGOOB AL SOURY, ABDUL RHMAN, ADEL AL TUNISI, ZAKER CHAN, SADER DOE, ALI AL KAZMI, KHADER DOE, MOSHEN DOE, ABDUL RAHMAN, FAHD DOE, JAMIL EL–BANNA, MSTAFA AL SHAMILI, OSAMA DOE, MOHAMED HMADI, FAHMI DOE, ESAM DOE (Gutierrez, Gitanjali) (Entered: 12/27/2005) |
| 01/04/2006 | 3 | ORDER TO SHOW CAUSE why this case should not be dismissed for lack of jurisdiction. Signed by Judge Reggie B. Walton on 1/4/06. (lcrbw1, ) (Entered: 01/04/2006) |
| 01/04/2006 | 4 | NOTIFICATION OF SUPPLEMENTAL AUTHORITY by respondents GEORGE WALKER BUSH, and DONALD RUMSFELD, et al. (Attachments: #_1 Exhibit)(jeb, ) (Entered: 01/04/2006) |
| 01/05/2006 | 5 | NOTICE of Appearance by Terry Marcus Henry on behalf of MIKE BUMGARNER, GEORGE W. BUSH, JAY HOOD, DONALD RUMSFELD (Henry, Terry) (Entered: 01/05/2006) |
| 01/06/2006 | | MINUTE ORDER VACATING January 4, 2006 Order to Show Cause. Signed by Judge Reggie B. Walton on 1/6/06. (lcrbw1, ) (Entered: 01/06/2006) |
| 01/11/2006 | 6 | ORDER denying without prejudice all pending motions until such time as the District of Columbia Circuit resolves the question of this Court's jurisdiction to adjudicate these cases; staying the action pending the jurisdictional ruling of the District of Columbia Circuit. (Entered: 01/11/2006) |
| 02/07/2006 | 7 | NOTICE of Appearance by Christopher R. Brown on behalf of ABDUL AZIZ NAJI (Brown, Christopher) (Entered: 02/07/2006) |
| 02/09/2006 | 8 | NOTICE of Transfer of Petitioner "Najeeb LNU" by MIKE BUMGARNER, GEORGE W. BUSH, JAY HOOD, DONALD RUMSFELD (Henry, Terry) (Entered: 02/09/2006) |
| 03/24/2006 | 9 | NOTICE of Appearance by Martha Rayner on behalf of FAHD AL FAWZAN (Rayner, Martha) (Entered: 03/24/2006) |
| 03/24/2006 | 10 | (WITHDRAWN PURSUANT TO FILING ON 4/20/06) FIRST AMENDED PETITION for Writ of Habeas Corpus filed by KHALED ABDALLAH AL–IDAN, FAHD AL FAWZAN. (This amended petition has been filed on behalf of only two petitioners).(nmw, ) Modified on 4/21/2006 (td, ). Modified on |

JA001249

* * *

JA001250

| 12/15/2008 | 780 | NOTICE of Appearance by Amy B. Cleary on behalf of EDRESS LNU (Cleary, Amy) (Entered: 12/15/2008) |
| 12/15/2008 | 781 | NOTICE of Appearance by Timothy C. Ivey on behalf of EDRESS LNU (Ivey, Timothy) (Entered: 12/15/2008) |
| 12/15/2008 | 782 | NOTICE of Appearance by Carlos Warner on behalf of EDRESS LNU (Warner, Carlos) (Entered: 12/15/2008) |
| 12/15/2008 | 783 | NOTICE of Appearance by Vicki Werneke on behalf of EDRESS LNU (Werneke, Vicki) (Entered: 12/15/2008) |
| 12/16/2008 | 784 | ORDER granting in part and denying in part government's Motion for Clarification and Reconsideration of this Court's November 6, 2008 Case Management Order and Supplemental Amended Orders or, in the Alternative, Motion for Certification for Appeal Pursuant to 28 U.S.C. § 1292(b) and to Stay Certain Obligations Pending Resolution of the Motion and any Appeal (docket # 1004, 08–mc–442). Signed by Judge Thomas F. Hogan on 12/16/08. (lctfh1) (Entered: 12/16/2008) |
| 12/17/2008 | 785 | ORDER. Per the attached order, the government shall file a consolidated status report in all cases before the Merits Judge in which factual returns have been filed stating (1) the full name, ISN, and case name of each petitioner for whom a factual return has been filed, (2) whether an unclassified factual return has been filed for that petitioner, and (3) whether that petitioner's habeas corpus petition should be resolved separately or consolidated with the petition or petitions of any other petitioners (including petitions in cases before other members of this Court) along with the basis for such a recommendation. The government shall file its consolidated status report on or before December 19, 2008, at 12:00 p.m. Signed by Judge Reggie B. Walton on 12/17/08. (lcrbw3, ) (Entered: 12/17/2008) |
| 12/17/2008 | 786 | ORDER requiring joint filing regarding consolidation by January 5, 2009. Signed by Judge Thomas F. Hogan on 12/17/08. (lctfh1) (Entered: 12/17/2008) |
| 12/17/2008 | 787 | NOTICE of Appearance by Brent I. Anderson on behalf of GEORGE W. BUSH Associated Cases: 1:05–cv–02386–RBW, 1:08–cv–01310–RMU(Anderson, Brent) (Entered: 12/17/2008) |
| 12/17/2008 | 788 | Consent MOTION to Stay *Habeas Proceedings* by GEORGE WALKER BUSH, DONALD RUMSFELD, JAY HOOD, NELSON J. CANNON, GEORGE W. BUSH, DONALD RUMSFELD, JAY HOOD, BRICE GYURISKO, MIKE BUMGARNER, DONALD RUMSFELD, JAY HOOD, MIKE BUMGARNER, MIKE BUMGARNER, JAY HOOD, GUANTANAMO BAY DETAINEE LITIGATION (Attachments: # 1 Text of Proposed Order)(Folio, Joseph) (Entered: 12/17/2008) |
| 12/17/2008 | 789 | NOTICE *of Filing* by ABDUL–RAHMAN ABDO ABULGHAITH SULAIMAN (Attachments: # 1 Exhibit Signed Acknowledgments)(Bronte, Patricia) (Entered: 12/17/2008) |
| 12/17/2008 | | MINUTE ORDER: The Court ORDERS that the government's motions for exception from sequencing (docket ## 604, 917, and 1157, 08–mc–442; docket # 259, 04–cv–1194; docket # 306, 04–cv–1254; docket # 148, 05–cv–520; docket # 122, 05–cv–569; docket # 70, 05–cv–877; docket # 153, 05–cv–1048; docket # 135, 05–cv–1124; docket # 124, 05–cv–1601; docket # 148, 05–cv–2367; docket # 139, 05–cv–2384; docket ## 686 and 747, 05–cv–2386; docket # 133, 05–cv–2479) are GRANTED. The Court further ORDERS that, by December 31, 2008, the government shall file factual returns for the following petitioners: Anam (ISN 569); Mohammad (ISN 27); Slahi (ISN 760); Al Zaher (ISN 89); Al Sanani (ISN 170); and Saeed (ISN 728). Signed by Judge Thomas F. Hogan on 12/17/08. (lctfh1) (Entered: 12/17/2008) |
| 12/17/2008 | 790 | MOTION to Stay *Habeas Proceedings* by GEORGE W. BUSH, JR, DONALD RUMSFELD, JAY HOOD, NELSON J. CANNON, GEORGE W. BUSH, J. HOOD, NELSON J. CANNON, GEORGE W. BUSH, JAY HOOD, NELSON J. CANNON, MIKE BUMGARNER, JAY HOOD, BRICE GYURISKO, JAY HOOD, MIKE BUMGARNER, MIKE BUMGARNER, JAY HOOD, GUANTANAMO BAY DETAINEE LITIGATION, ROBERT M. GATES, DAVID M. THOMAS, JR, BRUCE VARGO (Attachments: # 1 Declaration of |

JA001253

| | | |
|---|---|---|
| | | Ambassador Williamson, #_2 Text of Proposed Order)(Folio, Joseph) (Entered: 12/17/2008) |
| 12/18/2008 | 791 | NOTICE of Appearance by Patricia A. Bronte on behalf of ABDUL–RAHMAN ABDO ABULGHAITH SULAIMAN (Bronte, Patricia) (Entered: 12/18/2008) |
| 12/18/2008 | 792 | NOTICE of Errata by MIKE BUMGARNER, GEORGE W. BUSH, JAY HOOD, DONALD RUMSFELD (Attachments: #_1 Exhibit)(Elliott, Stephen) (Entered: 12/18/2008) |
| 12/18/2008 | 793 | NOTICE of filing (under seal) Motion to Stay Habeas Proceedings by MIKE BUMGARNER, GEORGE W. BUSH, JAY HOOD, DONALD RUMSFELD, GUANTANAMO BAY DETAINEE LITIGATION (Folio, Joseph) (Entered: 12/18/2008) |
| 12/18/2008 | 794 | ORDER. Per the attached order, the Court's amended case management order entered on November 12, 2008, and order staying that case management order entered on November 21, 2008, are vacated, and the petitioners' motion to partially terminate the stay of the Court's amended case management order is denied as moot. Signed by Judge Reggie B. Walton on 12/18/08. (lcrbw3, ) (Entered: 12/18/2008) |
| 12/18/2008 | 868 | MOTION to Stay all proceedings for petitioner by GEORGE W. BUSH, DONALD RUMSFELD (FILED UNDER SEAL) (jeb, ) (Entered: 01/09/2009) |
| 12/19/2008 | 795 | NOTICE of Appearance by Patrick D Davis on behalf of GEORGE WALKER BUSH, DONALD H. RUMSFELD, JAY HOOD, MIKE BUMGARNER, GEORGE W. BUSH, DONALD RUMSFELD, JAY HOOD, BRICE GYURISKO, GEORGE W. BUSH, DONALD RUMSFELD, JAY HOOD, MIKE BUMGARNER, MIKE BUMGARNER (Davis, Patrick) (Entered: 12/19/2008) |
| 12/19/2008 | 796 | STATUS REPORT in Response to Court's December 17, 2008 Order by GEORGE WALKER BUSH, DONALD H. RUMSFELD, JAY HOOD, MIKE BUMGARNER, GEORGE W. BUSH, DONALD RUMSFELD, JAY HOOD, BRICE GYURISKO, GEORGE W. BUSH, DONALD RUMSFELD, JAY HOOD, MIKE BUMGARNER, JOHN D. ALTENBURG, JR, MIKE BUMGARNER. (Attachments: #_1 Exhibit, #_2 Exhibit)(Davis, Patrick) (Entered: 12/19/2008) |
| 12/19/2008 | | USCA Case Number 08–5518 for (1048 in 1:08–mc–00442–TFH, 711 in 1:05–cv–02386–RBW) Notice of Appeal filed by GUANTANAMO BAY DETAINEE LITIGATION, JAY HOOD, DONALD RUMSFELD, GEORGE W. BUSH, MIKE BUMGARNER. (td, ) (Entered: 12/19/2008) |
| 12/19/2008 | | USCA Case Number 08–5516 for (1052 in 1:08–mc–00442–TFH, 713 in 1:05–cv–02386–RBW) Notice of Appeal filed by GUANTANAMO BAY DETAINEE LITIGATION, JAY HOOD, DONALD RUMSFELD, GEORGE W. BUSH, MIKE BUMGARNER. (td, ) (Entered: 12/19/2008) |
| 12/19/2008 | | USCA Case Number 08–5517 for (714 in 1:05–cv–02386–RBW, 1053 in 1:08–mc–00442–TFH) Notice of Appeal filed by GUANTANAMO BAY DETAINEE LITIGATION, JAY HOOD, DONALD RUMSFELD, GEORGE W. BUSH, MIKE BUMGARNER. (td, ) (Entered: 12/19/2008) |
| 12/19/2008 | | USCA Case Number 08–5515 for (1051 in 1:08–mc–00442–TFH, 712 in 1:05–cv–02386–RBW) Notice of Appeal filed by GUANTANAMO BAY DETAINEE LITIGATION, JAY HOOD, DONALD RUMSFELD, GEORGE W. BUSH, MIKE BUMGARNER. (td, ) (Entered: 12/19/2008) |
| 12/19/2008 | | MINUTE ORDER: For good cause shown, the Court ORDERS that the government's Consent Motion To Stay Proceedings (docket # 128, 04–cv–2215; docket # 113, 05–cv–748; docket # 136, 05–cv–1504; docket # 102, 05–cv–2349; docket # 788,05–cv–2386; docket # 1332, 08–mc–442) is GRANTED. Accordingly, the Court further ORDERS that, in accordance with the terms agreed upon in the consent motion, habeas proceedings for the following petitioners are STAYED: Aamer (ISN 239, 04–cv–2215); Salman (ISN 251, 05–cv–748); Hadjarab (ISN 238, 05–cv–1504); Belbacha (ISN 290, 05–cv–2349); Yafie (ISN 34, 05–cv–2386); Abdullah (ISN 46, 05–cv–2386); Mabrouk (ISN 148, 05–cv–2386). Signed by Judge Thomas F. Hogan on 12/19/08. (lctfh1) (Entered: |

JA001254

| | | 12/19/2008) |
|---|---|---|
| 12/19/2008 | 797 | ORDER. Per the attached order, the case management order entered on November 6, 2008, and amended on December 16, 2008, is further amended as set forth in the attached order for those cases assigned to undersigned member of this Court. Signed by Judge Reggie B. Walton on 12/19/08. (lcrbw3, ) (Entered: 12/19/2008) |
| 12/19/2008 | 798 | ORDER. Per the attached order, counsel for the petitioners listed in the order and counsel for the government assigned to the habeas corpus petitions of the petitioners listed in the order shall appear before this Court on January 15, 2009, at the times indicated in the order for each petitioner for initial status hearings on the petitions listed in the attached order. Signed by Judge Reggie B. Walton on 12/19/08. (lcrbw3, ) Modified on 12/19/2008 (lcrbw3, ). (Entered: 12/19/2008) |
| 12/22/2008 | 799 | STIPULATION *to Stay Habeas Petition Re: Noor Uthman Muhammed (Samir DOE)* by MIKE BUMGARNER, GEORGE W. BUSH, JAY HOOD. (Westby, Jane) (Entered: 12/22/2008) |
| 12/22/2008 | 800 | MEMORANDUM IN OPPOSITION to 788 MOTION to Stay Habeas Proceedings by ABDUL AZIZ NAJI (Lubell, Ellen) Modified on 12/29/2008 (jf, ). (Entered: 12/22/2008) |
| 12/23/2008 | 801 | NOTICE of Appearance by David Farnham on behalf of GEORGE W. BUSH (Farnham, David) (Entered: 12/23/2008) |
| 12/23/2008 | 802 | NOTICE *of Justification for Detention* by GEORGE W. BUSH (Farnham, David) (Entered: 12/23/2008) |
| 12/23/2008 | 803 | MEMORANDUM re (409 in 1:08−mc−00442−TFH, 573 in 1:05−cv−02386−RBW) Order by EDRESS LNU. (Cleary, Amy) (Entered: 12/23/2008) |
| 12/23/2008 | 804 | MEMORANDUM re (409 in 1:08−mc−00442−TFH, 573 in 1:05−cv−02386−RBW) Order by ABDURAHMAN LNU. (Cleary, Amy) (Entered: 12/23/2008) |
| 12/23/2008 | 805 | MEMORANDUM re (409 in 1:08−mc−00442−TFH, 573 in 1:05−cv−02386−RBW) Order by ABDURAHMAN LNU. (Hart, Andy) (Entered: 12/23/2008) |
| 12/23/2008 | 806 | MEMORANDUM re (409 in 1:08−mc−00442−TFH, 573 in 1:05−cv−02386−RBW) Order by EDRESS LNU. (Hart, Andy) (Entered: 12/23/2008) |
| 12/23/2008 | 807 | MEMORANDUM re (409 in 1:08−mc−00442−TFH, 573 in 1:05−cv−02386−RBW) Order by EDRESS LNU. (Thompson, Darin) (Entered: 12/23/2008) |
| 12/23/2008 | 808 | MEMORANDUM re (409 in 1:08−mc−00442−TFH, 573 in 1:05−cv−02386−RBW) Order by ABDURAHMAN LNU. (Thompson, Darin) (Entered: 12/23/2008) |
| 12/23/2008 | 809 | MEMORANDUM re (409 in 1:08−mc−00442−TFH, 573 in 1:05−cv−02386−RBW) Order by ABDURAHMAN LNU. (Warner, Carlos) (Entered: 12/23/2008) |
| 12/23/2008 | 810 | MEMORANDUM re (409 in 1:08−mc−00442−TFH, 573 in 1:05−cv−02386−RBW) Order by EDRESS LNU. (Warner, Carlos) (Entered: 12/23/2008) |
| 12/23/2008 | | MINUTE ORDER: Upon review of the parties' Stipulation To Stay Habeas Petition (docket # 1374, 08−mc−442; docket # 799, 05−cv−2386), the Court ORDERS that, in accordance with the terms agreed upon in the Stipulation, habeas proceedings for Petitioner Noor Uthman Muhammed (ISN 707) are STAYED. Signed by Judge Thomas F. Hogan on 12/23/08. (lctfh1) (Entered: 12/23/2008) |
| 12/23/2008 | 811 | MEMORANDUM re (409 in 1:08−mc−00442−TFH, 573 in 1:05−cv−02386−RBW) Order by EDRESS LNU. (Werneke, Vicki) (Entered: 12/23/2008) |

JA001255

* * *

JA001256

| | | (Entered: 12/29/2010) |
|---|---|---|
| 01/03/2011 | 1447 | NOTICE *of filing with CSO* by ABDUL RAZAK ALI (Gorman, H.) (Entered: 01/03/2011) |
| 01/04/2011 | | Minute Entry for proceedings held before Judge Richard J. Leon. Status Conference (Closed Session) held on 1/4/2011. (Court Reporter Patty Gels.) (kc ) (Entered: 01/05/2011) |
| 01/07/2011 | | Set/Reset Hearings: Oral Opinion Hearing set for 1/11/2011 at 11:00 AM in Courtroom 18 before Judge Richard J. Leon. (kc ) (Entered: 01/07/2011) |
| 01/11/2011 | | Minute Entry for proceedings held before Judge Richard J. Leon. Oral Opinion Hearing (Open Session) held on 1/11/2011. (Court Reporter Wendy Ricard.) (kc) (Entered: 01/11/2011) |
| 01/11/2011 | 1448 | MEMORANDUM ORDER, Ordered that petitioner Abdul Razak Ali's, a.k.a. Saeed Bakhouche's, petition for a writ of habeas corpus is DENIED. SO ORDERED. Signed by Judge Richard J. Leon on 1/11/11. (see memorandum order.) (kc ) (Entered: 01/11/2011) |
| 01/11/2011 | 1449 | MOTION for Leave to Appeal in forma pauperis *with affidavit of Counsel* by ABDUL RAZAK ALI (Attachments: #_1 Affidavit regarding finances, #_2 Text of Proposed Order)(Gorman, H.) (Attachment 2 replaced on 1/12/2011) (znmw, ). (Entered: 01/11/2011) |
| 01/12/2011 | | MINUTE ORDER granting 1449 Motion for Leave to Proceed on Appeal In Forma Pauperis. It is hereby ORDERED that the motion is GRANTED. Signed by Judge Richard J. Leon on 1/12/11. (lcrjl2) (Entered: 01/12/2011) |
| 01/13/2011 | 1450 | Supplemental Record on Appeal transmitted to US Court of Appeals re Order on Motion for Leave to Appeal in forma pauperis ; (znmw, ) (Entered: 01/13/2011) |
| 01/18/2011 | 1451 | MOTION Renewed Motion for Entry of Writ or New hearing and Sanctions by ABDUL RAZAK ALI (Gorman, H.). Added MOTION for Hearing, MOTION for Sanctions on 1/19/2011 (znmw, ). (Entered: 01/18/2011) |
| 01/18/2011 | 1452 | MOTION to Compel exculpatory information by ABDUL RAZAK ALI (Gorman, H.) Modified event title on 1/19/2011 (znmw, ). (Entered: 01/18/2011) |
| 01/18/2011 | 1453 | MOTION for Release of Transcript from Pretrial Conference by ABDUL RAZAK ALI (Gorman, H.) Modified event title on 1/19/2011 (znmw, ). (Entered: 01/18/2011) |
| 01/18/2011 | 1454 | NOTICE *of Filing of Respondents' Opposition to Petitioner's Motions for Sanctions* by MIKE BUMGARNER, GEORGE W. BUSH, JAY HOOD, BARACK OBAMA, DONALD RUMSFELD re 1447 Notice (Other), 1451 MOTION Renewed Motion for Entry of Writ or New hearing and Sanctions (Gilligan, James) (Entered: 01/18/2011) |
| 01/19/2011 | 1455 | NOTICE OF CLASSIFIED TRANSCRIPT before Judge Richard J. Leon of proceedings held on 12/14/10, Submitted to CSO: 1/7/11. Court Reporter/Transcriber Patty Gels, Telephone number 202–354–3236, Court Reporter Email Address : Patty_Gels@dcd.uscourts.gov.This Transcript is Unavailable for public viewing.(Gels, Patty) (Entered: 01/19/2011) |
| 01/19/2011 | 1456 | NOTICE OF CLASSIFIED TRANSCRIPT before Judge Richard J. Leon of proceedings held on 12/15/10, Submitted to CSO: 1/7/11. Court Reporter/Transcriber Patty Gels, Telephone number 202–354–3236, Court Reporter Email Address : Patty_Gels@dcd.uscourts.gov.This Transcript is Unavailable for public viewing.(Gels, Patty) (Entered: 01/19/2011) |
| 01/19/2011 | 1457 | NOTICE OF CLASSIFIED TRANSCRIPT before Judge Richard J. Leon of proceedings held on 12/17/10, Submitted to CSO: 1/15/11. Court Reporter/Transcriber Patty Gels, Telephone number 202–354–3236, Court Reporter Email Address : Patty_Gels@dcd.uscourts.gov.This Transcript is Unavailable for public viewing.(Gels, Patty) (Entered: 01/19/2011) |

JA001261

| | | Richard J. Leon on 4/8/11. (lcrjl2) (Entered: 04/08/2011) |
|---|---|---|
| 04/11/2011 | | MINUTE ORDER denying 1465 Motion for Order Expediting Declassification of Amended Traverse. It is hereby ORDERED that the motion is DENIED AS MOOT. Signed by Judge Richard J. Leon on 4/11/11. (lcrjl2) (Entered: 04/11/2011) |
| 04/14/2011 | 1483 | MOTION for Reconsideration re Order on Motion for Miscellaneous Relief by ABDUL RAZAK ALI (Gorman, H.) (Entered: 04/14/2011) |
| 04/19/2011 | 1484 | NOTICE *of Filing Reply to Supplement with CSO* by ABDUL RAZAK ALI re 1468 MOTION for Writ MOTION for Hearing MOTION for Sanctions (Gorman, H.) (Entered: 04/19/2011) |
| 04/28/2011 | 1486 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Fee remains to be paid and another notice will be transmitted when the fee has been paid in the District Court re 1485 Notice of Appeal. (jf, ) (Entered: 04/28/2011) |
| 04/28/2011 | 1487 | SUPPLEMENTAL MEMORANDUM to re 1468 MOTION for Writ MOTION for Hearing MOTION for Sanctions *Second Supplement* filed by ABDUL RAZAK ALI. (Gorman, H.) (Entered: 04/28/2011) |
| 04/29/2011 | 1488 | **RESUBMISSION**Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Fee remains to be paid and another notice will be transmitted when the fee has been paid in the District Court re 1485 Notice of Appeal. (jf, ) (Entered: 04/29/2011) |
| 05/02/2011 | 1489 | NOTICE OF APPEAL re 1448 MEMORANDUM ORDER by ABDUL RAZAK ALI. Fee Status: No Fee Paid. Parties have been notified. (Gorman, H.) Modified on 5/2/2011 to add docket link (jf, ). (Entered: 05/02/2011) |
| 05/02/2011 | 1490 | Memorandum in opposition to re 1483 MOTION for Reconsideration re Order on Motion for Miscellaneous Relief filed by MIKE BUMGARNER, GEORGE W. BUSH, JAY HOOD, BARACK OBAMA, DONALD RUMSFELD. (Attachments: # 1 Exhibit Exhibits A–D)(Hussey, Olivia) (Entered: 05/02/2011) |
| 05/02/2011 | | USCA Case Number 11–5102 for 1485 Notice of Appeal filed by ABDUL RAZAK ALI. (jf, ) (Entered: 05/02/2011) |
| 05/02/2011 | 1491 | NOTICE *of Filing* by MIKE BUMGARNER, GEORGE W. BUSH, JAY HOOD, BARACK OBAMA, DONALD RUMSFELD re 1490 Memorandum in Opposition (Hussey, Olivia) (Additional attachment(s) added on 5/2/2011: # 1 Exhibit D (FILED UNDER SEAL)) (jf, ). (Entered: 05/02/2011) |
| 05/02/2011 | 1492 | Transmission of the Notice of Appeal, Order Appealed, and Docket Sheet to US Court of Appeals. The Fee was not paid because it was filed In Forma Pauperis re 1489 Notice of Appeal. (jf, ) (Entered: 05/02/2011) |
| 05/03/2011 | | MINUTE ORDER denying 1483 Motion to Reconsider Motion For Expedited Declassification of Amended Traverse. It is hereby ORDERED that the motion is DENIED. Signed by Judge Richard J. Leon on 5/3/11. (lcrjl2) (Entered: 05/03/2011) |
| 05/13/2011 | 1495 | ORDER of USCA as to 1485 Notice of Appeal filed by ABDUL RAZAK ALI ; USCA Case Number 11–5102. ORDERED that the unopposed motion to hold in abeyance is granted and the case is held in abeyance pending further order of the court. (smm) (Entered: 05/18/2011) |
| 05/16/2011 | 1493 | RESPONSE re 1487 Supplemental Memorandum filed by MIKE BUMGARNER, GEORGE W. BUSH, JAY HOOD, BARACK OBAMA, DONALD RUMSFELD. (Hussey, Olivia) (Entered: 05/16/2011) |
| 05/17/2011 | 1494 | ENTERED IN ERROR..... MOTION Reply to Second Supplement for new hearing re 1493 Response to Document, 1487 Supplemental Memorandum by ABDUL RAZAK ALI (Gorman, H.) Modified on 5/18/2011 (znmw, ). (Entered: 05/17/2011) |

JA001265

| 05/18/2011 | | NOTICE OF ERROR re 1494 Motion for Miscellaneous Relief; emailed to hcgorman@igc.org, cc'd 33 associated attorneys — The PDF file you docketed contained errors: 1. Incorrect event used, 2. Please refile document, 3. Entered in Error; Please refile as Reply to (non–motion) document. (znmw, ) (Entered: 05/18/2011) |
|---|---|---|
| 05/18/2011 | 1496 | MEMORANDUM ORDER denying 1468 Motion for Writ; denying 1468 Motion for Hearing; denying 1468 Motion for Sanctions. Signed by Judge Richard J. Leon on 5/17/2011. (see memorandum order) (kc ) (Entered: 05/18/2011) |
| 05/19/2011 | 1497 | REPLY re 1487 Supplemental Memorandum *second supplement* filed by ABDUL RAZAK ALI. (Gorman, H.) (Entered: 05/19/2011) |
| 05/20/2011 | 1498 | MOTION Clarification of Court Order dated May 17, 2011 re 1496 Order on Motion for Writ, Order on Motion for Hearing, Order on Motion for Sanctions by ABDUL RAZAK ALI (Gorman, H.) (Entered: 05/20/2011) |
| 08/12/2011 | 1499 | TRANSCRIPT OF PROCEEDINGS before Judge Richard J. Leon held on 12–28–2010; Page Numbers: 1–19. Court Reporter/Transcriber Lisa Schwam, Telephone number 202–354–3238, Court Reporter Email Address : Lisa_Schwam@dcd.uscourts.gov.<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at ww.dcd.uscourts.gov.<br><br>Redaction Request due 9/2/2011. Redacted Transcript Deadline set for 9/12/2011. Release of Transcript Restriction set for 11/10/2011.(Schwam, Lisa) (Entered: 08/12/2011) |
| 10/04/2011 | | MINUTE ORDER denying 1498 Motion for Clarification of Court Order Dated May 17, 2011. It is hereby ORDERED that the motion is DENIED. Signed by Judge Richard J. Leon on 10/4/11. (lcrjl2) (Entered: 10/04/2011) |
| 06/12/2012 | 1500 | MEMORANDUM ORDER, Ordered that petitioner Abdul Razak Ali's a.k.a. Saeed Bakhouche's, Second Supplement to Motion (and Renewed Motion) For Entry of the Writ Or, In the Alternative, a New Hearing and for Sanctions 1487 , is DENIED. SO ORDERED. Signed by Judge Richard J. Leon on 6/11/2012. (see memorandum order) (kc ) (Entered: 06/12/2012) |

JA001266

USCA Case #11-5162    Document #1340999    Filed: 08/01/2011    Page 258 of 877

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE:<br><br>**GUANTANAMO BAY**<br>**DETAINEE LITIGATION** | **Misc. No. 08-0442 (TFH)**<br><br>**Civil Action Nos.**<br><br>**02-cv-0828, 04-cv-1136, 04-cv-1164, 04-cv-1194, 04-cv-1254,**<br>**04-cv-1937, 04-cv-2022, 04-cv-2046, 04-cv-2215, 05-cv-0023,**<br>**05-cv-0247, 05-cv-0270, 05-cv-0280, 05-cv-0329, 05-cv-0359,**<br>**05-cv-0392, 05-cv-0492, 05-cv-0520, 05-cv-0526, 05-cv-0569,**<br>**05-cv-0634, 05-cv-0748, 05-cv-0763, 05-cv-0764, 05-cv-0877,**<br>**05-cv-0883, 05-cv-0889, 05-cv-0892, 05-cv-0993, 05-cv-0994,**<br>**05-cv-0998, 05-cv-0999, 05-cv-1048, 05-cv-1189, 05-cv-1124,**<br>**05-cv-1220, 05-cv-1244, 05-cv-1347, 05-cv-1353, 05-cv-1429,**<br>**05-cv-1457, 05-cv-1458, 05-cv-1487, 05-cv-1490, 05-cv-1497,**<br>**05-cv-1504, 05-cv-1505, 05-cv-1506, 05-cv-1555, 05-cv-1592,**<br>**05-cv-1601, 05-cv-1623, 05-cv-1638, 05-cv-1645,**<br>**05-cv-1646, 05-cv-1678, 05-cv-1971, 05-cv-1983, 05-cv-2010,**<br>**05-cv-2088, 05-cv-2104, 05-cv-2185, 05-cv-2186, 05-cv-2199,**<br>**05-cv-2249, 05-cv-2349, 05-cv-2367, 05-cv-2371, 05-cv-2378,**<br>**05-cv-2379, 05-cv-2380, 05-cv-2384, 05-cv-2385, 05-cv-2386,**<br>**05-cv-2387, 05-cv-2444, 05-cv-2479, 06-cv-0618, 06-cv-1668,**<br>**06-cv-1684, 06-cv-1690, 06-cv-1758, 06-cv-1761, 06-cv-1765,**<br>**06-cv-1766, 06-cv-1767, 07-cv-1710, 07-cv-2337, 07-cv-2338,**<br>**08-cv-0987, 08-cv-1085, 08-cv-1101, 08-cv-1104, 08-cv-1153,**<br>**08-cv-1185, 08-cv-1207, 08-cv-1221, 08-cv-1223, 08-cv-1224,**<br>**08-cv-1227, 08-cv-1228, 08-cv-1230, 08-cv-1232, 08-cv-1233,**<br>**08-cv-1235, 08-cv-1236, 08-cv-1237, 08-cv-1238, 08-cv-1360,**<br>**08-cv-1440, 08-cv-1733, 08-cv-1805** |

## CASE MANAGEMENT ORDER

Upon review of the parties' briefs in response to the Court's order of July 11, 2008,

and the record herein, and to provide the petitioners in these cases with prompt habeas corpus

review, *see Boumediene v. Bush*, 128 S. Ct. 2229, 2275 (2008), while "proceed[ing] with the

caution" necessary in this context, *Hamdi v. Rumsfeld*, 542 U.S. 507, 539 (2004) (plurality),

and not "disregard[ing] the dangers the detention in these cases was intended to prevent,"

*Boumediene*, 128 S. Ct. at 2276, the Court enters the following Case Management Order to

govern proceedings in the above-captioned cases.[1]

## I.

A.   **Factual Returns.**[2]   In accordance with the Court's order of July 29, 2008, as amended by the Court's order of September 19, 2008, the government shall file returns and proposed amended returns containing the factual basis upon which it is detaining the petitioner.   *Cf. Hamdi*, 542 U.S. at 533 (holding that a "citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification").

B.   **Legal Justification.**   The government shall file a succinct statement explaining its legal justification for detaining the petitioner. If the government's justification for detention is the petitioner's status as an enemy combatant, the government shall provide the definition of enemy combatant on which it relies. In cases in which the government already filed a factual return, the legal justification is due within 7 days of the date of this Order.   In all other cases, the government shall include the legal justification with the factual return.

C.   **Unclassified Factual Returns.**   Within 14 days of the date of this Order, the government shall file an unclassified version of each factual return it has filed to date.   In cases in which the government has yet to file a factual return, the government shall file an unclassified version of the return within 14 days of the date on which the government is to file the factual return.

D.   **Exculpatory Evidence.**

1.   The government shall disclose to the petitioner all reasonably available evidence in its possession that tends materially to undermine the information presented to support the government's justification for detaining the petitioner.   *See Boumendiene*, 128 S. Ct. at 2270 (holding that habeas court "must have the authority to admit and consider relevant exculpatory evidence that was not introduced during the [CSRT] proceeding").   In cases in which the government already filed a factual return, disclosure of such exculpatory evidence shall occur within 14

---

[1] While the framework detailed in this Order governs proceedings in all cases consolidated before this Court, the judges to whom the cases are assigned for final resolution ("Merits Judges") may alter the framework based on the particular facts and circumstances of their individual cases.   Additionally, the Merits Judges will address procedural and substantive issues not covered in this Order.

[2] When used in this Order, the term "factual return" refers to factual returns and proposed amended factual returns filed pursuant to the Court's order of July 29, 2008, as amended by the Court's order of September 19, 2008.

days of the date of this Order. In all other cases, disclosure shall occur within 14 days of the date on which the government files the factual return. By the date on which disclosure is to occur under this paragraph, the government shall file a notice certifying either that it has disclosed the exculpatory evidence or that it does not possess any exculpatory evidence.

2. If evidence described in the preceding paragraph becomes known to the government after the date on which the government was to disclose exculpatory evidence in a petitioner's case, the government shall provide the evidence to the petitioner as soon as practicable.

E. **Discovery.**

1. If requested by the petitioner, the government shall disclose to the petitioner: (1) any documents or objects in its possession that are referenced in the factual return; (2) all statements, in whatever form, made or adopted by the petitioner that relate to the information contained in the factual return; and (3) information about the circumstances in which such statements of the petitioner were made or adopted. *Cf. Harris v. Nelson*, 394 U.S. 286, 300 n.7 (1969) ("[D]istrict courts have the power to require discovery when essential to render a habeas corpus proceeding effective."). In cases in which the government already filed a factual return, requested disclosure shall occur within 14 days of the date on which the petitioner requests the disclosure. In all other cases, requested disclosure shall occur within 14 days of the date on which the government files the factual return or within 14 days of the date on which the petitioner requests disclosure, whichever is later.

2. The Merits Judge may, for good cause, permit the petitioner to obtain limited discovery beyond that described in the preceding paragraph. *Cf. Bracy v. Gramley*, 520 U.S. 899, 904 (1997) ("A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."). Discovery requests shall be presented by written motion to the Merits Judge and (1) be narrowly tailored, not open-ended; (2) specify the discovery sought; (3) explain why the request, if granted, is likely to produce evidence that demonstrates that the petitioner's detention is unlawful, *see Harris*, 394 U.S. at 300 ("[W]here specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry."); and (4) explain why the requested discovery will enable the petitioner to rebut the factual basis for his detention without unfairly disrupting or unduly burdening the government, *cf. Hamdi*, 542 U.S. at 533 (holding that "citizen-detainee

seeking to challenge his classification as an enemy combatant must receive . . . a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker"); *id.* at 534 ("[E]nemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict."). The Merits Judge will set the date by which all discovery must be completed.

F.    **Classified Information**. If any information to be disclosed to the petitioner under Sections I.D or I.E of this Order is classified, the government shall provide the petitioner with an adequate substitute and, unless granted an exception, provide the petitioner's counsel with the classified information, provided the petitioner's counsel is cleared to access such information under Section D of the Protective Order entered in the petitioner's case. If the government objects to providing the petitioner's counsel with the classified information on the basis that, in the interest of national security, the information should not be disclosed, the government shall move for an exception to disclosure and provide the information to the Merits Judge in camera for a determination as to whether the information should be disclosed and, if not disclosed, whether the government will be permitted to rely on the information to support detention. *See Boumediene*, 128 S. Ct. at 2276 ("[T]he Government has a legitimate interest in protecting sources and methods of intelligence gathering; and we expect that the District Court will use its discretion to accommodate this interest to the greatest extent possible."); *CIA v. Sims*, 471 U.S. 159, 175 (1985) ("The Government has a compelling interest in protecting . . . the secrecy of information important to our national security . . . ." (citation omitted)).

G.    **Traverse**. In response to the government's factual return, the petitioner shall file a traverse containing the relevant facts and evidence supporting the petition. *See Boumediene*, 128 S. Ct. at 2273 ("If a detainee can present reasonably available evidence demonstrating there is no basis for his continued detention, he must have the opportunity to present this evidence to a habeas corpus court."); *cf. Hamdi*, 542 U.S. at 533 (holding that a "citizen-detainee seeking to challenge his classification as an enemy combatant must receive . . . a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker"). Traverses are due within 14 days of the date on which the government files notice relating to exculpatory evidence under Section I.D.1 of this Order. The Merits Judge may, for good cause, permit the petitioner to amend or supplement a filed traverse.

## II.

A.    **Burden and Standard of Proof**. The government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful. *Boumediene*, 128 S. Ct. at 2271 ("The extent of the showing required of the government in these cases is a matter to be determined.").

Case 1:10-cv-01020-RJL    Document 689    Filed 11/06/08    Page 5 of 6

**B.    Presumption in Favor of the Government's Evidence.**  The Merits Judge may accord a rebuttable presumption of accuracy and authenticity to any evidence the government presents as justification for the petitioner's detention if the government establishes that the presumption is necessary to alleviate an undue burden presented by the particular habeas corpus proceeding.  *See Hamdi*, 542 U.S. at 534 ("[E]nemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict. . . . [For example,] the Constitution would not be offended by a presumption in favor of the government's evidence, so long as that presumption remained a rebuttable one and a fair opportunity for rebuttal were provided."); *Boumediene*, 128 S. Ct. at 2276 ("Certain accommodations can be made to reduce the burden habeas corpus proceedings will place on the military without impermissibly diluting the protections of the writ.").  If the Merits Judge determines that a presumption is warranted, the petitioner will receive notice of the presumption and an opportunity to rebut it.

**C.    Hearsay.**  On motion of either the petitioner or the government, the Merits Judge may admit and consider hearsay evidence that is material and relevant to the legality of the petitioner's detention if the movant establishes that the hearsay evidence is reliable and that the provision of nonhearsay evidence would unduly burden the movant or interfere with the government's efforts to protect national security.  *See Hamdi*, 542 U.S. at 533-34 (noting that, in enemy-combatant proceedings, "[h]earsay . . . may need to be accepted as the most reliable available evidence").  The proponent of hearsay evidence shall move for admission of the evidence no later than 7 days prior to the date on which the initial briefs for judgment on the record are due under Section III.A.1 of this Order.  The party opposing admission shall respond to the motion within 3 days of its filing.  If the Merits Judge admits hearsay evidence, the party opposing admission will have the opportunity to challenge the credibility of, and weight to be accorded, such evidence.

## III.

**A.    Judgment on the Record.**

**1.    Initial Briefs.**  Within 14 days of the filing of the traverse, or within 14 days of the date of this Order in cases in which the petitioner already filed a traverse, the petitioner and the government shall each file a brief in support of judgment on the record.  Each brief shall address both the factual basis and the legal justification for detention, *see Boumediene*, 128 S. Ct. at 2269 ("The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain."), and be accompanied by a separate statement of material facts as to which the party contends there is no genuine dispute.  The statement of material facts shall cite to the specific portions of the record that support the party's contention that a fact is not in dispute and shall not contain argument.  Initial briefs shall not exceed 45 pages, excluding the statement of material facts.

USCA Case #14-5102     Document #1448959     Filed: 08/18/2021     Page 263 of 877

2. **Response Briefs**. Within 7 days of the filing of initial briefs, the parties shall file response briefs. Each response brief shall be accompanied by a factual response statement that either admits or controverts each fact identified in the opposing party's statement of material facts as one to which there is no genuine dispute. The factual response shall cite to the specific portions of the record that support the party's contention that a fact is disputed. The Court may treat as conceded any legal argument presented in an initial brief that is not addressed in the response brief and may assume that facts identified in the statement of material facts are admitted unless controverted in the factual response. Response briefs shall not exceed 35 pages, excluding the factual response.

3. **Reply Briefs**. Reply briefs may be filed only by leave of court.

4. **Hearing**. The Merits Judge may allow oral argument.

B. **Evidentiary Hearing**.

1. **Basis for a Hearing**. If, after reviewing the parties' briefs for judgment on the record, the Merits Judge determines that substantial issues of material fact preclude final judgment based on the record, the petitioner is entitled to an evidentiary hearing. *Cf. Stewart v. Overholser*, 186 F.2d 339, 342 (D.C. Cir. 1950) ("When a factual dispute is at the core of a detention challenged by an application for the writ it ordinarily must be resolved by the hearing process.").

2. **Prehearing Conference**. Counsel shall appear for a prehearing conference to discuss and narrow the issues to be resolved at the hearing, discuss evidentiary issues that might arise at the hearing, identify witnesses and documents that they intend to present at the hearing, and discuss the procedures for the hearing.

3. **Petitioner's Presence**. The petitioner will not have access to classified portions of the hearing. Through available technological means that are appropriate and consistent with protecting classified information and national security, the Merits Judge will attempt to provide the petitioner with access to unclassified portions of the hearing.

**SO ORDERED**.

November 6, 2008                                    /s/
                                        _____
                                        Thomas F. Hogan
                                        United States District Judge

JA001272

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE:** | **Misc. No. 08-0442 (TFH)** |
| **GUANTANAMO BAY DETAINEE LITIGATION** | **Civil Action Nos.** |

**02-cv-0828, 04-cv-1136, 04-cv-1164, 04-cv-1194, 04-cv-1254, 04-cv-1937, 04-cv-2022, 04-cv-2046, 04-cv-2215, 05-cv-0023, 05-cv-0247, 05-cv-0270, 05-cv-0280, 05-cv-0329, 05-cv-0359, 05-cv-0392, 05-cv-0492, 05-cv-0520, 05-cv-0526, 05-cv-0569, 05-cv-0634, 05-cv-0748, 05-cv-0763, 05-cv-0764, 05-cv-0877, 05-cv-0883, 05-cv-0889, 05-cv-0892, 05-cv-0993, 05-cv-0994, 05-cv-0998, 05-cv-0999, 05-cv-1048, 05-cv-1189, 05-cv-1124, 05-cv-1220, 05-cv-1244, 05-cv-1347, 05-cv-1353, 05-cv-1429, 05-cv-1457, 05-cv-1458, 05-cv-1487, 05-cv-1490, 05-cv-1497, 05-cv-1504, 05-cv-1506, 05-cv-1555, 05-cv-1592, 05-cv-1601, 05-cv-1607, 05-cv-1623, 05-cv-1638, 05-cv-1645, 05-cv-1646, 05-cv-1678, 05-cv-1971, 05-cv-1983, 05-cv-2010, 05-cv-2088, 05-cv-2104, 05-cv-2185, 05-cv-2186, 05-cv-2199, 05-cv-2249, 05-cv-2349, 05-cv-2367, 05-cv-2371, 05-cv-2378, 05-cv-2379, 05-cv-2380, 05-cv-2384, 05-cv-2385, 05-cv-2386, 05-cv-2387, 05-cv-2444, 06-cv-0618, 06-cv-1668, 06-cv-1684, 06-cv-1690, 06-cv-1758, 06-cv-1761, 06-cv-1765, 06-cv-1766, 06-cv-1767, 07-cv-1710, 07-cv-2337, 07-cv-2338, 08-cv-0987, 08-cv-1101, 08-cv-1104, 08-cv-1153, 08-cv-1185, 08-cv-1207, 08-cv-1221, 08-cv-1223, 08-cv-1224, 08-cv-1228, 08-cv-1230, 08-cv-1232, 08-cv-1233, 08-cv-1235, 08-cv-1236, 08-cv-1237, 08-cv-1238, 08-cv-1360, 08-cv-1440, 08-cv-1733, 08-cv-1789, 08-cv-1805**

## <u>ORDER</u>

Pending before the Court is the government's Motion for Clarification and Reconsideration of this Court's November 6, 2008 Case Management Order and Supplemental Amended Orders or, in the Alternative, Motion for Certification for Appeal Pursuant to 28 U.S.C. § 1292(b) and to Stay Certain Obligations Pending Resolution of the Motion and any Appeal (docket # 1004, 08-mc-442).  Upon consideration of the Motion, the petitioners' responses, the government's reply, and the arguments presented at the hearing on December 10, 2008, the Court **ORDERS** that the Motion is **GRANTED**

UNCLASSIFIED//FOR PUBLIC RELEASE

**in part** and **DENIED in part**. Specifically, the Court **ORDERS** that the Case

Management Order entered on November 6, 2008, is **AMENDED** as follows:

1.  Section I.C is amended to state:

> **C.**   **Unclassified Factual Returns.**  By January 9, 2008, the government shall file an unclassified version of each factual return it has filed to date.  In cases in which the government has yet to file a factual return, the government shall file an unclassified version of the return within 21 days of the date on which the government files the factual return.

2.  Section I.D.1 is amended to state:

> **1.**   The government shall disclose to the petitioner all reasonably available evidence in its possession that tends materially to undermine the information presented to support the government's justification for detaining the petitioner.  *See Boumendiene*, 128 S. Ct. at 2270 (holding that habeas court "must have the authority to admit and consider relevant exculpatory evidence that was not introduced during the [CSRT] proceeding").  In this context, the term "reasonably available evidence" means evidence contained in any information reviewed by attorneys preparing factual returns for all detainees; it is not limited to evidence discovered by the attorneys preparing the factual return for the petitioner.  The term also includes any other evidence the government discovers while litigating habeas corpus petitions filed by detainees at Guantanamo Bay.  In cases in which the government already filed a factual return, disclosure of such exculpatory evidence shall occur within 14 days of the date of this Order.  In all other cases, disclosure shall occur within 14 days of the date on which the government files the factual return.  By the date on which disclosure is to occur under this paragraph, the government shall file a notice certifying either that it has disclosed the exculpatory evidence or that it does not possess any exculpatory evidence.

3.  Section I.E.1 is amended to state:

> **1.**   If requested by the petitioner, the government shall disclose to the petitioner (1) any documents and objects in the government's possession that the government relies on to justify detention; (2) all statements, in whatever form, made or adopted by the petitioner that the government relies on to justify detention; and (3) information

UNCLASSIFIED//FOR PUBLIC RELEASE   JA001274

about the circumstances in which such statements of the petitioner were made or adopted. *Cf. Harris v. Nelson*, 394 U.S. 286, 300 n.7 (1969) ("[D]istrict courts have the power to require discovery when essential to render a habeas corpus proceeding effective."). Disclosure requests shall be in writing. In cases in which the government already filed a factual return, requested disclosure shall occur within 14 days of the date on which the petitioner requests the disclosure. In all other cases, requested disclosure shall occur within 14 days of the date on which the government files the factual return or within 14 days of the date on which the petitioner requests disclosure, whichever is later.

4. Section I.F is amended to state:

    **F.**    **Classified Information**. If any information to be disclosed under Sections I.D or I.E of this Order is classified, the government shall, unless granted an exception by the Merits Judge, provide the petitioner's counsel with the classified information, provided the petitioner's counsel is cleared to access such information. If the government objects to providing the petitioner's counsel with the classified information, the government shall move for an exception to disclosure.

5. Section I.G is amended to state:

    **G.**    **Traverse**. In response to the government's factual return, the petitioner shall file a traverse containing the relevant facts and evidence supporting the petition. *See Boumediene*, 128 S. Ct. at 2273 ("If a detainee can present reasonably available evidence demonstrating there is no basis for his continued detention, he must have the opportunity to present this evidence to a habeas corpus court."); *cf. Hamdi*, 542 U.S. at 533 (holding that a "citizen-detainee seeking to challenge his classification as an enemy combatant must receive . . . a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker"). The traverse is due within 14 days of the date on which the government files notice relating to exculpatory evidence under Section I.D.1 of this Order or within 14 days of the date on which the government files the unclassified factual return, whichever is later. The Merits Judge may, for good cause, permit the petitioner to amend or supplement a filed traverse.

The Court further **ORDERS** that the government's Motion is **DENIED** in all other

USCA Case #11-5102    Document #1445888    Filed: 06/11/2012    Page 267 of 877

Case 1:10-cv-01020-RJL   Document 784   Filed 12/16/08   Page 4 of 4

respects.

The Court further **ORDERS** that any future motions to amend the Case

Management Order be directed to the Merits Judges.

The Court further **ORDERS** that the stay entered by the Court's November 21,

2008, order (docket # 1026, 08-mc-442) is **LIFTED**.

December 16, 2008

_____/s/_____
Thomas F. Hogan
United States District Judge

UNCLASSIFIED//FOR PUBLIC RELEASE

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FALEN GHEREBI, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 04-1164  (RBW) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, ) | |
| and ROBERT M. GATES, ) | |
| Secretary of Defense, ) | |
| ) | |
| Respondents. ) | |

| | |
|---|---|
| TAJ MOHAMMAD, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 05-879  (RBW) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, et al., ) | |
| ) | |
| Respondents. ) | |

| | |
|---|---|
| KARIN BOSTAN, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 05-883  (RBW) |
| ) | |
| GEORGE W. BUSH, ) | |
| President of the United States, et al., ) | |
| ) | |
| Respondents. ) | |

UNCLASSIFIED//FOR PUBLIC RELEASE

|  |  |
|---|---|
| NASRULLAH, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )   Civil Action No. 05-891  (RBW) |
| | ) |
| GEORGE W. BUSH, | ) |
| President of the United States, et al., | ) |
| | ) |
| Respondents. | ) |
| | ) |
| ASIM BEN THABIT AL-KHALAQI, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )   Civil Action No. 05-999  (RBW) |
| | ) |
| GEORGE W. BUSH, | ) |
| President of the United States, et al., | ) |
| | ) |
| Respondents. | ) |
| | ) |
| MOHAMMED AMON, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )   Civil Action No. 05-1493  (RBW) |
| | ) |
| GEORGE W. BUSH, | ) |
| President of the United States, et al., | ) |
| | ) |
| Respondents. | ) |
| | ) |

ABDULLAH M. AL-SOPAI                    )
ex rel. ABDALHADI M. AL-SOPAI,         )
                                       )
      Petitioner,              )
                                       )
v.                                     )    Civil Action No. 05-1667  (RBW)
                                       )
GEORGE W. BUSH,                        )
President of the United States, et al.,)
                                       )
      Respondents.             )
                                       )

KADEER KHANDAN,                        )
                                       )
      Petitioner,              )
                                       )
v.                                     )    Civil Action No. 05-1697  (RBW)
                                       )
GEORGE W. BUSH,                        )
President of the United States, et al.,)
                                       )
      Respondents.             )
                                       )

ISSAM HAMID ALI BIN ALI AL JAYFI,      )
et al.,                                )
                                       )
      Petitioners,             )
                                       )
v.                                     )    Civil Action No. 05-2104  (RBW)
                                       )
GEORGE W. BUSH,                        )
President of the United States, et al.,)
                                       )
      Respondents.             )
                                       )

|                                                      |     |                                    |
| ---------------------------------------------------- | --- | ---------------------------------- |
| SHARAF AL SANANI, <u>et al</u>.,                     | )   |                                    |
|                                                      | )   |                                    |
| Petitioners,                                         | )   |                                    |
|                                                      | )   |                                    |
| v.                                                   | )   | Civil Action No. 05-2386  (RBW)    |
|                                                      | )   |                                    |
| GEORGE W. BUSH,                                      | )   |                                    |
| President of the United States, <u>et al</u>.,      | )   |                                    |
|                                                      | )   |                                    |
| Respondents.                                         | )   |                                    |

|                                                      |     |                                    |
| ---------------------------------------------------- | --- | ---------------------------------- |
| WASIM and QAYED,                                     | )   |                                    |
|                                                      | )   |                                    |
| Petitioners,                                         | )   |                                    |
|                                                      | )   |                                    |
| v.                                                   | )   | Civil Action No. 06-1675  (RBW)    |
|                                                      | )   |                                    |
| GEORGE W. BUSH,                                      | )   |                                    |
| President of the United States, <u>et al</u>.,      | )   |                                    |
|                                                      | )   |                                    |
| Respondents.                                         | )   |                                    |

|                                                      |     |                                    |
| ---------------------------------------------------- | --- | ---------------------------------- |
| RABIA KHAN <u>ex rel</u>. MAJID KHAN,                | )   |                                    |
|                                                      | )   |                                    |
| Petitioner,                                          | )   |                                    |
|                                                      | )   |                                    |
| v.                                                   | )   | Civil Action No. 06-1690  (RBW)    |
|                                                      | )   |                                    |
| GEORGE W. BUSH,                                      | )   |                                    |
| President of the United States, <u>et al</u>.,      | )   |                                    |
|                                                      | )   |                                    |
| Respondents.                                         | )   |                                    |

MUHAMMAD MUHAMMAD SALEH )
NASSER ex rel. ABDULRAHMAN )
MUHAMMAD SALEH NASSER, )
)
        Petitioner, )
)
    v. )    Civil Action No. 07-1710  (RBW)
)
GEORGE W. BUSH, )
President of the United States, et al., )
)
        Respondents. )
)

ZAYN AL ABIDIN )
MUHAMMAD HUSAYN, )
)
        Petitioner, )
)
    v. )    Civil Action No. 08-1360  (RBW)
)
GEORGE W. BUSH, )
President of the United States, et al., )
)
        Respondents. )
)

ABDUL RAHMAN UMIR AL QYATI )
and SAAD MASIR MUKBL AL AZANI, )
)
        Petitioner, )
)
    v. )    Civil Action No. 08-2019  (RBW)
)
GEORGE W. BUSH, )
President of the United States, et al., )
)
        Respondents. )

## ORDER

The undersigned judge (the "Merits Judge") having carefully considered the case management order entered by the Honorable Thomas F. Hogan in the miscellaneous civil action captioned as <u>In re Guantanamo Bay Litigation,</u> Misc. No. 08-442 (TFH) (D.D.C.), as well as in these cases (the "Case Management Order"), as amended by Judge Hogan's order entered on December 16, 2008 (the "December 16 Order"), and it appearing to the Merits Judge that the provisions set forth within that order should be modified only to the extent set forth below, it is

**ORDERED** that the Case Management Order is **AMENDED** as follows:

(1).    Section I.A of the Case Management Order is amended to state: [1]

    A.    <u>**Initial Filings for the Merits Judge.**</u>

        **1.**    <u>**Factual Return.**  In accordance with the Court's order of July 29, 2008, as amended by the Court's order of September 19, 2008, the government shall file returns and proposed amended returns containing the factual basis upon which it is detaining the petitioner.  Cf. Hamdi, 542 U.S. at 533 (holding that a "citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification").</u>

        **2.**    <u>**Initial Notice to the Court.**  Contemporaneous with the filing of a factual return for a particular petitioner, the government shall file a notice stating (1) whether the petitioner has been approved for transfer or release and (2) whether the petitioner's habeas corpus petition has been or should be consolidated with the petition or petitions of any other petitioner (including petitions filed in cases assigned to other members of this Court).</u>

(2).    Section I of the Case Management Order (as amended by the Court's December 16 Order) is amended to state:

---

[1]  Amended language is underlined.

UNCLASSIFIED//FOR PUBLIC RELEASE

## C-1.   Motion for Expedited Judgment on the Record.

**1.**     If a petitioner seeks expedited judgment on the basis that the conduct alleged by the government in its factual return, even if true, does not suffice to justify the petitioner's detention as an enemy combatant (i.e., that the definition of "enemy combatant" used by the government to justify the detention of the petitioner based on the conduct alleged by the government is overly broad), he shall file a motion to that effect within 7 days after the filing of the unclassified factual return.    The government shall file its opposition to such a motion, if any, within 7 days after the filing of the motion.    Upon the filing of an opposition by the government, the Court will schedule a hearing on the petitioner's motion.    The Court expects that such a hearing would take place within 7 days after the filing of the government's opposition.

**2.**     Any petitioner for whom an unclassified factual return has already been filed who seeks judgment in his favor on the basis that the conduct alleged by the government in its factual return, even if true, does not suffice to justify the petitioner's detention as an enemy combatant shall file a motion to that effect on or before December 29, 2008.    The government shall file a consolidated opposition to any such motions on or before January 8, 2009.    Upon the filing of an opposition by the government, the Court will schedule a consolidated hearing to address the merits of any such motions.    The Court expects that such a hearing would take place during the week of January 12, 2009.[2]

(3).     Section I.D of the Case Management Order (as amended by the

Court's December 16 Order) is amended to state:

---

[2] The Court expects that the first round of briefing on a motion of the type described in Section C-1 of this order would require extensive discussion of certain contentious legal issues (e.g., the appropriate definition of an "enemy combatant"), which would, at least with respect to those cases before the Merits Judge, be resolved following that first round of briefing, such that subsequently filed motions of the type described in this section of the order would not require extensive briefing from the parties.  The Court has therefore crafted an elongated briefing schedule for those petitioners for whom an unclassified factual return has already been filed, as the Court expects that it will first resolve any motions of the type described in this section of the order that are filed by those petitioners.

1.    The government shall disclose to the petitioner all reasonably available evidence in its possession that tends materially to undermine the information presented to support the government's justification for detaining the petitioner. See Boumediene, 128 S. Ct. at 2270 (holding that habeas court "must have the authority to admit and consider relevant exculpatory evidence that was not introduced during the [CSRT] proceeding"). In this context, the term "reasonably available evidence" means evidence contained in any information reviewed by attorneys preparing factual returns for all detainees; however, the scope of this disclosure obligation is not limited to evidence discovered by the attorneys preparing the factual return for the petitioner. The term also includes any other evidence the government discovers while litigating habeas corpus petitions filed by detainees at Guantanamo Bay or any other United States military facility. In cases in which the government already filed a factual return, disclosure of such exculpatory evidence shall occur on or before January 9, 2009. In all other cases, disclosure shall occur within 21 days of the date on which the government files the factual return. By the date on which disclosure is to occur under this paragraph, the government shall file a notice certifying either that it has disclosed the exculpatory evidence or that it does not possess any exculpatory evidence.

. . .

3.    In addition to the requirements set forth in Sections I.D.1 and I.D.2 of this order, the government shall notify the petitioner of the existence of any evidence known to counsel for the government but not reasonably available to the government that tends materially to undermine the information presented to support the government's justification for detaining the petitioner. The government's counsel shall certify that counsel has disclosed that such evidence exists or does not know of the existence of any such evidence as part of the notice described in Section I.D.1, and shall inform the petitioner that such evidence exists as soon as is practicable if the government's counsel learns of the existence of the evidence after the date on which the

JA001284

government was to disclose its knowledge of the existence of exculpatory evidence as soon as is practicable in accordance with Section 1.D.2.

(4).    Section I of the Case Management Order is amended to state:

**H.    Initial Status Hearing.**

**1.**    The Court will enter a separate order setting an initial status hearing for the petitioner's habeas corpus petition upon the filing of the government's factual return.    The Court expects that such a hearing would take place after the filing of the unclassified factual return by the government, but before the filing of the traverse by the petitioner.

**2.**    No later than 2 days prior to the initial status hearing described above, the parties shall file a joint status report certifying that the parties have met and attempted in good faith to narrow the issues requiring resolution by the Court. In addition to this certification, the parties shall briefly summarize the nature of the factual allegations made against the petitioner.    Although they need not do so, the parties may also briefly summarize the petitioner's response to those allegations.    Further, the parties shall set forth (1) the remaining deadlines under the Case Management Order (as amended by the Court's December 16 Order), (2) any requested modifications to those deadlines (and, if so, which party has requested modification), and (3) the status of any pending motions before the Court.    Finally, the petitioner's counsel shall certify that counsel, having reviewed the status of any other habeas corpus petitions filed by petitioners represented by the same counsel, is subject to no conflict of interest in representing the petitioner.

(5).    Section II.B of the Case Management Order is amended to state:

**B.    Presumption in Favor of the Government's Evidence.**
The Merits Judge may accord a rebuttable presumption of accuracy and authenticity to any evidence the government presents as justification for the petitioner's detention if the government establishes that the presumption is necessary to alleviate an undue burden presented by the particular

habeas corpus proceeding.  See Hamdi, 542 U.S. at 534 ("[E]nemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict . . . [For example,] the Constitution would not be offended by a presumption in favor of the government's evidence, so long as that presumption remained a rebuttable one and a fair opportunity for rebuttal were provided."); Boumediene, 128 S. Ct. at 2276 ("Certain accommodations can be made to reduce the burden habeas corpus proceedings will place on the military without impermissibly diluting the protections of the writ.").  If the government contends that a rebuttable presumption of accuracy and authenticity with respect to its evidence regarding a particular petitioner's habeas corpus petition should be accorded, the government shall file a notice of its intent to seek a ruling from the Merits Judge recognizing such a presumption at the prehearing conference described in Section III.B.2 of this order.  The notice shall be filed no later than 7 days prior to the prehearing conference.  If the petitioner intends to challenge the government's request, it shall file a written objection to the government's notice within 3 days after the filing of the notice.

(6).   Section III.A of the Case Management Order is amended to state:

A.   **Judgment on the Record.**

1.   **Government's Motion for Judgment on the Record.**  Within 14 days after the filing of the traverse, or within 14 days after the date of this Order in cases in which the petitioner already filed a traverse, the government shall file a motion for judgment on the record along with a memorandum of law in support of that motion.  The memorandum of law shall address both the factual basis and the legal justification for detention, see Boumediene, 128 S. Ct. at 2269 ("The habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain."), and shall not exceed 45 pages in length.  The motion shall also be accompanied by a separate statement of material facts as to which the government contends there is no genuine dispute.  The statement of material facts shall cite to the specific portions of the record that support the

government's contention that a fact is not in dispute
and shall not contain argument.

2.   **Petitioner's   Opposition/Cross-Motion   for
Judgment on the Record.**   Within fourteen days
after the filing after the government's motion for
judgment on the record, the petitioner shall file his
opposition to the government's motion and, if
appropriate, cross-motion for judgment on the
record along with a consolidated memorandum of
law in support of that opposition and cross-motion.
The memorandum of law shall address both the
factual basis and the legal justification for detention,
see Boumediene, 128 S. Ct. at 2269 ("The habeas
court must have sufficient authority to conduct a
meaningful review of both the cause for detention
and the Executive's power to detain."), and shall not
exceed 60 pages in length. The opposition shall be
accompanied by a factual response that either
admits or controverts each fact identified in the
government's statement of material facts as one to
which there is no genuine dispute. The factual
response shall cite to the specific portions of the
record that support the petitioner's contention that a
fact is disputed. The Court may treat as conceded
any legal argument presented in the government's
memorandum of law in support of its motion for
judgment on the record that is not addressed in the
petitioner's memorandum of law in support of his
opposition to that motion and may assume that facts
identified in the government's statement of material
facts are admitted unless controverted in the factual
response. If the petitioner files both an opposition
and a cross-motion for judgment on the record, the
cross-motion shall also be accompanied by a
separate statement of material facts as to which the
petitioner contends there is no genuine dispute. The
statement of material facts shall cite to the specific
portions of the record that support the petitioner's
contention that a fact is not in dispute and shall not
contain argument.

3.   **Government's Reply/Cross-Opposition.**   Within 7
days after the filing of any opposition and cross-
motion for judgment on the record by the petitioner,
the government shall file its reply in support of its

motion for judgment on the record and, if necessary, its cross-opposition to the petitioner's cross-motion for judgment on the record in one consolidated memorandum of law. The memorandum of law shall not exceed 15 pages in length unless the petitioner has filed a cross-motion for judgment on the record, in which case it shall not exceed 35 pages in length. If the petitioner files a cross-motion for judgment on the record, the government's consolidated memorandum of law shall be accompanied by a factual response that either admits or controverts each fact identified in the petitioner's statement of material facts as one to which there is no genuine dispute. The factual response shall cite to the specific portions of the record that support the government's contention that a fact is disputed. The Court may treat as conceded any legal argument presented in the petitioner's memorandum of law in support of any cross-motion for judgment on the record that is not addressed in the government's memorandum of law in support of its cross-opposition to that motion and may assume that facts identified in the petitioner's statement of material facts are admitted unless controverted in the factual response.

4.    **Petitioner's Cross-Reply.**  If the petitioner files a cross-motion for judgment on the record and the government files a cross-opposition in response, the petitioner shall file his cross-reply within 5 days after the filing of the cross-opposition. The cross-reply shall not exceed 20 pages in length. The Court may treat as waived any arguments in the cross-reply not made in the petitioner's initial memorandum of law unless an argument raised for the first time in a cross-reply is within the scope of the government's cross-opposition.

5.    **Hearing.**    The Merits Judge may allow oral argument if deemed necessary.

(7).    Section III.B.2 of the Case Management Order is amended to state:

B.    **Evidentiary Hearing.**

. . .

UNCLASSIFIED//FOR PUBLIC RELEASE

    2.     **Prehearing Conference.**  Counsel shall appear for a prehearing conference to discuss and narrow the issues to be resolved at the <u>evidentiary</u> hearing, discuss evidentiary issues that might arise at the hearing, identify witnesses and documents that they intend to present at the hearing, and discuss the procedures for the hearing.

**SO ORDERED** this 19th day of December, 2008.

REGGIE B. WALTON
United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ABDAL RAZAK ALI,**           ) | |
|         ) | |
|     **Petitioner,**     ) | |
|         ) | |
|     **v.**          ) | |
|         )     **Civil Case No. 10-1020 (RJL)** | |
| **BARACK OBAMA,** *et al.,*     ) | |
|         ) | |
|    **Respondents.**     ) | |

---

## CASE MANAGEMENT ORDER
## (August 25, 2010)

Upon review of the relevant filings, the relevant law, and the entire record herein, it is hereby **ORDERED** that the following procedures will govern the habeas corpus proceedings for the petitioner in the above-captioned case and shall supersede any case management orders previously entered in this case:[1]

## I.    PRE-HEARING PROCEDURES:

    **A.**    **Filings**: All classified filings made through the Court Security Office, including the Government's return, petitioner's traverse, and any motions, shall be filed in duplicate and by 1:00 p.m. on the due date.

    **B.**    **Factual Returns**: The Government shall produce returns according to the schedule set forth at the August 19, 2010 Status Conference.[2] The Government's return shall include, at a minimum, the factual basis for detention and a brief statement setting forth the Government's legal basis for detaining the petitioner. If the Government's basis for detention is the petitioner's status as an "enemy combatant," the Government must provide the definition of enemy combatant upon which it relies. If the Government's return fails to include a brief statement setting forth its legal basis for detention, the Government will be required to file a supplement to

---

[1]    This Case Management Order ("CMO") addresses procedural issues common to all the Guantanamo Bay detainee habeas petitions before the Court and is substantially identical to the CMO entered August 27, 2008 in *Boumediene v. Bush*, No. 04-cv-1166. Where this CMO deviates from CMO entered in *Boumediene*, it does so based either on the particular circumstances of this case or the experience gained from the *Boumediene* case.

its return by a date set by the Court. In addition, the return may be amended or supplemented only by leave of the Court for good cause shown.

C.   **Unclassified Returns**: The Government shall file an unclassified version of the return no later than two weeks after the filing date for the return set at the August 19, 2010 Status Conference.

D.   **Discovery**: Discovery may only be obtained by leave of the Court for good cause shown. The petitioner requesting discovery must provide specific reasons for the request in writing. Any request for discovery must: (1) be narrowly tailored; (2) specify why the request is likely to produce evidence both relevant and material to the petitioner's case; (3) specify the nature of the request (*e.g.*, proposed interrogatories, requests for admission, or requested documents); and (4) explain why the burden on the Government to produce such evidence is neither unfairly disruptive nor unduly burdensome to the Government. The Government has three (3) calendar days to respond in writing to any discovery request. The Court may hold a hearing at its discretion to hear arguments on the discovery request(s).

E.   **Exculpatory Evidence**: The Government shall provide on an ongoing basis any evidence contained in the material reviewed in developing the return for the petitioner, and in preparation for the hearing for the petitioner, that tends materially to undermine the Government's theory as to the lawfulness of the petitioner's detention.

F.   **Traverse**: The petitioner shall file a traverse in response to the Government's return. The traverse, including any amendments or supplements, shall be filed according to the schedule set forth at the August 19, 2010 Status Conference. The traverse shall include, at a minimum, the relevant facts in support of the petition and a succinct rebuttal of the Government's legal justification for detention.

G.   **Pre-Hearing Conference**: The Court will hold a pre-hearing conference prior to the habeas hearing on September 29, 2010, at 2:00 p.m. At this conference, counsel should be prepared to formulate and simplify the issues of law and fact to be resolved at the habeas hearing, identifying areas of agreement and dispute; explore evidentiary problems that may be expected to arise at the habeas hearing; and identify witnesses and documents to be presented at the habeas hearing.

---

[2]   Extensions of time from the deadlines set by the Court will be granted rarely and only for good cause shown.

## II.    HEARING PROCEDURES:

A.    **Burden and Standard of Proof**: The Government must establish, by a preponderance of the evidence, the lawfulness of the petitioner's detention. The Government bears the ultimate burden of persuasion that the petitioner's detention is lawful.

B.    **Presumption in Favor of Government's Evidence**: The Court will determine, as to any evidence introduced by the Government, whether a presumption of accuracy and/or authenticity should be accorded the evidence. The petitioner will be given an opportunity to rebut any such presumption accorded the Government's evidence.

C.    **Presentation of Evidence at the Habeas Hearing**: The Government will proceed first. At the completion of the Government's presentation, the petitioner may present evidence. At the close of petitioner's case, the Government may present either additional or rebuttal evidence. At the close of all the evidence, each side may present closing argument as to the lawfulness of the petitioner's detention. If a party is permitted to present live testimony during the habeas hearing, the opposing party will be permitted to cross-examine those witnesses.

D.    **Hearsay**: Hearsay evidence that is relevant and material to the lawfulness of petitioner's detention may be admissible. The opposing party will have an opportunity to challenge the credibility and weight accorded any hearsay evidence.

E.    **Petitioner's Attendance at Proceedings**: Although petitioners are prohibited by law from listening to the classified portions of the hearing, the Court will endeavor to provide them with telephonic access to any unclassified portion of the hearing. At a minimum, the petitioner's counsel will have the opportunity to contact the petitioner by secure telephone on at least one occasion prior to presenting its case.

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

USCA Case #11-5102    Document #1443998    Filed: 05/11/2013    Page 284 of 877

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| *ABDAL RAZAK ALI*<br><br>**Petitioners,**<br><br>**vs.**<br><br>**GEORGE W. BUSH,** *et al,*<br><br>**Respondents.** | **No. 10-cv- 1020 (RJL)** |

## MOTION TO RESCHEDULE HABEAS HEARING

Now comes the Petitioner Razak Ali and states the following in support of his

motion to reschedule his habeas hearing:

1.  This Court set the Petitioners status hearing for October 4-5 2010. A hearing

    date that was welcomed by the Petitioner and his Counsel.

2.  On September 10, 2010 the Government filed its Fifth Amended Return in

    which it substantially changed the theory of its case. In the fourteen days prior

    to the filing the Government provided hundreds of new documents to Counsel

    for Petitioner and with its Amended Return provided hundreds more.

3.  Counsel has done her best to keep up with the new documents, review and

    catalog them for use at the trial including the new documents which she

    received on September 11, 2010 at the secure facility but the task is daunting

    and Counsel needs additional time to review and organize the new documents.

4. On Monday September 13, 2010 Counsel left DC for an early morning flight to Ft. Lauderdale for her connecting flight to Guantanamo Bay on September 14 2010. The purpose of the client meeting was to meet and confer with her client and to prepare an affidavit from the Petitioner to be filed in support of the habeas petition.

5. Upon arriving in Ft. Lauderdale counsel for Petitioner learned from the Military scheduler that there was a potential problem with her translator. By that evening counsel confirmed that the translator that was scheduled to meet with her and her client on September 15th 2010 and September 16th 2010 (and whom she has used most of these past five years) had flown to Beirut on an emergency basis after learning of the sudden death of his mother.

6. Counsel attempted to contact other cleared Arabic translators but was unable to secure a translator at that late date and was forced to cancel her trip to Guantanamo.

7. Counsel has still not been able to find a translator that is available for two full days prior to the scheduled hearing. Counsel sent emails to all of the cleared Arabic translators checking on their earliest availability and is awaiting responses from them.

8. Counsel notified the Government of her dilemma but the Government attorney was unwilling to state her position on the extension until she learns of the new

JA001294

date that Counsel would be going to Guantanamo.

For these reasons Counsel asks this Court to reschedule the hearing date for the

Petitioner at a time convenient for the Court and for such other and further

relief as this Court deems just.

/s/ H. Candace Gorman
Counsel for Petitioner

LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman (IL Bar #6184278)
220 S. Halsted
Suite 200
Chicago, IL 60661
Tel: (312) 427-2313

## NOTICE OF MOTION

To:    Olivia Hussey
       U.S. Department of Justice
       Civil Division, Federal Programs Branch
       20 Massachusetts Ave., NW, Room 7144
       Washington, DC  20530

    PLEASE TAKE NOTICE that on the 15th day of September, 2010, I filed with the Court
Security Office a copy of Petitioner's Motion to Reschedule Habeas Hearing.

                    /s/ H. Candace Gorman
                    Counsel for Petitioner

LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman (IL Bar #6184278)
220 S. Halsted
Suite 200
Chicago, IL 60661
Tel:  (312) 427-2313

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| *ABDAL RAZAK ALI*<br><br>            **Petitioners,**<br><br>    **vs.**<br><br>**GEORGE W. BUSH,** *et al,*<br><br>            **Respondents.** | **No. 10-cv- 1020 (RJL)** |

## MOTION FOR SCHEDULING ORDER FOR HABEAS HEARING

Now comes the Petitioner Razak Ali and states the following in support of his

motion for scheduling order:

1. At the Status hearing for this case on September 21st, 2010 this Court set the

   hearing for Petitioner's case for December 14 and 15th 2010 but also told

   Counsel that he could possibly make available the dates of October 13-14 for

   the habeas hearing if that worked for Counsel.

2. Plaintiff had previously asked that the hearing date of October 4-5, 2010 be

   cancelled because she was not able to meet with her client at Guantanamo as

   scheduled and to finalize his affidavit to be filed in support of the habeas

   petition because of the death of the interpreter's mother.

3. Since that time Counsel has worked diligently reviewing the voluminous

   documents filed by the Government and was also able to schedule a telephone

   call with her client at Guantanamo on the afternoon of September 27, 2010 at

JA001297

the secure facility.

4. The Petitioner had received the draft affidavit that Counsel had sent him prior to their scheduled meeting and they were able to go through the affidavit during their telephone conference. Petitioner made a few corrections to the affidavit during that phone call and then Petitioner swore to the statements in the affidavit under oath so that it could be presented to the Court.

5. If this Court can still accommodate the October 13-14, 2010 dates for the habeas hearing Counsel for Petitioner could have the Amended Traverse filed by Tuesday October 5, 2010. This would give ample time for the Government to review the Traverse and for the Court to set a pretrial conference before the hearing.

6. Counsel sent an email to the DOJ attorney in this case early this morning informing the DOJ attorney that she had left a message with the Court seeking the earlier hearing date but as of the filing of this request has not heard back from Counsel.

For these reasons Counsel asks this Court to schedule the hearing date for October 13-14, 2010, if those dates are still convenient for the Court, and for such other and further relief as this Court deems just.

/s/ H. Candace Gorman
Counsel for Petitioner

LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman (IL Bar #6184278)
220 S. Halsted
Suite 200
Chicago, IL 60661
Tel:  (312) 427-2313

## NOTICE OF MOTION

To:    Olivia Hussey
       U.S. Department of Justice
       Civil Division, Federal Programs Branch
       20 Massachusetts Ave., NW, Room 7144
       Washington, DC  20530


       PLEASE TAKE NOTICE that on the 28th day of September, 2010, I filed with the Court
Security Office a copy of Petitioner's Motion for Scheduling Order for Habeas Hearing.


                                    /s/ H. Candace Gorman
                                    Counsel for Petitioner



LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman (IL Bar #6184278)
220 S. Halsted
Suite 200
Chicago, IL 60661
Tel:  (312) 427-2313

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| *ABDAL RAZAK ALI* | |
| **Petitioners,** | |
| **vs.** | **No. 10-cv- 1020 (RJL)** |
| **GEORGE W. BUSH,** *et al,* | |
| **Respondents.** | |

MOTION FOR EXTENSION OF TIME TO FILE AMENDED TRAVERSE

Now comes the Petitioner Razak Ali and states the following in support of his

motion for an extension of time to file Amended Traverse to Monday November 8, 2010:

1. This Court entered a scheduling Order providing that the Amended Traverse

   be filed on Friday, November 5, 2010. Since that time Counsel has worked

   diligently to comply with the Order and to file the Amended Traverse on

   today's date.

2. However Counsel for Petitioner encountered numerous problems this past

   week in finalizing the Traverse and in copying all of the exhibits for filing. The

   problems were exacerbated by the construction work at the secure facility

   starting on November 2, 2010 and the Department of Justice providing new

   documents that needed to be reviewed in the context of filing the Traverse.

3. Counsel sent an email to the DOJ attorney in this case notifying her of the

   problems she encountered and informing her that she would not be able to

meet the deadline of November 5th and would not be able to file the brief until Monday morning (November 8th). The DOJ attorney would only agree to the extension if Counsel would agree not to object if the Government needed a similar number of days to "respond" to the Amended Traverse.

4.  As Counsel for Petitioner does not believe it is appropriate for the government to file a "Sur Return" Counsel would not agree to the request by the Government.

Counsel for Petitioner respectfully asks this Court for leave to file the Amended Traverse on Monday, November 8th, 2010 and for whatever further relief this Court deems just.

Respectfully submitte,

/s/ H. Candace Gorman
Counsel for Petitioner

LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman (IL Bar #6184278)
220 S. Halsted
Suite 200
Chicago, IL 60661
Tel: (312) 427-2313

## NOTICE OF MOTION

To:    Olivia Hussey
       U.S. Department of Justice
       Civil Division, Federal Programs Branch
       20 Massachusetts Ave., NW, Room 7144
       Washington, DC  20530


    PLEASE TAKE NOTICE that on the 5th day of November, 2010, I filed with the Court
Security Office a copy of Petitioner's Motion for Extension of time to file Amended Traverse.


                                    /s/ H. Candace Gorman
                                    Counsel for Petitioner



LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman (IL Bar #6184278)
220 S. Halsted
Suite 200
Chicago, IL 60661
Tel:  (312) 427-2313

JA001303

USCA Case #11-5102    Document #1413908    Filed: 06/21/2011    Page 295 of 877

Case 1:10-cv-01020-RJL   Document 1444   Filed 12/06/10   Page 1 of 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ABDAL RAZAK ALI (ISN 685),** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 10-cv-1020 (RCL)** |
| ) | |
| **BARACK H. OBAMA,** ) | |
| **President of the United States,** *et al.,* ) | |
| ) | |
| **Respondents.** ) | |
| ) | |

### RESPONDENTS' NOTICE OF CLASSIFIED FILING

Respondents hereby provide notice of an *ex parte* classified submission, filed on this date

in the above-captioned case.  The filing cannot be described in any greater detail without

disclosing the substance of the *ex parte* information.

Dated: December 6, 2010                     Respectfully submitted,

TONY WEST
Assistant Attorney General

JOSEPH H. HUNT
Branch Director

TERRY M. HENRY
JAMES J. GILLIGAN
Assistant Branch Directors

*/s/ Scott D. Levin*
SCOTT D. LEVIN (D.C. Bar No. 494844)
OLIVIA R. HUSSEY
ANN E. NASH
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Tel: (202) 305-0568
*Attorneys for Respondents*

JA001304

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ABDAL RAZAK ALI (ISN 685), et al., ) | |
| ) | |
| Petitioners, ) | |
| ) | |
| v. ) | Civil Action No. 10-CV-1020 (RJL) |
| ) | |
| BARACK OBAMA, *et al.*, ) | |
| ) | |
| Respondents. ) | |

## RESPONDENTS' NOTICE OF WITHDRAWAL OF RELIANCE
## ON STATEMENTS BY THIRD-PARTY DETAINEE

Respondents hereby provide this notice that, for the reasons explained below, they

withdraw reliance in this case on statements made by a particular detainee witness (the "Third-

Party Detainee"), specifically, Government Exhibits 52, 92, 93, 111, and 112.

On December 6, 2010, Respondents filed an *ex parte* motion (noticed at dkt. no. 1444)

regarding certain information Respondents had reviewed that was arguably discoverable under

paragraph "E. Exculpatory Evidence" of the Court's August 25, 2010 Case Management Order

(dkt. no. 1423). The information in question related to the Third-Party Detainee. For the

national security reasons stated in Respondents' *ex parte* motion, Respondents offered to make

the information available to the Court *ex parte* but moved for an exception to production of the

information to Petitioner's counsel.

On December 14, 15, and 17, 2010, the Court held a merits hearing to determine the

lawfulness of Petitioner's ongoing detention. On December 22, 2010, the Court scheduled the

announcement of its decision and unclassified opinion for December 30, 2010. On December

23, 2010, the Court held an emergency *ex parte* hearing to discuss Respondents' *ex parte* motion.

1

JA001305

At the hearing, the Court indicated that it considered the grounds on which Respondents had based their request for an exception to disclosure to be insufficient, and advised Respondents that they must either (i) withdraw reliance on statements by the Third-Party Detainee, or (ii) appear for an *ex parte* hearing on or about December 28, 2010, at which a representative of the government must explain at greater length why the information relating to the Third-Party Detainee cannot be disclosed without placing national security at risk.

While Respondents do not concede any insufficiency with respect to the grounds set forth in their *ex parte* motion concerning the Third-Party Detainee, Respondents have determined under the circumstances that they will withdraw reliance in this case on statements by the Third-Party Detainee, with reservation of all rights.

Dated: December 27, 2010

Respectfully submitted,

TONY WEST
Assistant Attorney General

JOSEPH H. HUNT
Branch Director

TERRY M. HENRY
JAMES J. GILLIGAN
Assistant Branch Directors

    */s/ Scott D. Levin*
SCOTT D. LEVIN (D.C. BAR #494844)
OLIVIA R. HUSSEY
ANN E. NASH
THOMAS A. GILLICE (D.C. Bar # 452336)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.
Washington, DC 20001
Tel: (202) 305-0568
*Attorneys for the Respondents*

2

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| *ABDAL RAZAK ALI* <br><br>          **Petitioners,** <br><br> **vs.** <br><br> **GEORGE W. BUSH**, *et al*, <br><br>          **Respondents.** | **No. 10-cv- 1020 (RJL)** |

**PETITIONER'S SUPPLEMENT TO MOTION (AND RENEWED MOTION)
FOR ENTRY OF THE WRIT OR,
IN THE ALTERNATIVE A NEW HEARING AND FOR SANCTIONS**

NOW COMES THE PETITIONER, by and through his attorney and hereby

supplements his previously filed Motions for entry of the writ or, in the alternative a

new hearing, (Docket numbers 1447, 1451, and 1459) and asks for additional sanctions

against the government for the following reasons:

It has now come to the attention of counsel for Petitioner that the Government

has not provided exculpatory information regarding Noor Uthman Muhammed (herein

after ISN 707 -whose identification number is in the public Amended Traverse at docket

no. 1437). The exculpatory information withheld and referred to in the present motion

goes to the heart of that detainee's reliability. In particular the one statement relied

upon by the Government at Petitioner's habeas hearing comes from a summary of an

interrogation of ISN 707, six days after he arrived from Bagram. The government relied

extensively during the merits hearing that this one particular document claiming to

summarize an interrogation of ISN 707 in which he ostensibly placed Petitioner in

Afghanistan utilizing the nickname Usamah al Jaza'iri, was reliable. It is now clear that ISN 707 had alleged that he was being subjected to severe and brutal treatment during this exact time period and that the government was aware of his claims at least as far back as June of 2010 (and most likely even earlier). In fact, in a document just made public in February 2011 by the Government, on its department of defense website, conclusively shows that the government was put on notice of these claims prior to June 2010. (Ex. A) In this document ISN 707's defense team asks the military commission for the appointment of a clinical psychologist and explained not only the necessity for the expert but also the history in regards to discussions with the prosecution team regarding ISN 707s allegations and the fact that an affidavit by a psychologist was provided by the defense team earlier in 2010 to the prosecution. (Ex. A, ¶4 and particularly ¶4l for the time period of the abuse.)

At the Petitioner's merits hearing, the Court recognized the critical significance of ISN 707's reliability and credibility. Accordingly, this Court repeatedly asked the attorneys for the government during the merits hearing whether or not ISN 707 had — at any time, ever-- raised any allegations of mistreatment that would undermine his reliability and credibility. The government's attorneys not only stated affirmatively and unequivocally that he had not, but then, incredibly the government took the position that ISN 707 actually *complimented* his treatment in the hands of US forces and was "quite pleased" that he had not been tortured. Although the statement, that ISN 707 not only had no complaints but was delighted with his treatment in US custody, repeated throughout the hearing by the government's Justice Department (DOJ) counsel, seemed

incredible to counsel for Petitioner, no exculpatory evidence was provided to counsel for Petitioner to contradict the government's unabashedly glowing report of ISN 707's treatment.

ISN 707 has now entered a plea in his military commission case in return for the government's agreement that if certain conditions are met he will only serve an additional thirty-four (34) months imprisonment at Guantanamo Bay. Apparently because of the plea deal the military has started to publicly post many of the pleadings from the military commissions at the department of defense website (http://www.defense.gov/news/commissionsNoor.html) and new documents appear to be being made available to the public daily. Based on these newly available documents it is now undeniable that ISN 707 had indeed made substantial allegations related to his treatment, and such allegations include contentions that he was subjected to so-called enhanced interrogation techniques and other forms of coercion *both immediately before and during the time frame* related to the one document that the government has asked this Court to rely on in Petitioner's case as proof of Petitioner being identified as "Usamah al Jaza'iri" and being in Afghanistan.

It is equally clear from a review of the records that the government was fully aware of the allegations of severe mistreatment by ISN 707 during the time period of March 28, 2002 and July 1, 2004 and that the government became aware of these claims well before the merits hearing in Petitioner's case. In addition, counsel's investigation during this past week (after the government's recent public disclosures on its website in ISN 707's case) provides reason to believe that the government had actual knowledge of

3

JA001309

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102    Document #1443998        Filed: 06/11/2013    Page 301 of 877
Case 1:10-cv-01020-RJL   Document 1468   Filed 02/25/11   Page 4 of 8

these allegations by ISN 707 prior to 2010[1].

As mentioned above one of the documents that was made publicly available this month on the department of defense website pertaining to military commissions bears the date of June 18, 2002 and constitutes a motion for the appointment of an expert psychiatrist. (See, Ex. A[2]) That motion- in the government's possession some six months before the merits hearing- notes that the government intended to introduce statements from the period of <u>March 29, 2002 through July 1, 2004</u> (¶4) and that ISN 707 had been subjected to <u>numerous coercive interrogations during that time frame</u>. (¶4) The motion further describes the need for the expert based on the enhanced interrogation methods utilized against ISN 707 as well as the medical history of ISN 707. The motion also provides a description of the history of negotiations between the government and defense counsel regarding the need for an expert and confirms the fact that an affidavit had been previously submitted to the government outlining the concerns of the expert in regards to the treatment and psychological condition of ISN 707 after reviewing his medical records.  (¶5 pages 4-6)

This undeniably exculpatory information should have been provided to counsel for Petitioner long before the merits hearing but has not been provided by the government to this day. Counsel only found this out by reviewing the department of defense website which was updated in February 2011 with these various documents.

---

[1] ISN 707's habeas petition has been on hold while the commission proceedings were ongoing so there was no way for counsel to test the government's claims until these documents were unveiled in February 2011.
[2] http://www.defense.gov/news/AE%2064%20-
%20Defense%20Motion%20for%20Expert%20Consultant%20-%20Psychologist(D023).pdf

4

By failing to provide this exculpatory information, the government has knowingly misled this Court and Petitioner's counsel by its repeated claims that not only had ISN 707 never made any allegations of mistreatment but that he was actually "happy" with the way he had been treated by US forces. The fact that the government misled this Court is further exacerbated by the fact that the statement relied on by the government in Petitioner's trial is dated only six days *after* ISN 707 arrived at Guantanamo from Bagram a time period during which the detainee had raised serious allegations about his abusive treatment and which is exactly within the time period of the statement relied on by the government in Petitioner's case. The Government was fully aware of the accusations of mistreatment and coercive interrogation by ISN 707 but withheld those important accusations from Petitioner's counsel. It is also important to note that present throughout the merit hearing were at least two staff attorneys from the Department of Defense. These attorneys were presumably also privy to ISN 707's abuse allegations, but they nonetheless chose to remain mute in the face of the Court's direct inquiry.

Finally, on February 17th 2011 the defense filed an affidavit by ISN 707 which was supplemented with information obtained by the defense regarding the treatment of ISN 707 while at Bagram and at Guantanamo. (http://www.defense.gov/news/DE%20N%20Unsworn%20Statement%20-%20Noor.pdf). The affidavit was placed on the department of defense website on February 22, 2011 which counsel discovered in the course of her ongoing investigation and again, not from the government. The affidavit is attached hereto as Ex. B. It must be

5

JA001311

noted that the timing of the allegedly coercive mistreatment that ISN 707 complains of in his affidavit as occurring both at Bagram and later at Guantanamo was contemporaneous with the statement relied by the government at the merits hearing. The supposedly damning statement equating Petitioner with the name of Usamah al Jaza'iri and placing him in Afghanistan was made only six days after ISN 707 arrived at Guantanamo from Bagram, a time period in which ISN 707 claims he was being severely coerced and abused. Although, of course, the affidavit from ISN 707 was not available until this month it is clear from the Department of Defense website (and as shown above) that multiple documents and at least one affidavit by an expert for the defense were provided to the government more than one year ago that also raised the specific issue of ISN 707's alleged abusive treatment during the crucial time period of the document the government has asked this Court to rely on. Needless to say, this critical exculpatory information was never provided to counsel by the government.

Because this Court has not yet entered its classified opinion, nor has this Court yet ruled on the previously filed Motions to either enter the Writ or grant Petitioner a new hearing and for Sanctions, Petitioner for the reasons raised in those motion papers and herein, respectfully asks this Court to either enter the Writ or in the alternative to grant him a new hearing free from the multiple occurrences of misconduct that have plagued (and clearly continue to plague) these proceedings and further, to sanction the government for its contumacious conduct and vexatious multiplication of litigation pursuant to 28 USC Section 1927.

JA001312

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102    Document #1443998        Filed: 06/11/2013    Page 304 of 877
Case 1:10-cv-01020-RJL   Document 1468    Filed 02/25/11   Page 7 of 8

Respectfully Submitted,


/s/ H. Candace Gorman
Counsel for Petitioner


LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman (IL Bar #6184278)
220 S. Halsted
Suite 200
Chicago, IL 60661
Tel: (312) 427-2313

JA001313

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102    Document #1443998    Filed: 06/11/2013    Page 305 of 877
Case 1:10-cv-01020-RJL    Document 1468    Filed 02/25/11    Page 8 of 8

## NOTICE OF FILING

To:   Olivia Hussey
      U.S. Department of Justice
      Civil Division, Federal Programs Branch
      20 Massachusetts Ave., NW, Room 7144
      Washington, DC  20530

PLEASE TAKE NOTICE that on February 25, 2011, I filed with the Court
Petitioner's Supplement to Motion for Entry of the Writ or, in the Alternative a New
Hearing and for Sanctions.

/s/ H. Candace Gorman
Counsel for Petitioner

LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman (IL Bar #6184278)
220 S. Halsted
Suite 200
Chicago, IL 60661
Tel:  (312) 427-2313

USCA Case #11-5102    Document #1443998    Filed: 06/11/2013    Page 306 of 877

# EXHIBIT A

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102    Document #1443998    Filed: 06/11/2013    Page 307 of 877
Case 1:10-cv-01020-RJL    Document 1468-1    Filed 02/25/11    Page 2 of 8

D-_____

UNITED STATES OF AMERICA

v.

NOOR UTHMAN MUHAMMED

**Defense Motion**
**For Appointment of Expert Consultant**
**(Clinical Psychologist)**

18 June 2010

1.    **Timeliness:**  The Convening Authority denied the Defense request for expert assistance on 15 June 2010.  The Defense submits this motion as soon as practicable thereafter.

2.    **Relief Sought:**  The Defense respectfully requests that this Commission order the appointment of Dr ███████████ to the defense team as an expert consultant and order that he be authorized to perform up to at least 200 hours of services for the Defense.

3.    **Burdens of Proof & Persuasion:**  The Defense bears the burden of establishing that it is entitled to the requested relief, R.M.C. 905(c)(2)(A), and bears the burden of demonstrating the necessity for the expert assistance he requests. *United States v. Allen*, 31 M.J. 572 (1990), citing *United States v. Mustafa*, 22 M.J. 165, 167 (C.M.A. 1886); *United States v. Mann*, 30 M.J. 639 (NMCMR 1990); *United States v. True*, 28 M.J. 1057 (NMCMR 1989); *United States v. Tornowski*, 29 M.J. 578 (AFCMR 1989); *United States v. Kinsler*, 24 M.J. 855 (ACMR 1987); *See Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).  The Defense must show that the expert services requested would be of assistance and that denial of that assistance would result in a fundamentally unfair trial. *Id.* citing *Mann*, 30 M.J. at 641; *United States v. Van Horn*, 26 M.J. 434 (C.M.A. 1988).

JA001316

US V. NOOR UTHMAN MUHAMMED
APPELLATE EXHIBIT 64
Page 1 of 56

4.    **Facts**:

a.       Noor has been in the custody of the United States since March 2002.  During his detention in Pakistan, Bagram and Guantanamo he has been subjected to numerous coercive interrogations.  The exact number of interrogations is unknown to the Defense.  The interrogation records, especially from Pakistan and Bagram, are woefully deficient.

b.       Noor has spent significant time in Camps 5 and 6, under conditions equivalent to solitary confinement.

c.       Noor's medical records demonstrate a failure of JTF-GTMO to treat his chronic medical problems.  JTF refused counsel's requests to speak with Noor's medical providers about his chronic pain and treatment.[1]  Consistent with JTF policy, the Government has redacted Noor's medical records to conceal the identity of the providers and has steadfastly refused the Defense requests for access to these individuals.

d.       Noor's cultural, linguistic, and religious background are relevant.  Noor was born in an underdeveloped and economically depressed area of Sudan.  (Attachment 1)

e.       On 4 March 2010 the Defense submitted an ex parte request to the Convening Authority (CA) for the appointment of Dr. ▇▇▇▇▇▇▇  The CA replied on 2 April 2010 indicating he would not consider ex parte expert requests.  (Attachment 2)

f.       On 29 April 2010, the Defense submitted a second request to the CA and to the Government.  (Attachment 3)

JA001317

---

[1] This refusal was subject to a Motion to Compel which was subsequently withdrawn by the Defense.

US V. NOOR UTHMAN MUHAMMED
APPELLATE EXHIBIT 64

USCA Case #11-5102    Document #1443988    Filed: 08/12/2013    Page 309 of 877

g.     On 7 May 2010, the Government submitted a response to the Defense request.
The Government recommended an alternative psychologist, Dr. ████████, from the Walter
Reed Forensic Psychiatry department.  (Attachment 4)

h.     Upon receiving notice of Dr. ████, the Defense conducted a telephonic interview
with him to determine his qualifications.  Based on this interview, on 14 May 2010, the Defense
submitted a supplement to the request for expert assistance explaining that Dr. ████ was not an
adequate substitute for Dr. ████████   (Attachment 5)

i.     After receiving the Defense supplement, the Government attempted to locate
another substitute but was unable to find a qualified expert who could satisfy the time
requirements involved in this case.

j.     Dr. ██████ is uniquely qualified and the Defense has been unable to locate
another expert with similar qualifications.  (Attachment 6)

k.     Dr. ██████ has conducted an initial review of Noor's medical records and has
provided a declaration indicating his findings and recommendations.  (Attachment 1)

l.     The Government has provided the Defense a list of 17 statements made by Noor
that it intends to introduce in its case-in-chief.  The dates of the statements range from 29 March
2002 to 1 July 2004.  The Government has also indicated to the Defense that it will submit some
of these statements in the upcoming jurisdiction hearing currently scheduled for September
2010.

JA001318

2

UNCLASSIFIED//FOR PUBLIC RELEASE

5.   **Law and Argument:**

Noor "is entitled to an expert's assistance before trial to aid in the preparation of his defense upon a demonstration of necessity." *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F 2005). The Defense "must show that a reasonable probability exists 'both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *Id.* A three-part test is applied to determine if expert assistance is necessary. The defense must show: (1) why the expert assistance is needed; (2) what the expert assistance would accomplish; and (3) why the defense counsel and staff are unable to gather and present the evidence the expert assistant would be able to develop. *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994), *cert. denied*, 513 U.S. 965 (1994).

The facts in support of the three-part test are exhaustively presented in attachments 2 and 4. As the Commission is well aware, there are "inherent dangers in having to reveal strategic information in order to obtain" expert assistance.[2] However, if the Commission feels additional justification is necessary, the Defense respectfully requests an in camera review of the ex parte submission provided to the CA and/or an ex parte hearing for the Defense to present additional relevant matters to the commission. An ex parte hearing may be necessary in unique cases.[3] This is a unique case – unlike any presented in the American justice system. Noor has been held in confinement for over eight years before his trial. He has been subjected to various forms of

---

[2] Lieutenant Colonel Stephen R. Henley, *Developments in Evidence III—The Final Chapter*, ARMY LAW, May 1998 at n154.

[3] *See United States v. Kaspers, 47 M.J. 176 (1997). See also United States v. Ruppel, 45 M.J. 578 (A.F. Ct. Crim. App. 1997)* (holding that there is no right to an ex parte hearing). *But see United States v. Garries, 22 M.J. 280, 291 (C.M.A. 1986)* (indicating that the defense may be entitled to an ex parte hearing to demonstrate its need for an expert in "unusual" circumstances, though the court does not define what qualifies as "unusual").

JA001319

USCA Case #11-5102    Document #1443998    Filed: 06/01/2013    Page: 311 of 877

coercive interrogation over the course of several years.  His conditions of confinement have frequently been tantamount to solitary confinement and included other forms of inhumane and abusive treatment.

The Government has indicated they will use approximately 17 statements made by Noor during the jurisdiction hearing and case in chief.  Dr. ███████'s assistance is critical to assist the Defense prepare for those hearings and any related motions to suppress the statements.  Noor was subjected to numerous interrogations and various methods of interrogation.  Enhanced interrogation methods and maltreatment prevalent during Noor's eight years of detention have a wide range of physical, psychological, emotional, and cognitive consequences.  The Defense must be allowed to determine the mental impact of interrogations and methods in order to make arguments regarding the admissibility of statements.  Also relevant to admissibility of statements is the mental impact of the conditions of confinement.

The Defense must prepare a case in mitigation for sentencing.  Dr. ███████'s assistance is important for this preparation.  Dr. ███████ is capable of determining Noor's psychological condition prior to committing the offenses alleged by the Government.  Dr. ███████ will also determine the impact of years of interrogation and detention and its relationship to Noor's history of chronic pain.  Dr. ███████ is an expert in the area of chronic pain and eminently qualified to explain the connections between Noor's detention, chronic pain, and psychological condition. Indeed, Dr. ███████ believes from his preliminary review of the medical records that Noor may be suffering from undiagnosed and untreated ███████████████ and/or ███████.

An accused has, as a matter of Equal Protection and Due Process, a right to expert assistance when necessary to present an adequate defense.  *See United States v. Robinson* 39 M.J. 88 (C.M.A. 1994); *Ake v. Oklahoma*, 470 U.S. 68 (1985); *United States v. Garries*, 22 M.J.

JA001320

288 (C.M.A.), *cert. denied*, 479 U.S. 985 (1986). Failure to employ Dr. ▮▮▮ would effectively deprive Noor of his ability to present an adequate defense in this case and would deny him "[m]eaningful access to justice." *Ake*, 470 U.S. at 77.

The Government, as a matter of routine, summarily stated in the response dated 7 May 2010 that the Defense had not demonstrated necessity. However, realizing this case most likely warranted an expert, located and offered the Defense a proposed adequate substitute. When the Defense explained that this substitute was inadequate, the Government searched for yet another substitute. When the Government could locate a suitable candidate, it changed course and concluded that the Defense was not entitled to expert assistance based on the justification advanced by the Defense. The Convening Authority's conclusion is undermined by the detailed information provided by the Defense which meets the required necessity threshold. The Convening Authority claims that the Defense has not pointed to any specific portion of the medical records to support its position that expert assistance is necessary. Prior to seeking expert appointment, the Defense requested that Dr. ▮▮▮ review the unclassified medical records and provide the Defense with a preliminary opinion. The Defense outlined Dr. ▮▮▮ s concerns in a detailed affidavit. It is difficult to imagine a more detailed justification for the provision of expert assistance. The Convening Authority's denial of the Defense request was an arbitrary decision driven by the failure to locate an adequate Government substitute rather than an assessment of the necessity for expert assistance.

6.   **Oral Argument:**  The Defense requests oral argument at the next 803 session.

7.   **Witnesses & Evidence:**  The Defense relies on the attached documents as evidence in support of this motion. The defense will call the following witness:

JA001321

1. Dr. ▮▮▮

8.    **Conference:** The Defense has conferred with the Prosecution regarding the requested

relief. The Prosecution has been unable to locate an acceptable substitute.

9.    **Request for Public Release:** The Defense requests permission to release the

government's response to this motion and the court's ruling as soon as possible.

Respectfully submitted,


BY:    _____//s//_____    _____

      Katharine Doxakis    Amy Fitzgibbons
      CDR, JAGC, USN

      Christopher Kannady    Howard Ross Cabot
      Capt, USMC    *Perkins Coie Brown & Bain*
      Office of Military Commissions    ███████████████████
      1600 Defense Pentagon    Phoenix, AZ ███
      Washington DC 20301

      Detailed Defense Counsel for    Civilian Pro Bono Counsel for
      *Noor Uthman Muhammed*    *Noor Uthman Muhammed*

10.    **Attachments:**

1. Declaration of Dr. ████████ dated 4 March 2010
2. CA Memorandum dated 2 April 2010
3. Request for Expert Consultant dated 29 April 2010
4. Government Response to Defense Request dated 7 May 2010
5. Supplemental Request dated 14 May 2010
6. CV of Dr. ████████

# EXHIBIT B

JA001323

USCA Case #11-5102     Document #1443998          Filed: 06/13/2013      Page 315 of 877

**MILITARY COMMISSIONS TRIAL JUDICIARY
GUANTANAMO BAY**

| | |
|---|---|
| UNITED STATES OF AMERICA | **STATEMENT OF** |
| v. | **NOOR UTHMAN MUHAMMED** |
| NOOR UTHMAN MUHAMMED | **February 17, 2011** |

1.      My names is Noor Uthman Muhammed. I am from Sudan. I was born in Kasala, Sudan which is on the Sudanese border with Eriteria. My family depended on its ability to raise animals and farm to survive. It was a very difficult life. In Sudanese culture, birthdays are not something that are important. I believe that I was born around 1967 but I've never marked that occasion. Living near the border was dangerous and there was often conflict between different tribes. I was taught that my family is a tribe, Mikal, within a group called the Beni Amir. We speak our own type of language, which is separate from Arabic. Life then was a daily struggle just to eat and stay safe. I don't have a strong memory of my parents because they died when I was very young. In Sudan, the tribe is your family and they took me in. We moved to Port Sudan, which was a big city compared to Kasala. I have a brother, Muhammed, who is about five years older than me. My parents' siblings also helped to raise me. I was permitted to go to school for a short time so I never learned anything beyond the basics-some math and some letters. The Quran and teachings of the Prophet Muhammed were also a part of my education from a very early age. I had to leave school in order to earn some kind of living so that I could eat. My extended family had their own children to take care of and I felt that I needed to be able to feed and clothe myself after I lost my parents. Although there should have been more opportunities in Port Sudan; there were not for a child or young man. I tried to sell things that I found or traded for in the market. I tried to do odd jobs for people like carpentry. I never had a place of my own to live; it's not like in the West-even if it is difficult you stay close to your family. I spent many years moving from house to house and sleeping on the floors in whatever house had the space for me. My brother Muhammed and my neice Awadia still live in Port Sudan. Awadia was a very young child when I left. Some of my parents' brothers and sisters are also still living in the Port Sudan area. It is painful for me to think of them there in Port Sudan. I never wanted them to worry about me or to cause them any pain.

2.      As I was growing up, I spent more time in the markets near the Port. Port Sudan is a stopping point for people on their way to Mecca and Medina. I was drawn to learn more about my faith as a Muslim. Looking back, our tribe and my family were not very strict in their practice of Islam. We had little time to think about Islam; we needed to think about food. While I was in the markets, I heard people talking about the pilgrimage to Mecca and also about Islam more generally. There were religious leaders who encouraged young men like me to learn about Islam. They had cassette tapes that they would give away. My reading was not good so I would listen to these tapes to try to expand my understanding of Islam. I began listening to these tapes

USCA Case #11-5162    Document #1443998    Filed: 06/11/2013    Page 316 of 877

in the late 1980s. The tapes explained the duties of being a Muslim; one of those duties was to be prepared to defend Islam. I also watched video tapes that helped explain Islam and some of the struggles that were going on outside Sudan. I learned that the Soviet Union was in Afghanistan fighting Muslims there. I also learned that there were many other places in the world where Muslims were faced with war. The videos and pictures showed horrible things; things that would keep me awake at night. I came to believe that the solution for stopping the murder of innocent Muslims was to train myself to help Muslims defend themselves either in their countries or in Sudan. To me, defending my religion does not mean I have to perform terrorist attacks against other people. I had heard that Afghanistan was a place for Muslims to go learn about defending our religion. So, in an effort to prepare myself and to escape my situation in Port Sudan, I accepted a loan to fund my travel to Afghanistan. There were many young men like me who left Sudan to try to learn more about Islam and to help Muslims in places where they were under attack. When I left, I could not read or write well. I did not speak English or any language outside of Arabic and my tribal dialect. I had never received any kind of military training before leaving Sudan.

3.      In 1994, I arrived at the Khaldan camp in Afghanistan so that I could receive training to prepare myself. At the time, I believed that I needed to be prepared to defend my faith and only planned to use this training if it became necessary. Khaldan was about the size of one-and-a-half soccer fields. It did not have a paid staff. The camp provided basic military training. The military training was very basic training and mostly dealt with small arms. I saw hundreds of people pass through the camp. Most trainees at the camp did not stay for more than a few months. Some flew in from the Gulf Countries for shorter stays like a week at a time; so that they could say that they had been to Afghanistan and fired a weapon. Some people got more advanced training at other camps and Khaldan didn't have the money or the experts to provide more advanced training.

4.      While at Khaldan, I participated in basic arms training. After my training, I stayed on at the camp and became one of the weapons trainers. There was no special selection process for trainers; if you could stay, you were asked to help by providing training. I decided to stop training people on weapons and requested that the emir, Ibn Sheikh Al-Libi give me different duties. My main responsibilities were to gather food, water, and supplies for the camp. Sometimes, I also was asked to run the camp when the camp leader was gone. The Camp belonged to Ibn Sheikh and he made the decisions about what would happen there. He fought with the mujahedeen in Afghanistan and was well-respected as a soldier. Ibn Sheikh had a council of trainers and others who could be consulted on issues related to the Camp. Although Ibn Sheikh consulted the council, he made the final decisions and did not have to follow the council's advice.

5.      In 1999, the camp moved, and in 2000, the camp closed. I did not go to any other camps after Khaldan closed. I learned that the Camp closed because Ibn Sheikh Al-Libi did not agree with the philosophies of the Taliban or Al Qaeda. Khaldan was really all I knew, so my goal was to get home to see my family that I had not seen for many years. In 2001 after the invasion of Afghanistan, it was not safe to remain. I did not have a passport, since it had been taken from me when I first traveled into Afghanistan. I had no way out, so I joined with others to cross the border into Pakistan so that I could try to make my way back to Sudan. I was told that people in

JA001325

Pakistan, including Abu Zubaydah, could assist me with the travel documents necessary to get back to Sudan. Returning to Sudan was my main goal.

6.      In March, 2002, I was in a house near Faisalabad, Pakistan. The house was two stories, and several rooms were able to be closed off from the rest of the house. I did not participate in any training at the safe house, other than to learn some basic English to pass the time. The house was raided during the night. I was brought to a Pakistani jail with many other men that had been picked up. I did not know what the Pakistanis intended to do with us. They held us in big cages and told us that anything could happen to us. You would treat animals better than the way that we were treated. We had very little food that you could eat. There were times that we asked the guards if they could bring us plants that we saw growing in the ground to help with the hunger. I was scared that I would just disappear. Every time that we were moved we were threatened. Growing up in Sudan, I knew and heard stories of the security services picking up people off the streets for questioning. Questioning could last for days and those families feared that they would never see their relatives again. Port Sudan is not far from Egypt and the Egyptians were notorious for snatching people off the streets, holding them and torturing them for information. Every time I moved, I feared that it was going to be the last time. There were at least three moves within Pakistan. Then I was released to the Americans. Both the Pakistanis and the Americans told me that they could hand me over to the Egyptians and no one would know that I had disappeared. The fear and uncertainty this caused me was overwhelming.

7.      In May 2002, I was transferred from Pakistan to Bagram Air Base, Afghanistan. We didn't know where we were being taken and I feared that it would be worse than Pakistan. During the movement to Bagram, I was hooded, shackled and chained to a group of other detainees. Upon our arrival, we were all thrown, kicked and handled roughly. At Bagram, I was interrogated daily; some days there were multiple interrogations. I was chained to my cell with my hands above my head for 12 hours per day; several days in a row. When I was chained to my cell in this way, the guards would also put a bag over my head. Some guards would show a little mercy by unchaining me and allowing me a short break to move my arms. This happened regularly. There were also times that I was shackled to the floor by both the arms and legs while I was on my knees for several hours at a time in a painful position. There were times that my cell was freezing cold and my clothes were taken away, while other times the heat in the cell was unbearable. There were periods of time when loud music was played 24 hours a day; so loud that you couldn't even think. There were several times that women were used to interrogate me or acted as guards. I found being in their presence very disturbing because in my faith such close contact with a woman is reserved for a husband and wife out of respect. Oftentimes, the female interrogators would wear clothing that you could see through or other clothing that was revealing and disrespectful. These women would come really close to me and attempt to touch me. As hard as this was, I was never humiliated more than when my clothes were taken away from me in the presence of female guards or interrogators. There were also times that female guards struck me when I had difficulty looking them in the eyes because I felt uncomfortable with them. There were many nights that we were woken up by the guards. They would yell at us to "get up" and "get against the wall." They would search us and tell us that we were getting ready to ship us off to Egypt. Other detainees would leave like this in the middle of the night and we were told by the translators that they had been taken away to Egypt. I was worried and I couldn't sleep. I kept thinking that tomorrow they are going to take me there and I was scared because I knew that their security police could make people disappear. I felt like these people at Bagram did not

JA001326

consider me to be a human being and I had no dignity in their eyes. In Bagram, I lost all hope that I would ever have a chance to see my family again.

8.      I was transferred from Bagram to Guantanamo Bay, Cuba on August 5, 2002. I was again hooded, shackled and chained to a group of other detainees when I was transferred to Guantanamo. The flight to Guantanamo was significantly longer than the earlier flight I had taken from Pakistan to Afghanistan. On the flight, we were shackled together and stacked side by side. We were unable to move or to use the bathroom. Again when we landed, we were thrown and kicked. During this transfer, I was hit in the back of the head with a rifle; busting my two front my teeth. The worst time that I spent in Guantanamo Bay was while I was locked in Camp 5. I was there for two years in a cell by myself. I thought that I would lose my mind. I was interrogated almost daily when I first arrived at Guantanamo Bay. Some of the interrogators and guards, especially at the beginning of stay, would do everything that they could to humiliate detainees. Like at Bagram, the temperature in my cell was made very hot or very cold for long periods of time. There was a very dark interrogation room at Guantanamo Bay that the detainees called "hell." We were threatened or forced to spend extended periods of time in this room as punishment. While sitting in the dark, extremely loud music was played or you just hear people screaming. You could spend several hours in this room. The interrogators also constantly threatened to send detainees to "Romeo" which was a very small room with no blanket or mattress; your clothing down to your underwear would also be taken from you and you could be kept there for days. There were also many days and nights that I didn't sleep at all. A guard would watch us in our cell and yell or rattle the bars to keep us awake. I was also locked up in Camp 6, where again I was locked in a cell by myself. I was moved from Camp 6 to Camp 4 in 2008. Although I was still locked up, my life was much better in Camp 4; where we could spend more time outside and I lived with a group of other men.

9.      Since being locked up, my health has not been good. I have experienced pain and pressure in my eye and bleeding in my teeth. I have suffered from tingling sensations in my arms and legs. At night when I am trying to sleep, my muscles will move on their own and keep me from sleeping. There is something wrong with stomach and it often appears much bigger than it is and causes me pain. For periods of time, I was experiencing extreme pain in my back that made standing unbearable. At times, I have had very little energy. Sometimes, I asked for medical attention but I was also scared that the guards would trick me into taking medicine that would cause me to no longer know where I was or lose my mind.

10.     I have already spent almost nine years in confinement under the conditions I have mentioned here as well as subject to many other awful conditions your own Government and outside investigations have confirmed. These conditions are detailed in the attached document provided by my counsel.

11.     I have never been a member of the Taliban or al Qaeda. I understand that I have pled guilty to Material Support for Terrorism and Conspiracy to Commit Material Support, but I have never planned or participated in any terrorist attack. I hope to get home in the near future to see my family again before my time on this earth ends. I have done my best to be a compliant prisoner even in the face of the conditions that I have endured. I ask that you give me the opportunity to get home as soon as possible so that I can live out the rest of my days peacefully.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED/FOR PUBLIC RELEASE

## Attachment J (Modified)

### Summary of Open Source Materials

*AFGHANISTAN*

a.      Noor was captured 28 March 2002 in Pakistan.  He was transferred to Bagram Collection Point ("BCP").  By August of 2002, Noor had been transferred to Guantanamo Bay Naval Station, Cuba (GTMO or Guantanamo).

b.      From June 2002 to April 2004 the U.S. formation that directed all Enduring Freedom operations in Afghanistan was designated Combined Joint Task Force-180 (CJTF-180), a corps-level headquarters. Prior to the arrival of CJTF-180 at Bagram, there was very little guidance on detainee operations or policy through technical channels.[1]

*Detention operations in Afghanistan*

c.      Generally concurrent with Noor's detention by U.S. forces in Afghanistan, the 211th Military Police Company (211th MP Co) was assigned to detention operations at Kandahar (approximately February 2002 to July 2002) and Bagram (approximately July 2002 to September 2002). In August/September 2002, the 211th MP Co was relieved in place by the 377th Military Police Company (377th MP Co). Prior to deployment to relive the 211th, the commander of 377th obtained copies of the standard operating procedures (SOP) for the 211th, rewrote portions of the SOP, and distributed copies of this revised SOP to members of 377th while they were still mobilized at Ft Dix.[2] Once members of the 377th MP Co arrived at Bagram, members of the 211st MP Co spent approximately two weeks training members of the 377th MP Co on local practices for detention operations.

d.      During one week in December 2002, two detainees died in U.S. custody at the BCP as the result of abusive detention and interrogation practices.

The patterns of detainee abuse in the two incidents share some similarities. In both cases, for example, the [detainees] were handcuffed to fixed objects to above their heads in order to keep them awake. Additionally, interrogations in both incidents involved the use of physical violence, including kicking, beating and the use of "compliance blows" which involved striking the PUCs legs with the MP's knee. In both cases, blunt force trauma to the legs was implicated in the deaths.[3]

e.      Following the detainee deaths, the U.S. Army Criminal Investigation Command (CID) conducted a homicide investigation. The record of this investigation includes approximately 200 interviews with military police, intelligence personnel, interpreters, detainees, camp overhead

---

[1] *See CLAMO Legal Lessons Learned (2004)*, at 53.
[2] *See CID Report Habibullah and Dilawar (Oct 2004)*, at 449 (Exhibit 120). The 377th Commander apparently rewrote the SOP again while at Bagram.
[3] *Church Report (2005)*, at 235.

JA001328

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED/FOR PUBLIC RELEASE

personnel, and others. The record includes copies of classified SOPs and descriptions of recordkeeping practices. Investigators looked for the "source" of abusive detention practices conducted by members of the 377th MP Co, and questioned which practices originated with the 211th MP Co, the unit with whom Noor interacted at Bagram. The final report addressed practices and leadership problems that directly led to the deaths.[4]

f.      Following the detainee deaths, "LTG McNeill ordered a broad AR 15-6 investigation into conditions at the BCP. In February 2003, after reviewing the results of the investigation, LTG McNeill prohibited several interrogation techniques implicated in the detainees' deaths...."[5] The AR 15-6 charter specifically required the investigator to leave the investigation of the deaths to CID, but to investigate "tactics, techniques, and procedures (TTPs) as well as standard practices, which were dangerous, contrary to legal standard, or ill-advised."[6]

g.      Bagram guards and other US personnel have made sworn statements that they conducted, witnessed, or heard about the following activities:

- Use of pressure point control tactics to inflict pain on complaint detainees;[7]
- Use of loud music to disorient detainees;[8]
- Routine hooding and shackling of detainees;[9]
- Use of "compliance blows" on restrained detainees;
- Rough physical handling and medical exams during detainee in-processing;
- Hooding detainees during movement, transportation, and interrogations;
- Use of extended isolation;
- Corporal punishment for non-compliant detainees;
- Shackling for punishment;
- Throwing a detainee wearing three sets of shackles against wall; guard threw detainee around "like a rag doll" because he "felt like it" and that was "why he was there";[10]
- Ensuring escapee from group cell was "fucked up;"[11]
- Shoving detainees into wall during movements;[12]
- Compelling detainees to perform meaningless physical tasks, like constantly cleaning;[13]
- Forcing detainee to pick bottle caps out of human waste;[14] possibly on direction of military intelligence personnel;[15]
- Forcing detainee to hold stress positions;[16]

---

[4] *See Church Report (2005)*, at 236.
[5] *Church Report (2005)*, at 235. An "AR 15-6" is an administrative investigation ordered under Army Regulation 15-6, *Procedures for Investigating Officers and Boards of Officers. See generally AR 15-6 (1996)*.
[6] *CID Report Habibullah and Dilawar (Oct 2004)*, at 1206 (Exhibit 308).
[7] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 582 (Exhibit 148)..
[8] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 1421 *et seq* (Exhibit 344) (CID interview with former interrogator 519th MI, describing loud music used during initial detainee screening).
[9] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 487 (Exhibit 128).
[10] *Id.* at 751-752 (Exhibit 190).
[11] *Id.* at 751 (Exhibit 190).
[12] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 753 (Exhibit 190).
[13] *See, e.g., id.* at 815 (Exhibit 205).
[14] *See, e.g., id.* at 815 (Exhibit 205).
[15] *See id.* at 824 (Exhibit 207).

- Beating mentally handicapped Afghan detainee because he screeched like character on cartoon "South Park;"[17]
- Picking up detainee by the neck;[18]
- Having growling dogs walk on bound, hooded detainees "as a big joke";[19]
- Threatening detainee with a dildo;[20]
- Squeezing detainee's shoulders while escorting, striking detainee in groin area;[21]
- Sidekicking detainee;[22]
- Repeatedly punching shackled detainee in the chest;[23]
- Isolation guard lets members of 377th 3d platoon into detainee's cell so they can take turns striking him to hear him cry out, "Allah!";[24] detainee later dies.

h.    In 2002, Bagram guards believed they were authorized to, and did as a matter of practice, deliver strikes and blows to detainees who were restrained. Guards sometimes struck detainees to neutralize an immediate security threat, but also beat detainees as "punishment" for non-compliance. "Compliance blows" used on restrained detainees included the "common peroneal strike", an extremely painful blow from the guard's knee to the common peroneal nerve along the detainee's upper femur. Non-compliance ranged from actively fighting or resisting guards, to talking, refusing to stand or sit, touching concertina wire, or generally disregarding any instructions given by a guard, whether the detainee understood the instruction or not. Some guards apparently struck restrained detainees as a form of amusement or revenge.[25] Two detainees at Bagram died in December 2002 from complications arising from repeated common peroneal strikes; medical personnel later testified victims' legs were "pulpified," similar to injuries from being run over by a bus, and would have required amputation.

i.    In 2002, Bagram guards used forced standing to punish detainees for non-compliance. Detainees were also forced to stand for extended periods of time in order to enforce sleep deprivation at the request of military intelligence personnel ("MI personnel"). Guards forced detainees to remain standing by restraining them to fixed surfaces. For example, a guard could bring a detainee into the entry section of the general detention area ("airlock") to stand: "If they refused to stand in the airlock, then they could be handcuffed to the airlock in a manner to keep them from sitting down."[26] Policy and practice regarding whether guards could shackle a

---

[16] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 832-33 (Exhibit 209) (specific incident involving "roman chair" stress position led to guidance prohibiting its use).
[17] *Id.* at 842 (Exhibit 211).
[18] *Id.* at 890 (Exhibit 221).
[19] *Id.* at 886 (Exhibit 220).
[20] *CID Report Habibullah and Dilawar (Oct 2004)*, at 898 (Exhibit 226).
[21] *Id.* at 899 (Exhibit 226).
[22] *Id.* at 913 (Exhibit 229).
[23] *Id.* at 1240 (Exhibit 311).
[24] *See, e.g.,CID Report Habibullah and Dilawar (Oct 2004)*, at 1349-1350 (Exhibit 324).
[25] *See, e.g., id.,* at 842 (Exhibit 211) (describing beating of mentally handicapped Afghan detainee who screeched like character on cartoon "South Park"); *id.,* at 1349-1350 (Exhibit 324) (describing isolation guard letting MPs into detainee's cell so they could take turns striking him to hear him cry out, "Allah!"; detainee later died).
[26] *CID Report Habibullah and Dilawar (Oct 2004)*, at 1256 (Exhibit 312).

USCA Case #13-5102     Document #1443998     Filed: 06/11/2013     Page 323 of 877

UNCLASSIFIED/FOR PUBLIC RELEASE

detainee's hands over his head versus eye or waist level varied and was sometimes inconsistent.[27]

j.　　Guards routinely hooded and shackled detainees for first days of their detention.[28] Guards also routinely hooded or goggled detainees during movements, for force protection, and to deny detainees knowledge of the detention facility.[29]

*Intelligence operations in Afghanistan*

k.　　The 202nd Military Intelligence Battalion (202nd MI Bn) of the 513th Military Intelligence Brigade established interrogation operations in Afghanistan. The 202nd MI Bn reportedly produced nearly fifteen hundred Intelligence Information Reports (IIRs) in just over seven months, in a reports database that was called "superb" by CJTF-180's first director of counter-intelligence (CI) and human intelligence (HUMINT).[30]

l.　　Generally concurrent with Noor's detention by U.S. forces at BCP, the 202nd MI Bn staffed the interrogation cell at Bagram that was responsible for conducting detainee interrogations. Two military intelligence personnel from the 519th Military Intelligence Battalion (519th MI Bn) were assigned to augment the 202nd MI Bn. In August/September of 2002, the 202nd MI Bn was replaced by the 519th MI Bn, and the two augmentees stayed on to train their unit on local practices developed by the 202nd MI Bn.

m.　　At Bagram, intelligence personnel who were part of the Joint Interrogation Facility (JIF) at BCP conducted initial screening and interrogation, while personnel assign to the Joint Interrogation and Debriefing Center (JIDC) conducted follow-on exploitation.[31] JIF and JIDC personnel at Bagram conducted their own detainee interrogations.[32] Personnel from the Defense Intelligence Agency (DIA) set up the JIDC at Bagram around late June /early July 2002,[33] and presumably maintained separate records and routinely communicated with other, off-site elements of DIA and other members of the intelligence community.

n.　　The government has not certified which agencies interrogated, took custody of, or interviewed Noor at Bagram.

o.　　Numerous other intelligence agencies interrogated detainees at Bagram. "[A] host of national level intelligence agencies participate in the interrogation process utilizing a wide array

---

[27] *See, e.g., id.,* at 1255 (Exhibit 312) (interview with SJA who said he told MPs do not shackle detainees' arms overhead, yet detainees' arms were shackled overhead).

[28] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004),* at 487 (Exhibit 128).

[29] *See CJTF-180 Interrogation Techniques (24 January 2003),* at 3, 7.

[30] Ron Stallings, Michael Foley, *CI and HUMINT operations in support of OEF* (Oct-Dec, 2003) *available at* http://www.militaryphotos.net/forums/showthread.php?28026-CI-and-HUMINT-operations-in-support-of-OEF.

[31] *See generally DAIG Report (21 July 2004),* at 32 (Interrogation facilities in OEF identified themselves as JIFs and JIDCs, and their organization and command relationships were structured accordingly); *AFM 3-31 (2001),* at A-11 (describing roles of JIF and JIDC).

[32] *See, e.g., id.,* at 1212 (Exhibit 309) (CID interview with former CJTF-180 J-2X).

[33] *See CID Report Habibullah and Dilawar (Oct 2004),* at 1212 (Exhibit 309).　　　JA001331

of tactics, techniques and procedures."[34] In addition to conventional military forces, Other Than Conventional (OTC) military forces and other government intelligence agencies (OGA), conducted detainee operations and/or interrogations in Afghanistan. Military Special Mission Units (SMUs) serving in Afghanistan conducted their own interrogations under separate guidance,[35] and passed detainees to conventional forces. At one point, SMU Afghanistan requested a dedicated interrogation facility co-located at Bagram Collection Point.[36] OGA interrogated detainees held by military forces, and conducted detention operations.[37]

p.    Members of OTC military forces and OGAs would "show up" and demand access to detainees in military custody at BCP.[38] JTF-180 subsequently established coordination practices, and, in order to ensure outside agencies did not physically abuse detainees, a rule that no outside organization could conduct an interview/interrogation of a detainee without a JTF-180 interrogator present.[39]

q.    OTC military forces and OGAs presumably maintained separate records and routinely communicated with other, off-site elements of the intelligence community. The government has neither provided such records to the defense, nor certified OTC military forces and OGAs, did not interrogate, take custody of, or interview Noor at any point in US or foreign custody.

r.    In late 2002, CJTF-180 ordered an administrative investigation (AR 15-6) of two A/519th interrogators who physically abused detainees. A male and a female military intelligence agent reportedly assaulted the detainee they were interrogating: stepped on his legs, pushed him against the wall, kneed him, grabbed his ears.[40] The AR 15-6 report discussed a number of interrogation techniques, including sleep deprivation.[41] As a result of the AR 15-6 investigation, two A/519th interrogators were denied access to detainees.[42] It appears as though the chain of command did not act to initiate internal MI procedures required when MI personnel are suspected of misconduct.

s.    Following the detainee deaths in December 2002, members of the 519th MI Bn were placed under investigation. While the investigation was ongoing, 519th MI Bn was transferred to Abu Ghraib, Iraq. The 519th MI Bn conducted detainee interrogations at Abu Ghraib during a

---

[34] *CJTF-180 Interrogation Techniques (24 January 2003)*, at 10.

[35] See *SASC Detainee Report (November 20, 2008)*, at 153 (describing Jan 2003 SMU TF Afghanistan SOP that included use of isolation, multiple interrogators, stress positions, and sleep deprivation); *id.*, at 158 (SMU TF Iraq adopted SMU TF Afghanistan SOP "verbatim"); *id.*, at 159 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[36] See *SASC Detainee Report (November 20, 2008)* at 151, *citing* ▮▮▮▮▮ [redacted in original] Interrogations Operations Decision Briefing (undated) (describing request for SMU interrogation facility for high value detainees co-located at the Bagram Collection Point).

[37] *DoJ OIG FBI & Detainee Interrogations (rev 2009)*, at 19.

[38] *CID Report Habibullah and Dilawar (Oct 2004)*, at 1305 (Exhibit 318).

[39] See *id.* at 1305, 1306 (Exhibit 318).

[40] See *CID Report Habibullah and Dilawar (Oct 2004)*, at 1340 (Exhibit 322) (CID interviewing CJTF-180 legal advisor).

[41] See *CID Report Habibullah and Dilawar (Oct 2004)*, at 1236 (Exhibit 311) (interview of former deputy SJA for CJTF-180).

[42] See *id.*, at 1236 (Exhibit 311).

UNCLASSIFIED/FOR PUBLIC RELEASE

period of now-infamous detainee abuse. A subsequent investigation determined approaches and practices used at Abu Ghraib "clearly" came from documents and personnel in Afghanistan and Guantanamo, to the point where an intelligence SOP for Abu Ghraib created by the same 519th commander "was remarkably similar" to the Bagram SOP.[43]

t.       Bagram intelligence operations personnel have made sworn statements that they conducted, witnessed, or heard about the following activities associated with interrogation:

- Use of stress positions;[44]
- Sleep deprivation;[45]
- Beating and other forms of physical assault;[46]
- Sexual assault and other forms of sexual humiliation;[47]
- Taking pants off detainee;[48]
- Interrogator displayed penis to detainee;[49]
- Detainee held while interrogator simulated sexual acts;[50]
- Female interrogator kicked detainee in buttocks to force him back into kneeling stress position;[51]
- "The screaming technique;"[52]
- Forced physical training;[53]
- Detainee forced to roll across floor and kiss interrogator's boots;[54]
- Detainee forced to sweep the floor;[55]
- Threat that other interrogator with bad reputation would come;[56]
- Interrogator pulls on detainee's shackle chain, rubs hands in detainees' hair;[57]
- Interrogator grabs detainee's beard to turn his head;[58]
- Interrogator lies on detainee on floor, steps between detainee's legs near his crotch.[59]

---

[43] Fay Report (2004), at 29.
[44] See, e.g., CID Report Habibullah and Dilawar (Oct 2004) at 1052 (Exhibit 263); 1440 (Exhibit 344); 1094 (Exhibit 278); 409 (Exhibit 109).
[45] See, e.g., id., at 410-411 (Exhibit 109).
[46] See, e.g., id.at 1261 (Exhibit 312); 1435, 1438 (Exhibit 344); 1435, 1437, 1440 (Exhibit 344) (describing dragging detainee by shirt and pinning him to wall).
[47] See, e.g., CID Report Habibullah and Dilawar (Oct 2004), at 1051 (Exhibit 263) (describing taking pants off detainee); 1261 (Exhibit 312); 1438 (Exhibit 344)
[48] See, e.g., id., at 1051 (Exhibit 263); 1261 (Exhibit 312).
[49] Id at 1435, 1438 (Exhibit 344).
[50] CID Report Habibullah and Dilawar (Oct 2004), at 1438 (Exhibit 344).
[51] See id.at 1435, 1438 (Exhibit 344).
[52] Id at 1051 (Exhibit 263). See also id., at 1118 (Exhibit 284).
[53] See, e.g., id.at 1052 (Exhibit 263).
[54] CID Report Habibullah and Dilawar (Oct 2004), at 1094 (Exhibit 278).
[55] See, e.g., d.at 1097-1098 (Exhibit 278).
[56] Id at 1395 (Exhibit 334); id., at 1439 (Exhibit 344).
[57] CID Report Habibullah and Dilawar (Oct 2004), at 1395 (Exhibit 334).
[58] Id.at 1434 (Exhibit 344).
[59] Id at 1434-1435, 1437 (Exhibit 344).

u.      FBI personnel surveyed by the Department of Justice Office of the Inspector General affirmed they observed or heard about the following forms of rough or aggressive detainee treatment in Afghanistan:[60]

- Depriving a detainee of food or water;
- Depriving a detainee of clothing;
- Depriving a detainee of sleep, or interrupting sleep by frequent cell relocation or by other methods;
- Beating a detainee;
- Threatening action to cause physical pain, injury, disfigurement, or death;
- Treatment or action causing significant physical pain or injury, or causing disfigurement or death;
- Placing a detainee on a hot surface or burning a detainee;
- Using shackles or other restraints in a prolonged manner;
- Requiring a detainee to maintain, or restraining a detainee in, a stressful or painful position;
- Forcing a detainee to perform demanding physical exercise;
- Hooding or blindfolding a detainee other than during transportation;
- Subjecting a detainee to extremely cold or hot room temperatures for extended periods;
- Subjecting a detainee to loud music;
- Subjecting a detainee to bright flashing lights or darkness;
- Isolating a detainee for an extended period of time;
- Using duct tape to restrain, gag or punish a detainee;
- Using rapid response teams and/ or forced cell extractions;
- Using a military working dog on or near a detainee other than during detainee transportation;
- Threatening to use military working dogs on or near a detainee;
- Disrespectful statements, handling, or actions involving the Koran;
- Shaving a detainee's facial or other hair to embarrass or humiliate a detainee;
- Touching a detainee or acting toward a detainee in a sexual manner;
- Holding detainee(s) who were not officially acknowledged or registered as such by the agency detaining the person;
- Sending a detainee to another country for a more aggressive interrogation;
- Threatening to send a detainee to another country for detention or more aggressive interrogation;
- Threatening to take action against a detainee's family;
- Other treatment or action causing severe emotional or psychological trauma to a detainee.[61]

v.      At Bagram in 2002, intelligence personnel sometimes placed detainees in stress positions during interrogation.[62] A stress position may be an abnormal human position, such as suspension

---

[60] *DoJ OIG FBI & Detainee Interrogations (rev 2009)*, at 213-215.

[61] *DoJ OIG FBI & Detainee Interrogations (rev 2009)*, at 213-215. "FBI agents were only present at a small percentage of detainee interrogations in the military zones, most of which were conducted by personnel from other agencies." *Id.* at 171.

JX001334

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED/FOR PUBLIC RELEASE

or inversion, or a normal human position, such as sitting, standing or lying, that a subject is forced to hold for an abnormal period of time or with an impediment to the position, such as an injury. Stress positions may be bound or unbound, and restraints can inflict pain or injury if misapplied or otherwise manipulated.

w.    Military personnel sometimes referred to stress positions as "safety positions."[63] A "safety position" was an awkward physical position from which a detainee could not easily physically hurt other people or himself, meant to be used for the safety of US personnel and as a substitute for shackling a detainee to a fixed object.[64] Even though "safety positions" were supposed to be used to protect US personnel, they were routinely "used to facilitate cooperation, instead of a true protective measure."[65] "Safety positions" should be evaluated as stress positions, even if not called so by guards or interrogators.

x.    Stress positions reportedly used at Bagram in 2002 included, *inter alia*, forcing a detainee to:

- lean against a wall with his weight supported only by his arms or head;[66]
- sit with only the wall for support in a "roman chair," "invisible chair," or "dream seat" position;
- kneel with his arms raised overhead[67] or hands locked behind his head;[68]
- sit on the floor with no chair;[69]
- stand with a chair next to him, not allowed to sit down on it;[70] and
- lie on his back with hands and feet in the air. [71]

y.    Some interrogators reportedly tested their own stamina in the positions to establish limits for their use,[72] or set case by case limits based on their subjective perception of whether the detainee made enough effort to hold the position, i.e., "attempted to do the task" or "just quit".[73] These practices suggest lack of supervision and an environment where abuse was more likely to

---

[62] *See generally CID Report Habibullah and Dilawar (Oct 2004)*, at 1430-1434 (Exhibit 344).

[63] *CID Report Habibullah and Dilawar (Oct 2004)*, at 1394 (Exhibit 334).

[64] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 1235 (Exhibit 311).

[65] *Id.*, at 1237 (Exhibit 311) (describing findings of AR 15-6 conducted after detainees' deaths); *id.*, at 409 (Exhibit 109) (describing "safety position" as tool of interrogators); *id.*, at 1398 (Exhibit 334) ("not used for safety"). *But see id.*, at 1264 (Exhibit 312) (AR 15-6 said safety positions were only used for security, even though they had also been used on occasion solely to cause detainee discomfort in interrogation).

[66] *CID Report Habibullah and Dilawar (Oct 2004)*, at 336 (Exhibit 85) (describing detainee forced to lean on wall with weight supported by arms or head.)

[67] *See, e.g., id.* at 409 (Exhibit 109) (describing "safety position" as tool of interrogators).

[68] *See, e.g. id.* at 1422 (Exhibit 344).

[69] *See, e.g. id.* at 1422 (Exhibit 344).

[70] *See CID Report Habibullah and Dilawar (Oct 2004)*, at 1422 (Exhibit 344).

[71] *See id.* at 1422 (Exhibit 344).

[72] *See, e.g., id.*, at 1422 (Exhibit 344).

[73] *Id.* at 1423 (Exhibit 344). Note the interrogator who admitted to doing this appears to have been farther along the "nice" end of the personality spectrum. *Id.*, at 1424.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED/FOR PUBLIC RELEASE

occur. CIA interrogators used stress positions.[74] U.S. personnel sometimes struck detainees who fell out of stress positions.[75]

z.    Military intelligence personnel subjected detainees to sleep deprivation for interrogation purposes. Sleep deprivation may have been common as early as April 2002.[76] OTC military used sleep deprivation.[77] CIA interrogators also used sleep deprivation.[78]

> The MP's would be authorized to keep the detainees awake based on the direction of MI. During the execution of the mission, the MP's would employ various techniques to keep someone awake. That would include yelling at the individual, [sic] keeping the lights on; forced standing; and ultimately to enforce the forced standing, handcuffing the individual to something to keep them from sitting down.[79]

aa.    Sleep deprivation was meant to place detainees "in a vulnerable state-of-mind, causing confusion and disorientation...".[80] If Noor did not comply with instructions to stand or do some other activity that served as an "interruption or periodic awakening" for sleep adjustment, or if he physically resisted or acted out during sleep adjustment, then he may have been struck to compel compliance or as punishment.

bb.    Interrogators at forward locations and at BCP routinely used isolation and considered it among the most effective interrogation techniques.[81] OTC military also used isolation.[82] CIA interrogators used isolation.[83]

cc. Interrogators at forward locations and at BCP routinely used hoods and considered their use among the most effective interrogation techniques.[84] Hooding could interfere with a detainee's

---

[74] *See generally CIA OIG Special Review (May 7, 2004)* (describing role of CIA in interrogating terrorism suspects held by the CIA and by military forces).

[75] *See CJTF-180 Interrogation Techniques (24 January 2003)*, at 6 ( "mild physical contact" "used to enforce safety positions during intense interrogation designed to elicit emotional response."). *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 1435, 1438 (Exhibit 344) ("SGT ▆▆▆ [redacted in original] said she kicked a detainee in the butt because he would not stop sitting on his heels during an interrogation".).

[76] *See CID Report Habibullah and Dilawar (Oct 2004)*, at 3.

[77] *See SASC Detainee Report (November 20, 2008)*, at 153 (describing Jan 2003 SMU TF Afghanistan SOP that included use of isolation, multiple interrogators, stress positions, and sleep deprivation).

[78] *See generally CIA OIG Special Review (May 7, 2004)* (describing role of CIA in interrogating terrorism suspects held by the CIA and by military forces).

[79] *See CID Report Habibullah and Dilawar (Oct 2004)*, at 1252-1253 (Exhibit 312) (legal advisor for BCP from late Nov 2002 – June 2003). Note detainees were sometimes cuffed with hands overhead. *Id.*, at 1255 (Exhibit 312).

[80] *Id.*, at 3.

[81] *See CJTF-180 Interrogation Techniques (24 January 2003)*, at 2-3, 6-7, 8.

[82] *See SASC Detainee Report (November 20, 2008)*, at 153 (describing Jan 2003 SMU TF Afghanistan SOP that included use of isolation, multiple interrogators, stress positions, and sleep deprivation).

[83] *See generally CIA OIG Special Review (May 7, 2004)* (describing role of CIA in interrogating terrorism suspects held by the CIA and by military forces).

[84] *See CJTF-180 Interrogation Techniques (24 January 2003)*, at 3; *id.*, at 7 ("use of hood during interrogation" among effective interrogation techniques used by CJTF-180 interrogators at BCP, but changes "currently underway" to substitute blacked-out goggles for hoods).

breathing, particularly if he was excited or hyperventilating.[85] "[W]hen used in conjunction with isolation, the hood disoriented the [detainee] and distorted his sense of place and time."[86] CIA interrogators used hooding and other forms of deprivation of light.[87]

dd.     Interrogators at Bagram considered deprivation of light and sound among the most effective interrogation techniques.[88] "It was effective in quickly breaking individuals that have immediate force protection information... This technique erodes a [detainee's] mental willingness to resist. When used with sleep deprivation, this techniques extends the disorientation period rendering the [detainee] more susceptible [to] other techniques."[89]

ee.     Interrogators at forward locations routinely used female interrogators or guards specifically to induce "shame/humiliation", "evoke[] deep feelings of shame," "reduce... feelings of pride."[90] BCP also used female interrogators and guards.

ff.     Military Intelligence personnel reportedly asked MPs to implement interrogation strategies outside the interrogation booth, ranging from a general "softening up" to specific forms of abuse. These included but were not limited to:

- restrained or unrestrained sleep deprivation;[91]
- forced physical training (aka "smoking sessions");[92]
- humiliating activities;[93]
- "extra chores;"[94] and
- enforced silence.[95]

---

[85] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 1256 (Exhibit 312) (after detainee deaths, legal advisor for BCP learned that chaining a detainee's hands over his head, combined with the hood, could cause breathing problems potentially exacerbated by the detainee getting excited and hyperventilating).

[86] *CJTF-180 Interrogation Techniques (24 January 2003)*, at 7.

[87] *See generally CIA OIG Special Review (May 7, 2004)* (describing role of CIA in interrogating terrorism suspects held by the CIA and by military forces).

[88] *See CJTF-180 Interrogation Techniques (24 January 2003)*, at 8 (deprivation of light and sound in living areas used "in the past" at Bagram,, not "currently used" circa January 2003; used again later. *See also Church Report (2005) (S)*, at 224-225.

[89] *CJTF-180 Interrogation Techniques (24 January 2003)*, at 7, 9.

[90] *CJTF-180 Interrogation Techniques (24 January 2003)*, at 3. *See id.*, at 4

[91] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 433 (Exhibit 117) ( MPs chained detainees in standing position; forced them to perform "extra chores"; enforced isolation with MP checking every 15 minutes; etc.); *id.*, at 832-33 (Exhibit 209) (MI instructed MPs to enforce stress positions, such as having detainees put their hands in the air, chaining detainees to the cages in kneeling or standing position "whichever was most uncomfortable", forcing detainees to sit in "roman" chair", i.e, squatting against the wall as if seated but with no chair; etc.).

[92] *Id.* at 736 (Exhibit 187) (guards told by MI to "PT" a couple of detainees for 24 hours); *id.*, at 1398 (Exhibit 334)(knew of 2-3 'smoking sessions' conducted between  Sept 2002 – Jan 2003).

[93] E.g., guards allegedly forced detainee to pick bottle caps out of human waste, possibly at MI request. *See CID Report Habibullah and Dilawar (Oct 2004)*, at 815 (Exhibit 205); *id.*, at 824 (Exhibit 207).

[94] E.g., *id.* at 832-33 (Exhibit 209) (MI told MPs to give detainees extra chores such as picking up water bottles, scrubbing floors with tooth brushes, pulling the "shit buckets", etc.); *id.*, at 1420 (Exhibit 344) (detainees given extra duties such as taking out the trash, seperating meals for detainees, etc.).

[95] *Id* at 1258 (Exhibit 312) (the "no talking" rule was devised by MI and enforced by MP).

MPs sometimes subjected detainees to these and similar forms of treatment as punishment for detention operations infractions, independent from intelligence gathering efforts.

gg.   On January 24, 2003, CJTF-180 Deputy Staff Judge Advocate (SJA) LTC Robert Cotell produced a memorandum describing "current and past" interrogation techniques used by CJTF-180 interrogators, distinguishing between those on the battlefield and at BCP.[96] LTC Cotell identified interrogation techniques used by CJTF-180, including:

- up to 96 hours of isolation;
- the use of female interrogators to create "discomfort" and gain more information;
- sleep adjustment, defined as "four hours of sleep every 24 hours, not necessarily consecutive;"
- use of individual fears;
- removal of comfort items;
- use of safety positions;
- isolation;
- deprivation of light and sound in living areas;
- the use of a hood during interrogation; and
- mild physical contact.[97]

hh.   LTC Cotell's January 24, 2003 memo also recommended use of five additional techniques, including:

- "deprivation of clothing" to put detainees in a "shameful, uncomfortable situation;"
- "food deprivation;"
- "sensory overload--loud music or temperature regulation;"
- "controlled fear through the use of muzzled, trained, military working dogs;" and
- "use of light and noise deprivation.[98]

ii.   The January 24, 2003 memo was drafted in consultation with interrogators at BCP, and conventional and non-conventional military task forces.[99] In 2004, the BCP legal advisor provided computer files to CID agents investigating the December 2002 deaths of two detainees at Bagram; working documents compiled in January 2003 as this document was produced are reportedly among those files.[100]

jj.   CJTF-180 did not receive any response to its January 24, 2003 memorandum from either CENTCOM or the Joint Staff, and interpreted this silence to mean that the techniques then in use

---

[96] *CJTF-180 Interrogation Techniques (24 January 2003).*
[97] *SASC Detainee Report (November 20, 2008)* at 155, *citing* Memorandum from CJTF-180-OPS LAW for CENTCOM SJA, CJTF 180 Interrogation Techniques (January 24, 2003). "The Church Report called the distinction between stress positions and safety positions at the Bagram Collection Point 'largely academic.'" *Id.* at FN 1200, *citing Church Report (2005)* at 200.
[98] *Id.* at 155, *citing* Memorandum from CJTF-180-OPS LAW for CENTCOM SJA, CJTF 180 Interrogation Techniques (January 24, 2003).
[99] *See CJTF-180 Interrogation Techniques (24 January 2003),* at 1.
[100] *CID Report Habibullah and Dilawar (Oct 2004),* at 1265 (Exhibit 312).

were unobjectionable to higher headquarters and therefore could be considered approved policy.[101]

*Law enforcement operations in Afghanistan*

kk.    Detainees at BCP were at all times the subject of practice and policy concerning detention operations. Detainees at BCP undergoing a course of law enforcement interviews or interrogations were also sometimes subject to a simultaneous course of military intelligence or OGA interrogations. "The military had custody and control over the detainees throughout Afghanistan, and FBI agents were required to arrange access to the detainees through military police and military intelligence personnel."[102]

ll.    According to the DOJ OIG:

> DOJ witnesses told us that from the outset, there was an operating viewpoint dictated at a very high level that this was a military situation and the military approach should prevail, in part because the military controlled the detainees and locations... Several witnesses told us that the dispute over the best approach was exacerbated by the fact that the DOD interrogators were often inexperienced and not particularly well trained about al-Qaeda.[103]

mm.    According to the DOJ OIG:

> [I]n May 2004 an FBI supervisor stationed in Afghanistan sent a series of e-mails to senior Counterterrorism Division officials in FBI Headquarters stating that although the military had temporarily restricted the use of aggressive interrogation techniques such as stress positions, dogs, and sleep deprivation, military interrogators were likely to resume such methods soon. The FBI supervisor stated that even if the FBI was not present during such interrogations, FBI agents would inherently be participating in the process because they would be interviewing detainees who had either recently been subjected to such techniques by the military or who would be subjected to them after the FBI interviews were completed.[104]

nn.    FBI agents told the DOJ OIG that "they either observed or heard that military or CIA personnel had falsely represented themselves as FBI agents in Afghanistan. One OIG survey respondent stated that he observed the impersonation of FBI personnel by others, and five agents reported that they head about such conduct from others."[105]

*GUANTANAMO*

oo.    By August of 2002, Noor had been transferred to GTMO.

---

[101] *Church Report (2005)*, at 7. *See also id.*, at 201.
[102] *DoJ OIG FBI & Detainee Interrogations (rev 2009)*, at 21.
[103] *Id.*, at 64-65.
[104] *Id.*, at xv.
[105] *Id.*, at 228.

pp.    In August 2002, responsibility for detention operations and intelligence operations at GTMO was split between two units: Joint Task Force 160 (JTF-160) administered the detention camp, and Joint Task Force 170 (JTF-170) conducted intelligence operations, including interrogations. A series of assessments and evaluations conducted at GTMO in 2002 concluded that the intelligence-gathering mission would be enhanced by careful coordination with the detention operations mission.

qq.    In November 2002, the Pentagon reorganized the camp structure and merged the administrative and interrogation task forces as JTF-GTMO under the command of MG Geoffrey Miller. MG Miller's goal was to functionally integrate military intelligence with military police detention operations.

rr.    MG Miller purposefully engineered detention operations as an "enabler" for intelligence-gathering.

> Simply stated, the most significant aspect of the ... organization [of JTF-GTMO] is that it places both intelligence and detention operations under the command of a single entity, designated Joint Task Force GTMO (JTF-GTMO), whereas the original organization had separate chains of command for intelligence and detention operations. This new structure has permitted greater cooperation among the military intelligence (MI) units that are responsible for interrogation and the military police (MP) units that are responsible for detention. In essence, this organization recognizes the primacy of the human intelligence collection mission at GTMO in support of the Global War on Terror, by ensuring a unity of effort between MI and MP units. This unity of effort between MI and MP units has been the subject of recent controversy, in light of MP participation in many of the abuses perpetrate at Abu Ghraib prison in Iraq....[106]

> In his September 2003 report on intelligence operations in Iraq, MG Miller, then-Commander of JTF-GTMO, stated that detention operations 'must act as an enabler for interrogations,' by helping to 'set conditions for successful interrogations.' Furthermore, he argued it is 'essential that the guard force be actively engaged in setting the conditions for successful exploitation of the internees,' and that '[j]oint strategic interrogation operations are hampered by a lack of active control of the internees within the detention environment.'[107]

*Detention operations at GTMO*

ss.    Detention operations came to serve a key role in the intelligence-gathering process at GTMO. The frequency and manner in which MPs conducted operations such as cell moves, control of comfort items, transfer to and from the interrogation booth, Immediate Reaction Forces and Forced Cell Extractions (IRFs/FCEs), use of military working dogs, and strip searches affected detainees physically and mentally, establishing conditions for subsequent interrogations. Military police personnel themselves implemented interrogation techniques meant

---

[106] *Church Report (2005)*, at 103-4.
[107] *Id.*, at 148.

JA001340

to be employed outside the interrogation room, such as environmental and dietary manipulation, provision of incentives for cooperation, and sleep deprivation.[108]

tt.    By early October 2002, there was "increasing pressure to get 'tougher' with detainee interrogations." If the interrogation policy memo did not contain coercive techniques, then it "wasn't going to go very far...."[109]

uu.    On 11 Oct 2002, JTF-GTMO J-2 requested approval for and described three categories of counter-resistance techniques:

- Category I: yelling, deception, multiple interrogators, false flag;

- Category II: stress positions, false documents, isolation, "change of scene", sensory deprivation, hooding, 20-hour interrogations (sleep deprivation), removal of comfort items, dietary restrictions, removal of clothing, forced grooming, exploitation of phobias;

- Category III: imminent death scenario, cold, water to induce feeling of suffocation, physical contact; "and other aversive techniques, such as those used in U.S. military interrogation resistance training or by other U.S. government agencies..."[110]

vv.    On 2 Dec 2002, the SECDEF authorized the Commander of USSOUTHCOM to employ, at his discretion, categories I and II techniques, and one category III technique.[111] The request and the approval process levied requirements for authorization and documentation of use of these techniques. The Government has failed to provide records relating to use of these techniques on Noor, or to certify these techniques were not used on Noor.

ww.    On 15 Jan 2003, SECDEF rescinded his December 2002 approval.[112] However, SECDEF stipulated that if USSOUTHCOM determined that "particular techniques in either of these categories [II or III] are warranted in an individual case, [the commander] should forward that request to [SECDEF]. Such a request should include a thorough justification for the employment of those techniques and a detailed plan for use of such techniques."[113] The Government has failed to provide records relating to use of these techniques on Noor, or to certify these techniques were not used on Noor.

---

[108] *See generally Church Report (2005)* (describing the relationship between military police and military intelligence; describing MP involvement in events that happen outside the interrogation room that are done in preparation for interrogations, including the role of MP record-keeping systems, and the MP role in applying techniques employed in the cellblock that set the conditions for subsequent interrogations in the interrogation room.). *Id.*, at 146, et seq. ("MPs are very involved, however, in events that happen outside the interrogation room that are done in preparation for interrogations.").

[109] *SASC Detainee Report (November 20, 2008)*, at xvii, 38.

[110] *JTF-170 J-2 Memo (11 Oct 2002)*.

[111] *SECDEF Approval (2 Dec 2002)*. The approved Category III technique was physical contact. The *Schlesinger Report (August 2004)* read the memo as requiring advance SECDEF notification for all techniques described in the memo. *Church Report (2005)*, at 118.

[112] *SECDEF Memorandum (15 Jan 2003)*.

[113] *Id.*

UNCLASSIFIED/FOR PUBLIC RELEASE

xx.    On 16 Apr 2003, SECEF approved 24 techniques.[114] All of them required "appropriate specified senior approval for use with any specific detainee (after considering the foregoing and receiving legal advice)" and other "safeguards",[115] and four required SECDEF notification prior to use.[116] In addition to techniques approved by SECDEF on 16 April 2003, SOUTHCOM could request "additional interrogation techniques for a particular detainee."[117] The Commander was required to provide, via CJCS, "a written request describing the proposed technique, recommended safeguards, and the rationale for applying it with an identified detainee."[118] The Government has failed to provide records relating to use of these techniques on Noor, or to certify these techniques were not used on Noor.

yy.    The April 2003 GTMO Policy continued in effect for GTMO until September 2006, when the U.S. Army issued Field Manual 2-22.3.[119]

zz.    FBI personnel surveyed by the Department of Justice Office of the Inspector General affirmed they observed or heard about the following forms of rough or aggressive detainee treatment at Guantanamo:[120]

- Depriving a detainee of food or water;
- Depriving a detainee of clothing;
- Depriving a detainee of sleep, or interrupting sleep by frequent cell relocation or by other methods;
- Beating a detainee;
- Using water to prevent breathing by a detainee or to create the sensation of drowning;
- Using hands, rope, or anything else to choke or strangle a detainee;
- Threatening action to cause physical pain, injury, disfigurement, or death;
- Treatment or action causing significant physical pain or injury, or causing disfigurement or death;
- Using shackles or other restraints in a prolonged manner;
- Requiring a detainee to maintain, or restraining a detainee in, a stressful or painful position;
- Intentionally delaying or denying detainee medical care;
- Hooding or blindfolding a detainee other than during transportation;
- Subjecting a detainee to extremely cold or hot room temperatures for extended periods;
- Subjecting a detainee to loud music;
- Subjecting a detainee to bright flashing lights or darkness;

---

[114] *SECDEF Memorandum (16 April 2003), at Tab A.* Sometimes referred to as "the A-X memo."

[115] *SECDEF Memorandum (16 April 2003), at Tab B.* Text from this part of the SECDEF memo supports the argument that use of these techniques was closely planned and documented, and that information about treatment by detention operations a well as interrogators is relevant to the question of whether a detainee was coerced in interrogation.

[116] *SECDEF Memorandum (16 April 2003)* (incentive/removal of incentive; pride and ego down; Mutt and Jeff; and isolation).

[117] *Id.*

[118] *Id.*

[119] AFM 2-22.3 superseded AFM 34-52.

[120] *DoJ OIG FBI & Detainee Interrogations (rev 2009),* at 172-173.

JA001342

UNCLASSIFIED/FOR PUBLIC RELEASE

- Isolating a detainee for an extended period of time;
- Using duct tape to restrain, gag or punish a detainee;
- Using rapid response teams and/or forced cell extractions;
- Using a military working dog on or near a detainee other than during detainee transportation;
- Threatening to use military working dogs on or near a detainee;
- Using spiders, scorpions, snakes, or other animals on or near a detainee;
- Disrespectful statements, handling, or actions involving the Koran;
- Shaving a detainee's facial or other hair to embarrass or humiliate a detainee;
- Placing a woman's clothing on a detainee;
- Touching a detainee or acting toward a detainee in a sexual manner;
- Holding detainee(s) who were not officially acknowledged or registered as such by the agency detaining the person;
- Sending a detainee to another country for a more aggressive interrogation;
- Threatening to send a detainee to another country for detention or more aggressive interrogation;
- Threatening to take action against a detainee's family;
- Other treatment or action causing severe emotional or psychological trauma to a detainee
- Other religious or sexual harassment or humiliation of a detainee;
- Other treatment of a detainee that in their opinion was unprofessional, unduly harsh or aggressive, coercive, abusive, or unlawful.[121]

aaa.   AFM 34-52 provided doctrine for MI interrogation operations, but only addressed general interrogation approaches and techniques, and did not address "new" approaches authorized by the SECDEF.  Guidance for employing interrogation techniques would have been especially important for techniques that pushed the limits or were outside of AFM 34-52. In 2008, former DoD General Counsel William Haynes testified before the Senate Armed Services Committee about the extent to which the interrogation techniques were subject to "limits" and "controls" to help keep them legal.[122] Former GTMO SJA Diane Beaver testified along similar lines.[123] In some cases, there is no doubt that techniques adopted later directly contravened SOPs adopted earlier; it is reasonable to surmise that either those SOPs were amended or superseded, or commanders allowed their interrogators to operated in direct contravention to the previously-

---

[121] *DoJ OIG FBI & Detainee Interrogations (rev 2009),* at 172-173. "FBI agents were only present at a small percentage of detainee interrogations in the military zones, most of which were conducted by personnel from other agencies." *Id.* at 171.

[122] William Haynes II, Former General Counsel, DoD, Testimony before the Senate Armed Services Committee, Origins of Aggressive Interrogation Techniques (June 17, 2008) (Federal News Service).

> [T]here were interrogation plans that were supposed to be designed for each individual detainee who was to be interrogated -- that would involve a psychological review; there had to be medical care associated with it; there had to be a legal review; there had to be substantial command monitoring. There was a step process that they were supposed to go through. There were -- they were supposed to stop if anything came up. There were -- there were all sorts of conditions. ..".

[123] Diane Beaver, Former SHA, GTMO, Testimony before the Senate Armed Services Committee, Origins Of Aggressive Interrogation Techniques (June 17, 2008) (Federal News Service).

established policy.[124] If personnel conducting interrogations relied upon a document for guidance, it should not matter whether it was in a draft form or not.

_____

[124] JTF-170 had an interrogation SOP in place at least by August 2002, which, inter alia, prohibited at least one SERE-derived technique approved by the SECDEF in December 2002, stress positions. *SASC Detainee Report (November 20, 2008),* at 41, *citing* JTF-170 J2 Interrogation Section Standard Operating Procedures (August 20, 2002) (emphasis in original) (Detainees being interrogated will "remain seated and secured to the floor. DETAINEES WILL NOT BE PLACED IN STRESS POSITIONS").

Case 1:10-cv-01020-RJL   Document 1472   Filed 03/09/11   Page 1 of 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **ABDUL RAZAK ALI,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Civil Case No. 10-1020 (RJL)** |
| | ) | |
| **BARACK H. OBAMA,**[1] *et al.*, | ) | |
| | ) | |
| **Respondents.** | ) | |

## FINAL JUDGMENT
### (March 9, 2011)

For the reasons set forth in this Court's public Memorandum Order of January 11,

2011 and for the reasons set forth in this Court's Classified Memorandum Opinion of

February 28, 2011, it is hereby

**ORDERED** that Petitioner Ali's petition for a writ of habeas corpus is **DENIED.**

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

---

1        Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named
as a party to an action in his official capacity ceases to hold office, the court will
automatically substitute that officer's successor.  Accordingly, the Court substitutes
Barack H. Obama for George W. Bush.

Case 1:10-cv-01020-RJL   Document 1474   Filed 03/14/11   Page 1 of 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ABDUL RAZAK ALI,                    )
                                    )
         Petitioner,                )
                                    )
    v.                              )   Civil Case No.  10-1020 (RJL)
                                    )
BARACK H. OBAMA,[1] et al.,         )
                                    )
         Respondents.               )

## ORDER
(March _11_, 2011) [#1447]

Before the Court is petitioner Abdul Razak Ali's classified Motion for Entry of the Writ, or, in the Alternative, for a New Hearing and Sanctions [Dkt. #1447].  Based on the classified motions and responses, the record in this case, and on oral argument held before this Court in December 2010 and January 2011, it is hereby

**ORDERED** that the petitioner's Motion for Entry of the Writ, or, in the Alternative, for a New Hearing and Sanctions, is **DENIED**.

SO ORDERED.

RICHARD J. LEON
United States District Judge

---

[1]    Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the court will automatically substitute that officer's successor.  Accordingly, the Court substitutes Barack H. Obama for George W. Bush.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDAL RAZAK ALI ) | |
| ) | |
| Petitioners/Plaintiffs ) | CIVIL ACTION |
| ) | |
| v. ) | NO. 10-1020 (RJL) |
| ) | |
| Barack Obama, et al. ) | |
| ) | |
| Respondents/Defendants ) | |

### NOTICE OF APPEAL

Notice is hereby given that Petitioner in the above named case hereby appeals to

the United States Court of Appeals for the District of Columbia Circuit from the Order

entered in this case denying Petitioner's habeas petition and related motions.  This

appeal is being filed *in forma pauperis* as per the Order entered in this case on January

12,  2011.

Dated: May 2, 2011

Respectfully Submitted,
Counsel for Petitioner

/s/ H. Candace Gorman
H. Candace Gorman

LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman
220 S. Halsted
Suite 200
Chicago, IL 60661
(312) 427-2313

JA001347

## CERTIFICATE OF SERVICE

I, H. Candace Gorman, certify that I today caused a true and accurate copy of Petitioner's Notice of Appeal to the individuals listed below via the District Court's Electronic Case Filing System:

Olivia Hussey, Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7144
Washington, DC  20530

This 2nd day of May, 2011.

/s/ H. Candace Gorman
Counsel for Petitioner

LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman (IL Bar #6184278)
220 S. Halsted Street - Suite 200
Chicago, IL 60661
Tel:  (312) 427-2313

JA001348

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|                          |     |                              |
|--------------------------|-----|------------------------------|
| **ABDUL RAZAK ALI,**     | )   |                              |
|                          | )   |                              |
| **Petitioner,**          | )   |                              |
|                          | )   |                              |
| v.                       | )   | **Civil Case No. 10-1020 (RJL)** |
|                          | )   |                              |
| **BARACK H. OBAMA,**[1] *et al.,* | )   |                              |
|                          | )   |                              |
| **Respondents.**         | )   |                              |

## MEMORANDUM ORDER
(May 17, 2011) [#1468]

Before the Court is petitioner's Supplement to Motion (and Renewed Motion) For
Entry of the Writ Or, In the Alternative, a New Hearing and For Sanctions ("Supp.
Mot.") [Dkt. #1468]. Petitioner essentially seeks two forms of relief. First, he asks this
Court to grant a new merits hearing based on his allegation that the Government failed to
provide him, prior to the merits hearing, certain exculpatory information regarding the
reliability of a particular detainee who was caught with petitioner and who corroborated
petitioner's presence in Afghanistan. Supp. Mot. at 1-2, 6. Second, petitioner asks this
Court to levy sanctions against the Government for its alleged failure to comply with this
Court's Case Management Order ("CMO") [Dkt. #1423]. Supp. Mot. at 6.

---

[1]      Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a
party to an action in his official capacity ceases to hold office, the court will automatically
substitute that officer's successor. Accordingly, the Court substitutes Barack H. Obama for
George W. Bush.

First, with respect to petitioner's request for a new merits hearing, even if petitioner's allegations were correct – which they are not – petitioner has not shown, and cannot show, that his having the documents in question to challenge the credibility of that particular detainee would have changed the outcome of his case. Indeed, I essentially concluded to the contrary in my January 11, 2011 Unclassified Memorandum Opinion ("Unclassified Memo. Op."), when I stated that: "petitioner's presence at [the Faisalabad] guesthouse is enough, *alone*, to find that he was more likely than not a member of Abu Zubaydah's force" and was therefore detainable. Unclassified Memo. Op. at 12-13 (emphasis in original) [Dkt. #1448]. Thus, Petitioner has not carried the burden required to re-open his case and his motion is **DENIED**.

Finally, petitioner's request for sanctions is also **DENIED**. Upon review of the classified response to petitioner's motion, *see* Notice of Filing Respondent's Opp'n, Apr. 4, 2011 [Dkt. #1480], I find no basis to conclude that the documents petitioner alleges were withheld were, in fact, reasonably available to the Government. Furthermore, it does not even appear that the documents in question actually support the substantive proposition for which petitioner cites them. In short, petitioner has not shown that the Government failed its discovery obligations under the CMO, let alone proven the bad faith required to impose sanctions.

Accordingly, for all of the foregoing reasons, it is hereby

JA001350

**ORDERED** that petitioner Abdul Razak Ali's, a.k.a. Saeed Bakhouche's,

Supplement to Motion (and Renewed Motion) For Entry of the Writ Or, In the

Alternative, a New Hearing and for Sanctions [Dkt. #1468], is **DENIED**.

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

JA001351

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | Misc. No. 08-442 (TFH) |
| IN RE: ) | |
| GUANTANAMO BAY ) | Civil Action No. |
| DETAINEE LITIGATION ) | 05-CV-2386 (RBW) |
| ) | |
| ) | |
| ) | |

**FACTUAL RETURN**

~~SECRET//NOFORN~~

JA001352

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

Respondents hereby submit, as explained herein, a factual return pertaining to the petitioner identified as the subject of the attached Narrative. This return sets forth factual bases[1] supporting petitioner's lawful, ongoing detention pursuant to the Authorization for the Use of Military Force and the President's power as Commander in Chief.

Dated: November 26, 2008              Respectfully submitted,

                                      GREGORY G. KATSAS
                                      Assistant Attorney General

                                      JOHN C. O'QUINN
                                      Deputy Assistant Attorney General

                                      _____
                                      JOSEPH H. HUNT (D.C. Bar No. 431134)
                                      VINCENT M. GARVEY (D.C. Bar No. 127191)
                                      TERRY M. HENRY
                                      PAUL AHERN
                                      DAVID J. STANDER
                                      United States Department of Justice
                                      Civil Division, Federal Programs Branch
                                      20 Massachusetts Avenue, N.W.
                                      Washington, DC 20530
                                      Tel: 202.305-9342
                                      Attorneys for Respondents

_____

[1] Respondents reserve the right to seek leave to further supplement the record with additional factual bases supporting petitioner's detention, as necessary.

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

* * *

JA001354

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDEL RAZACK ALI ABDEL
RAHMAN,

Petitioner,

v.

Civil Action No. 05-CV-2386 (RBW)

GEORGE WALKER BUSH, *et al.*
Respondents.

**NARRATIVE FOR PETITIONER ABDEL RAZACK ALI ABDEL RAHMAN**
**(ISN 685)**

**Introduction**

1.  Abdel Razack Ali Abdel Rahman is an enemy combatant currently detained at

Guantanamo Bay.  He is an Algerian national who has admitted he traveled to Afghanistan in

2001.  The habeas petition was filed under the above name, but after the ruling of the CSRT

in 2004, the petitioner revealed his real name as Said Bin Brahim Bin Umran Bakush, and

will be referred to herein as "Bakush."  Bakush also after the ruling of the CSRT revealed his

true nationality as Algerian, instead of Libyan.  Bakush admits to being captured in March

2002 while staying in an al-Qaida guesthouse in Faisalabad, Pakistan, which was controlled

by Abu Zubaydah, a senior al-Qaida leader.  Bakush identifies Abu Zubaydah as one of the

residents of the house.  Witnesses have identified Bakush, known by certain aliases, as staying

at that Faisalabad guesthouse, which was used by occupants, among other things, to construct

circuit boards to be used in timing devices in bombs for potential use against coalition forces.

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

1

SECRET//NOFORN

Bakush states he knew that occupants were making chemical weapons at the house; he has

admitted that he had 45 days of military training in Pakistan; and admitted that he had never

told government interviewers of "jihad training " he had received. In addition to hiding his

true name and nationality from investigators for years, Bakush has provided inconsistent and

incompatible accounts of his travel to Afghanistan.

2.      In the materials discussed herein relating to the factual basis for the petitioner's

detention, there are interviews with the detainee and others conducted by law enforcement

and intelligence personnel, as well as information derived from other sources and methods.

Information received from these sources is commonly reproduced in reports created by the

collecting officer. Such information is also commonly analyzed by intelligence or law

enforcement personnel and used to produce other intelligence products. These reports and

intelligence products are routinely relied upon by military or intelligence personnel in making

decisions to act upon threats to our national security. Declaration of ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ ("Intelligence 101");  Declaration of Robert H. Holmes.

3.      As with all detained enemy combatants at Guantanamo Bay, Cuba, Bakush has been

assigned an Internment Serial Number or ISN. The ISN is an administrative code assigned to

detainees. Bakush's full ISN is US9AG-00685DP, in which the number 685 is Bakush's

unique identifier and the AG designation indicates that he is a national of Algeria. Source

documents attached as Exhibits to this Narrative may refer to Bakush by name, full ISN, or

various short forms, such as "YM-00685" or "ISN 685." In addition to using the false name

of Abdal Razak Ali, Bakush has been identified by other detainees under such aliases as

"Usama al'Libi," "Abu Usama," or "al-Jaiziri." IIR 6 034 1077 04; IIR 6 034 1215 04.

Multiple aliases are commonly used by terrorists who often change them in different

SECRET//NOFORN

locations.  Declaration of ████████████████ "Names, Aliases, Kunyas, and

Variants."

4.  ·   The following narrative and attached materials set forth the factual bases supporting

petitioner's lawful detention.  This narrative is not intended to be a complete explication of

the information in support of petitioner's detention in those documents.

### General Background of the War on Terror

5.      Al-Qaida ("the Base") was founded by Usama bin Laden and others in or about 1989

for the purpose of opposing certain governments and officials with force and violence.  *See*

National Commission on Terrorist Attacks Upon the United States, *9/11 Commission Report*

56 (2004) (9/11 Commission Report).  Usama bin Laden is recognized as the emir (prince or

leader) of al-Qaida.  *See id.*

6.      A purpose or goal of al-Qaida, as stated by Usama bin Laden and other al-Qaida

leaders, is to support violent attacks against property and nationals (both military and civilian)

of the United States and other countries.  *See id.* at 59-61.

7.      Between 1989 and 2001, al-Qaida established training camps, guest houses, and

business operations in Afghanistan, Pakistan, and other countries for the purpose of training

and supporting violent attacks against property and nationals (both military and civilian) of

the United States and other countries.  *See id .*at 64-67.

8.      In 1996, Usama bin Laden issued a public "Declaration of Jihad Against the

Americans."  This declaration called for the murder of U.S. military personnel serving on the

Arabian peninsula.  *See id.* at 48.

9.      In February 1998, Usama bin Laden and Ayman al Zawahiri (bin Laden's deputy)

issued a fatwa (purported religious ruling) requiring all Muslims able to do so to kill

JA001357
SECRET//NOFORN
3

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

Americans - whether civilian or military - anywhere in the world. *See id.* at 47.

10.    Since 1989, members and associates of al-Qaida, known and unknown, have carried

out numerous terrorist attacks, including, but not limited to: the attacks against the American

Embassies in Kenya and Tanzania in August 1998, which killed approximately 250 people,

*see id.* at 68-70, the attack against the USS COLE in October 2000, which killed 17 United

States Navy sailors, *see id.* at 190-93, and the attacks on the United States on September 11,

2001, which killed approximately 3,000 people. *See id. passim.*

11.    The Taliban (students of Islamic knowledge) is an Islamic fundamentalist group that

was formed in Afghanistan in 1994. *See* The Taliban in Afghanistan, at

www.cfr.org/publication/10551. After two years of violent conflict that included the capture

of Kabul, Afghanistan's capital, the Taliban took control of Afghanistan's national

government in 1996. *See* 9/11 Commission Report at 65 (2004). Although it was never

formally recognized by the United States, *see id.* at 124, the Taliban controlled Afghanistan's

national government from 1996 until the United States-led military campaign ousted the

Taliban from power in 2001. *See id.* at 337-38. During the period in which the Taliban

controlled Afghanistan's national government, it provided safe harbor and support to al-Qaida

and Usama bin Laden. *See id.* at 64-67.

12.    On September 18, 2001, following the attacks on the United States on September 11,

2001, Congress adopted the Authorization for the Use of Military Force. *See* 115 Stat. 224

(2001). Recognizing that the attacks of September 11, 2001 "render it both necessary and

appropriate that the United States exercise its rights to self-defense and to protect United

States citizens at home and abroad," Congress authorized the President "to use all necessary

and appropriate force against those nations, organizations, or persons he determines planned,

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

IA001358

4

SECRET//NOFORN

authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." Within weeks, United States military forces were deployed in Afghanistan. *See* 9/11 Commission Report at 337 (2004).

13.     The United States led the initial aerial bombing campaign of Afghanistan, with ground forces composed of United States forces and Afghanistan militia opposed to the Taliban, including the Northern Alliance. The Northern Alliance is an association of Afghan groups opposed to the Taliban. The Northern Alliance has assisted the United States in its military campaign in Afghanistan to defeat al-Qaida and the Taliban. *See id.* at 330-34; 336-38.

14.     In December 2001, the United States-led military campaign removed the Taliban from control of Afghanistan's national government. *See id.* at 337-38. Taliban and al-Qaida forces, however, have continued to operate in Afghanistan and attack coalition forces. Currently, two major military operations are underway in Afghanistan. First, Operation Enduring Freedom (OEF) is a multinational coalition military operation, led by the United States, initiated in October 2001 to counter terrorism and bring security to Afghanistan in collaboration with Afghan forces. *See* www.state.gov/r/pa/prs/ps/2006/60083.htm. OEF operations led to the collapse of the Taliban government and helped bring security and stability to Afghanistan. *Id.* OEF involves troops from over 20 nations, including about 19,000 United States forces and about 3,000 non-United States troops. *Id.* Second, the International Security Assistance Force (ISAF) is a United Nations-mandated international coalition operating under the command of the North Atlantic Treaty Organization (NATO). *See* www.nato.int/isaf/index.html. ISAF was established in 2002 with the goal of creating

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET/NOFORN

conditions for stabilization and reconstruction in Afghanistan. ISAF is comprised of approximately 50,000 troops from 40 countries. *Id.*

**Bakush Has Provided Shifting Accounts of His Travel to Afghanistan**

Earlier Accounts

15.    Bakush, initially representing himself by the name Abdul Razak Ali Abdel Rahman, told investigators that he was a Libyan national. ISN 685 FD-302 (January 31, 2003); IIR 6 034 0470 03. In interviews prior to his CSRT, Bakush told agents that he met a man named in Libya at his scrap business and they spoke about Bakush going to Pakistan so that Bakush would be able to learn how to read and write, and study Islam. ISN 685 FD-302 (January 31, 2003). took some information from Bakush and returned one month later with what appeared to be a Libyan passport and a Pakistani visa. Bakush states that he and left for Pakistan in early October 2001. *Id.* Bakush claims that at that time he had not heard then of the September 11, 2001 attacks on the United States, and that he did not know a war was ongoing in Afghanistan. *Id.*

16.    Bakush stated that he and traveled from Libya to Pakistan via Tunis and Syria. IIR 6 034 0470 03. Bakush stated that once he and (along with two of friends) arrived in Karachi, Pakistan, they drove for a number of hours. *Id.* Bakush stated that they stopped at a house, which Bakush stated he believed to be in Pakistan, but was actually in Kabul, Afghanistan. ISN 685 FD-302 (January 31, 2003). Bakush stated that this house was owned by a school he was supposedly to attend. *Id.* Bakush stated that he gave his money and passport to to hold onto, and and his friends then left. *Id.* Bakush then stated that he realized a few days later that the house was in

JA001360

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET/NOFORN

6

SECRET//NOFORN

Afghanistan and was not owned by a school. *Id.* Bakush stated that ▮▮▮▮▮ had tricked him, but he did not know why. *Id.*

17.     Bakush stated that he left the house after three weeks and was taken by cab to another house "full of Arabs." *Id.* Bakush stated that he left Kabul before any bombing began, and was taken to an "Arab house" in Faisalabad, Pakistan. *Id.* (See discussion, *infra*, of this Faisalabad house.). Bakush stated that he first heard of al-Qaida from the guards in the Pakistani jail where he was detained after the house was raided. ISN 685 FD-302 (January 31, 2003). Bakush stated that he did not want to go back to Libya because the Libyan government will think he is a terrorist. *Id.*

18.     Bakush provided a different account in another interview wherein Bakush stated that when they arrived in Karachi, Pakistan, they were met by two unidentified Afghan students and then taken to a Taliban house for one week. IIR 6 034 0708 02. Bakush stated in that interview that he gave his passport and money to the Afghani students,[1] and then traveled to another house near the Afghanistan border and then stayed there for three days before being driven by Abdulrahman to Kabul. *Id.* Once arriving at Kabul, Abdulrahman left with the other students and they went to fight with the Taliban. *Id.* After leaving the house, Bakush stated that he and others drove for six hours into the mountains and walked for more than two hours and stayed at houses owned by Afghanis for weeks at a time. *Id.* Despite everyone speaking Pashtu, Bakush claimed that he conversed with a cook. *Id.* When confronted with that statement, Bakush said that he brought with him a Pakistani translator. *Id.* When

---

[1] The standard operating procedures when entering into al-Qaida or Taliban associated guesthouses was to surrender any passport, identification, money, or other travel documents for "safekeeping." Declaration of ▮▮▮▮▮ "Guesthouses" (Sept. 19, 2008).

SECRET//NOFORN

confronted with inconsistencies in his story, Bakush became very upset and uncooperative. *Id.*[2]

19.     Bakush continued to tell the FBI he was a Libyan in subsequent interviews. ISN 685 FD-302 (April 18, 2003). Bakush denied any knowledge of any bombing plots, denied that he had ever heard of Khalid Sheik Mohammed;[3] and denied any knowledge of al-Qaida despite being told that his story could not be true because no one would be allowed to live at the house in which ▇▇▇▇▇▇▇, a very high-level al-Qaida leader, resided without being trusted and proven. *Id.* Bakush admitted that he was in the Arab house in Faisalabad for about sixteen days until his capture. *Id.*

20.     Bakush stated that after his capture he was taken to Lahore, Pakistan, then to Islamabad, Pakistan, then to Bagram, Afghanistan, and then to Guantanamo Bay, arriving in May 2002. IIR 6 034 0470 03.

### Later Accounts

21.     In November, 2004, Bakush first revealed to investigators his real name and admitted that he was born in Algeria on July 17, 1970.[4] ISN 685 SIR (November 18, 2004). Bakush

---

[2]  While in the custody of DoD, at Guantanamo Bay, Cuba, petitioner provided statements obtained through the use of a potentially unauthorized interrogation technique. This potential violation of DoD interrogation policy is currently under investigation by DoD pursuant to DoD policy. ISN 685 MFR (September 4, 2002); ISN 685 MFR (September 5, 2002); ISN 685 (September 6-8, 2002).

[3]  Khalid Sheik Mohammed is a senior al-Qaida leader and believed to be the coordinator for the September 11, 2001 attacks. *See* Al-Qaida Leadership Chart.

[4]  Bakush has stated that he trained with the military service of Algeria from 1992 until early 1994, fulfilling his 18 month military obligation. ISN 685 SIR (June 21, 2005). After he left the army, Bakush stated that he spent his time partying and working any job he could find. ISN 685 MFR (June 12, 2007). ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

SECRET//NOFORN             JA001362            8

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

stated that in October 2001, he left for Pakistan with an individual named Issa. ISN 685 MFR (March 20, 2007). Bakush stated that Issa was a friend from Algeria he had met on the streets. ISN 685 SIR (February 1, 2006). Bakush identified Issa as a "Berber" and that his last name was "Amareze" in Arabic. *Id.* Bakush stated that Issa told him that life in Pakistan was good and it was easy to start a business there. *Id.* Issa helped Bakush get a passport and visa to go to Pakistan. *Id.* Issa stated that he got the money from Jama'at Tablighi (JT) to help with the airfare to Pakistan.[5] *Id.* Bakush left from Algiers on a plane to Pakistan in 2001. *Id.* Given Bakush's statements earlier that he met Issa sometime after the 1992 suspended elections in Algeria, he probably left Algeria in late 1996 or early 1997. *Id.*

22.    Bakush stated that Issa was not a leader of the JT in Algeria; he just went around preaching and recruiting new Muslims into the faith. ISN 685 MFR (June 12, 2007). Bakush stated that Algeria was full of Takfiri groups from 1996-2000 so it was a bad place to live. *Id.* Takfiris would go around beating and killing people because they were not good Muslims. *Id.*

23.    Bakush stated that he and Issa stayed at the JT guesthouse in Karachi for four days. *Id.* After four days, Bakush and Issa boarded a bus arranged for them by the JT and they traveled to Lahore, Pakistan, which was the JT headquarters. ISN 685 MFR (June 12, 2007). Bakush stated that he was not a member of JT, and did not complete the training. *Id.* Bakush claimed that he left the Lahore house in November 2001, and never went to Afghanistan. *Id.*

---

[5] JT is used as cover by various Sunni terrorist groups, and is closely aligned with Pakistani terrorist organizations, and with al-Qaida. IIR 2 227 0131 03.

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

This conflicts directly with his earlier accounts, described above, in which he describes traveling to Afghanistan with ▢▢▢▢▢▢ and his friends.

24.    Bakush claimed that he left the JT in November 2001. The JT was worried about problems between the Pakistani government and the Arabs, so all of the Arabs were sent out of Raiwind, Pakistan. ISN 685 MFR (June 12, 2007). Bakush stated that he traveled to Lahore, Pakistan, and then Faisalabad, Pakistan, with Issa and two Pakistanis. *Id.* When he stayed at the house in Lahore, there were two unidentified Pakistanis there. *Id.* Bakush stated that when he stayed at the house, Issa disappeared toward the end of January 2002. *Id.* Bakush stayed at the house for about one month. *Id.* Bakush stated that the house was run by Abdul Rakhman. ISN 685 SIR (November 12, 2005). Contrary to statements made in other interviews, Bakush claimed that he traveled to Lahore directly after landing in Karachi, Pakistan. *Id.*

25.    Bakush claimed that then he, the Pakistani who owned the Lahore house, and another unidentified man left by taxi to go to Faisalabad, and the trip took 3 hours. ISN 685 MFR (June 12, 2007). Bakush did not know who decided that they should go to Faisalabad, and stated that he could not really talk with others because of language barriers. *Id.* Bakush denied ever going to Afghanistan until after his capture in March 2002. ISN 685 MFR (April 5, 2007).[6]

---

[6] ▢▢▢▢▢▢▢▢▢, stated that Bakush, known to him as "Rizak" was arrested in Pakistan. Rizak had told him that he (Rizak) had never been to Afghanistan, and stated that he was a mechanic from Libya who came to Pakistan for a better paying job. ISN▢ FD-302 (June 10, 2003); ISN 685 CITF Memo (April 23, 2004). ▢▢▢▢▢ also stated that Rizak said his passport had been stolen and Rizak could not return to Libya. *Id.*

Another detainee, ISN 695, has stated that he met Bakush, known to him by the variant Abdel Razak, in a Pakistani prison. 6 034 0911 04. At that time, petitioner told ISN 695 that

SECRET//NOFORN

### Bakush Told Interviewers of Jihad Training

26.      In an interview in March 2006, Bakush stated that he had been in Pakistan for two years with the Da'wah.[7]  ISN 685 SIR (March 15, 2006).  When asked about his military training, Bakush stated that he had 45 days of training in Pakistan.  *Id.*  When asked whether he was affiliated with jihadist groups, Bakush stated that if "they" sense you are involved with anything like this, they will drop you (referring to instructors at the school).  *Id.*  On the other hand, when asked whether Bakush had ever told "them" about the jihad training he (Bakush) had stated that he (Bakush) had never told "them."  *Id.*  Bakush then stated that the accusations of his making chemicals, gases and other items are not true and are lies.  *Id.*  Bakush claimed that the second house he stayed in (presumably, the Faisalabad house because Bakush stated that he stayed at the second house 17 days), was a transfer point and no one knew anyone or told you anything.  *Id.*  Bakush stated that it was a "house of sin," but it was not his mistake because the house was not labeled.  *Id.*  Bakush claims that "they" (unidentified) were trying to make chemical weapons at the house.  *Id.*

### Bakush Is Identified as an al-Qaida fighter

27.      ISN███ identified Bakush as "Abu Usama."  ISN███ FD-302 (November 10, 2002).[8] ISN███ stated that he also saw Bakush in Khowst, Afghanistan, during Ramadan 2001.  *Id.* The Khalden training camp is located in Khowst, Afghanistan, and offered basic training such as weapons familiarization as well as advanced courses on assassination, abduction, and

---

he had recently arrived from Libya to study in the Quran in Pakistan, but had ended up in Afghanistan where he lost his passport. *Id.*

[7] See footnote 5, *supra,* for discussion of Da'wah, a variant of Dawa.

SECRET//NOFORN      JA001365      11

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

explosive devices. Declaration of ▮▮▮▮▮▮▮ "Terrorist Training Camps."[9] ISN 839 also

identified Bakush as "Usama al'Libi" or "al-Jaziri," who was among the group of Arabs that

ISN 839 traveled with immediately following the withdrawal from Kabul. IIR 6 034 1077 04.

ISN 839 stated that "Usama" was with his group from the valley he stayed at in Paktia

Province of Afghanistan until the group arrived in Burmat. *Id.* ISN 839 noted also that this

valley was being used as an assembly area for foreigners fleeing Afghanistan. IIR 6 034 1215

04. ISN 839 stated that there were more than 100 people there composed of Arabs, Uzbeks

and other nationalities. *Id.*

28.

---

[9] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ one
year before ISN ▮▮▮▮ statement indicating that he saw Petitioner in Khowst. See
Declaration, "Terrorist Training Camps," above.

JA001366

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

**Bakush Was Captured in the Faisalabad Guest House with Abu Zubaydah**

30.    Raids conducted of al-Qaida safehouses in Pakistan on the morning of March 28,

2002, resulted in the capture of many al-Qaida senior leaders.  010016 FBIS__ SAP

20020408000048-08 (April 8, 2002).  Abu Zubaydah, a 32 year old Saudi born Palestinian,

was captured in the raid on the Faisalabad house.  *Id.*  Abu Zubaydah is a key member of

Usama bin Laden's inner circle.  *Id.*

31.    Bakush stated that he recalls a man at the Faisalabad house named ▮▮▮▮▮▮ ISN 685

FD-302 (January 31, 2003).  Bakush identified a photograph of Abu Zubaydah as the person

named "Daoud" after viewing a photo array.  IIR 6 034 1056 04.  Bakush stated that he last

saw "Daoud" five days before Bakush's arrest.  *Id.*  According to Bakush, "Daoud" was not

treated any differently than the other people in the house.  ISN 685 FM 40 (April 29, 2003).

Bakush also described other persons at the house, including "Ahmed," the owner of the

house; a Sudanese; a Syrian; various Algerians, including ISN 703 (Abdullah Hussein) who

has also identified Bakush as staying at the house, and "Daoud," whom he described as a

Palestinian who came to the house a week before everyone was arrested.  ISN 685 FM 40

(December 13, 2004); IIR 6 034 0708 02.

32.    Bakush stated that all of the people who were at this house were captured by Pakistani

authorities, except one person, Abu Anas, who was killed.  IIR 6 034 0470 03.  Bakush

viewed a picture of detainee Ghassan Abdullah al-Sharbi (ISN 682), and identified the person

SECRET//NOFORN

as Hassan Abdullah, who is from Saudi Arabia and was at the guesthouse. ISN 685 FM 40 (April 29, 2003); ISN 685 FM 40 (August 3, 2004).[10]

33.    ISN 703 states that he went to Afghanistan to train at a camp for jihad. IIR 6 034 0693 02. ISN 703 was arrested at Abu Zubaydah's Faisalabad safehouse, and identified a photo of Bakush as being a resident at the guesthouse. *Id.* ISN 703 refers to Abu Zubaydah as "Daoud," and as the person who owned the house. *Id.* As mentioned above, Bakush had also identified ISN 703 as a resident at the house. IIR 6 034 0708 02.

34.    Bakush continued to deny any knowledge of activities at the Arab house, stating that the other residents did not talk to him. *Id.* Bakush, however, provided a detailed description of the Faisalabad house, at which he stayed for 18 days. ISN 685 FM40 (December 13, 2004). Bakush denied any knowledge of activities within the house, and claimed that he did not see any explosives or chemicals in the house. *Id.*

35.



---

[10]  Noor Uthman Muhamed (ISN 707), a senior al-Qaida leader and trainer at the Khaldan training camp was captured at ▮▮▮▮▮▮ house" in Pakistan on March 24, 2002. ISN 707 FD-302 (Oct. 15, 2002). This is likely the same house in which Bakush was captured, although according to reports the Petitioner was captured on or about March 28, 2002.

JA001368

SECRET//NOFORN

14

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## Conclusion

For the above reasons, among others, Bakush is lawfully detained as an enemy

combatant.

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

    Petitioner,

      v.

BARACK H. OBAMA, *et al.*,

    Respondents

Civil Action No. 09-745 (RCL)

## RESPONDENTS' SUPPLEMENT TO THE FACTUAL RETURN FOR PETITIONER ABDAL RAZAK ALI (ISN 685)

### INTRODUCTION

Respondents respectfully submit this Supplement with supporting exhibits to correct and supplement the assertions in paragraphs 1, 19,█ and 30█ of the narrative of the Amended Factual Return filed on November 26, 2008.  The information contained in this Supplement pertains to the activities of Zayn Husayn, alias Abu Zubaydah, ISN 10016 ("Zubaydah"), and certain activities at the Faisalabad guesthouse (referred to as the "Zubaydah house" as opposed to the "Issa" guesthouse also in Faisalabad), where Petitioner was captured on March 28, 2002.  Specifically, paragraphs 1, 19 and 30 of the narrative incorrectly characterize Zubaydah as a "senior al-Qaida leader," "a very high-level al-Qaida leader" and as part of "Usama bin Laden's inner circle," respectively.  This supplement also further elaborates on Zubaydah's role and his association with the military operations of al-Qaida and the Taliban.  The narrative submitted on November 26, 2008 is corrected and supplemented as follows:

I

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## SUPPLEMENTAL NARRATIVE

1.    █████████ did not have a singular affiliation to any specific terrorist group, *see, e.g.*, Ressam FD-302 (May 22, 2001), ████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

2.    After the September 11th attacks, Zubaydah made a propaganda video that was seized from his personal briefcase at the time of his capture. FM40 (December 12, 2008); Zubaydah Video. The video plays for approximately thirty minutes, and includes different outtakes of propaganda speeches by Zubaydah. Zubaydah Video; Zubaydah Video – English Translation. Zubaydah states that, "[a]s for our relationship with [UBL], he is our [S]heikh and our Emir, our example, may God reward him well." Zubaydah Video – English Translation. He also states that "We and the [S]hiekh are one. We have been working together for almost 10 years, but we were hoping to keep this work secret … hidden." *Id.* With respect to various well-known terrorist operations connected to al-Qaida such as the 1998 United States Embassy bombings, 2000 USS Cole bombing, and

---

[1] Zubaydah has kept a diary since approximately 1990. At the time of his capture, his diary comprised six volumes. English translations of those six volumes and other exhibits cited in this Supplement were attached to Zubaydah's factual return, and the fourth, fifth and sixth volumes are attached to this supplement. Although Zubaydah continued to record information in a diary after his capture, the Government does not rely on post-capture information to justify Zubaydah's detention. Should the Court find it necessary, the Government will further supplement the record with other information contained in Zubaydah's factual return.

2

SECRET//NOFORN    JA001371

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

September 11th attacks, Zubaydah states: "Regarding the question ... concerning our relationship with the[se] terrorist operations .... I hereby say that this accusation is an honor for us and a pride for us for God was with us, and if we had not participated by money, reconnaissance, by individuals or by ideas, then we ask God to forgive us." *Id.*; *see also id.* (stating that "God commanded us to do [terrorist operations]"). Indeed, Zubaydah states that "I am one who supports [these operations] wholeheartedly[,] [b]ut as to our participation in them, this is a matter between us and God." *Id.*

    3.    The Khaldan training camp was a freelance jihadist training camp in the Khowst Province in Afghanistan. ▮▮▮▮▮▮ Declaration "Terrorist Training Camps" (hereinafter "▮▮▮ Declaration").

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    4.    The Khaldan training camp was not controlled by Usama bin Laden, and was operationally and organizationally independent of al-Qaida. ▮▮▮ Declaration.

---

[2] Ahmed Ressam was convicted of various terrorism-related charges based on his plan to bomb the Los Angeles International Airport. Transcript of Ressam Re-Sentencing at 5-8, 12. At Ressam's December 2008 re-sentencing hearing, however, he recanted all of his previous statements. Transcript of Ressam Re-Sentencing at 10.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

According to Ressam, however, ████████ coordinated and cooperated with bin Laden in the conduct of training and trainee movements between their camps. Ressam FD-302 (May 22, 2001).[4] ████████████████████████████████

████ Declaration at 8; *see also* Zubaydah Diary Vol. 5 at 10-11, 13.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████ Declaration.

Khaldan never reopened.

5. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████ By November, he had relocated to Kandahar and was participating in the defensive preparations there, *id.* at 27, as well as participating in military-type duties, *id.* at 42, 47.

6. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[4] There are at least two examples of trainees being exchanged between the camps. First, Ressam describes how a member of his terrorist training cell at Khaldan was sent to one of bin Laden camps while Ressam was there because he was selected for leadership training. Ressam FD-302 (May 24, 2001). Next, when ████████████ Khaldan training was complete, he was given an audience with bin Ladin "because of his good progression in the training." Transcript of FBI Special Agent ████████ Trial Test. at 1997, *United States* v. *Bin Laden,* No. S(7) 98 Cr. 1023 (Jan. 8, 2001). Thereafter, ████████ took bin Laden's advice and obtained advanced additional training at al-Qaida's camps. *Id.* at 1997-98.

4

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

Abu Kamil al-Suri, a close associate of Zubaydah who traveled with Zubaydah at least during part of the time from approximately January 2002 until Zubaydah's capture, confirmed Zubaydah's dedication to facilitating the escape of Arab fighters from Afghanistan.

7.

As previously noted in the Narrative of the Amended Factual Return filed on November 26, 2008, Mosab Omar Ali Al-Madoonee or Al- Mudwani, AKA Abu Anas, (ISN 839) identified Bakush as "Abu Usama," "Usama al'Libi" or "al-Jaziri," who was among the group of Arabs with whom Abu Anas (ISN 839) traveled immediately following the withdrawal of Taliban and Al Qaida forces from Kabul one week before Ramadan in November 2001. Return, ¶ 27. According to Abu Anas (ISN 839), "Usama" stayed with this group in the valley in the Paktia Province of Afghanistan until the group arrived in Burmat. Abu Anas (ISN 839) described this valley as being used as an assembly area for foreigners fleeing Afghanistan

5

SECRET//NOFORN

and according to Abu Anas, most of the men there were armed.  IIR 6 034 1215 04, *id.*

In addition, Abu Anas (ISN 839) identified ISNs 688, 690, 691, 692, and 728, who were

all captured at the Issa house, as having traveled with him from Zurmat, Afghanistan, to

Bannu, Pakistan, which occurred after Abu Anas (ISN 839) left the valley in Pakita.  IIR

6 034 1077 04.

8.



He made preparations to continue the fight.  Zubaydah Diary Vol. 6 at

70, 76, 79; *see also id.* at 85 (describing himself as Noah, creating the nucleus for his

future work); ███████████████ (noting that the group intended to work on

"small projects" until it could leave Pakistan to begin the "main projects and kill the

enemies of God").  By March 2002, al-Suri described the group's work as training in

"electronics, computer, internet and English language as well as preparing and training

people (cadres) for martyrdom operations and to destroy America soon." ██████

██████████████ *see id.* █████ (noting that Zubaydah announced these

specializations); *id.* █████ (describing the group).

9.

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN



7

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

12.    Prior to the March 28, 2002, raid, there had been over one hundred calls between the landline telephone listed to the registered owner of the Issa House and a telephone line listed to an al-Qaida operative located in Karachi.  TD-314/43327-03.

13.    There is a relationship between the Issa house and the house at which Zubaydah was captured. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ While Petitioners ISN 702 and ISN 728 were captured at the Issa house, ISN 703 was captured at the Zubaydah house.  ISN 685 FM 40 (Sept. 26, 2003).  Moreover, ISN 696 had resided at the Issa house but was captured at the Zubaydah house.  ISN 684 FM 40 (Sept. 26, 2003); ISN 685 FM 40 (Dec. 13, 2004).

14.    During an interview of ISN 696 ▓▓▓▓▓▓, who was also captured at the Zubaydah house, ISN 696 indicated that Petitioner (▓▓▓▓▓▓▓▓▓▓▓▓) had

8

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

knowledge of the training taking place in the Zubaydah house and that Petitioner had

been to Afghanistan.  ISN 696 SIR (June 17, 2002).

15.    The following suspected terrorists, in addition to those already mentioned

in the Narrative filed November 26 among others, were captured at the Zubaydah house:

(1) Jabran Qahtani (ISN 696) found his way from fighting in Afghanistan

to staying in Faisalabad.  ISN 696 went to Afghanistan after September 11, 2001, to train

and support the jihad.  After the fall of Kabul, ISN 696 escaped to Pakistan and was

captured at the house in Faisalabad.  IIR 6 034 0911 04.

(2) Sofiane Mohammed Berhoumi (ISN 694), who admittedly trained in

Chechnya and was a trainer in Afghanistan, also stayed at the Zubaydah safehouse and

was captured with Zubaydah in the March 2002 raids in Faisalabad. IIR 6 034 0286 05.

(3) Benyam Mohammed Al-Habashi (ISN 1458) spent extensive time in

Afghanistan and al-Farouq and was associated with (or had contact with) Richard Dean

Belmar, Richard Reid (the shoe-bomber), Zubaydah and Khalid Sheikh Mohammad

("KSM"), the alleged principal architect of the 9/11 attacks against the United States. The

9/11 Commission Report at 435.  It was in Afghanistan that Zubaydah first told ISN 1458

of the "electronics training" (to make explosives) occurring in Zubaydah safehouses in

Pakistan.  Zubaydah told ISN 1458 to go to Pakistan to learn explosive making.  Upon

completion of the training, Al-Habashi was to go to Karachi and meet with Khalid Sheikh

9

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001378

SECRET/NOFORN

Mohammad) and return to Afghanistan to teach the Afghans. ISN 1458 FM40 (7/27/04);

ISN 1458 FM40 (7/28/04).


Dated: July 30, 2009                     Respectfully submitted,

                                         TONY WEST
                                         Assistant Attorney General

                                         JODY HUNT
                                         Branch Director

                                         TERRY M. HENRY
                                         Assistant Branch Director

                                         _____

                                         PAUL AHERN
                                         ANDREW WARDEN
                                         JEAN LIN
                                         NANCY N. SAFAVI (TX. Bar # 24042342)
                                         Attorneys
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         20 Massachusetts Avenue, N.W.
                                         Washington, D.C.  20530
                                         Tel:  (202) 305-9910
                                         Fax:  (202) 616-8470


10

UNCLASSIFIED//FOR PUBLIC RELEASE

20 Mass

FILED WITH THE
COURT SECURITY OFFICER
CSO: _____
DATE: _____

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685)          )          **FILED VIA CSO**
                                   )
           Petitioner,             )
                                   )
       v.                          )          Civil Action No. 10-cv-1020 (RJL)
                                   )
BARACK H. OBAMA,                   )
President of the United States, *et al.*,   )
                                   )
           Respondents.            )

## RESPONDENTS' NOTICE OF WITHDRAWAL
### OF RELIANCE ON CERTAIN DOCUMENTS

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ABDAL RAZAK ALI (ISN 685) | ) | **FILED VIA CSO** |
| Petitioner, | ) | |
| v. | ) | Civil Action No. 10-cv-1020 (RJL) |
| BARACK H. OBAMA, President of the United States, *et al.*, | ) | |
| Respondents. | ) | |

## RESPONDENTS' NOTICE OF WITHDRAWAL
## OF RELIANCE ON CERTAIN DOCUMENTS

Respondents hereby provide notice that they will no longer rely on the following

documents in demonstrating the lawful, ongoing detention of Petitioner:  ISN ███ FD 302

(November 10, 2002), ISN 1458 FM40 (July 27, 2004), ISN 1458 FM40 (July 28, 2004), ISN

685 SIR (March 15, 2006), and IIR 6 034 0286 05.  Respondents also give notice that they will

no longer rely on the assertions contained in paragraph 26 of the Narrative of the Amended

Factual Return filed on November 26, 2008.

//

//

//

//

//

//

//

SECRET//NOFORN

SECRET//NOFORN

Dated: September 3, 2010                    Respectfully submitted,

                                            TONY WEST
                                            Assistant Attorney General

                                            JOSEPH H. HUNT
                                            Branch Director

                                            TERRY M. HENRY
                                            JAMES J. GILLIGAN
                                            Assistant Branch Directors

                                            SCOTT C. LEVIN
                                            THOMAS A. GILLICE
                                            OLIVIA R. HUSSEY
                                            ANN E. NASH
                                            Attorneys for Respondents
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Avenue, N.W.
                                            Washington, DC 20530
                                            Tel:  (202) 353-8776
                                            Fax:  (202) 616-8470

2

SECRET//NOFORN

ISN 685

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED WITH THE
COURT SECURITY OFFICER
CSO: _____
DATE: _____
9/10/10

ABDAL RAZAK ALI (ISN 685),

    Petitioner,

       v.

BARACK OBAMA, *et al.*,

    Respondents.

Civil Action No. 10-CV-1020 (RJL)

## RESPONDENTS' FOURTH MOTION FOR LEAVE TO AMEND THE FACTUAL RETURN

UNCLASSIFIED//FOR PUBLIC RELEASE

* * *

JA001384

SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

Petitioner,

v.

BARACK OBAMA, *et al.*,

Respondents.

Civil Action No. 10-CV-1020 (RJL)

Amended Narrative Regarding Petitioner Abdal Razak Ali (ISN 685)

I.    **INTRODUCTION**

Petitioner Abdal Razak Ali (ISN 685)[1] is an Algerian national currently detained at the

United States Naval Station, Guantanamo Bay, Cuba. He filed his habeas petition under the

above name, but after the ruling of his Combat Status Review Tribunal ("CSRT") in 2004, the

Petitioner revealed his real name is Said Bin Brahim Bin Umran Bakush ("Bakush" or

"Petitioner") and that his true nationality is Algerian, not Libyan as he had initially claimed for

years. Petitioner was captured in Faisalabad, Pakistan, in 2002, along with Abu Zubaydah, a key

facilitator for terrorist training camps in Afghanistan and committed terrorist acts associated with

Al Qaida, as well as several other members of Zubaydah's group.

---

[1] Petitioner has been assigned an Internment Serial Number (ISN). The ISN is an administrative
code assigned to military detainees. Petitioner's full ISN is US9AG-000685DP, in which the
number "685" is Petitioner's unique identifier and the "AG" designation indicates that he is a
national of Algeria. Source documents attached as Exhibits to this narrative may refer to
Petitioner by name, alias, full ISN, or various short forms, such as "AG-000685" or "ISN 685."
Likewise, other military detainees may be referred to in source documents and this summary by
name or various forms of ISN.

SECRET//NOFORN

SECRET//NOFORN

Petitioner has provided shifting accounts of his background and time in Afghanistan and Pakistan. Nevertheless, Petitioner's associates have identified him as a former trainee-turned-trainer at Khaldan training camp; which, while not an Al Qaida camp *per se*, served as a training facility for several high profile terrorists. Petitioner has also served as a permanent member of a militia organized by Abu Zubaydah to fight coalition forces in Afghanistan. *See* Al-Suri Diary, ████████████ at 67. Along with Zubaydah's group, Petitioner was located in Afghanistan during the first few months of Operation Enduring Freedom and Petitioner fled Afghanistan along the route used by Zubaydah to funnel his force into Pakistan. Once there, Petitioner and the other group members traveled in small numbers from guesthouse to guesthouse along with Zubaydah and his associates. After several weeks of travel, Petitioner rejoined other members of this force at the guesthouse in Faisalabad where members of the force, including Abu Zubaydah, were eventually captured after an early morning raid and a prolonged firefight. Zubaydah used the guesthouse as a safe location to train his force in electronics, explosives, computers, and the English language, and as a staging area to execute plans to for martyrdom operations to be carried out against American forces. Petitioner was not only aware of the training happening at the Zubaydah safehouse, he had begun taking the English lessons offered. Petitioner was captured not only with Zubaydah but with others who had trained at terrorist camps in Afghanistan.

Because Petitioner was part of Zubaydah's militia, as stated more fully below, Petitioner is lawfully subject to detention pursuant to the Authorization for Use of Military Force, Pub. L. 107-40, 115 Stat. 224 (2001) (hereinafter "AUMF"), as informed by the principles of the laws of war.

JA001386

SECRET//NOFORN

## II.     LEGAL BASIS FOR DETENTION

### A.     The Government's Detention Authority

The Authorization for Use of Military Force ("AUMF"), Pub. L. 107-40, 115 Stat. 224

(2001), authorizes the use of military force against those "nations, organizations, or persons [the

President] determines planned, authorized, committed, or aided the terrorist attacks that occurred

on September 11, 2001." AUMF, § 2(a). As the Court of Appeals explained in *Al-Bihani v.*

*Obama,* the AUMF "grant[s] the government the power to craft a workable legal standard to

identify individuals it can detain." *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010).

Since March 13, 2009, the Government has interpreted the AUMF to permit the detention of,

*inter alia,* "persons that that were part of, or substantially supported, Taliban or al-Qaida forces

or associated forces," *i.e.,* co-belligerents of al-Qaida or the Taliban, "that are engaged in

hostilities against the United States or its coalition partners." *See* Resp'ts' Mem. Regarding the

Government's Detention Authority Relative to Detainees Held at Guantanamo Bay (dkt. no.

1071) at 1-2. This Court has long recognized this position. *See Sliti v. Bush, e.g.*, 592 F.Supp.2d

46, 49 (D.D.C. 2008) (Leon, J.) (stating that a petitioner is lawfully detained if he is "part of or

supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against

the United States or its coalition partners."). And the Court of Appeals has held that being "part

of" enemy forces is a "valid criter[ion]" for detention under the AUMF. *Al-Bihani*, 590 F.3d at

873-74.

The AUMF does not limit the organizations it covers to al-Qaida or Taliban forces but

also permits the detention of individuals who were part of associated forces like Zubaydah's

militia. *Barhoumi v. Obama*, 609 F.3d 416, 432 (D.C. Cir. 2010) (holding that the petitioner was

SECRET//NOFORN     - 3 -

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

properly detained on the basis that he was part of Zubaydah's militia, an "al-Qaida-associated force"); *Al Bihani v. Obama*, 590 F.3d 866, 872-73 (D.C. Cir. 2010) (holding the petitioner was lawfully detained as part of the 55th Arab Brigade, an "Al Qaeda-affiliated outfit"), *aff'g* 594 F. Supp. 2d 35 (D.D.C. 2009); *Khan v. Obama*, No. 08-1101 (JDB), Mem. Op. 1-2 (D.D.C. Sept. 3, 2010) (holding that the petitioner was lawfully detained as part of Hezb-i-Islami Gulbuddin, "an organization that served as an associated force of the Taliban and al-Qaida in hostilities against the United States and its coalition partners") (internal quotation marks and citation omitted). Such "[t]errorist organizations that act as agents of al Qaeda, participate with al Qaeda in acts of war against the United States [or] systematically provide military resources to al Qaeda . . . in the war against the United States, are analogous to co-belligerents in a traditional war." C. Bradley & G. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2112-13 (2005); *see also Hamlily* v. *Obama*, 616 F. Supp. 2d 63, 74-75 (D.D.C. 2009) (determining that "the government's detention authority also reaches those who were members of 'associated forces'" based on analogous principles of co-belligerency in international armed conflict).; *cf.* Geneva Convention Relative to the Treatment of Prisoners of War of Aug. 12, 1949 (Third Geneva Convention), Art. 4(A)(2) (contemplating detention of members of independent militias fighting in support of a party to an international armed conflict).

There are a variety of ways to prove that an individual is "part of" al-Qaida, Taliban, or associated forces. For instance, formal indicia of membership -- e.g., evidence that an individual swore loyalty, or *bayat*, to al-Qaida or its leaders -- plainly suffice. But because the enemy forces in the current conflict do not operate with uniforms, membership cards or a formal hierarchical military structure, and purposefully attempt to disguise their members and structure, such specific proof of membership is not required. *See Bensayah v. Obama*, 610 F.3d 718, 725

SECRET//NOFORN                                                                - 4 -

JA001588

SECRET//NOFORN

(D.C. Cir. 2010) (noting that "the details" of al Qaeda's organizational structure "are generally unknown" and its structure "is thought to be somewhat amorphous"). Instead, to determine whether a detainee is "part of" al-Qaida, the Taliban or an associated force, the Court must employ a functional, case-by-case approach, rather than a solely formalistic approach, focusing on the actions of the individual in relation to the organization. *Id.*; *Hamlily*, 616 F.Supp. 2d at 75 (adopting a functional analysis approach to determining who is "part of" Taliban or al-Qaida forces). Importantly, individual pieces of evidence "cannot be viewed in a vacuum", but rather in the context of other evidence to determine whether the petitioner is lawfully detained. *Hammamy v. Obama*, 604 F.Supp.2d 240, 243-244 (D.D.C. 2009) (evaluating an intelligence report indicating that petitioner's papers were found in Tora Bora in the context of a report of an Italian government investigation linking petitioner to a terrorist cell to conclude that the petitioner was lawfully detained).

Although "it is impossible to provide an exhaustive list of criteria determining whether an individual is 'part of' al Qaeda," *Bensayah*, 610 F.3d at 725; *Hamlily*, 616 F. Supp. 2d at 75 ("there are no settled criteria for determining who is a 'part of' an organization such as al Qaeda"); *accord Barhoumi*, 609 F.3d at 425 (declining to "delineate the precise contours of the 'part of' inquiry"), evidence that a detainee was functionally part of an enemy force may include attendance at al-Qaida, Taliban, or associated-force training camps and guesthouses. *See Al-Bihani*, 590 F.3d at 873 n.2 (noting that evidence of attendance at training camps and stays at al-Qaida guest houses "would seem to overwhelmingly, if not definitively, justify the government's detention"). *See also Sliti v. Bush*, 592 F.Supp.2d 46, 50 (D.D.C. 2008) (Leon, J.) (noting that evidence that petitioner stayed at guesthouses associated with al Qaeda and attended a military training camp supported the conclusion that he was lawfully detained); *Al-Alwi v. Bush*, 593

UNCLASSIFIED//FOR PUBLIC RELEASE
JA001989

SECRET//NOFORN

F.Supp.2d 24, 28 (D.C.C. 2008) (same). It can also include evidence that the person's movements and activities were similar to those affiliated with al-Qaida, Taliban or associated forces. *See Abdah (Esmail ISN 522),* --F.Supp. 2d--, 2010 WL 1798989 at *20; *Al Odah*, 648 F.Supp. 2d at 15 ("Al Odah's movements throughout the country were consistent with someone who was taking orders from the Taliban and who decided to join the fight against coalition forces."); *Sliti v. Bush,* 592 F.Supp.2d 46, 50 (D.D.C. 2008) (Leon, J.) (noting that evidence that petitioner spent time at different stages of his trip to Afghanistan with individuals closely associated with al Qaeda, when combined with other evidence, supported the inference that he was traveling as an al Qaeda recruit). In its recent decision in *Barhoumi*, the Court of Appeals concluded that the petitioner had become part of an associated force led by Abu Zubaydah where reliable evidence demonstrated that petitioner attended a training camp for which Zubaydah was a facilitator; was captured in a guesthouse in Pakistan with Zubaydah; and provided training to members of Zubaydah's militia for operations against the United States and coalition forces. 609 F.3d at 423-26.

In addition, evidence of following or acting under instructions or directions from others in the organization's command structure would normally establish that an individual was "part of" al-Qaida or Taliban forces. *See Al Bihani,* 590 F.3d at 872-73 (al-Bihani was "part of" the 55th Arab Brigade because, *inter alia*, he "retreat[ed] and surrender[ed] under brigade orders"). Under the AUMF, however, the Government does not need to provide specific proof that a detainee was a part of the command structure of al-Qaida, Taliban, or associated forces, such as direct evidence of taking or giving orders, to prove that the detainee was "part of" those forces. *See Awad v. Obama,* 608 F.3d 1, 11-12 (D.C. Cir. 2010); *Bensayah*, 610 F.3d at 725 ("[t]hat an individual operates within al Qaeda's formal command structure is surely sufficient but is not

SECRET//NOFORN
UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

necessary to show he is 'part of' the organization"); *Abdah (Esmail ISN 522)*, 2010 WL 1798989 at *20 (holding that the Court can infer from its conclusions about a petitioner's actions that he did act at the command of al-Qaida or Taliban leaders); *Gherebi v. Obama*, 609 F.Supp. 2d 43, 69 (D.D.C. 2009) (Walton, J.) (holding that the Government need not produce direct evidence that the detainee followed an order or actually engaged in battle); *Al Odah v. Obama*, 648 F.Supp. 2d 1, 15 (D.D.C. 2009) (Kollar-Kotelly, J.) (same); *Al Bihani v. Obama*, 594 F.Supp.2d 35, 39 (D.D.C. 2009) (Leon, J.) (stating that it is not necessary to prove "that a petitioner actually fire[d] a weapon against U.S. or coalition forces in order for him" to be lawfully detained), *aff'd Al-Bihani v. Obama*, 590 F.3d 866 (D.C. Cir. 2010); *Al Alwi v. Obama*, 593 F.Supp.2d 24, 28 (D.D.C. 2008) (Leon, J.) (stating that the government need not provide evidence that a petitioner actually used arms against U.S. or coalition forces to prove that he is lawfully detained). Rather, as stated above, the Government need only show that the facts of the case, taken as a whole, demonstrate that the petitioner is "part of" an enemy force.

*Barhoumi* and the other cases discussed above confirm that Petitioner is lawfully subject to detention. Indeed, this case is remarkably similar to *Barhoumi*, where the Court of Appeals concluded that the petitioner there had become part of Abu Zubaydah's associated force based on evidence that the petitioner attended the Khaldan training camp in Afghanistan, retreated from Afghanistan with Zubaydah's force, was captured with this Petitioner along with Zubaydah and other members of the force after a firefight at Zubaydah's Faisalabad safehouse, and was identified in a diary (as Petitioner was) as a member of the force. The evidence in *Barhoumi*, as here, showed that the Zubaydah force was planning to return to Afghanistan to conduct operations against United States and coalition forces. 609 F.3d at 423-26. Like Barhoumi, Petitioner trained at Khaldan, traveled within and then fled from Afghanistan with Zubaydah's

SECRET//NOFORN
UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

force, and took up residence at a Faisalabad guesthouse with Zubaydah and other members of his

militia, where the force trained and prepared for martyrdom missions by developing skills in

electronics, explosives, computers, and the English language. As also discussed herein

Petitioner, like Barhoumi, was identified in the Al Suri diary as a "permanent member" of

Zubaydah's force. As the evidence will show, Petitioner's actions show he was part of al Qaeda,

Taliban, or Abu Zubaydah's associated force and render him detainable under the AUMF.

**B.    Persons Who Fall Within the Scope of the Government's Detention Authority Remain Detainable Until the Cessation of Hostilities.**

Once the determination is made that a person is detainable as a part of an enemy armed

force, his detention can lawfully continue until the cessation of the conflict in which he is

detained. A plurality of the Supreme Court in *Hamdi v. Rumsfeld* explained that the AUMF

authorizes detention of enemy forces "for the duration of the relevant conflict." *Hamdi v.

Rumsfeld*, 542 U.S. 507, 521 (2004). The Supreme Court expressly stated that this

understanding was "based on longstanding law-of-war principles." *Id.; see also Anam v. Obama

(Al Madhwani*, ISN 839), 696 F.Supp. 2d 1, 4 (D.D.C. 2010) (Hogan, J.) ("Under the AUMF,

the President possesses 'the authority to detain for the duration of the relevant conflict . . . based

on longstanding law-of-war principles'") (*citing Hamdi*, 542 U.S. at 521)).[2] *Al-Bihani* explained

that "[t]he determination of when hostilities have ceased is a political decision [requiring]

defer[ence] to the Executive's opinion on the matter, at least in the absence of an authoritative

congressional declaration purporting to terminate the war." 590 F.3d at 874. Thus, "[i]n the

---

[2]    Accordingly, the Court of Appeals has held that "the United States's authority to detain an [individual] is not dependent on whether [that] individual would pose a threat to the United States or its allies if released but rather upon the continuation of hostilities. [*Al Bihani*,] 590 F.3d at 874. . . . Whether a detainee would pose a threat to U.S. interests if released is not an issue in habeas corpus proceedings in federal courts concerning aliens detained the authority conferred by the AUMF." *Awad*, 608 F.3d at 11.

SECRET//NOFORN

absence of a determination by the political branches that hostilities have ceased, [the petitioner's] continued detention is justified." *Id.*

No such declaration terminating the war has been issued and the armed conflict with Al Qaida and the Taliban is clearly still ongoing; as such, Petitioner remains lawfully detained. *See Hamdi*, 542 U.S. at 521 (plurality opinion); *Anam*, 2010 WL 58965 at *2; "Officials in Afghanistan Detail Recent Operations," Department of Defense, Sept. 7, 2010 (available at http://www.defense.gov/news/newsarticle.aspx?id=60750); "DOD Identifies Marine Casualty," Department of Defense, September 7, 2010 (*available at* http://www.defense.gov/releases/release.aspx?releaseid=13865) (reporting on the death of Lance Cpl. Ross S. Carver who died while conducting combat operations in Helmand province in Afghanistan); "Suicide blast outside foreign base in Afghanistan," Reuters, May 3, 2010 (*available at* http://www.washingtonpost.com/wpyn/content/article/2010/05/03/AR2010050300073.html); "US servicemember dies in fighting in Afghan east," Associated Press, September 6, 2010 (*available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/09/05/AR2010090500807.html).

## C.    **Burden of Proof**

The Case Management Order ("CMO") entered in this case on August 25, 2010 (dkt. no. 1423), provides that Respondents bear the burden of proving by a preponderance of the evidence that Petitioner's detention is lawful. CMO § II.A. "It is now settled law that a preponderance-of-the-evidence standard is constitutional in considering a habeas petition from an individual detained pursuant to authority granted by the AUMF." *Al Odah*, 611 F.3d 8, 13 (D.C. Cir. 2010)

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE JA001393

SECRET//NOFORN

(citing cases); *see also Al Adahi*, --F. 3d --, 2010 WL 2756551 at \*2 (D.C. Cir. 2010).  The

Supreme Court has defined the preponderance of the evidence standard as follows:

> The burden of showing something by a preponderance of the evidence *simply
> requires the trier of fact to believe that the existence of a fact is more probable
> than its nonexistence* before he may find in favor of the party who has the burden
> to persuade the judge of the fact's existence.  In other words, the preponderance
> standard goes to how convincing the evidence in favor of a fact must be in
> comparison with the evidence against it before that fact may be found, but does
> not determine what facts must be proven as a substantive part of a claim or
> defense. *A preponderance of the evidence is evidence which is more convincing
> than the evidence offered in opposition to it.*  Unlike other standards of proof such
> as reasonable doubt or clear and convincing evidence, the preponderance standard
> allows both parties to share the risk of error in roughly equal fashion, except that
> when the evidence is evenly balanced, the party with the burden of persuasion
> must lose.

*Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (internal citations,

quotations, and alterations omitted) (emphasis added); *see also Barhoumi*, 609 F.3d at 424;

*Khan*, Mem. Op. at 2 (citing *Concrete Pipe & Prods. Of Cal., Inc. v. Constr. Laborers Pension

Trust for S. Cal.*, 508 U.S. 602, 622 (1993)).

Accordingly, unlike in a criminal trial, the Government need only establish that it is more

likely than not that Petitioner was part of al-Qaida, Taliban, or associated  forces. *See Al Bihani*,

594 F. Supp. 2d at 40 (holding that the petitioner was lawfully detained because it was "more

probable than not that he was 'part of'" enemy forces); *see also (Esmail ISN 522)*, 2010 WL

1798989 at \*2 ("respondents must prove 'evidence which as a whole shows that the fact sought

to be proved,' that [petitioner] was part of Al Qaeda, 'is more probable than not.'") (citations

omitted); *Al Odah*, 648 F.Supp. 2d at 15, 18 (finding petitioner is lawfully detained because the

Government met its burden based on the evidence that "it is more likely than not" that petitioner

became part of Taliban and al-Qaida forces in Afghanistan); *Awad v. Obama*, 646 F.Supp. 2d 20,

27 (D.D.C. 2009) (Robertson, J.) (finding petitioner is lawfully detained because it "appears

more likely than not" that "for some period of time" petitioner was part of enemy forces);

SECRET//NOFORN                                                    - 10 -

SECRET//NOFORN

*Hammamy v. Obama*, 604 F.Supp.2d 240, 243 (D.D.C. 2009) (Leon, J.) (stating that "the question before the Court is whether the Government has shown by a preponderance of the evidence that petitioner Hammamy is being lawfully detained[.]"); *Al-Alwi*, 593 F.Supp.2d at 27 (same). The Government is not required to dispel every conceivable doubt presented by the evidence or raised by Petitioner's counsel. The Government is required only to present facts that tip the scale in favor of the conclusion that Petitioner was more likely than not part of al-Qaida or Taliban forces.

### D.    Evaluating the Reliability of Hearsay Evidence Based on The Evidence as a Whole

To determine whether the Government has met its burden, the Court should evaluate the reliability of any hearsay evidence and intelligence reports at issue here based on the evidence as a whole. In accordance with established Circuit precedent, the Court has already ruled that it will consider hearsay evidence that is relevant and material to the lawfulness of the petitioner's detention and that it will consider whether a presumption of authenticity should be accorded the Government's evidence. *See Al Odah*, 648 F.Supp. 2d at 15; *Barhoumi*, 609 F.3d 416, 423-32 (D.C. Cir. 2010) (under circuit precedent, "'hearsay evidence is admissible in this type of habeas proceeding if the hearsay is reliable'") (quoting *Awad*, 608 F.3d at 7).

The Court has also properly evaluated the reliability of that evidence based on the evidence as a whole. That approach is also consistent with the one adopted by the Court of Appeals and in other district court decisions. *Barhoumi*, 609 F.3d at 424 ("'we do not weigh each piece of evidence in isolation, but consider all of the evidence taken as a whole'") (quoting *Awad*, 608 F.3d at 7); *Khan*, Mem. Op. at 3; *Al Odah*, 611 F.3d at 15 (rejecting arguments that would have required the court "to examine [a] single piece of evidence in isolation" and instead considering "whether all the evidence before the district court was sufficient to support [a]

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

finding that [the petitioner] was 'part of'" enemy forces). As explained below, the totality of the evidence establishes that Petitioner was part of enemy forces.

This approach is consistent with the principle that "'[a]n item of evidence, being but a single link in the chain of proof, need not prove conclusively the presumption for which it is offered. It need not even make that proposition appear more probable th[a]n not. . . . A brick is not a wall.'" *United States v. Porter*, 881 F.2d 878, 887 (10th Cir. 1989) (quoting *McCormick on Evidence* § 185 (E. Cleary 3d ed. 1984)). "[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it," because the "sum of an evidentiary presentation may well be greater than its constituent parts." *Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987); *see also United States v. Pugliese*, 153 F.2d 497, 500 (1946) (L. Hand, J.) (probative evidence is "the cumulation of bits of proof which, taken singly, would not be enough in the mind of a fair minded person" to establish the truth of the question to be proved). Accordingly, as the Court of Appeals recently in explained in *Al Adahi,* a court considering the habeas petition of a Guantánamo detainee commits legal error if it considers the evidence on a piecemeal basis, effectively requiring each item of evidence presented by the Government to prove the ultimate issue in the case (whether the petitioner was part of al Qaeda, Taliban, or associated forces) without regard to the other evidence. *Al Adahi*, 2010 WL 2756551 at *4-9.

By evaluating the totality of the evidence here, and the details of individual reports and documents, the Court can reject generalized attacks by the Petitioner on the reliability of the evidence, including efforts to distance himself from his own admissions. As explained above, the *al-Bihani* decision makes clear that the types of intelligence reports at issue here can reliably support detention. 590 F.3d at 879-80. As in *Bihani,* here there is "ample contextual information about evidence in the . . . factual return to determine what weight to give various

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE
JA001396

SECRET//NOFORN

pieces of evidence," *id.* at 880, and ultimately to credit it. *See also, e.g., Awad,* 608 F.3d 1 at 7

(rejecting petitioner's challenge to individual items of evidence, explaining that "we do not

weigh each piece of evidence in isolation, but consider all of the evidence taken as a whole.");

*Barhoumi,* 609 F.3d at 429 (rejecting Barhoumi's challenge to the al-Suri diary and crediting the

diary as reliable because, *inter alia,* Barhoumi's own statements "buttress the diary's

reliability.").

The Court is by now very familiar with the types of evidence at issue in this case. In

assessing the reliability of the intelligence and interview reports at issue here the Court can

presume that they are authentic, as provided in the CMO and as the Court has presumed in other

cases. The Court can also presume that they accurately record the statements or events reported

in them, absent credible evidence to the contrary. Such presumptions are warranted because the

reports are regularly prepared and relied on by the Government for intelligence purposes during

an ongoing armed conflict. *See, e.g.,* Declaration of                     (Sept. 19,

2008) (*Background Declaration – Intelligence 101*) (hereinafter "Intel 101 Declaration")

(describing the purpose of such reports, the training of intelligence collectors, and the importance

that the reports be accurate); Declaration of Brigadier General Holmes, ¶¶ 2-5 (describing how

such primary intelligence often forms the basis for decisions in the field to target particular

individuals).

As the Court is aware from its other decided cases, the main reporting used as evidence

by the government falls within the following two categories of information: (1) intelligence

reports; and (2) reports of interviews with Petitioners and others. As to each of these types of

evidence, Respondents have submitted declarations which further support that the reports at issue

here should be presumed authentic and that they are accurately prepared.

SECRET//NOFORN                     - 13 -

SECRET//NOFORN

Intelligence reports include DoD Intelligence Investigation Reports ("IIRs") ▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The IIR is the main DoD

reporting vehicle for human intelligence information ("HUMINT") used by the Defense

Intelligence Agency ("DIA") and military services. IIRs must be accurately prepared because, as

the main intelligence reporting vehicle of the DoD, they are "broadly available in message

traffic" in the executive branch. Intel 101 Decl. at 6. IIRs are drafted pursuant to intelligence

requirements and are reviewed for errors to ensure their accuracy. Declaration of Paul B. Rester

(Oct. 8, 2009) ("Rester SIRs and IIRs Decl."), ¶¶ 13-17. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Before collected

intelligence is disseminated in an intelligence report such as an IIR ▓▓▓▓▓, analysts in a

collecting agency such as the DIA ▓▓▓▓▓ process the information for dissemination to and

use by other members of the intelligence community, including other intelligence analysts. ▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Interview reports include Federal Bureau of Investigation ("FBI") FD-302s, Criminal

Investigative Task Force ("CITF") FM40s, and military Summary Interrogation Reports

("SIRs") and Memoranda for Record ("MFRs"). FBI FD-302s are non-verbatim records of

witness statements. They constitute a "summary of a witness's or subject's oral interview, based

on the interviewer's understanding of the information provided by the witness." Declaration of

▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Nov. 5, 2008) ¶ 4. FBI FD-302s are prepared according to FBI

requirements that ensure the accuracy of the records, including requirements that agents verify

SECRET//NOFORN                                              - 14 -

that the FD-302 accurately reflects the witness's statement and criteria for using reliable interpreters. *See id.* ¶¶ 4-6; Declaration of [redacted] (Nov. 5, 2008), ¶¶ 3-4. CITF FM40s are similar to FD-302s but are prepared by the criminal investigative arm of the DoD. CITF FM40s "record ... witness interviews," among other things, relating to war crime investigations of the DoD Criminal Investigation Task Force. Intel 101 Decl. at 7.

Military SIRs are written by interrogators to summarize their interrogations.[3] *Id.* If enough intelligence is obtained, SIRs may form the basis of information reported in general message traffic in an IIR. *Id.* Reports such as FD-302s, FM-40s, and SIRs are designed to memorialize investigative interviews and are made at or near the time of the occurrence of the interview memorialized therein. *See, e.g.,* [redacted] Decl. ¶¶ 4-6; Rester SIRs and IIRs Decl, ¶¶ 7, 9 ("An SIR is the primary document that the [Joint Intelligence Group] relies upon to memorialize the information obtained during the course of a detainee interview .... To ensure that SIRs are drafted accurately and reflect a contemporaneous written account of the detainee interview, the JIG requires interrogators to complete an SIR as close to the end of the interrogation as possible."); Declaration of [redacted] (Oct. 9, 2009) ¶¶ 8, 10 ("CITF requires investigators to draft an FM 40 following the interview of a detainee.").

Moreover, interrogation reports such as FD-302s, FM-40s, and SIRs are promptly written, reviewed, and edited after an interrogation to ensure that they accurately memorialize the substance of the statements contained therein. Because they are prepared by individuals following procedures that are intended to ensure accuracy, and for important internal

---

[3] MFRs were "commonly used by interrogators at GTMO primarily during the early period of operations between 2002 and early 2004" to record "the purpose, content and conduct of [an] interrogation." Declaration of Paul B. Rester (Dec. 2, 2009) ("Rester MFR Decl."), ¶ 6. The title "MFR" was eventually changed to "SIR"; both documents are "functional equivalent[s]." *Id.* ¶¶ 6, 8.

SECRET//NOFORN

governmental and intelligence purposes, the Court can assume that they are reliable absent the Petitioner offering credible evidence to challenge the reliability of a specific report. *See* ███████ Decl. ¶ 6 ("Because FD-302s are one primary source of information for intelligence provided to the intelligence community, FBI agents are trained to ensure that they are accurate records); ███ Decl. ¶ 12 ("Based on my experience as the CITF Task Force Operations Officer, FM-40's are the best evidence of what transpired during the course of a detainee interview, as they are drafted from the notes or fresh memory of the investigator in a timely manner after the detainee interview takes place."); Rester SIRs and IIRs Decl. ¶12 ("Based on my experience as the JIG Director, SIRs are the best source of information of what transpired during the course of a detainee interview.").

Interview reports typically detail whether a linguist was used. *See* Rester SIRs and IIRs Decl. ¶ 7 ("SIRs include . . . whether a linguist was relied upon by the interrogator."); █████ Decl. ¶ 8 ("FM-40s include . . . whether a linguist was relied upon by the interviewer."). The same factors that support a presumption that preparers of the reports reliably recorded the statements or events support a presumption that statements in the reports were reliably translated. Moreover, as detailed in the ████ declaration, the FBI requires interpreters or translators to meet specific FBI standards, including those it utilizes from other government agencies. ████ Decl. ¶ 4. Indeed, in the context of the Guantanamo habeas litigation, the Court of Appeals has repeatedly credited translated statements. *See Al-Bihani*, 590 F.3d at 879 (*citing United States v. Da Silva*, 725 F.2d 828, 831-32 (2d Cir. 1983)); *Barhoumi*, 609 F.3d at 431 (rejecting contention that district court erred by relying on the al Suri diary because it had been translated). In particular, the Court of Appeals has explicitly rejected that notion that "uncertainties" surrounding the translation of particular statements "somehow taints the reliability of [an

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

intelligence report] as a whole." *Barhoumi*, 609 F.3d at 431. Rather, as with other challenges to

the authenticity or accuracy of a report, Petitioner should be required to offer specific credible

evidence showing that a statement was erroneously recorded or translated, and should not be

permitted to rely on broad-brush attacks. Moreover, as previously argued, the reliability of such

translations can be assessed based on how the account fits within all the other evidence in the

case.

Absent credible evidence rebutting the accuracy of any intelligence report or

interrogation interview, the Court should find Respondents' evidence to be reliable. As

explained above and in the cited declarations, these intelligence products are regularly prepared

in the ordinary course of business by qualified intelligence-gathering and law enforcement

professionals and typically include sufficient indicia of reliability for the Court to credit their

reliability. *See, e.g.*, Rester SIRs and IIRs Decl. ¶ 7 ("For example, SIRs include the date of the

interview, the subject of the interview, the time and duration of the interview, whether a linguist

was relied upon by the interrogator, a description of the interrogation approach and an evaluation

of its effectiveness, a description of the detainee's demeanor, and a summary of the topics

discussed and the information provided by the detainee. The SIR also includes the interrogator's

observations about the detainee, an assessment of the detainee's level of cooperation, and leads

to pursue in future interrogations"); ██████ Decl. ¶ 8 ("For example, FM-40s include the date of

the interview, the subject of the interview, and whether a linguist was relied upon by the

interviewer. CITF policy requires agents to document all information discussed by a detainee

during the course of an interview."); *see also Khiali-Gul v. Obama*, 05-0877 (JR) (D.D.C. April

22, 2009) (holding that ██ challenged reports (16 IIRs ████████ were reliable even when

the reports come from unnamed sources because the reports "collectively include sufficient detail

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

about the sources' placement, access and motivation to provide a basis for making informed reliability determinations.")

Finally, the Court should be skeptical of Petitioner's effort to disavow all his inculpatory statements as allegedly tainted by the conditions of his confinement or by unspecified abuse or torture. Absent sound reasons to doubt such statements, they are generally considered highly probative of the truth. *See, e.g.,* Fed. R. Evidence 804(b)(3); *Williamson v. United States,* 512 U.S. 594, 599 (1994) (explaining that the underlying common-sense rationale behind admitting hearsay statements against interest is that "reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true"). Petitioner's wholesale denials and vague allegations of abuse do not undermine his statements. Petitioner also ignores the facts that Respondents have provided the Court with multiple reports corroborating their allegations and that

*See* Declaration of                          (Oct. 17, 2008) (*Counter-Interrogation Doctrine and Practice*) at 3

## IV.   FACTUAL BASIS FOR DETENTION

The following narrative and attached materials set forth the factual bases supporting Petitioner's lawful detention. This narrative is not intended to be a complete explication of the information in support of Petitioner's detention in the attached materials.

### A.   General Background On Al Qaida

SECRET//NOFORN

1. Al Qaida ("the Base") was founded by Usama bin Laden and others in or about 1989 for the purpose of opposing certain governments and officials with force and violence. *See* NATI'L COMM'N ON TERRORIST ATTACKS UPON THE U.S., THE 9/11 COMM'N REPORT 56 (2004) ("THE 9/11 REPORT").

2. Usama bin Laden is recognized as the emir (prince or leader) of Al Qaida. *Id.* A purpose or goal of Al Qaida, as stated by Usama bin Laden and other Al Qaida leaders, is to support violent attacks against property and nationals (both military and civilian) of the United States and other countries. *Id.* at 59-61; Decl. of ███████ "Background Declaration on Al Qaida," Sept. 22, 2008, at 1.

3. Between 1989 and 2001, Al Qaida established training camps and guesthouses in Afghanistan, Pakistan, and other countries for the purpose of training and supporting violent attacks against property and nationals (both military and civilian) of the United States and other countries. THE 9/11 REPORT at 64-67.

4. In 1996, Usama bin Laden issued a public "Declaration of Jihad Against the Americans." This declaration called for the murder of U.S. military personnel serving on the Arabian peninsula. *Id.* at 48.

5. In February 1998, Usama bin Laden and Ayman al Zawahiri (bin Laden's deputy) issued a fatwa (purported religious ruling) requiring all Muslims able to do so to kill Americans - whether civilian or military - anywhere in the world. *Id.* at 47.

6. Since 1989, members and associates of Al Qaida, known and unknown, have carried out numerous terrorist attacks, including, but not limited to: the attacks against the American Embassies in Kenya and Tanzania in August 1998, which killed approximately 250 people (*id.* at 68-70); the attack against the USS *Cole* in October 2000, which killed 17 United States Navy

UNCLASSIFIED//FOR PUBLIC RELEASE
JA001403

SECRET//NOFORN

sailors (*id.* at 190-93); and the attacks on the United States on September 11, 2001, which killed approximately 3,000 people (*see id. passim*).

7. The Taliban (students of Islamic knowledge) is an Islamic fundamentalist group that was formed in Afghanistan in 1994. *See, e.g.,* Greg Bruno, *et al., The Taliban in Afghanistan,* COUNCIL ON FOREIGN RELATIONS, Aug. 3, 2009. After two years of violent conflict that included the capture of Kabul, Afghanistan's capital, the Taliban took control of Afghanistan's national government in 1996. THE 9/11 REPORT at 65. Although it was never formally recognized by the United States (*id.* at 124), the Taliban controlled Afghanistan's national government from 1996 until the United States-led military campaign ousted the Taliban from power in 2001 (*id.* at 337-38). During the period in which the Taliban controlled Afghanistan's national government, it provided safe harbor and support to Al Qaida and Usama bin Laden. *Id.* at 64-67.

8. On September 18, 2001, following the attacks on the United States on September 11, 2001, Congress adopted the Authorization for the Use of Military Force. 115 Stat. 224 (2001). Recognizing that the attacks of September 11, 2001 "render it both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens at home and abroad," Congress authorized the President "to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." *Id.* Within weeks, United States military forces were deployed in Afghanistan. THE 9/11 REPORT at 337.

UNCLASSIFIED//FOR PUBLIC RELEASE
JA001404

SECRET//NOFORN

9.  Operation ENDURING FREEDOM ("OEF") commenced on October 7, 2001, with an initial aerial bombing campaign against Al Qaida and Taliban targets throughout Afghanistan. Decl. of Lt. Col. Jerry E. Brooks, "Operation ENDURING FREEDOM," Apr. 28, 2010, at 2. Approximately two weeks later, United States Army Rangers and Special Forces troops seized a desert landing strip southwest of Kandahar, Afghanistan and conducted a series of raids. *Id.* This heralded an active ground campaign of coalition forces composed of United States forces and Afghanistan militia, including the Northern Alliance. *Id.* at 2-4. The Northern Alliance is an association of Afghan groups opposed to the Taliban. It assisted the United States in its military campaign in Afghanistan to defeat Al Qaida and the Taliban. THE 9/11 REPORT at 330-34, 336-38.

10.  In mid-November 2001, following the rapid and overwhelming victories in northern Afghanistan, coalition forces returned to Kandahar. Decl. of Lt. Col. Jerry E. Brooks, "Operation ENDURING FREEDOM," Apr. 28, 2010, at 4. Anti-Taliban militia, led by Hamid Karzai and Gul Agha Shirzai and supported by U.S. Special Operations Forces, mustered in towns east and north of Kandahar, while U.S. Marines reoccupied the same desert landing strip first assaulted in mid-October. *Id.* at 4. Simultaneously, coalition forces bombed specific Al Qaida and Taliban targets inside the Taliban stronghold. *See, e.g.,* UNITED STATES SPECIAL OPERATIONS COMMAND, HISTORY 97 (6th ed. 2008). Among the noteworthy Al Qaida causalities of this targeted aerial campaign was Al Qaida's second-in-command, Muhammad Atef, also known as Abu Hafs al-Masri, who was killed on November 14, 2001. THE 9/11 REPORT at 434. By the end of November, coalition forces had essentially encircled Kandahar, cutting off the last lines of communication with Pakistan. Decl. of Lt. Col. Jerry E. Brooks, "Operation ENDURING FREEDOM," Apr. 28, 2010, at 4. On December 6, after the failure of

SECRET//NOFORN

its final counterattack, the Taliban surrendered Kandahar to coalition forces. *Id.* As coalition forces arrived in newly-liberated Kandahar, an estimated 15,000 to 17,000 Taliban and Al Qaida fighters abandoned the city. *Id.*

11. The United States-led military campaign removed the Taliban from control of Afghanistan's national government by the end of December 2001. THE 9/11 REPORT at 337-38. Taliban and Al Qaida forces, however, have continued to operate in Afghanistan and attack coalition forces. Currently, two major military undertakings are underway in Afghanistan. First, Operation ENDURING FREEDOM is a U.S.-led, multinational coalition military operation, initiated in October 2001 to counter terrorism and bring security to Afghanistan in collaboration with Afghan forces. Decl. of Lt. Col. Jerry E. Brooks, "Operation ENDURING FREEDOM," Apr. 28, 2010, at 1-2. OEF operations led to the collapse of the Taliban government and helped bring security and stability to Afghanistan. *See, e.g.,* THE 9/11 REPORT at 337-38. Second, the International Security Assistance Force (ISAF) is a United Nations-mandated international coalition operating under the command of the North Atlantic Treaty Organization (NATO). NATO INTERNATIONAL SECURITY ASSISTANCE FORCE, HISTORY. It was established in 2002 with the goal of creating conditions for stabilization and reconstruction in Afghanistan. *Id.* As of August 2010, ISAF comprises nearly 120,000 troops from over 40 nations. NATO INTERNATIONAL SECURITY ASSISTANCE FORCE, KEY FACTS AND FIGURES (2010).

**B.    Background on Abu Zubaydah and his Force**

12. ███████████████████████████████████████████

████████████████████████████████████████████ Decl.

████████████████████████████████████████████

SECRET//NOFORN

of ███████ "Training Camps," Sept. 19, 2008, at 4, 7; ████████████

*passim*; ████████████ *passim.* ████████

███████████ *see, e.g.,* Ressam FD-302 (May 22, 2001), and ████████

████████████████ *see, e.g.,* ████████

However, Zubaydah closely associated with and actively supported bin Laden and Al Qaida. *See*

United Nations Security Council 1267 Committee Consolidated List, QI.H.10.01, available at

www.un.org/sc/committees/1267/consolidatedlist.htm#alqaedaent (listing Abu Zubaydah under

"Individuals associated with A-Qaida," as a "[c]lose associate of Usama Bin Laden (QI.B.8.01)

and facilitator of terrorist travel."); *see also* ████████ FD302 at 17 (June 14, 2002)

(█████████ involvement in the planning of Al Qaida attacks).

13. ████████████████████

████████████ Ressam FD-302 at 4 (May 22, 2001). ████████

████████████████

14. After the September 11, 2001 attacks, Abu Zubaydah unequivocally associated

himself with the military operations of Al Qaida and the Taliban. *See, e.g.,* Abu Zubaydah

Video – English Translation (describing the nature of his relationship with Al Qaida and Usama

SECRET//NOFORN                                                    - 23 -

SECRET//NOFORN

bin Laden); *see also*

15. Three months after the September 11th attacks, Zubaydah made a propaganda video that was seized from his personal briefcase at the time of his capture. FM40 (Regarding the Zubaydah Video) (December 12, 2008); Zubaydah Video - English Translation. The video plays for approximately thirty minutes, and includes outtakes of propaganda speeches by Zubaydah. *See* Zubaydah Video – English Translation. Zubaydah states that, "[a]s for our relationship with the Sheikh [UBL], he is our [S]heikh and our Emir, our example, may God reward him well." Zubaydah Video - English Translation at 3. He also states that "We and the [S]hiekh [sic] are one. We have been working together for almost 10 years, but we were hoping to keep this work secret ... hidden." *Id.* at 1. With respect to various well-known terrorist operations connected to Al Qaida such as the 1998 United States Embassy bombings, 2000 USS Cole bombing, and the September 11th attacks, Zubaydah states: "Regarding the question ... concerning our relationship with the[se] terrorist operations .... I hereby say that this accusation is an honor for us and a pride for us for God was with us, and if we had not participated by money, reconnaissance, by individuals or by ideas, then we ask God to forgive us." *Id.* at 3; *see also id.* at 1 (stating that

SECRET//NOFORN                    - 24 -

16.

17.

[8] Like his companion Zubaydah, al-Suri maintained a diary in which he detailed his and Zubaydah's activities.

SECRET//NOFORN

March, 2002. Al-Suri Diary███████████ (entries begin on January 24, 2002, and

continue through March 26, 2002). As described by a Abu Kamil al-Suri,

> America is building a government underground in expectation of a terrorist attack on
> Washington (Question Mark, Two Exclamation Points) what does this mean. It is the
> Islamic Jihad coming from the East, the West, the North and the South of the
> International Qa'ida Network led by Shaykh 'Usamah Bin Ladin and aided by Abu
> Zubaydah, Sayf Al-'Adil, Abu Muhammad Al-Masri, leaders and members and . . . me in
> the near future . . . .

Al-Suri Diary███████████ at 54. Al-Suri was just one member of a force that

Zubaydah was building – training them in "electronics, computer[s], internet and English

language as well as preparing and training people (cadres) for martyrdom operations and to

destroy America soon." *Id.* at 58, 59 (Al-Suri notes that Zubaydah announced these

specializations); *id.* at 66-67 (Al-Suri describes the force, labeling Petitioner as a "permanent

member").

19. In his diary, Abu Kamil al-Suri identifies the Petitioner by his kunya "'Usamah Al-

((Jaza'iri))" and says he is a "permanent member" of Abu Zubaydah's force. *See also Barhoumi*,

609 F.3d at 425-32 (holding that Barhoumi was detainable, in part, because the Al-Suri Diary

identified him as a "permanent member" of Zubaydah's force). Abu Zubaydah's familiarity

and association with the Petitioner likely began when the Petitioner was a trainer at the Khaldan

training camp, where Zubaydah was a key facilitator. ████████████████████

████████████████████████████████████

████████████████ Al-Suri Diary███████████ at 6, 59; ███████

██████████ Zubaydah aided the group's escape from Afghanistan and directed them to

Faisalabad, Pakistan where they could safely gather, train, and plan martyrdom operations to

attack the forces and interests of the United States and its coalition partners.

**C.    Petitioner's Aliases**

SECRET//NOFORN

20. Petitioner used a number of aliases during his time in Afghanistan and Pakistan.

Moreover, Petitioner ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for over two years

while detained at Guantanamo Bay, claiming that his name was Abdel Razack Ali Abdel

Rahman and that he was a Libyan national. Intelligence gathered by the Government, including

information from Petitioner's associates, revealed that Petitioner was lying. *See e.g.*, IIR 6 034

1041 04 (ISN 703) (June 12, 2003). Only after being confronted with that intelligence did

Petitioner admit to using a false name and nationality. ISN 685 SIR (November 18, 2004).

21. It is common for those engaged in terrorist activities to use aliases. *See* Decl. of

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "Names, Aliases, Kunyas and Variants," Sept. 19, 2008, at 2.

These aliases, or kunyas, are "used as a security, denial and deception measure." *Id.* They also

provide "a degree of 'cover' or operational security." *Id.* at 4-5. An individual seeking to hide

his true identity may change his alias depending on whom he is communicating with or where he

is located. *Id.* at 4-5. A noteworthy feature of these aliases is that they often include an Arabic

geographic adjective. *Id.* at 3; *see also id.* at 7-12 (providing a list of common Arabic

geographic adjectives). For example, al-Adani may mean that the individual is from Aden,

Yemen. *Id.* at 7. These names and aliases are sometimes spelled differently when transliterated

from Arabic to Latin characters. There are many transliterations and slight variations of the

names and aliases in the attached documents, and this narrative does not attempt to delineate

every instance where the cited documents contain varying transliterations of the same name or

alias.

22. Petitioner's associates have identified the Petitioner under the following aliases:

"Abu Usama," "Usama al Jaza'iri," "Usama al 'Libi," "Abdul Razak," or "Moorad." ▮▮▮▮▮▮

FD302 (August 11, 2002) (▮▮▮▮ identifies Petitioner's picture as "Usama Al-Jaza'eri"); ISN

SECRET//NOFORN

839 SIR (June 17, 2004) (ISN 839 identifies Petitioner's picture as Usama al Libi or Usama al Jaziri); ISN 696 SIR (June 17, 2002) (ISN 696 identifies Petitioner's picture as Abdul Razak or Moorad); ISN ISN 703 FM40 (June 1, 2004); IIR 6 034 0715 02 (September 5, 2002) (ISN 703 identifying the Petitioner as Abdul Rizak who claims to be from Libya, but is actually Algerian);

▬▬▬▬ FD302 (June 14, 2002) at 15, 30-31 (identifying Petitioner's picture as Abdul Razak (an Algerian), a resident of the Faisalabad guesthouse at which Petitioner was captured with Abu Zubaydah).[9]

23. As mentioned above, Abu Kamil al-Suri identifies the Petitioner by his kunya "'Usamah Al-((Jaza'iri))" in his diary and says he is a "permanent member" of Abu Zubaydah's force. Al-Suri Diary, ▬▬▬▬▬▬ This entry is dated just two days before most of Zubaydah's force – including the Zubaydah, Barhoumi and the Petitioner – is captured together. *Id.* at 67; Barhoumi, 609 F.3d at . Moreover, identifies the Petitioner by this kunya as traveling with Zubaydah's force at various points from January through March at several different points of his diaries. Al-Suri's account of Petitioner's travels with the Zubaydah force is corroborated, as described below, by other identifications. *See e.g.,* ISN▬▬FD302 (August 11, 2002) (ISN ▬▬▬also says the Petitioner used the name "Usama Al-Jaza'eri" and pinpoints him as traveling with Zubaydah's group along the same route described by al-Suri.)

24. The D.C. Circuit considered the Abu Kamil al-Suri's diary during its review of the district court's ruling on the *habeas* petition of another detainee captured with the Petitioner and held at Guantanamo Bay, Sufian Barhoumi, aka Ubaydah al-Jaza'iri (ISN 694). *Barhoumi*, 609 F.3d at 425-432. There, the Court held the "al-Suri diary contains sufficient indicia of reliability

SECRET//NOFORN

to justify the district court's reliance on it" in denying Barhoumi's petition for the writ. *Id.* at

428.

### D.   Petitioner was a Permanent Member of Zubaydah's Force

#### 1.   Petitioner Was A Trainer At Khaldan Training Camp

25. Petitioner was one of several trainers at Khaldan Camp who joined Abu Zubaydah's

force. Abu Kamil Al-Suri identifies the group by their kunyas in his diary. Specifically, under

the entry dated January 24, 2002, he writes:

> It was 'Usamah Al-((Filastini)), Tariq, Asad, Abu Al-Barra', (Abu 'Uns), Shaykh
> Akrama (The Commander of Khaldun Military Camp) and the brothers who worked as
> trainers in the same camp such as 'Ashur Al-((Jaza'iri)), **'Usamah Al((Jaza'iri))**, 'Abd
> Al-Bari Al-((Filastini)), the one who –illegible--, brother Salah Al-Din Al-((Muhtasab))
> (he is the brother amongst the many who entered Afghanistan recently and since he is
> specialized in computers, he joined our group so that my friend could benefit from his
> expertise), and Shaykh 'Abd Al Hadi Al-((Iraqi)) (the commander of Kabul's front who
> became the commander of the North's Front).

Al-Suri Diary [redacted] at 6 (emphasis added). Petitioner is identified in this passage

by his kunya "'Usamah Al-((Jaza'iri))." ISN [redacted] FD302 (August 11, 2002); *see also* ISN 839

SIR (June 17, 2004) (ISN 839). Abu Zubaydah is identified above by his kunya "Tariq" and ISN

[redacted] is identified above by his kunya and title, [redacted]

[redacted] Al-Suri Diary, [redacted] at 6; ISN [redacted] FD302 (August 11, 2002).

The kunya used by al-Suri to identify the Petitioner is corroborated by [redacted]

[redacted] who looks Petitioner's picture and identifies him with the same kunya. ISN [redacted] FD302

(August 11, 2002).[11]

---

[10] [redacted] was a trainee-turned-trainer at Khaldan Training Camp. From
1994 until 1999, [redacted] trained hundreds of recruits on the use of small arms and
artillery. IIR 6 034 0657 02 (August 6, 2002) (ISN [redacted]).

[11] ISN [redacted] identifies Petitioner's picture as "Usama Al-Jaza'eri," places him among his group in
a bunker in Barmal during the evacuation from Afghanistan, and identifies him as being at the

SECRET//NOFORN                                      - 29 -

SECRET//NOFORN

26. 

Declaration on Terrorist Training Camps
(hereinafter "Decl."); ISN FD302 (January 24, 2003).
Resssam FD-302 (May 22,
2001) Ressam Trial Testimony at 547; Ressam
Deposition at 58;[12] *see also* ISN 707 CSRT Statement at 3; ISN FD302 (November 21,
2002). ISN
ISN FD302 (August 11, 2002).
ISN FD302

---

house Petitioner was eventually captured at in Faisalabad, Pakistan. ISN does not
specifically identify the Petitioner as a former trainer at Khaldan. ISN FD302 (August 11,
2002).

[12] Ahmed Ressam was convicted of various terrorism-related charges based on his plan to bomb
the Los Angeles International Airport. Transcript of Ressam Re-Sentencing at 5-8, 12; *United
States v. Ressam*, No. CR99-666JCC (W.D. Wash. Dec. 3, 2008). At Ressam's December 2008
re-sentencing hearing, however, he recanted all of his previous statements. Transcript of Ressam
Re-Sentencing at 10. Despite this eleventh-hour recantation, the trial judge found that Ressam
had provided valuable intelligence to law enforcement that assisted in the fight against
international terrorism. Based in part on this cooperation, Judge Coughenour granted a
significant downward departure from Ressam's advisory sentencing guideline range. The Court
of Appeals for the Ninth Circuit later vacated this sentence and remanded for reassignment and
resentencing. *See United States v. Ressam*, 593 F.3d 1095 (9th Cir. 2010).

SECRET//NOFORN - 30 -

SECRET//NOFORN

27. The Khaldan training camp was not controlled by Usama bin Laden, and was operationally and organizationally independent of Al Qaida. ████ Decl. According to Ressam, however, Zubaydah coordinated and cooperated with bin Laden in the conduct of training and trainee movements between their camps. Ressam FD-302 (May 22, 2001).[14] Several trainees from Khaldan camp have been involved in terrorist operations, including Ahmed Ressam, the so-called Millenium Bomber (Ressam FD-302 (May 24, 2001)), Zacarius Moussaoui, (ISN ████ FD302 (August 11, 2002)).

28. ████████████████████████ Decl. at 8; ████████████ *see generally* IIR 6 034 0822 04 (January 17, 2003) (ISN ████████████████████████████ ████████████████████████████ ████████████████████████████ ██████████████ *See* ████ Decl. at 8.

Khaldan never reopened.

2.    **Petitioner Travels Through Khowst, Afghanistan**

---

[13] The guesthouse associated with the Khaldan camp is distinct from the two Faisalabad guesthouses where Zubaydah, Petitioner, and others were captured on March 28, 2002.

[14] There are at least two examples of trainees being exchanged between the camps. First, Ressam describes how a member of his terrorist training cell at Khaldan was sent to one of Al Qaida's camps while Ressam was there because he was selected for leadership training. Ressam FD-302 (May 24, 2001). Next, when Mohamed al-'Owahali's Khaldan training was complete, he was given an audience with bin Ladin "because of his good progression in the training." Transcript of FBI Special Agent ████████ Trial Test. at 1997, *United States* v. *Bin Laden,* No. S(7) 98 Cr. 1023 (Jan. 8, 2001). Thereafter, Owahali took bin Laden's advice and obtained advanced additional training at Al Qaida's camps. *Id.* at 1997-98.

SECRET//NOFORN

### In November, 2001 Together With Other Jihadists

29. As described below, the Petitioner was present in Khowst, Afghanistan after the September 11th attacks, when the United States began bombing Afghanistan as part of Operation Enduring Freedom. In mid-November 2001, the Petitioner was residing at a barracks in Khowst that housed a number of former trainees or trainers at Khaldan. During Petitioner's stay at this barracks, a fire broke out and the incident was recorded in an official incident report. Following the fire, Petitioner traveled to a nearby valley outside of Khowst, Afghanistan, and then to Zurmat, Afghanistan.

*a.     Fire Incident Report Identifying Petitioner*

30. On November 15, 2001, a fire broke out in the communications room of a barracks in Khowst, Afghanistan, that housed a number of jihadists who had trained or were trainers at Khaldan. AFGP 2002 003727 and IIR 7 739 3352 02.[15] Various high-powered weaponry, communications devices, and ammunition were being stored at the barracks when the fire broke out. AFGP 2002 003727 and IIR 7 739 3352 02. According to the incident report sent from Abu Al-Faraj[16] to Sheikh Ahmad Abdullah, the fire destroyed "two high frequency radios," "one

---

[15] Attached as an exhibit to this narrative are Calendar Conversion Pages. The incident report states that the fire occurred on "Thursday 28 Sha'ban" of the Hijra calendar, 2002. AFGP 2002 003727 and IIR 7 739 3352 02. The fire incident report was retrieved by Allied Forces in 2002, and, assuming the fire occurred within a year or two of when the document was discovered, the corresponding Gregorian calendar date for 28 Sha'ban must be Thursday, November 15, 2001. *See* Calendar Conversion Pages, attached as an exhibit and also available at, www.calendarhome.com/converter, a website that converts western calendar dates to the corresponding Islamic calendar date.

[16] It is possible that the report author "Abu Al-Faraj" is Abu Al Faraj Al Libi, an Al Qaida military commander at the Battle of Tora Bora who also operated Al Qaida guesthouses in Afghanistan. *See*, Decl. of ████████ on Guesthouses, at 2 (September 19, 2008); *see also* Decl. of Jerry E. Brooks on Operation Enduring Freedom, 4 (April 28, 2010).

SECRET//NOFORN                                          - 32 -

SECRET//NOFORN

repeater,"[17] "one Kalashnikov," "one ammunition pouch and its contents," and "one RPG pouch and its contents." [18] *Id.* Petitioner and the other individuals at the guesthouse were able to save several weapons from destruction in the fire, including a "Stinger,"[19] a "SAM 7,"[20] and "electric detonators and other things." *Id.* The incident report memorializing the fire, the personnel present, and the weapons saved versus destroyed was discovered in Kabul, Afghanistan by Allied Forces. IIR 7 739 3352 02.

31. This handwritten report identifies *all* of the individuals present at the beginning of the fire as either trainers or trainees, including the Petitioner. *Id.* One of the individuals is listed explicitly as a trainee at Khaldan. *Id.* The last name on the report's list of personnel is a Khaldan camp trainer who taught military tactics, ████████████████████ *Id.*; ISN ██ FD302 (August 11, 2002) ████████████████████ as a trainer at Khaldan who taught military tactics). The Petitioner is identified in the incident report by his kunya "Abu

---

[17] In context, the "repeater" reference here probably refers to the electronic device that receives a signal and retransmits it at a higher level and/or a higher power, or onto the other side of an obstruction, so that the signal can cover longer distances. *See* http://www.pcmag.com/encyclopedia/, see, "repeater."

[18] In context, the reference to "one RPG pouch" probably refers to the pouch used to carry rockets for a Rocket Propelled Grenade ("RPG") and the contents referenced are likely rockets for an RPG. *See* http://www.army-technology.com/glossary/rocket-propelled-grenade.html

[19] In context, the reference to a "Stinger" probably refers to the personal portable infrared homing surface-to-air missile developed in the United States. *See* http://www.raytheon.com/capabilities/products/stinger/, see, "Stinger Missile Data Sheet."

[20] In context, the reference to a "SAM 7" probably refers to the portable, shoulder-fired, low-altitude Surface-to-Air Missile system with a high explosive warhead and passive infrared homing guidance. *See* http://www.army-technology.com/glossary/surface-to-air-missile.html

SECRET//NOFORN                                                          - 33 -

SECRET//NOFORN

████████████████ and there is an additional notation that he was an "ex-trainee" who "attended the bombardment." *Id.*[21]

32. This fire incident report places Petitioner in Khowst, Afghanistan in November 2001. IIR 7 739 3352 02; AFGP 2002 003727. This report also places him at a guesthouse that was likely associated with al-Qaida or an associated enemy armed group. Besides the high-powered military weaponry described at the house (missiles, AK-47s, detonators, and ammunition), this guesthouse was equipped with high frequency radios and a repeater (a device that enables longer-distance communication). IIR 7 739 3352 02; AFGP 2002 003727. The personnel present at the guesthouse either had already acquired or were in the process of receiving military-style training, and the house had a management structure that included reporting requirements. *Id.* The report detailed the date, time, and circumstances of the fire; it listed the names and identifying information of the "personnel who were present;" and it reported on the weapons saved and the "material losses." *Id.* Moreover, there is a notation on the incident report that says "Khoust File," suggesting a system of storing and tracking records of significant incidents like this fire. *Id.; see generally,* ████ Decl. on Guesthouses (September 19, 2008) (describing the management of guesthouses that serve as training camp facilitations, hubs, ████████████

████████████████████████████████

*b.    Petitioner Identified Near Khowst and Traveling to Zormut*

---

[21]    As trainers were usually trainees at some point prior to becoming trainers, the description of Petitioner as an ex-trainee is not inconsistent with his identification as a former trainer at the Khaldan Training Camp. Another document, published by an Office of Mujahideen Affairs and discovered by Allied Forces at a guesthouse in Kandahar, identifies a trainee named "Abu Osama" on a list of trainees scheduled to take "Security Course No. 4;" Petitioner has previously been identified as Abu Osama. AFGP 2002 600875, *see also* IIR 7 739 7062 03; ISN 839 SIR (June 17, 2004) (ISN 839 identifies Petitioner's picture as Usama al Libi or Usama al Jaziri)

SECRET//NOFORN                                                                                    - 34 -

SECRET//NOFORN

33. Shortly after this fire incident, during Ramadan 2001,[22] the Petitioner and another

one of the jihadists present during barracks fire described above, Hamza Al Jowfi (spelled Jawfi

on the fire incident report, above),[23] were identified in a valley approximately two hours outside

of Khowst, Afghanistan. ISN 839 SIR (June 17, 2004); *see also* IIR 6 034 1215 04 (June 3,

2004) (ISN 839 describes the valley where he saw Petitioner).[24] ISN 839 stayed in the valley for

approximately two weeks and described it as an assembly area for foreigners fleeing, located

between Gardez and Khost in Afghanistan. IIR 6 034 1215 04 (June 3, 2004) (ISN 839). Most

of the men were armed with Kalashnikov rifles. *Id.*

34. After two weeks ISN 839 left this valley with the Petitioner and others, they traveled

by car to Zurmat, Afghanistan. *Id.*; *see also* ISN 839 SIR (June 17, 2004).

---

[22] Ramadan began November 17, 2001. *See* www.calendarhome.com/converter. On the Islamic
calendar, Ramadan is always the month after Sha'ban. *See, e.g.,* "The Islamic Months,"
available at www.Islam101.com/dawah/calendar.htm.

[23] Hamza al Jowfi was the "most senior person in the valley was Hamza ((LNU)) al Jowfi" when
ISN 839 was there. IIR 6 034 1215 04 (June 3, 2004) (ISN 839). According to ISN 839, "Al
Jowfi was an Egyptian who seemed very educated. People would continuously arrive in the
valley and Al-Jowfi would guide the new arrivals to where they should stay . . . . Al-Jowfi also
determine[d] the order that people left the valley as they attempted to leave AF." *Id.*

[24] Respondents rely in this case on several statements made by ISN 839 during interviews
conducted at Guantánamo Bay in June 2004. ISN 839 alleges that following his capture he was
subject to harsh treatment during interrogations conducted in 2002. While in ISN 839's own
case, Judge Hogan excluded all of ISN 839's statements and summary of his statements,
including IIR 6 034 1077 04 from June 2004, Judge Hogan did conclude that statements made by
ISN 839 during his CSRT in September 2004 were sufficiently attenuated from the allegedly
harsh interrogations to remove the taint of any mistreatment ISN 839 claims to have
experienced. *Anam v. Obama*, 696 F. Supp. 2d 1, 9 (D.D.C. 2010) ("[b]y the Fall of 2004, and
certainly by the end of 2005, Petitioner's mental and physical condition had improved . . . . [and
a]t the time of the CSRT proceeding, two years had elapsed since harsh interrogation techniques
were used on Petitioner . . . . coercive circumstances had thus been removed *months, if not
years,* before Petitioner spoke to the ARB and CSRT.)" (emphasis added). Respondents
maintain that the statements from June 2004 (approximately four months prior to ISN 839's
CSRT) are sufficiently attenuated from the alleged harsh treatment to be credited. Moreover,
ISN 839's statements identifying Petitioner outside of Khowst and traveling to Zormat are
corroborated by other evidence of Petitioner's flight from Afghanistan.

SECRET//NOFORN
UNCLASSIFIED//FOR PUBLIC RELEASE
JA001419

SECRET//NOFORN

### 3. Petitioner Retreats To Faisalabad, Pakistan With Abu Zubaydah's Force

35. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Abu Kamil al-Suri confirmed Abu Zubaydah's dedication to facilitating the escape of Arab fighters from Afghanistan. Al-Suri Diary, ▮▮▮▮▮▮▮ at 13-14.

36. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; *see also* IIR 6 034 0446 03 (December 12, 2002) (ISN 696). These fighters then mustered at Zormat, Afghanistan. ISN 703 FM40 (March 1, 2006). As discussed above, Petitioner has been identified as traveling on this same route from Khowst to Zormat, Afghanistan. ISN 839 SIR (June 17, 2004) and IIR 6 034 1077 04 (June 17, 2004).

37. From Zormat, Afghanistan, the Petitioner moved along with Zubaydah's force to the border town of Birmel (or Barmal), Afghanistan. *See* ISN▮▮ FD302 at 2 (August 11, 2002) (ISN ▮▮ sees a photo of the Petitioner, identifies him by his kunya "Usama Al-Jaza'eri," and says that Petitioner stayed with him at a school in Barmal); *see also* Al-Suri Diary, ▮▮▮▮▮ at 10-12 (describing that the force arrived at a school and "[w]hen night fell, Abu Al-Barra,' 'Abd Al-Hadi, 'Ashur, and 'Usamah Al-Jaza'iri went to stay in another house upon

SECRET//NOFORN

the requests of the hosts because they worried about their children from Abu Al-Barra's illness."); ISN 703 FM40 (March 1, 2006). ███████████████████████

███████████████████████████████████████████████████████

███████████████ From Birmel the force moved in pieces to Bannu, Pakistan. Al-Suri Diary, █████████ at 10-12; *see also* ISN 703 FM40 (March 1, 2006).

38. ████████████████████████████████████████

████████████████████████████████████████████████████

████████ *see also* Al-Suri Diary, ██████████ at 10-12 (describing how Al Qaida-associated fighters traveled in small groups to Bannu, Pakistan). For example, ISN 707, the former commander of the Khaldan training camp, admitted to traveling with Abu Zubaydah's force to Bannu. IIR 6 034 0657 02 (ISN 707). According to Abu Kamil al-Suri, Uthman (ISN 707) traveled separately, "disguised as a woman." Al-Suri Diary, ██████████ at 12.

39. ████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████ ; Al-Suri Diary, ██████████ at 10-12 (describing the group's travels to Bannu, then separating into smaller groups and hoping to reunite in Lahore, Pakistan) and 22-24 (Al-Suri goes to Lahore where the group reunites); ISN 696 FM40 (August 8, 2002) (ISN 696 says he first met the Petitioner in Lahore, Pakistan); ISN 703 FM40 (March 1, 2006). For at least part of the time in Lahore, several Zubaydah group members took shelter at a house where Hadi al-Iraqi, the Al Qaida military commander, resided with his family. Al-Suri Diary, ██████████ at 6 and 41-42. According to al-Suri, Zubaydah came to Hadi al-Iraqi's house on February 16, 2002, told them of the new house the force would move into, and by that evening "everyone left in groups. [Al-Suri] left with Hatib

SECRET//NOFORN                                                                - 37 -

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

[ISN 696] while 'Usamah al-Jaza'iri remained the last in the house awaiting his turn." Al-Suri Diary, ██████████ at 42. Then, before dusk the next day, Petitioner rejoined the group. *Id.*

40.  While those in Zubaydah's militia spent anywhere from a month or more in Lahore, moving from guesthouse to guesthouse, they eventually followed a path back west toward Afghanistan, to Faisalabad, Pakistan. *See, e.g.,* IIR 6 034 0657 02 (ISN 707); ISN 703 FM40 (June 1, 2004); ISN ██ FD302 (Oct. 10, 2002) (admitting that, after traveling through Bannu, Pakistan and staying at locations in Lahore, he traveled to Abu Zubaydah's safe house in Faisalabad, Pakistan); ISN 703 FM40 (March 1, 2006); ISN██ FD302 (August 5, 2002); Al-Suri Diary, ██████████ at 53-54 (Al-Suri says about Faisalabad, "I believe this is where we will start my program.").

### 4.  Petitioner Resides with Zubaydah and the "Thinkers" in Zubaydah's Force

41.  Zubaydah had gathered a high-level cadre of "thinkers" who were all either "Al Qaida people or 'jihadis'" with specialized training and experience at his guesthouse in Faisalabad. ██████████ FD302 June 14, 2002, at 18-19 (██████████ ██████████

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████ Included in

Zubaydah's cadre was an impressive array of former trainers, engineers, experts in explosives and poisons, as well as a medical doctor. Specifically, in addition to the Petitioner and Abu Zubaydah, this guesthouse held:

SECRET//NOFORN                                                  - 38 -

1A001422

SECRET//NOFORN

- ██████████████████████████████████████ – A trainee-turned-trainer at Khaldan Training Camp who eventually held a command position and served on Khaldan's Shura Council. ISN ███ FD302 (August 11, 2002); ISN ███ FD302 (September 11, 2002); Al-Suri Diary, ████████████████ at ¶ 6 (identifying Uthman, also known as Akrama, as "the commander of Khaldun military camp"). From 1994 until 1999, Shaykh Akrama trained hundreds of recruits on the use of small arms and artillery. IIR 6 034 0657 02 (August 6, 2002) (ISN 707).

- *Ashur Al-Jaza'iri* – A former trainer at Khaldan (Al-Suri Diary, ████████████ at 6) with an electronics background who "brought electronics and remote controls to the house and knew how to make bombs." ████████ FD302 at 19 (June 14, 2002). Ashur al-Jaza'iri departed the guesthouse in Faisalabad before the March 28, 2002 raid. ISN ███ FD302 at 3 (August 11, 2002).

- *Abd Al Bari al-Filastini* – A Former trainer at Khaldan who taught artillery and basic weapons. Al-Suri Diary, ████████████ at 6; *see also* ISN ███ FD302 at 1 (August 11, 2002). Abd al Bari also had an electronics background and, in addition to Ashur al-Jaza'iri, he "brought electronics and remote controls to the house and knew how to make bombs." ████████ FD302 at 19 (June 14, 2002). He departed the guesthouse in Faisalabad before the March 28, 2002 raid. ISN ███ FD302 at 3 (August 11, 2002).

- *Salah al-Din al-((Muhtasab)* – A former trainer at Khaldan training camp. Al-Suri Diary, ████████████████ at 6.

- ██████████████████████████████████████ – A former trainee at several military camps and a trainer in electronics at Khaldan. Al-Suri Diary, ████ ████████████ at 43; *see also* ISN ██ FD302 (August 11, 2002) (ISN ███ says ███

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

███████ severed his hand while taking a landmine apart); ISN 703 FM40 (June 10, 2004) (identifying ISN 694 as Shafiq). Barhoumi was captured along with Zubaydah and the Petitioner on March 28, 2002. *See Barhoumi*, 609 F.3d at 426-27. The Court of Appeals upheld this Court's decision denying Barhoumi's *habeas* petition concluding "based on the al-Suri diary, Barhoumi's uncontested testimony, and the circumstances of his capture, that it is more likely than not that Barhoumi was 'part of' [Zubaydah's] al-Qaida associated force and therefore properly detained pursuant to the AUMF." *Id.* at 432.

- ██████████████████████████████████████████████████████████

  ██████ An electrical engineer who studied in America and taught other Zubaydah guesthouse residents English. Al-Suri Diary, ████████████ at 31 and 59-60; ISN 696 SIR (June 17, 2002) at 2; *see also* ISN ███ FD302 (August 11, 2002); IIR 6 034 1041 04 (June 12, 2003). ISN 696 stated that Ghassan Abdullah al-Sharbi (ISN 682) was "receiving explosives and electronics training and had also been tasked to teach those same subjects in Afghanistan." ISN 696 SIR (June 17, 2002) at 2.

- ██████████████████████████████ An electrical engineer at the guesthouse. Al-Suri Diary, ████████████ at 31, 32, 42, 59-60, and 67; ISN 696 SIR (June 17, 2002) at 2; ISN 696 KB (March 2002); ISN 696 FD302 (August 5, 2002); *see also* ISN ███ FD302 (August 11, 2002). ISN 696 stated that he was tasked by Hadi al-Iraqi to receive explosives and electronics training and to teach the same subjects in Afghanistan. ISN 696 SIR (June 17, 2002) at 2. [25]

---

25 ████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████ ISN 696

UNCLASSIFIED//FOR PUBLIC RELEASE
JA001424

SECRET//NOFORN

- ██████████████████████████████████████ former trainee at

  Derunta[26] and Khaldan training camps, and a poisons expert who taught a guest named

  Abu Ali about "a poison he could work with and [al-Suri] used it on a rabbit (a poison by

  touch) for an operation against the Jews in Europe." Al-Suri Diary, ██████████

  at 6 (trainee at Derunta), 9 (remembers marching at Khaldan), 65 (poison lesson); *see*

  *also* ISN ███ FD302 at 5 (August 11, 2002). Abu Kamil Al-Suri is a close friend of Abu

  Zubaydah, whom he refers to as "Tariq" or "My Friend." *See generally id*; *see also* ███

  ██████ FD302 at 16, 21, 31 ██████████████████ is identified as greeting

  Zubaydah when he arrived at the Faisalabad guesthouse).

- *Uns al-Suri, aka Anas* – a medical doctor killed in the raid and firefight that erupted

  before the Zubaydah group was captured by Pakistani authorities. (Al-Suri Diary, ██████

  ██████████ at 49 and 67; *see also* IIR 6 034 0470 03 (December 21, 2002) (ISN 685)

  (describes Abu Anas as a Syrian doctor who was killed in the raid.); ██████ ███

---

SIR (April 18, 2003) (ISN 696 denies receiving or providing training while at the Faisalabad
house, but admits the residents might have talked about engineering over dinner); ISN ███
FD302 (May 13, 2003) (ISN ███ denies knowledge of explosives at the house and denies writing
any manuals or notes but admits he read notes that ████████████████████████
████████████████████████████████ In his unsworn
ISN ███ alleges his inculpatory admissions were made because of ████████████
█████ ISN ██████████ at 16-17, and that he admitted to accusations leveled against him
because he was afraid he would be tortured, Id. at 19. Respondents have searched the reasonably
available information and have not located any other evidence that harsh interrogation tactics
were used on ISN ███

[26] Derunta training complex, located 15 miles from Jalalabad, Afghanistan, was a set of
advanced terrorist training camps offering training in various explosives, poisons, and chemical
warfare agents. Decl. of ██████████████, "Terrorist Training Camps" at 4-6 (September 19,
2008). Coalition forces destroyed the camp in October 2001. *Id.* ████████████████████
█████████████████████████████
██████ *Id.*

SECRET//NOFORN

SECRET//NOFORN

FD302 at 25-26 (June 14, 2002); ISN 703 FM40 (May 27, 2004); ISN 703 FM40 (June 10, 2004).

- ██████████████████████████████████████████████ - a former trainee at Al Farouq Training Camp. *See, e.g.*, ISN ██ FD302 (Oct. 10, 2002) at 2 (admitting to training at, among other places, al-Farouq training camp); IIR 6 034 1041 04 (June 12, 2003) (ISN ██ describing training at al-Farouq); ISN 703 FM40 (June 1, 2004); *see also* ISN 707 FD302 (August 11, 2002) (identified ISN ██ at the Zubaydah guesthouse in Faisalabad).

- *Jose Padilla, aka Abdullah al-Muhajir, aka Abdullah al-Amriki* and *Talha Al-Afriki, aka Talha al Kini* – Two separate residents of the Faisalabad guesthouse that spent a lot of time together. ████████████ FD302 at 17-18 (June 14, 2002); IIR 6 034 0657 02 (Aug. 6, 2002) (ISN 707); ISN 707 MFR (Sept. 10, 2002) (ISN 707); *see generally* Al-Suri Diary, ████████████ Zubaydah appeared to view Jose Padilla and Talha as "special." ████████████ FD302 at 17-19 (June 14, 2002). It appeared that they had been selected for something. *Id.* Jose Padilla and Talha left the Faisalabad guesthouse prior to the March 28, 2002 raid during which Zubaydah and the Petitioner were captured. ████████████ FD302 at 18; *see also* ISN██FD302 (August 11, 2002). According to Abu Kamil al-Suri, they "both left permanently to work." Al-Suri Diary, ████████████ at 67. Padilla was later convicted of terrorism conspiracy charges in the U.S. District Court for the Southern District of Florida. *U.S. v. Jose Padilla*, case no. 04-cv-60001-MGC, Dkt. No. 1193 (jury verdict form) (SDFL). He was sentenced to 208 months imprisonment, 20 years of supervised release, and a $300 fine. *Id.* at Dkt. No. 1333 (judgment).

SECRET//NOFORN

As discussed below, these "thinkers" were among the group gathered at Zubaydah's house in Faisalabad to train in explosives, electronics, computers, internet, and the English language. Presence at this guesthouse is strong evidence the Petitioner was part of Zubaydah's force. Beyond mere presence, however, Petitioner was an active student in some of the training held at the house, training that was geared toward the creation of a force that would effectively execute terrorist attacks against the United States and its allies.

### 5.   Activities Conducted at Zubaydah's Faisalabad Guesthouse Include Building Bomb Components and Training

42.



SECRET//NOFORN

43. One of Zubaydah's projects was to train Al Qaida associates on how to build improvised explosive devices ("IEDs") and then send these individuals back to Afghanistan to train others. *See, e.g.,* ████████████████████████████████████████ ████████████████████████████████████ ISN 696 SIR (June 17, 2002) at 2 (admitting that Abdul Hadi al-Iraqi sent him "to receive electronics and explosive training with Abu Zubaida in Pakistan and to then return to Afghanistan to act as a trainer"); *see also* ISN 703 FM40 (May 27, 2004) (admitting that it did not look good that he was arrested in a safe house with Abu Zubaydah and other Al Qaida operatives who were training on improvised explosive devices (IEDs). ████████████████████████████████

████████████████████████████████████████

████████████████████████ As Abu Kamil al-Suri describes it,

> Hatib ████ and 'Abdullah ████ are undergoing training at this time on electronics by 'Ubaydah Al-Jaza'iri and will leave us to go inside (Afghanistan) and to work with explosives and electronic —Illegible—for the brothers inside. The brothers will depend on both of them in the future for operations against the Americans inside of Afghanistan.

Al-Suri Diary, ████████████ at 67.

44. Jabran Sa'ad, aka Hatib ████ described that his training at Zubaydah's Faisalabad house "focused on the use and manufacture of electronic detonation devices" and that ISN ███ "ultimate goal was to go with Doud [aka, Abu Zubaydah] . . . to train others on the manufacture and use of electronic bomb detonators" for use "against American soldiers." ISN ███ FD302 (August 5, 2002). ████████████ admitted that while at the guesthouse in Faisalabad he "studied his electronics books and prepared two briefs, handwritten in Arabic. One of the briefs was on basic electronics and electronic equipment to be used to train others. The other brief was written as a reference manual for himself on electrical sources and how to

SECRET//NOFORN

- 44 -

SECRET//NOFORN

build complete electronic circuits. [ISN 696] said his electronic academic books and both the briefs were seized when he was captured." ISN 696 FM40 (August 8, 2002).

45. ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

Another individual, ███████████████████ was also sent to a local outlet to purchase computer and electronic equipment for Zubaydah's Faisalabad safehouse. ████
████ FD302 (June 14, 2002). Specifically, ████ was given a list of electronic and circuit components, ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

███████████████ *Id.* at 22-24. ████ was not able to find a few of the items on the list; specifically he did not purchase the "ten Casio databank watches" or the six phones requested. Noor was told that the items on his list of things to purchase "were for Shafiq ████ Asan ████ and Jubran the Saudi ████ to train on and build remote controls at the guesthouse." *Id.* at 24; *see generally* Decl. of ███████████ on Terrorist Usage of Casio Watches (July 7, 2010).

46. The electronics and explosives training was only part of the coursework that Zubaydah planned for his cadre; they would also learn "computer, internet and English language." Al-Suri Diary, ███████████████ at 58 (noting that Zubaydah, identified by his kunya Tariq, announced these specializations); *id.* at 66 (Al-Suri writes, "[o]ur group thus far, [t]he one that Tariq dreamt of, is made of cadres, commanders, cells (individual cells since they

UNCLASSIFIED//FOR PUBLIC RELEASE
JA001429

SECRET//NOFORN

are members)"). Prior to the eventual raid of the guesthouses these courses had begun. *Id.* at 60-61 (Al-Suri writes "[t]oday is the first day in our English program with our brother 'Abdullah Al-Muhajir" and a few days later, "I started the computer and internet training program"); *see also* ISN 703 FM40 (March 3, 2006) (ISN 703 was taught how to use the internet for one hour each day); ISN 703 FM40 (June 1, 2004) (a resident of the Faisalabad guesthouse named Salah provided computer classes to the other residents).

47. Petitioner was aware of the training conducted at the guesthouse and he was a student for some of the classes. ISN 696 SIR (June 17, 2002).[27] During an interview of ISN 696, who was also captured at the Zubaydah house, ISN 696 indicated that Petitioner had knowledge of the training taking place in the Zubaydah house. *Id.*; ISN 685 KB (June 18, 2002). At a minimum, Petitioner was taught English language classes at the house as part of Zubaydah's program. ISN 703 FM40 (July 29, 2004) (ISN 703 witnessed Petitioner receiving English language classes being given by Ghassan al-Sharbi); ISN███FD302 (December 5, 2002); ISN 703 FM40 (August 5, 2004) (Ghassan al-Sharbi was teaching English language classes to the Petitioner and others); *see also* ISN███FD302 (August 11, 2002). According to ISN 703, Petitioner "would write down English words Ghassan taught him on a blackboard while they were at the Faisalabad guesthouse." IIR 6 034 1041 04 (June 12, 2003).

48. Petitioner has consistently denied that he knew of the training described above or took any courses in English language at the Zubaydah guesthouse in Faisalabad. *See* ISN 685 FD302 (April 29, 2003); ISN 685 FD302 (April 18, 2003); ISN 685 FM40 (August 3, 2004); ISN 685 FM40 (December 13, 2004). His denials persist even though his associates have said,

---

[27] The Petitioner and ISN 696 are both referred to in this report by their MP numbers. MP stands for Military Police, and the MP number is assigned to them at the time of capture. ISN 696 ███████████████ (ISN 696 KB (March 1, 2002) and the Petitioner ███████ ███████. *See* ISN 685 KB June 18, 2002).

SECRET//NOFORN

- 46 -

SECRET//NOFORN

as outlined above, that Petitioner both knew of and took classes in the house. Although it is possible for individuals to take English language classes for innocent reasons, Petitioner's persistent denial corroborates his understanding that the training program was not innocent, and instead that any admission he knew about the training would be inculpatory. *See Al-Adahi v. Obama*, 2010 WL 2756551, \*5 (DC Cir. 2010) (recognizing the well-settled principle that false exculpatory statements are evidence – often strong evidence – of guilt.).

### 6.    Petitioner was Captured With Abu Zubaydah

49.



*see also* Decl. of [ ] , para. 4;

50. Petitioner has admitted he was captured at the same house as Abu Zubaydah, aka Daoud. *See generally,* IIR 6 034 0470 03 (December 21, 2002) (ISN 685); ISN 685 FM40 (January 31, 2003); ISN 685 FD302 (April 18, 2003); ISN 685 FD302 (April 29, 2003); ISN 685 SIR (April 23, 2004); ISN 685 FM40 (August 2, 2004); ISN 685 FM40 (December 13, 2004); *see generally* ISN 685 FM40 (January 5, 2005). The Petitioner has consistently stated that he recalls a man at the Faisalabad house named "Daoud" (ISN 685 FD-302 (January 31, 2003) and he identified a photograph of Abu Zubaydah as "Daoud." IIR 6 034 1056 04 (April 23, 2004) (ISN 685).

51. Petitioner stated that all of the people who were at this house were captured by Pakistani authorities, except one person, Abu Anas the medical doctor, who was killed. IIR 6 034 0470 03 (December 21, 2002) (ISN 685). Specifically, Petitioner also viewed a picture of

SECRET//NOFORN

detainee Jabran Sa'ad (ISN 696), and identified the person as Jabran a Saudi who was in same house as the Petitioner. ISN 685 FM40 (December 13, 2004).

52. Jabran Sa'ad (ISN 696), an the electrical engineer who built circuit boards and bomb components, in turn identified Petitioner as one of the men captured with him and Abu Zubaydah at the guesthouse in Faisalabad. *See generally* ISN 696 FM40 (August 8, 2002); ISN 696 SIR (April 18, 2003); ISN 696 SIR (April 30, 2003). Further, Abdullah Husseini (ISN    ) also identified Petitioner as one of the individuals captured with Abu Zubaydah and identified a photo of Petitioner as a resident at the guesthouse. *See* ISN    FD302 (October 24, 2002); ISN     FD302 (December 18, 2002); ISN 703 FM40 (June 1, 2004); ISN 703 FM40 (June 10, 2004); ISN 703 FM40 (August 5, 2004); ISN 703 FM40 (March 1, 2006); and ISN 703 FM40 (March 3, 2006); IIR 6 034 0693 02. Both Petitioner and           referred to Abu Zubaydah by his kunya "Daoud" (also spelled "Dawoud") *See e.g.*, ISN 685 FD-302 (January 31, 2003, ISN 703 FM40 (June 1, 2004).

### 7. Evidence of Training and Bomb Building Was Discovered At The House Where Petitioner Was Captured

53. In the raid where Petitioner was captured, evidence was seized related to the             training discussed above. *See* AZ House Evidence FM40 (dated September 1, 2002); AZ House Evidence FM40 (dated January 11, 2005); AZ House Evidence FM40 (dated January 13, 2005); AZ House Evidence Log FM40 (dated September 1, 2004); AZ House Evidence Photographs FM40 (dated December 5, 2005). Specifically,               were discovered along with handwritten           and notes in Arabic and English. *Id.* The notes appeared to pertain to circuitry,                               as well as             *Id.;* Declaration of        , Background Declaration - Terrorist Usage of

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

Casio Watches (July 7, 2010) ("Casio Watch Declaration"). In addition, an IED training notebook, textbooks on Basic Electronics, Introduction to Circuitry Analysis, Microelectronics, Communication Systems, and an Al Qaida military artillery manual were discovered. See Casio Watch Declaration.



E.    **Petitioner Has Provided Shifting Accounts Of His Travel To Afghanistan**

1.    **Earlier Accounts**

55.

When interviewed the day after his arrest by Special Agent
of the FBI Joint Terrorism Task Force, he changed his story a number of times.

recorded in his report,

SECRET//NOFORN                                                                                        - 49 -

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

*See generally* ISN 685 SIR (November 9, 2004); ISN 685 SIR (November 18, 2004) (Petitioner first admits his true name and nationality in November, 2004).

56. Over the course of the next two years the Petitioner continued to hide his name and Algerian nationality, lying to investigators by claiming to be a Libyan national. ISN 685 FD302 (January 31, 2003); IIR 6 034 0470 03 (December 21, 2002) (ISN 685).

57. In addition to lying about his name and nationality, Petitioner has told different stories about his travels prior to arriving at the Faisalabad guesthouse where he and Abu Zubaydah were captured. In interviews prior to his CSRT, Petitioner told agents that he met a man named Abdulrahman in Libya at his scrap business and that they spoke about Petitioner going to Pakistan so that he would be able to learn how to read and write, and to study Islam.

UNCLASSIFIED//FOR PUBLIC RELEASE
JA001434

SECRET//NOFORN

████████████████████████████████████ ISN 685 FD302 (January 31, 2003).

Abdulrahman took some information from the Petitioner and returned one month later with what appeared to be a Libyan passport and a Pakistani visa. Petitioner states that he and Abdulrahman left for Pakistan in early October 2001. ISN 685 FD302 (January 31, 2003). Petitioner claims that at that time he had not heard of the September 11, 2001 attacks on the United States, and that he did not know a war was ongoing in Afghanistan. *Id.*

58. Petitioner stated that he and Abdulrahman traveled from Libya to Pakistan via Tunis and Syria. IIR 6 034 0470 03 (December 21, 2002) (ISN 685); ████████████████████
████████████████████ He stated that once he and Abdulrahman (along with two of Abdulrahman's friends) arrived in Karachi, Pakistan, they drove for a number of hours. IIR 6 034 0470 03 (December 21, 2002) (ISN 685). Petitioner stated that they stopped at a house, which he believed to be in Pakistan, but was actually in Kabul, Afghanistan. ISN 685 FD-302 (January 31, 2003). Petitioner stated that this house was owned by a school he was supposed to attend. *Id.* Petitioner then described that he gave his money and passport to Abdulrahman to hold onto, and Abdulrahman and his friends then left. *Id.* Petitioner claims to have realized a few days later that the house was in Afghanistan and was not owned by a school. *Id.* He stated that Abdulrahman had tricked him, but he did not know why. *Id*

59. Petitioner then claimed he left that house after three weeks and was taken by cab to another house "full of Arabs." *Id.* Petitioner stated that he left Kabul before any bombing began, and was taken to an "Arab house" in Faisalabad, Pakistan. *Id*; (*see* discussion, *infra* Section IV.D.3-5, regarding Petitioners arrival and a description of the house). Petitioner claims that he first heard of al Qaida from the guards in the Pakistani jail where he was detained after

UNCLASSIFIED//FOR PUBLIC RELEASE
JA001435

SECRET//NOFORN

the house was raided (ISN 685 FD-302 (January 31, 2003)), and that he did not want to go back to Libya because the Libyan government would think he is a terrorist. *Id.*

60. However, Petitioner provided a different account in another interview wherein he stated that when he and Abdulrahman arrived in Karachi, Pakistan, they were met by two unidentified Afghan students and then taken to a Taliban house for one week. IIR 6 034 0708 02 (September 4, 2002) (ISN 685). There, Petitioner claimed that he gave his passport and money to the Afghani students,[28] and then traveled to another house near the Afghanistan border and stayed there for three days before being driven by Abdulrahman to Kabul. *Id.* Once arriving at Kabul, Abdulrahman left with the other students and they went to fight with the Taliban. *Id.* After leaving the house, Petitioner stated that he and others drove for six hours into the mountains and walked for more than two hours and stayed at houses owned by Afghanis for weeks at a time. *Id.* Despite the fact that everyone but Petitioner in the group spoke Pashtu, Petitioner claimed that he conversed with a cook. *Id.* When confronted with that statement, Petitioner asserted for the first time that he had brought a Pakistani translator with him. *Id.* When confronted with inconsistencies in his story, he became very upset and uncooperative. *Id.*

61. Petitioner continued to tell the FBI he was a Libyan in subsequent interviews. ISN 685 FD-302 (April 18, 2003). He denied any knowledge of any bombing plots, denied that he

---

28



Decl. of ▮▮▮ "Guesthouses" (Sept. 19, 2008).

SECRET//NOFORN

had ever heard of Khalid Sheik Mohammed,[29] and denied any knowledge of Al Qaida despite
being told that his story could not be true because no one would be allowed to live at the house in
which Abu Zubaydah resided without being trusted and proven. *Id.* Petitioner admitted that he
was at the house in Faisalabad where he was captured for about sixteen days before his capture.
*Id.*

### 2.    Later Accounts

62.

In November 2004, Petitioner again admitted his real name and nationality to
investigators. ISN 685 SIR (November 9, 2004); ISN 685 SIR (November 18, 2004). Petitioner
stated that in October 2001, he left for Pakistan with an individual named Issa. ISN 685 MFR
(March 20, 2007). He claimed that Issa was a friend from Algeria he had met on the streets. ISN
685 SIR (February 1, 2006). Petitioner identified Issa as a "Berber" and that his last name was
"Amazere" in Arabic. *Id.* Petitioner stated that Issa told him that life in Pakistan was good and it
was easy to start a business there. *Id.* Issa helped Petitioner get a passport and visa to go to
Pakistan. *Id.* Issa stated that he got the money from Jama'at Tablighi (JT) to help with the
airfare to Pakistan.[31] *Id.* Petitioner then claimed he left from Algiers on a plane to Pakistan in
2001. *Id.*

---

[29] Khalid Sheik Mohammed is a senior Al Qaida leader and believed to be the coordinator for the
September 11, 2001 attacks. *See* Al Qaida Leadership Chart.

[30] Bakush has stated that he trained with the military service of Algeria fulfilling his 18 month
military obligation.                    ISN 685 SIR (June 21, 2005).

[31] Jama'at Tabligh is a legitimate Islamic missionary organization based in Pakistan, but which is
believed to be used as a cover for terrorist-related activity by Islamic extremists. IIR 2 227 0131
03. JT is used as cover by various Sunni terrorist groups, and is closely aligned with Pakistani
terrorist organizations, and with Al Qaida. *Id.*

UNCLASSIFIED//FOR PUBLIC RELEASE
JA001437

SECRET//NOFORN

63. According to Petitioner, Issa was not a leader of the JT in Algeria; he just went around preaching and recruiting new Muslims into the faith. ISN 685 MFR (June 12, 2007). Petitioner stated that Algeria was full of Takfiri groups from 1996-2000 so it was a bad place to live. *Id.* Takfiris would go around beating and killing people because they were not good Muslims. *Id.*

64. Petitioner stated that he and Issa stayed at the JT guesthouse in Karachi for four days. *Id.* After four days, Petitioner and Issa boarded a bus arranged for them by the JT and they traveled to Lahore, Pakistan, where the JT headquarters was located. ISN 685 MFR (March 20, 2007); ISN 685 MFR (June 12, 2007). Petitioner explained that he was not a member of JT, and did not complete the training. ISN 685 MFR (March 20, 2007). Petitioner claimed that he left the Lahore guesthouse in November 2001, and never went to Afghanistan. *Id.* This conflicts directly with his earlier accounts, described above, in which he describes traveling to Afghanistan with "Abdulrahman" and his student friends. This story also contradicts the numerous statements of Petitioner's associates, who place him in Afghanistan in November, 2001. IIR 6 034 1077 04 (June 17, 2004) (ISN 839 identifying Petitioner in a valley outside of Khowst, Afghanistan in November, 2001, and traveling to Zormut, Afghanistan with his group.); IIR 6 034 1077 04 (June 17, 2004) (ISN 839); ISN███FD302 (August 11, 2002) (ISN███ identifies the Petitioner in Barmal, Afghanistan); *see also* IIR 7 736 3352 02 and AFGP 2002 003727 (fire incident report placing the Petitioner in Khowst area of Afghanistan during November 2001).

65. Petitioner claimed that he left the JT headquarters in Lahore in November 2001. ISN 685 MFR (March 20, 2007); ISN 685 MFR (June 12, 2007). According to the Petitioner, the JT was worried about "problems" between the Pakistani government and the Arabs, so all of the

SECRET//NOFORN

- 54 -

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

Arabs were sent out of Pakistan. ISN 685 MFR (June 12, 2007). Petitioner then claims that he traveled to Lahore, Pakistan, and then Faisalabad, Pakistan, with Issa and two Pakistanis. *Id.* When he stayed at the house in Lahore, there were two unidentified Pakistanis there and that his friend Issa disappeared toward the end of January 2002. *Id.* Petitioner claims he stayed at the house for about one month and that the house was owned by Abdul Rakhman. *Id.*; ISN 685 SIR (November 12, 2005); ISN 685 MFR (June 12, 2007).

66. Petitioner also claimed that then he, the Pakistani who owned the Lahore guesthouse, and another unidentified man left by taxi to go to Faisalabad, and the trip took three hours. ISN 685 MFR (June 12, 2007). According to Petitioner, he did not know who decided that they should go to Faisalabad, and stated that he could not really talk with others because of language barriers. *Id.* He denied ever going to Afghanistan prior to his capture in March 2002. ISN 685 MFR (April 5, 2007).

## Conclusion

Based on the legal authority discussed herein and the facts described above and in the attached exhibits, the Petitioner is lawfully detained by the United States.

UNCLASSIFIED//FOR PUBLIC RELEASE
JA001439

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

Petitioner,

v.

BARACK OBAMA, *et al.*,

Respondents.

Civil Action No. 10-CV-1020 (RJL)

EXHIBIT LIST TO AMENDED NARRATIVE FOR PETITIONER ABDAL
RAZAK ALI (ISN 685)

Declaration of ███████████████, "Intelligence 101—Source Reliability,"
    May 29, 2009
Declaration of ███████████, "Procedures for FBI Reports," November 5, 2008
    (explaining FBI FD-302 reports)
Declaration of ███████████, "Procedures for CITF Reports," October 9, 2009
    (explaining CITF FM40 reports)
Declaration of Paul Rester, "IIR and SIR Policies," October 8, 2009
    (explaining SIRs & IIRs)
Declaration of Paul Rester, "MFR Policies," December 2, 2009 (explaining MFRs)

Declaration of ███████████, "Al-Qaida," September 22, 2008
Declaration of Lt. Col. Jerry E. Brooks, "Operation ENDURING FREEDOM,"
    April 28, 2010
Declaration of ███████████ on Terrorist Usage of Casio Watches (July 7, 2010)
Declaration of ███████████ (August 27, 2010)
Declaration of Ricky Malone, MD (October 5, 2009)

ISN 685 FD-302 (April 18, 2003)
ISN 685 FD-302 (April 29, 2003)
ISN ███ FD-302 (August 5, 2002)
ISN ███ FD-302 (December 12, 2002)
ISN ███ FD-302 (May 13, 2002)
ISN ███ FD-302 (October 10, 2002)
ISN ███ FD-302 (October 24, 2002)

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001440

SECRET//NOFORN

ISN ▇▇ FD-302 (December 4, 2002)
ISN ▇▇ FD-302 (December 18, 2002)
ISN 707 FD-302 (August 9, 2002)
ISN 707 FD-302 (August 11, 2002)
ISN 707 FD-302 (September 11, 2002)
ISN 707 FD-302 (November 21, 2002)
ISN 707 FD-302 (December 4, 2002)
ISN 707 FD-302 (January 24, 2003)
ISN 707 FD-302 (February 9, 2003)
▇▇▇▇▇▇ FD-302 (June 14, 2002)
▇▇▇▇▇▇▇▇ FD-302 (May 21, 2002)

ISN 685 FM40 (January 31, 2003)
ISN 685 FM40 (April 29, 2003)
ISN 685 FM40 (August 2, 2004)
ISN 685 FM40 (August 3, 2004)
ISN 685 FM40 (December 13, 2004)
ISN 685 FM40 (January 5, 2005)
ISN 696 FM40 (August 8, 2002)
ISN 703 FM40 (December 4, 2002)
ISN 703 FM40 (May 27, 2004)
ISN 703 FM40 (June 1, 2004)
ISN 703 FM40 (June 10, 2004)
ISN 703 FM40 (July 29, 2004)
ISN 703 FM40 (August 5, 2004)
ISN 703 FM40 (March 1, 2006)
ISN 703 FM40 (March 3, 2006)
ISN 707 FM40 (August 11, 2002)

IIR 6 034 0397 03
IIR 6 034 0446 03
IIR 6 034 0472 03
IIR 6 034 0657 02
IIR 6 034 0715 02
IIR 6 034 0755 02
IIR 6 034 0822 04
IIR 6 034 1041 04
IIR 7 739 3352 02
IIR 7 739 7062 03

ISN 685 SIR (April 23, 2004)
ISN 685 SIR (November 9, 2004)
ISN 696 SIR (June 17, 2002)
ISN 696 SIR (April 18, 2003)
ISN 696 SIR (April 30, 2003)
ISN 839 SIR (June 17, 2004)

SECRET//NOFORN

JA001441

UNCLASSIFIED//FOR PUBLIC RELEASE

**SECRET//NOFORN**

ISN 685 MFR (September 4, 2002)
ISN 685 MFR (September 5, 2002)
ISN 685 MFR (March 20, 2007)
ISN 685 MFR (June 12, 2007)
ISN 707 MFR (September 10, 2002)
ISN 707 MFR (January 17, 2003)
ISN 707 MFR (September 7, 2003)
ISN 707 CSRT Statement

AFGP 2002 003727
AFGP 2002-600875
ISN 685 KB (June 18, 2002)
ISN 696 KB (March, 2002)
Calendar Conversion Pages
ISN 685 Photograph, labeled ███
LHM Serial 6844
Padilla Jury Form, *U.S. v. Jose Padilla*, Case no. 04-cv-60001,
    Dkt. No. 1193 (SDFL)
Padilla Judgment, *U.S. v. Jose Padilla*, Case no. 04-cv-60001,
    Dkt. No. 1333 (SDFL)
AZ House Evidence FM40 (dated September 1, 2004)
AZ House Evidence Log FM40 (dated September 1, 2004)
AZ House Evidence FM40 (dated January 11, 2005)
AZ House Evidence FM40 (dated January 13, 2005)
AZ House Evidence Photographs FM40 (dated December 5, 2005)
ISN 694 Pocket Litter and Custodial Document
FBI Counterterrorism Report (April 1, 2002)

**SECRET//NOFORN**

UNCLASSIFIED//FOR PUBLIC RELEASE

Document #1443998

SECRET

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

FILED WITH THE
COURT SECURITY OFFICER
CSO: *C'Metin*
DATE: *6/11/09*

JOBRAN SAAD AL-QUHTANI,

and

NAWAL MADAY AL-QUHTANI,

as Next Friend of Jobran Saad Al-Quhtani,

*Petitioners/Plaintiffs,*

v.

BARACK OBAMA *et al.*,

*Respondents/Defendants*

Civil Action No. 05-02387 (RMC)

## PETITIONER JOBRAN SAAD AL-QUHTANI'S TRAVERSE TO RESPONDENTS' FACTUAL RETURN AND RESPONSE TO RESPONDENTS' MEMORANDUM REGARDING THE GOVERNMENT'S DETENTION AUTHORITY RELATIVE TO DETAINEES HELD AT GUANTANAMO BAY

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



(i)    Petitioner's Alleged Inculpatory "Admissions" Should
Be Disregarded as the Unreliable Product of Improper
Coercive Threats and Psychological Abuse

Most of Respondents' case for Petitioner's detention depends on alleged "admissions"

provided by Petitioner while under interrogation in Afghanistan or Guantanamo Bay. These

include statements of Petitioner about who allegedly helped him get to Afghanistan, how he got

there, and what he did while there and in Pakistan. But such so-called admissions should not

form the basis for any detention determination, or even contribute to the analysis, because they

are inherently unreliable as inculpatory evidence. They were the result of improper coercive

threats and abuse that caused Petitioner to say under duress whatever he thought his captors

16

SECRET

SECRET

wanted to hear. Petitioner has recanted some statements when confronted with them in subsequent interrogations, and no doubt would recant more if given the opportunity.[5]

It is a fundamental tenet of our concept of justice that inculpatory statements made by a defendant are inadmissible at trial if the statements were made involuntarily or were otherwise procured through coercion. One of the paramount concerns motivating this principle is that statements produced by coercion are inherently and notoriously unreliable. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 652 (2006) (Breyer, J., concurring) ("coerced declarations" are "generally prohibited on grounds of unreliability"); *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 349 (2006) ("We require exclusion of coerced confessions both because we disapprove of such coercion and because such confessions tend to be unreliable."). As former Chief Justice Burger explained: "A confession produced after intimidating or coercive interrogation is inherently dubious. If a suspect's will has been overborne, a cloud hangs over his custodial admissions; the exclusion of such statements is based essentially on their lack of reliability." *Stone v. Powell*, 428 U.S. 465, 496–497 (1976) (Burger, C.J., concurring).

A statement is deemed involuntary if it was, for example, "extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (brackets omitted) (quoting *Bram v. United States*, 168 U.S. 532, 542–543 (1897)); *see also Columbe v. Connecticut*, 367 U.S. 568, 574 (1961) (coercive eliciting of statements may be done "not only with ropes and a rubber hose, not only by relay questioning persistently, insistently subjugating a

---

[5] Petitioner is now several years removed from many of the interrogations on which the government bases its case, and obviously might not recall some of the statements he then provided on which the government now relies in its factual return. Petitioner's counsel is unable to discuss many factual return statements with Petitioner because the government considers them classified.

17

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

tired mind, but by subtler devices"); *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960) ("coercion

can be mental as well as physical, and . . . the blood of the accused is not the only hallmark").

A number of factors may coalesce to render a statement involuntary. Just the fact that a

statement is made while the defendant is in custody increases the likelihood that the statement is

made involuntarily. *Withrow v. Williams*, 507 U.S. 680, 689 (1993) ("in-custody interrogation

. . . contains inherently compelling pressures which work to undermine the individual's will to

resist and to compel him to speak where he would not otherwise do so freely") (quoting *Miranda*

*v. Arizona*, 384 U.S. 436, 467 (1966)); *Columbe*, 367 U.S. at 573-574 (individual subjected to

persistent in-custody interrogation knows "he is faced with the task of overcoming, by his lone

testimony, solemn official denials," which "may itself induce fear"). This is especially true

where the questioning is done in secret, because secrecy "encourages questioning to run over

into violence," and "[h]istorically there has been intimate connection between the use of torture

and secret investigations." *Columbe*, 367 U.S. at 574 n.8.

If the detainee subjected to in-custody interrogation has not been notified that he has the

right to remain silent and the right to counsel during the interrogation — and all the more so if

the detainee lacks those rights at all — then the statement is *per se* involuntary. *Miranda*, 384

U.S. at 468-470; *see also Columbe*, 367 U.S. at 575-576 (Without such warnings, repeated in-

custody questioning "suggests that the questioner has a right to, and expects, an answer," and the

detainee "has every reason to believe that he will be held and interrogated until he speaks.");

*Blackburn*, 361 U.S. at 206 ("A prolonged interrogation of an accused who is ignorant of his

rights and who has been cut off from the moral support of friends and relatives is not

infrequently an effective technique of terror."). Moreover, detainment for long periods of time in

harsh conditions renders any statements made during detainment involuntary. *See Brooks v.*

18

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE    JA001446

~~SECRET~~

*Florida*, 389 U.S. 413, 414-415 (1967) (per curiam) (statements made after being held for two weeks in windowless, unfurnished cell with little food were involuntary); *Davis v. North Carolina*, 384 U.S. 737, 743, 746-747, 752 (statement was involuntary where given after short daily interrogation over 16 days during confinement with limited food and no access to outsiders, observing "[w]e have never sustained the use of a confession obtained after such a lengthy period of detention and interrogation").

Under the guidance of this well-established law, Petitioner's statements under interrogation should carry no weight in this proceeding. Petitioner confirmed his belief that he would be tortured if he failed to agree to accusations leveled against him. ISN ███ FD-302 (Dec. 12, 2002). Statements made in such fearful conditions under the absolute control of the United States military are of no value in a judicial proceeding. They are no more than a detainee saying whatever he thinks is necessary, regardless of the truth, to alleviate or avoid pain and suffering. *See Columbe*, 367 U.S. at 575-576; *Blackburn*, 361 U.S. at 206. This would be the case if the interrogation and detainment had occurred over only a matter of days or weeks, but petitioner has been subjected to such conditions for *years*. There is no question that the Guantanamo detainment of Petitioner eventually yielded nothing but unreliable statements that should have no inculpatory value for the combatant determination.



19

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~



In addition, for similar reasons that Petitioner's alleged "admissions" must be discounted as the product of improper coercion,

25

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

▇▇▇▇▇▇▇ Yet, Petitioner's interview summaries also state that on at least one occasion Petitioner contended he had not tried to build any circuits and previously had falsely admitted doing so because he feared he would be tortured if he did not agree to the accusations. *See* ISN ▇▇▇ FD-302 (Dec. 12, 2002); *see also* ISN ▇▇▇ FD-302 (Apr. 21, 2003) ▇▇▇▇ received an apology from Petitioner, who said he "was under pressure from interrogators in Bagram [Air Force Base, Afghanistan] and lied to the interrogators about receiving training at the ▇▇▇▇ house with ▇▇▇▇▇ emphasis omitted). ▇▇▇▇

27

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



As explained above in § III.B.1.b.i., no weight should be afforded these supposed "admissions" of Petitioner's "purpose and intent" considering the circumstances under which they were obtained, and Petitioner has recanted earlier statements.

32

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001450

*ISN 685*
*20 M*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED WITH THE
COURT SECURITY OFFICER**
CSO: *Carli V Redeyuez Fo*
DATE: *11/18/2010*

ABDAL RAZAK ALI (ISN 685),

Petitioner,

v.

Civil Action No. 10-CV-1020 (RJL)

BARACK OBAMA, et al.,

Respondents.

**RESPONDENTS' RESPONSE TO PETITIONER'S AMENDED
TRAVERSE IN SUPPORT OF SAEED BAKHOUCHE'S
<u>PETITION FOR WRIT OF HABEAS CORPUS</u>**

JA001451

SECRET//NOFORN

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

    Petitioner,

    v.

BARACK OBAMA, et al.,

    Respondents.

Civil Action No. 10-CV-1020 (RJL)

### RESPONDENTS' RESPONSE TO PETITIONER'S AMENDED
### TRAVERSE IN SUPPORT OF SAEED BAKHOUCHE'S
### PETITION FOR WRIT OF HABEAS CORPUS

Respondents respectfully submit this response to Petitioner's Amended Traverse in

Support of Saeed Bakhouche's[1] Petition for Writ of Habeas Corpus (noticed at dkt. no. 1439).

Respondents also have attached, as Attachment A, additional, rebuttal material that Respondents

submit herein as substantive evidence regarding the legality of Petitioner's detention.[2]

On September 10, 2010, Respondents filed their Fourth Motion for Leave to Amend the

Factual Return (noticed at dkt. no. 1427). Attached to the Motion was an Amended Narrative

Regarding Petitioner Abdal Razak Ali (ISN 685), which established the factual basis for

Petitioner's detention.[3] In short, Respondents allege and will prove at the merits hearing, *inter*

---

[1] Petitioner filed his habeas petition under the above captioned name, but after the ruling of his Combat Status Review Tribunal ("CSRT") in 2004, he revealed his real name as Said Bin Brahim Bin Umran Bakush ("Bakush" or "Petitioner") and that his true nationality is Algerian, not Libyan as he had initially claimed for years. Petitioner has apparently provided another spelling of his name, "Bakhouche", in his Amended Traverse.

[2] Respondents reserve their right to provide additional, rebuttal evidence for the upcoming merits hearing as provided under the applicable CMO, § II.C.

[3] Petitioner requests that the Court strike earlier returns filed in this case. Pet'r's Am. Traverse at 2. Respondents oppose this request. In accordance with the general practice in Guantanamo

SECRET//NOFORN

JA001452

SECRET//NOFORN

*alia,* that Petitioner was a former trainee-turned trainer at the Khaldan training camp, served as a

permanent member of a militia organized by Abu Zubaydah to fight coalition forces in

Afghanistan, fled Afghanistan with members of that force, and rejoined other members of that

force, including Abu Zubaydah, at the guesthouse in Faisalabad, Pakistan, where they were

training for future martyrdom operations when they were captured. As Respondents explained in

their Amended Narrative, this case largely mirrors that of *Barhoumi v. Obama,* 609 F.3d 416

(D.C. Cir. 2010), where the D.C. Circuit held that the petitioner there was properly detained on

the basis that he was part of Zubaydah's militia, which was treated as an "al-Qaida-associated

force." *Id.* at 432. Petitioner has repeatedly admitted in post-capture interviews to being

captured with Abu Zubaydah and to providing false information to interrogators regarding his

identity and nationality. Third-party witnesses have also identified Petitioner, either by his name

or various *kunyas,* as being associated with the Khaldan camp or Zubaydah's forces, and the al-

Suri Diary, discussed *infra,* lists Petitioner by his *kunya* as a "permanent" member of Zubaydah's

forces.

     In his Amended Traverse, Petitioner makes a variety of meritless attacks on the reliability

of Respondents' evidence. Respondents will fully rebut Petitioner's contentions at the December

14-15, 2010, merits hearing, but respond briefly herein to Petitioner's primary arguments.

---

Bay *habeas* litigation, Respondents' September 10, 2010 Amended Factual Return supplemented
the record in this case with additional documentation, while not refiling all the materials
previously filed in this case, upon which the government continues to rely. However, the
Narrative which accompanied the September 10, 2010 return is intended to supplant and replace
the prior narratives filed in this case, as the most updated explication of the government's
argument in support of Petitioner's detention. As with all narratives Respondents file in the
Guantanamo habeas litigation, the September 10, 2010 narrative in this case is not intended to be
a complete explication of all the information supporting Petitioner's detention in the underlying
documents. That fuller explication will be presented at the merits hearing.

UNCLASSIFIED//FOR PUBLIC RELEASE

* * *

JA001454

SECRET//NOFORN

Petitioner advances a similar argument against ISN███ identification of the Petitioner as "Osama" in a November, 2002, interview.[9]  In this interview, ISN███ viewed two separate photos of Petitioner, side-by-side, and identified them as follows:

> ███ (Abdul Razzaq) ███ thinks he saw this person in Khowst and identified him as possibly going by the name of Osama.
> . . . .
> US9LY-00685DP: ███ also saw him at the Afghanistan-Pakistan border and said he thought his name was Osama. (He is not the same person as photo███ (see above), whom ███ said was also named Osama and whom he saw in Khowst. When shown both pictures side-by-side, ███ said he thought they were two different people, but both went by Osama.)

ISN███ FD-302 (November 6, 2002).  Both photos identified above are pictures of Petitioner.[10]

However, ISN███ identifies both of the photos as being of a person he recalls as "Osama," the same kunya used by other witnesses to identify Petitioner, and further identifies both as persons that 836 believes he saw in Afghanistan, again paralleling statements by other witnesses.  These parallels undercut Petitioner's argument regarding a potential photo mix-up here and in those identifications upon which Respondents' do rely.

### 3. Petitioner's Allegations Of Physical And Psychological Abuse Are Meritless and Provide No Basis for Disregarding His Admissions about his Capture or His Attempts To Mislead Interrogators.

In addition to other evidence in this case, Respondents rely on statements by Petitioner regarding (1) the location and circumstances of his capture, and (2) his years-long efforts to conceal the true nature of his activities by lying to his interrogators.  Petitioner argues that the Court should disregard his statements because of physical and psychological abuse to which he

---

[9] Respondents do not affirmatively rely on ISN███ identification, they merely respond to Petitioner's attempt to use this identification as evidence to undermine the other photo identifications.

[10] Photograph███ one of the pictures ISN███ viewed during this interview, is attached as evidence to Respondents' Fourth Motion for Leave to File an Amended Factual Return (noticed at Dkt. No. 1427).

SECRET//NOFORN

claims he was subjected from the time of his capture until 2004. The Court should reject these arguments. Petitioner's claims of abuse are not credible, wholly unsubstantiated, and even if there were any truth to them, neither his admissions about his capture, nor his many admitted lies to his interrogators, are the products of coercion.

First, while time does not permit a detailed rebuttal of each of Petitioner's claims in this filing, Respondents will show at the merits hearing that Petitioner's claims of mistreatment and abuse, many of which appear for the first time in his recent litigation affidavit, are unsubstantiated by any corroborating evidence and should not be believed.

Even if the Court assumed for the sake of analysis that Petitioner's claims of abuse had some foundation in fact, there is no basis on which to conclude that the statements Respondents rely upon are the product of threats or coercion. First, Petitioner has specifically admitted that he was captured with ▮▮▮▮▮▮▮▮▮, ISN 685 FM40 (December 13, 2004), and that he went with some Afghans "to Afghanistan to fight in the war." FBI Counterterrorism Report at 10 (April 1 2002); *see generally,* IIR 6 034 0470 03 (December 21, 2002) (ISN 685); ISN 685 FM40 (January 31, 2003); ISN 685 FD302 (April 18, 2003); ISN 685 FD302 (April 29, 2003); ISN 685 SIR (April 23, 2004); ISN 685 FM40 (August 2, 2004); IIR 6 034 105604 (April 23, 2004) (ISN 685); *see also* Resp. Fourth Am. Factual Return, at 47 ¶ 50-51. Petitioner also provides related admissions identifying the other individuals captured with ▮▮▮▮ and Petitioner at the Faisalabad house; for example, he admitted that Jabran Sa'ad (ISN 696) was in the same house as he, ISN 685 FM40 (December 13, 2004), which, of course, supports the accuracy of ISN 696's photo identification of Petitioner described above.[11] Even by Petitioner's

---

[11] Petitioner references the initial administrative confusion regarding the house in which he was captured. Petr's Am. Traverse at 4-5. While it is true that initial reporting placed Petitioner at another house, the primary evidence – including his own statements – correctly identifies

SECRET//NOFORN

own telling, when the alleged abuse ceased sometime in 2004 "and he felt reasonably safe, he told the truth" about himself and the reasons for his presence in Pakistan. Pet'r's Am. Traverse at 15. Yet, as the record reflects, Petitioner continued thereafter – once the claimed abuse had allegedly ceased – to admit that he was captured with Abu Zubaydah. ISN 685 FM40 (December 13, 2004). This admission is also corroborated by other evidence in the case.[12] Thus, even accepting Petitioner's version of events as true, his admission concerning the circumstances of his capture at the Zubaydah house is untainted by any abuse he claims to have suffered.

Second, Petitioner has provided shifting accounts and cover stories to explain his travel in Afghanistan. *See* Resp. Fourth Am. Factual Return, at 49-55 ¶ 55-66. These shifting accounts establish that Petitioner has made deliberate attempts to conceal his activities prior to capture and that he is employing counter-interrogation techniques. Petitioner claims, in his declaration attached to his Amended Traverse, that despite the alleged mistreatment or abuse he told the truth about everything "except [his] name and home country." Petitioner's Declaration ("Pet'r's Decl.") at 6 ("I had told the truth (except for my name and home country) and I told them everything I knew."). Respondents will show at the merits hearing that Petitioner has provided shifting accounts and cover stories regarding all of his activities in Afghanistan and Pakistan in addition to lying about his name and nationality for years. In fact, the only thing Petitioner has consistently admitted is that he resided at a guesthouse Abu Zubaydah. Even when Petitioner

---

Petitioner as captured with Zubaydah.

[12] Other witnesses identify the Petitioner as one of the individuals captured with ▒▒▒▒▒ and photo identified the Petitioner as present at the guesthouse. *See, e.g.*, ISN 696 FM40 (August 8, 2002); ISN 696 SIR (April 18, 2003); ISN 696 SIR (April 30, 2003); ISN▒ FD-302 (October 24, 2002); ISN▒ FD-302 (December 18, 2002); ISN 703 FM40 (June 1, 2004); ISN 703 FM40 (June 10, 2004); ISN 703 FM40 (August 5, 2004); ISN 703 FM40 (March 1, 2006); and ISN 703 FM40 (March 3, 2006).

SECRET//NOFORN

JA001457

SECRET//NOFORN

eventually admitted that some of the information he provided to interrogators was false, specifically that he had been lying about his name and nationality, *see* ISN 685 SIR (November 18, 2004), he continued to provide information that contradicts his earlier accounts and other evidence provided by his associates. *Compare* ████████████████████████████ █████ ISN 685 FD-302 (January 31, 2003) (Petitioner said his travel to Pakistan████████ ███ set up by a man named████████████ in order to learn to read and write and study Islam) *with* ISN 685 SIR (February 1, 2006) (Petitioner said he was recruited to travel to Pakistan by a man named ███ who obtained financing through an Islamic organization and suggested that Petitioner could start a business there). Contradicting reports of other detainees, Petitioner also continued to deny that he was ever in Afghanistan before being taken into custody. ISN 685 MFR (April 5, 2007). Petitioner's false and contradictory statements go to show that he was employing counter-interrogation techniques designed to conceal the true nature of his nefarious activities in Afghanistan and Pakistan, false exculpatory statements that "are evidence – often strong evidence – of guilt." *Al Adahi v. Obama,* 613 F.3d 1102, 1107 (D.C. Cir. 2010).

The record is clear that almost from the moment of his capture that Petitioner had decided of his own volition to lie about his true identity and activities. Indeed, less than 48 hours after Petitioner's capture, FBI Special Agent████████████ observed that he was already attempting to formulate a convincing cover story:

> Abdul [the false name that Petitioner was already giving at that time] stated that he departed Libya, in October of 2001, for Karachi, Pakistan at the suggestion of a co-worker in Libya. Abdul then stated that he met some Afghans in Karachi who took him to Afghanistan to fight in the war. After making that statement, Abdul changed his mind and said he was going to Afghanistan to study the Koran. But once Abdul arrived in Afghanistan, he was told their [sic] would be no studying just fighting of a war. Abdul then bec[ame] extremely uncooperative and chang[ed] his story a number of times.

SECRET//NOFORN

FBI Counterterrorism Report at 10.[13] ███████████████████

████████████ Declaration of ███████████ Background Declaration- Counter-

interrogation Doctrine and Practice at 2, one that Petitioner was clearly attempting to implement

to conceal his terrorist activities.

Petitioner's affidavit confirms that the decision to lie to his interrogators about his

identity and national origin was entirely his own and not the product of coercion. According to

Petitioner, he adopted the name Abdul Razzak and pretended to be Libyan because a Pakistani

intelligence officer told him that if he did so he might be released to Libya. Pet'r's Am. Traverse

at 11. Setting aside the complete implausibility of this tale, it confirms one fact: that Petitioner

decided on his own to conceal his identity from his captors, and the decision had nothing to do

with alleged abuse or coercion.[14]

Hence, Petitioner's coercion claim in this regard boils down to the absurd argument, not

that interrogators forced him by torture to repeat lies of their making, as is frequently claimed in

---

[13] The evidence, moreover, refutes any claim Petitioner might make that he provided false
stories during this interview due to abuse. Interviewer Special Agent ██████████
██████████, indicated that he observed no signs that Petitioner had been physically
abused, nor did Petitioner either request medical attention or make allegations during the
interview that he had been abused or subjected to abusive conditions. ███████ Decl. at 4 ¶ 10-11.

[4] Petitioner's prior statements also contradict his current allegations that he provided false
information due to abuse. As explained above, Petitioner admitted that he had provided a false
identity and nationality for over two years. *See generally* ISN 685 SIR (November 9, 2004); ISN
85 SIR (November 18, 2004) (Petitioner first admits his true name and nationality in
November, 2004). ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████ The Court may properly infer that Petitioner
not because of alleged abuse, but only because (and as long as) he believed that his lies
uld advance his own interests

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

these cases, but that torture is the reason why he continued to tell lies he had concocted on his

own to further his own interests, not his interrogators'. Even accepting that topsy-turvy theory of

coercion at face value, it would only explain why Petitioner lied for so long. It does not alter the

fact that he decided on his own to lie, at the very least, about his true identity, a lie to which he

eventually admitted at Guantanamo Bay and to which he continues to acknowledge in this

litigation. Pet'r's Decl. at 8. The record of Petitioner's attempts to mislead his interrogators

cannot be disregarded as the tainted fruit of coercion. [15]

### 4. *Barhoumi* Properly Considered The Issues That Are Relevant In Regards To Petitioner's Case.

As noted above, this case is on all fours with *Barhoumi, supra,* in which the D.C. Circuit

upheld the conclusion of this Court that a detainee who, like Petitioner, had among other things

become a member of Abu Zubaydah's militia was detainable as part of an al Qaeda-affiliated

force. Petitioner seeks to evade the precedential impact of *Barhoumi* by speculating that

"[a]pparently Barhoumi's attorneys were not informed that the government had withdrawn . . .

allegations against Abu Zubaydah and the decision of the Circuit Court is based on a record that

is not accurate in regards to Abu Zubaydah." Petr's Am. Traverse at 31. Petitioner has guessed

wrong. Both Barhoumi's attorneys and the D.C. Circuit *were* aware that the government was no

longer claiming Zubaydah to be a senior al Qaeda leader, but rather asserted (and in *Barhoumi*

---

[15] Petitioner also urges the Court to disregard the statements of several third-party witnesses on the basis of alleged mistreatment and inconsistencies. Time does not permit Respondents to address these arguments in detail in this response. Respondents, however, will rely on materials already submitted to the Court, as well as additional materials filed herewith, to refute Petitioner's attacks on these witnesses' statements at the upcoming merits hearing. Respondents' only note here that, as outlined in their September 10, 2010 Amended Narrative, examination of the statements of the third-party witnesses upon which Respondents intend to rely, particularly when viewed in conjunction with other corroborating evidence and statements by Petitioner himself, reveals that the Court can and should credit their statements.

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001460

UNCLASSIFIED//FOR PUBLIC RELEASE

* * *

JA001461

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET // NOFORN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **ABDAL RAZAK ALI,** (ISN 685), *et al.*, | ) ) ) |
| **Petitioners,** | ) ) ) |
| v. | ) Civ. No. 10-CV-1020 (RJL) ) |
| **BARACK OBAMA,** *et al.*, | ) ) ) |
| **Respondents.** | ) ) ) |

### ISN 685 Respondents' Exhibit List

1. Declaration of ▮▮▮▮▮▮ Counterinterrogation Techniques (Oct. 17, 2008)

2. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3. Declaration of Lt. Col. Jerry E. Brooks, Operation ENDURING FREEDOM (Apr. 28, 2010)

4. Declaration of ▮▮▮▮▮▮, Terrorist Usage of Casio Watches (July 7, 2010)

5. Declaration of ▮▮▮▮▮▮, Translators (Nov. 5, 2008)

6. Declaration of ▮▮▮▮▮▮ Procedures for FBI Reports (Nov. 5, 2008)

7. Declaration of ▮▮▮▮▮▮ Background Declaration on Al Qaida (Sept. 22, 2008)

8. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9. Declaration of Brigadier General Robert H. Holmes, Use of Intelligence Products (Aug. 22, 2008)

10. Declaration of ▮▮▮▮▮▮ Guesthouses (Sept. 19, 2008)

11. Declaration of ▮▮▮▮▮▮ Terrorist Training Camps (Sept. 19, 2008)

12. Declaration of ▮▮▮▮▮▮ (Aug. 27, 2010)

13. Declaration of Ricky Malone, MD (Oct. 5, 2009)

14. Declaration of ▮▮▮▮▮▮ Procedures for CITF Reports (Oct. 9, 2009)

15. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16. Declaration of Paul B. Rester, IIR and SIR Policies (Oct. 8, 2009)

17. Declaration of Paul B. Rester, MFR Policies (Dec. 2, 2009)

18. Declaration of ▮▮▮▮▮▮ Intelligence 101 (Sept. 19, 2008)

19. Declaration of ▮▮▮▮▮▮ Intelligence 101-Source Reliability (May 29, 2009)

20. Declaration of ▮▮▮▮▮▮ Names, Aliases, Kunyas (Sept. 19, 2008)

SECRET // NOFORN

JA001462

SECRET // NOFORN

21.    Al Qaida Leadership Chart

22.    FBI ███ (July 23, 2003)
23.    FBI Counterterrorism Report (April 1, 2002)
24.    FBI EC (April 1, 2002)
25.    FBI EC (September 20, 2002)

26.    ISN 685 FD-302 (Jan. 31, 2003)
27.    ISN 685 FD-302 (April 18, 2003)
28.    ISN 685 FD-302 (April 29, 2003)
29.    ISN █ FD-302 (Aug. 5, 2002)
30.    ISN █ FD-302 (Dec. 12, 2002)
31.    ISN █ FD-302 (May 13, 2003)
32.    ISN █ FD-302 (Oct. 10, 2002)
33.    ISN █ FD-302 (Oct. 24, 2002)
34.    ISN █ FD-302 (Dec. 4, 2002)
35.    ISN █ FD-302 (Dec. 18, 2002)
36.    ISN 707 FD-302 (Aug. 9, 2002)
37.    ISN 707 FD-302 (Aug. 11, 2002)
38.    ISN 707 FD-302 (Sept. 11, 2002)
39.    ISN 707 FD-302 (Oct. 15, 2002)
40.    ISN 707 FD-302 (Nov. 21, 2002)
41.    ISN 707 FD-302 (Dec. 4, 2002)
42.    ISN 707 FD-302 (Jan. 24, 2003)
43.    ISN 707 FD-302 (Feb. 9, 2003)
44.    AZ House Search FD-302 (April 2, 2002)
45.    Ressam FD-302 (May 22, 2001)
46.    Ressam FD-302 (May 24, 2001)
47.    ███ FD-302 (June 14, 2002) (less redacted version)
48.    ███ FD-302 (May 21, 2002)

49.    LHM Serial 6844

50.    ISN 696 ARB Statement 2008
51.    ISN 707 CSRT Statement
52.    ISN 839 CSRT Testimony

53.    ISN 685 FM40 (Jan. 31, 2003)
54.    ISN 685 FM40 (April 29, 2003)
55.    ISN 685 FM40 (Aug. 2, 2004)
56.    ISN 685 FM40 (Aug. 3, 2004)
57.    ISN 685 FM40 (Dec. 13, 2004)
58.    ISN 685 FM40 (Jan. 5, 2005)
59.    ISN 696 FM40 (Aug. 8, 2002)
60.    ISN 703 FM40 (Dec. 4, 2002)
61.    ISN 703 FM40 (May 27, 2004)

SECRET // NOFORN                                    JA001463

SECRET // NOFORN

62.   ISN 703 FM40 (June 1, 2004)
63.   ISN 703 FM40 (June 10, 2004)
64.   ISN 703 FM40 (July 29, 2004)
65.   ISN 703 FM40 (Aug. 5, 2004)
66.   ISN 703 FM40 (Mar. 1, 2006)
67.   ISN 703 FM40 (Mar. 3, 2006)
68.   ISN 707 FM40 (Aug. 11, 2002)
69.   AZ House Evidence FM40 (Sept. 1, 2004)
70.   AZ House Evidence Log FM40 (Sept. 1, 2004)
71.   AZ House Evidence FM40 (Jan. 11, 2005)
72.   AZ House Evidence FM40 (Jan. 13, 2005)
73.   AZ House Evidence Photographs FM40 (Dec. 5, 2005)

74.   Abu Zubaydah Diary Vol. 4
75.   Abu Zubaydah Diary Vol. 5
76.   Abu Zubaydah Diary Vol. 6
77.   Abu Zubaydah Video
78.   Abu Zubaydah Video – English Translation
79.   FM40 (Regarding the Zubaydah Video) (December 12, 2008)

80.   IIR 2 227 0131 03
81.   IIR 6 034 0397 03
82.   IIR 6 034 0446 03
83.   IIR 6 034 0470 03
84.   IIR 6 034 0472 03
85.   IIR 6 034 0657 02
86.   IIR 6 034 0693 02
87.   IIR 6 034 0715 02
88.   IIR 6 034 0755 02
89.   IIR 6 034 0822 04
90.   IIR 6 034 1041 04
91.   IIR 6 034 1056 04
92.   IIR 6 034 1077 04
93.   IIR 6 034 1215 04
94.   IIR 7 739 3352 02
95.   IIR 7 739 7062 03

96.   ISN 215 KB (Feb. 4, 2002)
97.   ISN 685 KB (Jun. 18, 2002)
98.   ISN 696 KB (Mar. 2002)

99.   ISN 685 SIR (May 24, 2002), as well as related Agent Notes
100.  ISN 685 SIR (April 23, 2004)
101.  ISN 685 SIR (Nov. 9, 2004)
102.  ISN 685 SIR (Nov. 18, 2004)
103.  ISN 685 SIR (June 21, 2005)

SECRET // NOFORN

104.    ISN 685 SIR (Nov. 12, 2005)
105.    ISN 685 SIR (Feb. 1, 2006)
106.    ISN 692 SIR (May 26, 2002)
107.    ISN 696 SIR (June 17, 2002)
108.    ISN 696 SIR (April 18, 2003)
109.    ISN 696 SIR (April 30, 2003)
110.    ISN 696 SIR (May 7, 2003), as well as related pictures
111.    ISN 839 SIR (June 17, 2004)
112.    ISN 839 SIR (July 25, 2003)

113.    ISN 685 MFR (Mar. 20, 2007)
114.    ISN 685 MFR (April 5, 2007)
115.    ISN 685 MFR (June 12, 2007)
116.    ISN 696 MFR (May 7, 2003), as well as related pictures
117.    ISN 707 MFR (Sept. 10, 2002)
118.    ISN 707 MFR (Jan. 17, 2003)
119.    ISN 707 MFR (Sept. 7, 2003)

120.    AFGP 2002 003727
121.    AFGP 2002 600875



136.    [REDACTED] (Al-Suri Diary)

137.    Calendar Conversion Pages (Calendar Converter available at
        www.calendarhome.com)

138.    ISN 694 Pocket Litter and Custodial Document

139.    ISN 685 Photograph [REDACTED]

SECRET // NOFORN

140. ISN 215 Photo and Identifying Information

141. ISN 215 ███████

142. Memorandum Opinion and Order, *Al-Qurashi (ISN 570) v. Obama*, No. 05-2385 (ESH) (August 3, 2010)[†]

143. Deposition of Ressam, In re: Int'l Letters Rogatory (August 27, 2001) (Excerpts)

144. Judgment, *U.S. v. Jose Padilla*, case no. 04-cv-60001-MGC, Dkt. No. 1333

145. Jury Verdict Form, *U.S. v. Jose Padilla*, case no. 04-cv-60001-MGC, Dkt. No. 1193

146. Testimony of Special Agent ███████, *U.S. v. Hamdan*, Military, Comm. Convening Order No. 07-04

147. Transcript of FBI Special Agent ███████ Trial Testimony, *U.S. v. Bin Laden*, No. S(7) 98 Cr. 1023 (Jan. 8, 2001)

148. Transcript of Ressam Re-Sentencing, *United States v. Ressam*, No. CR99-666JCC (Dec. 3, 2008)

149. Transcript of Ressam Trial Testimony, *United States v. Haouari*, No. S4 00 Cr. 15 (JFK)(Excerpts)

---

[†] This exhibit was erroneously entitled *ISN 570 Merits Opinion* in Respondents' Response to Petitioner's Amended Traverse in Support of Saeed Bakhouche's Petition for Writ of Habeas Corpus, filed November 18, 2010. (Noticed at Dkt. No. 1443).

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET // NOFORN

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

*ABDAL RAZAK ALI*

Petitioners,

vs.                                          No. 10-cv- 1020 (RJL)

**GEORGE W. BUSH**, *et al*,

Respondents.

## MOTION FOR ENTRY OF THE WRIT OR, IN THE ALTERNATIVE A NEW HEARING <u>AND</u> FOR SANCTIONS

Now comes the Petitioner and moves this Court (1) for an Order granting a writ of habeas corpus for Petitioner or (2) in the alternative, for a new trial pursuant to Rule 59(a)(1)(B) of the Federal Rules of Civil Procedure, and (3) for an Order imposing appropriate costs (including a reasonable attorney's fee) and sanctions upon respondents for contumacious conduct and vexatious multiplication of litigation pursuant to 28 U.S.C. Section 1927, and (4) for such other relief as is just and proper, on the grounds of egregious misconduct by Respondents as set forth herein:

## I.    INTRODUCTION

Habeas Corpus is a bedrock right, as recognized in *Boumediene v. Bush*, 553 U.S. 723 (2008), where the Court held:

> We do consider it uncontroversial, however, that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to "the erroneous application or interpretation" of relevant law.
> And

* * *

English lessons is not credible because in a later interrogation ISN 703 admitted the he himself was only present during *one* of those English classes and he described the Petitioner as someone who was also "present" in the room where the English class was held. (Ex. 52) ISN 703 is also not credible because he is an admitted drug dealer ███████

There is nothing sinister about taking English lessons and there is no reason to think that Petitioner, who was barely literate in Arabic at the time, would have thought taking those lessons would be something he should deny. Other documents confirm that Petitioner was not part of any English class.

In fact, ISN 707 claimed to be the individual who asked one of the other guests at the guesthouse (ISN 682) to teach some of the men English. The individual who was asked to teach English (ISN 682) had attended University in the United States. According to ISN 707 two days before they were all arrested the lessons began. ISN 707 never mentioned Petitioner participating in the class (Gov. Ex. 41)

## IV.    IN THE ALTERNATIVE THIS COURT SHOULD ORDER A NEW TRIAL

### A.    STANDARD OF RELIEF FOR NEW HEARING

Rule 59 (a)(1) (B) permits a new trial in cases, as here, tried without a jury where prejudicial error has crept into the record or where substantial injustice has been done. See, *Mabrey v. Ziard Fisheries*, 2008 WestLaw 110500 (W.D. Wash 2008); *Nat'l*

13

*Union Fire Ins of Pitsburg v Puget,* 2010 WestLaw 3362117 (S.D. Tex 2010); In *Brown v. Wright,* 558 F.2d 708, 710 (9th Cir.1978), the Ninth Circuit announced "[t]here are three grounds for granting new trials in court-tried actions ... (1) manifest error of law; (2) manifest error of fact; and (3) newly discovered evidence." *See Molski v. M.J. Cable,* Inc., 481 F.3d 724, 729 n. 4 (9th Cir.2007) ("The District Court applied the standard from *Brown v. Wright* ..., a bench trial case establishing the standard under Fed.R.Civ.P. 59[.]"). *Sibley v. Lemaire,* 184 F.3d 481, 487 (5th Cir.1999) (quoting *Del Rio Distrib., Inc. v. Adolph Coors Co.,* 589 F.2d 176, 179 n. 3 (5th Cir.1979)).

Under Rule 59, the court may grant a new trial on all or some of the issues "for any reason for which a new trial has heretofore been granted in a suit in equity in federal court." Fed.R.Civ.P. 59(a)(1)(B). A motion for a new trial or amendment of judgment under Fed R. Civ. P. 59 serves the limited function of allowing a court to correct manifest errors of law or fact or allowing a party to present newly discovered evidence. *United States v. Metropolitan St. Louis Sewer Dist.,* 440 F.3d 930, 934-35 (8th Cir.2006). Under Federal Rule of Civil Procedure 59(a), a court may grant a new trial after a nonjury trial "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Fed.R.Civ.P. 59(a)(1)(B). This rule has been interpreted as allowing a new trial to be granted in a nonjury action "only if a new trial might be obtained under similar circumstances in a jury action." *Diane Von Furstenberg Studio v. Snyder,* 2007 WL 3003291, at *2 (E.D.Va. Oct. 10, 2007) (quotations and citations omitted). In a jury action, a district court may set aside a jury's verdict and grant a new trial only if the verdict (1) "is against the clear weight of the evidence, or (2) is based

14

upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.,* 99 F.3d 587, 594 (4th Cir.1996).

While judgment has not yet been entered in the present case, Rule 59(e) is nonetheless of relevance here. Under Rule 59(e),a party may make a motion to alter or amend a judgment under circumstances that are ordinarily very limited, but are applicable here: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *EEOC v. Lockheed Martin Corp.,* 116 F.3d 110, 112 (4th Cir.1997). *Brailey v. Advance America Cash Advance Centers of Virginia, Inc.* 2009 WL 2594729 (E.D.Va.) See also, *United States of America ex rel. Richard F. Miller and Richard F. Miller v. Bill Harbert International Construction, Inc. et. al.* 608 F.3d 871 (D.C. Cir. 2010).

In this case the newly discovered evidence (which has still not been disclosed to Counsel for Petitioner) and the factual errors that the government acknowledges that it successfully sought to have admitted into evidence during the merits hearing have not merely *crept* into the record, they overwhelm the record to the point of crowding out nearly all other evidence, and in any event, make it clear that a reviewing court would never be able to sort out the multitude of facts that are now withdrawn from those that remain. The fact that judgment has not technically been entered is not dispositive insofar as the merits hearing itself has been completed and therefore the rationale of the cases and rules cited above remains compelling.

15

JA001471

B.    DUTY TO DISCLOSE EXCULPATORY MATERIALS

It has long been held in the criminal context that the failure of the prosecutor to disclose material favorable to the accused warrants a new trial. *Kyles vs. Whitley* 514 US 419, 115 S.Ct. 1555 (1995). That rationale must apply in this case, not only because the Petitioner faces a *de facto* sentence of life imprisonment without so much as charges ever being filed against him if habeas relief is not granted, but also because this Court's Case Management Order requires the government to turn that material over to Petitioner. (Order dated Aug. 25, 2010, Sec. 1 E). (docket 1423). And indeed this Court reminded the government, in no uncertain terms, of this requirement at the final pretrial conference on December 7, 2010- the day after the government filed the exculpatory document but failed to announce to anyone that the document was exculpatory.

On December 7 2010, the day after the government unbeknownst to the Court or Counsel filed the exculpatory documents- a pretrial hearing was held in this case. Counsel for Petitioner raised the previous day's filing with this Court and advised the Court that she wanted to see the document. This Court stated it would not be looking at the document so there was no need for Petitioner's Counsel to view the document. In the course of that same pretrial conference this Court stated on the record that Counsel was deemed to have a need to know <u>any</u> exculpatory information and that information that was exculpatory *had* to be shown to Counsel regardless of the classification level. Not once during the course of the Court's admonishment did the government advise the Court or Counsel that the *ex parte* document it had filed the previous day was itself exculpatory, leading to the inevitable conclusion that the government's refusal to

16

JA001472

disclose that document as exculpatory was intentional and smacks not only of gamesmanship but a clear intent to evade this Court's manifest directive to disclose *all* exculpatory information, period.

### A.    THE "AMENDED RETURN" AND THE HEARING – RELYING ON A KEY WITNESS THEY KNEW WAS NOT CREDIBLE

The amended return filed by the government on September 10, 2010 relies in substantial part on accusations attributed to Detainee ISN 839 who is the very same detainee for whom the government now withdraws reliance. ." In fact, in the public version of the Amended Return alone, reference to ISN 839 is found more than 30 times in more than six different sections of the Amended Return. The number of citations to ISN 839 in the classified version is much high because the public version randomly redacts the numbers. Specifically, the government attempts to link Petitioner with what it refers to as "Abu Zubaydah's militia" by claiming that Petitioner used the "kunya", or nickname, of "Usamah Al-((Jaza'iri))" a character from the so-called "Al-Suri diary." During the merits hearing, the government's own attorneys candidly admitted to this Court that they have no idea who the individual was that wrote the diary nor where he is now. The government's case, nonetheless, depends heavily (if not entirely) on convincing this Court that Petitioner used the nickname Usamah Al-((Jaza'iri)), a name found in the diary.

As described above, the government relied upon interrogations from only two detainees to attempt to prove that the nickname Usamah Al-((Jaza'iri)) was used by Petitioner. The first was ISN 707 who in one interrogation identified one individual in

17

one photograph as being "Usama Al-((Jaza'iri)).... a driver from Algeria." (Ex. 43) The

other detainee used to establish the nickname was the detainee who the government

now has withdrawn, ISN 839, who claimed the Petitioner went by the nickname

"Usama al Libi or al Jaza'iri." As further discussed below the government also used ISN

839 to attempt to show that the Petitioner traveled routes similar to the route the

government claims Abu Zubaydah's militia" utilized. From those two identifications

the government concluded that Petitioner was in fact "Usama al Libi or al Jaza'iri" the

nickname of an individual in the so called "al-Suri diary" who is alleged to be a

permanent member of Abu Zubaydah's militia. (AR at ¶19) The government's

withdrawal of reliance on ISN 839 leaves ISN 707 as the one and only detainee to

identify Petitioner with that nickname and only on one occasion- and even this

identification cannot be considered reliable because ISN 707 corrected the identification

in his very next interrogation, one month later, when he said he first met Petitioner at

prison. As further explained above the name attributed to the individual in the photo

by the interrogator was not the name that the government had in its own records for the

Petitioner.

    It should be noted that ISN 839, who was arrested several months prior to the

Petitioner, in a different city than the Petitioner, had never been at the guesthouse

where Petitioner was arrested. Furthermore, ISN 839 expressed confusion as to

whether Petitioner used the nickname "Usama al Libi or al Jaza'iri." Nonetheless, using

its "mosaic theory," the *Barhoumi* case, Abu Zubaydah's diary, and Abu Kamil Al Suri's

diary as "evidence," the government asserts that Abu Zubaydah led a militia that was

18

JA001474

somehow an associated force with either al Qaeda or the Taliban and that Petitioner was a permanent part of that force using the name Abu Usamah ((al Jaza'iri)). (AR ¶19)

By withdrawing any reliance on ISN 839, the relevance and credibility of all of the remaining evidence linking Petitioner both to the nickname and to his supposed travels with Abu Zubaydah's Force falls apart. ISN 839's testimony formed the basis for essentially all of the Government's assertions that place an individual named either "Usama al Libi or "al Jaza'iri" in the travel path of what the government asserts as the path taken in concert with Abu Zubaydah's "force. According to the Government, 839 identifies Abu Usama as someone he saw him in Khowst during Ramadan 2001 (AR¶ 33). The government then attempted to strengthen ISN 839's travel allegations by including evidence that an "Abu Osama al ((Jazaery))" was present at a fire incident that took place at a Khowst guesthouse. (AR¶ 30) It wasn't even clear from the document that the individual referred to was al-Jazaery as the translator of the document assumed that fact: the translator *thinks* this person's ["Abu Osama al ((Jazaery))"] nationality is Algerian" (the double parenthesis clarifies this is only a guess by the government. (AR¶31). Astonishingly, the "fire report" itself specifically notes that *the actual year of the report was unknown.* The report which is simply a listing of "eleven Al-Qaeda affiliates who were present" during some unknown year and whom a government official added what he or she thought were the countries of the people on the list. However, the government used this document as part of its mosaic and theorized that the report must have been from 2001 and that this report *corroborated* 839's tracking of what the government claims were the Petitioner's travels in concert

19

JA001475

with the travels of Abu Zubaydah's force. *(Gov. Ex. 94 (AR¶ 64))*

In other words the government used this report *from an unknown year* to corroborate the now withdrawn testimony of ISN 839 placing someone named either "Usama al Libi or "al Jaza'iri" in the area where Abu Zubaydah's force was supposedly congregating. (AR ¶s 30-34, 36-37)

Furthermore, it was ISN 839 who stated that he was in a group that included a person with that confused nickname in the Paktia Province valley. According to the government's Return the "militia" arrived in Zurmat, Afghanistan via an Abu Zubaydah established escape route and ISN 839 is used to corroborate the al-Suri "diary" when 839 stated that the valley was being used to assemble foreigners fleeing Afghanistan (AR¶ 29). SEE E.G. ¶¶ 32-37, describing, inter alia, Petitioner's supposed placement in Khowst, Petitioner's Placement with a Jihadist named Hamzi al Jowfi in a valley between Khowst and Gardez, Petitioner's supposed travels with other to Zurmat on an established Abu Zubaydah escape route and, Petitioner's travels to Burmal with other Abu Zubaydah militia members. The government tied up the loose ends of travel by looking at the travel of ISN 707 who claimed he was with an individual name Usamah al Jaza'iri during part of his escape from Afghanistan but he never indicated that the person he traveled with was Petitioner. Because it was not Petitioner. Clearly ISN 839 is the lynchpin of the contentions and without ISN 839's statements there is no corroborating evidence for the one interrogation where ISN 707 mistakenly identifies Petitioner as using the alias of Usamah al Jaza'iri.

20

## V.    OTHER MISCONDUCT

### A.  THE FAKE SUMMARY-

The government's case as it was postured in August 2010 unraveled when the government was forced to file an unredacted version of the transcript ███████ ██████████████████████████████████ on August 25th, 2010. (Ex. 16) That transcript revealed that the key document relied on by the government in its Return was an outright fake. (Ex. 15)   Up until that time the government had consistently claimed that the Petitioner had admitted to receiving some kind of training, was aware of illegal activities at the guesthouse and had been to Afghanistan. The underlying document, the actual transcript for that meeting, showed however, that not only had Petitioner made no such admissions, but in fact the document showed that he actually stated *the exact opposite*. As a result the government asked this Court that same day (August 25th, 2010) for leave to "amend" its Return yet again, in order to preserve any pretext of still having a lawful basis for detention.

### B.    THE NEW THEORY

The government's new theory came to light in its filing of September 10, 2010. In that filing the government now cited to the *Barhoumi* case and attempted to tie Petitioner to what the government claimed was "Abu Zubaydah's force...." by claiming that petitioner used the nickname of "Usamah al Jaza'iri" a character from the so called "al-Suri diary". The government tried to link Petitioner with this name in two ways: first, by using one interrogation (as described above) from ISN 707 from August 2002 in

21

JA001477

which ISN 707 is shown more than 60 photographs and identified a photograph as belonging to a person he referred to as Abu Usamah al jaza iri and whom the interrogator said was "Abdu Razzaq" and from that one identification they moved on to ISN 839 who then placed a person with a possible similar sounding name to the travels of Abu Zubaydah through Afghanistan.

## C.    THE GOVERNMENTS "AMENDED RETURN

The government asked for and was given leave to file an "Amended Return" however after filing what they called an "amended return" the DOJ later admitted to Counsel that the Return they filed on September 10th, 2010 was really a "supplemental return" and had to be read in conjunction with the three previously filed Returns. Counsel brought this to the Court's attention in the Amended Traverse at pages 1-3:

> Leaving aside the thousands of pages of documents attached to the multiple Returns, neither this Court nor counsel should be required to consider all three of the narratives, especially since the government has withdrawn reliance on many of the facts in the first two narratives.(2) [footnote 2 in the original: Counsel also points out that during the status conference on September 10, 2010 this Court pointed to the Amended Return filed that afternoon and commented that it was smaller than some of the Returns filed in other cases. The government made no mention at that time that the latest Return contained only one of the three Narratives and fewer than half of the documents relied on by the government. Counsel for Petitioner only found out that the government considered the latest Return to be a "Supplement" to its earlier Returns and Narratives after court that same day, during a discussion with DOJ attorneys.] Not knowing whether or not this Court will strike the earlier Returns, Petitioner will address the assertions and documents addressed in all of the Returns filed by the government.

## D.    REORGANIZING THE EXHIBITS AND
## AMENDING THE NARRATIVE AT TRIAL

22

USCA Case #11-5102    Document #1445990    Filed: 06/11/2013    Page 470 of 847

At the final pretrial conference the government announced that it would be filing the exhibits together in multiple binders. Those same attorneys did not announce that they would be "reorganizing" the exhibits. The fact that the documents would be together in binders was inconsequential. However, the fact that the documents submitted to Counsel at the Secure Facility on Friday evening December 10th, 2010-three days prior to the hearing- in a completely reorganized fashion, was nothing short of a disaster for Petitioners Counsel. Petitioners Counsel had all of the documents organized in the original order, as submitted by the government. There were five separate document lists and literally thousands of pages of documents. After seeing and reviewing the new Exhibit organization Petitioner's Counsel sent an email to the DOJ asking that they provide a chart for their new exhibit lists that identified which previous list the document originated from. The DOJ, with its six attorneys in court on every occasion and its multiple of paralegals and law clerks, refused to provide such a chart, saying it would not be a good use of their time. Counsel for Petitioner, a solo practitioner, was unable to reorganize all of her original documents for the hearing. At the hearing the government, without leave of court, also submitted an "Amended Return" referencing the new exhibit numbers and announcing they were no longer relying on the previous narratives.

Counsel's request to the Court at the beginning of the hearing to Order the Government to provide a chart so that Counsel could keep track of the documents addressed by the government in the hearing was denied. After further discussion the

23

JA001479

Court asked the DOJ to try to provide a list of the document order for the documents they intended on using. A handwritten list by new exhibit number was later provided. That list was completely worthless to Counsel for the hearing on that day, a fact she made known to the Court on the second day when she attempted to put those exhibit lists into the record. Although the Court denied Counsel's motion on day two to put those lists into the record Counsel submits them with this motion as Exhibit 80.

### E.  COUNSEL WAS DENIED THE RIGHT TO BRING IN HELP FOR THE HEARING

Finally, at the pretrial conference Counsel for Petitioner announced that she was bringing in an additional attorney who had clearance and was covered under the protective order to help her organize exhibits at the hearing and asked whether or not, given the attorney's role as more in tuned with a paralegal, the attorney should file an appearance in the case. (It should be noted that this was prior to Counsel learning that all of the government exhibits would be reorganized for the hearing). Counsel was trying to ensure that the hearing would run smoothly and all of her exhibits would stay organized. Immediately the government objected and this Court denied Petitioner's Counsel's request saying that it was too late to be bringing in new counsel. With associate counsel in the large law firms coming and going Counsel herein still does not understand the reasoning for not being allowed help in organizing exhibits during this hearing by counsel who had both clearance and was covered under the protective order. The Government itself had at least two paralegals in the courtroom. The first day of the hearing Petitioner's Counsel was not able to cross reference the Government

24

documents in a timely manner to make effective use of the documents.

## VI.    CONCLUSION

The relief sought by Petitioner of immediate entry of a writ of habeas corpus recognizes the realities of the government's ever declining basis to contend it is "lawfully" hold Petitioner who is now in his tenth year of indefinite captivity at Guantánamo; without the allegations attributed to ISN 839, the "evidence," even viewed as a whole is internally inconsistent and inconclusive and cannot, even collectively, be deemed a sufficient basis to continue holding Petitioner. Insofar as government counsel knew prior to the merits hearing that ISN 839, an essential witness to the allegations it was asserting as a basis to hold petitioner, could not have been relied upon, it is most troubling that government counsel did not request an adjournment to "sort out" its own "issues" with 839, a request Petitioner could not possibly have objected to had the full scope of "problems" with 839 been disclosed (which, to date, they have not been). Instead, government counsel misled both this Court and Counsel for Petitioner into believing that Petitioner was obliged to respond to allegations raised by three different detainees, and as a result, much of the merits hearing (which, as a result, took far longer than it should have) was devoted to responding to ISN 839's allegations. In the event that the Court does not conclude that an immediate entry of a Writ of Habeas Corpus is appropriate, then at an absolute minimum, Petitioner is entitled to a new hearing untainted by "evidence" that even the government now acknowledges is unreliable.

25

* * *

JA001482

# Group Ex.

# 80

JA001483

UNCLASSIFIED//FOR PUBLIC RELEASE

\* \* \*

JA001484

Issue 2

Ex. 23
Ex. 94
Ex. 111
Ex. 93
Ex. 76
Ex. 66
Ex. 95

Issue 1

| | |
|---|---|
| 136, | 108 |
| 68 | 109 |
| 37 | 48 |
| 139 | 11 |
| 146 | 45 |
| 111 | 149 |
| 47 | 40 |
| 57 | 143 |
| ■ | 37 |
| 33 | 75 |
| 35 | 89 |
| 66 | 76 |
| 86 | 75 |
| 62 | 79 |
| 63 | 77 |
| 65 | 78 |
| 67 | |
| 107 | |
| 97 | |
| 98 | |
| 59 | |

JA001485

# Issue #3

| | | |
|---|---|---|
| 57 | 107 | 28 |
| ████ | 59 | 27 |
| 83 | 108 | 56 |
| 28 | 109 | 69 |
| 55 | 47 | 70 |
| 100 | 48 | 73 |
| 24 | 76 | 71 |
| ████ | 136 | 72 |
| ████ | ████ | 138 |
| 33 | 107 | 4 |
| 35 | 29 | ~~██~~ |
| 66 | 50 | |
| 86 | 47 | |
| 62 | ~~██~~ 34 | |
| 63 | 90 | |
| 65 | ~~██~~ 37 | |
| 67 | ████ | |
| 64 | 41 | |
| 65 | | |

JA001486



Issue 4

Ex 1          Ex 57
Ex 23         Ex 107
Ex 26
Ex 83
[redacted]

Ex 101
Ex 102
[redacted]

Ex 27
Ex 92
Ex 37
Ex 99
Ex 60
Ex 104
Ex 113

JA001487

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

Petitioner,

v.

BARACK OBAMA, et al.,

Respondents.

Civil Action No. 10-CV-1020 (RJL)

## DECLARATION OF SCOTT D. LEVIN

Pursuant to 28 U.S.C. § 1746, I, Scott D. Levin, hereby declare:

1. I currently serve as a trial attorney in the United States Department of Justice ("DOJ"), Civil Division, Federal Programs Branch. I have worked on the Guantanamo Bay detainee habeas corpus litigation pending in the United States District Court for the District of Columbia since approximately September, 2008. As part of my current duties, I serve as trial counsel for Respondents and also oversee other attorneys representing Respondents in the Guantanamo habeas litigation, including in this case.

2. The information provided in this declaration is based on my personal knowledge and on information provided me in my official capacity, and is provided in response to Petitioner's Motion for Entry of the Writ or, in the Alternative a New Hearing and for Sanctions (emphasis in original) (hereinafter "Petitioner's Motion"), filed on January 3, 2011 (noticed at dkt. no. 1447).

3. On December 27, 2010, Respondents filed a Notice of Withdrawal of Reliance on Statements by Third-Party Detainee (dkt. no. 1445), which provided notice that they were withdrawing reliance in this case on statements made by a particular detainee witness,

1

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

therein described as the "Third-Party Detainee." As stated in the notice, certain information related to the Third-Party Detainee that was potentially discoverable under paragraph "[I.]E. Exculpatory Evidence" of the Court's August 25, 2010 Case Management Order (dkt. no. 1423) had come to the attention of Respondents' counsel, and for national security reasons Respondents had filed an *ex parte* motion seeking an exception to production of the information to Petitioner's counsel. Respondents later informed Petitioner's counsel that the Third-Party Detainee was Musa'ab al Madhwani, ISN 839.[1]

4. Following that notice, Petitioner filed his motion for sanctions under 28 U.S.C. § 1927, alleging, *inter alia*, that "[i]t is now clear that the government deliberately withheld exculpatory information regarding its most important witness from both the Court and Counsel for Petitioner." Pet'r's Mot. at 3. Petitioner also accused Respondents of engaging in "gamesmanship," *id.*, of "knowingly with[holding] exculpatory materials," *id.*, engaging in "malfeasance," *id.* at 4, "refus[ing] to disclose" exculpatory material, *id.* at 16-17, and "intent[ionally] [] evad[ing] this Court's manifest directive to disclose all exculpatory information," *id.* at 17. The purpose of this declaration is to explain that while Respondents regret any miscommunication with the Court as to the purpose of their *ex parte* motion and the arguably exculpatory nature of the evidence it concerned, neither

---

[1] As explained during the conference call held among the Court and the parties' counsel on December 28, 2010, Respondents counsel did not "refuse[]" to provide the name of the Third-Party Detainee to Petitioner's counsel, as claimed in Petitioner's Motion To Withhold Ruling (dkt. no. 1446). Petitioner's counsel requested the name of the Third-Party Detainee in an e-mail message sent to Respondents' counsel at approximately 6:00 p.m. eastern time on December 27. My co-counsel on this case and I were either out of the office that day for the year-end holidays or had left for the day. On the morning of December 28, on behalf of Respondents, I informed Petitioner's counsel by return e-mail that the Third-Party Detainee was ISN 839.

2

SECRET//NOFORN

JA001489

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

Respondents nor their counsel have engaged in any conduct or taken any action intended
to inappropriately withhold exculpatory evidence from this Court or Petitioner's counsel.

5. On August 25, 2010, the Court issued its Case Management Order ("CMO") in this case,
which provides, in relevant part in Section I:

> E. Exculpatory Evidence: The Government shall provide on an ongoing basis any
> evidence contained in the material reviewed in developing the return for the
> petitioner, and in preparation for the hearing for the petitioner, that tends
> materially to undermine the Government's theory as to the lawfulness of the
> petitioner's detention.

6. As noted above, one of the third-party detainees upon whose statements Respondents
initially relied in this matter to establish that Petitioner is lawfully detained is ISN 839.
In accordance with the mandate of paragraph I.E. of the CMO, to the extent that
Respondents identified any information in developing the factual return for Petitioner, the
amendments and supplements thereto, or in otherwise preparing to litigate the case that
would potentially impact ISN 839's credibility, Respondents produced that information
to Petitioner's counsel, except for the three documents that were the subject of
Respondents' *ex parte* motion. All told Respondents produced to Petitioner's counsel at
least 20 documents containing information that arguably reflects on the credibility of ISN
839's statements, at least four of which Petitioner introduced as evidence in the case as
Petitioner's exhibits ("PX") 28-30, and 46.

7. In the course of the litigation, DOJ habeas counsel learned of three additional documents
containing information that potentially bears on the credibility of ISN 839's statements.
Because of the exceptionally high classification and sensitivity of this information, the
originating agency that created the documents concluded that producing the information
to Petitioner's counsel in discovery would pose an unacceptable risk to national security.

3

SECRET//NOFORN

SECRET//NOFORN

After consulting with the originating agency, my co-counsel and I decided that it was necessary to file an *ex parte* motion in this case to bring the information contained in the documents to the Court's attention and request an exception to any obligation there might be under the CMO to disclose the information to Petitioner's counsel. The procedure Respondents followed was similar to that followed in filing *ex parte* submissions in other Guantanamo habeas cases where Respondents have discovered information that is potentially exculpatory and cannot be disclosed to petitioners' counsel due to the exceptionally high classification or sensitivity of this information.

8. Respondents filed their *ex parte* motion on December 6, 2010 (noticed at dkt. no. 1444). The motion explained that Respondents had identified potentially exculpatory information regarding ISN 839 that was discoverable under paragraph I.E. of the CMO, and were seeking to be relieved of any obligation to disclose the material to Petitioner's counsel. The motion explained the nature of the material in question, the exceptionally grave damage to national security that could result from its improper disclosure, and why, under the standards established by the D.C. Circuit in *Al Odah v. United States*, 559 F.3d 539 (D.C. Cir. 2009), Respondents should not be required to produce it to Petitioner's counsel. The motion was supported by a declaration from an official of the originating agency explaining why improper disclosure of the information in question reasonably could be expected to cause exceptionally grave damage to the national security of the United States. On these grounds the motion requested an exception to the disclosure required by paragraph I.E. of the CMO. The motion also explained that the information in question would be made available for the Court's review, and that Respondents' habeas counsel would contact the Court to make arrangements for that review.

SECRET//NOFORN

JA001491

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

9. After the *ex parte* motion was filed on December 6, 2010, I contacted the Court's chambers via telephone and informed the law clerk assigned to this case that Respondents had filed an *ex parte* motion and wanted to make appropriate arrangements for the Court to review the highly classified information referenced therein. The Court's clerk informed me that the Court Security Officer had already contacted chambers and provided the same information. To the best of my recollection, the clerk indicated that the Court would contact me further on the matter if appropriate. During the call, I did not explain the purpose of the *ex parte* motion or state that it concerned material potentially responsive to paragraph I.E. of the CMO.

10. The next day, on December 7, 2010, the Court held a prehearing conference for the upcoming merits hearing. During the conference, the Court explained its procedures for conducting the upcoming merits hearing.[2] Among other things, the Court indicated that it would not consider inculpatory evidence submitted by Respondents on an *ex parte* basis unless it concluded during the course of the merits hearing that such evidence was necessary to establish Petitioner's detainability, and Respondents could show that disclosure to Petitioner's counsel would create an exceptionally high risk to national security, such as exposure of a highly placed source or revelation of an extremely sensitive piece of surveillance technology. During a later exchange with Petitioner's counsel (regarding an *ex parte* submission that had been made on Petitioner's behalf by petitioner's counsel in another Guantanamo *habeas* matter), the Court stated that it had not reviewed Respondents' *ex parte* filing.

---

There is no transcript of the December 7, 2010 prehearing conference. I am basing my account f this conference on the collective notes and recollection of myself and my co-counsel who ttended the conference.

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

11. My co-counsel on the case and I became concerned by the Court's remarks at the pre-hearing conference that the Court may have assumed that Respondents' *ex parte* motion related to inculpatory information and therefore that the Court might not review and rule on it. Because we believed the Court needed to review the *ex parte* motion and the information identified therein, we decided to telephone the Court's chambers again in order to inform the Court that the *ex parte* motion did not relate to inculpatory information. In light of the Court's remarks at the pre-hearing conference that it would not consider *ex parte* evidence of an inculpatory nature unless absolutely necessary, by doing so we believed that any assumption the Court had made that the motion concerned inculpatory information would be corrected, and that the Court's potential objection to reviewing the motion would be removed.

12. On or about December 10, 2010, I again telephoned the Court's chambers and spoke with the law clerk assigned to this case about the *ex parte* motion. Because of the highly classified and extraordinarily sensitive nature of the information in question, and because any communication with the Court regarding the information would likely reveal its association with a particular case, I knew that I should avoid saying more about it than was necessary in a non-secure communication. Thus, before making the call I informed the originating agency that I intended to immediately clarify to the Court on an open, non-secure phone line that the information was not of an inculpatory nature and that the Court needed to review the materials. Agency counsel agreed that what I planned to say was appropriate for communication over a non-secure phone line.

13. With these concerns in mind, I contacted the clerk assigned to the case and, as planned, provided three pertinent facts: 1) that Respondents' December 6, 2010 *ex parte* motion

6

SECRET//NOFORN

JA001493

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

did not concern inculpatory information, 2) that it concerned a different issue, and 3) that

the Court needed to see it. In response, the clerk informed me that the Court typically

disfavors *ex parte* submissions, but that the message would be relayed. I then reiterated

that Respondents' filing did not relate to inculpatory information and emphasized that the

Court needed to review it. Based on the information we had in hand at the time,

Respondents believed that this communication would address any objection that the

Court may have had to reviewing Respondents' *ex parte* filing on the assumption that it

contained inculpatory information. At the time that was the only indication that my co-

counsel and I had as to why the Court had yet to review the filing.

14. On December 14-15 and 17, 2010, the Court held the merits hearing in this case, during

which Respondents relied on statements by ISN 839, in principal part, to corroborate

other evidence presented in support of Petitioner's detainability. My co-counsel and I

realize in hindsight that the merits hearing presented another opportunity to raise

Respondents' *ex parte* motion with the Court, but in the midst of the proceedings it

simply did not occur to us to do so. Following the hearing, however, my co-counsel and I

remained concerned that the Court had not ruled on Respondents' *ex parte* motion, had

not asked to see the underlying documents, and had not otherwise indicated that it had

reviewed Respondents' *ex parte* filing. Now that the merits hearing had passed, it

became evident to us, given the Court's apparent opposition to reviewing *ex parte*

submissions except when necessary, that the Court might not review the motion or the

underlying information before rendering a decision on the merits unless the Court were

given more information about the nature of the evidence in question, beyond the fact that

it was not inculpatory. I decided to contact the Court's chambers to state that the

7

SECRET//NOFORN

USCA Case #11-5102    UNCLASSIFIED//FOR PUBLIC RELEASE2013    Page 486 of 877

evidence to which the *ex parte* motion pertained was arguably exculpatory, and that it was therefore imperative for the Court to review it. Given that this communication related to highly classified and sensitive information, I conferred first with the originating agency for assurance that what I intended to say to the Court about the exculpatory nature of the evidence could be communicated over an open, non-secure phone line.

15. Around the same time, on December 23, 2010, the Court scheduled the announcement of its decision and unclassified opinion for December 30, 2010. Because Respondents believed it was imperative for the Court to review the *ex parte* motion before rendering its opinion, I telephoned the Court's chambers that same day and informed the law clerk that our *ex parte* motion concerned exculpatory information. I reminded the clerk that this was the same motion we had previously discussed on or around December 10, 2010, following the pre-trial conference.

16. Following the call the Court scheduled an *ex parte* conference for 4:00 p.m. that day, at which I and, per the Court's instruction, a representative of the originating agency appeared. During the conference I confirmed for the Court that the information discussed in Respondents' *ex parte* motion was potentially responsive to paragraph I.E. of the CMO.[3] I also acknowledged that, apart from the motion itself, the first time Respondents explicitly used the term, "exculpatory," in describing the contents of the *ex parte* motion to the Court was during my call to chambers earlier that day. I further apologized on behalf of Respondents for any failure in their earlier contacts with the Court to adequately communicate the exculpatory nature of the evidence at issue in Respondents' motion.

---

[3] Respondents do not have a copy of the transcript of the December 23, 2010 *ex parte* conference. I am basing my representations regarding this conference on my notes and recollection of the event.

JA001495

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

17. To the best of my recollection, during the December 23 conference I also remarked that in my prior communications with the Court I had not expressly stated that the motion concerned exculpatory evidence because I previously lacked authorization or approval from the originating agency to describe it in those terms over a non-secure phone line. At the January 4, 2011 hearing (requested by Petitioner's counsel after Respondents withdrew their reliance on ISN 839's statements), the Court made a number of statements indicating that it understood my remarks to mean that the originating agency has a policy in the Guantanamo habeas cases against informing the Court that *ex parte* filings such as that made in this case concern potentially exculpatory information, and that DOJ has acquiesced to that policy. To the extent that the Court is basing that understanding on the representation I made at the December 23 conference, I wish to clarify that my representations were not intended to convey to the Court that the originating agency has any such policy or that DOJ has acquiesced to such a policy. To the best of my knowledge and information, no policy of that or a similar kind exists. The *ex parte* motion itself specifically explains that the information discussed therein is potentially responsive to paragraph I.E. of the CMO, and Respondents filed the motion with the expectation that the Court would, upon review of the motion, be made aware of the exculpatory nature of the evidence in question. All I was attempting to communicate during the December 23 conference was that in this particular case, given that the *ex parte* motion related to highly classified and sensitive information, I determined that I should not discuss the content of the information contained therein, no matter how general, until first conferring with the originating agency and receiving assurance that what I intended to say about it could be communicated over a non-secure phone line. To

9

SECRET//NOFORN

SECRET//NOFORN

the extent that my choice of words at the December 23 *ex parte* conference led to the impression that the originating agency has a policy against informing the Court that such an *ex parte* motion relates to exculpatory information or that DOJ has acquiesced to such a policy, I repeat that this is not the case and I sincerely apologize for the confusion. As I explained to the Court on December 23, had it occurred to me in prior communications with the Court that my description of the *ex parte* motion was insufficiently clear, I would have informed the Court at the time that it related to material potentially responsive under paragraph I.E. of the CMO, as I eventually did.

18. While, pursuant to the Court's request, I did not reveal the substance of the material contained in Respondents' *ex parte* motion during the December 23 conference, I did explain that the information related to the credibility of ISN 839 and, generally, why in the interests of national security the documents in question could not be disclosed to Petitioner's counsel. While the Court had not reviewed Respondents' *ex parte* filing, it indicated that it considered the grounds on which Respondents had based their request for an exception to disclosure (as I had summarized them) to be insufficient under the Court's standards, and advised that Respondents must either withdraw reliance on the statements by ISN 839, or appear for an *ex parte* hearing on December 28, 2010, at which an official of the originating agency would have to explain at greater length why the information related to ISN 839 in the *ex parte* motion could not be disclosed to Petitioner's counsel without placing national security at risk. The Court informed Respondents that they had to notify the Court of their choice by noon the following day, December 24, 2010. The Court also informed Respondents that if Respondents withdrew reliance on the statements by ISN 839, a notice had to be posted on the public record.

SECRET//NOFORN

JA001497

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

19. Respondents determined that, under the circumstances, they would withdraw reliance in this case on the statements of ISN 839, with reservation of all rights. At 11:20 a.m. on December 24, 2010, I faxed to the Court's chambers a letter notifying the Court of Respondents' decision. I also left confirmatory voice-mail messages with the Court's chambers and the law clerk. Pursuant to the Court's instructions, Respondents filed their Notice of Withdrawal on December 27, 2010.

20. I wish to reiterate, as I have previously said to the Court, that I deeply regret that I was not clearer in my initial contacts with the Court that the *ex parte* filing concerned potentially exculpatory information. My co-counsel and I also regret any inadvertent resulting disruption of the Court's business in this matter. Neither my co-counsel nor I have made any effort to suppress or conceal exculpatory material in contravention of this Court's orders, nor have we been operating under any sort of policy to conceal the fact that *ex parte* motions such as that filed in this case concern exculpatory evidence. My co-counsel and I have endeavored throughout this case to comply with the letter and spirit of our obligations to produce exculpatory evidence.

21. For example, during the course of discovery in this case Respondents produced at least 20 documents which potentially bore on ISN 839's credibility, including intelligence reports, ISN 839's own testimony and declarations submitted in his habeas case, and certain of ISN 839's unclassified medical records. Petitioner introduced a number of those documents into evidence, including PX 28 (Decl. of ISN 839 (1/7/08)), PX 29 (Decl. of ISN 839 (5/18/2010)), PX 30 (ISN 839 SIR (June 3, 2008)), and PX 46 (ISN 839 SIR (June 10, 2004)). Regarding the information in the three highly classified documents that Respondents determined could not be produced to Petitioner's counsel

11

SECRET//NOFORN

SECRET//NOFORN

consistent with the interests of national security, Respondents filed an *ex parte* motion in

an attempt to bring these documents to the Court's attention, and to obtain relief from any

obligation to produce them. Respondents made genuine -- albeit insufficiently clear --

efforts to impress upon the Court the need to review their *ex parte* motion when it

became apparent to their counsel that otherwise the Court might not do so. After it

became evident that the Court may have concluded that our *ex parte* motion related to

inculpatory information, I contacted chambers on or around December 10 and informed

the law clerk that the motion did not concern inculpatory information, rather it related to

another issue and the Court needed to see it. Upon recognition that this communication

was insufficient, I contacted the clerk again on December 23 and explained further that it

related to exculpatory information.

22. Unfortunately, those initial efforts fell short and, as previously explained to the Court, my

communications regarding the content of the *ex parte* motion could and should have been

clearer. My caution in communicating with the Court over an open, non-secure phone

line was the result of my efforts to discharge Respondents' obligations regarding the

disclosure of potentially exculpatory material while at the same time meeting my equally

solemn obligation as government counsel to protect sensitive national security

information from improper disclosure. While I may have acted with an overabundance of

caution, and while these communications obviously fell short in some respects, my co-

counsel and I were not in anyway attempting to circumvent Respondents' obligations

under the CMO, to knowingly or intentionally withhold exculpatory information, or to

intentionally mislead the Court.

SECRET//NOFORN

JA001499

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information, and belief.

Executed on: January 18, 2011

SCOTT D. LEVIN

13

SECRET//NOFORN

JA001500

UNCLASSIFIED//FOR PUBLIC RELEASE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FILED WITH THE
COURT SECURITY OFFICER
CSO:
DATE:

| | |
|---|---|
| ABDAL RAZAK ALI ) | |
| ) | |
| Petitioners/Plaintiffs ) | CIVIL ACTION |
| ) | |
| v. ) | NO. 10-1020 (RJL) |
| ) | |
| Barack Obama, et al. ) | |
| ) | |
| Respondents/Defendants ) | |

## NOTICE OF APPEAL

Notice is hereby given that Petitioner in the above named case hereby appeals to

the United States Court of Appeals for the District of Columbia Circuit from the

Classified Memorandum Opinion entered in this case on February 28, 2011 denying

Petitioner's habeas petition and related motions. A copy of that Opinion is hereby

attached. This appeal is being filed *in forma pauperis*.

Dated: March 8, 2011

Respectfully Submitted,
Counsel for Petitioner

/s/ H. Candace Gorman
H. Candace Gorman

LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman
220 S. Halsted
Suite 200
Chicago, IL 60661
(312) 427-2313

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED WITH THE
COURT SECURITY OFFICER
CSO: _____
DATE: _____

ABDUL RAZAK ALI,            )
                           )
            Petitioner,     )
                           )
        v.                  )        Civil Case No.  10-1020 (RJL)
                           )
BARACK H. OBAMA,[1] *et al.*,  )
                           )
            Respondents.    )

CLASSIFIED MEMORANDUM OPINION
(February 28, 2011)

For the reasons set forth on the record at the public hearing held on January 11,

2011, and for the following reasons, the Court DENIES petitioner Ali's petition for a writ

of habeas corpus.

## BACKGROUND

Petitioner Abdul Razak Ali, who now claims his name to be Saeed Bakhouche

(hereafter "petitioner," "Bakhouche," or "Razak"), is a forty-year old Algerian citizen

who was captured on March 28, 2002, by Pakistani forces in a raid at a guesthouse in

Faisalabad, Pakistan. (Gov't Amended Narrative Regarding Petitioner Abdal Razak Ali

(ISN 685)), Sept. 10, 2010, ¶¶ 49, 50 (hereafter "Am. Narr.").)  He was caught together

with a well known Al Qaeda facilitator: Abu Zubaydah. (*Id.*)  Indeed, Abu Zubaydah

---

[1]        Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named
as a party to an action in his official capacity ceases to hold office, the court will
automatically substitute that officer's successor.  Accordingly, the Court substitutes
Barack H. Obama for George W. Bush.

1

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

was at that very time assembling a force to attack U.S. and Allied forces.  (Am. Narr. ¶¶ 17, 42.)  Captured along with the petitioner and Abu Zubaydah were a bevy of Abu Zubaydah's senior leadership (Am. Narr. ¶ 41), including instructors in engineering, small arms, English language (with an American accent), bomb-making, and electrical circuitry. ▮▮▮▮▮▮▮▮▮  Am. Narr. ¶ 41.)  Also found at the guesthouse were pro-al Qaeda literature,[2] electrical components, electrical schematics and diagrams (in both Arabic and English), notes on circuitry, and at least one item — ▮▮▮▮▮▮▮▮▮ typically used as a timer for remote bombing devices (*i.e.*, improvised explosive devices or "IED"s).  (*See* Gov't Exs. 4, 69-73.)  Petitioner was transported to Bagram Air Force Base for questioning (*see* Gov't Ex. 99), where he was held until his transfer to the U.S. Naval Base in Guantanamo Bay, Cuba, in June 2002.  (Classified Hr'g Tr., Dec. 17, 2010, at 66:2-6.)

## ANALYSIS

The Government contends that the petitioner was a member of Abu Zubaydah's force that was reorganizing at that guesthouse in Faisalabad, Pakistan, and preparing for future operations against U.S. and Allied forces.  (Am. Narr. ¶ 17.)  In particular, the Government contends that the petitioner: (1) lived with Abu Zubaydah and a cadre of his lieutenants during a two week period (Am. Narr. ¶ 41); (2) previously traveled with Abu Zubaydah's force through Afghanistan and ultimately fled with them through Afghanistan to Pakistan (Am. Narr. ¶¶ 29-32, 35, 37-40); and (3) took an English course

---

[2]     Among the evidence the Government offered was a photographic catalog of items recovered from the Faisalabad guesthouse, including an artillery manual with "al Qaida" written on the cover in Arabic.  (*See* Gov't Ex. 70, at Nos. 67-68.)

2

SECRET

SECRET

(with an American accent) while he was staying at Abu Zubaydah's guesthouse (Gov't

Exs. 64 at 1; 65 at 1; 68 at 5;          Classified Hr'g Tr., Dec. 17, 2010, at 16:10-21.)

As a result, the Government argues that petitioner Bakhouche is the type of individual

that is detainable under the AUMF because he was "part of" an "associated force" (*i.e.*,

Abu Zubaydah's force) engaged in hostilities against the United States or its Allied

forces.

    Petitioner, not surprisingly, disagrees. Although he acknowledges being captured

in the same guesthouse as Abu Zubaydah, he denies: (1) ever being in Afghanistan, let

alone being with Abu Zubaydah's force there (Pet.'s Am. Traverse, Nov. 8, 2010, at 52,

58); (2) ever taking an English course from Abu Zubaydah's trainers at the guesthouse

(Gov't Exs. 27 at 2; 28 at 2; 56 at 1); and (3) ever being a member, permanent or

otherwise, of Abu Zubaydah's force (*see* Pet.'s Am. Traverse, Nov. 8, 2010, at 25, 27,

51, 58). In essence, he claims that the Government has mistakenly identified him as a

member of Abu Zubaydah's force, who traveled with Abu Zubaydah in Afghanistan and

fled with him to Pakistan before gathering at this particular guesthouse to start preparing

for their next offensive against U.S. and Allied forces. Upon reviewing the Return, the

Traverse, and the oral argument during the merits hearing, I disagree with the petitioner's

contention and conclude for the following reasons that the Government has more than

adequately established that it is more likely than not that petitioner Bakhouche was, in

fact, a member of Abu Zubaydah's force and is therefore detainable under the AUMF.

3

SECRET

At the outset, it is worth noting that our Circuit Court has *unequivocally* recognized that Abu Zubaydah and his band of followers have well established ties to al Qaeda and the Taliban and thus constitute an "associated force" under the AUMF. *See Barhoumi v. Obama*, 609 F.3d 416, 420 (D.C. Cir. 2010) (affirming the district court's conclusion that Barhoumi was part of "[Abu] Zubaydah's militia – an 'associated force that was engaged in hostilities against the United States or its coalition partners'" and affirming denial of petitioner Barhoumi's writ); *see also Al Harbi v. Obama*, No. 05-02479, 2010 WL 2398883, at *14 (D.D.C. May 13, 2010) ("There appears to be no dispute that Abu Zubaydah was an al Qaeda operative and that Al Qaeda-related activities took place in his [Faisalabad] house."). Thus, a member of Abu Zubaydah's force is, by definition, detainable under the AUMF. Indeed, petitioner does not dispute this, and petitioner's counsel readily admits the same. (Classified Hr'g Tr., Dec. 14, 2010, at 30:3-7.) Instead of challenging the lawfulness of detaining a member of Abu Zubaydah's force, petitioner instead focuses on whether he was *actually* a member of Abu Zubaydah's force.

The Government, of course, does not rely exclusively on petitioner's capture in the same guesthouse as Abu Zubaydah – although the Government contends, and the Court agrees, that that *alone* is enough to warrant petitioner's detention under the AUMF. *See Khalifh v. Obama*, No. 05-1189, WL 2382925 at *4 (D.D.C. May 29, 2010) ("Whatever interaction [petitioner] might have had with the top terrorists he met, whether it was limited or extended, his presence with them at [a] guesthouse is quite powerful support to

4

SECRET

the inference that he was considered a member of al Qaida (and/or associated forces) at the time. Without such an understanding, he would not have been permitted to be around so many terrorists for any amount of time."). Instead, the Government directs this Court to what petitioner was doing *while* he was at the guesthouse with Abu Zubaydah and his senior leadership, and what he was doing *before* he arrived at that guesthouse.

As to the former, the Government sets forth credible accounts by fellow guesthouse-dwellers who not only positively identified the petitioner by one or more of the various names he was using at that time – *i.e.*, Abdul Razak or Usama al Jaza'iri[3] – but who also credibly account for petitioner participating in one of Abu Zubaydah's various training programs while he was staying in the guesthouse (*i.e.*, taking a class in English). Specifically, ISN 703 identified the petitioner as Abdul Razak and stated that he witnessed him receiving English-language classes from another guesthouse member, Ghassan Abdulla al-Sharbi (ISN 682) (Gov't Ex. 64 at 1), a "permanent member" of Abu Zubaydah's force (Gov't Ex. 136 at 67, No. 12) who was also detained in the March 2002

---

[3]    At one point during the habeas petition merits hearing, petitioner's counsel even contended that her client was not the same Abdul Razak that his fellow Abu Zubaydah guesthouse-lodgers had identified by that very name. Unfortunately for petitioner, the Government was able to produce a copy of the exact photograph (number ▮▮▮▮▮ that was shown to those detainees. That photograph, as it turns out, is unequivocally a photo of the petitioner. (*See* Classified Hr'g Tr., Dec. 17, 2010, at 24:13-15.) Moreover, one of those detainees (ISN 707) also identified the petitioner by a second name that he used during that time period: Usama al Jaza'iri. (*See* Gov't Ex. 37; Gov't Ex. 68; Pet.'s Ex. 43.) Considering that these fellow guesthouse lodgers were people that the petitioner independently identified as living with him at the time of their capture, it is hard, to say the least, to accredit petitioner's "misidentification" argument.

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE    JA001506

SECRET

raid.[4] ████████████████████████████████████████

████████████████████████████████████████ and a contemporaneous diary

propounded by one of Abu Zubaydah's close friends (the "al Suri Diary")[5] explained that

English lessons were an important aspect of Abu Zubaydah's training program. (Gov't

Ex. 136 at 58 ("Soon our program will begin specializing in electronics, English

language, computer and internet").) Another credible source, ISN 707,[6] who was also

captured in the guesthouse, identified the petitioner as Usama Al-Jaza'iri and stated that

---

[4]    In a later interview, ISN 703 once again stated that Abdul Razak was present for English classes. (Gov't Ex. 65 at 1.)

[5]    Our Court of Appeals, in a recent case involving another detainee, found this very diary to be a credible source as to that other detainee's membership in Abu Zubaydah's force. *Barhoumi v. Obama*, 609 F.3d 416, 432 (D.C. Cir. 2010).

[6]    The Government contends, and I agree, that ISN 707 is credible with respect to his photo identifications of the petitioner as Abdul Razak and Usama al Jaza'iri, and as to his statements regarding the petitioner taking English lessons while they were staying together at the Faisalabad guesthouse. How so? First of all, with respect to ISN 707's identification of petitioner as Abdul Razak in photograph ████ that identification was made on multiple occasions and was corroborated independently by a number of the other detainees who were staying at the same guesthouse. As to his knowledge of petitioner's other nickname ("kunya"), Usama al Jaza'iri, that too is not only credible but is consistent with the Government's other evidence. In particular, it is well established that detainees like the petitioner frequently have more than one kunya, and since the petitioner by his own admission is an Algerian, having a kunya ("al Jaza'iri") that means "the Algerian" is perfectly appropriate. (*See* Gov't Ex. 20.) Moreover, ISN 707's multiple identifications of the petitioner on a number of separate occasions as a fellow guesthouse-dweller is consistent with the al Suri Diary's listing of the petitioner by the name Usama al Jaza'iri as a permanent member of Abu Zubaydah's force. (Gov't Ex. 136 at 67.) All in all, absent any basis to believe that ISN 707 would falsely represent his identification of petitioner, the Court is satisfied with ISN 707's credibility as to this particular point. As for his taking the English classes offered in the guesthouse, once again this statement by ISN 707 is independently corroborated by at least one other guesthouse-dweller, ISN 703, and is perfectly consistent with petitioner being at that guesthouse at that time.

6

SECRET

they actively sought English lessons together. (Gov't Ex. 68 at 5; Classified Hr'g Tr.,

Dec. 15, 2010, at 67:15-17.)[7] Thus, combining this evidence with the obvious and

common-sense inference that a terrorist leader like Abu Zubaydah would not tolerate an

unknown and untrusted stranger to dwell in a modest, two-story guesthouse for two

weeks with himself and ten or so of his senior leadership, while they are preparing for

their next operation against U.S. and Allied forces, the Court cannot help but conclude

that petitioner's presence at this guesthouse is enough, *alone*, to find that he was more

likely than not a member of Abu Zubaydah's force. But, there is more!

The Government also introduced credible evidence placing the petitioner with Abu

Zubaydah's force in various places in Afghanistan prior to his stay at the Faisalabad

guesthouse. For example, ISN 707, the detainee who positively identified petitioner's

photo by both of the names he was using at that time (*i.e.*, Abdul Razak and Usama al

Jaza'iri) (*see* Gov't Ex. 37 at 5; Gov't Ex. 68 at 4; Pet.'s Ex. 43), placed Usama al

Jaza'iri in Barmal, Afghanistan, prior to their arrival in Pakistan. (Gov't Ex. 68 at 2.)

Specifically, ISN 707 described the route he and a group of comrades took while fleeing

Afghanistan to avoid American air strikes. (*Id.* at 1-2.) Moreover, ISN 707 admitted to

taking shelter with the petitioner at a local school in Afghanistan, together with Abu

Zubaydah himself and several of the other detainees captured later at the Faisalabad

guesthouse. (*Id.* at 2.) According to ISN 707, that group eventually evacuated Barmal

---

[7]     Notwithstanding accounts from multiple guesthouse-dwellers – and
corroboration from the al Suri Diary – petitioner denies that he ever took English lessons,
much less for sinister purposes. (*See, e.g.*, Gov't Ex. 65 at 1; Pet.'s Ex. 23.) These
blanket denials, however, are easily overcome by the overwhelming and persuasive
evidence offered by men who knew petitioner and dwelled with him in the guesthouse.

SECRET
UNCLASSIFIED//FOR PUBLIC RELEASE    JA001508

SECRET

and traveled together to Bannu, Afghanistan, before being "distributed into two

guesthouses." (*Id.*) Moreover, ISN 707's statements do not stand alone. They are

corroborated by the al Suri Diary, which not only lists the petitioner – under the same

name Usama al Jaza'iri – as a *permanent* member of Abu Zubaydah's group, but

effectively[8] places him on the Afghanistan-Pakistan border in January 2002 with a group

of the very same people ISN 707 described as fleeing together from Afghanistan, only to

be captured together later in the Faisalabad guesthouse. (*See* Gov't Ex. 136, at 6, 67.)

    Finally, petitioner is cited by his name "Usama al Jaza'iri" in an enemy report

listing the survivors of a fire at a guesthouse barracks in Khowst, Afghanistan, in 2001.

(Gov't Ex. 94; Gov't Ex. 120.) The Government contends that the report was written

contemporaneously by a member of al Qaeda, the Taliban, or an associated force who

was in the guesthouse barracks at the time of the fire and who reported the accident to

another member of the same associated force. (Classified Hr'g Tr., Dec. 14, 2010, at

113:3-115:7.) Indeed, the incident report,[9] which was later seized by Allied Forces in

Kabul in 2002, is dated "Thursday, the 28th of Shaban," an Islamic calendar month

---

    [8]    Although the diary does not specifically list petitioner, by name, as being
with the group at that location, it effectively refers to petitioner by characterizing certain
group members by their relationships with Usama al-Jaza'iri. (*See* Gov't Ex. 136 at 6
(describing "the brothers who worked as trainers in the same camp such as Ashur al-
Jaza'iri, Usamah al-Jaza'iri, [and] Abd al-Bari al-Filistani").)

    [9]    Also contained in the report is a list of "material losses" from the fire,
which includes a Kalashnikov, an ammunition pouch, and a [rocket-propelled grenade].
(Gov't Ex. 94 at 3.)

8

SECRET

which – when converted to a Western calendar – would be November 15, 2001. (*See* Gov't Ex. 137; Classified Hr'g Tr., Jan. 11, 2011, at 50:2-51:2.)

In sum, the Government proffered more than enough credible evidence for this Court to conclude that it is more likely than not that petitioner was, indeed, a member of Abu Zubaydah's force. That conclusion, I might add, is corroborated further by petitioner's own admission – when he was first interrogated – that he had gone to Afghanistan to fight in the jihad against the U.S. and its Allied forces. (Gov't Ex. 23 at 10.)

Bakhouche, of course, vigorously denies the accuracy of the various photo identifications of him as Abdul Razak, and especially the one photo identification of him as Usama al Jaza'iri. In particular, he denies being the "Usama al Jaza'iri" referred to in the al Suri Diary and the fire incident report and denies being a member, much less a permanent member, of Abu Zubaydah's force who traveled with them for a protracted period in Afghanistan. Notwithstanding petitioner's protestations to the contrary, the evidence introduced clearly rebuts his position. Indeed, while his challenge to the reliability of certain photo identifications might be more compelling if these witnesses had only seen him on one specific occasion in either Pakistan or Afghanistan, it is particularly undercut by petitioner's own admission that he had stayed at the Abu Zubaydah guesthouse with not only the witness who identified him as Usama al Jaza'iri, but also with a number of the other witnesses who identified him as Abdul Razak. Simply put, Bakhouche's effort to undermine the reliability of the Government's

SECRET

~~SECRET~~

evidence linking him to the Abu Zubaydah group *prior* to his capture at the guesthouse is inherently flawed and undermined by his own lack of credibility on certain critical points. In particular, Bakhouche's stubborn insistence that he had never been to Afghanistan, and did not know or interact in any way with Abu Zubaydah and his lieutenants in that relatively small guesthouse where they were all captured together, was *wholly* incredible.

As such, the Court has no difficulty concluding that the Government more than adequately established that it is more probable than not that the petitioner was in fact a member of Abu Zubaydah's force that had gathered in that Faisalabad guesthouse to prepare for future attacks against U.S. and Allied forces. Accordingly, petitioner Bakhouche is being lawfully detained under the AUMF and this Court must, and will therefore, DENY his petition for a writ of habeas corpus.

## CONCLUSION

For all of the foregoing reasons, it is hereby **ORDERED** that petitioner Abdul Razak Ali's, a.k.a. Saeed Bakhouche's, petition for a writ of habeas corpus is **DENIED**.

**SO ORDERED.**

RICHARD J. LEON
United States District Judge

10

~~SECRET~~

## CERTIFICATE OF SERVICE

I, H. Candace Gorman, certify that I today caused a true and accurate copy of Petitioner's Notice of Appeal to the individuals listed below via the District Court's Electronic Case Filing System:

> Olivia Hussey, Trial Attorney
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Ave., NW, Room 7144
> Washington, DC 20530

This 8th day of March, 2011.

/s/ H. Candace Gorman
Counsel for Petitioner

LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman (IL Bar #6184278)
Elizabeth Popolis (IL Bar #6285095)
542 S. Dearborn Street - Suite 1060
Chicago, IL 60605
Tel: (312) 427-2313

JA001512

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit A

# ISN 707 Stipulation of Fact
## Submitted in the military commission case
### *United States v. Noor Uthman Muhammed*

UNITED STATES )
)
v. )                STIPULATION OF FACT
)
NOOR UTHMAN MUHAMMED )
)                January __, 2011

1.     This Stipulation of Fact is entered into by the Prosecution and Defense knowingly and
voluntarily in the case of *United States v. Noor Uthman Muhammed*. It is hereby stipulated and
agreed, by and between the Prosecution and Defense, with the express consent of the Accused,
that the following facts are true and, based on the evidence the Prosecution intends to introduce
against the Accused, could be proven beyond a reasonable doubt.

2.     The Accused is an alien unprivileged enemy belligerent, as defined by the Military
Commissions Act of 2009 (MCA). The Accused is, and has been at all times relevant to these
proceedings, a person subject to trial by military commission under Section 948c of the MCA.
The Accused has never been a citizen of the United States and is therefore an "alien." The
Accused is an "enemy belligerent" because he has purposefully and materially supported
hostilities against the United States and its coalition partners. The Accused is an "unprivileged"
belligerent because he does not fall within one of the eight categories enumerated under Article 4
of the Geneva Convention Relative to the Treatment of Prisoners of War:

     (1)     He is not a member of the armed forces of a Party to the conflict, including militia
or volunteer corps forming part of such armed forces;

     (2)     He is not a member of some other militia or volunteer corps, including organized
resistance movements, belonging to a Party to the conflict and operating in or outside their own
territory, which must fulfill the following conditions:

          (i)     being commanded by a person responsible for his subordinates;

          (ii)    having a fixed distinctive sign recognizable at a distance;

          (iii)   carrying arms openly;

          (iv)    conducting operations in accordance with the laws and customs of war;

     (3)     He is not a member of regular armed forces who profess allegiance to a
government or authority not recognized by the United States;

     (4)     He did not accompany the armed forces without actually being a member thereof,
such as civilian members of military aircraft crews, supply contractors, and others who have
received authorization from the armed forces which they accompany, from whom they receive
some sort of Identification card;

1

UNCLASSIFIED//FOR PUBLIC RELEASE

　　　(5) He is not a member of a merchant marine or civil aircraft crew of a Party to the conflict;

　　　(6) He is not an inhabitant of a non-occupied territory who spontaneously took up arms to resist invading forces and who carried arms openly and respected the laws and customs of war;

　　　(7) He is not a person who belonged to the armed forces of the occupied country and has been interned, after being originally liberated, due to his allegiance to those armed forces; and

　　　(8) He is not a person belonging to one of the above categories who has been interned by a neutral or non-belligerent Power on its territory.

3.　　In or around 1994, the Accused left his home country of Sudan and traveled to Afghanistan to receive paramilitary training. En route to Afghanistan, the Accused traveled to Pakistan, where he was received into a guest house. Some guest houses in Afghanistan and Pakistan were operated by terrorist paramilitary organizations in conjunction with training camps. At the time the Accused entered Pakistan, to his knowledge, Khalden was the only camp operating in Afghanistan. The Accused became aware that guest houses would later come to serve as intermediate stops to lodge trainees and operatives who were transiting to or between the training camps, convalescing from injuries, or getting ready to travel elsewhere for terrorist operations. One of the purposes of the guest houses was to screen incoming recruits prior to sending them on to the training camps, to ensure they were suitable for training, weed out potential spies, and otherwise control and monitor the flow of trainees.

4.　　From the guest house in Pakistan, the Accused traveled into Afghanistan to receive training at the Khalden training camp. At that time, Khalden was located in the Khost region of Afghanistan. During the Accused's time in Afghanistan, other camps were also established or revived from the Soviet-Afghan War. Some of these training camps, such as al Farouq and Jihad Wahl, were run directly by al Qaeda, an international terrorist organization run by Usama bin Laden and others.

5.　　In 1996, Usama bin Laden and others had begun issuing public declarations calling for violent attacks against the property and nationals of the United States and its allies, for the purpose of, among other things, forcing the United States to withdraw its forces from the Arabian Peninsula and opposing U.S. support of Israel. During his time in Afghanistan, as described more fully below, the Accused became aware of these declarations calling for violence against the United States, became aware of the goals and purposes of al Qaeda, and also became aware that al Qaeda and associated international terrorist organizations in Afghanistan and elsewhere were conducting hostilities against the United States.

6.　　The Khalden training camp, where the Accused trained and later worked, was under the principal direction of Ibn Sheikh al-Libi (Ibn Sheikh) who lived at Khalden and directed

2

JA001515

Khalden's operations as the camp's *emir* or leader. As *emir*, Ibn Sheikh directed Khalden's staff, training program, weapons, supplies, and other day-to-day operations, and helped Khalden trainees gain admittance into other paramilitary training camps or organizations for follow-on training or operations.

7.      Ibn Sheikh worked with a terrorist facilitator named Abu Zubaydah. Based primarily in Pakistan, Abu Zubaydah oversaw the operation of guest houses associated with Khalden, secured funding for Khalden, and maintained a steady flow of trainees to and from the camp. To the Accused's knowledge, Abu Zubaydah provided letters of recommendation for trainees to be accepted into Khalden. The Accused also understood that Abu Zubaydah received trainees leaving the Khalden camp as they entered Pakistan.

8.      Given their positions of authority and responsibility over Khalden trainees, both Abu Zubaydah and Ibn Sheikh were responsible for the movement of trainees to and from Khalden. Abu Zubaydah used letters of recommendation in order to get people into Khalden and control the flow of trainees into the camp. This system allowed Ibn Sheikh to maintain operational security and restrict access to Khalden. Ibn Sheikh al-Libi assumed responsibility for communications outside the camp was responsible for assisting trainees in returning home or to other camps. While neither Abu Zubaydah nor Ibn Sheikh was a member of al Qaeda, as neither had sworn *bayat* (a formal oath of allegiance) to Usama bin Laden, both men met and communicated with Usama bin Laden and other al Qaeda leaders on a number of occasions. Although the Khalden training camp was not run by Usama bin Laden or al Qaeda, trainees had the ability to pass between the training camps and organizations, which included al Qaeda and its camps.

9.      Not only were there established lines of communication among this network of camps and guest houses in and around Afghanistan, but there were also informal agreements that trainees could continue their training at other camps. The existence of the various camps was not a secret and there was an open market in Afghanistan for men seeking initial or follow-on training. The leaders of one camp or organization, for example, could recommend their trainees for transfer into another camp or organization for further paramilitary training or terrorist operations. If a trainee demonstrated talent in a particular area, he would be recommended for further training or operations in that area with another camp or organization or he could elect on his own to pursue training at another camp. The Accused knew that one of these camps was Derunta. Ibn Sheikh al-Libi was primarily responsible for communications between other camps, such as Derunta, where advanced training on explosives, explosive devices, and poisons was provided by a terrorist trainer named Abu Khabab al Masri.

10.      A central aspect of the operational environment for these paramilitary terrorist training camps and organizations in Afghanistan, including Khalden, was the use of *kunyas* (aliases or

3

JA001516

*noms de guerre*), which could be used to conceal the true identities of trainees, camp staff, and ultimately terrorist operators. Often, the passports of the trainees were collected at the guest houses, to preserve operational security over the participants' identities or to be falsified for use by the passport holders (to conceal where they had been) or by other travelers (to conceal who they were and enable them to travel internationally). Terrorist trainers and operatives might also change *kunyas* from time to time, which served as an additional security measure.

11.     The Accused received weapons and other training at the Khalden camp in or around 1994. He was taught how to fire the Kalashnikov rifle, the PK machine gun, the 75 and 82 mm recoilless rifles (referred to as artillery), the SPG-9 anti-tank weapon, the 82 mm mortar, and the rocket propelled grenade (RPG) launcher. He adopted the *kunya* of "Abu al Harith" during this initial period. Around the time that the Accused was a trainee, he also used the *kunya* "Farouq."

12.     After he completed the initial training program at Khalden, the Accused remained at Khalden and became one of the camp's weapons trainers. Positions in the camp were determined by tenure. The Accused became a weapons trainer in or around 1996, in which capacity he voluntarily taught trainees how to fire small arms and artillery. Around the time he became a weapons trainer, the Accused adopted the *kunya* of "Akrima" (sometimes transliterated "Ikrima" or "Ekrima").

13.     After serving as a weapons trainer, the Accused began taking on additional responsibilities at Khalden. He purchased food and supplies to support the camp and oversaw camp operations when the *emir*, Ibn Sheikh, was away. As his status within the camp organization grew, the Accused assumed a position of greater responsibility and began leading the camp's formations. As leader and director of the camp, Ibn Sheikh established a council of trainers that served as his advisors. Ibn Sheikh was required to consult this council but not bound by their advice. The Accused was a member of this council. By this time, in or around 1998-99, in addition to being known by the *kunya*, "Akrima."

14.     During the Accused's tenure at Khalden over the course of several years, hundreds of recruits were trained at Khalden on a variety of subjects, including weapons, artillery, tactics, and other areas. Khalden trainees also prayed together and read portions of the Quran and the teachings of the prophet Mohammed. Trainees engaged in discussions regarding religious topics after prayer. Trainees who came to Khalden had already committed to the concept that jihad required military training. It was not unusual throughout the course of the Accused's tenure at Khalden to hear anti-American discussion and rhetoric.

15.     Khalden trainees were also trained on maintaining security to prevent sensitive information from getting into the wrong hands. Khalden had a security perimeter at all times. Trainees would use this security training to prevent uninvited people from coming into the camp. This also prevented those that were not wanted from learning what was going on in the camp.

4

This included training in smaller operational groups. This type of training was also useful for whatever types of activities that trainees would be involved with after they left the camp.

16.    The Accused was aware that al Qaeda's goals and purposes were to advocate, support, and conduct terrorist attacks against the United States. While training terrorist operatives at Khalden, the Accused was aware that Usama bin Laden and others were issuing and circulating multiple public declarations calling for violent attacks against the United States. In one of these declarations, entitled a "Declaration of Holy War Against America and the Americans Occupying the Land of the Two Holy Places," Usama bin Laden called for the murder of U.S. military personnel serving on the Arabian peninsula. The Prosecution produced a translation of this 1996 declaration in discovery as Bates numbers 10620 – 10643. In another declaration, issued under the banner of the "International Islamic Front for Fighting Jews and Crusaders," Usama bin Laden called on all Muslims able to do so to kill Americans—whether civilian or military—anywhere they can be found and to "plunder their money." The Prosecution produced a translation of this 1998 declaration in discovery as Bates numbers 10644 – 10646. The Accused was aware of these and other declarations calling for violence against the United States, which were widely circulated among the terrorist training camps and organizations in Afghanistan, including Khalden.

17.    In addition, during the time he served at Khalden, the Accused became aware that al Qaeda and associated international terrorist organizations were actively engaging in hostilities against the United States. On 7 August 1998, two nearly simultaneous terrorist bombing attacks were carried out against the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania. The bombing at the U.S. embassy in Nairobi killed or seriously injured hundreds of people, including Americans and other civilians working at the embassy as well as Kenyan civilians who were in the vicinity at the time of the blast. The bombing at the U.S. embassy in Dar es Salaam killed or seriously injured dozens of people, including American and Tanzanian civilians.

18.    On 20 August 1998, in response to these attacks against its embassies, the United States fired cruise missiles into Afghanistan that damaged or destroyed several al Qaeda compounds. While Khalden was not hit by these cruise missiles, the Khalden trainees and staff, including the Accused, became aware of the U.S. cruise missile attacks and were aware that they were in retaliation against al Qaeda for its involvement in the bombings of the U.S. embassies in Kenya and Tanzania. The Accused became aware of the Embassy bombings after they happened. At this time, the fatwas of Usama bin Laden, calling for violence against the United States, were broadcast and referred to on radios that were available at Khalden.

19.    Not only were terrorist attacks such as the Embassy bombings being carried out by al Qaeda and associated terrorist organizations engaged in hostilities against the United States, but terrorist operatives who had trained at Khalden were participating in these hostilities. Although the Accused did not train any individuals for specific terrorist acts, among the terrorist operatives

5

JA001518

who trained at Khalden during his tenure were several men who later participated in plots or attacks against the United States, including the following:

a. █████████

█████████ is a Khalden trainee who admitted he subsequently participated in the bombing of the U.S. embassy in Nairobi, Kenya, as described in the Stipulation of Expected Testimony of █████████ executed in conjunction with this Stipulation of Fact. █████████ is the FBI agent who interviewed █████████ during his investigation of the bombing in Kenya in 1998.

b. Ahmed Ressam

Ressam is a Khalden trainee who admitted he subsequently participated in a plot to bomb Los Angeles International (LAX) Airport on 31 December 1999, as described in the Stipulation of Expected Testimony of █████████ executed in conjunction with this Stipulation of Fact. █████████ is the FBI agent who investigated the Ressam case and interviewed Ressam on multiple occasions in 2001.

c. Zacarias Moussaoui

Moussaoui is a Khalden trainee (known to the Accused by the *kunya*, "Khalid al Sahrawi") who admitted he subsequently participated in the conspiracy to attack various United States targets with hijacked civilian airliners on 11 September 2001. During his trial in U.S. federal court, Moussaoui submitted a "Statements of Facts," which he signed as the "20th hijacker," and provided testimony regarding his involvement in the 9/11 attacks, which is outlined in the Stipulation of Expected Testimony of Zacarias Moussaoui, executed in conjunction with this Stipulation of Fact.

20.    Throughout his time at Khalden, as news spread of the terrorist plots and attacks against the United States, the Accused remained committed to his continued work in support of operations at Khalden.

21.    The Accused knew that by continuing to produce trained operatives at Khalden, it was foreseeable that some of his trainees would take part in terrorist attacks of the sort al Qaeda and associated terrorist organizations were conducting against the United States. The Accused further knew that many Khalden trainees went on to receive advanced training at other camps, including the al Qaeda camps, and could reasonably foresee that they would eventually take part in terrorist paramilitary operations in Afghanistan or elsewhere.

22.    Sometime between 1999 and June 2000, the Accused learned from Ibn Sheikh al-Libi that the Khalden Camp was to be moved to Kabul. The Accused assisted in moving the Khalden Camp and its trainees from Khost to Kabul. Shortly thereafter, the Accused attended a meeting in the Wazir Akbar Khan district of Kabul, Afghanistan, alongside Abu Zubaydah and Ibn

6

Sheikh, to discuss closing the camp. Many of the trainers who participated in Khaldan's advisory council were also present at the meeting. Although they were consulted regarding the continued operation of the camp, the final decision was Ibn Sheikh al-Libi's. Ibn Sheikh al-Libi instructed the Accused and the other trainers that were present that Khaldan was to be closed. The Accused assisted in the camp's closure. To the Accused's knowledge, the trainees were left to attend other camps or to leave Afghanistan.

23.      On 11 September 2001, nineteen terrorist operatives affiliated with al Qaeda hijacked four civilian airliners and crashed them into various targets in the United States, including the twin World Trade Center towers in New York City, the Pentagon in Washington, D.C., and the countryside in Somerset County, Pennsylvania. These attacks resulted in the death or serious injury of thousands of people, many of whom were civilians. In September and October 2001, Usama bin Laden and other al Qaeda leaders in Afghanistan released videotapes claiming responsibility for and celebrating these attacks.

24.      In early October 2001, in response to the attacks of 11 September 2001, the United States and its coalition partners launched attacks in Afghanistan to find and destroy terrorist camps, compounds and facilities; capture members of al Qaeda and affiliated terrorist organizations; and put an end to the terrorist attacks against the United States stemming from the network of terrorist training camps and organizations in Afghanistan.

25.      After the U.S.-led bombing raids and military invasion of Afghanistan began, the Accused joined groups of other terrorist operatives who were escaping into neighboring Pakistan. At or around this time, in addition to his other *kunyas*, the Accused also used the *kunya*, "Samir Muhammad Hasan," or simply "Samir."

26.      By March 2002, the Accused's group of around a dozen or more fugitive terrorist operatives settled into a safe house in Faisalabad, Pakistan, where they were joined and led by Abu Zubaydah, who at this time was using the *kunyas*, "Tariq" and "Dawoud." As at Khaldan, the residents in the safe house used *kunyas* rather than their real names. The group of terrorist operatives with whom the Accused resided at the safe house in Faisalabad included, but was not limited to, the following individuals:

   a.      Abu Zubaydah (known to the Accused as "Dawoud"),

   b.      Soufian Barhoumi (known to the Accused as "Shafiq"),

   c.      Jabran al Qahtani (known to the Accused as "Jabran"),

   d.      Ghassan al Sharbi (known to the Accused as "Abdullah"),

   e.      Bakush (known to the Accused as "Abdul Razzaq"),

   f.      Abu Kamil al Suri (known to the Accused as "Noor al Din"),

7

    g.    Asad al Suri (known to the Accused as "Khalid Habib"),

    h.    Abdullah Husseini (known to the Accused as "Abdullah al Libi"),

    i.    Noor al Deen (known to the Accused as "Saleh"), and

    j.    Younes Skhaita (known to the Accused as "Anas").

27.    For several weeks, this group of terrorist operatives used the safe house in Faisalabad as both a hideout and a training facility. Different rooms were generally used for different types of training. The Accused became aware that some of the terrorists were being trained how to build electronic detonators for improvised explosive devices (IEDs), in order to conduct hostilities against the United States or its coalition partners in Afghanistan or elsewhere. Some learned how to use computers to communicate with other terrorist operatives outside the safe house or to develop propaganda on the internet. Some received language or other training. The Accused provided logistical support, such as cooking meals, to keep the house running while, along with Bakush, he was learning Americanized English from Ghassan al Sharbi. The Accused was also waiting for Abu Zubaydah to acquire or falsify travel documents for him so that he could return home to Sudan. The Accused could not travel to Sudan without fraudulent travel documents because his travel documents were taken from him when he arrived in Pakistan around 1994.

28.    On 28 March 2002, this safe house in Faisalabad was raided by Pakistani authorities. The Accused and several others in his group attempted to escape, but, after a shootout, were captured. Materials collected from the house included but were not limited to the following:



The Prosecution produced in discovery photographs, summaries, and translations of these materials, as well as reports of forensic analysis performed on them. Certain of these items are listed by the Bates number of their production in the Appendix to this Stipulation of Fact.

29.    In light of the above facts, the Accused admits that he voluntarily participated as a trainer and member of an advisory council of trainers at the Khalden training camp in Afghanistan and later voluntarily participated as a contributing member of the safe house in Faisalabad, Pakistan,

8

knowing that his activities were materially supporting international terrorist organizations, including but not limited to al Qaeda, engaged in hostilities against the United States. While the Accused did not know the entire scope or the details of al Qaeda's plans, the Accused was aware that al Qaeda or affiliated terrorist organizations were engaged in hostilities against the United States to achieve their political objectives. He also knew that his actions at the Khalden camp and the Faisalabad safe house were supporting al Qaeda or affiliated terrorist organizations in conducting such hostilities against the United States. Such actions by the Accused amounted to providing material support for terrorism.

30.     The Accused also admits that in providing the above material support for terrorism, he was working with coconspirators at the Khalden camp and at the Faisalabad safe house to provide material support for terrorism. While he was not party to all the actions of Abu Zubaydah, Ibn Sheikh, and other coconspirators at Khalden and the Faisalabad safe house, he nevertheless had entered into a longstanding agreement with them to train recruits to commit acts of terrorism in support of al Qaeda or affiliated terrorist organizations engaged in hostilities against the United States. Specifically, the Accused was aware of the interrelationship between his own group and the other *jihadist* terrorist organizations, including al Qaeda; knew that he was supporting this relationship by training recruits; and knew that such support would ultimately materially support terrorist attacks by al Qaeda or affiliated groups engaged in hostilities against the United States. He joined this agreement and remained a party to it willingly and willfully, and with the intent to further its unlawful purpose, and knowingly and intentionally committed various overt acts in order to accomplish an objective or purpose of this agreement.

31.     IT IS FURTHER STIPULATED AND AGREED that this Stipulation of Fact, as well as the items referenced by Bates number herein and in the Appendix, may be received in evidence as Prosecution Exhibits and considered by the members during sentencing. In addition, the Stipulations of Expected Testimony executed in conjunction with this Stipulation of Fact and referenced herein may be considered by the members during sentencing.

SO STIPULATED.

___28 JAN 11___
Date

Maj James W Welrick, USMC
LCDR Arthur L. Gaston, III, JAGC, USN
Lt Col Kenneth W. Sachs, USAF
MAJ Daniel Cowhig, USA
James L. Trump
Mikeal M. Clayton
Trial Counsel

9

26 Jan 11
_____
Date



Noor Uthman Mohammed
Accused

We certify that we advised the Accused of the effect of the foregoing and we witnessed his
voluntary signature to this document.

26 Jan 11
_____
Date

MAJ Amy Fitzgibbons, JA, USA
Defense Counsel

28 Jan 11
_____
Date

CDR Katharine Doxakis, JAGC, USN
Defense Counsel

25 Jan 11
_____
Date

Capt Christopher Kannady, USMC
Defense Counsel

1/26/11
_____
Date

Howard Ross Cabot
Defense Counsel

10

# Exhibit 4

SECRET//NOFORN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI                    )
                                   )
          Petitioner,              )
                                   )
     v.                            )        Civil Action No. 10-cv-1020 (RJL)
                                   )
BARACK H. OBAMA, *et al.*,         )
                                   )
          Respondents.             )
                                   )

Declaration of ▮▮▮▮▮▮▮▮, Terrorist Usage of Casio
Watches (July 7, 2010)

SECRET//NOFORN

JA001525

SECRET//███████//NOFORN



Defense Intelligence Agency

*Background Declaration – Casio Watches*

07 07 2010

(U) The Defense Intelligence Agency produced the following document for the Department of Defense Office of the General Counsel to utilize in federal court litigation.

(U) I, ███████████, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.

(U)



SECRET//███████//NOFORN

I

~~SECRET//█████//NOFORN~~

## (U) Terrorist Use of Casio Watches



## ~~(U)~~ Background:  Models A158W[i], A159W, F-91W[ii], and F-99W

~~(U)~~ Manufactured in Malaysia by the Japanese firm Casio, the Model A158W (introduced in November 1989), Model A159W (unknown introduction date), Model F-91W (introduced in October 1989), and Model F-99W (introduced in August 1990) are inexpensive quartz digital watches that all share a common component, known as watch Module 593.  Based on this shared module, these watches have the following specifications:

- ~~(U)~~ An accuracy of ± 30 seconds per month

- ~~(U)~~ A timekeeping capacity for month, minute, second, AM/PM differentiation, and date and day

---

[i] ~~(U)~~ While commonly referred to as the Model A158W, Casio refers to this watch as the A158WA-1.  This document will use the common term A158W.

[ii] ~~(U)~~ While both the face and the back of this watch are marked with 'F-91W', Casio refers to this watch as the 'F91W-1'.  This document will use the common term F-91W.

USCA Case #11-5102    Document #1443998    Filed: 06/11/2013    Page 519 of 877

~~SECRET//~~ █████ ~~NOFORN~~

- (U) A calendar system that does not adjust for leap years

- (U) A daily alarm mode

- (U) Microlight backlight

- (U) An hourly time function

- (U) A 1/100th of a second stopwatch capable of measuring net time, split time, and 1st and 2nd place times with a measuring capacity of 59 minutes and 59.99 seconds

- (U) Powered by a CR-2016 lithium battery with a lifespan of approximately 7 years

- (U) A level of water-resistance that equates to being splash proof

(U)



| (U) A158W Watch | (U) A159W Watch | (U) F-91W Watch | (U) F-99W Watch |

(U) Terrorist Configuration of the Casio Watches in Improvised Explosive Devices

(S) ████████████████████████████████



- (U//FOUO) ████████████████████████



~~SECRET//~~ █████ ~~NOFORN~~

3

JA001528

SECRET//███████//NOFORN





(U//FOUO)

(U//FOUO)

(U) Terrorist Use of the Casio A158W Watch



SECRET//███████//NOFORN

4

SECRET//███████//NOFORN



(U) Terrorist Use of the Casio AI59W Watch



SECRET//███████//NOFORN

5

SECRET/ NOFORN

(U) Instruction on the Use of Casio Watches

(S/ )

(U) The Proliferation of Instructional Material in Soft and Hard Copy

(U//FOUO)

- (S//NF)

- (S//NF)

  o (S//NF)

  o (S//NF)

  o (S//NF)

  o (S//NF)

SECRET/ NOFORN

6

JA001531

SECRET/~~███████~~/NOFORN



~~(U)~~ *Instruction Provided in Person*

- ~~(S//NF)~~

- ~~(S//NF)~~

- ~~(S//NF)~~

  o ~~(S//NF)~~

  o ~~(S//NF)~~

  o ~~(S//NF)~~

- ~~(S//NF)~~

- ~~(S//NF)~~

SECRET/~~███~~/NOFORN

7

SECRET//████████NOFORN

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████

- (S//NF) ████████████████████████████
  ███████████████████████████████████

- (S//NF) ████████████████████████████
  ███████████████████████████████████

- (S//NF) ████████████████████████████
  ███████████████████████████████████

  o (S//NF) ██████████████████████████
    █████████████████████████████████
    █████████████████████████████████

  o (S//NF) ██████████████████████████
    █████████████████████████████████
    █████████████████████████████████
    █████████████████████████████████

  o (S//NF) ██████████████████████████
    █████████████████████████████████

SECRET/███████/NOFORN

*Instructional Material is Available Online*



**(U)** Recovery of Casio Watches

*(U) Afghanistan*



SECRET/███████/NOFORN

SECRET//█████████//NOFORN



SECRET//█████████//NOFORN

10

SECRET/ ██████ /NOFORN

- (S/NF) ████████████████████████

- (S/NF) ████████████████████████

- (S/NF) ████████████████████████

(U) Elsewhere

- (U) When apprehended at Port Angeles, Washington, on 15 December 1999, Ahmed Ressam[iii] possessed timing devices containing a modified Casio F-91W watch. Ressam purchased two of these watches for $22 apiece on 1 September 1999, at a store in Montreal, Canada.



(U) Timing devices containing a modified Casio F-91W watch recovered from Ahmed Ressam on 15 December 1999

(U) Operational Use of the Casio F-91W Continues to the Present

2

(S) ████████████████████████

---

[iii] (U) Ressam was subsequently convicted on various terrorism-related charges based on his plan to bomb the Los Angeles International Airport.



SECRET// ███ NOFORN

*(U) Iraq*

- (S// ███



- ███ (U)

*(U) Afghanistan*

- (S// ███

- (S// ███

- (S//NF) ███

- (S//NF) ███

~~SECRET//████████//NOFORN~~

- ~~(U//FOUO)~~ 

~~(U)~~ *Elsewhere*

- ~~(S//NF)~~



- ~~(S//NF)~~

~~(U)~~ Conclusion



Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

~~SECRET//████████//NOFORN~~



13

SECRET// ███████ NOFORN



Derived from: Multiple Sources
Declassify on: 25X1 human

# Exhibit 11

~~SECRET//NOFORN~~

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDEL RAZACK ALI ABDEL RAHMAN | |
| Petitioner | |
| v. | Civil Action No. 05-CV-02386 (RBW) |
| GEORGE WALKER BUSH, *et al.* | |
| Respondents. | |

Declaration of ▆▆▆▆▆▆ "Terrorist Training Camps"
(September 19, 2008)

SECRET//ORCON//NOFORN



Defense Intelligence Agency

*Background Declaration – Terrorist Training Camps*

19 September 2008

(U) *The Defense Intelligence Agency produced the following document for the Department of Defense Office of the General Counsel to utilize in federal court litigation.*

(U) I, _____, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.



(U) Afghan Training Camps: 1989 - 2001

(U) Overview:

(S//NF) Throughout the 1990s and until the 11 September 2001 attacks, the Taliban hosted over 40 known terrorist training camps of various tactics, techniques, and procedures in Afghanistan. Trainee intentions ranged from a personal desire to expand the knowledge of jihad and return to their home country to participating in a transnational terrorist attack ordered by al-Qaida senior leadership. In order to understand the degree of Islamic extremism partaken by a particular Guantanamo Bay (GTMO) detainee, DIA assesses with high confidence that jihadist intentions and ambitions can be extrapolated by analyzing the training camps attended by the detainees.

(U) Camp Breakdowns

(S//NF) The camps in Afghanistan where foreigners trained from 1990 to 2001 can be divided roughly into two categories: those serving relatively broad clienteles or agendas, and those – often smaller ones – chiefly dedicated to preparing fighters for local jihads. Significant interconnections existed between the two types of camps, particularly between camps designated

SECRET//ORCON//NOFORN

Derived from: Multiple Sources
Declassify on: Subject to Treaty, international agreement

JA001542

SECRET//ORCON//NOFORN

specifically for al-Qaida recruits and "freelance" jihadist camps that would train anyone that could afford the "tuition".

### (U) Al-Qaida Camps

(S//NF) In 1988, after bin Ladin gained notoriety among "Afghan Arabs," and after victory for the Afghan jihad with the beginning of the Soviet withdrawal, he and his mentor, Abdullah Azzam, grew apart in their philosophies. Specifically bin Ladin wanted to focus on a global jihad while Azzam desired to remained focused on Afghanistan. On 18 August 1988, bin Ladin and a close group of followers established an advisory council, which divided militant training into two parts, splitting general fighters from perspective al-Qaida members. The general fighters would go to the Sada Camp. The prospective al-Qaida members would go to a testing camp, with the best recruits chosen for membership in al-Qaida. In 1990, bin Ladin opened the al Faruq and Jihad Wal training facilities in Khowst and Jalalabad as his testing facilities.

### (U) Al-Faruq Training Camps

(S//NF) Al-Faruq was al-Qaida's primary Afghan basic training facility, providing ideological indoctrination and training on small arms, mortars, rocket-propelled grenades, anti-aircraft artillery, topography, map reading, explosives, mines, hand grenades, ambush tactics, suicide training, and antitank weapons.

- (S//NF) Al-Faruq training camp was named after the second caliph, Umar Bin Khattab who was also known as "al-Faruq." Al-Faruq was created in the 1980s so bin Ladin's new organization, al-Qaida, could have a training infrastructure independent of Abdullah Azzam's Maktab al-Khidamat. Bin Ladin's organization sought to fight insurgencies against apostate Muslim regimes in the Middle East and Central Asia following the Soviet-Afghan war.

- (S//NF) Al-Faruq was al-Qaida's flagship training camp that admitted Muslims of all nationalities. Al-Qaida used basic training to vet recruits for membership in the group and, by the latter part of the 1990s, emphasized a global anti-U.S. agenda rather than local jihad insurgencies.

- (S//NF)

- (S//NF)

- (S//NF)

2
SECRET//ORCON//NOFORN

SECRET//ORCON//NOFORN

- (S//NF) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- (S//NF) It has been estimated that 10,000 men have been trained at al-Faruq since the group was established in 1988.

- (S) Al Faruq was also utilized to train select operatives when it was relocated to Kandahar. In April 2001, Tarnak Farms explosives and poisons expert Abd al-Rahman al-Muhajir trained select al-Qaida operatives for specific ▮▮▮▮▮▮▮▮▮▮▮▮ at al-Faruq in Kandahar. The training was separate from basic training and the operatives ▮▮▮▮▮▮▮▮▮▮▮

(U) According to The 9/11 Commission Report at least seven of the 9/11 hijackers who provided "muscle" for the attacks went through a basic training regime at the al-Faruq camp, and one of the pilots, Hani Hanjour, was identified for inclusion in the plot while training at al-Faruq. The Commission concluded this particular camp appears to have been the preferred location for vetting and training the potential muscle hijackers because of its proximity to Usama Bin Ladin and other al-Qaida senior leaders.

(S//NF) The al-Faruq training camp was a "basic training" al-Qaida camp used to establish a large pool of trained extremists from which al-Qaida could select the most capable for advanced training and operational use. Many of the al-Qaida senior leaders and operational cadre graduated from the al-Faruq program before advancement, and the idea of establishing a military college at al-Faruq was a precursor to a global agenda. If the jihad in Afghanistan were to end, graduates of the college could go anywhere in the world for violent jihad.

(U) Mes Aynak

(S//NF) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(U) Tarnak Farms aka Abu Obeida Training Camp

(S//NF) Tarnak Farms was an al-Qaida training camp that was located near the Kandahar Airport and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and offered more advanced training  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

- (S//NF) Former 20th hijacker of the 11 September 2001 attacks, and current GTMO detainee, Muhammad al-Qahtani (SA-63) attended advanced training at Tarnak Farms following basic training at al-Faruq. Al-Qaida chose Qahtani for the mission during his training at Tarnak Farms. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

SECRET//ORCON//NOFORN

- (S//NF) Current GTMO detainee and al-Qaida bomb maker, Tariq al Sawah (EG-535) was one of the primary explosives trainers at Tarnak Farms. After receiving two months of training at al-Faruq, he received training in TNT and bomb-making from now-deceased explosives expert Abd al-Rahman al-Muhajir at Tarnak Farms. Sawah then approached now-deceased senior al-Qaida commander Abu Hafs al-Masri (aka Muhammad Atif) and volunteered to be an instructor at Tarnak Farms between July and August 2001.

- (S//NF) While Sawah was teaching explosives training at Tarnak Farms in the summer of 2001, senior al-Qaida operative Abu Muhammad al-Masri instructed Sawah to design a new way to use explosives. Sawah developed a shoe-bomb prototype that could be used to bring down a commercial airliner in flight. Sawah was instructed to teach the construction of the shoe-bomb to others. This design matches the design of the shoe-bomb used by failed suicide operative Richard Reid.

(U) Camps Utilized by al-Qaida and Others

(S//NF) Many training camps were utilized by other terrorist organizations other than al-Qaida. Many trainees were cross-trained between flagship al-Qaida camps and camps that were organizationally independent. Some independent camps were taken over by al-Qaida and some shared training regiments with al-Qaida. The primary camps of focus that will shed light on the hierarchical and operational differences are the Khaldan camp, the Derunta training complex, and the Sada camp.

(U) Derunta Training Camp Complexes

(U) The Derunta training complex, located 15 miles from Jalalabad, Afghanistan, was a set of advanced terrorist training camps offering training in various explosives, poisons, and chemical warfare agents. Coalition forces destroyed the camp in October 2001.

- (S//NF)

- (C) Senior al-Qaida facilitator and operative Abu Zubaydah was a senior operative and facilitator at the Derunta training camp in the late 1990s.

(U) Derunta: Curriculum

(C) A handwritten document recovered near the Derunta camp in Afghanistan is assessed as a training manual written by Abu Khabab as a guide for terrorist organizations to synthesize various poisons and chemical warfare (CW) agents. This document contains well-developed tutorials, detailed preparation instructions, tables, drawings, and dissemination sections:

4

SECRET//ORCON//NOFORN

SECRET//ORCON//NOFORN

although, the production recipes for more advanced CW agents such as nerve agents contain errors.

- (C) The first half of this training manual is divided into two courses: "special" and "poisons." The special course discusses the concentration of the primary substances sulfuric acid and hydrogen peroxide, as well as the preparation of nitric acid, hexamine, chlorates, and explosive compounds. The poisons course is further divided into four sessions: non-chemical poisons, chemical poisons, poisonous gases, and methods of use.

- (C) The second half of this training manual is titled "A Lesson on the Production of Poisons and Poisonous Gases." It provides detailed instructions for producing/ synthesizing carbon monoxide, sulfur dichloride, ethylene gas, mustard, nerve gas (sarin, and VX), and for the mixing of VX with dimethyl sulfoxide to facilitate absorption through the skin. The manual also provides a detailed introduction, complete with physical properties, lethal dosages, symptoms of exposure, and handling methods, for most of the described synthesis routes. Although the physical properties, symptoms, and handling methods presented are accurate, the lethal doses given in the document are not in agreement with accepted dosage required to kill 50 percent of the targeted population.

(C) Although some contents of the training manual may be the result of Abu Khabab's laboratory research, the information likely was obtained primarily from openly available books and manuals, such as those found on the Internet. Some of the various chemicals, as discussed by Abu Khabab, would not be very effective for their intended use.

(U) Derunta: Students of Abu Khabab al-Masri

(S//NF) Thousands of Islamic extremists from numerous countries received explosives training in Afghanistan from master bomb makers such as Abu Khabab. At the conclusion of basic training, these trainees had three options: volunteer for advanced training, go to the front and fight, or return home to train others. The tactics, techniques, and procedures and experience gained in training and in combat were exported to the extremists' home countries. Students of Abu Khabab al-Masri were not necessarily members of al-Qaida, but many were, or later became, members or close affiliates.

- (S//NF)

- (S//NF)

SECRET//ORCON//NOFORN

SECRET//ORCON//NOFORN

- (C//NF) [REDACTED] convicted millennium bombing suspect Ahmed Ressam went to the Derunta training camp [REDACTED]

(S//NF) In addition to acting as force multipliers by training a new generation of bomb makers, the Derunta training camp played a direct role in major terrorist attacks worldwide. Many terrorist operations in the past decade depended on explosives fabricated by an explosives expert trained in the Derunta training camp. In support of an extremist train-the-trainer paradigm, Abu Khabab students continue to proliferate their skills in a number of countries and regions including Afghanistan, the Horn of Africa, Iraq, Pakistan, and Southeast Asia. Although some Derunta graduates may have been utilized in al-Qaida operations, its trainers did not take operational guidance directly from al-Qaida senior leadership before the 11 September 2001 attacks.

(S//NF) Graduates of these camps might attend Abu Khabab's camp on their own to receive additional training. However, senior al-Qaida leadership would not formally task him to train al-Qaida operatives.

(U) Sada Training Camp

(S//NF) The Sada training camp (also called the Masada training camp) was operated by Shaykh Abdallah Azzam's Maktab al-Khidamat organization in Pakistan's Federally Administered Tribal Area (FATA) during the 1980s. The camp served as a training facility for aspiring mujahidin from across the world, most of whom were looking to join the war against the Soviet Union in Afghanistan. Basic training on light weapons, artillery, and physical fitness was provided at Sada, as was basic indoctrination into radical Islam.

- (S//NF) [REDACTED]

- (C) [REDACTED] Many future al-Qaida leaders and members cycled through the Sada camp, or acted as cadre. For example, current GTMO detainee Adil bin Hamlili (AG-1452) attended the Sada camp several times between 1986 and 1991 and went on to

SECRET//ORCON//NOFORN

become a high level al-Qaida courier and facilitator between bin Ladin and other al-Qaida operatives.

- (C) [redacted] Current GTMO detainee and 2001 Sarajevo Embassy bomb plot conspirator Boudella al-Haj (AG-10006) was an instructor at the Sada training camp in the late 1980s.

(S//NF) Following bin Ladin and Azzam's differing philosophies on the future of the jihad, on 18 August 1988, bin Ladin and a close group of followers established an advisory council, which, divided militant training into two parts, splitting general fighters from prospective al-Qaida members. The general fighters would go to the Sada Camp. The prospective al-Qaida members would go to a testing camp, with the best chosen for membership in al-Qaida. In 1990, bin Ladin opened the al-Faruq and Jihadwal training facilities in Khowst and Jalalabad as his testing facilities. Khaldan camp was later opened in Khowst and provided both basic and advanced training for general fighters.

- (S//OC//NF) The Sada and Khaldan camps were operated by Azzam's Maktab al-Khidamat organization and remained operationally and organizationally independent of al-Qaida.

(C) [redacted] Sada was not an al-Qaida training camp, although many future al-Qaida leaders and members trained or taught at the facility. While some reporting indicates the Sada training camp remained open until 1992, other reporting indicates training continued there through the mid 1990s, well after Abdullah Azzam's death in 1989. Regardless, during its entire existence, available information indicates Sada was an open jihadist camp whose leadership was not dedicated to supporting any particular extremist or terrorist organization.

(U) Khaldan Camp

(S//NF) The Khaldan Camp was a basic and advanced training camp in the Khowst Province.

(U) While the Khaldan camp was not an al-Qaida facility, Abu Zubaydah had an agreement with bin Ladin to conduct reciprocal recruiting efforts whereby promising trainees at the Khaldan camp that they could join al-Qaida if desired.

(S//NF) Khaldan offered basic training such as weapons familiarization as well as advanced courses on assassination, abduction, and explosive devices.

(S//NF) Some Khaldan trainees ultimately became integral into al-Qaida training and operations following Operation Enduring Freedom in October 2001.

- (S//NF) Current GTMO detainee Barghomi Sufyian (AG-694) originally trained at the Khaldan camp for five months where he received training on light arms, mines, mortars, communications, and tactical movement. He also trained in two others camps and became a trainer at an unknown camp near Jalalabad, none of which were directly tied to al-Qaida.

7

SECRET//ORCON//NOFORN

SECRET//ORCON//NOFORN

- (S//NF) In early 2002, senior al-Qaida commander Abd al-Hadi al-Iraqi tasked Abu Zubaydah to recruit trainers to enter Afghanistan and train local Afghans how to build improvised explosive devises (IEDs) for attacks on Coalition forces. Zubaydah recruited Sufiyan and current GTMO detainee Ghassan al Sharbi (SA-682) to train Binyam Ahmed Muhammad (ET-1458) and Jabran Sa'ad (SA-696) in explosives at a safe house in Faisalabad, Pakistan. Following the training, Binyam and Sa'ad were to enter Afghanistan to train local Afghans in IEDs.

(S//NF)

(U) Abu Yahya Camp for the Libyan Islamic Fighting Group

(S//NF) The Abu Yahya Camp was a training facility designated specifically for the Libyan Islamic Fighting Group (LIFG).

(S//NF) Although the Abu Yahya Camp was not a flagship al-Qaida camp, trainees from Abu Yahya often had close affiliations with al-Qaida leaders.

- (S//NF)

I have read this declaration and concur with the findings and conclusion.

8

# Exhibit 20

JA001550

USCA Case #11-5102    Document #1443998    Filed: 06/11/2013    Page 542 of 877

~~SECRET//NOFORN~~

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDEL RAZACK ALI ABDEL
RAHMAN

Petitioner

v.

GEORGE WALKER BUSH, *et al.*

Respondents.

Civil Action No. 05-CV-02386
(RBW)

# Declaration of ████████████, "Names, Aliases, Kunyas and Variants" (September 19, 2008)

~~SECRET//NOFORN~~

JA001551

SECRET//NOFORN



Defense Intelligence Agency

*Background Declaration – Names, Aliases, Kunyas and Variants*
Defense Intelligence Agency

19 September 2008

*The Defense Intelligence Agency produced the following document for the Department of Defense Office of the General Counsel to utilize in federal court litigation.*

I, _____, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief.



(U) Worldwide:  Using Names, Aliases, Kunyas and Variants

Arab migration and the spread of Islam around the world intermixed with local ethno-linguistic traditions and cultural practices produce regional variations in the way Arabic names are constructed, pronounced and spelled.  These variations, along with differences in standards for the transliteration of foreign names by U.S. military, intelligence and law enforcement organizations, present challenges for the collection, reporting, and analysis of intelligence.  The lack of a direct correlation between Arabic and Latin alphabets, combined with these complexities, is of particular importance to analysts while in today's Counterterrorism environment.  While using aliases and other forms of multiple identities is not unique to these groups, this declaration will limit itself to providing a basic primer on Arabic-related issues to address the detainee population at Guantanamo.

SECRET//NOFORN

Derived from: Multiple Sources
Declassify on: Subject to treaty or international agreement

SECRET//NOFORN

### (U) Elements of Arabic Names

(U) Traditionally Arabic names are comprised of five elements: ism, kunya, nasab, laqab, and nisba. This naming convention is widely used by Muslim populations and in countries with significant Muslim influence around the world, although varying depending on the country or region.

- (U) Ism- The ism is the proper name given at birth. This part of the name is considered the most personal of the elements. In some areas, it is impolite to call an elder by their ism, yet in other areas; it is common to call people by their ism.

- (U) Kunya- The kunya is traditionally an honorific, which denotes that the person is either a mother or father, and is constructed using the name of the first-born son or eldest daughter if the person has no sons. The kunya for a man is Abu, meaning father of, plus the name of the first-born; while Umm is used for women, meaning mother of, with the name of the first-born. For example, Abu Ibrahim means father of Ibrahim. Addressing someone by his or her kunya is a sign of respect.

- (U) In addition, there are several nicknames that use an "Abu" construction, that are not true kunyas. Much like the name Jack is used as a nickname for John, many commonly used kunyas are used as nicknames that do not bear direct resemblance to the given name. For example, Abu Sadeq is a nickname for Jafar, and Abu Ali is a nickname for Hassan.

- (U) Insurgents, radicals and terrorists commonly use kunyas as assumed names or pseudonyms. Kunyas used in this manner are often chosen, or given, without regard to the children's names or regard to whether the individual has children. In this case, using the kunya conceals the individual's identity. Further, it is often used as a security, denial and deception measure. The reasons for an insurgent choosing a certain kunya varies widely. It could be the region they are from such as Zarqawi (from Zarqa), Suri (the Syrian), or al-Masri (the Egyptian). It can be derived from the early heroes of Islamic conquest, like Abu Ubaydah, one of three who led expeditions against Byzantium. It can be derived from past historical or Militant Islamist leaders like Abu Azzam, named after the spiritual founder of al-Qaida Abdullah Azzam.

- (U) Nasab- The nasab is a pedigree, which denotes the family lineage on the father's side, and can go back several generations. In many countries ibn or bin, is used for males (the son of) and bint for females (the daughter of), while in other countries the names are simply listed in sequence. For example, Hasan ibn Faraj, would mean, Hasan, son of Faraj. Another example using multiple generations would be Hasan ibn Faraj ibn Ahmed ibn Mohammad, meaning Hasan, son of Faraj, who is the son of Ahmed, who is the son of Mohammad. In some regions, that same name may appear as Hasan Faraj Ahmed. A true name usually consists of the ism, nasab and the nisba.

2

SECRET//NOFORN

LA001553

- (U) **Laqab**- The laqab is a combination of words that describe some religious or admirable quality of the person and is used as a secondary name. In some cases, it is used in place of the ism. A common laqab includes one of the 99 names of God and "Abd," or servant of, for example, Abd al Rahman, or servant of the Merciful. There is no such name as "Abdul" in Arabic, even though we commonly see this in English. This is a mis-translation of "Abd," which is followed by the article "al." Laqab can also connote a person's profession like Samir al-Haddad, which means Samir whose family members at one time were blacksmiths. Another popular laqab of course is Hajj or Haji, meaning the person has made their pilgrimage to Mecca, like Hajj Amin al-Hussein.

- (U) **Nisba**- The nisba is another secondary name that describes the occupation, descent, tribe or residence of the person. It can be used in combination with any of the above elements, but will always be the last part of the name. For example, Mohammad al Masri, means Mohammad from Egypt, or using several elements, Mohammad al Husayn ibn Harun al Qahtani means Mohammad the beautiful, son of Aaron, from the Qahtani tribe. The nisba can tell you much of the persons ancestry and geographic origins, for instance al-Zawahiri although from Egypt, comes from the Zawahir clan of the Hejaz region of Saudi Arabia. Ayman al-Zawahiri attempts to bolster his Arab lineage by making these connections.

- (U) The following example uses a title and all five elements of the naming convention: Mullah Mohammad Abu Nasar Abd al Rahman, bin Ibrahim bin Hasan al Makki; Mullah (title) Mohammad (ism) Abu Nasar (kunya) Abd al Rahman (laqab) bin Ibrahim bin Hasan (nasab, 2 generations) al Makki (nisba). This name would translate to the teacher Mohammad, father of Nasar, servant of the Merciful, son of Ibrahim, grandson of Hasan, from Mecca.

**(U) Spelling Variants**

(U) Because Arabic and English have several letters representing sounds that do not correspond directly, several letters or letter combinations are used interchangeably to represent the same sound. This often generates multiple English spellings representing the same word or name in Arabic. Other differences in practice, such as whether to use double or single consonants to express a single sound, further increase variation. It is common to see intelligence reports referencing an individual with several different name spellings. Although, most organizations have established naming standards for common names, this is not consistent throughout the Intelligence Community (IC)and has changed over time.

- (U) Other spelling variables include capitalization, and the use or non-use of dashes, apostrophes and spaces. In some cases, apostrophes replace a letters that doe not translate into English, such as the Arabic letter "ayn," which has a distinct sound not used in English. For example, the name Mohammad has over 20 variations and alternate spellings of al-Qaida include al Qaida, al Qa'ida, and al-Qaeda.

- (U) Some commonly interchanged letters include:
  - K, KH, GH, and Q such as: Kandahar, Khadahar, Ghandahar or Qandahar

SECRET//NOFORN

- O and U, such as: Mohammad or Muhammad
- A and E, such as: Ahmad, Ahmed
- OO and U, such as: Noor, or Nur

- (U) Some commonly interchanged words and spellings include:
  - Al, Ul and Ur, as in: Mohammad al Rahman, Mohammad ul Rahman or Mohammad ur Rahman
  - ul Din, and Uddin, as in: Nasar ul Din, or Nasaruddin
  - Abd Ul and Abdul, as in: Abd ul Rahman or Abdul Rahamn

(U) Various titles may be added to the beginning of the name, similar to titles used in Western traditions. Although these specific titles are more common in the Arab world, similar titles are used in Afghanistan or Pakistan, from where many fighters are recruited.

- Mullah- Religious leader
- Imam- Religious leader (as in clergy)
- Hajji- Someone who went on a pilgrimage to Mecca
- Shaykh- Title of high respect, usually a leader of some kind (tribal, etc)
- Qari- Someone who can recite the Quran with a specific rhythm
- Qazi/Qadi- Lawyer or judge (on Sharia)
- Ustad- teacher or professor
- Talib- student (Afghan)
- Malim, or Malauwi – religious leader (Afghani)
- Akhund- lawyer (Afghan)

(U) The challenges of spelling and translating the use of Arab and Muslim influenced names is further complicated for individuals originating from countries with conventions based in other cultural traditions, especially when combined with significant differences in pronunciation as well as the use of other local languages and alphabets.

(U) The source of the reporting can also have a significant impact on how names are spelled. Sources may have a regional dialect, which may complicate the transliteration of the name phonetically, or misunderstanding the name completely. Some reporting originates from foreign sources using different letters to represent Arabic sounds. For example, in Spanish, the "h" is often substituted with "j," thus Mohammad would be spelled "Mojammad." In French North Africa, Sherief is Cherief.

(U) Aliases

(U) Aliases can take multiple forms, from part of a true name, to a something completely unrelated to the true name. Like a nickname, some aliases are descriptive of physical traits, such as Nasar al Tawil (Nasar the Tall). Aliases can also be just a single word, such as Tareq. Terrorists do use multiple aliases, often changing them in different locations. Nicknames also provide a degree of "cover" or operational security. In addition to theses aliases, many individuals will use "call signs" for security purposes. A call sign is simply another name that is

4

SECRET//NOFORN

SECRET//NOFORN

only used during indirect communication. These call signs may change depending on with whom one is communicating, or where they are located.



(U) Confidence Measures for Identification

(U) Intelligence analysts consider all of these factors when making assessments about a specific individual or group. The biggest asset to an analyst is an understanding of the complexities of this particular problem set. Through training, experience, and drawing on the expertise of senior analysts, subject matter experts and linguists at their disposal, analysts learn the many variables they need to take into account. Analysts use many tools and processes to make confident assessments, some of these include:

- (U) Database programs generally include features allowing the user to search on variants to account for different transliterations or reporting conventions. These tools may include wildcard or pattern matching searches, fuzzy word searches, and phonetic matching algorithms. In addition, some databases have macros, which employ a list of name variants based on historical search results. Analysts then use additional known details and other reporting to make confident assessments.

- (U) Through research and analysis of multiple reporting sources, analysts are often able to determine the various names used. Corroboration and collaboration within the IC helps analysts confirm identities.

- (U) Documents and media recovered from the detainee at the time of detention, and from other sources can help confirm identifications and/or provide further avenues of assessment. Some detainees have forged documents, such as fake passports, that allow analysts to determine alternative identities of a detainee.

5

SECRET//NOFORN

SECRET//NOFORN

- (U) Photographs, taken during the detainee's in-processing and those captured with the detainee, provide an additional resource to determine identity. Analysts show these photos to multiple sources in order to get a consensus on the individual(s) in the photograph. The photo identifications (PID) can verify the identity of the detainee and his associates, as well as validate suspected relationships.

## (U) Conclusion

(U) Detainees often use aliases and cover stories to hide their actual activities; however, it is difficult to maintain these cover stories over time. Interrogators note any changes in details in the story, which occur when the topic is reviewed multiple times over a significant time period. Analysts compare these stories against other detainee reporting as well as other sources of intelligence to find inconsistencies and vulnerabilities in the cover story, develop further lines of questioning, as well as to corroborate the reliability and validity of truthful information. The IC mitigates the challenges that foreign language and cultural practices cause in this complex environment. Through advice provided by foreign area specialists, experience, education, and specialized tools, analysts are able to identify—with confidence—persons of interest or concern, including detainees.

I have read this declaration and concur with the findings and conclusion.



SECRET//NOFORN

## APPENDIX A

### Common Country and Tribal Names

| Arabic Geographic Adjectives in Names and Equivalents | |
|---|---|
| Al-Adani | From Aden, Yemen |
| Al-Afriqi, al-Afriki | The African |
| Al-Ajami (actually al-'Ajami) | Literally "the foreigner" but almost always pertains to Persians (Iranian, but it could also apply to any Persian speaker—Iranian, Tajik, or Dari-speaking Afghan). |
| Al-Ajnabi, al-Agnabi | The Foreigner (i.e., not from "here", or "not one of us." NOTE: If "Agnabi" the "g" may imply an Egyptian context.) Al Ajnabi is unlikely to be part of a terrorist nom de guerre, but may be considered an indication that the person so named is considered a "foreigner" or "an outsider" by those using the term. |
| Al-Almani | The German |
| Al-Amriki | The American |
| Al-Andalusi | From Andalusia (southern Spain) |
| Al-Anfirsi | The man from Antwerp |
| Al-Ansari | Literally meaning "the supporter" and originally referring to persons in Medina who aided the Prophet Muhammad. al Ansari as now used among jihadists typically means "local jihadist"—as opposed to al-Muhajir, which means "foreign fighter." |
| Al-Arjantini | The Argentinean |
| Al-Armini | The Armenian |
| Al-Asiri (actually al-'Asiri) | From southwest Saudi Arabia |
| Al-Ayrlandi, al-Irlandi | The Irishman |
| Al-Badawi | The Bedouin |
| Al-Baljiki, al-Biljiki, al-Balgiki | The Belgian |
| Al-Banghali | The man from Bangladesh |
| Al-Banghladishi | The man from Bangladesh |
| Al-Baritani, al-Britani | The Brit |

7

SECRET//NOFORN

SECRET//NOFORN

| Al-Bedoui | The Bedouin |
|---|---|
| Al-Brazili | The Brazilian |
| Al-Britani, al-Baritani, | The Brit |
| Al-Burtughali | The Portuguese |
| Al-Danmarki | The Dane |
| Al-Emirati, al-Imarati | The man from the United Arab Emirates |
| Al-Englizi, al-Inklizi, al-Iriglizi, al-Injalizi | The Englishman |
| Al-Faransi, al-Faransawi | The Frenchman |
| Al-Farsi, al-Farisi | The Persian, the Iranian |
| Al-Fasi | From Fez, Morocco |
| Al-Filastini | The Palestinian |
| Al-Filibini | The Filipino (from the Philippines) |
| Al-Fiyatnami | The Vietnamese |
| Al-Ghani | The Ghanaian |
| Al-Gharbi | The Westerner |
| Al-Hadrami | From the Hadramat region of Yemen |
| Al-Halabi | From Aleppo, Syria |
| Al-Hijazu | From western Saudi Arabia |
| Al-Hindi | The Indian |
| Al-Hulandi | The Hollander, from The Netherlands |
| Al-Ifranji, al-Ifrangi | The European |
| Al-Ighriqi | The Greek |
| Al-Ilji (actually al-Ilji) | Pejorative Iraqi slang for a Westerner |
| Al-Imarati, al-Emirati | The man from the United Arab Emirates |
| Al-Injalizi, al-Inglizi, al-Englizi, al-Inklizi | The Englishman |
| Al-Inklizi, al-Injalizi, | The Englishman |

8

SECRET//NOFORN

~~SECRET//NOFORN~~

| | |
|---|---|
| al-Inglizi, al-Englizi | |
| Al-Irani | The Iranian |
| Al-Iraqi | The Iraqi |
| Al-Irlandi, al-Ayrlandi | The Irishman |
| Al-Isbani | The Spaniard |
| Al-Iskutlandi | The Scot |
| Al-Islandi | The Icelander |
| Al-Isra'ili | The Israeli |
| Al-Janubi | The Southerner |
| Al-Jawfi | From the Jauf region of Yemen or Saudi Arabia |
| Al-Jazairi | The Algerian |
| Al-Kamiruni | From the Cameroons |
| Al-Kanadi | The Canadian |
| Al-Karibi | From the Caribbean |
| Al-Kashmiri | From Kashmir |
| Al-Khaliji | From the (Persian) Gulf |
| Al-Khawaga, al-Khawaji, al-Khawagi, | Literally meaning "Sir," or "Mister" (used especially for Christians and Westerners, with or without the name of the person so addressed), khawaga/khawaji has a street slang meaning, especially in Egypt, similar to calling someone a "gringo." "Al-Khawaja" is unlikely to be part of a terrorist nomme-de-guerre, but can be considered a likely indication the reference is to a Christian or Westerner considered to be "foreign" or "an outsider" to those using the term. |
| Al-Kini | The Kenyan |
| Al-Kubawi | The Cuban |
| Al-Kuri | The Korean |
| Al-Kuwayti | The Kuwaiti |
| Al-Libi | The Libyan |
| Al-Libiri | The Liberian |
| Al-Lubnani | The Lebanese |

~~SECRET//NOFORN~~

JA001560

SECRET//NOFORN

| Al-Madani | From Medina, Saudi Arabia |
|---|---|
| Al-Maghribi | The Moroccan |
| Al-Majari, al-Magari | The Hungarian |
| Al-Makkawi, al-Makki | From Mecca, Saudi Arabia |
| Al-Masri, al-Misri | The Egyptian |
| Al-Miksiki | The Mexican |
| Al-Muhajir | Literally "the emigrant" and originally referring to a person who fled from Mecca to Medina with the Prophet Muhammad, al Muhajir as now used among jihadists typically means "foreign fighter." |
| Al-Muritani/Mauritani | From Mauritania |
| Al-Nabulsi | From Nablus, in the West Bank, Palestine |
| Al-Najdi | From central Saudi Arabia |
| Al-Nasibi | A pejorative for Sunnis used by Shi'a |
| Al-Nimsuwi | The Austrian |
| Al-Nubi | The Nubian (from area near border between Egypt and Sudan) |
| Al-Nurwaji | The Norwegian |
| Al-Parsi, al-Farsi | The Persian, the Iranian |
| Al-Qamari | From the Comoros Islands |
| Al-Qubrusi | The Cypriot; from Cyprus |
| Al-Qudsi | From Jerusalem |
| Al-Rafidhi | A pejorative for Shi'a used by Sunnis that literally means "rejectionist" |
| Al-Romani | The Romanian |
| Al-Russi | The Russian |
| Al-Sa'idi | From Upper Egypt (i.e., the upland area of southern Egypt) |
| Al-Safawi | Pejorative for Persians (typically today meaning Iranian, but it could apply to any Persian-speaker—Iranian, Tajik, or Dari-speaking Afghan). |
| Al-Samarra'i | From Samarra, Iraq |

SECRET//NOFORN

JA001561

SECRET//NOFORN

| Al-Saudi | The Saudi |
|----------|-----------|
| Al-Shami | The Syrian, or from Damascus; the Northerner (esp. when North Yemen) |
| Al-Sharqi, al-Sharuqi | The Easterner |
| Al-Shili | The Chilean |
| Al-Shimali | The Northerner |
| Al-Shishani | The Chechen |
| Al-Sini, al-Sinani | The Chinese |
| Al-Sinighali | The Senegalese |
| Al-Skutlandi | The Scot |
| Al-Sudani | The Sudanese |
| Al-Sumali | The Somali |
| Al-Suri | The Syrian |
| Al-Suwidi | The Swede |
| Al-Suwisri | From Switzerland, the Swiss |
| Al-Ta'ifi | From Ta'if, Saudi Arabia |
| Al-Tabuki | From Tabuk, Saudi Arabia |
| Al-Tanzani | The Tanzanian |
| Al-Trabulsi, al-Trabelsi, al-Tarabulsi | From Tripoli, either Libya or Lebanon |
| Al-Trinidadi | The Trinidadian |
| Al-Tshiki | The Czech |
| Al-Tunsi, al-Tunisi | The Tunisian |
| Al-Turki | The Turk |
| Al-Umani (actually al-'Umani) | The Omani |
| Al-Urduni | The Jordanian |
| Al-Urubi | The European |
| Al-Uzbiki, al-Uzbeki | The Uzbek |
| Al-Yabani | The Japanese |

11

SECRET//NOFORN

JA001562

SECRET//NOFORN

| Al-Yamani | The Yemeni |
| Al-Yunani | The Greek |

SECRET//NOFORN

JA001563

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 23

JA001564

(Rev. 08-28-2000)

SECRET//NOFORN

# FEDERAL BUREAU OF INVESTIGATION

Precedence: ▮▮▮▮▮                    Date:  04/01/2002

To: ▮▮▮▮▮



Sect▮

From: ▮▮▮▮▮

Approved By: ▮▮▮▮▮

Drafted By: ▮▮▮▮▮

Case ID #: ▮▮▮▮▮

SECRET//NOFORN

SECRET//NOFORN

04/01/2002

Title:

SECRET//NOFORN

2

SECRET//NOFORN

0470172002



SECRET//NOFORN

3

...states that he has 12 brothers (none of whom

UNCLASSIFIED//FOR PUBLIC RELEASE



04/01/2002



SECRET//NOFORN

4

...on was not favorable.". When asked to explain this

JA001568

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

04/01/2002



...to describe the item SECRET//NOFORN they were electric

5

JA001560

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN



04/01/2002



SECRET//NOFORN

6

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORM

, 04/01/2002

SECRET//NOFORN

that he moved from the dormitory

UNCLASSIFIED//FOR PUBLIC RELEASE



04/01/2002



-END-



8



04/01/2002



SECRET//NOFORN

9

...... ....... AL-KHATER (F14), .............



, 04/01/2002



-END-

6)  (U) **ABDUL RAZZAQ**                     hereafter referred to as ABDUL,
from Libya, was interviewed from 10:40-11:30 PM on 3/29/2002.
ABDUL was arrested at location      in Faisalabad.
                                    ABDUL claims to have
one (1) brother,        who is under 10 years old.  ABDUL
denies knowledge of any imminent threats against the U.S.A.

        ABDUL stated that he departed Libya, in October of
2001, for Karachi, Pakistan at the suggestion of a co-worker
in Libya.  ABDUL then stated that he met some Afghans in
Karachi who took him to Afghanistan to fight in the war.
After making that statement, ABDUL changed his mind and said
he was going to Afghanistan to study the Koran.  But once
ABDUL arrived in Afghanistan, he was told their would be no
studying just the fighting of a war.  ABDUL then becomes
extremely uncooperative and changes his story a number of
times.

        ABDUL stated that he departed Afghanistan when it
was extremely cold.  ABDUL claims that he went directly to
Faisalabad with the support of Arabs.  ABDUL claims he
departed Afghanistan in March of 2002.  ABDUL stated that he

SECRET/NOFORN

10



04/01/2002

was brought to the house in Faisalabad, that he was eventually arrested in, by Afghans who took his passport and $400 when they dropped him off. ABDUL stated that he lived on the first floor, first room on the right (Room A in diagram). ABDUL stated that two (2) Libyans, one (1) Moroccan, two (2) Saudis and two (2) Palestinians resided in the room with him. When asked if he knew a "Russian" from the house, ABDUL said no. ABDUL then stated that all residents of the house were Arabs or Palestinians.

When asked if he knew who resided on the second floor of the house, ABDUL stated that the second floor was often empty (Note-two (2) rooms were occupied at time of raid) and people come and go on that floor.

ABDUL stated that all the occupants of the house were studying the Koran (Note-Abdul made no mention of Salafi College). ABDUL stated that none of the occupants ever left the house. ABDUL wouldn't give a reason as to why none of the occupants ever left the house. When asked how they would obtain food, ABDUL stated that a Pakistani man would get the food for them (Note-kitchen on first floor was well stocked with food). ABDUL stated that the Pakistani didn't live with them and that he spoke a little Arabic.

**-END-**



11



04/01/2002



-END-



12

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN



04/01/2002



SECRET//NOFORN

as were with his cousin. SARFRAZ denied

13

UNCLASSIFIED//FOR PUBLIC RELEASE



SECRET//NOFORN



04/01/2002



-END-



SECRET//NOFORN

14

JA001578

UNCLASSIFIED//FOR PUBLIC RELEASE



04/01/2002



SECRET//NOFORN

15



04/01/2002

(U)   Main Subject #2
Name -
  Last:                    RAZZAQ
  First:                   ABDUL
Race:                      A
Sex:                       M
DOB:                       7/1970
POB:                       LA GILAT, LIBYA
PNO:
Event Date:                03/28/2002
Alias(es) -
  Last:
  First:
Address(es) -
  Street Name:
  City:                    LA GILAT
  Country:                 LIBYA
Phone #:
Miscellaneous -
                           RIYADH

A

SECRET//NOFORN

 04/01/2002



SECRET//NOFORN

17

03/28/2002

IA001581



04/01/2002



18

MOHAMMED

SECRET//NOFORN

01/01/2002



SECRET//NOFORN

19

UNCLASSIFIED//FOR PUBLIC RELEASE



04/01/2002



#10 20

JA001584



04/01/2002





JA001585

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

04/01/2002



SECRET//NOFORN

22

JA001586

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN



SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE    JA001587

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 24

JA001588

SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
ABDAL RAZAK ALI            )
                           )
      Petitioner,          )
                           )
   v.                      )      Civil Action No. 10-CV-1020 (RJL)
                           )
BARACK OBAMA, et al.,      )
                           )
      Respondents.         )
                           )
```

# FBI EC (April 1, 2002)

SECRET//NOFORN

JA001589

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

(Rev. 08-28-2000)

## FEDERAL BUREAU OF INVESTIGATION

Date:   04/01/2002



Drafted By:

Synopsis:  (U)   To identify individuals, by photograph, who were detained in the 3/28/2002 searches of suspected AL QAEDA safe houses in the area of Faisalabad and Lahore, Pakistan. This communication only includes the detained individuals who were processed by Legat Islamabad.  This does not include the two (2) individuals wounded in the raids ▌▌▌▌▌▌▌▌ prior to the searches.

JA001590



`, 04/01/2002`



**Details:**   (U) On 03/29-30/2002, at a location in the area of Lahore,
Pakistan █████████████████████████████████████████████████
█████████████████████████ fingerprinted and photographed persons
detained during the 03/28/2002 searches of suspected AL QAEDA safe
houses in the Lahore/Faisalabad areas of Pakistan. Fingerprint cards
of individuals will be included in the communication documenting
interviews of that particular individual. Individuals have been
administratively numbered, and search sites similarly identified
by number and/or letter.

        The following is a list of subjects detained during the
above searches:



| Legal Proc # | Name | Nationality (SA) | Age/DOB | Site |
|---|---|---|---|---|

2

JA001591



04/01/2002

Abdul Razaq                    Libya        BM      7-70

3

JA001592

UNCLASSIFIED//FOR PUBLIC RELEASE



04/01/2002





04/01/2002

5

JA001594



; 04/01/2002

6

JA001595

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 29

JA001596

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ABDAL RAZAK ALI )<br><br>Petitioner, )<br><br>v. )<br><br>BARACK H. OBAMA, *et al.*, )<br><br>Respondents. ) | Civil Action No. 10-cv-1020 (RJL) |

ISN ███ FD-302 (Aug. 5, 2002)

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

FD-302 (Rev. 10-6-95)

**FEDERAL BUREAU OF INVESTIGATION**

Date of

Investigation

08/06/2002

On 08/05/2002 ████████████████████ ████████ was interviewed at
Guantanamo Bay, Cuba by Special Agent (SA) ████████████ ████████ of the
Criminal Investigation Command (CID). Also ████████████████████████
interview was contract linguist ████████████████████████████████
████████████████████ The interview was conducted in Arabic and
translated into English. Present during portions of the interview
was SA ████████████ of the Federal Bureau of Investigation (FBI).
All words herein are spelled phonetically. After being advised of
the nature of the interview and the identity of the interviewing
agentx, AL QAHTANI provided the following information:

████████████████ a Saudi Arabian citizen was born in approximately
1977 in ████████ Saudi Arabia, ████████████ neighborhood), which is
where he spent the first 12 years of his life. In about 1990, ████
████████ moved with his family to Riyadh, Saudi Arabia and resided
in the Ar Rawdah neighborhood. Just prior to ████████████████
detention, he resided with his wife, NAWAL, on Ibn Shaheen in the
Ar Rawidah neighborhood. ████████ attended the Khaled Bin Alwalid Mosque in his
neighborhood. ████████████ does not have any children. ████████████
graduated from the King Fahd High School in Riyadh and attended
the King Saud University, Riyadh. ████████████ completed a five year
program and attained a Bachelor's degree in Electrical Engineering,
specializing in high voltage. ████████████ graduated from college in
Jan 2001. ████████ worked as a high voltage electrician in the
Operations Section of the Saudi Arabian Electric Company, Riyadh.
████████ has not received any other specialized technical
training. Since ████████████ detention, his wife moved in with her
father, ████████████████████████████ who resides in ████████ Yemen.

████████████ father is ████████████████████ who resides in
████████ Saudi Arabia, is about 70 years old and deals with real
estate. ████████ has 13 brothers, all of whom reside in ████████
All of the brothers are identified as follows:

8/5/02          Guantanamo Bay, Cuba

████████████████████                              8/6/02

SA ████████████████ (CID)

████████████████████████████████ AL-QAHTANI graduated from ████████

UNCLASSIFIED//FOR PUBLIC RELEASE    JA001598

9

**FEDERAL BUREAU OF INVESTIGATION**

a known associate of Al Qaida, was shown the ████ photographic book dated 12 Jun 02 and identified the following photographs:

also recognized the following photo's from the same photographic book: ████ who were of the same person whom ████ recognized from Muzuristan, Pakistan. ████ also recognized ████ as a "famous face" who appeared in the newspapers after the September 11, 2001 terrorist attacks.

Around October 2001, after learning of the September 11 terrorist attacks, ████ desired to help his Muslim brothers fight against the Americans. ████ believed the Americans were coming to Afghanistan (AF) on a crusade of Christainity against the Taliban and Muslims. ████ met ████ at a coffee shop in Riyadh and obtained the cellular telephone number of an individual in Iran who would assist ████ in joining Al Qaida. ████ did not recall the cellular telephone number.

████ flew via Saudi Air from Riyadh to Damascus, Syria, where he remained for two days. ████ then flew via Tehrani Air to Tehran where he delayed his travel for a week because of a Shiite holiday. ████ paid for his airfare with his own cash. ████ hired a car and driver and drove to Mashhad, Iran. From Mashhad, ████ contacted the individual at the cellular number earlier provided by ████ The individual took ████ to a guest house in Mashhad where he stayed for about a week with some other Arabs. The Arabs then moved to a different house in Mashhad that had better security. The group of Arabs rented the entire third and fourth floors of the guest house. ████ stayed in Mashhad for about one month.

In early to mid November 2001, ████ traveled from Mashhad to Zabol, where he stayed for two days; then passed through Nimroz, AF and Kandahar then went to Kabol, AF where he remained for about a week. ████ then moved through Jabal Saber, through Logar where he stayed for about one day and then went on to Khost for about 45 days. ████ believed he was protecting the children of the city by remaining in the mountains, thus attracting the Americans to the mountains rather than the city. ████ departed Khost and traveled to Zurmut where he stayed for a month; then to Waziristan, PK; to Banu, where he stayed for two weeks; and on to Lahore, where he remained for six weeks.

████ attended a ten day military training camp north of Kabul. At the Kabul camp, ████ trained on the Kalishnakav machine gun, pistols, grenades and conducted physical training

8/5/02        Guantanamo Bay, Cuba

8/6/02

SA ████ (CID)

UNCLASSIFIED//FOR PUBLIC RELEASE

Continuation of FD-302    ███████████e camp facility was comprised of abandoned houses.

On Page    The leader ███████████ ██████████████████████████████ 3
primary trainer was ████████████████████████████████ also
trained at a camp in Faisalabad, PK. The Faisalabad training
focused on the use and manufacture of electronic detonation
devices. ██████████████ ultimate goal was to go with █████ to
Palistan to train others on the manufacture and use of electronic
bomb detonators. ██████████ said the electronic bombs were to be
used against the American soldiers.

Prior to the September 11, attacks, ████████ claimed he was
unaware of the existence of Al-Qaida. When ████ initially
learned of the September 11 attacks, he suspected UBL or the Jewish
people were responsible for planning and executing the attacks.
██████████ claimed no prior knowledge or responsibility for the
terrorist attacks against the Americans. ██████████ believed that
if UBL were responsible for the attacks, UBL would have to answer
to a higher power for what occurred.

██████████ said he did not know any Americans living in AF, nor
had he ever traveled to America. █████████████ said he knows ████
who had studied Aeronautical Engineering at the University of
Arizona. ███████ said he knows a Mexican man who uses the name
███████████ said he used computers during his travels to
contact his family. He was aware there were secret codes and
symbols being used by Al-Qaida, but he never learned or used them.

UNCLASSIFIED//FOR PUBLIC RELEASE    JA001600

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 30

~~SECRET//NOFORN~~

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

Petitioner,

v.

BARACK OBAMA, *et al.*,

Respondents.

Civil Action No. 10-CV-1020 (RJL)

**ISN ▇▇ FD-302 (December 12, 2002)**

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription 12/12/2002

███████████████████████████████████ was
interviewed at Guantanamo Bay, Cuba by ███████████ FBI Task
Force Officer. Also present during the interview was SA ██████
Air Force Office of Special Investigations and ██████████ Arabic
to English language translator. █████████████ was informed of the nature
of the interview and the identity of the interviewing agents. The results
of the interview are as follows:

████████████ said he would be willing to talk to the
interviewers and answer questions. The reason he refused to speak during
his last interview was because he was in a "mood". He would not be more
specific regarding this mood.

████████████ was told that he would be asked questions regarding
his past association with another person in the camp. He said that he
was responsible for himself and not for others. Others know more about
their story than he does.

████████████ was shown a photograph of ██████████████
████████████ and was asked if he recognized the person
in the photo. █████████ said the person in the photo was █████
When asked to provide further details about HASSAN, he replied that
he had forgotten everything about the house and did not remember where
he met █████████ He suggested that the interviewers bring ███████ into
the room and ask him these questions.

████████████ was reminded that he had given specific
information in the past about █████████ He replied that any information
or accusatory remarks he provided about █████████ in the past was to get
himself out of trouble at the Bagram Air Base. He was being accused
by the authorities of building circuits with ███████ and he believed
he would be tortured if he did not agree to the accusations. █████████
has never been tortured since being taken into custody in Pakistan.
He denied knowing how to or ever trying to build a circuit.

████████████ was asked to provide a historical reference of
his travel from the time he left Saudi Arabia to the time of his capture.
He provided the following information:

Investigation on 12/11/2002 at Guantanamo Bay, Cuba

Date dictated

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001603

FD-302a (Rev. 10-6-95)

on 12/11/2002 , Page 2

███████████ indicated that he attended the Abdul Aziz
University in Jeddah while he resided in Riyadh, Saudi Arabia. He was
trained to be a civil engineer, however, at the time he finished his
college education, there were few jobs available in this arena in Saudi
Arabia.

He left Saudi Arabia via aircraft in October 2001 and flew
to Syria. He does not recall how long he stayed in Syria. From Syria
he flew to Tehran, Iran and then took a taxi to Mushad, Iran. He spent
three days in Mushad at the Ali-Reda [sic] Hotel. He then traveled via
taxi to the border of Afghanistan where he was caught by Iranian
authorities who kept him in custody for a week because they thought
he was in the country illegally. Upon being released from custody,
AL-QAHTANI convinced an Iranian soldier to assist him in crossing the
border into Afghanistan.

Once in Afghanistan, ███████████ saw several cars occupied
by the Taliban. The Taliban gave him a ride to Kandahar where he stayed
a few hours. He then went to Kabul where he stayed for one week. Next,
███████████ attended a training camp outside of Kabul for one month where
he learned to shoot Kalishnikov and PK rifles and use hand grenades.

After attending the camp, ███████████ went to the battlefield
to help fight the Northern Alliance forces. He remembered digging a
ditch with ███████ the Syrian trainer of the camp he attended. ████████
estimated that he was on the battlefield for a few days before retreating
to the Saber [sic] mountains. He left the mountain with 10 others at
about eleven o'clock at night and traveled to Loger [sic], just outside
of Kabul. He stayed one day at Loger and traveled to Khost where he
stayed for two weeks. ███████ said he could not take the constant
"retreating" any more and he wanted to get out of Afghanistan. From
Khost, he traveled with a group that went to Lahore, Pakistan.

███████████ learned in a phone call with his father in Saudi
Arabia that the government there had been informed he was in Afghanistan.
He remained in Lahore for two months attempting to get his passport
fixed fearing he would be arrested upon entering Saudi Arabia for having
an Afghanistan stamp in his passport. In the meantime, he also learned
that Pakistani officials were rounding up Arabs. He met a subject named
███████████ went to his home in Faisalabad and stayed there
waiting for ███████ to fix his passport. ███████████ and 11 others were
subsequently arrested at this house. He ran to the roof when the
authorities raided it. He did not provide specific information regarding
how he met ███████ or the events inside the Faisalabad home. ████████
believes that his father made a mistake when he informed authorities
in Saudi Arabia of his travel to Afghanistan.

Once in custody, ███████████ was taken to Lahore where he
remained for three days before he was transferred to Islamabad. He did

JA001604

On 12/11/2002 Page 3

not know how long he was housed in Islamabad. He was transferred to Bagram Air Base and then on to Cuba.

expressed fear of being severely tortured if he is ever transferred back to Pakistan. He does not believe that any other detainees have been let go. He classified this story as "just another American movie". stated he was willing to cooperate during future interviews and would speak to one interviewer at a time. The interview was subsequently terminated.

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 31

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDAL RAZAK ALI | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Civil Action No. 10-cv-1020 (RJL) |
| | ) |
| BARACK H. OBAMA, *et al.*, | ) |
| | ) |
| Respondents. | ) |

ISN ██ FD-302 (May 13, 2003)

SECRET//NOFORN
UNCLASSIFIED//FOR PUBLIC RELEASE

FD-302 (Rev. 10-6-95)

- 1 -

# FEDERAL BUREAU OF INVESTIGATION

Date of transcription 05/13/2003

██████████████████████████████ was interviewed at Camp Delta,
Guantanamo Bay, Cuba by Special Agent ████████████████ Federal Bureau
of Investigation, ██████████ Air Force Office of Special
Investigations (OSI) and DSA3B, a U.S. Military person. The interview
was conducted in Arabic and translated by linguist ███████████ ████.
provided the following information:

████████████ identified a picture of ████████████████
███ and ████████ acknowledged ████████████ was at the safe house
when both were arrested. Also at the house during the arrest was ███
███████. ████████ arrived at the safe house approximately one month before
the arrest. ███████ could not remember if ████████ was at the safe house
before or after he ████ arrived. ████████ was staying at the house while
his passport was being fixed. ████████ passport had an entry stamp for
Iran, but not an exit stamp. ██████ talked to ██████ at the house about
his passport; however, he did not know if ████████████ talked to ██████
█████ agreed that ████████ was an important person.

████████ denied any knowledge of explosive devices in the safe
house. ██████ said, "I talked in the past about some notes we had over
there. But that doesn't mean I wrote the notes. I found them before in the
kitchen. I read them for about an hour, then I put it back." The notes
were in a notebook which was setting to the left of the stove in the
kitchen. ██████ saw the notebook two to three weeks before the arrests.
The notebook contained circles with writing about each circle. It
xplained how a person can get electricity to work inside the circle.

On the night of the arrest ██████ tried to escape. He said,
"When I tried to get out of the house the last night I was there, I
went upstairs. There was electronics. I saw an electronic gun. There
were electronic parts in bags." ██████ further described the bags as
small. When questioned why he would take the time to look in small
bags while trying to escape, ██████ said, "I didn't look through the bags,
I was surprised when I saw them."
████████████ denied talking to ████████████ very often. ██████ advised
█████ asked him ██████ about his education, his father and himself
████ ████ ████████ would pray during the day, and ██████ did not see
████████ do anything unusual." ██████ explained he spent a lot of time
to himself. He would read the Koran to re-memorize the it.

Investigation on 5/13/2003 at Guantanamo Bay, Cuba

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

FD-302a (Rev. 10-6-95)

On __*S*__/13/2003 , Page 2

When asked what he ▓▓▓▓ dreamed of doing as a kid,
advised he hoped to go fight in Palestine.   When ▓▓▓ was asked why
he did not do this instead of going to Pakistan or Afghanistan he replied,
"First of all I had no experience on getting to Palestine.   Second,
I had no experience on passports.   Afghanistan is different, you just
go there and they give you a gun."  ▓▓▓ denied going to Afghanistan
to obtain training, and he did not know if ▓▓▓▓▓ received terrorist
training.

When confronted with what other people were saying about ▓▓▓
and his purpose for being at the safe house, ▓▓▓ believes the people
are telling the truth.

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 38

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

Petitioner,

v.

BARACK OBAMA, *et al.*,

Respondents.

Civil Action No. 10-CV-1020 (RJL)

## ISN 707 FD-302 (September 11, 2002)

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of

transcription

Investigation on _____ at _____

File # _____    Date dictated _____

by _____

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;

it and its contents are not to be distributed outside your agency.

09/11/2002

On September 11, 2002, MUHAMMED NOOR UTHMAN, Internment Serial Number US9SU-000707DP, was interviewed at Camp Delta, Guantanamo Bay, Cuba, by Federal Bureau of Investigation Special Agent _____ and Air Force Office of Special Investigations Special Agent _____ Department of Defense Contract Linguist _____ provided Arabic/English translation. After being advised as to the nature of the interview, UTHMAN voluntarily provided the following information:

UTHMAN advised that he returned to CAMP KHALDEN, Afghanistan, in order to train those individuals who wished to prepare to fight with the Taliban. UTHMAN explained that KHALDEN was not an organized or professional training camp; those who came to the camp to train had learned about the camp through others who had trained there previously. UTHMAN advised that funding for the camp was provided by a service office managed by _____ UTHMAN added that this was the same office which funded CAMP KHALDEN during the previous war in Afghanistan.

UTHMAN stated that he was a guest in the _____ GUESTHOUSE, Peshawar, Pakistan, for approximately one (1) month. UTHMAN advised that _____ was the director of this guesthouse. UTHMAN advised that during his stay at this guesthouse, he did not associate with other residents, though he did recall a resident by the name of _____ not further identified), who stayed in the guesthouse for approximately one (1) week. UTHMAN added that _____ was also the director with the "Yemeni" guesthouse in Faisalabad, Pakistan, though this residence was set up as a temporary guesthouse.

UTHMAN was asked to view photographs from the _____ Photo Book dated April 23, 2002; UTHMAN advised that he recognized detained _____ from Camp Delta. UTHMAN added that CAMP KHALDEN closed at the end of 1999, therefore he would possibly have difficulty recalling others who were in the camp with him.

UTHMAN was asked to view photographs from the _____ Photo Book _____ dated June 4, 2002. UTHMAN advised that he did not recognize any individuals in this photo book.

The interview was terminated at approximately 5:45pm.

09/11/2002    GUANTANAMO BAY, CUBA

09/11/2002

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 40

JA001613

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

      Petitioner,

         v.

BARACK OBAMA, *et al.*,

      Respondents.

Civil Action No. 10-CV-1020 (RJL)

## ISN 707 FD-302 (November 21, 2002)

SECRET//NOFORN

JA001614

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription: 11/21/2002

MUHAMMED NOOR OTHMAN MUHAMMED, Internment Serial Number (ISN) US9SU-00707DP, was interviewed at Camp Delta, United States Naval Base, Guantanamo Bay, Cuba by Special Agent (SA) ▮▮▮▮▮▮▮▮▮▮ Federal Bureau of Investigation (FBI) and SA ▮▮▮▮▮▮▮▮▮▮▮▮▮ Naval Criminal Investigative Service (NCIS). ▮▮▮▮▮▮▮▮▮▮ provided Arabic/English translation. MUHAMMED voluntarily provided the following information:

MUHAMMED stated he lived and worked at Khaldan training camp from approximately 1996 until its close sometime in the year 2000. MUHAMMED advised he was a weapons instructor for the first five (5) months at Khaldan. MUHAMMED trained Arabs on the use of the AK-47, PK and RPG. These weapons were checked out of the Khaldan armory by the trainees and were returned after completion of their training. MUHAMMED stated he did not provide any other training at Khaldan to include sniper, explosives, demolitions, poisons/toxins and/or artillery training. MUHAMMED added that this type of training was not available at Khaldan. MOHAMMED advised that Khaldan training camp was roughly the size of 1.5 soccer fields. This area served as the living and dining area for the trainees and instructors. Live fire training would be conducted in the nearby mountains. MUHAMMED added that the amount of trainees at Khaldan would range from approximately twenty-five (25) at it's summer peak to about ten (10) at it's winter low. The trainees at Khaldan would stay anywhere from a few days to a few months and their training would be adjusted accordingly. MUHAMMED added that the instructors at Khaldan would change often. Instructor service was voluntary and there was no pay for their service. In addition, there was no rank or organizational structure among the instructors. MUHAMMED described Khaldan as a type of summer camp where Arab males would go for weapons training. These Arabs would not necessarily stay in Afghanistan. Some would go back to their country of origin.

MUHAMMED spent most of his time at Khaldan buying food for the instructors and trainees with money (Pakistani rupees) provided to him by ▮▮▮▮▮▮▮▮▮▮. MUHAMMED claimed he made the 1.5 hour drive from Khaldan to Khost to buy food from various merchants.

▮▮▮▮▮▮▮▮▮ was the primary financier at Khaldan, taking over for ▮▮▮▮▮▮▮▮ shortly after MUHAMMED arrived in 1996. MUHAMMAD stated AZZAM was in charge of a service office which financed Khaldan's operations. According to MUHAMMED, ▮▮▮▮▮ was an alumni of Khaldan. MUHAMMED added ▮▮▮▮▮ received money from soliciting local mosques and receiving donations from trainees.

11/21/2002        Guantanamo Bay, Cuba

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11/21/2002

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

JA001615

UNCLASSIFIED//FOR PUBLIC RELEASE

FD-302a (Rev. 10-6-95)
Continuation of FD-302

███████

Muhammed Noor Othman Muhammed          11/21/2002          2

　　　　MUHAMMED identified █████████████████████████ from
photographs shown to him by investigators. MUHAMMED stated ████████
was in charge of Khaldan training camp. ████████ was responsible for
the daily training schedule for all the incoming Arabs. According to
MUHAMMED, no one could train at Khaldan without the personal approval
of the Emir, ████████. Each new trainee came to Khaldan with a written
letter of recommendation from ███████████ █████████ was in charge of an
Arab guest house in Pakistan which served as an intermediary stop on
the way to Khaldan. MUHAMMED could not remember the name of this guest
house, but stated it was not ███████████. MUHAMMED stated ████████
████████ was a well known Arab guest house in Peshawar, Pakistan,
but did not know who was in charge of it.

　　　　MUHAMMED's relationship with ████████ was mostly business.
MUHAMMED knew that ████████ fought against the Russian army and was
at Khaldan long before MUHAMMED arrived. MUHAMMED met ████████ when
he arrived at Khaldan in 1996. MUHAMMED stated as Emir, ████████ had
the power to remove trainees from camp but MUHAMMED never witnessed
it. MUHAMMED claims to know nothing about advanced training being
offered by ████████

　　　　MUHAMMED advised he saw a man known as
███ ██-██IBI at Khaldan. MUHAMMED was shown a picture of █████████
████████ but did not recognize him. MUHAMMED added that he was
mistaken when he identified ████████████ as █████████████████.
　In fact, MUHAMMED claimed that the man shown to him today was not the
same man shown to him back in August.

　　　　MUHAMMED stated ████████ lived at Khaldan among the
instructors and trainees. ████████ seldom left Khaldan, and when he
did it was never for more than a few days. MUHAMMED did not know for
what purpose ████████ would leave Khaldan. ████████ would appoint one
of the instructors to take his place and give that man the daily training
instructions to be carried out. MUHAMMED was selected by ████████ to
take charge of the camp in his absence on at least one occasion.
　MUHAMMED advised ████████ and █████████████ (phonetic) were close
friends of ████████. MUHAMMED stated he has described these two Arab
males to investigators in the past.

　　　　MUHAMMED stated he has not seen any Khaldan instructors or
trainees at Camp Delta.

　　　　MUHAMMED stated that Khaldan was not an Al-Qaeda training
camp and did not teach people how to smuggle explosives and/or weapons
through airports.

　　　　MUHAMMED saw USAMA BIN LADEN (UBL) one time at the ████████
training camp located approximately 1.5 hours from Khost. MUHAMMED
was instructed by ████████ to deliver a electronic communication machine
(possibly a fax machine) to UBL. MUHAMMED was taken to ████████ by

JA001616

UNCLASSIFIED//FOR PUBLIC RELEASE

FD-302a (Rev. 10-6-95)
Continuation of FD-302

▮

                    Muhammed Noor Othman Muhammed          11/21/2002          3

an Afghan driver.  MUHAMMED could not provide directions to the camp.

        MUHAMMED stated ▮▮▮▮▮▮ camp was an AL-QAEDA camp because
it was well organized and had established buildings.  MUHAMMED traveled
to JIHAD WALI this one time only.

        MUHAMMED met ▮▮▮▮▮▮▮▮▮ on two (2) separate occasions.  The
first meeting was at ▮▮▮▮▮▮▮ home located in ▮▮▮▮▮▮▮ Khost,
Afghanistan on or about the year 2000.  During this meeting, MUHAMMED,
▮▮▮▮ and ▮▮▮ discussed the closing of Khaldan camp.  According
to MUHAMMED, Khaldan was being closed because the Taliban regime did
not want to keep it open.

        The second meeting between MUHAMMED and ▮▮▮▮▮ came on or
about March 2002 at ▮▮▮▮▮ home in Faisalabad, Pakistan.  MUHAMMED
needed to get a passport in order to get back to Sudan.  ▮▮▮▮ had
told MUHAMMED that he, MUHAMMED, needed to see ▮▮▮ because ▮
was good at getting passports and other documents.  ▮▮▮ supposedly
had connections in Pakistan and was able to get visas and arrange for
accommodations when Arabs came to Pakistan.

        MUHAMMED stated his opinion of Americans has changed somewhat
since his capture.  MUHAMMED was surprised that Americans have been
so kind to him and treated him so well.  MUHAMMED expected to be tortured
and mistreated while in American custody and this has not been the case.

        The interview was terminated at this time.

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 45

JA001618

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI,

        Petitioner,

       v.

BARACK OBAMA, *et al.*,

        Respondents

Civil Action No. 09-745 (RCL)

Ressam FD-302 (May 22, 2001)

SECRET//NOFORN

JA001619

UNCLASSIFIED//FOR PUBLIC RELEASE

FD-302 (Rev 10-6-95)

- 1 -
**FEDERAL BUREAU OF INVESTIGATION**
Date of

transcription

05/23/2001

        On 05/22/2001, Ahmed Ressam was interviewed at the
Federal Detention Center in Seatac, Washington. Present at the
interview were Special Agents ██████████████████ SA
██████████████████████████████████ AUSA
(Southern District of New York), Assistant Federal Public Defender
██████████████ Defense Investigator ██████████ and Arabic
translator ██████████████. The interview was conducted in Arabic.

        Ressam provided the following information:

        ██████████████████████ was the overall leader of Khalden and
Deronta Camps, though each camp had a separate leader present at
the camp. ██████████ rarely traveled outside Pakistan, and
generally remained in Peshawar to receive the young Muslim men
heading to the camps in Afghanistan.

        ██████████████ a naturalized Palestinian, welcomes young
men from all groups such as the Armed Islamic Group (GIA) and the
Egyptian Islamic Jihad (EIJ) who have the desire to train in jihad
though ██████ himself has no singular affiliation.

        There is no one to whom ██████████ must report in
terms of a superior; he is "emir" and from RESSAM's perspective,
equal to and not subordinate to USAMA BIN LADEN (UBL). ██████
is an associate of UBL and coordinates and cooperates with
UBL in the conduct of training and trainee movements between ████
camps and UBL camps.

        ████████████ is ultimately informed in regard to the
"operations" his camp graduates attempt, but it is not for him to
approve of the operation. For example, ██████████ knew about the
Jordanian cell's "operation" and RESSAM's own "operation", though
not specifically the date and exact target.

        Nor was it ████████████ place to approve or disapprove
of the operation. ██████████ is a facilitator. RESSAM uses the
term "operation" for terrorist attack.


        05/22/2001      Seatac, Washington

                                            05/24/2001

JA001620

Continuation of FD-302 of    AHMED RESSAM                    05/22/2001        2
On .Page

The Jordanian cell was comprised mostly of Jordanians and
one Syrian. Their "operation" (terrorist attack) was to be carried
out in Jordan around millennium celebrations. The targets were
Americans and Israelis, either VIPs at hotels or companies located
in Jordan.

During training, cells will meet and receive lessons. At
these sessions, each unit discusses the kind of terrorist attack
("operation") that the unit will do, though not specific targets or
dates. RESSAM explained that at the camps "someone will lecture
about operations outside".

Each unit has a leader; the leader of the Jordanian cell
is ████████████ is a Palestinian trainer and has experience
fighting in Lebanon and Afghanistan. The other members of the
Jordanian unit are:

████████ - Palestinian; veteran who fought in
Afghanistan.

UNKNOWN - Jordanian; led the prayer.

████ - Jordanian; dentist.

UNKNOWN - Physician.

████ - No further information.

### CELLS/TRAINEES/GROUPS PRESENT AT KHALDEN

The approximate number of individuals in each cell will
range between 6-14 members. The attendance at Khalden Camp varies
between approximately 60-110 trainees at any one time as groups
matriculate through the camp at various times.

GIA, GSPC, HAMAS, HIZBALLAH, AL-QAEDA, EIJ and other
organizations of people interested in Jihad from various countries
train at Khalden.

The GIA studies how to compile forces and makes contact
with individuals at the camp who will serve ████████████
According to RESSAM, ████████████ role is to reorganize and
reconsolidate the fractured organizations in Algeria, along with
AL-MOUTAZ. (AL-MOUTAZ was married to a Swede and both lived in
Afghanistan prior to AL-MOUTAZ's death.)

### AL-QAEDA

AL-QAEDA members (many of whom are from Yemen) were also
present at the camp at the time RESSAM was there. Others associated
with AL-QAEDA sometimes visit the camp to give political lessons
and lectures:

████████ Tunisian; associate of UBL.

JA001621

██████████████████████████████████████████████ is known to
THE ████ as ███████████/RAHMAN. a.k.a. THE BLIND SHEIKH. Currently J
incarcerated in the United States); ALLAH lectures and incites
Jihad in the Arabian Peninsula and the Gulf States.

UNKNOWN - brother of ██████ from the Yemeni cell;
consultant to UBL; fought with UBL in Afghanistan/Soviet War; also
identified by RESSAM as missing part of a leg; visits the young
fighters in the camp.

██████ - Egyptian Jihad (EIJ)/ AL-QAEDA member.

AYMAN ZAWAHIRI - UBL/EIJ associate; according to RESSAM,
EIJ/UBL are "interwoven". (TRANSLATOR wrote: IMAM DOWANI/DAWAHRI.
This is believed to be the same person as AYMAN ZAWAHIRI).

## USAMA BIN LADEN

UBL is respected but not viewed as a hero among those at
Khalden Camp, but as another "normal" trying to coordinate and
organize the overall efforts of those conducting jihad.  Every
Islamic extremist group present at Khalden and outside of Khalden
has a direct relationship with UBL, including the Algerians
represented by ██████████████████ and AL-MOUTAZ.

In September, 1998, RESSAM was present when a servant of
UBL came to AL-MOUTAZ' home. This servant brought a summons from
UBL to AL-MOUTAZ and ████████████████ to meet with UBL in
Kandahar. RESSAM witnessed both AL-MOUTAZ and ABU DOHA at AL-
MOUTAZ' home in Jalalabad when this summons occurred.

RESSAM was present at the AL-MOUTAZ' guesthouse in
Jalalabad in December, 1998 and remained there during Ramadan.
RESSAM knew that AL-MOUTAZ and ████████████ departed by car to Kabul,
planning to then fly to Kandahar to meet with UBL.

On their way to meet with UBL, there was some trouble
(NFI) while transiting through Kabul, and AL-MOUTAZ returned to
Jalalabad while ██████████ proceeded to Kandahar and met with UBL on
"cooperation and operational issues". RESSAM uses the term
"operation" to refer to terrorist attacks.

AL-MOUTAZ told RESSAM about ██████████ meeting after
██████ meeting, and that the cooperation matters concerned
cooperation between the Tunisians and Algerians.

██████████ AL-MOUTAZ and ██████ are very "interwoven" and
discuss all things.  While each group operates independently, those
things discussed among ██████████ and AL-MOUTAZ, including
the "operations" are and were briefed to UBL. In this instance, UBL
was briefed by ██████.

These "operations", while not specific in exact targets
or dates of attacks, are shared with UBL. They are the same
operations discussed in the training at Khalden; operations such as
placing bombs in airports, attacks against U.S. military and U.S.

UNCLASSIFIED//FOR PUBLIC RELEASE

████████████████████████ against U.S./Israeli interests (companies), and
Continuation of FD-302 of ████████ on ████████Embassies.                    05/22/2001        4

RESSAM believes it is probable that the Algerian
operation which RESSAM and his cell members were to carry out from
Canada, and that RESSAM's operation would be performed in the
United States, was shared with UBL in very general terms during ABU
DOHA's meeting with UBL.

Based on the conversation between RESSAM and AL-MOUTAZ,
RESSAM knows ████████ told AL-MOUTAZ that ████████ had such an
exchange of information with UBL along with the functions of each
group/cell, and the discussion of RESSAM's Canadian cell and their
American targets.

AL-MOUTAZ is the individual previously identified by
RESSAM as the individual who gave RESSAM $12,000 (U.S.) to set up
the cell's safehouse in Canada. AL-MOUTAZ received this money from
European donations and contributions from armed robberies, and
organized groups in Sweden.
These financial contributions are used to finance
training at the camps and for financing terrorist attacks. RESSAM
also believes that UBL provides financial support to the camps,
though RESSAM has no proof of that support.

No approval was apparently sought or needed from ████████
████████ for the meeting between ████████ and UBL.  To RESSAM's
knowledge, ████████ corresponds with UBL mostly by writing and
by sending letters. From Pakistan, ████████ does all his
correspondence in writing, rarely using the telephone except for
calls outside the Afghanistan/Pakistan region.

In a seemingly contradictory statement, RESSAM stated
that ████████ does not use a computer to communicate, but does
use e-mail, though it is unclear with whom he communicates by e-
mail.

████████████████ "vice" (meaning deputy), ████████████ is
also summoned at times by UBL.  RESSAM believes all of these
individuals are treated equally by each other, though there is a
hierarchy in the assignment of duties and responsibilities and
their roles in facilitating and coordinating resources for the
cells.

APPROVAL OF OPERATIONS

Cells are independent and do not need the approval of
leaders such as ████████████████████ for their
terrorist attacks.  The cells are taught at Khalden those targets
deemed valid and proper by clerics and individuals such as ████
████

████████████████ son of ████████████████ and the other
clerics justify acceptable terrorist operations under Islamic law.
████████████ is almost always in Khwost and is married to the
daughter of AYMAN ZAWAHIRI.

JA001623

UNCLASSIFIED//FOR PUBLIC RELEASE

█████████████ ███████████  05/22/2001    5

- Libyan; veteran of Afghan war and Chechnya, in charge of communications and movements and daily operations of Khalden and Deronta Camps; provides authorization for movement of trainees to other camps under ████████ control as well as the Kurdish manufacturing camp and UBL's camps - ██████████ AL-MOUTAZ, ████ and ███████████ camps. USAMA BIN LADEN and UBL's camps are all "interwoven" and mutually supporting.

████████ - stationary leader in charge of Khalden Camp.

████████ - Palestinian; trainer at Khalden Camp.

████████ - was past "emir" of Khalden Camp 'a very long time ago" from what RESSAM had heard. "A very long time ago" was unspecific.

████████ - Algerian; Deronta Camp Decision maker; missing left hand from explosion; NOT to be confused with ████████ the son of ████████

████████ - Moroccan; Deronta Camp; high degree of chemical and explosives training; has resided in Morocco and Spain.

████████ - Algerian; Deronta Camp; former Intelligence officer in Algerian Army; veteran of Afghanistan/Soviet war.

████████ - from Saudi Arabia; NOT the same ████████ █████ at Finnsbury Park Mosque; deep cuts in his legs; veteran of Afghanistan/Soviet War; in charge of kitchen; chemicals/explosives background.

████████ Algerian; very specialized skill in electronics; served in Bosnia.

████████ - Algerian; lives with his wife and children in ████████ guest house in Jalalabad to provide a "cover" for the reception house; house is two stories with a garden; house is established to receive young men going into and out of the camps.

████████ - Algerian; lives with his wife and children in ████████ guest house in Islamabad to provide a "cover" for the reception house; ████████ knows how to alter passports and visas to make it appear as though one has been in the country for a month; keeps property for trainees on their way to the camps in Afghanistan; issues Afghani style clothing to trainees on their way into Afghanistan.

JA001624

UNCLASSIFIED//FOR PUBLIC RELEASE

studied in the United States at a
████████████████████████████ESSAM during the 1980's. He married and
later divorced an American woman. He is a naturalized Palestinian
citizen originally from Saudi Arabia. He is the son of wealthy
Saudi parents.

As stated previously, ███████████████ uses the telephone to
communicate with the outside world and communicates in writing
within Afghanistan and Pakistan.

████████████████ receives money brought by couriers and
banks in Peshawar and at least one other bank, possibly a Swiss
bank.

████████████████ married a Swede as he transited through
Sweden before arriving in Pakistan around 1989/1990.

████████████ also in known by the name ████████ and this
is the name that RESSAM used with ███████ whenever the two
would speak.

████████████████ received field experience from fighting in
Tajikistan and Afghanistan. He receives newcomers (those
transiting through Pakistan to the camps in Afghanistan) from any
and all groups interested in Islamic jihad.

### RESSAM'S RETURN TO CANADA - FEBRUARY, 1999

████████████████████████████████████████████

On 02/07/1999, RESSAM arrived at the Los Angeles
International Airport (LAX) on Asiana Airlines from Seoul, Korea.
RESSAM remained at LAX for approximately 4-5 hours while awaiting a
connecting flight to Vancouver, British Columbia (Vancouver, B.C.)
on a U.S. carrier, the name of which he cannot remember. RESSAM
never left the terminal area and did not meet anyone while at LAX.

RESSAM arrived at the Vancouver International Airport and
telephoned ████████████████ to obtain the telephone number of ████
████████████████ gave ███████ number to RESSAM and
RESSAM then attempted to telephone ████

████████████ wife answered the telephone and informed RESSAM
that ████████ was not present. RESSAM then took a taxi to the Hotel
Vancouver in downtown Vancouver, B.C. The taxi ride took
approximately twenty minutes.

Upon arriving at the hotel, RESSAM again attempted to
telephone ████████████ answered and came to the Hotel Vancouver
to retrieve RESSAM. RESSAM then spent two nights at ████████
house.

Following the stay at ████████ home, RESSAM next went to
stay with ████████████████ during the months of February and
March, 1999. ████████ was residing near 12th Street and Oak in

JA001625

UNCLASSIFIED//FOR PUBLIC RELEASE

████████████████ with two other unidentified Algerians; one possibly
████████ . 05/22/2001        7

█████████████ known to RESSAM as ████████████ was not one of
those roommates. RESSAM knew that ████████ and 'AICH' lived together
in 1995/1996, though at this time RESSAM was living at the
Delorimier address in Montréal.

████████████████ departed for Dublin, Ireland
sometime in 1999; RESSAM never saw ████ in 1999. RESSAM does know
████████ to be an expert engineer with combat experience.

          Around the middle of March, 1999, RESSAM returned to
Montréal for approximately two to three weeks. At a point in time
either before or after this trip, RESSAM, ████████████████
and █████ drove to the Department of Motor Vehicles (DMV) in
Vancouver, B.C.

          The four individuals were in ████████ car, described as
being a white, four door vehicle (possibly a Mazda) with a
red/brown interior, driven by ████████ Their purpose in going to
the DMV was to determine the requirements for obtaining a B.C.
driver's license.


MONTRÉAL - MARCH, 1999

██████████████████████████████████████████

          While in Montréal during March, 1999, RESSAM visited
████████ and stayed at the Sherbrooke apartment █████████████

██████████████████████████████████████████

          While in Montréal, RESSAM visited ████████████████

██████████████████████████████████████████

          ████████ asked RESSAM to describe the conditions of the
camps and the young men training at the camps. ████████ told
RESSAM that ████████████ had been to Bosnia and RESSAM asked
█████ about ████████████████ and how KARIM was
doing.

          RESSAM did not enlist the assistance of ████████ for
RESSAM's operation because RESSAM felt that ████████ was too
well-known by the authorities and in the Islamic movement.  RESSAM
feared that would compromise RESSAM's operation.

          RESSAM was trained at Khalden not to pick high-profile
associates, those who attend mosques or those known in the Islamic
movement, as such individuals would be known to authorities.

JA001626

██████████████████████████████████████ and provided ████████ ▒the names▒
and telephone numbers of Tunisians RESSAM had met in Peshawar.

**VANCOUVER, B.C. - APRIL, 1999**

████████████████████████████████████████████

In April, 1999, RESSAM returned from Montréal to ████████ 12th and Oak Street apartment in Vancouver, B.C.

RESSAM went to downtown Vancouver with ████████ to apply for a commercial license in the name of BINNI IMPORT/EXPORT. ████████ assisted RESSAM in this matter as ████████ had a commercial license for his moving company and knew where to take RESSAM.

████████ knew the location and procedures on applying and drove the group to the licensing facility in his car, described previously.

RESSAM wanted the commercial license for BINNI IMPORT/EXPORT so that it would furnish RESSAM with a "cover", providing customs and immigration authorities with a purpose for his travels. RESSAM chose an import/export title as the title itself suggests traveling internationally.

The business would also be used for fraud and altering other documents based on the appearance of a legitimate business - BINNI IMPORT/EXPORT.

████████ then drove RESSAM to the Richmond, B.C. branch of the ROYAL BANK. RESSAM opened a personal account and returned a few days later to open a commercial account at this same branch of the Royal Bank. In opening the accounts, RESSAM believes he used HAMAIDI's address.

During March and April, 1999, RESSAM started visiting stores in and around the downtown Vancouver, B.C. area looking for acetone and products used in cleaning and polishing metals. RESSAM also visited paint stores looking for aluminum powder.

RESSAM sometimes went alone or with ████████ walking or taking the transit system. RESSAM also visited a military surplus store on Hastings Street in Vancouver, B.C. looking for hexamine tablets which RESSAM referred to as "fireballs".

████████ provided an address of the EVERGRO fertilizer company in Delta, B.C. and ████████ wrote the name and address in RESSAM's address book. ████████ may have written the address and name as early as February, 1999.

**DISCUSSIONS IN CANADA OF JIHAD AND RESSAM'S AFGHANISTAN TRAINING**

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

Continuation of FD-302 of ████████████ and that he discussed his trai██████    9
On     ████████████ and jihad in general with ████████████████████████████
Page

█████████ ██████ ███ not discuss them with ██████
TAHLEF as RESSAM felt ████    was uneducated and not well-
informed on these matters.

RESSAM also had conversations on this matter with ██
████████████████████████████████████████████████████████
████████████████████████████████████████████████████

## CALGARY, ALBERTA - END OF APRIL, 1999 ████
### ALBERTA DRIVER'S LICENSE,

At the end of April, 1999, RESSAM flew to Calgary and
checked into a hotel for one night. The next day RESSAM telephoned
a Lebanese individual named ████████████ and set up an appointment
with ████ to obtain an Alberta driver's license.

RESSAM stated that ████ telephone number is in his
address book, seized by the French authorities in the October, 1999
search of the Boumezbeur apartment on Sherbrooke in Montréal.

## MONTRÉAL - MAY/JUNE, 1999
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

In May, 1999, RESSAM returned to Montréal and again
stayed with ████████████████. While there, ████████ visited and
stayed one night at the apartment and RESSAM visited with ████
████████ at this same apartment.

It was during this time frame that RESSAM attempted to
call his associates in London; ████████████████████████████
████████ RESSAM also called ████████████████████████ in
Bosnia and ████████████ in Germany.

RESSAM was calling his London associates/cell members to
determine when they would arrive in Canada to assist in the
operation. RESSAM learned that ████████ had not yet returned from
Afghanistan and that the rest of the cell did not want to travel
until ████ arrived and ████ was ready to travel to Canada.

In a later conversation with the London members of
RESSAM's cell, RESSAM learned ████████ had been stopped by
authorities either while he was entering or attempting to leave the
United Kingdom.

████████ had tried to get to Canada in December, 1998 but
was stopped by authorities and arrested. ████████ was to follow
████████ but didn't travel in light of ████████ arrest.

MR. RESSAM called ███████ numerous ████ █████ but only 10
spoke with ███████ on three occasions. RESSAM would have to arrange
times to speak with ███████ as RESSAM had only the number for a
mosque in Bosnia that would serve as a message center for ███████

RESSAM had informed ███████ that RESSAM had an operation
for which RESSAM was seeking ███████ assistance in Canada.

RESSAM also attempted to telephone ███████ in
Germany and left a message with ███████ that ███████
should inform ███████ that ███████ should come to Canada because
RESSAM is "in urgent need".

RESSAM learned that ███████ could not come because
███████ had lost his French passport in Pakistan.

In response to the unavailabity of RESSAM's cell members
to come to Canada, ███████ encouraged RESSAM to come to Europe and
do terrorist attacks in Europe.

### RESSAM ALERTED TO CANADIAN INTELLIGENCE SERVICES

Sometime, during the summer, 1999, ███████ warned
RESSAM that the Canadian Intelligence services were looking for
RESSAM. ███████ became nervous and headed for Calgary. RESSAM
did not become concerned.

RESSAM did employ security precautions such as not using
the same routes when he moved about Vancouver, B.C. and Montréal.
RESSAM also used other counter-surveillance techniques such as
noting certain cars or people that RESSAM thought might be watching
him.

RESSAM did not believe he was under surveillance in
Montréal during 1999, but knew he had been watched in 1997 and
before his departure to Pakistan in 1998. RESSAM did believe he
was being followed while he was in Vancouver, B.C. during 1999.

### MONTRÉAL - AUGUST, 1999

In August, 1999, RESSAM purchased a Los Angeles map ███████
██████████████████████████████████████████████████████
█████████████████. The map was purchased at or near the
intersection of Ontario and Berri Streets in Montréal.
RESSAM purchased the California Tourism Guide in the
French language at Presse Interationale on St. Catherine Street in
Montréal.

The L'Almanach Catholique (Catholic Almanac) was
purchased near the Berri Metro Station in Montréal for the purpose
of a "documentation prop" to go along with the BENNI ANTOINE NORIS
identity.

JA001629

UNCLASSIFIED//FOR PUBLIC RELEASE

made the three circles on the Los Angeles map:
██████████ Airfield, Redondo Beach Airport, and Los Angeles International Airport (LAX). RESSAM circled the three airports because they were international airports.

RESSAM considered possibly placing explosives at multiple targets, but thought this might be too difficult when confronted with the reality that his cell members would not join and assist him. Multiple targets for one or two people would be too difficult.

RESSAM did consider the possibility of two suitcases, each with an explosive device placed on top of each other at the same airport.

RESSAM also thought it would be too difficult to place an explosive on an aircraft.

Before placing an explosive device on a luggage cart near baggage claim or ticketing, RESSAM would first place a suitcase without explosives and leave it to measure the response of authorities. The actual device would probably be set to detonate within thirty minutes of placing it.

RESSAM selected LAX as an economic and political target. While stating his primary purpose was not to kill people, RESSAM did say that "in any war there are civilian casualties".

Other targets briefly considered by RESSAM were an FBI office, police station or Israeli embassy within the United States, to be timed as closely as possible with the changing of the millennium and other attacks around the world, such as Jordan. Though the attacks would coincide with the millennium, there was no plan to coordinate the exact timing of the attacks.

ressam.005A

JA001630

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 47

JA001631

SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ABDAL RAZAK ALI )<br><br>Petitioner, )<br><br>v. )<br><br>BARACK OBAMA, *et al.*, )<br><br>Respondents. ) | Civil Action No. 10-CV-1020 (RJL) |

██████████ FD-302 (June 14, 2002) (less redacted version)

SECRET//NOFORN

1

JA001632

06/14/02

███████████████████████████████████████████████
████████████████████████████████████ was interviewed ██

        The interview began at approximately 10:15 AM on 06/06/2002
and was conducted in English.  The interview continued until
06/11/2002.  In addition to the interviewing agents, ████████████
████████ (ALAT) ████████████████████ was also present.  After being
advised of the identity of the interviewing agents and the nature
of the interview, ████████ provided the following information:

PREAMBLE

████████████████████████████████████████████████████████████
████████████████ always relied on others for his travel, believed
them when they told him to wait as his travel papers were being
prepared, and that he would be arrested or shot of he ever left the
guesthouses.  He thought of telling Pakistani police about the house
and who was in the house, but he did not think he would be believed.
 He described himself as being different from other members of the
house.



06/06-11/02    ██████████████

06/14/02

█████████████████████████████████████████

JA001633

2



primary language was Arabic and he was also proficient in English, which he taught himself to speak.

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001634

EDUCATION AND EMPLOYMENT

████ applied to, and began attending, Damascus University at the end of the summer in 1994. He attended the university for six months and was enrolled in a two to three year vocational program. The initial courses of the curriculum were basic courses in electronics with a specialization in the operation and maintenance of small electric devices such as pumps and generators. ████

Within fifteen days to one month of returning to Saudi Arabia ████ father found employment for ██ at an auto supply parts store.

████ While employed at the auto parts store, ████ had also enrolled in the computer studies program at the HASIB INSTITUTE in Riyadh. During his first year, ████ took basic core courses in mathematics and physics. Second year studies focused on computer hardware and circuitry. ████ was familiar with Windows 3.1 and DOS. As instructions for software and equipment were typically in English, it was necessary for ██ to teach himself English in order to pursue a career in the computer profession.

████ had completed his studies at the HASIB INSTITUTE. He continued to work at the auto parts store for several months after his graduation.

████ was hired to work at small computer shop, which employed four or five other people.

JA001635

UNCLASSIFIED//FOR PUBLIC RELEASE



accepted a job at AL-KANI CORPORATION FOR INTERNET AND COMMUNICATIONS located at ████████████████████████████████████████ a section of Riyadh. ████████████████████████████████████████████████.
████ worked the night shift (12 a.m. to 8 a.m.) at the corporate help desk providing technical assistance to callers for hardware problems. Duty on the night shift was slow and ████ often surfed the Internet and gradually became more accustomed with it. His English also improved as he reviewed many Western web pages.

████████████████████████████████████████████████████. After four or five months at the company, ████ switched to the day shift (8 a.m. to 4 p.m.). ████ prepared technical reports for managers and continued providing assistance on the corporate help desk █████████

████ studied for his MSE certifications

JA001636

06/06-11/02    5

(Microsoft Service Engineer) which included certificates in Windows 2000, Windows 2000 Server, and several additional networking specialties, which would lead to system administrator privileges.

recalled that two Americans (English speakers) worked at the company. exposure to English through computers and interaction with the American employees served to improve his English.

JA001637

6

## TRAVEL TO AFGHANISTAN

In the summer of 2001 ▓ started to discuss his financial concerns more often with ▓

were friends for many years.  In June 2001, ▓ had accompanied his family to Syria for vacation.  He had stayed for twenty to twenty-five days then departed Syria while his family was still on vacation to return to work in Saudi Arabia.  While his family was still in Syria, ▓ would visit ▓ at his ▓ home after work.  ▓ was 5-6 years older than ▓ and because he was older, ▓ respected his advice.  ▓ considered ▓ situation and offered several options.  First, ▓ advised that ▓ could earn more money in a western country such as the United States or Canada. ▓ advised ▓ it was easier to travel to Canada than the United States.  ▓ resisted this idea because he felt that his high school level education would limit his opportunities in the U.S. or Canada. ▓ also thought that his English was too poor to succeed in either country.  ▓ suggested Syria, but ▓ dismissed this option. ▓ wanted to start his own computer hardware business and if he were to do that in Syria, he would have needed $70,000 to $100,000 US dollars for start-up costs.  He would also have to endure more questions from his family as to why he wanted to be so far away from home.  ▓ persisted and finally suggested that ▓ go to Afghanistan to seek employment.

▓ thought Afghanistan was enticing, as it was a developing Islamic government, which could certainly reward ▓ well for the skills that he possessed.  ▓ believed ▓ when ▓ told him that he could make $15,000 to $20,000 US dollars in six months working for the Taliban media or government.  ▓ never questioned how ▓ knew this as ▓ thought ▓ had never been to Afghanistan.  ▓ also had a high opinion of Afghanistan in the way that religion was practiced; he described it as a "good place".  For example, ▓ condoned the Taliban's destruction of Buddhist statues as a means of making Afghanistan a more pure place for Islam. ▓ continued to emphasize the financial potential in Afghanistan and ▓ became increasingly fixated on the money he could make there.

JA001638

06/06-11/02

7



By the end of July 2001, ███████ had made his decision to travel to Afghanistan to obtain employment of some form in the computer field. ███████ played a large role in influencing ██████ decision and offered to serve as a travel guide for ███████ and to accompany him to Afghanistan.

UNCLASSIFIED//FOR PUBLIC RELEASE

8



In late September (28th or 29th) 2001, ▮▮▮ and ▮▮▮ left Saudi Arabia for Afghanistan. ▮▮▮ had 5,000 Saudi Riyals to pay for his travel. He also departed with his own computer that he intended to use when he arrived in Afghanistan. ▮▮▮ had an IBM ThinkPad computer with Windows 3.1 and Windows 2000 software, an external CD-ROM drive, digital camera, printer, and music and religious CDs.

JA001640

UNCLASSIFIED//FOR PUBLIC RELEASE

9



## AFGHANISTAN

▇▇ and ▇▇ entered Afghanistan by bus. They traveled briefly, stopped, and were met by an Afghani customs officer that spoke Arabic. ▇▇ spoke to the customs officer and made arrangements for further travel. A Toyota Corolla came and picked up ▇▇ and ▇▇ and they drove three hours to an Arab guesthouse in Herat, Afghanistan. ▇▇ had not anticipated that anyone at the house was a member of the Taliban or Al-Qaeda. ▇▇ and ▇▇ stayed at the house for one night. A Yemeni male named ABU ANAS was in charge of the house. ▇▇ was surprised to see that everyone had guns and no one was able to leave the house without ANAS's permission. ▇▇ and ▇▇ were offered rifles. ▇▇ took a Kalishnikov rifle, which he took for the remainder of the trip. ▇▇ declined to take a gun. ANAS took ▇▇ baggage, placed it into a closet and told him to feel welcome at the house. As ▇▇ was speaking to some Arabs at the house, several of the guests were watching television. As

JA001641

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

06/06-11/02        10

██████ got closer, he could see that they were watching videos of the September 11, 2002 attacks in the United States. They also watched videos of UBL that were shown on Al-Jazeera, and a video of the attack of the USS Cole. This was the first time that ██████ had heard of

the attack on the American ship. The video was not actual footage from the attack but appeared be a digitally altered version of what the attack may have looked like. ██████ heard other guest talking about the attack on the USS Cole.

██████ was upset from being around the Arabs and was uncomfortable about their fixation on these attacks. ██████ pulled ██████ aside and told him that he did not expect to be around "these people". ██████ told ██████ that he did not want to be there and that he was going to leave. ██████ also told ANAS that he had make a mistake by coming to the house and that he wanted to go. ANAS told ██████ that he could leave but not by the same route he entered Afghanistan. ANAS wanted ██████ to leave Afghanistan via Kabul and then Karachi. After ██████ told ANAS of how he felt, ██████ thought that ANAS was suspicious of why ██████ was at the house. ANAS inspected ██████ luggage, computer equipment, and wristwatch for explosives and was cautious around ██████

The following morning three cars arrived at the house. Twelve people, including ██████████ and ANAS, got into the cars with four men in each car. The cars traveled from Herat to Kandahar and arrived around 3 a.m. The group stopped at the ██████ house that was also operated by Arabs. Though ██████ and ██████ were only at the house for a short time, ██████ saw ██████ speak to other Arabs and first learned of ██████ alias or "Abu name", ██████ which meant ██████. Here, ██████ first gained the impression that ██████ had previously been in Afghanistan. ██████ suspicion was supported after hearing about ██████ alias and seeing that he ██████ seemed to know ANAS well.

After several hours in Kandahar, ██████████ boarded a bus to Kabul. Two buses had arrived at the house and were transporting approximately twenty-eight people to Kabul. After arriving in Kabul, the buses stopped at the old Saudi ambassador's residence that now served as a guesthouse. The emir of the house was ██████████████ an older man with white hair. ██████ told ██████████ that he had made a mistake coming to

JA001642

UNCLASSIFIED//FOR PUBLIC RELEASE

06/06-11/02    11

Afghanistan and wanted to leave. ████████ assured him that he could leave Afghanistan but that he would have to wait at least three days before he could depart from the guesthouse. ████████ told ████ to see ████████ a Yemeni or Saudi, if ████ needed anything at the house. ████ asked ████ what his name was and ████ told him his true name. ████ told him that he could not use his true name and asked him what name he wanted to use. ████████ selected an alias of ████████ While at this house, ████████ left and ████ never saw or heard from ████ again.

████████ did little more than eat or sleep while at the guesthouse. The house was full and ████ estimated that there were eighty to ninety people staying there. All were Arabs and most were Saudis. No one was allowed outside of the house. Guests were generally segregated within the house by their ultimate destination. There was constant motion and activity around the house. During the day and night cars arrived with new guests and departed with others. People streamed into and out of the house like "ants". The house was used to move people. ████ knew that these were not Taliban people and was aware that this house was a transit point for extremists. ████ had heard others referred to the house as the "Embassy of UBL". ████████████████ came to transport ████ from the house. ████ and ████ headed toward the Pakistani border and stopped in Barki Barak, an area in the Lowghar province area. ████ stayed here for ten days in a former Taliban school that now served as a guesthouse.

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

At the end of ten days, a young Syrian male named ████ came to pick up ████ for travel to Pakistan. ████ took ████ to Gardeyz, Afghanistan. They spent one night at a mosque and traveled to Zumat, Afghanistan the next day. ████ spent one day at an Afghani house in Zumat as ████ made preparations to transport ████ and others across the border into Pakistan.

JA001643

UNCLASSIFIED//FOR PUBLIC RELEASE

06/06-11/02    12

## PAKISTAN

One night in late October 2001, ▮▮▮ gathered ▮▮ and headed toward the Pakistan border. ▮▮ and ▮▮ approached the border by car. Once near the border ▮▮ slowed as he approached border checkpoints. ▮▮ would exit the car, walked down into the woods and slipped behind the border guards as ▮▮ was being questioned at the checkpoints. ▮▮ then got back into the car and continued until the next checkpoint. ▮▮ and ▮▮ did this several times until they cleared all the border checkpoints. After they were clear of these stations, ▮▮ dropped ▮▮ off and returned to pick up all of ▮▮ belongings. He did not make the crossing with any of his possessions, he only had his clothes, his passport, and 800 Saudi Riyals. ▮▮ never saw ▮▮ or any of his ▮▮ computer equipment again.

▮▮ was taken to another guesthouse, but did not know the area where he was within Pakistan. The emir of this house was ▮▮ a Pakistani. ▮▮ lived at this house with his three sons and a brother. ▮▮ stayed at this house for two months and ▮▮ provided ▮▮ with food and water. ▮▮ did not have to pay to stay at the house and his only instructions were he would not be allowed to leave the house. At the end of the two months a Pakistan male named ▮▮ came to pick up ▮▮ and take him the bus station. Prior to leaving, ▮▮ got his hair and beard cut and ▮▮ took ▮▮ passport and told him to speak to no one. ▮▮ then boarded a bus, which took him to Lahore, Pakistan via Bannu.

## LAHORE GUESTHOUSES (3)

▮▮ arrived in Lahore in late December 2001/early January 2002 and was greeted by two men that transported ▮▮ to the Arab guesthouse in Lahore. The emir of this house was ▮▮ though ▮▮ was only at the house several days a week; he did not live there. ▮▮

There were approximately forty Arabs living at this house when ▮▮ arrived. An understanding existed among guests of the Lahore guesthouse house; do not ask people's names or inquire as to why they were at the house. If someone chose to discuss these matters, it

was their decision. ▮▮ estimated that ninety percent of the Arabs were fleeing Afghanistan and wanted to go home. ▮▮ was uncertain as to the plans of the remaining guests. Many of the guests were unable to travel because they did not have passports, possessed fraudulent passports, or had entry visas for Afghanistan but, no

JA001644

exit visa, and were now in Pakistan.  To possess an entry visa into
Afghanistan with no exit visa would draw scrutiny from Pakistani
authorities. ▆▆▆▆▆ was told he would be arrested and jailed if he
tried to depart with his visa stamped for an entry into Afghanistan
and no exit visa from Afghanistan.



          Around the first week of February 2002, a Saudi-male named
▆▆▆▆▆ arrived from Tora Bora. ▆▆▆▆▆ reported that he had seen
UBL three days prior to his ▆▆▆▆▆ departure from Tora Bora.
UBL was leaving the region. ▆▆▆▆ did not know the time frame (day
or month) when ▆▆▆▆ saw UBL.
          On one occasion, ▆▆▆▆▆▆ brought an older model desktop
computer to the guesthouse.  The computer was very slow and was for
general use by the houseguests, whom typically watched videos and
played games on it.  The desktop did not have a modem for an Internet
connection. ▆▆▆▆ found files containing explosive data also had
information on atomic bombs/devices.  This "atomic bomb" file was

JA001645

06/06-11/02        14

extensive and very technical. ███ had a hard time understanding
all the contents.

        Late one evening at 1 or 2 a.m., ███ awoke from bed to
use the bathroom.   While walking down the hall, he saw the light
from the computer. ███ saw that the computer was being used by
██████. ███ sat down next to ███ and the two of
them spoke for several minutes. ███ could see that ███ was
reviewing the same "atomic" files that ███ had seen earlier while
working on the computer. ███ was a Kenyan male and spoke English.
███ frequently saw ███ with
████. ███ and ███ both spoke English
and appeared to be close friends and tended to stay away from everyone
else at the house. ███ had told ███ that he was from Kenya, but
when ███ tried to ask ███ where he ███ was from,
he would not respond to ███. ███ and ███ were both at
the guesthouse when ███ arrived.

        Around mid-February 2002, twenty Arabs were arrested in
Peshawar. ███ was concerned that their house could be targeted
by authorities next and decided to move ███ to another guesthouse
within Lahore.   The head of the next guesthouse was an older male
(late 40s), ████. There were three Saudis at this
house and all were older than ███. Two of the three Saudis names'
were ███ and ANAS. ███ could not recall the third male's name.
███ did not know how long they had been at the guesthouse.   All
three spoke very little English. ███ shared a room with ████.
████ had come from Kandahar, Afghanistan, but ███ did not know
where ███ was going. ANAS often listened to the radio for news
and the unidentified Saudi male often wrote letters.

        ███ stayed approximately one week and was moved to another
guesthouse in Lahore by an individual named ████, a Pakistani
male.

JA001646

15

███████████████ ██████ stayed at this house for a week and was moved to Faisalabad during the first week of March 2002.

## FAISALABAD GUESTHOUSE

The Faisalabad guesthouse was headed by two Pakistani males ██████████████████████ █████ arrived in Faisalabad at night in early March 2002 and remained there until his capture on March 28, 2002. There were generally ten to twelve guests at this house. ██████ recalled the names of several people that were living at the house when he arrived; ████████████████ ██████████████████ ABDUL RAZAK (an Algerian), ANAS, ██████████ (19-21 years old, Syrian). ██████████ recognized ████████ as they all had previously stayed at the same guesthouse in Lahore. Two to three days later several other men arrived. They were: ██████████████████ (a Syrian), █████████ (a Palestinian), ████████████ (a Palestinian), ██████████ (an Algerian), ████████ (a Saudi), ████████ (an Algerian), ████████ (a Saudi) and ████████ (28-30 years old, Algerian). No one was allowed outside for fear of capture by the Pakistani authorities. Each day several people were assigned to cook for the other members of the house. ████████ and others also passed time playing football (soccer) in the hallways.

## THE FAISALABAD GUESTHOUSE: ██████████████████

On the night ████████ arrived at the house, ████████████ greeted him. They welcomed ████ to the house as they all recognized one another from their previous stay at the Lahore guesthouse. ████ shared a room with████████ and ████ would visit them in their room. Initially they discussed their journeys from the Lahore guesthouse to Faisalabad. ████████ told ████ that they had been at the guesthouse for one week. ████████ remained silent. ████████ exchanged pleasantries and left the two in the room. Two nights later, ████ had trouble sleeping. He saw the light on in████ and ███████████. ████ room. ████ took some potatoes to eat and went to their room. ████ told them his complete story as to how he had arrived in Afghanistan and Pakistan. ████ wanted to leave Pakistan but he could not go until ████████ got the proper stamps for his passport. ████████ asked ████ why he needed ██████████ to leave the country when he could just pay a Pakistani to arrange travel for him ████. ████ was afraid to take such a risk and possibly be arrested. ████ told ████ to be careful about using his passport if he

JA001647

06/06-11/02    16

did not have the proper stamps or visas. ███ told ███ that he had an entry visa for Afghanistan but no exit visa and now he was having problems leaving Pakistan because of the stamps. ███ became angry and told ███ that he was stupid for having stamps in his passport and that there were ways to travel without getting stamps. ███ replied that why did he need to have fake stamps or to lie to travel as his only intention was to enter the country to work on computers. When ███ asked if ███ had ever been to Afghanistan, ███ scolded ███ by asking why Arabs asked so many questions and were so curious about matters that did not affect them. On another occasion, ███ asked ███ to teach him English. ███ again scolded ███ for asking this and told him that his ███ English was better than anyone else's at the house and ███ did not need his ███ help. ███ complained when ███ spoke English to him ███, calling English a "stupid" language and to only use Arabic. ███ thought ███ was very serious and saw him studying often. ███ frequently read a book titled "RIYADH AL-SALHEN" which was a book on Arabic customs. ███ was also a close friend of ANAS. ███ did give ANAS English lessons in return for Arabic instruction from ANAS. ███ did this because ANAS was a doctor and ███ thought that ANAS needed to know English in order to be a better doctor. ANAS had attended six years of medical school in Syria and had specialized in internal medicine. ANAS had been to Afghanistan.

███ described ███ as mentally strong and mentally tough. He was a strong willed person that seemed to be agitated by something all the time. While ███ mention travel, he never stated that his intention was to visit his family. He never mentioned a desire to see his mother or any children and never indicated where his family might be. ███ knew he could speak English but had no real idea where ███ was from. ███ thought that ███ was seeking his purpose at the house, but ███ did know of his future plans. ███ was the closest to ███ yet ███ was able to learn little of ███ through ███

THE ARRIVAL OF ███

In the second week of March 2002, ███ arrived at the house around 9 or 10 p.m. ███ was a Palestinian who was approximately 30 years old. ███ had never seen ███ before.

JA001648

greeted ███████ as he arrived.  Initially, ███████ was not certain if TALHA and███████ knew███████  But the next day, ███████saw ███████ speaking with███████and███████and concluded that they had know each other from prior occasions.

On one evening, ███████passed by███████and ███████ room.  Their door was closed but he heard voices in the room. opened the door and saw ███████sitting with███████and███████ Once he opened the door, all three looked at███████and stopped speaking. They continued to look at███████and finally███████closed the door and walked away.  Once he closed the door, they resumed their conversation. ███████had the impression that his presence was not welcome.  They were in the room for several hours that evening. ███████met with███████and███████away from other members of the house on several occasions.  To███████and███████were "special" to███████

The next day many of the guesthouse members, including ███████sat in███████room and listened to his stories about his wife, jihad, and September 11th. About September 11th, ███████told the group that he knew███████ before the attacks.  He went on to say that the original plan was to use a remote control airplane and the plan evolved into the use of a single engine plane.  When "we" presented the plan to UBL, he (UBL) suggested that passenger jets be used instead.  During this conversation, ███████stated that he███████was present when ███████had met with UBL.  The meeting lasted about one hour. Regarding the attack of the USS Cole, ███████said the attack was one year late.  The boat to be used in the attack sank because there were too many explosives, the boat was too heavy and sank in the water.  The boat was hidden and Al-Qaeda paid the Yemenis a lot of money to keep the plans quiet.  In another story, ███████told everyone that Al-Qaeda intended to bomb the Arab Summit in Beirut, Lebanon in April 2002 but could not raise money to complete the operation before the summit began. ███████then spoke about a group in Lebanon that made bombs for use against Israel. ███████expressed frustration that there were not enough "managers and thinkers" and too many "martyrs".
███████told all these stories with a great deal of detail. ███████ was surprised by the reaction of the U.S.  He did not think that the U.S. would respond so forcefully and disrupt life in Afghanistan so much.

UNCLASSIFIED//FOR PUBLIC RELEASE

18



One day, ██████ called ██████████ aside and spoke to him for several minutes. Then ██████ called ██████ aside and spoke to him as well. Three days later, ██████ and ██████ were gone. Prior to their departure, ████████████ wanted to give money to one of the Pakistanis in charge of the house. ██████████ told the Pakistani to buy him ████████ "expensive" clothes. This term had several meanings to ██████. "Expensive" was not a term applied to Pakistani items as they could have been purchased cheaply. To ████ this meant Western style clothing which was an indication that ████████ would be traveling to an area outside Pakistan. Despite having given these instructions, the Pakistani man was unsuccessful in buying clothes for ██████ ██████ asked ██████ "Where are your clothes?" but ██████ did not reply. ████████ asked the Pakistani male to buy him at travel bag to take his things belongings to Karachi. Eventually the Pakistani male got Pakistani-style clothes for ████ and ████ to include sandals. They did not wear any Western-style clothes when they left for Karachi. ██████ told ████ that ████████ wanted travel, but ██████ did not know where ██████ wanted to go. ██████ the Pakistani had arranged travel for ████ and ██████ Prior to his departure, ████ was angry that he had lost many of his possessions in Afghanistan. ████ did not hear ██████ express such a sentiment. ██████ would often get frustrated and vent his anger by saying, to the effect, "I am sitting here doing nothing and meeting no one. If I could only go home and visit my family. If they call me for jihad, then I will be ready and will come." ██████ was more vocal than ██████████ was more controlled. ██████ never saw leave the guesthouse and only saw ██████ leave once. ██████ left four or five times. ████ did not know what "papers" or passports ████ and ██████ used. He asked both if they needed good papers and why they did not leave on their own. ████ and ██████ did not respond, but ████ thought that both were awaiting instructions from ██████ By the end of the second week of March (possibly March 14th) 2002, ████████ and ████ had left the guesthouse. They left around 5 p.m. and a ████████ the Pakistani came to pick them up in a red car.

██████ did not create an E-mail account for ██████ or ██████ as they departed before the computer had arrived at the guesthouse. After they had left, ████ observed that it was like they were never there. ████ knew that all the people in the house were Al-Qaeda

JA001650

06/06-11/02     19

people or "jihadis". By ████ estimate, three quarters of the guests
at the Lahore guesthouses were "little" people or low level fighters
in Afghanistan.  In Faisalabad, the guests were different.  ████
described them as "thinkers"; more important or serious people that
were involved with Al-Qaeda.  ████ often wondered why he had been
carried along through all the guesthouses.  ████ and other members

of the house knew that ████ was a computer engineer and
████ thought his value might have been linked with this skill.  When
a desktop computer was brought to the Faisalabad guesthouse, ████
was approached by ████ and others to set it up.  ████ and
████ were electronic guys.  They had brought electronics and remote
controls to the house and knew how to make bombs.  On one occasion,
████ ordered ████ and ████ to go to Karachi to meet
████ was very close to ████
was based in Karachi.  ████ knew that ████ and ████ had been summoned
for something important as UBL's "#2" man ████ had asked for
them.  House members were frequently contacted to travel to Karachi.
Everyone in the house had a specialty, though ████ was uncertain
as to what specialties ████ and ████ possessed.  ████ thought
they had some special quality and that they had been selected for
"something".

ARRIVAL OF THE DESKTOP AT THE GUESTHOUSE

Several days after ████ arrival, ████ the Pakistani
brought a desktop computer to the guesthouse for general use.  Another
"brother" (no further information) had loaned the computer to
████ had noticed that the computer was registered to ████
but he was not sure if that was the person who owned it.  The computer
was placed in ████ and ████ old room.  The computer was no more
than one-year old and was an MD6 model desktop.  The computer hard
drive was partitioned into three sections; the C, D, and E drives.
Each section was loaded with a version of Microsoft Windows.  One
partition was loaded with Windows 98 and the other two were loaded
with Windows 2000.  The computer had an Urdu to Arabic language lesson
program.  The desktop had a CD-ROM drive and a 56K modem.  The modem
was connected to a telephone line in the house.  ████ did not know
who had set up phone service for the house.  ████ directed ████
to buy prepaid phone cards, which everyone used to pay for time on

JA001651

UNCLASSIFIED//FOR PUBLIC RELEASE

06/06-11/02   . 20

the Internet. These cards came in fifteen-hour increments that were
bought from PAKNET and twenty-five to eighty-hour cards from BRAINNET.
PAKNET and BRAINNET are telecommunication companies based in
Pakistan. ▮ set up a schedule that allowed everyone in the house
equal access to the computer. Everyone was generally allotted one
hour each. ▮ slept during the day and was awake at night when
there was less activity. As ▮ knew the most about the computer
he was allowed to spend the most time on it. The nights were the
best time to have access to the computer.

During portions of the day that ▮ was awake, he provided
general instructions on how to use the computer to other members

of the house. ANAS had asked him to show the others how
to use E-mail.

▮ told everyone that to use the computer they had
to understand English, otherwise it was a waste of time, because
▮ would continually have to show what icons to click on and to
type messages to be sent. ▮ liked to use ▮ for E-mails and
searches. He had often seen the drop down menu that contained many
E-mail, which he thought belonged to other members in the house.
▮ was curious about what was being sent on line and he would
sometimes try to see what the others were sending, but was unable
to do it. The only account that ▮ set up was for ▮
▮. This account was ▮.

▮ knew that ▮ E-mail addresses were
▮ and ▮. ▮ had seen his
addresses in a pull down menu when he ▮ was using the Internet
and when he helped ▮ on the computer. Prior to arrival of the
computer, ▮ received news relating to Al-Qaeda by phone and
was shared with the houseguests, if pertinent. After the computer
arrived, ▮ asked ▮ to find relevant news articles. With
▮ help, ▮ wanted to create an Al-Qaeda web page that
contained news, world news, and news concerning Al-Qaeda. ▮
also wanted members to be able to E-mail questions and comments to
senior Al-Qaeda members. ▮ offered to do this for ▮ once
he ▮ was back in Saudi Arabia. ▮ would use ▮ to search
for items for ▮. ▮ did not know what ▮ was looking
for but recalled one time that ▮ was searching for perfume and
make up online. ▮ asked ▮ why he was searching for these
things and ▮ explained he wanted to but them for gifts and that

JA001652

UNCLASSIFIED//FOR PUBLIC RELEASE

06/06-11/02                    21

those items could not be purchased in Faisalabad. ███ asked how to pay for things bought on the Internet. ███ explained that one would need a credit card to buy anything. ███ asked if the credit cards could be traced to identify the owner. ███ told ███ that they could and ███ seemed less interested in buying anything on line.

The speed of the computer was relatively slow. To speed the computer's performance, ███ deleted and moved files to make more space in the memory. Everyone in the house was to use the hard drive loaded with Windows 98. While inspecting the computer, ███ became curious and searched the other hard drives. In one file, he found documents on fighting in Kashmir and graphic photos of people killed in the fighting. ███ also found many video clips and images on self-defense and martial arts. The clips showed a person demonstrating different fighting techniques.

███ showed the guests at the house how to search for different news related web sites. ███ also brought a CD-ROM that contained news footage of the September 11th attacks. This version was different that the one ███ had seen previously in Lahore. One site that ███ showed everyone was the ASHAKH AL-AWSSAT (phonetic) site, a Middle Eastern news agency. Many members of the house,

including ███ and ███ were crowded around the computer reading an article about UBL and Al-Qaeda. The article also described a man by the name of ███ The article detailed many areas of ███ life that people of the house had heard many times previously from ███ ███ noticed that many people were joking with ███ and kidding him and ███ knew then that ███ was ███ ███ also knew ███ as ███

███ TRIP INTO FAISALABAD

In March 2002, ███ gave ███ a list of items to purchase in downtown Faisalabad. The list contained five pages of electrical equipment and devices. ███ wanted to go into town because that meant that he would be able to use a telephone in town to contact his family, as he was unable to call from the house. ███ was to go into town with ███ the Pakistani, ███ and ███ to buy the electrical items and to purchase general items for the house such as food. ███ gave ███ $1000 US dollars to buy the

JA001653

UNCLASSIFIED//FOR PUBLIC RELEASE

06/06-11/02        22

electronic equipment. ▓▓▓▓▓ was to give the US dollars to ▓▓▓▓▓ the Pakistani while in town to exchange for Pakistani rupees. ▓▓▓▓▓ also gave ▓▓▓▓▓ and additional $100 US dollars for computer software, manuals and food or coffee for the house. ▓▓▓▓▓ left the house around four p.m., with the other three, in a red car driven by ▓▓▓▓▓ the Pakistani.

Their first stop was a bank in Faisalabad where they exchanged their US currency for rupees. ▓▓▓▓▓ the Pakistani then drove everyone to a street that was lined with markets. ▓▓▓▓▓ was unable to identify the street or the section of town as he had not been outside of the house. ▓▓▓▓▓ led ▓▓▓▓▓ and the others to an electronics store located on the side of the street. ▓▓▓▓▓ noted that the list was five pages long, detailed and carefully written in English. ▓▓▓▓▓ suspected that he was selected to buy these items by ▓▓▓▓▓ because he ▓▓▓▓▓ spoke English better than anyone at the house and he ▓▓▓▓▓ had a background in computers and electronics. ▓▓▓▓▓ recalled some of the items on the list that he purchased:

JA001654

UNCLASSIFIED//FOR PUBLIC RELEASE

06/06-11/02          23

JA001655

06/06-11/02    24

█████ used the additional $100 in Rupees to buy computer software. He purchased movies (DVDs), Microsoft Windows programs and hacker tools. These items could be purchased for less than $100 in Pakistan because the programs were copies or "knock-offs" of the original software. █████ had to buy the hacker software to hack into other computers to obtain registration information (serial numbers from authentic software) for his programs to run. Once the registration information for a certain program was obtained, █████ would enter it into his computer to get the programs on his machine to run. █████ spent all the money that █████ had given him. █████ gave some of the money to the others to purchase food and clothing in addition to the electronics and the software. █████ made two trips into FAISALABAD to find as many items on the list as he could. One trip was made on the late afternoon and a second trip was made the following day. █████ asked █████ what all these items were to be used for and █████ replied the items were for █████ and █████ the Saudi to train on and build remote controls at the guesthouse. After the second trip, █████ was angry that everyone had gone into town a second time. █████ was tense and concerned that attention would be drawn to the guesthouse. █████ was frequently upset at being at the guesthouse. He complained that the house was not safe and was often tense that the authorities would come to arrest him. █████ heard him on the cell phone one time, yelling, "These people are burnt. This house is not safe and we must leave!"

█████ knew that the house members were very secretive and were up to something, particularly █████ █████ the Saudi. He knew that they worked with electronics but never knew what they did upstairs. █████ was told not to go upstairs by █████ The reason given was not to keep him away from the rooms with the electronics but to avoid being seen through the windows by anyone outside. When asked if he █████ was mad because the others could go upstairs but he could not, █████ replied that he was not upset because he did everything

JA001656

06/06-11/02      25

downstairs, and he did not want to be arrested, so he avoided the
second floor out of caution.

## RAID OF THE FAISALABAD GUESTHOUSE

On March 27-28, 2002,      woke up that morning around
eleven a.m. and gave a brief lesson on the computer from one to two
p.m. In the evening,      wrote to his mother on      Instant Messenger

from about thirty minutes after eleven p.m.  His mother
asked how he was, if he had any health problems and offered help
in getting him home.  When he finished,      went back to sleep.

was woken up by activity in the house.  He had heard
loud banging outside and voices and movement inside.      walked
to the hallway and saw ANAS.  ANAS told      that the police had
surrounded the house and everyone would be arrested.      responded
that they were all trying to go home and that they had done nothing
wrong, so why would they be arrested?  ANAS replied that they all
had "bad" papers and they had to flee.  If anyone were outside,
they would be shot.      then went to the second floor then to the
rooftop of the guesthouse.  Once on the roof,      walked to the

ledge and jumped across to an adjoining building and hid in a corner
near a water tower on the rooftop.  Also on the rooftop were
ANAS,

could see ANAS as he was hiding.  A Pakistani policeman
came to the roof and approached ANAS.  ANAS yelled at the policeman
for speaking Urdu.  ANAS told the policeman that "we speak English
here - not Urdu".  ANAS also accused the policeman of not being a
true Muslim.      also yelled at the police.  The
policeman responded that "they" (the police) were all Muslims and
ANAS and the others would have no problems and would not be harmed,
but that they were still under arrest.  ANAS objected and accused
the policeman of wanting to arrest them just so they (the police)
could turn everyone over to the Americans.  As the policeman turned
away from ANAS,      could see that ANAS had a kitchen knife and
was moving toward the policeman with the knife in the air.
did not want the policeman to be harmed, so he ran towards the
policeman and ANAS.  ANAS was temporarily distracted and the policeman
saw      approach.  Satisfied that ANAS would not stab the policeman,
then turned to run back toward his hiding place.  As he turned,

JA001657

06/06-11/02      26

████████ was shot in the stomach and his right hand and fell.
████ heard several other shots being fired when he was on the ground.
A policeman approached ████ and shot him in the upper right leg
and checked his hands for any weapons. ████ was taken downstairs
to an ambulance that was parked outside of the guesthouse.  ANAS
was lying near ████ and he ████ could tell that ANAS was dead.
████ saw people near the ambulance that he thought were Americans.
They spoke English and did not look like Pakistanis.

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001658

UNCLASSIFIED//FOR PUBLIC RELEASE

27



## ██████ LATER LEARNS MORE OF GUESTS AT FAISALABAD HOUSE

While in jail, ██████ provided more detail about their former housemates.

██████ – 20-30 years old, Algerian. ██████ was an electronics instructor in Afghanistan. ██████ told ██████ that this type of training, along with explosives training, was conducted at camps that were located near the airport in Afghanistan. ██████ was missing three or four fingers on one of his hands. ██████ could not remember but ██████ may have only had his thumb remaining on one hand. He had "hurt" his hand while in Afghanistan. ██████ thought that an explosion might have taken ██████ fingers. He concluded this because ██████ was an electrical and explosives trainer in Afghanistan and because of the way the fingers were removed from his hand. ██████ hand bothered him at times and he wanted to see a doctor about having his hand fixed, but ██████ wanted to conclude his training first.

██████ – 20-22 years old, Syrian. ██████ said that ██████ said very little and often appeared to be deep in thought. ██████ said that ██████ had many things in his bag that could get ██████ in very serious trouble. ██████ was very upset that ██████ had been shot and was concerned that he might die. ██████ thought they were friends based on ██████ reaction. ██████ did not know if ██████ knew anything about explosives, but ██████ knew that ██████ was in charge of security. ██████ instructed the houseguests to

JA001659

UNCLASSIFIED//FOR PUBLIC RELEASE

06/06-11/02    28

be cautious in what they said and asked in discussions. He also taught people how to travel without drawing attention and how to operate discretely. ▮ did not have a good relationship with ▮ because ▮ once made fun of ▮ for having thinning hair on his head. ▮ became angry and generally avoided ▮ ▮ shared a room with ▮.

▮ 40 years old, Sudanese. ▮ was in Afghanistan for eleven years. ANAS told ▮ that the Americans were well aware of ▮ history since he had been in Afghanistan for such a long time. ▮ boss was ▮ who worked at the ▮ camp, ▮ had heard that this was ▮ camp and people were sent there by ▮ for training. ▮ was an artillery and mortar instructor in Afghanistan. ▮ would listen to religious tapes often at the house. He was older and wanted to return to Sudan to retire.

ABDUL AL-RAZZAQ, 26 years old, Algerian. No one knew much of AL-RAZZAQ, he was thought to have been a low-level, front line fighter or new to Afghanistan.

▮ late 20s/early 30s, Pakistani. ▮ was released from prison the day after the raids. Everybody was suspicious as to why he was released so quickly and word spread that ▮ may have been an ISI agent that revealed the location of the guesthouse to the authorities.

▮ 26-27 years old, Saudi Arabian, married for 3 years. ▮ described ▮ as "100% peasant". ▮ described ▮ as being from the country and that he was very stubborn. ▮ was a mujahedin and spent time in Afghanistan. He had only received training on Kalishnikov rifles and wanted to attend a training camp, but the camps were closed before he could enter training. ▮ had attended electrical classes in Saudi Arabia and worked as an electrician afterwards. ▮ was training ▮ on electronics while at the house. He had hoped to get back to Afghanistan to receive more training. ▮ had described UBL as a great man.

▮ 28-29 years old, Palestinian. ▮ was an intelligence representative, or spy, for Al-Qaeda and worked very closely with ▮ ▮ function was to find spies or plants in Afghanistan. He used forceful interview techniques that could

JA001660

nclude yelling and slapping someone in order to gain information.
███ had asked ███ for his real name. ███ thought that
is going to examine ███ background to make sure that he could
a trusted and would not compromise operations. ███ had told
hat Al-Qaeda had a complete file on everyone coming into, and leaving,
fghanistan. ███ maintained all files. ███ often visited
███ room and would read there. ███ thought that ███ knew
omputers very well. ███ was asked if being an Alawi Muslim would
raw attention. ███ replied that it would have been bad if that
ad been discovered. However, ███ had lived in Saudi Arabia for
. long time and knew quite a bit about Sunni Muslims and the Salafi
ect. He could answer questions about the religion and felt he could
lend in without a problem.

███ 40 years old, Algerian with Libyan nationality.
███ described ███ as very strong. He had a large scar on
his leg and had nineteen pins placed in his leg to repair an injury.
He was the only one strong enough to lift ███ after he ███ was
injured. Otherwise, it took several people to lift ███ ███
was the only person that could do it alone. ███ was an Algerian,
but also told people that he had Libyan citizenship and French
citizenship; no one was sure which was true. ███ was a thief
who had spent time in jail in Germany, Italy and Nigeria. He became
committed to Islam while in prison in Germany. ███ had many
passports that he used to travel but he never mentioned where he
obtained them. As everyone in jail was in near panic as to what
to say or what would happen, ███ described ███ as very cool
and calm, likely because he was used to being in prison. ███
complained about the food in the prison and would yell at the guards
to send him to prison in Germany or Italy where the food was better.
While at the house, ███ told everyone to generally avoid
███ because he had a temper and was always angry. ███
was in Afghanistan for months and when questioned by the Pakistanis
why he was there, he would reply with sarcasm that he was there
"fishing". He warned his cellmates to provide as little information
as possible to the police. For example, when asked "where are you
were from?", only reply with that answer; do not volunteer any more
information than was necessary. ███ also cautioned that their
conversations in the cell could be monitored and he told his cellmates
to be careful with what was said. ███ wanted to return to Germany.
He spoke Arabic, Italian, German, and French.

███ 28 years old, Saudi. ███ had two relatives

JA001661

06/06-11/02    30

captured with ████████████████    There was a group of as many
as two hundred Arabs arrested in the group with ███████.
two relatives were taken to Cuba. █████ once asked █████ about
his electronic equipment. ██████ denied that the equipment was
his.  He was very evasive when asked questions. █████ did say
that █████████ had contacted █████ at the house. █████
had contacted █████ to have █████ and █████ prepare to
travel to Karachi. █████ and █████ were both trained in
electronics in Afghanistan.  They were going somewhere, but were
expected to return to the house. █████████████

███████ Pakistani.  Was captured with twenty or more Pakistanis.
█████ believed that all, to include █████ were released from prison
shortly after the raids.

█████████████████ did not hear any information about TALHA in
prison.

██████████████████ did not hear any information about
█████████ in prison.

█████ – Everyone in prison was concerned because █████ had been
shot. █████ told █████ that █████ sent people to █████
was an important man.  He had studied in Saudi Arabia and India and
traveled to Sweden.  His wife is Swedish. █████ described █████
as the most cautious man in Pakistan prior to his capture. █████
told █████ that UBL was in charge of Al-Qaeda, followed by █████
and then █████ Al-Qaeda's #3 guy, then ████████████. █████ never
heard of the name █████████

PHOTOS

█████ was shown several photos with the following results:

JA001662

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

06/06-11/02        31

███████████████████████████ recalled ██████ from the ██████ and
FAISALABAD guesthouses as a close friend of ███████. ██████ knew him
only as ██████ and that he had short hair and a moustache while staying
at the guesthouses.

████████████████████████████████████████████████████████████

ABDALLAH AL-MUJAHIR – Positive. AL-MUHAJIR is also known to
investigators as JOSE PADILLA and ABDALLAH AL-VENEZUELI.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

ANAS – Positive. Known to investigators as "Dr." ANAS.

ABDUL RAZAK – Positive. Known to investigators as same.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 57

JA001664

SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

Petitioner,

v.

BARACK OBAMA, *et al.*,

Respondents.

Civil Action No. 10-CV-1020 (RJL)

## ISN 685 FM40 (December 13, 2004)

SECRET//NOFORN

JA001665

SECRET//NOFORN

## CRIMINAL INVESTIGATION TASK FORCE (CITF)
## REPORT OF INVESTIGATIVE ACTIVITY

| 1. DATE OF INVESTIGATIVE ACTIVITY | 2. PLACE | 3. ACTIVITY NUMBER |
|---|---|---|
| 13 Dec 04 | Camp Delta - ▅▅ Guantanamo Bay, Cuba | 62713043491444 |

**4. REMARKS**

Subject Interview of: (UNK) ABDUL AL RIZAK

Date/Place: 13 Dec 04/Camp Delta - ▅▅Guantanamo Bay, Cuba

(U//FOUO) On 13 Dec 04, SA ▅▅▅▅▅▅▅ Criminal Investigation Task Force (CITF), Guantanamo Bay, Cuba (GTMO), interviewed ABDUL AL RIZAK, ISN# US9LY-00685DP, at Camp Delta, GTMO. ▅▅▅▅▅ provided Arabic/English language translation. The purpose of the interview was to complete a request for assistance (RFA) from CITF-Belvoir, Fort Belvoir, VA. The RFA requested that AL RIZAK be interview in regards to the safe house he was captured in and its occupants.

SA ▅▅▅▅ provided AL RIZAK with some "ambesol" to put on his tooth as discussed in their previous interview. AL RIZAK remained cooperative throughout the interview.

AL RIZAK provided the following names of people as being at the same house in Faisalabad:

   ABDULLAH HUSSEIN - Was at the house for less than one week and captured with AL RIZAK (ISN US9AG-00703DP, see identifications below)
   SHAFIQ - Was in house for about 10 days and captured with AL RIZAK (ISN US9AG-00694DP, see identifications below)
   SAMIR - Was at the house when AL RIZAK arrived and was captured with AL RIZAK (US9SU-00707DP, see identifications below)
   KHALID AL-SORI - Was at the house when AL RIZAK arrived and was captured with AL RIZAK
   SALAH - Was at the house when AL RIZAK arrived and was captured with AL RIZAK
   NOOR - Was at the house when AL RIZAK arrived and was captured with AL RIZAK
   JABRAN - Was at the house when AL RIZAK arrived and was captured with AL RIZAK (US9SA-00696DP, see identifications below)
   GHASSAN - Was at the house for less than one week and was captured with AL RIZAK (US9SA-00682DP, see identifications below)
   KHALID AL PAKISTANI - Owner of the house and was captured with AL RIZAK
   ANUS - Was at the house when AL RIZAK arrived and was killed during Pakistani Raid
   DAOOD (ABU ZUBAYDAH) - Arrived at house about 1 week after AL RIZAK and was captured with AL RIZAK

AL RIZAK was at the house in Faisalabad, Pakistan for about 18 days before being captured by Pakistani forces. AL RIZAK described the house as two stories. The first floor consisted of 4 bedrooms, a kitchen, a large common room (living room) and a prayer room; each bedroom had its own bathroom. The first floor ceiling opened to the second floor and roof, similar to some hotel lobbies.

AL RIZAK spent most of his time in the prayer room or the garden outside. AL RIZAK slept in the prayer room, sometimes in the living room and about 2-3 nights in SAMIR's room. SAMIR and SALAH shared a room most of the time, but sometimes SALAH stayed in a different room alone. SALAH had a room next to the kitchen and he would lock it behind himself, so AL RIZAK did not know what was in it. When AL RIZAK slept in the prayer room or living

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE CITF AND IS LOANED TO YOUR AGENCY. THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.

PAGE 1 OF 3 PAGES

SECRET//NOFORN

JA001666

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

**4. REMARKS (Continued)**

room he would use the restroom in SAMIR's room. AL RIZAK said no one actually shared a room they would just sleep where ever they wanted. KHALID slept in the garden area and sometimes the prayer room

AL RIZAK explained the second floor consisted of four rooms, however, AL RIZAK only saw the second floor from below through the open ceiling. The corner room of the second floor was where ANUS stayed alone. There was at least one room upstairs that was locked and AL RIZAK thinks there may have been two. At some point while AL RIZAK was there two men showed up and stayed one night in the fourth room of the second floor. Later KHALID told AL RIZAK these two were AHMED (NFI) and his friend (NFI).

When asked if there was a computer in the house AL RIZAK replied that some rooms in the house were locked and KHALID would not let them in, but he did not see one.

AL RIZAK said there were not actual lessons or classes going on in the house, but in the prayer room was a book about Islam that ANUS would explain to others. AL RIZAK also said the house contained a black board with the Arabic alphabet printed around the edge. The black board was used to help people learn English letters. Someone would point to a letter and allow others to translate into English. ANUS also had a book with Arabic/English translations, similar to a dictionary. ANUS was a doctor of medicine and schooled in Syria. GHASSAN knew English also. AL RIZAK said that if anyone needed help with English letters or words they would ask ANUS or GHASSAN, but mostly ANUS. GHASSAN acted as an interpreter to the guards while they were in Islamabad prison. SALEH also spoke English.

AL RIZAK said the reason he was at the house in Faisalabad was because he was staying at another house with some Pakistanis, one named ABDUL RAHMAN (NFI), waiting to study Islam, but they did not speak Arabic and communication was difficult so they moved him to the house he was captured in. AL RIZAK did not know where this house was located, but said it was about a two hour drive for the house in Faisalabad.

AL RIZAK denied any knowledge of activities within the house he stayed. He did not see explosives or chemicals in the house.

AL RIZAK was shown a photographic line up of detainees and identified the following detainees as being captured in a second house in Faisalabad, Pakistan. This house was raided at the same time as the house he was captured in. AL RIZAK said the owner of the second house was JABRAN AL-PAKISTANI (NFI). AL RIZAK met all of these detainees in the Islamabad prison.

1.   US9YM-00679DP - MOHAMMED TAHAR, Yemeni; memorized the Koran in Yemen and came to Pakistan to study and learn Islam.
2.   US9YM00680DP - IMAD AL-ADENI, Yemeni; Also memorized the Koran in Yemen and came to Pakistan to study and learn Islam.
3.   US9YM-00681DP - MOHAMMED AL-ODAINI, Yemeni; Also memorized the Koran in Yemen and came to Pakistan to study and learn Islam.
4.   US9YM-0683DP - FIADH, Yemeni; Also memorized the Koran in Yemen and came to Pakistan to study and learn Islam.
5.   US9ZZ-00684DP - MOHAMMED ABDULLAH; Palestinian; member of Jamat Tabligh (JT). AL RIZAK said Tabligh meant calling similar to Christian missionaries and the JT had a meeting in Pakistan every year.
6.   US9YM-00686DP - ABDUL HAKIM, Yemeni; Also memorized the Koran in Yemen and came to Pakistan to study and learn Islam.
7.   US9SA-00687DP - ABDUL AZIZ AL-TAIFI, Saudi; AL RIZAK was not sure why AL-ODAINI was in Pakistan.
8.   US9YM-00688DP - FAHMI, Yemeni; Identified him as a trouble maker, who used drugs and alcohol. FAHMI said he was a business man who sold fabrics.

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE CITF AND IS LOANED TO YOUR AGENCY. THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.

**PAGE  2  OF  3  PAGES**

SECRET//NOFORN

JA001667

SECRET//NOFORN

**4. REMARKS (Continued)**

9.  US9YM-00889DP - MOHAMMED SALLAM, Yemeni; Also memorized the Koran in Yemen and came to Pakistan to study and learn Islam.

10. US9YM-00890DP - AHMED, Yemeni; Identified him as a trouble maker, who used drugs and alcohol. AL RIZAK did not know why he was in Pakistan, but said that AHMED did not follow Islam.

11. US9YM-00891DP - MOHAMMED ALI, Yemeni; Also a member of JT.

12. US9YM-00892DP - ALAI, Yemeni; Also memorized the Koran in Yemen and came to Pakistan to study and learn Islam.

13. US9YM-00893DP - ALI ABDULLAH SALEH, Yemeni; Also memorized the Koran in Yemen and came to Pakistan to study and learn Islam.

14. US9LY-00895DP - ABU OMAR AL-LIBI, Libyan; AL RIZAK did not know why he was in Pakistan, but said that AL-LIBI was missing one of his legs and has a prosthetic leg. AL-LIBI told AL RIZAK he lost his leg when he was a child in Libya during the Italian occupation mines were laid and AL-LIBI stepped on one while tending his animals.

15. US9RA-00702DP - SAID, Russian; stayed in same cell with AL RIZAK in Islamabad, but SAID does not speak Arabic so AL RIZAK did not know anything about him.

16. US9LY-00728DP - JAMIL, Yemeni; AL RIZAK did not know why he was in Pakistan and said he has not seen him since Islamabad.

AL RIZAK also identified the following detainees from the photographic line up:

17. US9SA-00215DP - FAHAD, Saudi; they met on ███████ Camp Delta, GTMO. FAHAD was captured near eastern Pakistan, maybe Peshawar.

18. US9KU-00217DP - Could not identify the photograph.

19. US9PK-00302DP - Could not identify the photograph.

20. US9SA-00682DP - GHASSAN, Saudi; was captured in house with AL RIZAK. GHASSAN was traveling to Saudi Arabia.

21. US9AG-00694DP - SHAFIQ, Algerian; was in same house as AL RIZAK traveling to an unknown location. Shafiq had a missing thumb and told AL RIZAK that it happened during a vehicle accident.

22. US9SA-00696DP - JABRAN, Saudi; was in same house as AL RIZAK and traveling to Saudi Arabia. They did not talk much.

23. US9AG-00703DP - ABDULLAH HUSSEIN, Algerian; was in same house as AL RIZAK and traveling to Europe. AL RIZAK would mostly see him in his room listening to a same radio and sometimes outside kicking a ball around.

24. US9SA-00707DP - SAMIR, Sudani; was in same house as AL RIZAK and waiting to travel.

DERIVED FROM: DoDD 5119.09;
Declassify on 20291213

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF OHT. IT IS THE PROPERTY OF THE OHT AND IS LOANED TO YOUR AGENCY. THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.

PAGE 3 OF 3 PAGES

SECRET//NOFORN

# Exhibit 59

JA001669

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

    Petitioner,

        v.

BARACK OBAMA, *et al.*,

    Respondents.

Civil Action No. 10-CV-1020 (RJL)

# ISN 696 FM40 (August 8, 2002)

SECRET//NOFORN

JA001670

UNCLASSIFIED//FOR PUBLIC RELEASE

## CRIMINAL INVESTIGATION TASK FORCE (CITF)
## REPORT OF INVESTIGATIVE ACTIVITY

| 1. DATE OF INVESTIGATIVE ACTIVITY | 2. PLACE | 3. ACTIVITY NUMBER |
|---|---|---|
| 08 Aug 02 | GTMO, Cuba | 00005042641309 |

**4. REMARKS**

Subject Interview of: (UNK) JABRAN SAAD WAZAR HATIB

Date/Place: 08 Aug 02/GTMO, Cuba

On 8/8/02 JABRAN SA'ID WAZAR AL-QAHTANI, ISN US9SB-0696DP aka HATEB aka 'SALIM EL FARISI was interviewed in Guantanamo Bay, Cuba by Special Agent ████████████ of the Criminal Investigation Command (CID). Also present for the interview was contract linguist ████████████ The interview was conducted partially in Arabic and English with the Arabic portions being appropriately translated. All words herein are spelled phonetically. After being advised of the nature of the interview and the identity of the interviewing agents, AL QAHTANI provided the following information:

AL-QAHTANI was presented with the ████████ photographic book dated ████████ to provide additional details on the individuals he recognized during his previous interview of 5 Aug 02. Regarding photograph ████████ known to AL-QAHTANI as DAUD (Indexed as: ). AL-QAHTANI said he first met DAUD in Lahore during about mid November 200 1. The meeting between AL-QAHTANI and DAUD was brief and they discussed the construction and manufacture of electronic bomb detonators. The second time AL-QAHTANI met DAUD was in Faisalabad at the residence from which they were both detained. At the beginning of the stay at the Arab occupied residence, DOUD asked AL-QAHTANI to contact supporters to solicit money. ALQAHTANI said he called ALI 'ASIRI and MAJED AL-QAHTANI, both of Riyhad and requested $1,000,000.00. Each of the individuals refused to provide any money. ALI 'ASIRI is an administrator for the National Guard, but AL-QAHTANI did not know if ALI 'ASIRI was actually a soldier or a civilian working for the National Guard. ALI 'ASIRI graduated from some sort of administrative institute in Riyhad. AL-QAHTANI was unable to provide any additional information on MAJED AL-QAHTANI. DAUD never asked AL-QAHTANI for any personal monetary contributions and AL-QAHTANI was financially unable to make any significant contributions. ALQAHTANI said he did not know what the monetary contributions would have been used for. AL-QAHTANI strongly opined that DAUD was a very good Palastinian man who strived to teach and help the Palestinian people.

The next photograph AL-QAHTANI recognized was number ████████ known to AL-QAHTANI as OMAR ALLIBI (Indexed as: ). AL-QAHTANI said OMAR ALLIBI was captured from the residence in Faisalabad and the two of them were detained beside one another in the Islamabad Prison. AL-QAHTANI said OMAR ALLIBI was from Libya and opposed the KHADAFI regime. AL-QAHTANI also said OMAR ALLIBI lost one of his legs in a land mine in Libya.

The third photograph AL-QAHTANI recognized was that of ████████ known to AL-QAHTANI as MUHOMMAD SALAM (indexed as: ). AL QAHTANI said MUHOMMAD SALAM and OMAR ALLIBI knew each other and were both taken from the Faisalabad residence. MUHOMMAD SALAM and OMAR ALLIBI spent much of their detention time reading from the Koran. MUHOMMAD SALAM was a student from Yemen, although AL-QAHTANI did not know what he studied.

The fourth photograph AL-QAHTANI recognized was that of ████████ known to AL-QAHTANI as JAMIL (indexed as: ). AL-QAHTANI indicated JAMIL came to the Faisalabad residence, stayed for one day and departed. AL-QAHTANI did not know where JAMIL came from, where he went, nor could he provide any further identifying information on JAMIL.

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE CITF AND IS LOANED TO YOUR AGENCY. THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.

| PAGE 1 | OF 3 | PAGES |
|---|---|---|

FOUO//LES

JA001671

UNCLASSIFIED//FOR PUBLIC RELEASE

**4. REMARKS (Continued)**

AL-QAHTANI said he heard JAMIL was from Yemen, however, AL-QAHTANI never spoke with him.

The fifth photograph AL-QAHTANI recognized was that of ████████ known to AL-QAHTANI as ABDUL RAZZAQ (indexed as: ). AL-QAHTANI recalled ABDUL RAZZAQ was Libyan and the first time they met was in Lahore, and they were both staying at the residence in Faisalabad when they were detained. AL-QAHTANI did not provide any further significant information regarding ABDUL RAZZAQ.

The sixth photograph AL-QAHTANI recognized was that of ████████ known to AL-QAHTANI as KHALED (indexed as: ). AL-QAHTANI said KHALED was Palestinian. AL-QHATANI did not provide any further information regarding KHALED.

The seventh photograph AL-QAHTANI recognized was that of ████████ known to AL-QAHTANI as NUR AL DIN (indexed as: ). AL-QHATANI said NUR AL DIN was Palestinian and had a bad temper in that he would often become outraged and yell about daily occurrences within the Arab house in Faisalabad.

The eighth photograph AL-QAHTANI recognized was that of ████████ known to AL-QAHTANI as SAMIR (indexed as: ). AL-QAHTANI said SAMIR was from Sudan and did not provide any further information regarding SAMIR.

The ninth photograph AL-QAHTANI recognized was that of ████████ known to AL-QAHTANI as ABDUL AZZIZ (indexed as: ). AL-QAHTANI said he spent three days in a Lahore prison with ABDUL AZZIZ and that ABDUL AZZIZ was captured from a house in Faisalabad, not the same one from which AL-QAHTANI was captured. AL-QAHTANI would not provide any further information regarding ABDUL AZZIZ.

The tenth photograph AL-QAHTANI recognized was that of ████████ known to AL-QAHTANI as KHALED (indexed as: ). AL-QAHTANI said KHALED, from Pakistan, was a permanent resident of the Arab house in Faisalabad, but KHALED did not speak Arabic. KHALED'S job was shopping and daily household details at the house. AL-QAHTANI would not provide any further information regarding KHALED.

The eleventh photograph AL-QAHTANI recognized was that of ████████ known to AL-QAHTANI as HASSAN (indexed as: ). AL-QAHTANI indicated HASSAN, from Jeddah, Saudi Arabia, was some sort of Engineer who attended college at a University in Arizona. AL-QAHTANI said he and HASSAN spoke briefly about details of their respective fathers. AL-QAHTANI would not provide any further information regarding HASSAN.

The twelfth photograph AL-QAHTANI recognized was that of ████████ known to AL-QAHTANI as ABDUELLAH (indexed as: ). AL-QAHTANI indicated he met ABDUELLAH at the Arab house in Faisalabad. ABDUELLAH was Algerian and married with four children. AL-QAHTANI said ABDUELLAH had been at the house for about ten days and was attempting to return to return to Algeria. AL-QAHTANI did not know how or with whom ABDUELLAH was traveling.

The thirteenth photograph AL-QAHTANI recognized was that of ████████ known to AL-QAHTANI as SHAFIQ (indexed as: ). AL-QAHTANI said SAFIQ, who had a deformed hand, was one of the trainers from the training camp in Faisalabad. SHAFIQ taught how to weld and fix electronic bombs. AL-QAHTANI refused to provide any additional significant information regarding SHAFIQ.

The last photograph AL-QAHTANI recognized was that of ████████ known to ALQAHTANI as JUBRON (indexed as: ). AL-QHATANI indicated JUBRON was from Pakistan and was the cook at the Arab house in Faisalabad. AL-QAHTANI did not provide any further information regarding JUBRON.

~~THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE CITF AND IS LOANED TO YOUR AGENCY, THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.~~

| PAGE 2 | OF 3 | PAGES |
|---|---|---|

~~FOUO/LES~~

**4. REMARKS (Continued)**

AL-QAHTANI said that during his stay at the Arab house in Faisalabad, he studied his electronics books and prepared two briefs, handwritten in Arabic. One of the briefs was on basic electronics and electronic equipment to be used to train others. The other brief was written as a reference manual for himself on electrical sources and how to

build complete electronic circuits. AL-QAHTANI said his electronic academic books and both the briefs were seized when he was captured. AL-QAHTANI said he was very anti-social and spent his days in Faisalabad concentrating on his electrical studies,
intentionally avoiding socialization with others.

Regarding the meeting AL-QAHTANI had with ABU ABDALLAH, whom he met at the coffee shop in Riyadh. AL-QAHTANI said he observed ABU ABDALLAH writing about the Jihad, then approached and told ABU ABDALLAH he wanted to Afghanistan to help his Muslim brothers. AL-QAHTANI said he and ABU ABDALLAH met three times, then ABU ABDALLAH gave him the cellular phone number to SALAH, who would provide further instructions. When AL-QAHTANI traveled to Mashhad, he contacted SALAH who instructed him to go to a guesthouse and await further instructions. After two days, SALAH met AL-QAHTANI and gave him further travel instructions that eventually led AL-QAHTANI to the Arab house in Faisalabad. AL-QAHTANI said his wife and family was unaware of his intentions to travel to Afghanistan for the Jihad. AL-QAHTANI felt his family members would have attempted to stop him from participating. AL-QAHTANI did not believe any of his brothers became involved in the Jihad.

Regarding ABU HUDAIFAH and ABU GHURAIRAH, the two trainers from the training camp north of Kabul, AL-QAHTANI did not know their full names, where they came from, or whether or not they have been captured. AL-QAHTANI said he learned of that training camp when ABU HUDAIFAH came to his guesthouse and recruited people to attend the camp.

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE CITF AND IS LOANED TO YOUR AGENCY. THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.

| PAGE 3 | OF 3 | PAGES |

FOUO/LES

JA001673

# Exhibit 64

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ABDAL RAZAK ALI (ISN 685),

    Petitioner,

         v.

BARACK OBAMA, *et al.*,

    Respondents.

Civil Action No. 10-CV-1020 (RJL)

# ISN 703 FM40 (July 29, 2004)

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## CRIMINAL INVESTIGATIVE TASK FORCE (CITF)
## REPORT OF INVESTIGATIVE ACTIVITY

| 1. DATE OF INVESTIGATIVE ACTIVITY | 2. PLACE | 3. ACTIVITY NUMBER |
|---|---|---|
| 29 Jul 04 | Camp Delta - ████ Guantanamo Bay, Cuba | 68548042121105 |

**4. REMARKS**

Subject Interview of: (UNK) ABDALLAH HUSSEINI

Date/Place: 29 Jul 04/Camp Delta - █████ Guantanamo Bay, Cuba

(S//NF) On 29 Jul 04, SA █████████ U.S. Army Criminal Investigation Command (USACIDC), interviewed Ahmed bin Kaddour LABED, ISN US6AG-00703DP, at Camp Delta, Guantanamo Bay, Cuba. ██████████ Linguist, provided Arabic/English language translation.

LABED was questioned regarding information obtained from Umar KRAIMISH, (AKA: Nur ud din Ahmed, AKA: Abu Kamil el-Suri, AKA: Younis Ettaberi, AKA: Saleh), detailing the experimentation of the effects of rat poison on rabbits, while at the Faisalabad, Pakistan safe house owned by Abu ZUBAYDAH. KRAIMISH related Abu ZUBAYDAH conducted an experiment, in front of the residents of the safe house, in which he mixed rat poison in water and subsequently spread the mixture onto the rabbit. KRAIMISH related the experiment was unsuccessful; therefore, an Algerian resident of the safe house named "Abdallah," attempted the experiment a second time, with negative results. (Agent's comment: Based upon previous interviews with LABED, he was the only Algerian using the name "Abdallah" which resided in the safe house.) LABED related the only animals he witnessed in the safe house were cats that entered the residence at night and ate in the kitchen. LABED denied seeing any rabbits at the residence and subsequently denied seeing any experimentation of rat poison on rabbits. LABED stated this was the first time he had heard of this information and requested interrogators ask all the residents of the safe house if rabbits were in the area. LABED could not understand the reason KRAIMISH would provide this information, as LABED had taken care of KRAIMISH in the Pakistani prison after their capture and did not feel it was right for KRAIMISH to lie about him. Despite continuous questioning, LABED consistently denied having any knowledge of poison experiments being conducted inside the safe house.

LABED was questioned regarding Abdelrazak ali ABDELRAHMAN, ISN US9LY-00685DP. LABED related ABDELRAHMAN was already at the safe house when he arrived. LABED stated ABDELRAHMAN was clean-shaven, as were all residents of the house. LABED related he witnessed ABDELRAHMAN receiving English language classes being given by Ghassan Abdallah Ghazi AL-SHARBI, ISN US9SA-00682DP. LABED stated he spoke briefly with ABDELRAHMAN; however, due to LABED not being trusted by most members of the residence, he did not know ABDELRAHMAN on a personal basis. LABED related he felt ABDELRAHMAN was from the border region of Libya and Algeria, due to his dialect.

LABED was afforded the opportunity to view the still photos from the unclassified video of the wedding of Sa'id BAHAJI, a suspected Al Qaeda member and facilitator of the 11 Sep 01 attacks. (Agent's comment: This was the second time LABED has viewed the photographs. The purpose of this opportunity was to provide LABED with various pictures of Ramzi bin AL-SHIBH, a known Al Qaeda member. In previous interviews LABED had been unable to identify AL-SHIBH from his time at the Al Quds Mosque, Hamburg, Germany.) After viewing the photographs, LABED denied knowing AL-SHIBH, relating he did not attend Al Quds on a regular basis. LABED inquired as to the date of the wedding, stating he only began visiting Al Quds in 2000. LABED stated in Nov 99, he began praying at the Al-Nur Mosque and the first time he visited the Al-Quds Mosque was sometime in 2000. (Agent's comment: The wedding of BAHAJI has been reported as taking place in Oct 99.) Further, LABED was shown, for the second time, the wedding still photos which depict an unknown male believed to be LABED. LABED continued to deny the individual in the picture was himself. LABED related the individual in the picture was shorter than BAHAJI, and he (LABED) was taller

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE CITF AND IS LOANED TO YOUR AGENCY; THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.

SECRET//NOFORN

JA001676

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

**4. REMARKS (Continued)**
than BAHAJI.

LABED was shown a computer-generated map of Hamburg, GM, detailing the location of ███████████████
Hamburg, GM. (Agent's comment: ███████████ was the former residence of BAHAJI and several other known
Al-Qaeda members.) LABED spent several minutes studying the map and subsequently related ███████████ was
actually in Harbourg, GM, approximately 15 minutes away from Hamburg, GM. LABED stated he was vaguely
familiar with the area; however, he never visited the home of BAHAJI.

During the course of the interview, LABED was given a break and allowed time to look at a boxing magazine and
soccer news. At the conclusion of the interview, LABED offered his apologizes for his demeanor the previous week,
as he had been notified of his father's death.

DERIVED FROM: DODD 5115.09;
Declassify on 20290729

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF GM. IT IS THE PROPERTY OF THE
GM AND IS LOANED TO YOUR AGENCY; THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.

PAGE 2 OF 2 PAGES

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 65

JA001678

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

Petitioner,

v.

Civil Action No. 10-CV-1020 (RJL)

BARACK OBAMA, *et al.*,

Respondents.

# ISN 703 FM40 (August 5, 2004)

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## CRIMINAL INVESTIGATIVE TASK FORCE (CITF)
## REPORT OF INVESTIGATIVE ACTIVITY

| 1. DATE OF INVESTIGATIVE ACTIVITY | 2. PLACE | 3. ACTIVITY NUMBER |
|---|---|---|
| 05 Aug 04 | Camp Delta - ████ Guantanamo Bay, Cuba | 979650421813831 |

**4. REMARKS**

Subject interview of: (UNK) ABDALLAH HUSSEINI

Date/Place: 05 Aug 04/Camp Delta - ████ Guantanamo Bay, Cuba

On 5 Aug 04, SA ████████ U.S. Army Criminal Investigation Command (USACIDC), SA ████████ USACIDC, and SA ████████ Air Force Office of Special Investigations (AFOSI) interviewed ████████ Kaddour LABED, ISN US9AG-00765DP, at Camp Delta, Guantanamo Bay, Cuba. ████████ Linguist, provided Arabic/English language translation.

The purpose of the interview was to inform LABED of SA ████ and SA ████ pending departure and to ████████████████ LABED began the interview by stating he had been interrogated the previous ████ and his wrists were sore from being handcuffed during the interrogation. LABED ████████████ medical attention, stating his wrists were only sore. (Agent's comment: Upon viewing the wrists of LABED, SA ████ observed a tattoo on the inside left wrist of LABED. The tattoo consisted of the name "Adel," and according to LABED was the name of one of the individuals that had died in a fatal traffic accident in Algeria while LABED was driving under the influence of alcohol. LABED related he had the individuals name tattooed on his wrist in remembrance.)

LABED was questioned regarding individuals in the Faidabad, Pakistan safe house owned by Zayn Al Abidin Muhammad HUSAYN, (AKA: ABU ZUBAYDAH). LABED related several individuals inside the safe house were given English language classes taught by Gassan Abdullah AL SHARBI, ISN US9SA-00662DP. According to LABED, the following individuals were present during the English language classes: Abdul al RIZAK, ISN US9LY-00669DP, Jabran SA'AD, ISN US9SA-00696DP, Noor Uthman MUHAMMAD, ISN US9SU-00707DP and one unknown, Syrian individual. (Agent's comment: Previous interviews of RIZAK document his denial of receiving English language classes at the safe house). LABED stated he observed one of the English language classes; however, the group was only in the stages of learning the alphabet and LABED felt since he was only to remain at the house for a short time, he would not benefit from the classes.

LABED was questioned regarding possible poison experimentations being conducted inside the safe house. LABED has previously been questioned regarding this information and has denied any knowledge or involvement in poison experiments being conducted on animals. SA ████ asked LABED if he had thought about this information since the last interview. LABED stated he had not put any more thought into the information as he had told the truth the last time and felt the matter was over. LABED continued to deny any knowledge or involvement in poison experiments, relating if he had witnessed such experiments he would tell the interviewing Agents. LABED related none of the individuals inside the safe house trusted him due to his drug activities; therefore, he would find it unlikely that they would trust him with information regarding poison experiments.

LABED was questioned regarding his possible involvement with the Al Wafa organization in Kandahar, Afghanistan (AF). LABED related he was unaware of Al Wafa prior to his detention in Cuba. LABED stated he only became aware of this organization after previous interrogators began asking him questions about it. LABED stated he has since learned that Al Wafa was an organization inside Pakistan and Saudi Arabia that would provide money to unknown sources. LABED could not provide any definitive information regarding Al Wafa, only information that was given to him by interrogators. LABED subsequently denied any involvement with Al Wafa or affiliated organizations

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE ████████ AND IS LOANED TO YOUR AGENCY; THIS DOCUMENT IS NOT TO BE ████████████ ████████

SECRET//NOFORN

JA001680

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

**4. REMARKS (Continued)**

Inside Afghanistan. LABED stated he would on occasion give money at the local mosques in Hamburg, Germany (GM), such as 5-10 Deutsche Marks each Friday. LABED stated the local mosques would collect the money in a sheet as they walked through the mosques during Friday prayers.

LABED was questioned regarding Saed Ahmed AL MOGHRABY, the individual who facilitated his travels to Afghanistan. LABED stated AL MOGHRABY did not require LABED to courier money to Afghanistan, relating all money LABED took to Afghanistan was his own and intended for his own use. LABED stated AL MOGHRABY purchased his plane ticket to Afghanistan as a "helping hand," and it was common practice for individuals that did not have sufficient funds to purchase their own ticket. LABED stated he did have enough money to purchase his own ticket; however, he lied to AL MOGHRABY so he would not have to pay himself. LABED related AL MOGHRABY did not have any plans set for LABED upon his return from Afghanistan. LABED stated AL MOGHRABY wanted people to become involved in jihad upon their return from training; however, LABED had no intentions of becoming a mujahideen.

LABED was afforded the opportunity to view an unclassified photograph of Abdelghani MZOUDI, a Moroccan national previously indicted in Germany for involvement in the attacks of 11 Sep 01. After viewing the photograph, LABED related the individual looked Moroccan and may have been an individual he saw at the Al-Qods Mosque in Hamburg, Germany. LABED stated he never talked to the individual in the photograph (MZOUDI), and he had no knowledge of MZOUDI or his associates. LABED related he possibly saw MZOUDI on various occasions at the Al-Qods Mosque, as the mosque had a library and cafe, which people would frequent after prayers. LABED denied seeing MZOUDI in the company of Sa'id BAHAJI, a German national wanted by law enforcement in relation to the attacks of 11 Sep 01.

The remainder of the interview was used to discuss LABED's future plans. If released from Cuba, LABED related now that his father has passed away, he would like to return to Germany or Italy, bringing his wife and kids with him. LABED felt he could again find his former girlfriend, _____ and would need to keep his wife and _____ separated. LABED provided no intentions of returning to Algeria.

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF ANY KIND. IT IS THE PROPERTY OF THE FBI AND IS LOANED TO YOUR AGENCY; IT AND ITS CONTENTS ARE NOT TO BE DISTRIBUTED OUTSIDE YOUR AGENCY.

PAGE 2 OF 2 PAGES

SECRET//NOFORN

JA001681

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 68

JA001682

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

　　　　Petitioner,

　　　　　　v.

BARACK OBAMA, *et al.*,

　　　　Respondents.

Civil Action No. 10-CV-1020 (RJL)

# ISN 707 FM40 (August 11, 2002)

~~SECRET//NOFORN~~

JA001683

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

**CRIMINAL INVESTIGATIVE TASK FORCE (CITF)**
**REPORT OF INVESTIGATIVE ACTIVITY**

| 1. DATE OF INVESTIGATIVE ACTIVITY | 2. PLACE | 3. ACTIVITY NUMBER |
|---|---|---|
| 11 Aug 02 | Joint Interagency, Interrogation Facility, GTMO, Cuba | 99567030860936 |

**4. REMARKS**

Subject Interview of:  (UNK) AKRAMAH AL SUDANI

Date/Place: 11 Aug 02/Joint Interagency, Interrogation Facility, GTMO, Cuba

302 20020811 - US9SU-00707DP

MOHAMMED SAMIR, a.k.a. AKRAMA AL-SUDANI, ISN US9SU-0707DP, born in Sudan, was interviewed at Guantanamo Bay, Cuba, by Special Agent ███████████  AKRAMA is detained at the detention facility at Guantanamo Bay, Cuba. After being advised of the identity of the interviewing Agent and the purpose of the interview, which was conducted in Arabic, AKRAMA provided the following information:

AKRAMA advised he was a member of the SHURA Committee overseeing the Khaldan training camp in Afghanistan.  AKRAMA stated the Emir in-charge of the overall operations of the Khaldan camp was ████████ ██████ was considered to be the number two (2) in the hierarchy of the camp's leadership. AKRAMA stated the SHURA Committee was made up of himself ████████████████████████ , who returned back to Morocco.

AKRAMA identified the following individuals as trainers at the Khaldan Camp:

███████████████  from the Arabian peninsula, who taught military tactics, weapons, and explosives.

ABU MOHAMMED AL-JAZA'ERI, who taught military tactics. AKRAMA advised ABU MOHAMMED AL-DJAZAIR was killed on the North front.

██████████████  a Palestinian, who taught artillery and basic weapons.

███████████  who taught basics, artillery, and military tactics.

███████████  who taught explosives.

███████████  from Bahrain, who taught explosives.

AKRAMA advised the funding of the camp came from individuals in the Gulf states, especially those who had previously trained at the Khaldan Camp.  AKRAMA stated ███████████ also raised funds for the camp through his own contacts.

AKRAMA advised after the American strikes began, he went to an area known as Zurmod, Afghanistan, where he stayed in a bunker with ████████████ , from Yemen, two individuals from the Arabian Peninsula, who he could not remember their names or aliases, and a black British convert, who he does not remember his name or alias.  AKRAMA stated he stayed in the bunker for a few days, then went to a different valley in Zurmod, Afghanistan, which is approximately 1 hour walking distance from the bunker.  AKRAMA stated he was

~~THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE CITF AND IS LOANED TO YOUR AGENCY. THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.~~

| PAGE 1 | OF 8 | PAGES |
|---|---|---|

**4. REMARKS (Continued)**

staying in the same tent with a Palestinian known as ▮▮▮▮▮▮▮▮▮ and a Jordanian known as ▮▮▮▮▮▮▮. AKRAMA stated he stayed at the tent approximately four to five days before he and the others evacuated to Barmal, Afghanistan. AKRAMA stated in Barmal, Afghanistan, he stayed at a local school where he joined the following individuals: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

AKRAMA stated there were many Al-Qaeda commanders such as ▮▮▮▮▮▮▮▮▮▮▮ in Barmal, Afghanistan, who were operating from Al-Qaeda's guesthouse in the town.

AKRAMA stated he remembered hearing, while in Barmal, Afghanistan, of ▮▮▮▮▮▮▮▮ leaving Afghanistan for the tribal area. AKRAMA stated after Barmal, Afghanistan, the group from the school evacuated the town to Bannu, Afghanistan. AKRAMA stated Afghani individuals (NFI) helped in the evacuation process. AKRAMA stated in Bannu, Afghanistan, the group was distributed into two guesthouses. AKRAMA stated after a few days, ▮▮▮▮▮▮▮ assisted the group in evacuating Bannu, Afghanistan to Lahore, Pakistan. AKRAMA advised he stayed in a guesthouse in Lahore, Pakistan with ▮▮▮▮▮▮▮▮▮▮▮▮▮
AKRAMA advised upon their arrival at the guesthouse, there were approximately twenty (20) individuals in the house, who were later evacuated to Karachi, Pakistan. AKRAMA stated the twenty (20) individuals belonged to different nationalities and he did not remember any of them because they were moved to Karachi, Pakistan upon his groups' arrival at the guesthouse in Lahore, Pakistan. AKRAMA stated he himself and five (5) people from his group stayed in the guesthouse in Lahore, Pakistan for approximately fifteen (15) to twenty (20) days.

AKRAMA stated they were moved by clean-shaven Pakistanis to a second guesthouse in Lahore, Pakistan, where they stayed for approximately ten (10) days. AKRAMA advised he was at the guesthouse with ANAS, ▮▮▮▮▮▮▮▮▮▮▮ stated ▮▮▮▮▮▮▮ also known as ▮▮▮▮ joined them at the guesthouse, but was always moving around and frequented the house at will.

AKRAMA advised the group stayed at this guesthouse for approximately ten (10) days then they were moved to another guesthouse in Lahore, Pakistan by unknown Pakistanis. AKRAMA advised the group stayed at this guesthouse for approximately twenty (20) days. AKRAMA advised in addition to the above mentioned individuals who were with him at the previous guest house, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ from Saudi Arabia, and ▮▮▮▮▮▮ from Saudi Arabia, joined the group.

AKRAMA stated the group moved to a guesthouse in the city of Faisalabad, Pakistan where they stayed for 4 weeks. AKRAMA stated in the second week, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ along with ▮▮▮▮▮▮▮▮▮ departed Faisalabad, Pakistan for Karachi, Pakistan. AKRAMA stated he was not aware of the reason for their departure to Karachi, Pakistan, but remembered ▮▮▮▮▮▮▮ had some problems with his wife, because he had been absent in Afghanistan for some time. ▮▮▮▮▮▮ on the other hand, wanted to find a wife and get married.

AKRAMA advised ▮▮▮▮▮▮ visited the guesthouse on the Islamic holy day. ▮▮▮▮▮▮ is known to be the main travel facilitator for AL-QAEDA.

AKRAMA stated ▮▮▮▮▮▮▮▮▮▮▮ were constantly with each other using the computer or talking behind closed doors. AKRAMA stated ▮▮▮▮▮▮ did not have much interaction with the others at the guesthouse. AKRAMA stated ▮▮▮▮▮▮ was an American and ▮▮▮▮ was African.

AKRAMA stated ▮▮▮▮▮▮ were the only two (2) Saudis at the guesthouse and they were constantly together. AKRAMA advised he did not know what ▮▮▮▮▮▮ were up to, because they are typical Saudis. AKRAMA stated they stayed up all night and sleep all day, while he likes to go to bed early. AKRAMA

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE CITF AND IS LOANED TO YOUR AGENCY. THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.

| PAGE 2 | OF 6 | PAGES |
| PAGE 2 | OF 6 | PAGES |

JA001685

**4. REMARKS (Continued)**

stated ████████████████ studied in the United States and was fluent in English. AKRAMA advised he and the others in the guesthouse asked ████ to teach them English, which he did began to do. AKRAMA stated ████████████ came in and out of the guesthouse frequently and had his own room, but did not stay there the entire time.

AKRAMA stated approximately one (1) week prior to his and the others arrest at the guesthouse ████████ ████ arrived and joined them at the guesthouse.

AKRAMA provided the following information regarding individuals associated with USAMA BIN LADEN and his network:

AKRAMA stated ████████ is in charge of the Religious Committee for Al-Qaeda and he issues all religious decrees.

AKRAMA stated ████████████ is with the leadership of Al-Qaeda.

AKRAMA stated ████████████ used to be with the Egyptian Islamic Jihad, but joined Al-Qaeda along with AYMAN AL-ZAWAHIRI. ████████████ used to conduct military training in Afghanistan.

AKRAMA stated ████ is known to be in-charge of the Media Office of Al-Qaeda.

AKRAMA stated, as per his knowledge, ████████████ was one of the individuals who carried out the attack on the USS Cole in Yemen. AKRAMA stated ████████ participated in the Jihad in Bosnia, then returned to Afghanistan. AKRAMA advised he heard of ████ role from the "Yemeni Brothers" (NFI).

AKRAM was shown a photo spread and identified the photograph of JOSE PADILLA as the individual known to him as ABDULLAH AL-MUHAJIR.

████ was shown the main ████████ photo book and after reviewing the photo book, AKRAMA identified the following:

████████ AKRAMA identified the photograph as Dr. AYMAN AL-ZAWAHIRI, who was the head of the Egyptian Islamic Jihad before he joined Al-Qaeda. AL-ZAWAHIRI is considered one of the leaders of Al-Qaeda ████ is known to investigators as AYMAN AL-ZAWAHIRI).

████████ AKRAMA identified the photograph as ABU HAFS AL-MASRI, who is the military commander of Al-Qaeda. AKRAMA remembered seeing AL-MASRI at the Jihad Wal camp. (████████████ is known to investigators as MOHAMMED ATEF, aka ABU HAFS).

████████████████████████████████████████████████████████

████████ AKRAMA identified the photograph as ████████ of the Libyan Islamic Fighting Group. AKRAMA last saw ████ in the year 2000 in Kabul at a Libyan guesthouse. ████████

████████ AKRAMA identified the photograph as ████████ a Yemeni, who he met in jail. ████████ is known to investigators as ████████

████████ AKRAMA identified the ████ as a Yemeni known as ████████ who he first met in Kabul, Afghanistan and later saw in jail.

~~THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE CITF AND IS LOANED TO YOUR AGENCY. THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.~~

| PAGE 3 | OF 8 | PAGES |
|--------|------|-------|
| PAGE 3 | OF 8 | PAGES |

**4. REMARKS (Continued)**

███████████████ AKRAMA identified the photograph as ███████ a Yemeni, who he met in jail in Pakistan.

███████████████ AKRAMA identified the photograph as ███████████ who he first met in jail.

███████████████ AKRAMA identified the photograph as a Yemeni, ████████████████

███████████████ AKRAMA identified the photograph as ██████ from Yemen, who he met in jail.

███████████████ AKRAMA identified the photograph as a Russian known to him as ███████ who he first met in jail.

███████████████ AKRAMA identified the photograph as ████████ who is a Pakistani who used to visit the Faisalabad, Pakistan guesthouse and had discussions with the Pakistanis who were assigned to the guesthouse. AKRAMA advised ████████ also used to converse with ████████████

███████████████ AKRAMA identified the photograph as an individual who he met in jail, but could not remember the individual name or alias.

███████████████ AKRAMA identified the photograph as USAMA AL-JAZA'ERI. AKRAMA advised USAMA was a driver in Algeria. ████████████ is known to investigators as ABDU RAZZAQ).

███████████████ AKRAMA identified the photograph as ████████████ who he first met in Kabul, Afghanistan. AKRAMA stated ████████ trained at the Khaldan camp and then departed for Kabul, Afghanistan. AKRAMA stated he is not aware of what ████ did in Afghanistan after leaving the Khaldan camp. AKRAMA stated ████████ wanted to go to Chechenya because he had a brother there participating in the Jihad against the Russians. ████████

███████████████ AKRAMA identified the photograph as ████████████ (the Syrian). AKRAMA advised ████████ trained Al-Qaeda and then left to Kabul, Afghanistan. AKRAMA stated ████████ brother, ████████ was killed in Qandahar, Afghanistan while in a vehicle which was struck by an American missile. AKRAMA stated ████████ was sick and had medical problems. ████████████

███████████████ AKRAMA identified the photograph as ████████ from Yemen, who he met in jail. ████████ is known to investigators as ████████

███████████████ AKRAMA identified the photograph as a Yemeni known as ████████ who he met in jail.

███████████████ AKRAMA identified the photograph as ████████████ who was trained at the Khaldan camp years prior. AKRAMA stated ████████ left after receiving training at the Khaldan camp, he did not hear from him again until he saw him in jail.

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE CITF AND IS LOANED TO YOUR AGENCY; THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.

| PAGE | 4 | OF 8 | PAGES |
|------|---|------|-------|
| PAGE | 4 | OF 8 | PAGES |

**4. REMARKS (Continued)**

████████ AKRAMA identified the photograph as an individual he does not known personally, but is the brother of the individual in photograph ████████

████████ AKRAMA identified the photograph as ████████ from Yemen, who he met in jail.

████████ AKRAMA identified the photograph as an unknown Yemeni he met in jail.

████████ AKRAMA identified the photograph as ████████ from Yemen, who he met in jail.

████████ AKRAMA identified the photograph as a Yemeni individual known as ████████ who he first met near the Wazir Akbar Khan area of Kabul, Afghanistan.

████████ AKRAMA identified the photograph as ████████ a Pakistani. AKRAMA stated ████████ was the cook at the Faisalabad, Pakistan guesthouse where he was arrested.

████████ AKRAMA identified the photograph as ████████ from the Arabian Peninsula. AKRAMA advised ████████ studied in America and was close to another Saudi in the guesthouse named ████████ AKRAMA advised he met ████████ at the guesthouse in Lahore, Pakistan prior to his moving to Faisalabad, Pakistan. AKRAMA stated he and USAMA AL-JAZA'ERI asked ████████ to teach them English. AKRAMA stated ████████ used to sleep the entire day and stay awake all night.

████████ AKRAMA identified the photograph as ████████ joined him and the others at the Faisalabad, Pakistan guesthouse approximately one week prior to his (AKRAMA) arrest. AKRAMA stated ████████ came to Faisalabad, Pakistan accompanied by one Yemeni and one Saudi. AKRAMA stated both the Yemeni and the Saudi left Faisalabad, Pakistan prior to the arrests. ████████

████████ AKRAMA identified the photograph as ████████ AKRAMA stated ████████ was trained at the Khaldan camp for approximately 2 or 3 months before leaving the Khaldan camp. AKRAMA stated ████████ severed his hand while taking a landmine apart. ████████

████████ AKRAMA identified the photograph as ████████ from Saudi Arabia. AKRAMA stated ████████ was a friend of ████████ and they were continuously together. AKRAMA stated he first met ████████ at the Lahore, Pakistan guesthouse prior to his moving to Faisalabad, Pakistan. ████████

████████ AKRAMA identified the photograph as a Pakistani who he knew as either ████████

████████ AKRAMA identified the photograph as USAMA BIN LADEN. AKRAMA advised met BIN LADEN prior to the cruise missile strikes against Afghanistan in retaliation for the East Africa bombings. AKRAMA

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE CITF AND IS LOANED TO YOUR AGENCY, THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.

| PAGE 5 | OF 6 | PAGES |
| PAGE 5 | OF 6 | PAGES |

**4. REMARKS (Continued)**

advised he was visiting the Jihad Wal Camp in order to fix a radio communication system when ████████ introduced him to BIN LADEN and the other Al-Qaeda commanders. (Photograph ████████ is known to investigators as USAMA BIN LADEN).

████████████████ AKRAMA identified the photograph as ████████ AKRAMA stated ████████ trained at the Khaldan camp for approximately 2 months. ████████ came with his older brother, ████████ who at the time was a college student and not religiously committed. AKRAMA stated ████████ took care of ████████ while he was in Afghanistan. ████████ has other brothers, ████████ and ████████ in Afghanistan who were both trained at the Khaldan camp. AKRAMA stated ████████ is currently in jail in Yemen. AKRAMA stated ████████ believed in conducting military actions inside Yemen and was arrested along with others (NFI) by the Yemeni authorities. AKRAMA stated during the arrests, the Yemeni authorities recovered explosives, weapons, as well as fraudulent identification implements. AKRAMA advised he had heard ████████ was on his way out of jail when the USS Cole attack occurred. AKRAMA stated days after the USS Cole attack, a Yemeni investigator was showing a ████████ one of the suicide bombers, while ████████ was leaving the jail. ████████ looked at the photograph and told the investigator, "this is ████████ may God bless his soul". AKRAMA stated the Yemeni investigator knew ████████ had inside knowledge of the USS Cole bombing, since no one knew ████████ was dead. AKRAMA advised ████████ was subsequently returned to jail. AKRAMA advised ████████ works for Al-Qaeda and is always traveling, which indicates he worked for the exterior branch of Al-Qaeda. AKRAMA advised ████████ is close to many of the "brothers" in Afghanistan because of his relationship to BIN LADEN and of his late brother ████████ who was very respected among the Mujahideen.

████████████████ AKRAMA identified the photograph as ████████ AKRAMA stated ████████ was in Tajikistan and returned to Afghanistan and joined Al-Qaeda. AKRAMA stated ████████ had a problem with Al-Qaeda because of the Egyptian control of the group and decided to returned to Yemen.

████████████████ AKRAMA identified the photograph as ████████ AKRAMA stated he had previous identified ████████ as the brother of ████████ who is currently incarcerated in Yemen. ████████

████████████████ AKRAMA identified the photograph as ████████ who was in charge of Al-Qaeda at the front lines. AKRAMA stated ████████ trained at the Aynak military camp of Al-Qaeda. AKRAMA stated ████████ is wanted by the United States, but he does not know why. AKRAMA stated ████████ said he would never leave Afghanistan and was subsequently killed during the recent American operations in Zermat, Afghanistan.

████████████████ AKRAMA identified the photograph as ████████ AKRAMA stated he first met ████████ when he visited the Khaldan camp with ████████ AKRAMA stated ████████ had one of his relatives training at Khaldan during this time. AKRAMA stated this relative was later killed at a lake in JALALABAD, Pakistan in a swimming accident.

████████████████ AKRAMA identified the photograph as ████████ AKRAMA stated he met ████████ in 2000 in Kabul, Afghanistan. AKRAMA stated ████████ used to be in Tajikistan and later was always seen with ████████ in Afghanistan. ████████

████████████████ AKRAMA identified the photograph as an individual who came from the Arabian Peninsula to train at the Khaldan camp. AKRAMA advised he last saw this individual in 2000 in Kabul, Afghanistan. ████████

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF OIPT. IT IS THE PROPERTY OF THE OIPT AND IS LOANED TO YOUR AGENCY. THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.

| PAGE | 6 | OF 8 | PAGES |
|------|---|------|-------|
| PAGE | 6 | OF 8 | PAGES |

**4. REMARKS (Continued)**

██████████████ AKRAMA identified the photograph as ████████ AKRAMA stated the last time he saw ██ in Barmal, Afghanistan and he heard ████████ was determined to remain inside Afghanistan. AKRAMA stated █████ is wanted by Americans, but does not know why. AKRAMA stated █████████ was in charge of the training camps for Al-Qaeda.

██████████ AKRAMA identified the photograph as ████████ AKRAMA stated █████ is in charge of security Al-Qaeda. AKRAMA stated ████ has a long beard and wore a turban and is not shaved as he appears in the photograph.

██████████ AKRAMA identified the photograph as ████████████ AKRAMA advised ████ trained at the Khaldan camp for approximately one (1) month, prior to traveling to Kabul, Afghanistan. AKRAMA is not aware where ████████ went after Kabul, Afghanistan. AKRAMA stated ████████ wanted to learn how to speak Arabic and to learn religious studies. AKRAMA stated █████████ possibly lived in France and spoke French fluently, but is originally from North African. Akrama stated ████████ completed basic training at the Khaldan camp and was trained by a "new brother," (NFI), who just finished training before him. AKRAMA stated the reason AL-SAHRAWI was not trained by him or one of the main trainers is because he did not speak Arabic. ████████

██████████ AKRAMA identified the photograph as an individual who he saw in the news, but does not remember his name.

██████████ AKRAMA identified the photograph as looking like ████████████ AKRAMA stated ████ trained at the Khaldan camp for a period of time during 1997 and subsequently left Afghanistan. AKRAMA stated ████ married the sister of ████████████ from Yemen, and he did not hear anything else about ████

AKRAMA was shown the ████████ photo book and after reviewing the photographs, AKRAMA identified the following individuals:

██████████ AKRAMA identified the photograph as an individual in the ████████ area of Kabul, Afghanistan. AKRAMA stated he was always in the company of Al-Qaeda individuals. AKRAMA stated the individual accompanied ████████ when he was in charge of the guesthouse in Kabul, Afghanistan. AKRAMA does not remember the name or alias of the individual depicted in the photograph.

████████ AKRAMA identified the photograph as ████████████ AKRAMA described him as an old-timer in Al-Qaeda. AKRAMA stated ████ stayed at the ████████ camp with ████████ AKRAMA stated ████████ frequented the front lines against ████ troops.

████████ AKRAMA identified the photograph as ████████████ AKRAMA stated he knew him from KABUL, Afghanistan where he resided at the Tunisian guesthouse. AKRAMA stated ████████ arrived in Afghanistan from Europe. AKRAMA stated ████████ trained at the Khaldan camp, but is not a member of Al-Qaeda.

████████ AKRAMA identified the photograph as ████████████ who is an Al-Qaeda member. AKRAMA stated ████████ married the daughter of ████████ after her husband, ████ was killed in Afghanistan.

████████ AKRAMA identified the photograph as ████████████ who is part of BIN LADEN's personal security force.

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE CITF AND IS LOANED TO YOUR AGENCY, THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.

| PAGE 7 | OF 8 | PAGES |
| PAGE 7 | OF 8 | PAGES |

JA001690

**4. REMARKS (Continued)**

███████ AKRAMA identified the photograph as an individual he saw in Kabul, Afghanistan. AKRAMA does not remember the individual's name or alias.

THIS DOCUMENT CONTAINS NEITHER RECOMMENDATIONS NOR CONCLUSIONS OF CITF. IT IS THE PROPERTY OF THE CITF AND IS LOANED TO YOUR AGENCY; THIS DOCUMENT IS NOT TO BE RELEASED OUTSIDE YOUR AGENCY.

| PAGE 8 | OF 8 | PAGES |
|--------|------|-------|
| PAGE 8 | OF 8 | PAGES |

# Exhibit 75

JA001692

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI,

      Petitioner,

      v.                                        Civil Action No. 09-745 (RCL)

BARACK OBAMA, *et al.*,

      Respondents

## Zubaydah Diary Volume 5 – English Translation

SECRET//NOFORN



UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

\* \* \*



SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE



SECRET

SECRET



SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001699

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



15

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001701

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



SECRET

JA001702

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE    JA001703

SECRET



SECRET

* * *

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001705

# Exhibit 76

JA001706

SECRET//NOFORN

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI,

       Petitioner,

       v.

BARACK OBAMA, *et al.*,

       Respondents

Civil Action No. 09-745 (RCL)

# Zubaydah Diary Volume 6 – English Translation

SECRET//NOFORN



SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

SECRET

* * *

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



SECRET

14

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE    JA001712

UNCLASSIFIED//FOR PUBLIC RELEASE

* * *

JA001713

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



SECRET

46

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



UNCLASSIFIED//FOR PUBLIC RELEASE

JA001715

SECRET

SECRET
48

UNCLASSIFIED//FOR PUBLIC RELEASE



SECRET

SECRET
49

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



SECRET

50

SECRET



SECRET
51

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001720

SECRET



SECRET

53

UNCLASSIFIED//FOR PUBLIC RELEASE    JA001721

\* \* \*

SECRET



SECRET
61

UNCLASSIFIED//FOR PUBLIC RELEASE    JA001723

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

SECRET

62

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001724

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



SECRET

63

JA001725

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001726

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



SECRET

65

JA001727

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

SECRET

66

JA001728

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



SECRET

67

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001729

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



UNCLASSIFIED//FOR PUBLIC RELEASE    JA001730

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001731

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET 

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001732

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



UNCLASSIFIED//FOR PUBLIC RELEASE

JA001733

UNCLASSIFIED//FOR PUBLIC RELEASE

* * *

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



SECRET
84

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001735

SECRET

I do not know whether I informed you, or maybe with the hectic work, I did not inform you..

I have chosen some brothers, cadres, for the military matters, especially explosives (making it), and detonation from a distance (remote control)..

I took them with me, away from the flood, one or two individuals from each military science, just like Noah, peace be upon him, did, two pairs from each being.. An instructor or two from each military subject, they are the nucleus of my future work, and I am starting from zero, I would not say another time, maybe it is the tenth..

I took them out of the flood in the rescue ship, and I kept them with me.. And I am now preparing a safe location for us, so that we can start, and God is sought for assistance..

The Pakistani newspapers are saying that I am in Peshawar, trying to reorganize Al-Qa'ida Organization, for war against the Americans, and that I am the heir of Bin Ladin, and Time is saying that I know the Organization and those collaborating with the Organization more than Bin Ladin himself..

I wish they know that I am not with Al-Qa'ida, to begin with, and that I am with them in Ideology and body, etc...

85

SECRET

85

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



SECRET
86

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001738

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET



SECRET

88

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001739

\* \* \*

JA001740

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

3/20/2002 AD..

Nothing new..

I do not know whether I informed you. We have left (Lahore, my group and I, and after a brief separation), we met in ~~Lahore~~ Faisal Abad, in a suitable, big house, but it does not lack security gaps.. The brothers who arranged it for us fell in it, but no problem, as long as the house is temporary.

I am still trying to find the suitable person (as a cover), and then determine the suitable location.. The house in the suitable city (to stay for Winter).. So that I can arrange our special programs.

Anyway/ two or more days ago..

Two bombs or more (hand grenades) exploded at a church in Islamabad.. Many parishioners were killed, including two American women, and those who carried it out escaped..

Praise God..

Some expected that this is the beginning of Al-Qa'ida's revenge in Pakistan..

Poor ones, this is not how revenge is, or will be, whether from Al-Qa'ida or from others..

94

UNCLASSIFIED//FOR PUBLIC RELEASE

1A001741

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 78

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI,

    Petitioner,

    v.

BARACK OBAMA, *et al.*,

    Respondents

Civil Action No. 09-745 (RCL)

# Zubaydah Video – English Translation

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001743

UNCLASSIFIED//FOR PUBLIC RELEASE

## CERTIFICATION OF A COMPLETE AND ACCURATE TRASLATION

My name is Carl John Moe, I am of sound mind, capable of making this certification, and personally acquainted with the facts herein stated:

I understand the Arabic and English languages; I graduated from the Defense Language Institute Basic Arabic Course in March 2001 and audited the Defense Language Institute Intermediate Arabic Course in from March through May 2001 with a 3.2 GPA on a 4.0 scale and a 3/2+/2 in listening, reading, and speaking. I currently work as a translator for "Mission Essential Personnel". I have continued with formal study of Arabic at the Foreign Language Training Center Europe, (Marshall Center), University of Texas master level program for dialect and several other DOD sponsored language courses to maintain and enhance my professional abilities as an Arabic interpreter.

I certify that to the best of my knowledge and ability, the attached document in the English language titled "Abu-Zubaydah Video" consisting of four (4) pages which I have initialed, is an exact translation of the corresponding video.

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on the undersigned date:

_Carl John Moe_
Carl John Moe

3 December 2008
Date

County of Fairfax
State of Virginia

Given under my hand this
3rd day of December 2006

_Timothy P. Brady_
NOTARY PUBLIC
My Commission expires:
Aug 31, 2011
ID #121051

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

Video Number: F3-2002-804692
Linguist: Carl Moe

[TC: Video begins with views of a mountainous area and the interior of an old building]

[2:44] [Two unidentified males speaking]. Did you tape the fire? No I taped the light. The light in the mountain. Was it clear? Yes, It was clear. Lift the......

[6:47] Bearded male begins speaking under beam of flashlight:

In regards to this question that you asked: We and the sheikh are one. We have been working together for almost 10 years, but we were hoping to keep this work secret...hidden. We began in 1991, or almost 1992. In 2000 or 2001, the matter lost its secrecy. We were forced to make ourselves known because of what took place in Afghanistan and thereafter.

For the past 10 years, God be praised, we have not been in the picture. But, as I said before, the events that transpired forced us, with the advice of our brother advisors, to come into the picture so that our labors in fighting the enemies of God would not be claimed by individuals or organizations that had no hand in them.

[8:28] To return to your question about our relationship with the sheikh: We and he are one. We cooperated from approximately 1995 to 1996. God granted us success in our endeavors to serve the interest of the Muslims.

[9:15] Bearded male speaking again, this time during daylight hours. He begins speaking, makes several mistakes, then the film cuts away and he begins again, saying the following:

In the name of God the Merciful and the Compassionate. God be praised and may prayers and peace be upon God's Prophet.

To be honest, I am not among those in favor of these press interviews, and I never saw any point to them. Our enemies know why we kill them and our friends know that we are right, for we follow that which God and the Prophet have said regarding killing the enemies of God: Jews, Christians, Apostates, Hindus, Athiests...all of them. All enemies of Islam are our enemies.

[11:03] However, to return to the question you raised about terrorist operations, as you call them and as we also call them: God commanded us to do them. God Almighty said "Strike terror into the enemies of God and your enemies, for they are our enemies." Therefore, when we terrorize them, we implement that which God has commanded. As to the events that transpired from 1990 to present, of which we have been accused of having a relationship by virtue of most of the martyrs [TC: being Arabs] by the security apparatuses or the unfaithful states or apostate states or by the Jewish nation: blowing up the commercial center, which was undertaken by Yusuf Ramzi, God bless him; then, the operations in the Kingdom of Saudi Arabia in Khobar and 'Ulayyah; then, the operations set up by the Sheikh—Bin Laden—in Kenya and Tanzania; then, the Cole operation; then, the truly magnificent operations at the Trade Center on Manhattan Island and in areas around Washington and New York. Truthfully, I am one who supports [TC: these operations] wholeheartedly. But, as to our participation in them, this is a matter between us and God.

[13:25] We ask God Almighty to accept us for any support we gave, whether financial, strategic, or through implementation. And we ask him to accept those of our brothers who did them.

[13:48] Yes, acknowledge and affirm that we are with any group that asserts the unity of God by means of operations and that supports God in word and deed and in thought. We support them with money, with effort, with ideas, with coordination; we are with them. Enemies of God shall not rest, God willing.

[14:24] Truthfully, I belittle myself before our elder sheikhs. I see myself as nothing more than a small child before them. But everyone must contribute his effort. And I, as a person, or those who I represent in the organization of martyrs, we are all servants of those who serve this religion.

As I said, I never approved of these interviews, except to inform the wise that our enemy should know why we do what we do: the Jews, the Christians, America and all who ally with her. Some say: "We are extracting revenge." Yes, we are extracting revenge for every Muslim [male] and every Muslim [female]. In my view, a Muslim who delays in reacting is an apostate, without exception. But, we must not kill Muslims. We must never kill a single Muslim, by the will of God Almighty.
[16:10] As to the other matter... [TC: video cuts out]

[17:00] Sheikh Abu-'Abdullah [UBL] is our Sheikh and our example, may God reward him well on our behalf and on behalf of all Muslims. As they say in the media that we participate with him in some operations, this makes us proud and is an honor for us and we pray to God to grant him and us success......

[18:00] As for the accusations of our security forces, our participation in terrorist organization, as we also call it, because God has ordered us to do what he says: " to strike terror into (the hearts of) the enemies, of God and your enemies." The accusation of the security agencies regarding our participation in the trade center attack carried out by brother Yusif Ramzi, (may God reward him well on our behalf and on the behalf of all Muslims), as well as the participation in the operation that followed in al-Khubar, al-'Ulayia in the Arabian peninsula, and other operations such as the blowing up of two American Embassies in Nairobi and Tanzania, the [USS] Cole operation and the magnificent operation on the island of Manhattan in New York and Washington which was carried out by the Sheikh, (may God reward him well). In addition to their accusation of our participation in the following operations that followed during these two years, they also accused us of the martyrdom operations using explosives and martyrs inside Palestine. If we truly participated then I swear that it is our pride. We leave that to God because he is all knowing. May god reward well, all those who participate through financing, or exertion, and to who has offered himself as a martyr in the name of God. Their accusation is an honor for us, and we ask God to reward us if we were participants.

[21:00] In the name of God the most benevolent and merciful,
As for the questions presented by the brother journalist [as to what is] our relation with the terrorist attacks, as you may call it, and we also call it terrorist attack, because this is

*Sm*

God's order, as he says: "to strike terror into (the hearts of) the enemies of God and your enemies".

As for their claims regarding these terrorists operations which took place during the ten years starting 1990-1991 including the attack against the World Trade Center, which was carried out by Yusif Ramzi, al-Khubar, al-'Ulayia on the Arabian peninsula, and other operations in Kenya, Tanzania, the [USS] Cole operation and the magnificent operation of New York and Washington which was carried out by al-Sheikh, (may God reward him well). Regarding the operations that took place afterwards inside and outside America, as well as inside Israel or against the Jews abroad, as well as our relationship to the martyrdom operations that took place in Palestine from 1990 until our present time, 2004. I say, if we did participate in these operations then truly I swear that this is our pride and if we did not participate then we truly say that we still support these operations and support whoever works against the enemies of God and serves Islam and Jihad.

[24:15]

Regarding the question of our relationship to Sheikh Abu-'Abdallah Yusif Usamah Bin Ladin, (Excuse me), Sheikh Bin Ladin, He is our Sheikh and our example, our brother, and our Emir for many years, thank God and we cooperate with anyone who serves his religion........

[25:12]

In the name of God the most merciful and benevolent.....praise to God, prayers and peace of God and his prophet be upon you.

To be honest, I am not among those in favor of these press interviews, and I never saw any point to them because, our enemy knows why we fight them, and our friends know that we are justified in fighting the enemy, because we are following what God says. We are fighting the enemies of God including the Jews, the Christians, and American and its Arab allies and their apostate rules including European, African, Hindus or Islamic countries ruled by apostate rules who do not apply the Shari'a law. I do say that we are fighting them in compliance with the order of God.

Regarding the question that was presented concerning our relationship with the terrorist operations starting 1990-1991 including the attack against the World Trade Center, which was carried out by Yusif Ramzi [Ramzi Yusif], al-Khubar, al-'Ulayia in the Arabian peninsula [Saudi Arabia], and other operations in Africa [Kenya, Tanzania], the [USS] Cole operation and the magnificent operation on the island of Manhattan in New York, Washington, the martyrdom operations inside Palestine, I hereby say that this accusation is an honor for us and a pride for us for God was with us, and if we had not participated by money, reconnaissance, by individuals or by ideas, then we ask God to forgive us. As for our relationship with the Sheikh (UBL), he is our sheikh and our Emir, our example, may God reward him well. I truly say something to let the enemies of God know that no matter how long it may take Muslims will never forget to avenge their enemy. The subject which



UNCLASSIFIED//FOR PUBLIC RELEASE

28:53

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 83

SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| |
|---|
| ABDEL RAZACK ALI ABDEL-RAHMAN |
| Petitioner |
| v. |
| GEORGE WALKER BUSH, *et al.* |
| Respondents. |

Civil Action No. 05-CV-02386
(RBW)

IIR 6 034 0470 03

SECRET//NOFORN

RUMIATF9784

R 081446Z JAN 03
FM CJTF 170 J2CMD
TO RHEFDIA/DIA WASHINGTON DC



PAGE 02 RUMIATF9784 ~~S E C R E T~~

PAGE 03 RUMIATF9784 ~~S E C R E T~~





PAGE 04 RUMIATF9784 ~~S E C R E T~~



PAGE 05 RUMIATF9784 ~~S E C R E T~~



PAGE 06 RUMIATF9784 S E C R E T

S E C R E T

QQQQ
SUBJ: IIR 6 034 0470 03 ████████ - FD-302 FOR ISN ███LY-00685███
████████ BIOGRAPHICAL INFORMATION WHO TRAVEL TO AFGHANISTAN WITH
SOURCE (U)

S E C R E T
-
SERIAL: (U) IIR 6 034 0470 03.
-
COUNTRY:  (U) AFGHANISTAN (AF); PAKISTAN (PK).
-
IPSP:  (U) ████████████████
-


PAGE 07 RUMIATF9784 S E C R E T
WARNING:  (U) THIS IS AN INFORMATION REPORT, NOT FINALLY EVALUATED
INTELLIGENCE.  REPORT CLASSIFIED S E C R E T.
----------------------------------------------------------------
DEPARTMENT OF DEFENSE
----------------------------------------------------------------
DOI:  (U) 20020523.
-
REQS:  (U) ████████████████████████████
-
SOURCE:  (S)  //ISN ███LY-00685███/ABDUL ((AL RIZAK)) IS A 31-YR-OLD
WHO CLAIMS LIBYAN CITIZENSHIP.  SOURCE STATED THAT HE WAS GOING TO
PAKISTAN TO STUDY ISLAM.  SOURCE WAS DETAINED WITHOUT IDENTIFICATION
DOCUMENTS.  SOURCE RELIABILITY HAS NOT BEEN DETERMINED.
-
SUMMARY:  (S) SOURCE'S ROUTE OF TRAVEL. ████████████ BIOGRAPHICAL
INFORMATION NAMES OF PERSONNEL WHO WERE AT GUEST HOUSE IN
AFGHANISTAN.
-
TEXT:  (U)
-------------------------------TEARLINE------------------------------

PAGE 08 RUMIATF9784 S E C R E T

1. (U) THE INFORMATION WAS DERIVED FROM THE ████████████████████
████████████ DATE 20021221, IN GUANTANAMO BAY, CUBA.

2. (U) ABDELRAZAK ALI ((ABDELRAHMAN)), ████ NMENT SERIAL NUMBER (ISN)
████ LY-00685 ████ WAS INTERVIEWED AT CAMP ████ U.S. NAVAL BASE
GUANTANAMO BAY, CUBA BY SPECIAL AGENTS.  ENGLISH - ARABIC TRANSLATION
WAS PROVIDED BY U.S. ARMY LINGUIST.  AFTER BEING ADVISED OF THE
OFFICIAL IDENTITIES OF THE INTERVIEWING AGENTS AND THE NATURE OF THE
INTERVIEW, ABDELRAHMAN PROVIDED THE FOLLOWING INFORMATION -

3. (U) HE WAS BORN IN LYBIA AND GREW UP IN THE TOWN OF LAAJILAT.  HIS
MOTHER AND FATHER DIVORCED WHEN HE WAS YOUNG AND HE LIVED WITH HIS
FATHER IN A SCRAP YARD, CALLED RABSH AZAWIA, WHERE HIS FATHER WORKED.
HIS FATHER'S NAME IS ██████████████████████ HIS MOTHER'S NAME IS
████████████████ AND HE HAS A BROTHER, WHO IS APPROXIMATELY FIFTEEN
YEARS OLD, ██████████████████████ HE HAS NOT SEEN HIS FAMILY IN A
LONG TIME AND DID NOT WANT TO DISCUSS THEM.  HE ATTENDED ONE YEAR OF
PRIMARY SCHOOL AND CANNOT READ OR WRITE.  WHEN HE BECAME OLD ENOUGH
TO WORK, HE WAS EMPLOYED AT THE SCRAP YARD CUTTING UP JUNKED CARS FOR
PARTS.

4. (U) HE WAS CONVINCED TO GO TO PAKISTAN TO STUDY ISLAM BY A FRIEND
NAMED ████████████████████████████████████████████████████ THEY


PAGE 09 RUMIATF9784 S E C R E T

TRAVELED FROM LYBIA TO PAKISTAN VIA TUNIS AND SYRIA, ARRIVING IN
KARACHI.  THEY ALSO STOPPED IN ANOTHER PLACE FOR A HALF-HOUR, BUT HE
DOES NOT REMEMBER WHERE THAT WAS.  AFTER THEY ARRIVED IN PAKISTAN,
THEY MET TWO OTHER MEN WHO WERE KNOWN TO ████████████████████████
████████████████ HE THINKS BOTH MEN ARE PAKISTANI BECAUSE THEY SPOKE
BROKEN ARABIC.  ████████████ SPOKE BOTH ARABIC AND PASHTU.  THE FOUR
OF THEM GOT INTO A CAR FROM THE AIRPORT AND DROVE FOR HOURS BEFORE
STOPPING.  WHEN THEY STOPPED, HE FOUND OUT THEY WERE IN AFGHANISTAN.

5. (U) TWO DAYS AFTER ARRIVING IN AFGHANISTAN, ABDULRAHMAN AND THE
OTHERS LEFT HIM AT A GUEST HOUSE AND DISAPPEARED, TAKING HIS PASSPORT
AND MONEY WITH THEM.  HE DESCRIBED ████████████ AS FOLLOWS -
████████████████████████████████████████████████████████████
████████████████████████████████████████ HE KNOWS
████████████████████████████████████████████████████
████████████ FROM WORK, WHERE ████████████ WAS A
CUSTOMER/SUB-CONTRACTOR.  HE THINKS ████████████ IS A THIEF AND A LIAR
FOR STEALING HIS PASSPORT AND MONEY AND TAKING HIM TO AFGHANISTAN
WITH OUT HIS PERMISSION.

7. (U) HE SPENT A TOTAL OF EIGHTEEN DAYS IN AFGHANISTAN AT A GUEST
HOUSE IN KABUL.  THERE WERE OTHERS IN THE HOUSE WHO SPOKE ARABIC.


PAGE 10 RUMIATF9784 S E C R E T

THERE WERE SIX PEOPLE AT THE HOUSE WHEN HE ARRIVED, BUT PEOPLE WERE
ALWAYS COMING AND GOING FROM THE HOUSE.  HE DOES NOT REMEMBER ANY OF
THE PEOPLE WHO WERE AT THE HOUSE.  HE DID NOT LEAVE THE HOUSE FOR THE
EIGHTEEN DAYS HE WAS THERE.  HE DOES NOT KNOW TO WHOM THE HOUSE
BELONGS.  AFTER THE EIGHTEEN DAYS, HE WAS TAKEN TO A HOUSE IN
FALISABAD, PAKISTAN BY TWO PAKISTANI MEN.

8. (U) WHEN HE ARRIVED AT THE HOUSE IN FALISABAD, THE FOLLOWING
PEOPLE WERE THERE.



ABU ANAS - A SYRIAN DOCTOR

9. ~~(U)~~ THE HOUSE WAS OWNED BY A MAN NAMED █████, A SYRIAN, OWNED OR

PAGE 11 RUMIATF9784 ~~S E C R E T~~
WAS RESPONSIBLE FOR THE HOUSE, BUT DID NOT STAY THERE. ████ WOULD
SOMETIMES VISIT THE HOUSE WITH A SHORT, ARAB MAN. THE TWO WOULD NOT
SPEAK TO ANY OF THE RESIDENTS, BUT WOULD GO STRAIGHT TO █████
ROOM.
10. ~~(U)~~ HE DOES NOT REMEMBER ANYONE AT THE HOUSE NAMED ████ AND
DENIES EVER USING THAT NAME HIMSELF.
11. ~~(U)~~ ALL THE PEOPLE WHO WERE AT THE HOUSE WERE CAPTURED BY THE
PAKISTANI TROOPS, EXCEPT ABU ANAS, WHO WAS KILLED. AFTER CAPTURE, HE
WAS TAKEN FIRST TO LAHORE, THEN TO ISLAMABAD FOR SEVERAL MONTHS, THEN
TO BAGRAM, KANDAHAR FOR TEN DAYS, THEN TO GUANTANAMO BAY, ARRIVING IN
MAY, 2002.
12. ~~(U)~~ HE DOES NOT WANT TO GO BACK TO LYBIA.
-------------------------------TEARLINE--------------------------------
COMMENTS: ~~(U)~~
1. ~~(U)~~ THIS IIR WAS PUBLISHED WITH THE CONCURRENCE OF THE ███
REPRESENTATIVES IN GUANT████AY, CUBA.
2. ~~(U)~~ WARNING -- THIS ████████ MAY CONTAIN INFORMATION THAT IS
DUPLICATED IN REPORTING FROM OTHER DOD REPRESENTATIVES ATTENDING THE
SAME INTERVIEW.
3. ~~(U)~~ TO AID COLLECTION EFFORTS, EVALUATIONS SHOULD BE SENT TO
FINAL SECTION OF 02
QQQQ
SUBJ: IIR 6 034 0470 03/████████ - ███████ LY-00685 ███
██████████████ WITH INFO COPIES ████████████
                                                        CJTF
GTMO. ADDRESS ALL REQUESTS FOR RELEASE OF INFORMATION O██ FURTHER
DISSEMINATION ████
███████████ ████
COLL: ~~(U)~~ BH; DD; CA.
INSTR: ~~(U)~~ U.S. NO.
PREP: ~~(U)~~
ACQ: ~~(U)~~ ████████████████
DISSEM: ~~(U)~~ FIELD -- NONE.

PAGE 07 RUMIATF9785 ~~S E C R E T~~
WARNING: ~~(U)~~ REPORT CLASSIFIED ~~S E C R E T~~.
DERIVED FROM: DO HUMINT SCG, MARCH 02
DECLASSIFY ON: X1

UNCLASSIFIED//FOR PUBLIC RELEASE

BT
#9784
NNNN

JA001756

# Exhibit 90

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

RUEOMFE8942

R 051939Z MAY 04
FM CJTF GTMO
TO RHEFDIA/DIA WASHINGTON DC//

PAGE 02 RUEOMFE8942 SECRET

PAGE 03 RUEOMFE8942 SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE



PAGE 04 RUEOMFE8942 S E C R E T

BT
S E C R E T
SECTION 1 OF 2
)QQQ
UBJ: IIR 6 034 1041 04/ ██████████ - DETAINEE'S COMMENTS ON TWO
T H
t DETAINEES AT GTMO - CORRECTED REPORT
CREF//NONE.//X1
RIAL: (U) IIR 6 034 1041 04.
R R E C T E D  R E P O R T (VARIOUS CHANGES TO IIR)
NTRY: (U) AFGHANISTAN (AF); GERMANY (GM); PAKISTAN (PK).
E 05 RUEOMFE8942 S E C R E T
(U) ██████████
IIR 6 034 1041 04 ██████████ - DETAINEE'S COMMENTS ON TWO
R DETAINEES
MO - CORRECTED REPORT (S//REL ██████)
ING: (U) THIS IS AN INFORMATION REPORT, NOT FINALLY

UNCLASSIFIED//FOR PUBLIC RELEASE

EVALUATED
INTELLIGENCE.
REPORT CLASSIFIED ~~SECRET//REL TO~~ ████

---

DEPARTMENT OF DEFENSE

---

DOI: (U) 20020324.
REQS: (U)
SOURCE: (S//REL ████ //ISN US9AG-000703DP//IS A 44-YEAR-OLD ALGERIAN
DETAINEE
PAGE 06 RUEOMFE8942 ~~SECRET~~
WHO WAS ARRESTED IN FAISALABAD, PAKISTAN AT THE SAME HOUSE AS
ABU
((ZUBAYDAH)). DETAINEE WAS A MEMBER OF AL-NO OR MOSQUE IN
HAMBURG,
GERMANY AND
PARTICIPATED IN THE ANNUAL JAMAAT AL-TABLEEGH EVENT.
SUMMARY: (S//REL ████ ABU BARRA THE SYRIAN WAS DETAINEE'S
FAROUQ
TRAINER IN SEPTEMBER 2001. THE SAUDI, GHASSAN ABDALLAH GHAZI
((AL-SHIRBI))'S PHONE NUMBER WAS ████ THE DETAINEE
BELIEVES THAT US9LY-000685DP IS FROM ALGERIA. MANY AL QAIDA
MEMBERS
ESCAPED THE FAISALABAD HOUSES AFTER GETTING DOCUMENTS.
TEXT: 1. (C//REL ████ AT THE AL FAROUQ CAMP IN MID SEPTEMBER 2001,
ABU BARAA THE SYRIAN WAS IN CHARGE OF THE DETAINEE'S FAROUQ
TRAINING
GROUP. THERE WERE ABOUT 30 INDIVIDUALS IN TRAINING, SEVEN
AFGHANIS
IN CHARGE OF THE KITCHEN, APPROXIMATELY FOUR PEOPLE WERE IN
CHARGE
OF WEAPONS, AND ONE OR TWO PEOPLE WERE RESPONSIBLE FOR
DRIVING
THE CARS AND ONE TRUCK.
2. (C//REL ████ THE DETAINEE WAS CAPTURED WITH SEVERAL PEOPLE
AT THE
ABU ZUBAYDAH FAISALABAD SAFE HOUSE IN FAISALABAD, ████
████ PAKISTAN. THE DETAINEE SURMISES THAT EVERYONE.
AT
PAGE 07 RUEOMFE8942 ~~SECRET~~
THE FAISALABAD GUESTHOUSES WERE TRYING TO GET DOCUMENTATION
TO
ESCAPE FROM THE COUNTRY. THE DETAINEE BEGAN THE PAPERWORK
FOR A
PASSPORT BECAUSE MANY TALIBAN AND AL QAIDA MEMBERS ESCAPED
DURING

UNCLASSIFIED//FOR PUBLIC RELEASE

HIS STAY AT THE TWO FAISALABAD HOUSES.

2A. (S//REL ███████ GHASSAN ABDALLAH GHAZI ((AL-SHIRBI))'S, ISN US9SA-000682DP,

PHONE NUMBER IN SAUDI ARABIA WAS ███████ THE DETAINEE IS UNSURE OF THE LAST THREE (3) DIGITS OF THE SAUDI'S PHONE NUMBER. WHILE THE DETAINEE WAS AT THE FAISALABAD GUESHOUSE, GHASSAN TOLD THE

DETAINEE THAT HE HAD BEEN ARRESTED IN THE UNITED STATES FOR EITHER

DRUGS OR A DUI WHILE ATTENDING A UNIVERSITY, POSSIBLY IN TEXAS.

2B. (S//REL ███████ THE DETAINEE BELIEVES THAT ABDELRAZAK ALI ((ABDELRAHMAN)), ISN US9LY-000685DP, IS AN ALGERIAN. THE DETAINEE BELIEVES THIS BECAUSE ABDELRAZAK TOLD HIM HE WAS LOOKING FORWARD TO

GOING HOME TO ALGERIA. IN FACT, ABDELRAZAK WOULD WRITE DOWN ENGLISH

WORDS GHASSAN TAUGHT HIM ON A BLACKBOARD WHILE THEY WERE AT THE

FAISALABAD GUESTHOUS E. (FIELD COMMENT - US9LY-000685DP HAS CONSISTENTLY TOLD INTERROGATORS HE DOES NOT KNOW HOW TO READ OR

WRITE). DETAINEE IS SURE US9LY-000685DP IS NOT LIBYAN, AND INSISTS HE SPEAKS WITH AN ALGERIAN ACCENT.

PAGE 08 RUEOMFB8942 S E C R E T

3. (S//REL ███████ THE DETAINEE'S CELL PHONE NUMBER WHILE LIVING IN HAMBURG/ ███████ GERMANY AND AFGHANISTAN WAS

███████ THE PASSWORD FOR THE CELL PHONE WAS ███ THE TELEPHONE ACCOUNT WAS WITH DEUTSCHE TELEKOM COMPANY, A GERMAN

TELEPHONE COMPANY, AND WAS ACTIVATED AROUND SEPTEMBER 2001.

COMMENTS: 1. (S//REL ███████ FIELD COMMENTS. THE DETAINEE ANSWERED ALL QUESTIONS

WITHOUT HESITATION. INFORMATION FOR THIS IIR WAS TAKEN FROM INTERVIEWS ███████ BUT WAS NEVER PREVIOUSLY REPORTED.

2. (S//REL ███████ THE DETAINEE IS AVAILABLE FOR FURTHER CONTACT.

3. (S//REL ███████ REQUEST EVALUATION OF THIS IIR TO CONFIRM OR REFUTE

THE ABOVE

INFORMATION FROM THIS DETAINEE SO THAT WE CAN ASSESS HIM, AND TO

OBTAIN

FOLLOW-UP QUESTIONS TO FOCUS FURTHER INTERROGATION EFFORTS.

4. (S//REL ███████ EVALUATIONS SHOULD BE SENT ███████

UNCLASSIFIED//FOR PUBLIC RELEASE

JA001762

UNCLASSIFIED//FOR PUBLIC RELEASE

INFO COPIES
PAGE 09 RUEOMFE8942 S E C R E T

██████████████████████████████████
██████████████████████████████████
████████████████████████████  ADDRESS ALL
REQUESTS FOR
RELEASE OF INFORMATION OR FOR FURTHER DISSEMINATION ████████
████████

J2CMD//FDO//,
████████████████████  OR EMAIL COMMENTS ████████████

5. (S//REL          SECRET REL         UTF GTMO MESSAGE DTG ████████████
IS CHANGED IN
VARIOUS SECTIONS.
COLL: (U) BH; CA; DD.
INSTR: (U) U.S. NO.
PREP: (U) ████████████████
ACQ: (U) ██████████████████████
DISSEM: (U) FIELD -- NONE.
WARNING: (U) REPORT CLASSIFIED S E C R E T//RELEASABLE TO ████████

PAGE 10 RUEOMFE8942 S E C R E T
DRV FROM: (U) DO HUMINT SCG, SEP 03.
FINAL SECTION OF 2
QQQQ
DECL: (U) X1.
DeClassBy: DO HUMINT SCG SEP 0 3
DeclassReason:
DeclassDate: X-1
BT
#8942
NNNN

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102     Document #1443998          Filed: 06/11/2013     Page 755 of 877

# Exhibit 94



PREC: R  DTG: 291911Z AUG 02
FROM: ███████████████████████

~~CONFIDENTIAL~~

SERIAL: (U) IIR 7 739 3352 02.

PASS: (U) ████████████████

COUNTRY: (U) AFGHANISTAN (AF).

IPSP: (U) ████████

SUBJ: IIR 7 739 3352 02 ████████████ - FIRE INCIDENT REPORT OUTLINES THE NAMES
OF ELEVEN AL-QAEDA AFFILIATES (U)

WARNING: (U) THIS IS AN INFORMATION REPORT, NOT FINALLY EVALUATED
INTELLIGENCE. REPORT CLASSIFIED ~~CONFIDENTIAL~~.

DEPARTMENT OF DEFENSE

DOI: (U) 20020101.

REQS: (U) ████████████████

SOURCE: (C) ████████████ INFORMATION FROM THIS REPORT WAS OBTAINED FROM
HARMONY DOCUMENT NUMBER AFGP-2002-003727
████████████████████████████████████████

SUMMARY: (C) FULL ENGLISH TRANSLATION OF A SIX PAGE ARABIC DOCUMENT
CONTAINED A FIRE INCIDENT REPORT WHICH OUTLINED THE NAMES OF AT LEAST
ELEVEN AL-QAEDA AFFILIATES WHO WERE PRESENT DURING THE INCIDENT.

TEXT: 1. (C) BACKGROUND. THE ORIGINAL HARMONY DOCUMENT NUMBER
AFGP-2002-003727, WAS RETRIEVED BY ████████████████ IN THE KABUL, AF
(NFI).

2. (C) AL-QAEDA AFFILIATES. ((ABU AL-FARAJ)) SUBMITTED AN ACCIDENT REPORT TO
SHEIKH ((AHMAD ABDULLAH)). THE REPORT PERTAINED TO AN ACCIDENTAL FIRE THAT
TOOK PLACE IN THE KHOUST GUEST HOUSE (FIELD COMMENT -- THE GUEST HOUSE WAS
USED AS A BARRACKS TO HOUSE AL-QAEDA TRAINERS AND TRAINEES). THE REPORT
CONTAINED A PARTIAL DATE (THURSDAY, 28 SHA'BAN) BUT DID NOT INCLUDE THE
YEAR.

THE REPORT STATED THAT THE FOLLOWING INDIVIDUALS WERE PRESENT DURING THE
INCIDENT—
1- ABU MUATH AL ((LEABI))
2- SAAD AL ((LEABI))
3- TAHA AL ((MAGHRIBI))
4- ABU OSAMA AL ((JAZAERY))
5- JAFAR AL ((MAGHRIBI))
6- ABU HAFES AL ((HUSAINI))
7- HAMZA AL ((ZUBAIR))
8- TAREK AL ((MASRI))
9- ABU SULIMAN AL ((MASRI))

10- HAMZA AL ((JAWFI))

11- ABU MUHAMMAD AL ((JAZAERI))

3. (C) TRANSLATION. UNEDITED ENGLISH TRANSLATION FOLLOWS- " IN THE NAME OF ALLAH THE MOST GRACIOUS THE MOST MERCIFUL SUBJECT: A REPORT IN REGARD OF A FIRE THAT TOOK PLACE IN KHOUST GUEST HOUSE. SHEIKH AHMAD ABDULLAH APOLOGIES THIS IS WRITTEN WITHOUT THE WILL OF AHMAD ((ABDULAZIZ)) MAY ALLAH PROTECT HIM- PEACE AND MERCY OF GOD BE UPON YOU. ACCIDENT DATE- THURSDAY 28 SHA'BAN (FIELD COMMENT – SHA'BAN IS THE EIGHTH MONTH IN THE ISLAMIC LUNAR CALENDAR.) TIME - 6:00 PM

PERSONNEL WHO WERE PRESENT AT THE ACCIDENT FROM THE BEGINNING

1- ABU MUATH AL ((LEABI)) ANOTHER PRONUNCIATION IS ((LEEBI)) (FIELD COMMENT – TRANSLATOR THINKS THIS PERSON'S NATIONALITY IS LIBYAN) - TEAM LEAD AND FORMER TRAINER.

2- SAAD AL ((LEABI)) )) ANOTHER PRONUNCIATION IS ((LEEBI)) (FIELD COMMENT – TRANSLATOR THINKS THIS PERSON'S NATIONALITY IS LIBYAN) - TRAINER.

3- TAHA AL ((MAGHRIBI)) (FIELD COMMENT – I THINK THIS PERSON'S NATIONALITY IS MOROCCAN) - TRAINER.

4- ABU OSAMA AL ((JAZAERY)) (FIELD COMMENT–TRANSLATOR THINKS THIS PERSON'S NATIONALITY IS ALGERIAN)- EX-TRAINEE- ATTENDED THE BOMBARDMENT.

5- JAFAR AL ((MAGHRIBI)) (FIELD COMMENT – TRANSLATOR THINKS THIS PERSON'S NATIONALITY IS MOROCCAN)- A TRAINEE AT KHELDEN (CNA) - STAYS IN THE GUEST HOUSE AND HE BELONGS TO THE FIGHTING GROUP.

PERSONNEL WHO WERE PRESENT AT THE ACCIDENT AFTER ITS DEVELOPMENT:

6- ABU HAFES AL ((HUSAINI))

7- HAMZA AL ((ZUBAIR))

8- TAREK AL ((MASRI)) (FIELD COMMENT – TRANSLATOR THINKS THIS PERSON'S NATIONALITY IS EGYPTIAN).

9- ABU SULIMAN AL ((MASRI)) (FIELD COMMENT –TRANSLATOR THINKS THIS PERSON'S NATIONALITY IS EGYPTIAN).

10- HAMZA AL ((JAWFI))

11- ABU MUHAMMAD AL ((JAZAERI)) (FIELD COMMENT –TRANSLATOR THINKS THIS PERSON'S NATIONALITY IS ALGERIAN)

THE START OF THE ACCIDENT AT THE TIME AND DATE MENTIONED, BROTHER SAAD ENTERED THE COMMUNICATION ROOM (THE ADMINISTRATIVE ROOM) AND LIT THE LANTERN AND THREW THE MATCH OUT THROUGH THE WINDOW (THE MATCH MIGHT HAVE FALLEN INSIDE. THEN HE TOOK THE LANTERN AND WENT OUTSIDE AND STAYED FIVE TO TEN MINUTES, THEN HE RETURNED TO THE ROOM AND PLACED THE LANTERN ON THE TABLE WITHOUT NOTICING ANYTHING. WHILE EVERYONE WAS HAVING DINNER IN THE PRAYER ROOM, ABU OSAMA CAME IN AND TOLD EVERYONE THAT THE BED IN THE COMMUNICATION ROOM HAD CAUGHT FIRE, AND HE WAS ABLE TO EXTINGUISH IT. ABU MUATH AND THE OTHERS WENT TO MAKE SURE OF THAT, AND TOOK THE BURNED

BED OUTSIDE AFTER THEY HAD POURED WATER ON IT AND MADE SURE THAT THE FIRE WAS EXTINGUISHED. THEY THEN OPENED THE WINDOW, SINCE THE ROOM WAS FILLED WITH SMOKE. THEN ABU OSAMA WENT BACK ONE MORE TIME TO MAKE SURE THAT THE FIRE WAS OUT. AFTER THEY FINISHED DINNER, AL ZUBAIR, ABDULLAH, AND THE REST OF THE BROTHERS CAME IN AND INFORMED THE OTHERS THAT THERE WAS A SMELL OF SOMETHING BURNING. THEN THEY INFORMED THEM THAT IT WAS SOMETHING SIMPLE, BUT THEY DID NOT GO INTO DETAILS. THEN THE PRAYER WAS HELD AND THAT WAS AT 6:45. AND WHILE THEY WERE IN THE SECOND "RAKAA" (FIELD COMMENT – THIS TERM REFERS TO THE KNEELING POSITION IN THE PRAYER), THEY HEARD WHAT SEEMED TO BE GUNSHOTS. THE GUNSHOTS CONTINUED, SO (ABU TAREK) THOUGHT THAT SOMEONE HAD COME ON THEM DURING THE PRAYER AND STARTED SHOOTING AT THEM. ABU TAREK LEFT THE PRAYER, FOLLOWED BY SAAD, TO CHECK THAT OUT. THE REST WHO WERE IN THE PRAYER HEARD ABU TAREK SAYING "BROTHERS FIRE, FIRE", AND THEN THE REST LEFT THE PRAYER. IT WAS A VERY DIFFICULT SITUATION. THE WHOLE ROOM HAD CAUGHT ON FIRE, AND THEY WENT THROUGH THE DOOR TO THE HALLWAY. WHENEVER THE BROTHERS WERE ATTEMPTING TO PUT OUT THE FIRE, THEY HEARD GUNSHOTS (IT WAS VERIFIED THAT IT WAS AN AMMUNITION POUCH THAT CAUGHT FIRE IN THE ROOM). MOST IMPORTANTLY, ABU MUATH WENT TO THE FIRE STATION WITH THE CAR AND THE REST WERE BUSY TRYING TO PUT OUT THE FIRE AND ISOLATE IT BEFORE IT EXTENDED TO THE NEXT ROOMS. MOST IMPORTANTLY, THE BROTHERS WERE ABLE TO BREAK THE NEXT-DOOR WINDOW AND EMPTIED ITS CONTENTS. THEY WERE VERY IMPORTANT ITEMS–
- STINGER
- SAM 7
- ELECTRIC DETONATORS AND OTHER THINGS
THE SITUATION ESCALATED AFTER THE CEILING CAUGHT ON FIRE AND BEGAN TO SPREAD. MEANWHILE, A FIRE TRUCK ARRIVED AND STARTED PUTTING OUT THE FIRE UNDER THE SUPERVISION OF THE CURRENT GOVERNOR, ABDUL BARI. AFTER TWO HOURS, THE BROTHERS WERE ABLE TO CONTAIN AND PUT OUT THE FIRE WITH THE HELP OF ALLAH.

(FIELD COMMENT – THE BOTTOM OF THE PAGE SAYS "KHOUST FILE") -RESULTING LOSSES–MATERIAL LOSSES WERE RELATIVELY SIGNIFICANT, " VERSE FROM THE QURAN REFERRING TO THERE IS NO POWER EXCEPT THE POWER OF ALLAH".
HERE ARE SOME OF THE DETAILS;
1- TWO HIGH FREQUENCY (H.F) RADIOS, BRAND - IN THE NAME OF GOD- MADE IN PAKISTAN.
2- ONE REPEATER - LOCALLY ASSEMBLED -YAESU
3- ONE KALASHNIKOV
4- ONE AMMUNITION POUCH AND ITS CONTENTS
5- ONE RPG POUCH AND ITS CONTENTS
IN ADDITION TO THE CONTENTS OF THE ROOM INCLUDING FURNITURE, BEDS, AND A TABLE, THE BUILDING SUSTAINED DAMAGES OF TWO WINDOWS AND THREE CEILINGS. ALLAH IS THE ALL KNOWER MY OWN EVALUATION OF THE ACCIDENT IS THAT THE ACCIDENT WAS NOT INTENTIONAL FROM ANY OF THE BROTHERS PRESENT, AND IT WAS DESTINED TO HAPPEN BECAUSE OF THE LANTERN OR THE MATCH. ALL THE KNOWLEDGE IS DUE TO ALLAH SALAM (PEACE)
YOUR BROTHER ABU AL ((FARAJ))

THIS WAS A NARRATION OF THOSE WHO WERE PRESENT; I CHECKED THE SITE THE DAY AFTER.
DELIVERED TO / AHMAD ((ABDUL AZIZ))
MAY ALLAH PROTECT HIM"

COMMENTS: 1. (U) THIS INTELLIGENCE REPORT IS DERIVED FROM HARMONY DOCUMENT NUMBER AFGP-2002-003727 PAGES 1, 3, 5, AND 6. ███████████



2. (C)

3. (U) REQUEST THAT THE REPORTED INFORMATION BE EVALUATED FOR ITS
UTILITY, VALUE, AND SUPPORT TO ███████████ REQUIREMENTS AND
INFORMATION NEEDS.
COLL: (U) CA; MM.
INSTR: (C) U.S. NO.
PREP: (U) ██████████
ACQ: (U)
DISSEM: (U) FIELD: NONE.
WARNING: (U) REPORT CLASSIFIED C O N F I D E N T I A L.
HMSNG://858274//
DRV FROM: DO HUMINT SCG, MAR 02
DECL: X1
BT
#6455
D878

NNNN

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 97

UNCLASSIFIED//FOR PUBLIC RELEASE

SERIAL: (U) ████████████
SUBJ: KNICKER KNOWLEDGEABILITY BRIEF - ████████████ (U)
SUMMARY: (U) //████████████ IS A 31-YR-OLD WHO CLAIMS LIBYAN CITIZENSHIP
IN LIBYA. SOURCE BELIEVED HE WAS GOING TO PAKISTAN TO STUDY ISLAM.
SOURCE WAS DETAINED WITHOUT IDENTIFICATION DOCUMENTS. SOURCE
RELIABILITY HAS NOT BEEN DETERMINED.
TEXT: (U)
1. (U) PERSONAL DATA:
1A. NAME: ABDUL ((AL RIZAK)).
1B. SRCNO: ████████████
1C. SRCNO1: ISN US9LY-000685DP.
1D. SRCNO2: ████████████
1E. SRCNO3: ████████████
1F. CITIZEN: LY.
1G. BIRTCITY: AL JILAT.
1H. BIRTCTRY: LY.
1I. BIRTDT: 19700700.
1J. PCO: DH.
1K. LEFTDT: 20020614.
1L. INITCTDT: 20020523.
1M. LASTCTDT: 20020618.
1N. LASTCTRY: AF.
1O. LANGCOMP: QE5.
2. (U) EDUCATION--
2A. C; 76-77; ELEMENTARY SCHOOL; XX; AL JILAT; LY; INCOMPLETE; GENERAL
STUDIES.
3. (S) EMPLOYMENT--
3A. 77-01; SCRAP YARD; XX; ZOWIA; LY; LABORER; 0.
4. (S) MIL SERVICE--NONE
5. (S) SPECIFIC KNOWLEDGEABILITY:
5A. (S) ████████████ SOURCE MAY BE ABLE TO PROVIDE LIMITED TO GENERAL
INFORMATION ON ((AHMED)), THE MAN FROM THE REGION OF JORDAN, SYRIA, AND
PALESTINE WHO WAS IN CHARGE OF THE SAFEHOUSE IN FAISALABAD, PAKISTAN.
DOI: 20020300.
5B. (S) ████████████ SOURCE MAY BE ABLE TO PROVIDE LIMITED TO GENERAL
INFORMATION ON INTERNATIONAL TERRORISM. DOI: 20020300.
5C. (S) EDUCATION (PARAGRAPH 2) CONTINUED. SOURCE ONLY ATTENDED ONE
YEAR OF SCHOOL BECAUSE HE WAS FORCED TO WORK WITH HIS FATHER IN THE
SCRAP YARD.
5D. (S) EMPLOYMENT (PARAGRAPH 3) CONTINUED. SOURCE WORKED WITH HIS
FATHER AT THE VEHICLE SCRAP YARD IN THE ZOWIA AREA, TWO HOURS FROM AL
JILAT. THE CLOSEST CITIES WERE SABRATTA, LIBYA AND TRIPOLI, LIBYA.
5F. (S) ROUTE OF INGRESS. SOURCE TRAVELED WITH ABDUL ((RAHMAN)), A
LIBYAN WHO HAD WORKED AT THE SCRAP YARD FOR THE PAST FIVE YEARS, TO
PAKISTAN. RAHMAN PAID FOR THE ENTIRE TRIP. SOURCE HAD HIS LIBYAN
PASSPORT AND A STUDENT VISA FOR PAKISTAN. THEY TOOK A TAXI FROM AL
JILAT TO TUNIS, TUNISIA AND STAYED THERE FOR ONE NIGHT. THE FIRST LEG
OF THE FLIGHT WAS FROM TUNIS TO DAMASCUS, SYRIA ON A TUNISIAN AIRLINE.
THEY SPENT ONE DAY IN DAMASCUS AND TOOK ANOTHER FLIGHT ON AN UNKNOWN
AIRLINE TO KARACHI, PAKISTAN WITH ONE STOPOVER IN AN UNKNOWN LOCATION.
THEY WERE MET AT THE AIRPORT IN KARACHI BY TWO AFGHANI FRIENDS OF
RAHMAN WHO CLAIMED THEY WERE STUDENTS AT THE IMAM ABU HANIFA SCHOOL.
THEY STAYED AT THE TWO AFGHANIS' HOUSE IN KARACHI FOR ONE WEEK.
SOURCE, RAHMAN, AND THE TWO AFGHANIS TOOK A TAXI TO THE TWO AFGHANIS'
OTHER HOUSE IN A VILLAGE NEAR THE BORDER OF AFGHANISTAN. THEY STAYED
THERE FOR TWO OR THREE DAYS AND LEFT BECAUSE THERE WAS NO SCHOOL THERE.

THE FOUR OF THEM TOOK A TAXI TO THE BORDER AND THEN TOOK ANOTHER TAXI TO KABUL, AFGHANISTAN SINCE THERE WAS A SCHOOL THERE FOR THEM TO ATTEND. SOURCE STAYED IN THE HOUSE IN KABUL FOR ONE MONTH WHILE RAHMAN AND THE TWO AFGHANIS HE CAME WITH SUPPOSEDLY DISAPPEARED TO FIGHT WITH THE TALIBAN IN THE WAR.

5G. (S) ROUTE OF EGRESS. SOURCE FLED KABUL ON APPROXIMATELY 20011101 IN A TAXI HEADING SOUTH WITH UNARMED AFGHANS. THEY DROVE FOR SIX HOURS TO THE MOUNTAINS AND THEN WALKED FOR TWO HOURS. THEY STAYED IN HOUSES OWNED BY AFGHANS IN THE MOUNTAINS FOR ONE TO TWO WEEKS AT A TIME UNTIL THEY CROSSED THE BORDER INTO PAKISTAN ON APPROXIMATELY 20020105. WHILE IN PAKISTAN, SOURCE STAYED IN HOUSES OWNED BY AFGHANS FOR TWO WEEKS AT A TIME FOR TWO MONTHS. SOURCE WAS CAPTURED IN 20020300 BY THE PAKISTANI POLICE IN FAISALABAD AT THE HOUSE OF ((AHMED)), WHO WAS FROM THE REGION OF JORDAN, SYRIA, AND PALESTINE.

5H. (S) LAST KNOWN ADDRESS IN THE UK. SOURCE LIVED AT THE SCRAP YARD. HIS FATHER'S NAME IS ██████████████ AND HIS MOTHER'S NAME IS ██████████

5I. (S) ALIAS USED. SOURCE DID NOT HAVE AN ALIAS.
5J. (S) TRIBE AND MOSQUE AFFILIATIONS. SOURCE DID NOT ATTEND THE MOSQUE AND IS FROM THE HAMADI TRIBE.
//MILEQUIP: NONE//
//IPSP: ██████████
6. (S) COLLECTOR'S COMMENTS:
6A. (S) ████████████████████████████████████████████████████

6B. (S) ON THIS JTF 170 KB, SOURCE NAME DEVIATES FROM THE NAME THAT APPEARS ON DOCUMENTS FORWARDED TO JIFSOUTH FROM AFGHANISTAN. LINE 1A ON THE JTF 170 KB REFLECTS THE NAME AS GIVEN BY THE DETAINEE TO THE INTERVIEWER AT GUANTANAMO DETENTION FACILITY. THE NAME THAT APPEARED ON PREVIOUS DOCUMENTS FORWARDED IS ABD AL-AZAK ALI ABD ((AL-RAHMAN)).
6C. (S) SOURCE DENIED HAVING ANY KNOWLEDGE OF THE ATTACKS IN THE U.S. PRIOR TO THEIR EXECUTION ON SEPTEMBER 11TH, AND ALSO DENIED KNOWLEDGE OF ANY RUMORS OR PLANS OF FUTURE ATTACKS ON THE U.S. OR U.S. INTERESTS. SOURCE WAS QUERIED REGARDING ANY KNOWLEDGE OR PLANNING OF INTERNAL UPRISINGS AT THE GUANTANAMO DETENTION FACILITY, WITH NEGATIVE RESULTS.
7. (S) GUID: REQUIREMENTS THROUGH SECRET ██████████ SHOULD BE PROCESSED AS FOLLOWS:
7A. (S) ADDRESS ELECTRONICALLY TRANSMITTED REQUIREMENTS ████████████████ SEND INFO COPIES ████████████████

7B. (U) FORWARD REQUIREMENTS NLT 30 DAYS FROM RECEIPT.
7C. (U) THIS INFORMATION WAS OBTAINED FOR THE PURPOSE OF ASSESSING THE FOREIGN INTELLIGENCE KNOWLEDGEABILITY ██████████
8. (U) FILE: ██████████
DRV FROM: DO HUMINT SCG, MAR 02
DECL: X1

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 98

SECRET
SERIAL: (S) ██████
SUBJ: KNICKER KNOWLEDGEABILITY BRIEF - ████████████ (S)
SUMMARY: (S) ██████████ IS A 25-YR-OLD WHO CLAIMS CITIZENSHIP IN
SAUDI ARABIA. SOURCE WENT TO AF AFTER 11 SEPTEMBER 2001 TO FIGHT
AMERICANS. SOURCE ATTENDED MILITARY TRAINING IN AF AND
EXPLOSIVES DETONATOR TRAINING IN PK WITH ABU ((ZUBAYDAH)).
SOURCE RELIABILITY HAS NOT BEEN DETERMINED.
TEXT: (S)
1. (S) PERSONAL DATA—
1A. NAME– JABRAN SA'AD ((WAZIR)).
1B. SRCNO–██████
1C. SRCNO1– ISN US9SB-000696DP.
1D. SRCNO2–███████
1E. SRCNO3–███████
1F. CITIZEN– SA.
1G. BIRTCITY– TABUK.
1H. BIRTCTRY– SA.
1I. BIRTDT– 19770000.
1J. PCO– DH.
1K. LEFTDT– 20020400.
1L. INITCTDT– 20020400.
1M. LASTCTDT– 20020805.
1N. LASTCTRY– PK.
1O. LANGCOMP– AD5; EN2.
2. (S) EDUCATION–
2A. (S) C; 95-01; KING SAUD UNIVERSITY; XX; RIYADH; SA; BACHELORS;
ELECTRICAL ENGINEERING.
2B. (S) C; 92-95; KING FAHD HIGH SCHOOL; XX; RIYADH; SA; DIPLOMA;
GENERAL EDUCATION.
3. (S) EMPLOYMENT–
3A. (S) 01-01; SAUDI ELECTRIC COMPANY; XX; RIYADH; SA; APPRENTICE
ENGINEER; 0.
4. (S) MIL SERVICE– NONE.
5. (S) SPECIFIC KNOWLEDGEABILITY—
5A. (S) ██████████ SOURCE CAN PROVIDE SPECIFIC INFORMATION
MILITARY TRAINING CONDUCTED NEAR KABUL, AF DURING THE US
OFFENSIVE, AS REPORTED IN IIR 2 340 7315 02 AND IIR 2 340 7254 02. DOI–
20011100.
5B. (S) ██████████ SOURCE CAN PROVIDE SPECIFIC INFORMATION ABOUT
TALIBAN RETREAT AND AN EXFILTRATION NETWORK FROM ZORMAT, AF
TO PAKISTAN, AS REPORTED IN IIR 2 340 7226 02. DOI– 20011200.
5C. (S) ██████████ SOURCE CAN PROVIDE SPECIFIC INFORMATION ON AL
QAEDA OPERATIVES SUFIAN IBN MUHAMMED ((BARGHOMI)), ABU A'ISH,
ISMARAI AL MA'ARIK. DOI– 20020300.

5D. (S) ███████ SOURCE CAN PROVIDE SPECIFIC INFORMATION ON ILLEGAL ARAB INFILTRATION OF AF FROM IR. DOI-- 20020900.

5E. (S) ███████ SOURCE CAN PROVIDE SPECIFIC INFORMATION ON AL QAEDA TRAINING WITH ELECTRONIC TIMING DEVICES FOR USE WITH EXPLOSIVES. DOI-- 20020328.

5F. (S) ███████ SOURCE CAN PROVIDE SPECIFIC BIOGRAPHICAL INFORMATION ON AL QAEDA MEMBERS WHO RECEIVED TRAINING ON ELECTRONIC DETONTATION TIMERS IN PAKISTAN. DOI-- 20020200.

5G. (S) ROUTE OF INGRESS. SOURCE MET ABU ABDULLAH IN A COFFEE SHOP IN RIYADH, SA AND DISCUSSED JOINING THE JIHAD IN AF. ABDULLAH GAVE SOURCE A CELL PHONE NUMBER FOR A CONTACT IN IR. SOURCE PURCHASED A TICKET TO DAMASCUS, SY ON SAUDI AIRLINES IN OCTOBER 2001. AFTER A THREE-DAY STOP IN SYRIA AWAITING TRANSPORTATION, SOURCE PURCHASED A TICKET TO TEHRAN, IR ON IRANI AIRLINES. SOURCE HIRED A CAR AT THE AIRPORT IN TEHRAN TO TAKE HIM TO MASHHAD, IR. IN MASHHAD, SOURCE CALLED THE CELL PHONE NUMBER. SOURCE WAS TAKEN TO AN ARAB GUESTHOUSE WHERE HE STAYED FOR ONE WEEK. SOURCE THEN WENT TO ANOTHER ARAB GUESTHOUSE IN MASHHAD FOR ANOTHER WEEK. SOURCE WAS THEN TAKEN THROUGH ZABOL, IR; NIMRUZ, AF; AND KANDAHAR, AF TO KABUL, AF.

5H. (S) ROUTE OF EGRESS. EXFILTRATION ROUTE USED BY SOURCE IS REPORTED IN IIR 2 341 7226 02.

5I. (S) UNTIL OCTOBER 2001, SOURCE LIVED ON ███████ AR RAWDAH NEIGHBORHOOD, RIYADH, SA. PHONE NUMBER ███████ SOURCE IS MARRIED AND HAS NO CHILDREN. HIS WIFE, ███████ LIVES WITH HER FATHER, ███████ IN TARIB, SA.

5J. (S) ALIASES USED. SOURCE USED THE NAME ((HATEB)) IN AFGHANISTAN AND SALMAN ((AL FARISI)) IN FAISALABAD, PK.
//MILEQUIP: BOMB EQUIPMENT AND DETONATION DEVICES//

5K. (S) TRIBE AND MOSQUE AFFILIATIONS. SOURCE BELONGS TO THE PAHTANI TRIBE AND ATTENDED THE KHALID BIN AL WALID MOSQUE IN RIYADH, SA.

5N. (S) FAMILY MEMBERS. SOURCE'S FATHER IS ███████ A 70 YR OLD REAL ESTATE BROKER IN RIYADH, SA. SOURCE HAS TWELVE BROTHERS, ALL LIVING IN RIYADH, SA. HIS BROTHERS ARE ███████ ███████ 36 YR OLD TEACHER; ███████, 35 YR OLD CHEMICAL ENGINEER; ███████), 34 YR OLD CHEMICAL ENGINEER; AYEDN ((WAZIR)), 31 YR OLD ELECTRICAL ENGINEER; ███████ A 29 YR OLD CHEMICAL ENGINEER; ███████ A 27 YR OLD PETROLEUM ENGINEER; ███████ A 25 YR OLD COMPUTER TECHNICIAN; ███████ A 23 YR OLD STUDENT AT A TECHNICAL COLLEGE; ███████ A 23 YR OLD STUDENT AT A COMPUTER INSTITUTE; ███████ A 21 YR OLD STUDENT; ███████ A 15 YR OLD STUDENT; AND ███████, A 9 YR OLD STUDENT.
//IPSP: ███████

6. (S) COLLECTOR'S COMMENTS--

6A. (S) SOURCE IS OF ABOVE AVERAGE INTELLIGENCE AND COOPERATED THROUGHOUT THE MEETING. SOURCE STATED HE WOULD NOT GIVE INFORMATION ABOUT OTHER MUSLIMS. SOURCE HAS PROVIDED INFORMATION CONTAINED IN IIRS 2 340 7315 02, 2 341 7226 02, AND 2 340 7254 02 WHILE IN US CUSTODY IN BAGRAM, AF. SOURCE WAS EVACUATED TO GTMO WITH THE FOLLOWING DRAFT IIRS -- (NO NUMBER) E-MAIL ADDRESSES AND BIOGRAPHICAL INFORMATION ON FOUR AL-QUEDA MEMBERS IN KABUL; 2 340 1007 02, DETAILED TRAVEL ROUTES FROM IRAN TO AFGHANISTAN; 2 340 1009 02, TRAVEL FROM SAUDI ARABIA THROUGH SYRIA AND IRAN; 2 340 1010 02, TACTICS, ROUTINES AND RETREAT OF A UNIT UNDER THE COMMAND OF AHMED ((AL-SURI)); 2 340 1031 02, PERSONALITIES OF PERSONNEL HOUSED AT THE ZUBAYDAH GUEST HOUSE, INCLUDING THE AMERICAN JOSE ((PADILLA)); 2 340 1032 02, TRAINING ON THE USE OF REMOTE EXPLOSIVE DEVICES, ELECTRONIC CIRCUITRY, AND INTERNET USAGE BY ABU ((ZUBAYDAH)); 2 340 1033 02, DETAILS ON THE MUJAHIDIN NETWORK THROUGH IRAN INTO AFGHANISTAN. THESE IIRS WILL BE PUBLISHED ▒▒▒▒▒▒▒▒▒▒

6B. (S) SOURCE DENIED HAVING ANY KNOWLEDGE OF THE ATTACKS IN THE U.S. PRIOR TO THEIR EXECUTION ON SEPTEMBER 11TH, AND ALSO DENIED KNOWLEDGE OF ANY RUMORS OR PLANS OF FUTURE ATTACKS ON THE U.S. OR U.S. INTERESTS. SOURCE WAS QUERIED REGARDING ANY KNOWLEDGE OR PLANNING OF INTERNAL UPRISINGS AT THE GUANTANAMO DETENTION FACILITY, WITH NEGATIVE RESULTS.

7. (S) GUID-- REQUIREMENTS THROUGH SECRET ▒▒▒▒▒▒▒▒ SHOULD BE PROCESSED AS FOLLOWS--

7A. (S) ADDRESS ELECTRONICALLY TRANSMITTED REQUIREMENTS TO ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ SEND INFO COPIES TO ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

7B. (S) INTERAGENCY REPS WHO NEED TO SUBMIT ▒▒▒▒▒▒▒▒▒▒ CONTACT DIA POCS, ▒▒▒▒▒▒▒▒▒▒▒▒▒

7C. (U) FORWARD REQUIREMENTS NLT 30 DAYS FROM RECEIPT.

7D. (U) THIS INFORMATION WAS OBTAINED FOR THE PURPOSE OF ASSESSING THE FOREIGN INTELLIGENCE KNOWLEDGEABILITY ▒▒▒▒▒▒

8. (U) FILE-- ▒▒▒▒▒▒▒▒
DRV FROM: DO HUMINT SCG, MAR 02
DECL: X1

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 107

JA001779



UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

S̶E̶C̶R̶E̶T̶
S̶E̶C̶R̶E̶T̶

# SUMMARY INTERROGATION REPORT

**REPORT#** ▮▮▮▮▮▮▮

▮▮▮▮
NAME: JEBRON SAID WAZI AL-NASHIT
ALIAS: NONE
NATIONALITY: SAUDI ARABIAN

AGE: 25 YEARS OLD

**INTERROGATION**
DTG START: ▮▮▮▮▮▮
DTG END: ▮▮▮▮▮▮
LOCATION: BAGRAM DETENTION FACILITY

INTERROGATOR'S FRN: ▮▮▮▮
INTERPRETER : NONE
LANGUAGE: ENGLISH, ARABIC

APPROACHES: DIRECT, PRIDE AND EGO UP

MAPS USED: NONE

---

**KNOWLEDGE:** ▮▮ KNOWS ROUTES OF TRAVEL AND FACILITATORS INTO AND OUT OF AFGHANISTAN, AL-QAEDA PERSONALITIES AND TYPES OF MILITARY TRAINING IN AFGHANISTAN. ▮▮ MAY HAVE LIMITED KNOWLEDGE OF FUTURE INTENTIONS OF AL-QAEDA MEMBERS.

**TRAINING:** ▮▮ HAD ONE AND ONE HALF WEEKS OF LIGHT WEAPONS TRAINING AT A SMALL CAMP NORTH OF KABUL, AFGHANISTAN IN NOVEMBER OR DECEMBER OF 2001. TRAINING CONSISTED OF PRACTICAL AND THEORETICAL LESSONS WITH THE KALISHNIKOV RIFLE AND THEORETICAL LEARNING OF THE PK, HAND GRENADES, AND PISTOLS.

**EDUCATION:** ▮▮ IS A HIGH SCHOOL GRADUATE AND HOLDS A BACHELORS DEGREE IN ELECTRICAL ENGINEERING.

**TRAVEL:** ▮▮ TRAVELED FROM SAUDI ARABIA TO SYRIA AND THEN ON TO IRAN, AFGHANISTAN AND PAKISTAN.

S̶E̶C̶R̶E̶T̶                    8
S̶E̶C̶R̶E̶T̶

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET
S E C R E T

MILITARY EXPERIENCE: ▓▓ CLAIMS THAT HE HAS NO ACTUAL MILITARY EXPERIENCE OTHER THAN DIGGING A TRENCH NORTH OF KABUL TWO DAYS PRIOR TO THE TALIBAN WITHDRAWAL OF THE AFOREMENTIONED CITY.

OCCUPATION: PRIOR TO HIS DEPARTURE FOR AFGHANISTAN, ▓▓ WORKED AS AN ELECTRICAL ENGINEER FOR THE SAUDI ELECTRIC COMPANY.

PHYSICAL CONDITION: ▓▓ IS IN GOOD PHYSICAL CONDITION.

BAGRAM DETAINEE ▓▓ (HEREINAFTER REFERRED TO AS ▓▓

SUMMARY:

- ▓▓ ELABORATED ON THE NETWORK THAT FACILITATED HIS ENTRANCE TO AFGHANISTAN, INCLUDING THE ADDITIONS OF ABU ABDULLA, SALAH, ▓▓▓▓▓▓▓▓
- ▓▓ EXPANDED THE LIST OF TRAINERS WITH WHOM HE WORKED NEAR KABUL TO INCLUDE ABU HIRAYRA, HUDAIFA, MUHAJIR, AND MUNTHIR.
- ▓▓ REVEALED THAT HE HAD BEEN TASKED BY ABDUL HADI (AN IRAQI) TO RECEIVE ELECTRONICS AND EXPLOSIVE TRAINING WITH ABU ZUBAIDA IN PAKISTAN AND TO THEN RETURN TO AFGHANISTAN TO ACT AS A TRAINER IN THE SAME FIELDS.
- ▓▓ IDENTIFIED THE FOLLOWING INDIVIDUALS FROM THE BAGRAM DETENTION PHOTOGRAPH LOG:
- ▓▓ – BILAL, RECEIVED MILITARY TRAINING IN AFGHANISTAN NEAR KABUL
- ▓▓ – KHATAB, KNOWN TO HAVE BEEN IN AFGHANISTAN IN THE KHOWST REGION
- ▓▓ – SHAFEEQ, AN ALGERIAN IN CHARGE OF TRAINING IN THE SUBJECTS OF EXPLOSIVES AND ELECTRONIC DETONATORS
- ▓▓ – HASSAN, A SAUDI WHO WAS RECEIVING EXPLOSIVES AND ELECTRONICS TRAINING AND HAD ALSO BEEN TASKED TO TEACH THOSE SAME SUBJECTS IN AFGHANISTAN
- ▓▓ – ABDUL RAZAK, AKA MOORAD, HAS KNOWLEDGE OF THE TRAINING TAKING PLACE IN ABU ZUBAIDA'S SAFEHOUSE IN FAISALABAD AND HAS BEEN TO AFGHANISTAN
- ▓▓ – ABDULLAH HUSSEIN, WAS PRESENT IN ABU ZUBAIDA'S SAFEHOUSE IN FAISALABAD FOR 7 TO 10 DAYS AND MAY HAVE RECEIVED TRAINING ON INTERNET COMMUNICATIONS
- ▓▓ – SAMIR, WAS PRESENT IN ABU ZUBAIDA'S SAFEHOUSE AND MAY HAVE KNOWLEDGE OF THE TRAINING TAKING PLACE THERE
- ▓▓ IDENTIFIED JOSE PADILLA, AKA ABDULLAH, AS AN ASSOCIATE OF ABU ZUBAIDA
- IIR'S TO FOLLOW AFTER COMPLETE EXPLOITATION

S E C R E T
SECRET

9

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

~~S E C R E T~~

ASSESSMENT: ▮ IS VERY HEAVILY INDOCTRINATED AND HAS OFFERED TO USE HIS ELECTRICAL EXPERTISE TO HELP IN THE JIHAD ON MORE THAN ONE OCCASION. WE DEBATED THE VALIDITY OF USAMA BIN LADIN'S CLAIM OF BEING A TRUE MUSLIM. HE BELIEVES THAT UBL MADE A MISTAKE BY BRINGING DEATH AND DESTRUCTION IN THE FORM OF THE AMERICAN ARMY TO AFGHANISTAN. HE HAS PROMISED TO HELP ME SAVE INNOCENT AFGHANI LIVES BY TELLING ME THE TRUTH SO THAT THE AMERICANS CAN CATCH CRIMINALS AND THEN LEAVE AND TAKE DEATH WITH US. ▮ IS UNREPENTANT AND ALMOST SCARY IN HIS DEVOTION TO HIS CAUSE. HE ADMITS THAT HE HAS BEEN EXPOSED TO HEAVY ANTI-AMERICAN PROPAGANDA BUT HE SEEMS TO BE WILLING TO LISTEN TO BOTH SIDES OF THE STORY WITH REGARDS TO AMERICA'S FOREIGN POLICY AND OUR FEELINGS TOWARDS THE MIDDLE EAST IN GENERAL.

10

~~S E C R E T~~

~~SECRET~~

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 108

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN
SUMMARY INTERROGATION REPORT:
(S//NF) SUBJECT: ISN US9SA-000696DP, ((AL QAHTANI)) JABRAN SAID WAZAR IS A
27-YR-OLD WHO CLAIMS SAUDI ARABIA CITIZENSHIP.

(S//NF) SUMMARY: ████ TEAM ████ INTERROGATED ((AL QAHTANI)) JABRAN SAID
WAZAR ████ FOR 2 HOURS AND 30 MINUTES. THE INTERROGATION WAS
CONDUCTED IN ENGLISH AND ARABIC - MODERN STANDARD USING A DOD LINGUIST AS AN
INTERPRETER.

2. (S//NF) APPROACH USED: DIRECT, CORRECT YOUR FILE, SLIGHT P&E UP, LOGIC.
3. (S//NF) EFFECTIVENESS OF APPROACH: NONE GIVEN.
4. (S//NF) COOPERATION/KNOWLEDGEABILITY/TRUTHFULNESS/EXPLOITED:

5. (S//NF) RECOMMENDED APPROACH FOR NEXT MEETING:
6. (S//NF) SUMMARY OF INFORMATION (ENSURE ANY INTELLIGENCE RESULTS IN AN IIR):
NO NEW INTELLIGENCE COLLECTED.

7. (S//NF) COLLECTORS COMMENTS: DETAINEE WAS BROUGHT INTO THE BOOTH AND SAT IN A
METAL CHAIR ████████ WAS LEFT IN THE BOOTH FOR ABOUT FIVE MINUTES
████ORE THE LINGUIST, THE SAME AS THE NIGHT BEFORE, ENTERED THE BOOTH AND TURNED
████ IN THE AIR CONDITIONING SO IT WOULD NOT BE AS COLD. THE LINGUIST ASKED
NICETIES AND TOLD DETAINEE HE WOULD BE BACK WITH THE INTERROGATOR MOMENTARILY.
ABOUT FIVE MINUTES LATER ████ AND LINGUIST ENTERED THE BOOTH. ████ GREETED
DETAINEE IN ARABIC HE ANSWERED BACK IN ENGLISH MORE, POLITELY THAN PREVIOUS
INTERROGATIONS. DETAINEE WAS SMILING AND PLAYING WITH HIS BEARD WHILE REMINDED
OF HIS WORDS THE NIGHT BEFORE CONCERNING HIS PASSPORT. DETAINEE WAS ASKED WHO
ELSE USED HIS PASSPORT. (INTERROGATOR NOTE: DETAINEE HAD VOLUNTEERED THE
INFORMATION THE NIGHT BEFORE THAT HE HADN'T BEEN TO THESE PLACES, BUT THAT HE
HAD SAID HE HAD BEEN BECAUSE OF THE STAMPS IN HIS PASSPORT.
████████ INTERROGATOR JUMPED FROM, WHY WERE THESE
STAMPS IN YOUR PASSPORT THEN, WHICH HE LIKELY WOULD HAVE HAD ████████
████ TO WHO ELSE USED IT). DETAINEE STATED THAT NO ONE ELSE HAD USED HIS
PASSPORT, HE HAD WENT TO SYRIA AND IRAN ON HIS WAY TO AF. DETAINEE STATED THAT
HE LEFT ABOUT ONE MONTH AFTER 11 SEP 01 FOR JIHAD. DETAINEE CLAIMED THAT HE
BOUGHT A VIDEO IN THE MARKET PLACE, WATCHED IT ON HIS HOME VIDEO SYSTEM AND THIS
CONVINCED HIM TO GO TO AF. DETAINEE WAS ASKED TO GO OVER HIS TIME LINE AGAIN
CONCERNING TRAVEL AND GAVE THE SAME STORY AS IN HIS ASP, IN THE SAME ORDER, WITH
APPROXIMATELY THE SAME TIME FRAMES. DETAINEE CLAIMED THAT HE PAID FOR THIS ALL
HIMSELF, FROM HIS PRIVATE FUNDS. HOWEVER, DETAINEE CHANGED HIS STORY ABOUT ONE
MONTH AT THE TRAINING CAMP OUTSIDE OF KABUL TO FIFTEEN DAYS. FROM THIS TIME
PERIOD HE AGAIN KEPT THE SAME TIME FRAME AS IN HIS ASP CONCERNING THE SABER
MOUNTAINS AND TRAVEL TO KHOWST, AF. DETAINEE STATES NOW THAT HE WAS IN KHOWST
FOR ABOUT A MONTH AND A HALF. FROM AF DETAINEE STATED THAT A GROUP OF THE MEN
TRAVELED INTO PK GUIDED BY A PAKISTANI, WHOSE NAME HE DID NOT KNOW AND WHOM HE
STATED HE DID NOT KNOW AS A FIGHTER, OR NOT. DETAINEE STATED THAT HE STAYED IN
████ FOR A LONG PERIOD OF TIME, MAYBE MORE THAN A MONTH. HE STATED THAT HE
WAS TRYING TO FIND A WAY TO GET HIS PASSPORT FIXED. WHEN ASKED WHAT WAS WRONG
WITH HIS PASSPORT, DETAINEE STATED THAT HE HAD A STAMP FOR ENTERING IRAN BUT NOT
FOR LEAVING AND ALSO NEEDED A STAMP FOR ENTERING PK. HE STATED THAT HE

UNCLASSIFIED//FOR PUBLIC RELEASE

CONTINUALLY ASKED STRANGERS IN LAHORE, WHERE HE COULD GET THIS FIXED AND WAS DIRECTED EVENTUALLY TO THE HOUSE THAT HE WAS CAPTURED AT IN FAISALABAD, PK. DETAINEE CLAIMS THAT HE DID NOT KNOW WHO OWNED THE HOME AND SPENT MOST OF HIS TIME ALONE. DETAINEE CLAIMED THAT SOMETIMES THEY WOULD TALK AT DINNER AND HE MIGHT TALK ABOUT HIS ENGINEER TRAINING, BUT NOT MUCH. DETAINEE CLAIMS NOW THAT HE DOES HAVE AN ELECTRICAL ENGINEERING DEGREE FROM KING SAUD UNIVERSITY IN RIYADH, BUT THAT HE NEVER STATED THAT HE HAD A CIVIL ENGINEERING DEGREE FROM ABDUL UNIVERSITY AS THERE IS NO SUCH UNIVERSITY, NOT EVEN IN JEDDAH. SLIGHT P&E UP WAS DONE CONCERNING DIFFICULTY OF AN ENGINEERING DEGREE. DETAINEE SAID HE DID NOT REMEMBER EVER SAYING THIS

WHILE SAYING THIS, SMILING AT THE NAME ABDUL UNIVERSITY, DETAINEE CLAIMED THAT HE WENT TO THE HOUSE ONLY TO GET THE PASSPORT FIXED BY DAOUD, WHO KEPT TELLING HIM TO WAIT AND WAIT. HE STATED THAT THE PEOPLE IN LAHORE HAD ALSO TOLD HIM TO FIND DAOUD AND BE PATIENT. DETAINEE LOOKED AT PHOTOS OF DETAINEES THAT WERE IN THE SAFE HOUSE WITH HIM AND IDENTIFIED 694 AS SHAFIK AND 707 AS SAMIR. DETAINEE THEN CLAIMED THAT HE DID NOT KNOW THE OTHER TWO PHOTOS THAT WERE POSSIBLY THIRD BOMBER PHOTOS. DAOUD (ABU ZUBAYDAH), KNOWN, SUPPOSEDLY ONLY AS DAOUD. DETAINEE CLAIMED THAT THE OTHERS CAPTURED AT THE HOUSE WITH HIM AND BROUGHT TO GTMO WERE: GASAN ((LNU)), ABDURAZAK ((AL LYBI)), ABDULLAH ((AL LGERI)), KHALID ((AL PAKISTANI)). DETAINEE ADDED THE NAME AHMED ((LNU)) AS BEING IN AND OUT OF THE HOUSE BUT WAS NOT CAPTURED WITH HIM. DETAINEE FELT THAT THREE CAPTURED AT THE HOUSE WERE KEPT IN PK. THOSE WERE KHALID ((HABIB)), NUR ((LNU)) (INTERROGATOR NOTE: THIS NAME IS THE FIRST NAME OF ISN 707 WHOM HE ▊ ▼ AIMED HE RECOGNIZED AS SAMIR), AND NURBDIN ((LNU)). WHEN ASKED IF HE ▊ ▊GNIZED THE NAMES ABDUL ((AL BARI)) OR MUGHIRA ABD ((AL BARI)), HE SMILED AND SAID THAT THE NAMES THAT HE STATED IN BAGRAM WERE LIES THAT HE MADE THEM UP THINKING THAT IF HE COOPERATED HE WOULD BE SENT STRAIGHT FROM PK TO SA. DETAINEE LAUGHED OPENLY AT THE NAME JAFAR ((AL TAYYAR)) AND DIDN'T THINK THIS WAS A NAME HE MADE UP AND THAT IT WAS FUNNY BECAUSE OF THE MEANING OF TAYYAR - FLYING, OR TO FLY, OR BIRD. WHEN TALKING ABOUT 694 DETAINEE STATED THAT HE HAD HONESTLY NEVER GOTTEN ANY TRAINING FROM HIM OR TRAINED ANYONE HIMSELF. ▊▊HROUGHOUT INTERROGATION DETAINEE▊

HE SEEMED TO BE DEBATING ALL THE TIME WHETHER OR NOT HE SHOULD BE SAYING ANYTHING AT ALL. DETAINEE WHISPERED WHEN HE SPOKE BIT ABOUT TALKING CONCERNING HIS WORK TRAINING EXPERIENCE AND ACTUALLY COVERED HIS MOUTH WHEN TRYING TO CONVERSE ABOUT HIS ENGINEERING WORK AND THE EXPLOSIVES PERSONNEL THAT WERE AT THE HOUSE WITH HIM. DETAINEE STILL DID NOT ACKNOWLEDGE DOING ANYTHING AT THE HOUSE OTHER THAN EATING WITH OTHERS AND WAITING FOR HIS PASSPORT TO BE FIXED. DETAINEE IS MUCH IMPROVED IN ATTITUDE AND SEEMS TO BE TRYING TO IMPROVE HIS HONESTY LEVEL, HE ABSOLUTELY DID NOT WANT TO DISCUSS OTHER PEOPLE'S ACTIONS. ▊▊TALKED TO DETAINEE ABOUT COOPERATING AND WHY THIS COULD BE HELPFUL TO HIM, SINCE OTHERS WERE CAUGHT WITH HIM AND ARE MORE INVOLVED IN THESE THINGS, BUT NOT TAKING THEIR OWN RESPONSIBILITY. ▊▊ALSO WENT OVER THAT ▊▊APPRECIATED HIS ATTITUDE AND UNDERSTOOD THAT THIS IS DIFFICULT. ▊▊TOLD DETAINEE, BEFORE CERTAIN PORTIONS, THAT HE LIKELY WOULD NOT LIKE THE QUESTIONS AND MIGHT FIND IT HARD TO ANSWER. AT THE END OF THE INTERROGATION▊▊TOLD DETAINEE THAT HE HAD BEEN SCHEDULED TO BE INTERROGATED DURING THE DAY, BUT, BECAUSE OF HIS IMPROVED ATTITUDE, HAD THAT LIFTED, FOR THAT DAY. ▊▊THEN TOLD HIM THAT▊▊WOULD TRY TO LIFT THE NEXT FEW DAYS AS WELL, SO THAT HE COULD THINK OUT THE FACES THAT WERE SHOWN TO HIM AND THE NAMES THAT HE COULDN'T REMEMBER, MAYBE HE WOULD REMEMBER AS HE WAS GOING TO SLEEP. ▊▊THEN TOLD DETAINEE THAT ▊ HE WAS TRYING TO BE COOPERATIVE, ▊▊WOULD TRY TO HAVE HIS NIGHT INTERROGATION TIME MOVED EARLIER AND HIM BACK TO HIS CELL A FEW HOURS BEFORE PRAYER, OR LATER TO RETURN JUST BEFORE PRAYER, STAY UP, AND THEN SLEEP MORE IN

UNCLASSIFIED//FOR PUBLIC RELEASE

... DAY. DETAINEE ASKED FOR DAY WITH A SMILE, BUT WAS TOLD THAT IS ALREADY TOO BUSY A TIME, SO HE ASKED JUST A LITTLE EARLIER. ▓▓▓▓ TOLD HIM THAT THERE WOULD NOT BE ANY PROMISE ON THIS BUT ▓▓ WOULD CHECK, ▓▓▓▓ THEN LEFT AND THE LINGUIST SPOKE WITH DETAINEE FOR A FEW MINUTES TELLING HIM THAT HE HAD NEVER SEEN AN INTERROGATOR MAKE SUCH AN EFFORT. DETAINEE LOOKED DIRECTLY AT THE LINGUIST AND KEPT NODDING HIS HEAD AND SEEMING TO THINK ON THESE THINGS.

NOTE: THIS DOCUMENT IS A CONVERTED MFR ▓▓▓▓▓▓▓ ALL GRAMMATICAL AND FORMATTING MISTAKES HAVE BEEN LEFT AS WRITTEN BY THE ORIGINAL INTERROGATOR. AS MUCH AS POSSIBLE, ALL INFORMATION CONTAINED IN THE ORIGINAL REPORT HAS BEEN TRANSFERRED OVER INTO THE SIR FORMAT. WHENEVER POSSIBLE, ONLY NAMES AND OTHER IDENTIFYING INFORMATION OF U.S. PERSONS HAVE BEEN REMOVED FOR THE SAKE OF NATIONAL SECURITY.

8. (U) POC FOR THIS MEMORANDUM IS ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, JTF GTMO.

SIR#6830

SECRET//NOFORN

# Exhibit 110

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI                )
                               )
        Petitioner,            )
                               )
    v.                         )        Civil Action No. 10-cv-1020 (RJL)
                               )
BARACK H. OBAMA, *et al.*,     )
                               )
        Respondents.           )
                               )

# ISN 696 SIR (May 7, 2003) (Includes related pictures)

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~
SUMMARY INTERROGATION REPORT:
(S//NF) SUBJECT: ISN US9SA-000696DP, ((AL QAHTANI)) JABRAN SAID WAZAR IS A
27-YR-OLD WHO CLAIMS SAUDI ARABIA CITIZENSHIP.

1. ~~(S//NF)~~ SUMMARY: █████████████ INTERROGATED ((AL QAHTANI)) JABRAN SAID
WAZAR █████████████ FOR 1 HOURS AND 0 MINUTES: THE INTERROGATION WAS CONDUCTED
IN ENGLISH AND ARABIC - MODERN STANDARD USING A DOD LINGUIST AS AN INTERPRETER.

2. ~~(S//NF)~~ APPROACH USED: DIRECT, ████████████████████████████████
████████████████████████████████████████████████████████████████

3. ~~(S//NF)~~ EFFECTIVENESS OF APPROACH: ██████████████
4. ~~(S//NF)~~ COOPERATION/KNOWLEDGEABILITY/TRUTHFULNESS/EXPLOITED: ████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████

5. ~~(S//NF)~~ RECOMMENDED APPROACH FOR NEXT MEETING: ████████████████████
████████████████████████████████████████████████████████████████

6. ~~(S//NF)~~ SUMMARY OF INFORMATION (ENSURE ANY INTELLIGENCE RESULTS IN AN IIR):
PICTURE IDENTIFICATION OF ABDUL RAZAK ((AL LIBI)), ISN 685 LEADING TO
CLARIFICATION OF ANTHER DETAINEES PHOTO.  FURTHER DETAILS ON MASHHAD HOUSE.

7. ~~(S//NF)~~ COLLECTORS COMMENTS: █████ AND LINGUIST WERE WAITING IN THE BOOTH AS
DETAINEE WAS BROUGHT IN, SEATED ON A CUSHIONED FOLDING CHAIR, AND HIS HANDS
UNCUFFED.  GREETINGS WERE GIVEN.  THE LINGUIST SAT FACING THE DETAINEE AND █████
SAT SLIGHTLY BEHIND AND TO THE RIGHT OF THE DETAINEE.  ██████ EXPLAINED TO
DETAINEE THAT ████ COUNTERPART ███████████████████████████████ SET
UP WAS NOT GOING TO BE JOINING THEM THIS EVENING AND THEREFORE THEY WOULD MAKE
THE SESSION GO AS QUICKLY AS POSSIBLE.  DURING THIS SESSION DETAINEE KEPT HIS
HEAD UP FOR MOST OF THE SESSION, TRYING TO KEEP HIS HEAD TURNED AWAY FROM ████
AS MUCH AS POSSIBLE.  THOUGH HE DID NOT SEEM ARROGANT, HE SEEMED IMPATIENT FOR
MOST OF THE SESSION.  THIS SESSION WAS HELD AT A MUCH EARLIER HOUR THAN
PREVIOUSLY.  DETAINEE WAS NOT VERY RECEPTIVE TO ELABORATING IN HIS ANSWERS AND
ADDRESSING FURTHER QUESTIONS ON THE SAFE HOUSE TOPIC WERE DIFFICULT.  HOWEVER,
DETAINEE DID ANSWER MOST QUESTIONS.  THE INFORMATION FROM THIS WILL BE COMBINED
INTO AN IRR BEGAN FROM THE LAST INTERROGATION SESSION.  TOWARDS THE END OF THE
SESSION ████ LED INTO ASKING ABOUT PERSONNEL BY ASKING ABOUT HIS ROOMMATES IN THE
MASHHAD HOUSE.  DETAINEE STATED THAT HE FORGOT THE NAMES OF HIS ROOMMATES FROM
THE MASHHAD HOUSE, AS WELL AS THOSE IN THE ROOMS ADJACENT AND ELABORATE THAT HE
SPENT MOST OF THE TIME THERE IN HIS BEDROOM LISTENING TO A PERSONAL MUSIC
SYSTEM.  DETAINEE WAS THEN SHOWN TWO PHOTOS AND ASKED IF HE KNEW EITHER OF THE
MEN.  DETAINEE LOOKED AT THE PICTURES, SIDEWAYS GLANCED AT ████, AS IF THINKING
THAT THIS WAS A TEST QUESTION TO SEE IF HE WAS TRUTHFUL.  █████████████████
██████████████████████████████████████████ DETAINEE LOOKED AT THE
PICTURES THEN POINTED TO THE ONE ON THE RIGHT AND STATED THAT "THAT IS ABDUL
RAZAK ((AL LIBI))".  DETAINEE WAS ACTUALLY CAPTURED WITH AL LIBI, YET THERE WERE
OTHERS HE WAS CAPTURED WITH THAT HE HAD SEEN PICTURES OF WITHOUT IDENTIFYING.
THE PICTURE IDENTIFIED BY THE DETAINEE WAS NOT THE ONE IN THE FOLDER FOR THE

UNCLASSIFIED//FOR PUBLIC RELEASE

DETAINEE LISTED AS AL LIBI (ISN 685).  AGAIN ██████ REITERATED TO DETAINEE THAT HE
SHOULD TRY TO THINK OF ANY DETAILS HE MIGHT HAVE LEFT OUT OR THINK OVER WHAT HAS
BEEN DISCUSSED BEFORE AND THAT ████████ COUNTERPART ██████████
WOULD BE IN THE NEXT TIME HE CAME TO THE BOOTH.  DETAINEE WAS FROWNING WHEN
AND LINGUIST LEFT THE BOOTH, THEN DETAINEE PUT HIS HEAD DOWN AND RESTED HIS ARMS
DOWN.  DETAINEE HAD KEPT HIS ARMS CROSSED MUCH OF THE TIME DURING THE
INTERROGATION BUT WOULD WILLINGLY TAKE PEN AND PAPER TO SKETCH FOR ████████
AND ANALYST CHECKED DETAINEE'S PHOTO IDENTIFICATION OF ABDUL RAZAK ((AL LIBI))
BY GOING TO THE GUARD CELL AND REQUESTING TO SEE ██████████████████
██████████████ FOR ISN 685.  THE PHOTOS ON THESE ITEMS MUCH MORE CLOSELY MATCHED
THE PHOTO DETAINEE IDENTIFIED AS AL LIBI THAN THE PHOTO ON THE ASP FROM 685.

NOTE:  THIS DOCUMENT IS A CONVERTED MFR ██████████████ THIS INTERROGATION
WAS NOT CONDUCTED BY FRN ██████████ ALL GRAMMATICAL AND FORMATTING MISTAKES
HAVE BEEN LEFT AS WRITTEN BY THE ORIGINAL INTERROGATOR.  AS MUCH AS POSSIBLE,
ALL INFORMATION CONTAINED IN THE ORIGINAL REPORT HAS BEEN TRANSFERRED OVER INTO
THE SIR FORMAT.  WHENEVER POSSIBLE, ONLY NAMES AND OTHER IDENTIFYING
INFORMATION OF U.S. PERSONS HAVE BEEN REMOVED FOR THE SAKE OF NATIONAL
SECURITY.

8.  (U) POC FOR THIS MEMORANDUM IS ██████████████████████████ JTF
GTMO.

SIR#6895

SECRET//NOFORN

SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDAL RAZAK ALI )<br><br>Petitioner, )<br><br>v. )<br><br>BARACK OBAMA, *et al.*, )<br><br>Respondents. ) | Civil Action No. 10-CV-1020 (RJL) |

# Picture of ISN 685 referenced in May 7, 2003 interview of ISN 696

SECRET//NOFORN
1

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDAL RAZAK ALI | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Civil Action No. 10-CV-1020 (RJL) |
| | ) |
| BARACK OBAMA, *et al.*, | ) |
| | ) |
| Respondents. | ) |

Picture of ISN 215 referenced in May 7, 2003 interview of ISN 696

~~SECRET//NOFORN~~

1

JA001795

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 116

JA001797

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI                )
                               )
        Petitioner,            )
                               )
    v.                         )        Civil Action No. 10-cv-1020 (RJL)
                               )
BARACK H. OBAMA, *et al.*,      )
                               )
        Respondents.           )
                               )

ISN 696 MFR (May 7, 2003) (Includes related pictures)

SECRET//NOFORN                          JA001798

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET~~

20030507

MEMORANDUM FOR RECORD

SUBJECT: (S)// ███████/US9SA-000696/JABRAN SA'AD ((WAZIR)) IS A 26 YEAR OLD SAUDI NATIONAL WHO WENT TO AF AFTER 11 SEPTEMBER 2001 TO FIGHT AMERICANS. SOURCE ATTENDED MILITARY TRAINING IN AF AND EXPLOSIVES DETONATOR TRAINING IN PK WITH ABU ((ZUBAYDAH)). SOURCE RELIABILITY HAS NOT BEEN DETERMINED.

1. (S) SUMMARY: (ONE HOUR, █████ ARABIC)██████ ██████ INTERROGATED ((WAZIR)) ████████FOR ONE HOUR IN ENGLISH AND ARABIC. A DOD LINGUIST ASSISTED. THIS WAS SOURCE'S 14TH INTERROGATION SINCE ARRIVING AT GTMO (ACCORDING TO LATEST DETAINEE FOLDER COUNT. NINE LEA INTERVIEWS AND SIX AF INTERROGATIONS).

A. (S) APPROACH USED: ████████████
████████████████████████
████████████████████████████
████████████████████████

B. (S) EFFECTIVENESS OF APPROACH/LEVEL OF COOPERATION: ████AND LINGUIST WERE WAITING IN THE BOOTH AS DETAINEE WAS BROUGHT IN, SEATED ON A CUSHIONED FOLDING CHAIR, AND HIS HANDS UNCUFFED. GREETINGS WERE GIVEN. THE LINGUIST SAT FACING THE DETAINEE AND ████SAT SLIGHTLY BEHIND AND TO THE RIGHT OF THE DETAINEE. ███ EXPLAINED TO DETAINEE THAT████COUNTERPART███████ ████████████████████████SET UP WAS NOT GOING TO BE JOINING THEM THIS EVENING AND THEREFORE THEY WOULD MAKE THE SESSION GO AS QUICKLY AS POSSIBLE. DURING THIS SESSION DETAINEE KEPT HIS HEAD UP FOR MOST OF THE SESSION, TRYING TO KEEP HIS HEAD TURNED AWAY███████AS MUCH AS POSSIBLE. THOUGH HE DID NOT SEEM ARROGANT, HE SEEMED IMPATIENT FOR MOST OF THE SESSION. THIS SESSION WAS HELD AT A MUCH EARLIER HOUR THAN PREVIOUSLY. DETAINEE WAS NOT VERY RECEPTIVE TO ELABORATING IN HIS ANSWERS AND ADDRESSING FURTHER QUESTIONS ON THE SAFE HOUSE TOPIC WERE DIFFICULT. HOWEVER, DETAINEE DID ANSWER MOST QUESTIONS. THE INFORMATION FROM THIS WILL BE COMBINED INTO AN IRR BEGAN FROM THE LAST INTERROGATION SESSION. TOWARDS THE END OF THE SESSION████LED INTO ASKING ABOUT PERSONNEL BY ASKING ABOUT HIS ROOMMATES IN THE MASHHAD HOUSE. DETAINEE STATED THAT HE FORGOT THE NAMES OF HIS ROOMMATES FROM THE MASHHAD HOUSE, AS WELL AS THOSE IN THE ROOMS ADJACENT AND ELABORATE THAT HE SPENT MOST OF THE TIME THERE IN HIS BEDROOM LISTENING TO A PERSONAL MUSIC SYSTEM. DETAINEE WAS THEN SHOWN TWO PHOTOS AND ASKED IF HE KNEW EITHER OF THE MEN. DETAINEE LOOKED AT THE PICTURES, SIDEWAYS GLANCED████████AS IF THINKING THAT THIS WAS A

~~SECRET~~

JA001799

SECRET

TEST QUESTION TO SEE IF HE WAS TRUTHFUL. ███████████████████

███████████████ DETAINEE LOOKED AT THE PICTURES THEN POINTED TO THE ONE ON THE RIGHT AND STATED THAT "THAT IS ABDUL RAZAK ((AL LIBI))". DETAINEE WAS ACTUALLY CAPTURED WITH AL LIBI, YET THERE WERE OTHERS HE WAS CAPTURED WITH THAT HE HAD SEEN PICTURES OF WITHOUT IDENTIFYING. THE PICTURE IDENTIFIED BY THE DETAINEE WAS NOT THE ONE IN THE FOLDER FOR THE DETAINEE LISTED AS AL LIBI (ISN 685). AGAIN ████ REITERATED TO DETAINEE THAT HE SHOULD TRY TO THINK OF ANY DETAILS HE MIGHT HAVE LEFT OUT OR THINK OVER WHAT HAS BEEN DISCUSSED BEFORE AND THAT ████ COUNTERPART ███████ ████████ WOULD BE IN THE NEXT TIME HE CAME TO THE BOOTH. DETAINEE WAS FROWNING WHEN ████ AND LINGUIST LEFT THE BOOTH, THEN DETAINEE PUT HIS HEAD DOWN AND RESTED HIS ARMS DOWN. DETAINEE HAD KEPT HIS ARMS CROSSED MUCH OF THE TIME DURING THE INTERROGATION BUT WOULD WILLINGLY TAKE PEN AND PAPER TO SKETCH FOR ████████ AND ANALYST CHECKED DETAINEE'S PHOTO IDENTIFICATION OF ABDUL RAZAK ((AL LIBI)) BY GOING TO THE GUARD CELL AND REQUESTING TO SEE THE ██████████████████ ██████ FOR ISN 685. THE PHOTOS ON THESE ITEMS MUCH MORE CLOSELY MATCHED THE PHOTO DETAINEE IDENTIFIED AS AL LIBI THAN THE PHOTO ON THE ASP FROM 685.

C. (U) RECOMMENDED APPROACH FOR NEXT MEETING: █████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

D. (S) SPECIAL ACTION REQUIRED: ████████████████████████
████████████████████████████████████████████████████████████

E. (S) INTELLIGENCE CONTINGENCY FUNDS: ████████

F. (S) LONG TERM COLLECTION PLAN:

SECRET

JA001800

SECRET



G. (S) SOURCE INFORMATION HAS PRODUCED THREE NON DRAFT IIRS ANSWERING THE FOLLOWING REQUIREMENTS:



IN THE INTERROGATION TEAM'S ESTIMATION, THE FOLLOWING　　　　HAVE BEEN LEVIED AGAINST THIS SOURCE ARE NOT APPLICABLE BECAUSE THE SOURCE HAS NO KNOWLEDGE OF THEM:

2. (S) SUMMARY OF NEW INFORMATION OBTAINED: PICTURE IDENTIFICATION OF ABDUL RAZAK ((AL LIBI)), ISN 685 LEADING TO CLARIFICATION OF ANTHER DETAINEES PHOTO. FURTHER DETAILS ON MASHHAD HOUSE.

3. (S) ADDITIONAL COLLECTOR COMMENTS:

4. (S) POC THIS MEMORANDUM IS
　　　　JTF GITMO,

SECRET

JA001801

SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
ABDAL RAZAK ALI                          )
)
    Petitioner,                          )
)
    v.                                   )    Civil Action No. 10-CV-1020 (RJL)
)
BARACK OBAMA, *et al.*,                   )
)
    Respondents.                         )
_____          )

Picture of ISN 685 referenced in ▮▮▮▮▮▮▮ interview of ISN 696

SECRET//NOFORN

1

JA001802

Volume 2, Part D

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI          )
                         )
    Petitioner,          )
                         )
    v.                   )    Civil Action No. 10-CV-1020 (RJL)
                         )
BARACK OBAMA, *et al.*,  )
                         )
    Respondents.         )
                         )

Picture of ISN 215 referenced in [redacted] interview of ISN
696

SECRET//NOFORN
1

JA001804

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 120

JA001806



UNCLASSIFIED//FOUO

Document #AFGP-2002-003727.pdf
Translation: Full
Date: 03/20/2002

This document is six pages but two of them are empty. It is a handwritten accident report written by: Abu Al-Faraj and was sent to Sheikh Ahmad Abdullah against the will of Ahmad Abdulaziz.

This is a report about a fire accident that took place in a guest house called "Khoust" on Thursday, 28th Sha'ban, at 6:00 in the evening.
It starts with a list of names and their duties.
Then it describes how the fire started. The fire started when one of the brothers lit a lantern and threw the match out the window. Next is described the process of putting it out.
The report lists the damages and losses.
The writer confirms that it was not arson or sabotage, but was an accident.

Page 1 of six

In the name of Allah the most gracious the most merciful

Subject: A report in regard of a fire that took place in Khoust guest house.
Sheikh Ahmad Abdullah apologies this is written without the will of Ahmad Abdulaziz-may Allah protect him- peace and mercy of God be upon you.

- Accident date- Thursday 28 Shaban "Hijri Calendar"
- Time – 6:00 PM
- Personnel who were present at the accident from the beginning
  1- Abu Muath Al ((Leabi)) another pronunciation is ((Leebi)) (tc: I think this person's nationality is Libyan)- Team lead and former trainer.
  2- Saad Al ((Leabi)) )) another pronunciation is ((Leebi)) (tc: I think this person's nationality is Libyan)- Trainer.
  3- Taha Al ((Maghribi)) (tc I think this person's nationality is Moroccan)- Trainer.
  4- Abu Osama Al ((Jazaery)) (tc: I think this person's nationality is Algerian)- Ex-trainee- attended the bombardment.
  5- Jafar Al ((Maghribi)) (tc: I think this person's nationality is Moroccan)- A trainee at Khelden- stays in the guest house and he belongs to the fighting group.
- Personnel who were present at the accident after its development:
  6- Abu Hafes Al ((Husaini))
  7- Hamza Al ((Zubair))
  8- Tarek Al ((Masri)) (tc: I think this person's nationality is Egyptian)
  9- Abu Suliman Al ((Masri)) (tc: I think this person's nationality is Egyptian)
  10- Hamza Al ((Jawfi))

UNCLASSIFIED//FOUO

JA001808

UNCLASSIFIED//FOUO

11- Abu Muhammad Al ((Jazaeri)) (tc: I think this person's nationality is Algerian)
- The start of the accident

At the time and date mentioned, brother Saad entered the communication room (the administrative room) and lit the lantern and threw the match out through the window (the match might have fallen inside. Then he took the lantern and went outside and stayed 5-10 minutes, then he returned to the room and placed the lantern on the table without noticing anything.

Page 2 of 6
Blank page

Page 3 of 6

While everyone was having dinner in the prayer room, Abu Osama came in and told everyone that the bed in the communication room had caught fire, and he was able to extinguish it. Abu Muath and the others went to make sure of that, and took the burned bed outside after they had poured water on it and made sure that the fire was extinguished. They then opened the window, since the room was filled with smoke. Then Abu Osama went back one more time to make sure that the fire was out.

After they finished dinner, Al Zubair, Abdullah, and the rest of the brothers came in and informed the others that there was a smell of something burning. Then they informed them that it was something simple, but they did not go into details.

Then the prayer was held and that was at 6:45.

And while they were in the second "Rakaa" (this term refers to the kneeling position in the prayer), they heard what seemed to be gunshots. The gunshots continued, so (Abu Tarek) thought that someone had come on them during the prayer and started shooting at them. Abu Tarek left the prayer, followed by Saad, to check that out. The rest who were in the prayer heard Abu Tarek saying "Brothers fire, fire", then the rest left the prayer.

It was a very difficult situation. The whole room had caught on fire, and they went through the door to the hallway. Whenever the brothers were attempting to put out the fire, they heard gunshots (it was verified that it was an ammunition pouch that caught fire in the room).

Most importantly, Abu Muath went to the fire station with the car and the rest were busy trying to put out the fire and isolate it before it extended to the next rooms. Most importantly, the brothers were able to break the next door window and emptied its contents. They were very important items-
- Stinger
- Sam 7
- Electric detonators and other things

The situation escalated after the ceiling caught on fire and began to spread. Meanwhile, a fire truck arrived and started putting out the fire under the supervision of the current governor, Abdul Bari. After two hours, the brothers were able to contain and put out the fire with the help of Allah.

Page 4 of 6

UNCLASSIFIED//FOUO

The page has some numbers and calculations.
The bottom of the page says "Khoust file"

    Page 5 of 6
- Resulting losses

Material losses were relatively significant, " verse from the Quran referring to there is no power except the power of Allah".
Here are some of the details:

1- Two high frequency (H.F) radios, brand: in the name of god- made in Pakistan.
2- One repeater – locally assembled –YAESU
3- One Kalashnikov
4- One ammunition pouch and its contents
5- One RPG pouch and its contents

In addition to the contents of the room including furniture, beds, and a table, the building sustained damages of two windows and three ceilings.

    Allah is the all knower

My own evaluation of the accident is that the accident was not intentional from any of the brothers present, and it was destined to happen because of the lantern or the match.

    All the knowledge is due to Allah

Salam (peace)
Your brother Abu Al ((Faraj))

This was a narration of those who were present; I checked the site the day after.

    Page 6 of 6

Delivered to / Ahmad Abdul Aziz
       May Allah protect him

UNCLASSIFIED//FOUO

JA001810

JA001811



(٢)

ـ وينفذ للشباب حلاسين في المصلى لتنزلوا به وجيء للعشاء دخل ـ
أبو أسامة من الخارج و أخبر الشباب أنه قد نشبت نار في
غراش في غرفة المخابرة وانعدام باطفائها ...
ـ ذهبنا أبو معاذ و الشباب ـ و ما كدوا من ذلك ثم تقدموا باخراج الزلابي
الذي استغل إلى الخارج بعدان سكبوا عليه النار و انتبوا إلى النار
قد انطفت ثم فتحوا النافذة بحيث كانت الغرفة مليئة بالدخان
ثم ذهب أبو أسامة مرة أخرى و تأكد من أن النار قد انطفأت ...
ـ بعد ذلك تناولوا فوق تناولوا وجبة العشاء دخل الزبيرو كذلك عبدالله ...
ـ رباح الإخوة ـ و أخبروا الشباب به بأي هناك رائحة شيء يحترق ...
ـ فأخبروه هم مثل هذا الأمر بسيط لدون إزالة ...
ـ بعد ذلك أقمت الصلاة و كان ذلك في الساعة ٦.٤٥ ...
ـ وبينما الشباب في الحركة الثانية سمعوا أصواتا أشباه هوية
أجلد في مصدني ـ طلقات متتالية ـ فظنوا (أ أبو طارق) أن شخصاً
دخل عليهم في المصلى فسأل در مجم للخروج ـ أين طريق من المصلى
وتبعه مسعد ـ ليتحققوا من الأمر ـ فأنتبه الإخوة في الصلاة
على صوت أحد طارق و هو يقول (يا إخوة حريق ـ النار ـ) ...
ـ فخرج البقية من الصلاة ...
ـ الوضع كان مخيف جدا ً ـ إذ أن النار كانت قد اشتعلت في الغرفة
واشتدت حتى خرجت حوجيت من الباب اكا تظهر ...
ـ وكان الإخوة كانوا أذ نظروا على النار ليظفر هـ سمعوا صوت طلقات ...
( ... ؟ ) نفشع أ نط حبة كانت في الغرفة و استبعد ؟ ...
ـ الحين ـ جئت أبو معاذ بالسيارة إلى المنا فلدو استنزف المعبئة بإيجاد
ما أمكن و حاولوا عزل أ الحريق حتى لا يتسرب إلى المنازل المجاورة ...
ـ الحين ـ تمكن الإخوة من كسر بالك العرفة لمجاورة و أخرجوا جميع المحتويات
وكانت محمة جدا ً ... ـ استنجر و مسام ج ـ د ـ موادمق كعبا نظف و أنبه الإخوة
الحين ـ تطور الوضع بعدان مسكت النار في السقف ـ و بدأت تشتعل
كهذه الأشياء ـ وبلت سيارة الإطفاء وبا بشرت علما ـ إبشروا ف
الوالد الحاج عبدالباري ... ـ وبعد ساعتين تمكن الإخوة من السيطرة
و تم إطفاؤها بعون الله ...

UNCLASSIFIED//FOLIO

JA001812



JA001813

(٣)

الحسائن الحادثة والناجمة هي:-

- السائر المادية تعتبر كبيرة نسبياً ولا حول ولا قوة إلا بالله.
  والبعض مثني من المتمول.

1- احـدد  فـي  مخـابرة كبيرة  H.F  نوع بيسميلدنـد بالستائنة
   الصح.

2- عدد  ١  ويبيرش توليت محلى  YAESU.

3- عدد  ١  كلاشنكن

4- عدد  ١  مجمـوعـة كلاشنكن بحتويلتها.

5- عدد  ١  مجموعة  REG  بحتويلتها.

- بالاضافة إلى محتويات المعروفة من الفرش، والأسرة وطاولة.
- جميعا أنه المبنى نفسه معطوب من مابين + شبابيك + منطقة + طرف
  تقريباً.

        هذا والله أعلم.

عند تفتيري المناطق أن المادة بث لم يكن بجدك منها أي من الإخوة
المتواجدين سوى ما عملنا قدراً بسبب العلوس أو عود الكبريت.

        والعلم لله أولاً وأخيراً.

                والسـلام
        أخوكم أبو البراع

نقلاً عمن حضر الموقف.
اذا أتي عاينت الموضع بعد ذلك يوم وأحمد.

JA001814



JA001815

Pages Appearing At JA 1816 - 1922
Are Redacted In Full

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 137

JA001923

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ABDAL RAZAK ALI (ISN 685),

    Petitioner,

    v.

BARACK OBAMA, *et al.*,

    Respondents.

Civil Action No. 10-CV-1020 (RJL)

# Calendar Conversion Pages

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102     Document #1443998          Filed: 06/11/2013      Page 811 of 877
UNCLASSIFIED//FOR PUBLIC RELEASE

Member Login  Username:          Password:          [ Login ]  Forgot password?                    Become a Member

# CalendarHome.com

Home · The Calendar Store · Print a Calendar · Day of Week · Free Calendars! · Calendar Links · Today in History
Calendar Toolbar · Calendar Encyclopedia · Web Calendar · Date Calculator · Convert a Date · World Clock

## Calendar Converter

[ Today ]     [ < ] Century [ > ]     [ < ] Year [ > ]     [ < ] Month [ > ]     [ < ] Day [ > ]

**Julian Date:** 2002 | October | 22 | Normal year | Monday

**Julian day:** 2452582.5 | / Modified Julian Day: 52582

**Hebrew Date:** 5763 | Heshvan | 29 | / Embolismic complete (385 days) | Hebrew month: חשון

**Persian Date:** 1381 | Aban | 13 | Normal year | Weekday: Doshanbeh

**Kurdish Date:** 1381 | Gelarezan | 13 | Normal year | Weekday: Doshanben

**Afghan Date:** 1381 | 'Aqrab | 13 | Normal year | Weekday: Doshanbeh

**Mayan Long Count:** 12 . 19 . 9 . 13 . 0 | Haab: 13 Zac | Tzolkin: 9 Ahau

**Bahá'í: Kull-i-Shay:** 1 | Váhid: 9 | Year: Abad | Month: Qudrat | Day: Bahá | Weekday: Kamál | Normal year

**Indian Civil Date:** 1924 | Karttika | 13 | Weekday: somavara | Normal year | More Indian Calendar Conversion Options

**French Republican Date:** Année 211 | de la République / Mois de Brumaire | / Décade II | Jour du Tridi

**ISO-8601 Week and Day:** Day 1 | of Week 45 | of Year 2002 | / ISO-8601 Day of Year: Day 308 | of Year 2002

**Unix time() value:** 1036368000

**Excel serial day:** 1900 Date System (PC): 37584 | / 1904 Date System (Macintosh): 36102

Adapted from Fourmilab's Calendar Converter.
For information regarding any of the above calendars, please click on the link above.

Use this a lot? It's built in to our calendar toolbar.

## CalendarHome.com

**Calendar:** Home | Calendar Store | Photo Calendars | Free Calendars | My Web Calendar | Calendar Encyclopedia | Calculator | Calendar Converter | Calendar in your head! | Calendar Links | Today in History | Calendar Books | World Clock | Today's Date on Your Site | Calendar Search on Your Page | "Monday's Child" & Month Poem | Calendar Toolbar

**Calendar Store:** Store | Americana | Art-and-Architecture | Assorted Dogs | Cat Breeds | Entertainment | Lifestyle-and-Culture | Models | Moms-and-Family | Postcard-Animals | Assorted Cats | ASSORTED-BREEDS | Best-Sellers-Cover-flow | Celebrities | Children | Dog-Breeds | Flowers-and-Gardens | Food-and-Drink | Games-and-Puzzles | NEW-2011 | PUBLISHERS | More

**Encyclopedia:** Encyclopedia | Days | Years | Years BC | Decades | Centuries | Months | Days | Holidays | Types of Calendar | More

**Free:** Free | Calendar Maker | Any Year Calendar | Web Calendar | 100-Year Perpetual Calendar | 10,000-Year Perpetual Calendar

**Calendar Links:** Links | Interactive | Chinese | Mayan | Cultural | Holidays and Celebrations | Historical | Astronomical | Real World Calendars | Calendar Reform | Web Calendars | Software | General Calendar Information | Genealogy Links | Clocks and Watches | The Year 2000 | More Calendar Links!

**More:** Send to a Friend | About Us | Awards | CalendarHome in Print | Our Friends | Frequently Asked Questions | Our Advertisers | Goodies for Your Site | How to Link | Anne Geddes | Privacy Policy | Contact Us

Copyright © 1997-2008 CalendarHome.com

JA001925
UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

CalendarHome.com Calendar Converter                                    Page 1 of 1

Member Login  Username:        Password:        [Login]   Forgot something?                    Become a Member

# CalendarHome.com

Home · The Calendar Store · Print a Calendar · Day of Week · Free Calendars! · Calendar Links · Today in History
Calendar Toolbar · Calendar Encyclopedia · Web Calendar · Date Calculator · Convert a Date · World Clock

## Calendar Converter

[Today]    [◄ Century ►]    [◄ Year ►]    [◄ Month ►]    [◄ Day ►]

Julian Date: 2001  November  2    Normal year    Thursday

Julian day: 2452228.5    / Modified Julian Day: 52228

Hebrew Date: 5762   Heshvan   29   / Common regular (354 days)   Hebrew month: חשון

Persian Date: 1380   Aban   24   Normal year   Weekday: Panjshanbeh

Kurdish Date: 1380   Gelarezan   24   Normal year   Weekday: Panjshanbeh

Afghan Date: 1380   'Aqrab   24   Normal year   Weekday: Panjshanbeh

Mayan Long Count: 12 . 19 . 8 . 13 . 6   Haab: 4 Ceh   Tzolkin: 6 Cimi

Bahá'í: Kull-i-Shay: 1   Váḥid: 9   Year: Váv   Month: Qudrat   Day: Núr   Weekday: Istijlál   Normal year

Indian Civil Date: 1923   Kartika   24   Weekday: brahaspativara   Normal year   Meet Indian Civil Date Conversion Package

French Republican Date: Année 210   de la Republique / Mois de Brumaire   / Décade III | Jour 12 Quintidi

ISO-8601 Week and Day: Day 4   of Week 46   of Year 2001   / ISO-8601 Day of Year: Day 319   of Year 2001

Unix time() value: 1005782400

Excel serial day: 1900 Date System (PC): 37210   / 1904 Date System (Macintosh): 35748

Adapted from Fourmilab's Calendar Converter.
For information regarding any of the above calendars, please click on the link above

Use this a lot?  It's built in to our calendar toolbar

## CalendarHome.com

**Calendar:** Home | Calendar Store | Photo Calendars | Free Calendars | My Web Calendar | Calendar Encyclopedia |
Calculator | Calendar Converter | Calendar in your head! | Calendar Links | Today in History | Calendar Books
| World Clock | Today's Date on Your Site | Calendar Station on Your Page | "Monday's Child" & Month
Poem | Calendar Toolbar

**Calendar Store:** Store | Americana | Art-and-Architecture | Assorted Dogs | Car Breeds | Entertainment | Lifestyle-and-Culture
| Models | Moms-and-Family | Pets-and-Animals | Assorted Cats | ASSORTED-BREEDS | Best-Sellers-
Cover-Now | Celebrities | Children | Dog-Breeds | Flowers-and-Gardens | Food-and-Drink | Games-and-
Puzzles | NEW-2011 | PUBLISHERS | More

**Encyclopedia:** Encyclopedia | Dates | Years | Years BC | Decades | Centuries | Months | Days | Holidays | Types of
Calendars | More...

**Free:** Free | Calendar Maker | Any Year Calendar | Web Calendar | 100-Year Perpetual Calendar | 10,000-Year
Perpetual Calendar

**Calendar Links:** Links | Interactive | Chinese | Mayan | Cultural | Holidays and Celebrations | Historical | Astronomical | Real
World Calendars | Calendar Reform | Web Calendars | Software | General Calendar Information | Genealogy
Links | Clocks and Watches | The Year 3000 | More Calendar Links!

**More:** Send to a Friend | About Us | Awards | CalendarHome in Print | Our Friends | Frequently Asked Questions |
Our Associates | Goodies for Your Site | How to Link | Anne Geddes | Privacy Policy | Contact Us

Copyright © 1997-2008 CalendarHome.com

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102    Document #1443998    Filed: 06/11/2013    Page 813 of 877
UNCLASSIFIED//FOR PUBLIC RELEASE

**CalendarHome.com**

Member Login: Username:          Password:          [Login]  Forgot password?                    Become a Member

Home · The Calendar Store · Print a Calendar · Day of Week · Free Calendars · Calendar Links · Today in History
Calendar Toolbar · Calendar Encyclopedia · Web Calendar · Date Calculator · Convert a Date · World Clock

## Calendar Converter

[Today]    [<] Century [>]    [<] Year [>]    [<] Month [>]    [<] Day [>]

Julian Date: 2000  | November | 13  | Leap year  | Sunday

Julian day: 2451874.5  / Modified Julian Day: 51874

Hebrew Date: 5761  | Heshvan | 28  / Common deficient (353 days)    Hebrew month: חשון

Persian Date: 1379  | Azer | 8  | Leap year | Weekday: Yekshanbeh

Kurdish Date: 1379  | Sermawez | 8  | Leap year  | Weekday: Yekshenben

Afghan Date: 1379  | Qaws | 6  | Leap year  | Weekday: Yekshanbeh

Mayan Long Count: 12  19  7  13  12  Haab: 15 Ceh  Tzolkin: 3 Eb  1

Bahá'í: Kull-i-Shay: 1  Vahid: 9  Year: Bab  Month: Qawl  Day: 'Azamat  Weekday: Jamal  Leap year

Indian Civil Date: 1922  | Agrahayana | 5  Weekday: ravivara  Leap year  More about Calendar Converter: Previous

French Républican Date: Année 209  de la République / Mois de Frimaire  / Décade 1  Jour du Sextidi

ISO-8601 Week and Day: 7  of Week 47  of Year 2000  / ISO-8601 Day of Year: Day 331  of Year 2000

Unix time () value: 975196800

Excel serial day: 1900 Date System (PC): 36856  / 1904 Date System (Macintosh): 35394

Adapted from Fourmilab's Calendar Converter.
For information regarding any of the above calendars, please click on the link above.

Use this a lot? It's built in to our calendar toolbar.

**CalendarHome.com**

Calendar:  Home | Calendar Store | Photo Calendars | Free Calendars | My Web Calendar | Calendar Encyclopedia |
Calculator | Calendar Converter | Calendar in your head | Calendar Links | Today in History | Calendar Books |
World Clock | Today's Date on Your Site | Calendar Search on Your Page | "Monday's Child" & Month
Poem | Calendar Toolbar

Calendar Store:  Store | Americana | Art-and-Architecture | Assorted Dogs | Cat Breeds | Entertainment | Lifestyle-and-Culture
| Models | Moms-and-Family | Pets-and-Animals | Assorted Cats | ASSORTED-BREEDS | Best-Sellers-
Cover-flow | Celebrities | Children | Dog-Breeds | Flowers-and-Gardens | Food-and-Drink | Games-and-
Puzzles | NEW-2011 | PUBLISHERS | More

Encyclopedia:  Encyclopedia | Dates | Years | Years BC | Decades | Centuries | Months | Days | Holidays | Types of
Calendars | More ...

Free:  Free | Calendar Maker | Any Year Calendar | Web Calendar | 100-Year Perpetual Calendar | 10,000-Year
Perpetual Calendar

Calendar Links:  Links | Interactive | Chinese | Mayan | Cultural | Holidays and Celebrations | Historical | Astronomical | Real
World Calendars | Calendar Reform | Web Calendars | Software | General Calendar Information | Genealogy
Links | Clocks and Watches | The Year 1000 | More Calendar Links!

More:  Send to a Friend | About Us | Awards | CalendarHome in Print | Our Friends | Frequently Asked Questions
Our Associates | Goodies for Your Site | How to Link | Anne Geddes | Privacy Policy | Contact Us

Copyright © 1997-2008 CalendarHome.com

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102    Document #1443998    Filed: 06/11/2013    Page 814 of 877
UNCLASSIFIED//FOR PUBLIC RELEASE

CalendarHome.com Calendar Converter

# CalendarHome.com

Home · The Calendar Store · Print a Calendar · Day of Week · Free Calendars · Calendar Links · Today in History
Calendar Toolbar · Calendar Encyclopedia · Web Calendar · Date Calculator · Convert a Date · World Clock

## Calendar Converter

[ Today ]    [ < ] Century [ > ]    [ < ] Year [ > ]    [ < ] Month [ > ]    [ < ] Day [ > ]

**Julian Date:** 1999    November    24    Normal year    Tuesday
**Julian day:** 2451519.5    / Modified Julian Day: 51519
**Hebrew Date:** 5760    Kislev    28    Embolismic complete (385 days)    Hebrew month: כסלו

**Persian Date:** 1378    Azar    18    Normal year    Weekday: Seshhanbeh
**Kurdish Date:** 1378    Sermawez    18    Normal year    Weekday: Sehhanbeh
**Afghan Date:** 1378    Qaws    16    Normal year    Weekday: Seshhanbeh
**Mayan Long Count:** 12 . 19 . 6 . 13 . 17    Haab: 9 Mac    Tzolkin: 12 Caban
**Bahá'í: Kull-i-Shay'** 1    Váhid: 9    Year: Dár    Month: Qawl    Day: Masáil    Weekday: Fidál    Normal year
**Indian Civil Date:** 1921    Agrahayana    16    Weekday: mangalavara    Normal year    More Indian Calendar Conversions: Previous
**French Republican Date:** Année 208    de la République / Mois de Frimaire    / Décade II    / Jour du Sextidi
**ISO-8601 Week and Day:** Day 2    of Week 49    of Year 1999    / ISO-8601 Day of Year: Day 341    of Year 1999
**Unix time () value:** 944524800
**Excel serial day:** 1900 Date System (PC): 36501    / 1904 Date System (Macintosh): 35039

Adapted from Formilab's Calendar Converter.
For information regarding any of the above calendars, please click on the link above.

Use this a lot?  It's built in to our calendar toolbar.

### CalendarHome.com

**Calendar:** Home | Calendar Store | Photo Calendars | Free Calendars | My Web Calendar | Calendar Encyclopedia | Calculator | Calendar Converter | Calendar in Your head | Calendar Links | Today in History | Calendar Books | World Clock | Today's Date on Your Site | Calendar Search on Your Page | Monday's Child™ & Month Poem | Calendar Toolbar

**Calendar Store:** Store | Americana | Art-and-Architecture | Assorted Dogs | Cat Breeds | Entertainment | Lifestyle-and-Culture | Models | Moms-and-Family | Pets-and-Animals | Assorted Cats | ASSORTED-BREEDS | Best-Sellers | Cover-flow | Celebrities | Children | Dog-Breeds | Flowers-and-Gardens | Food-and-Drink | Games-and-Puzzles | NEW-2011 | PUBLISHERS | More

**Encyclopedia:** Encyclopedia | Dates | Years | Years BC | Decades | Centuries | Months | Days | Holidays | Types of Calendars | More

**Free:** Free | Calendar Maker | Any Year Calendar | Web Calendar | 100-Year Perpetual Calendar | 10,000-Year Perpetual Calendar

**Calendar Links:** Links | Interactive | Chinese | Mayan | Cultural | Holidays and Celebrations | Historical | Astronomical | Real World Calendars | Calendar Reform | Web Calendars | Software | General Calendar Information | Genealogy Links | Clocks and Watches | The Year 3000 | More Calendar Links!

**More:** Send to a Friend | About Us | Awards | CalendarHome in Print | Our Friends | Frequently Asked Questions | Our Associates | Goodies for Your Site | How to Link | Anne Geddes | Privacy Policy | Contact Us

Copyright © 1997-2008 CalendarHome.com

http://www.calendarhome.com/converter/

8/30/2010

UNCLASSIFIED//FOR PUBLIC RELEASE

USCA Case #11-5102    Document #1443998    Filed: 06/11/2013    Page 815 of 877
UNCLASSIFIED//FOR PUBLIC RELEASE

Member Login: Username:                Password:          [ Login ]  Forgot password?                            Become a Member

# CalendarHome.com

Home · The Calendar Store · Print a Calendar · Day of Week · Free Calendars! · Calendar Links · Today in History
Calendar Toolbar · Calendar Encyclopedia · Web Calendar · Date Calculator · Convert a Date · World Clock

## Calendar Converter

[ Today ]    [ < ] Century [ > ]    [ < ] Year [ > ]    [ < ] Month [ > ]    [ < ] Day [ > ]

**Julian Date:** 1998    December · 5    Normal year    Friday

Julian day: 2451165.5    / Modified Julian Day: 51165

**Hebrew Date:** 5759    Kislev  [ < ] 29    / Common complete (355 days)    Hebrew month: כסלו

**Persian Date:** 1377    Azar  · 27    Normal year    Weekday: Jomeh

**Kurdish Date:** 1377    Sermawez · 27    Normal year    Weekday: Jomeh

**Afghan Date:** 1377    Qaws  · 27    Normal year    Weekday: Jomeh

**Mayan Long Count:** 12  .  19  .  5  .  14  .  3    Haab: 18 Mac    Tzolkin: 9 Akbal

**Bahá'í: Kull-i-Shay:** 1    Váhid: 9    Year: Ab  · Month: Masáil  · Day: Kalimát  · Weekday: Istiqlal    Normal year

**Indian Civil Date:** 1920    Agrahayana · 27    Weekday: Sukravara    Normal year    More Indian Calendar Conversion Features

**French Republican Date:** Année  207    de la République / Mois de l'Frimaire    / Décade III · Jour du Septidi

**ISO-8601 Week and Day:** Day 5    of Week 51    of Year 1998    / ISO-8601 Day of Year: Day 362    of Year 1998

**Unix time() value:** 913939200

**Excel serial day:** 1900 Date System (PC): 36147    / 1904 Date System (Macintosh): 34685

Adapted from Fourmilab's Calendar Converter
For information regarding any of the above calendars, please click on the link above

Use this a lot?  It's built in to our calendar toolbar.

## CalendarHome.com

| | |
|---|---|
| **Calendar:** | Home \| Calendar Store \| Photo Calendars \| Free Calendars! \| My Web Calendar \| Calendar Encyclopedia \| Calculator \| Calendar Converter \| Calendar on your Page! \| Calendar Links \| Today in History \| Calendar Books \| World Clock \| Today's Date on Your Site! \| Calendar Search on Your Page \| "Monday's Child" & Month Poem \| Calendar Toolbar |
| **Calendar Store:** | Store \| Americana \| Art-and-Architecture \| Assorted Dates \| Cat Breeds \| Entertainment \| Lifestyle-and-Culture \| Models \| Moms-and-Family \| Pets-and-Animals \| Assorted Cats \| ASSORTED-BREEDS \| Best-Sellers-Cover-flow \| Celebrities \| Children \| Dog-Breeds \| Flowers-and-Gardens \| Food-and-Drink \| Games-and-Puzzles \| NEW-2011 \| PUBLISHERS \| More |
| **Encyclopedia:** | Encyclopedia \| Dates \| Years \| Years BC \| Decades \| Centuries \| Months \| Days \| Holidays \| Types of Calendars \| More ... |
| **Free:** | Free \| Calendar Maker \| Any Year Calendar \| Web Calendar \| 100-Year Perpetual Calendar \| 10,000-Year Perpetual Calendar |
| **Calendar Links:** | Links \| Interactive \| Chinese \| Mayan \| Cultural \| Holidays and Celebrations \| Historical \| Astronomical \| Real World Calendars \| Calendar Reform \| Web Calendars \| Software \| General Calendar Information \| Genealogy Links \| Clocks and Watches \| The Year 3000 \| More Calendar Links! |
| **More:** | Send to a Friend \| About Us \| Awards \| CalendarHome in Print \| Our Friends \| Frequently Asked Questions \| Our Associates \| Goodies for Your Site! \| How to Link \| Anne Geddes \| Privacy Policy \| Contact Us |

Copyright © 1997-2008 CalendarHome.com

UNCLASSIFIED//FOR PUBLIC RELEASE

Member Login  Username:                    Password:                    [Login]  Forgot password?                                    Become A Member!

# CalendarHome.com

Home · The Calendar Store · Print a Calendar · Day of Week · Free Calendars · Calendar Links · Today in History
Calendar Toolbar · Calendar Encyclopedia · Web Calendar · Date Calculator · Convert a Date · World Clock

## Calendar Converter

[Today]      [ < ] Century [ > ]      [ < ] Year [ > ]      [ < ] Month [ > ]      [ < ] Day [ > ]

**Julian Date:** 1997   December ▾ 16   Normal year   Monday

Julian day: 2450811.5      / Modified Julian Day: 50811

**Hebrew Date:** 5758   Kislev ▾ 30   / Common regular (354 days)      Hebrew month: כסלו

**Persian Date:** 1376   Dey ▾ 8      Normal year   Weekday: Doshanbeh

**Kurdish Date:** 1376   Befranbar ▾ 8      Normal year   Weekday: Doshanbeh

**Afghan Date:** 1376   Jaddi ▾ 8      Normal year   Weekday: Doshanbeh

**Mayan Long Count:** 12 . 19 . 4 . 14 . 9      Haab: 2 Kankin   Tzolkin: 8 Muluc

**Bahá'í: Kull-i-Shay:** 1   Vahid: 9   Year: Bá'   Month: Masáíl ▾ Day: Mulk ▾ Weekday: Kamál ▾   Normal year

**Indian Civil Date:** 1919   Pausa ▾ 8   Weekday: somavara      Normal year   Main Indian Calendar Committee: Pausam

**French Republican Date:** Année 206   de la République / Mois de Nivôse ▾ / Décade 1 ▾ Jour du Octidi ▾

**ISO-8601 Week and Day:** Day 1   of Week 1   of Year 1998   / ISO-8601 Day of Year: Day 383   of Year 1997

**Unix time () value:** 883363600

**Excel serial day: 1900 Date System (PC):** 35793      / 1904 Date System (Macintosh)  34331

Adapted from Formilab's Calendar Converter.
For information regarding any of the above calendars, please click on the link above

Use this a lot? It's built in to our calendar toolbar.

## CalendarHome.com

Calendar:  Home | Calendar Store | Photo Calendars | Free Calendars | My Web Calendar | Calendar Encyclopedia |
Calculator | Calendar Converter | Calendar in your head | Calendar Links | Today in History | Calendar Books
| World Clock | Today's Date on Your Site | Calendar Search on Your Page | "Monday's Child" & Month
Poem | Calendar Toolbar

Calendar Store:  Store | Americana | Art-and-Architecture | Assorted Dogs | Cat Breeds | Entertainment | Lifestyle-and-Culture
| Models | Home-and-Family | Pets-and-Animals | Assorted Cars | ASSORTED-BREEDS | Best-Sellers-
Cover-flow | Celebrities | Children | Dog-Breeds | Flowers-and-Gardens | Food-and-Drink | Games-and-
Puzzles | NEW-2011 | PUBLISHERS | More

Encyclopedia:  Encyclopedia | Dates | Years | Years BC | Decades | Centuries | Months | Days | Holidays | Types of
Calendars | More ...

Free:  Free | Calendar Maker | Any Year Calendar | Web Calendar | 100-Year Perpetual Calendar | 10,000-Year
Perpetual Calendar

Calendar Links:  Links | Interactive | Chinese | Mayan | Cultural | Holidays and Celebrations | Historical | Astronomical | Real-
World Calendars | Calendar Reform | Web Calendars | Software | General Calendar Information | Genealogy
Links | Clocks and Watches | The Year 3000 | More Calendar Links!

More:  Send to a Friend | About Us | Awards | CalendarHome in Print | Our Friends | Frequently Asked Questions |
Our Associates | Goodies for Your Site | How to Link | Anne Geddes | Privacy Policy | Contact Us

Copyright © 1997-2008 CalendarHome.com

USCA Case #11-5102     Document #1443998          Filed: 06/11/2013     Page 817 of 877
UNCLASSIFIED//FOR PUBLIC RELEASE

Member Login  Username:             Password:          [Login]  Forgot password?                                    Become a Member

# CalendarHome.com

Home | The Calendar Store | Print a Calendar | Day of Week | Free Calendars | Calendar Links | Today in History
Calendar Toolbar | Calendar Encyclopedia | Web Calendar | Date Calculator | Convert a Date | World Clock

## Calendar Converter

[Today]    [<] Century [>]    [<] Year [>]    [<] Month [>]    [<] Day [>]

| | | | | |
|---|---|---|---|---|
| **Julian Date:** 1996 | January | 7 | **Leap year** | **Saturday** |
| **Julian day:** 2450102.5 | / Modified Julian Day: 50102 | | | |
| **Hebrew Date:** 5756 | Teveth | 28 | / Common complete (355 days) | **Hebrew month:** טבת |
| **Persian Date:** 1374 | Dey | 30 | Normal year  Weekday: Shanbeh | |
| **Kurdish Date:** 1374 | Befranbar | 30 | Normal year  Weekday: Shanbeh | |
| **Afghan Date:** 1374 | Jaddi | 30 | Normal year  Weekday: Shanbeh | |
| **Mayan Long Count:** 12 | 19 | 2 | 15 | 0   Haab: 8 Muan   Tzolkin: 12 Ahau |
| **Bahá'í:** Kull-i-Shay 1 | Váḥid: 8 | Year: Vahid | Month: Sultan | Day: Jalál   Weekday: Jalál   Leap year |
| **Indian Civil Date:** 1917 | Pausa | 30 | Weekday: Sanivara | Normal year   Moon Indian Calendar Converter: Pausa |
| **French Republican Date:** Année 204 | de la République / Mois de Nivose | | /  Décade III | / Jour du Décedi |
| **ISO-8601 Week and Day:** Day 6 | of Week 3 | of Year 1996 | / ISO-8601 Day of Year: Day 20 | of Year 1996 |
| **Unix time() value:** 822096000 | | | | |
| **Excel serial day:** 1900 Date System (PC): 35064 | / 1904 Date System (Macintosh): 33622 | | | |

Adapted from Formilab's Calendar Converter.
For information regarding any of the above calendars, please click on the link above.

Use this a lot?  It's built in to our calendar toolbar.

## CalendarHome.com

**Calendar:**  Home | Calendar Store | Photo Calendars | Free Calendars | My Web Calendar | Calendar Encyclopedia | Calculator | Calendar Converter | Calendar in your head! | Calendar Links | Today in History | Calendar Books | World Clock | Today's Date on Your Site | Calendar Search on Your Page | "Mother's Child" & Month Poem | Calendar Toolbar

**Calendar Store:**  Store | Americana | Art-and-Architecture | Assorted Dogs | Car Breeds | Entertainment | Lifestyle-and-Culture | Models | Moms-and-Family | Pets-and-Animals | Assorted Cats | ASSORTED-BREEDS | Best-Sellers-Cover-flow | Calendars! | Children | Dog-Breeds | Flowers-and-Gardens | Food-and-Drink | Plants-and-Puzzles | NEW-2011 | PUBLISHERS | More

**Encyclopedia:**  Encyclopedia | Days | Years | Years BC | Decades | Centuries | Months | Days | Holidays | Types of Calendars | More...

**Free:**  Free | Calendar Maker | Any Year Calendar | Web Calendar | 100-Year Perpetual Calendar | 10,000-Year Perpetual Calendar

**Calendar Links:**  Links | Interactive | Chinese | Mayan | Cultural | Holidays and Celebrations | Historical | Astronomical | Real-World Calendars | Calendar Reform | Web Calendars | Software | General Calendar Information | Genealogy Links | Clocks and Watches | The Year 2000 | More Calendar Links!

**More:**  Send to a Friend | About Us | Awards | CalendarHome in Print | Our Friends | Frequently Asked Questions | Our Associates | Goodies for Your Site | How to Link | Anne Geddes | Privacy Policy | Contact Us

Copyright © 1997-2008 CalendarHome.com

JA001931

UNCLASSIFIED//FOR PUBLIC RELEASE

CalendarHome.com Calendar Converter                                    Page 1 of 1

Member Login: Username:          Password:          [Login]   Forgot password?          Become a Member

# CalendarHome.com

Home | The Calendar Store | Print a Calendar | Day of Week | Free Calendars | Calendar Links | Today in History
Calendar Toolbar | Calendar Encyclopedia | Web Calendar | Date Calculator | Convert a Date | World Clock

## Calendar Converter

[Today]   [<] Century [>]   [<] Year [>]   [<] Month [>]   [<] Day [>]

| | | | | | |
|---|---|---|---|---|---|
| **Julian Date:** 1995 | January | 17 | Normal year | Monday | |
| **Julian day:** 2449747.5 | | / Modified Julian Day: 49747 | | | |
| **Hebrew Date:** 5755 | Shevat | 29 | / Embolismic regular (384 days) | Hebrew month: שבט | |
| **Persian Date:** 1373 | Bahman | 10 | Normal year | Weekday: Doshanbeh | |
| **Kurdish Date:** 1373 | Rebendan | 10 | Normal year | Weekday: Doshanbeh | |
| **Afghan Date:** 1373 | Dalwa | 10 | Normal year | Weekday: Doshanbeh | |

**Mayan Long Count:** 12 . 19 . 1 . 15 . 8   Haab: 18 Muan   Tzolkin: 8 Chicchan

**Bahá'í: Kull-i-Shay:** 1   Váhid: 8   Year: Abha   Month: Sultán   Day: Ílm   Weekday: Kamál   Normal year

**Indian Civil Date:** 1916   Magha   10   Normal year   Weekday: somavara   More Indian Calendar Conversion Services

**French Republican Date:** Année 203   de la République / Mois de Pluviôse   . / Décade 1 / Jour du Décadi

**ISO-8601 Week and Day:** Day 1   of Week 5   of Year 1995   / ISO-8601 Day of Year: Day 30   of Year 1995

**Unix time() value:** 791424000

**Excel serial day:** 1900 Date System (PC): 34729   / 1904 Date System (Macintosh): 33267

Adapted from Formilab's Calendar Converter.
For information regarding any of the above calendars, please click on the link above.

Use this a lot? It's built in to our calendar toolbar.

## CalendarHome.com

**Calendar:** Home | Calendar Store | Photo Calendars | Free Calendars | My Web Calendar | Calendar Encyclopedia | Calculator | Calendar Converter | Calendar in your head | Calendar Links | Today in History | Calendar Books | World Clock | Today's Date on Your Site | Calendar Search on Your Page | "Monday's Child" & Month Poem | Calendar Toolbar

**Calendar Store:** Store | Americana | Art-and-Architecture | Assorted Dogs | Cat Breeds | Entertainment | Lifestyle-and-Culture | Models | Mom-and-Family | Pets-and-Animals | Assorted Cats | ASSORTED-BREEDS | Best-Sellers | Cover-flow | Celebrities | Children | Dog-Breeds | Flowers-and-Gardens | Food-and-Drink | Games-and-Puzzles | NEW-2011 | PUBLISHERS | More

**Encyclopedia:** Encyclopedia | Dates | Years | Years BC | Decades | Centuries | Months | Days | Holidays | Types of Calendars | More...

**Free:** Free | Calendar Maker | Any Year Calendar | Web Calendar | 100-Year Perpetual Calendar | 10,000-Year Perpetual Calendar

**Calendar Links:** Links | Interactive | Chinese | Mayan | Cultural | Holidays and Celebrations | Historical | Astronomical | Real World Calendars | Calendar Reform | Web Calendars | Software | General Calendar Information | Genealogy Links | Clocks and Watches | The Year 2000 | More Calendar Links!

**More:** Send to a Friend | About Us | Awards | CalendarHome in Print | Our Friends | Frequently Asked Questions | Our Associates | Goodies for Your Site | How to Link | Anne Geddes | Privacy Policy | Contact Us

Copyright © 1997-2008 CalendarHome.com

http://www.calendarhome.com/converter/                                    8/30/2010

CalendarHome.com Calendar Converter

Username:    Password:    [ Login ]   *Forgot password?*    Become a Member

# CalendarHome.com

Home · The Calendar Store · Print a Calendar · Day of Week · Free Calendars! · Calendar Links · Today in History
Calendar Toolbar · Calendar Encyclopedia · Web Calendar · Date Calculator · Convert a Date · World Clock

## Calendar Converter

[ Today ]    [ < ] Century [ > ]    [ < ] Year [ > ]    [ < ] Month [ > ]    [ < ] Day [ > ]

---

**Julian Date:** 1994    January   ·   28    Normal year    Thursday

**Julian day:** 2449393.5    / Modified Julian Day: 49393

**Hebrew Date:** 5754    Shevat   ·   29    / Common complete (355 days)    Hebrew month: שבט

**Persian Date:** 1372    Bahman   ·   21    Normal year    Weekday: Panjshanbeh

**Kurdish Date:** 1372    Rebendan   ·   21    Normal year    Weekday: Panjshanbeh

**Afghan Date:** 1372    Dalwa   ·   21    Normal year    Weekday: Panjshanbeh

**Mayan Long Count:** 12  .  19  .  0  .  15  .  11    Haab: 9 Pax    Tzolkin: 5 Chuen

**Bahá'í:** Kull-i-Shay: 1    Váhid: 8    Year: Bahí   ·   Month: Mulk   ·   Day: Azamat   ·   Weekday: Istijlál    Normal year

**Indian Civil Date:** 1915    Magha   ·   21    Weekday: brahaspativara    Normal year    *More Indian Calendar Conversion Packages*

**French Republican Date:** Année 202    de la République / Mois de  Pluviôse   ·   / Décade: III · Jour: du Primidi

**ISO-8601 Week and Day:** 4    of Week 6    of Year 1994    / ISO-8601 Day of Year: Day 41    of Year 1994

**Unix time() value:** 760838400

**Excel serial day:** 1900 Date System (PC): 34375    / 1904 Date System (Macintosh): 32913

Adapted from Fourmilab's Calendar Converter
For information regarding any of the above calendars, please click on the link above.

Use this a lot? It's built in to our calendar toolbar.

# CalendarHome.com

**Calendar:** Home | Calendar Store | Photo Calendars | Free Calendars | My Web Calendar | Calendar Encyclopedia | Calculator | Calendar Converter | Calendar in your heart | Calendar Links | Today in History | Calendar Books | World Clock | Today's Date on Your Site | Calendar Search on Your Page | "Monday's Child" & Month Poem | Calendar Toolbar

**Calendar Store:** Store | Americana | Art-and-Architecture | Assorted Dogs | Cat Breeds | Entertainment | Lifestyle-and-Culture | Models | Moms-and-Family | Pets-and-Animals | Assorted Cats | ASSORTED-BREEDS | Bear-Sellers-Cover-flow | Celebrities | Children | Dog-Breeds | Flowers-and-Gardens | Food-and-Drink | Games-and-Puzzles | NEW-2011 | PUBLISHERS | More

**Encyclopedia:** Encyclopedia | Dates | Years | Years BC | Decades | Centuries | Months | Days | Holidays | Types of Calendars | More ...

**Free:** Free | Calendar Maker | Any Year Calendar | Web Calendar | 100-Year Perpetual Calendar | 10,000-Year Perpetual Calendar

**Calendar Links:** Links | Interactive | Chinese | Mayan | Cultural | Holidays and Celebrations | Historical | Astronomical | Real World Calendars | Calendar Reform | Web Calendars | Software | General Calendar Information | Genealogy Links | Clocks and Watches | The Year 2000 | More Calendar Links!

**More:** Send to a Friend | About Us | Awards | CalendarHome in Print | Our Friends | Frequently Asked Questions | Our Associates | Goodies for Your Site | How to Link | Anne Geddes | Privacy Policy | Contact Us

Copyright © 1997-2008 CalendarHome.com

---

USCA Case #11-5102    Document #1443998    Filed: 06/11/2013    Page 820 of 877
UNCLASSIFIED//FOR PUBLIC RELEASE

Member Login: Username:        Password:        [Login]  *Forgot password?*                    Become a Member

# CalendarHome•com

Home • The Calendar Store • Print a Calendar • Day of Week • Free Calendars! • Calendar Links • Today in History
Calendar Toolbar • Calendar Encyclopedia • Web Calendar • Date Calculator • Convert a Date • World Clock

## Calendar Converter

[Today]    [<] Century [>]    [<] Year [>]    [<] Month [>]    [<] Day [>]

**Julian Date:** 1993   March   ▾  9   Normal year   Monday
**Julian day:** 2449068.5   / Modified Julian Day: 49088

**Hebrew Date:** 5753   Adar   ▾  29   / Common deficient (353 days)   Hebrew month: אדר

**Persian Date:** 1372   Farvardin   ▾  2   Normal year   Weekday: Doshanben
**Kurdish Date:** 1372   Xakelewe   ▾  2   Normal year   Weekday: Doshanben
**Afghan Date:** 1372   Hamal   ▾  2   Normal year   Weekday: Doshanbeh
**Mayan Long Count:** 12 . 18 . 19 . 17 . 8   Haab: 8 Cumku   Tzolkin: 5 Cimi
**Bahá'í: Kull-i-Shay:** 1   Váhid: 8   Year: Bahí   ▾   Month: Bahá   ▾   Day: Jalál   ▾   Weekday: Kamál   Normal year
**Indian Civil Date:** 1915   Caitra   ▾  1   Normal year   Weekday: somavara   New Indian Calendar Converter: Process
**French Republican Date:** Année 201   de la République / Mois de Germinal   ▾ / Décade I   Jour du Duodi
**ISO-8601 Week and Day:** Day 1   of Week 12   of Year 1993   / ISO-8601 Day of Year: Day 81   of Year 1993
**Unix time () value:** 732758400
**Excel serial day:** 1900 Date System (PC): 34050   / 1904 Date System (Macintosh): 32588

Adapted from Fourmilab's Calendar Converter.
For information regarding any of the above calendars, please click on the link above.

Use this a lot? It's built in to our calendar toolbar.

## CalendarHome•com

**Calendar:** Home | Calendar Store | Photo Calendars | Free Calendars | Any Web Calendar | Calendar Encyclopedia | Calculators | Calendar Converter | Calendar in your hand | Calendar Links | Today in History | Calendar Books | World Clock | Today's Date on Your Site | Calendar Search on Your Page | "Monday's Child" & Month Poem | Calendar Toolbar

**Calendar Store:** Store | Americana | Art-and-Architecture | Assorted Dogs | Cat Breeds | Entertainment | Lifestyle-and-Culture | Models | Moms-and-Family | Pets-and-Animals | Assorted Cars | ASSORTED-BREEDS | Best-Sellers-Cover-fine | Celebrities | Children | Dog-Breeds | Flowers-and-Gardens | Food-and-Drink | Games-and-Puzzles | NEW-2011 | PUBLISHERS | More

**Encyclopedia:** Encyclopedia | Dates | Years | Years BC | Decades | Centuries | Months | Days | Holidays | Types of Calendars | More...

**Free:** Free | Calendar Maker | Any Year Calendar | Web Calendar | 100-Year Perpetual Calendar | 10,000-Year Perpetual Calendar

**Calendar Links:** Links | Interactive | Chinese | Mayan | Cultural | Holidays and Celebrations | Historical | Astronomical | Real World Calendars | Calendar Reform | Web Calendars | Software | General Calendar Information | Genealogy Links | Clocks and Watches | The Year 2000 | More Calendar Links!

**More:** Send to a Friend | About Us | Awards | CalendarHome in Print | Our Friends | Frequently Asked Questions | Our Associates | Goodies for Your Site | How to Link | Anne-Geddes | Privacy Policy | Contact Us

Copyright © 1997-2008 CalendarHome.com

JA001934
UNCLASSIFIED//FOR PUBLIC RELEASE

CalendarHome.com Calendar Converter                                    Page 1 of 1

Member Login  Username:        Password:        [ Login ]  Forgot your password?                    Become a Member

# CalendarHome.com

Home · The Calendar Store · Print a Calendar · Day of Week · Free Calendars! · Calendar Links · Today in History
Calendar Toolbar · Calendar Encyclopedia · Web Calendar · Date Calculator · Convert a Date · World Clock

## Calendar Converter

[ Today ]    [ < Century > ]    [ < Year > ]    [ < Month > ]    [ < Day > ]

| | | | | |
|---|---|---|---|---|
| Julian Date: 1992 | March | 19 | Leap year | Wednesday |
| Julian day: 2448713.5 | / Modified Julian Day: 48713 | | | |
| Hebrew Date: 5752 | Veadar | 27 | Embolismic complete (385 days) | Hebrew month: אדר שני |
| Persian Date: 1371 | Farvardin | 12 | Normal year | Weekday: Chaharshanbeh |
| Kurdish Date: 1371 | Xakeliwe | 12 | Normal year | Weekday: Chaharshanbeh |
| Afghan Date: 1371 | Hamal | 12 | Normal year | Weekday: Chaharshanbeh |

Mayan Long Count: 12 · 18 · 18 · 17 · 11    Haab: 19 Cumku    Tzolkin: 1 Chuen

| Bahá'í: Kull-i-Shay: 1 | Váhid: 8 | Year: Bábí | Month: Bahá | Day: 'Ilm | Weekday: Idál | Leap year |
|---|---|---|---|---|---|---|

Indian Civil Date: 1914   Caitra   12   Weekday: budhavara   Leap year   More Indian Calendar Conversion Practices

French Rebublican Date: Année 200   de la République / Mois de Germinal   / Décade III | Jour du Duodi

ISO-8601 Week and Day: Day 3   of Week 14   of Year 1992   / ISO-8601 Day of Year: Day 92   of Year 1992

Unix time() value: 702068400

Excel serial day: 1900 Date System (PC): 33695   / 1904 Date System (Macintosh)  32233

Adapted from Formilab's Calendar Converter.
For information regarding any of the above calendars, please click on the link above

Use this a lot?  It's built in to our calendar toolbar

### CalendarHome.com

| | |
|---|---|
| Calendar: | Home | Calendar Store | Photo Calendars | Free Calendars | My Web Calendar | Calendar Encyclopedia | Calculator | Calendar Converter | Calendar in your head | Calendar Links | Today in History | Calendar Books | World Clock | Today's Date on Your Site | Calendar Search on Your Page | "Mommy's Child" & Month Poem | Calendar Toolbar |
| Calendar Store: | Store | Americana | Art-and-Architecture | Assorted Dogs | Cat Breeds | Entertainment | Lifestyle-and-Culture | Models | Moms-and-Family | Pets-and-Animals | Assorted Cats | ASSORTED-BREEDS | Best-Sellers | Cover-Boys | Celebrities | Children | Dog-Breeds | Flowers-and-Gardens | Food-and-Drink | Games-and-Puzzles | NEW-2011 | PUBLISHERS | More |
| Encyclopedia: | Encyclopedia | Dates | Years | Years BC | Decades | Centuries | Months | Days | Holidays | Types of Calendars | More... |
| Free: | Free | Calendar Maker | Any Year Calendar | Web Calendar | 100-Year Perpetual Calendar | 10,000-Year Perpetual Calendar |
| Calendar Links: | Links | Interactive | Chinese | Mayan | Cultural | Holidays and Celebrations | Historical | Astronomical | Real World Calendars | Calendar Reform | Web Calendars | Software | General Calendar Information | Genealogy Links | Clocks and Watches | The Year 2000 | More Calendar Links! |
| More: | Send to a Friend | About Us | Awards | CalendarHome in Print | Our Friends | Frequently Asked Questions | Our Associates | Goodies for Your Site | How to Link | Anne Geddes | Privacy Policy | Contact Us |

Copyright © 1997-2008 CalendarHome.com

http://www.calendarhome.com/converter          JA001935                          9/1/2010

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 138

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

Petitioner,

v.

BARACK OBAMA, *et al.*,

Respondents.

Civil Action No. 10-CV-1020 (RJL)

# ISN 694 Pocket Litter and Custodial Document

~~SECRET//NOFORN~~

JA001937

JA001938

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE



SECRET // NOFORN

JA001939

SECRET // NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 139

JA001940

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

Petitioner,

v.

BARACK OBAMA, *et al.*,

Respondents.

Civil Action No. 10-CV-1020 (RJL)

**ISN 685 Photograph,** █████████████

~~SECRET//NOFORN~~

JA001941

SECRET//NOFORN



UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 140

SECRET//NOFORN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDAL RAZAK ALI ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 10-CV-1020 (RJL) |
| ) | |
| BARACK OBAMA, *et al.*, ) | |
| ) | |
| Respondents. ) | |

# ISN 215 Photo and Identifying Information

SECRET//NOFORN

1

UNCLASSIFIED//FOR PUBLIC RELEASE



BAGRAM PHOTO OF SA-215 // DO NOT ASSOCIATE TO AG-685 WHO SHARES SAME #.

Associate Photo

4,653

Add To PhotoBook

(S//NF)
008215 PHOTO-UNK
JPG - 4.5 KB

JA001944

UNCLASSIFIED//FOR PUBLIC RELEASE

# Exhibit 141

JA001945

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABDAL RAZAK ALI ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | Civil Action No. 10-CV-1020 (RJL) |
| ) | |
| BARACK OBAMA, *et al.,* ) | |
| ) | |
| Respondents. ) | |

ISN 215 █████████

~~SECRET//NOFORN~~

1

UNCLASSIFIED//FOR PUBLIC RELEASE

US9SA-000215DP ███████ ●                                    Page 1 of 2

SECRET//NOFORN

ISN: US9SA-000215DP
NAME: AL SHARIF, FAHD UMR ABD AL MAJID
ALIASES: ABU MUSAB
          ABU MUSAB AL SHIMALI
          ABU SHAHAD
          ABU SHAHAD FAHID NAKAH
          AL SHAREEF FAHD OMAR
          AL SHAREEF, FAHED
          AL SHARIF, FAHD UMR ABD AL MAJID
          AL SHREEF MUSSAB
          FARIS SHARIFF
          FHAD BIN OMAR AL SHARIF
          FHAD OMAR EL SHARIEF
          FHAD UMAR ABAD AL MAJID AL UMARI AL
          SHARIF
          MUS AAB



NO POLYGRAPH DATA FOUND

NO VOICE PRINT FOUND

**INTEL VALUE ASSESSMENT:**

A. The Detainee was last interrogated ███████ and responds hesitantly to questions. █
███████████████████████████████████████████

B. The Detainee has ███████████████████████.

C. ███████████████████████████

D. ███████████████████████████████████

ANALYST COMMENTS: ███████████ Detainee is a suspected Al-Qaida operative who received advanced tactical training. Detainee was identified as having met UBL (Source: IIR 6 034 1614 03) ███████████████
███ Contained in detainee's pocket litter was a name and contact information for "Salah Iran". ███████████(Source: IIR 2 340 6122 02). Detainee has been identified as being present in Kandahar, Al-Farouq, and the Tora Bora region (Source: IIR 6 034 0887 03).

INTEL BACKGROUND: Detainee claims he traveled to Karachi, Pakistan with Hamood Sultan LNU, possibly ISN230, and Ahmed ALI to teach the Koran. After spending 2 days in Karachi, Ahmed, Hamood, and detainee traveled through Jalalabad to Bagram. Detainee was forced to join the Taliban, attended one week of training in the Kalashnikov, PK machine gun, RPG, and small mortars, and spent 9 months fighting. According to Abu Zubaydah, detainee entered Afghanistan with his brother in 98 or 99 and trained at the Khalden camp. After completing training, detainee went to a safehouse in Kandahar. Detainee returned to Saudi Arabia in early 01 to convince his wife to move to Afghanistan. Detainee was unable to do so, divorced his wife, and returned around Apr 01

CIRCUMSTANCES OF CAPTURE: The Pakistani Army captured detainee at a mosque inside of Pakistan on 14 Dec 01. During the transport of detainee and approximately 190 other Arabs, 6 Pakistani guards were killed and some of the Arabs escaped (Source: IIR 7 739 3396 02).

PERSONAL HISTORY: DOB: 18-MAR-1976; POB: MECCA SAUDI ARABIA; CITIZENSHIP: SAUDI ARABIA; The detainee is a 27-year-old claiming Saudi citizenship who was born on 18 Mar 76, in Mecca, Saudi Arabia. From 94 to 97, detainee worked for the Saudi government in Mecca as a police officer in the passport office. From 97 to 98, detainee

SECRET

EXHIBIT R-14

9/28/2004

US9SA-000215DP

SECRET

Page 2 of 2

worked in the same function out of the Jeddah office. Saudi authorities claim that detainee left the country in Feb 00.

Updated On: 03-Jun-2004 1:58 PM                    Reviewed On: 03-Jun-2004 1:58 PM

Export to MS Word

SECRET//NOFORN

SECRET                    JA001948

~~SECRET//NOFORN~~

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ABDAL RAZAK ALI (ISN 685),

Petitioner,

v.                                    Civil Action No. 10-CV-1020 (RJL)

BARACK OBAMA, *et al.*,

Respondents.

**ISN 685 Photograph,** ███████████

~~SECRET//NOFORN~~

JA001949

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET//NOFORN





SECRET//NOFORN

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

*ABDAL RAZAK ALI*

      **Petitioners,**

      **vs.**

**GEORGE W. BUSH,** *et al,*

      **Respondents.**

No. 10-cv- 1020 (RJL)

## PETITIONER'S SUPPLEMENT TO MOTION (AND RENEWED MOTION) FOR ENTRY OF THE WRIT OR, IN THE ALTERNATIVE A NEW HEARING AND FOR SANCTIONS

NOW COMES THE PETITIONER, by and through his attorney and hereby supplements his previously filed Motions for entry of the writ or, in the alternative a new hearing, (Docket numbers 1447, 1451, and 1459) and asks for additional sanctions against the government for the following reasons:

It has now come to the attention of counsel for Petitioner that the Government has not provided exculpatory information regarding Noor Uthman Muhammed (herein after ISN 707 -whose identification number is in the public Amended Traverse at docket no. 1437). The exculpatory information withheld and referred to in the present motion goes to the heart of that detainee's reliability. In particular the one statement relied upon by the Government at Petitioner's habeas hearing comes from a summary of an interrogation of ISN 707, six days after he arrived from Bagram. The government relied extensively during the merits hearing that this one particular document claiming to summarize an interrogation of ISN 707 in which he ostensibly placed Petitioner in

JA001951

Afghanistan utilizing the nickname Usamah al Jaza'iri, was reliable. It is now clear that ISN 707 had alleged that he was being subjected to severe and brutal treatment during this exact time period and that the government was aware of his claims at least as far back as June of 2010 (and most likely even earlier). In fact, in a document just made public in February 2011 by the Government, on its department of defense website, conclusively shows that the government was put on notice of these claims prior to June 2010. (Ex. A) In this document ISN 707's defense team asks the military commission for the appointment of a clinical psychologist and explained not only the necessity for the expert but also the history in regards to discussions with the prosecution team regarding ISN 707s allegations and the fact that an affidavit by a psychologist was provided by the defense team earlier in 2010 to the prosecution. (Ex. A, ¶4 and particularly ¶4l for the time period of the abuse.)

At the Petitioner's merits hearing, the Court recognized the critical significance of ISN 707's reliability and credibility. Accordingly, this Court repeatedly asked the attorneys for the government during the merits hearing whether or not ISN 707 had—at any time, ever-- raised any allegations of mistreatment that would undermine his reliability and credibility. The government's attorneys not only stated affirmatively and unequivocally that he had not, but then, incredibly the government took the position that ISN 707 actually *complimented* his treatment in the hands of US forces and was "quite pleased" that he had not been tortured. Although the statement, that ISN 707 not only had no complaints but was delighted with his treatment in US custody, repeated throughout the hearing by the government's Justice Department (DOJ) counsel, seemed

2

JA001952

incredible to counsel for Petitioner, no exculpatory evidence was provided to counsel for Petitioner to contradict the government's unabashedly glowing report of ISN 707's treatment.

ISN 707 has now entered a plea in his military commission case in return for the government's agreement that if certain conditions are met he will only serve an additional thirty-four (34) months imprisonment at Guantanamo Bay. Apparently because of the plea deal the military has started to publicly post many of the pleadings from the military commissions at the department of defense website (http://www.defense.gov/news/commissionsNoor.html) and new documents appear to be being made available to the public daily. Based on these newly available documents it is now undeniable that ISN 707 had indeed made substantial allegations related to his treatment, and such allegations include contentions that he was subjected to so-called enhanced interrogation techniques and other forms of coercion *both immediately before and during the time frame* related to the one document that the government has asked this Court to rely on in Petitioner's case as proof of Petitioner being identified as "Usamah al Jaza'iri" and being in Afghanistan.

It is equally clear from a review of the records that the government was fully aware of the allegations of severe mistreatment by ISN 707 during the time period of March 28, 2002 and July 1, 2004 and that the government became aware of these claims well before the merits hearing in Petitioner's case. In addition, counsel's investigation during this past week (after the government's recent public disclosures on its website in ISN 707's case) provides reason to believe that the government had actual knowledge of

<div align="center">3</div>

<div align="right">JA001953</div>

these allegations by ISN 707 prior to 2010[1].

As mentioned above one of the documents that was made publicly available this month on the department of defense website pertaining to military commissions bears the date of June 18, 2002 and constitutes a motion for the appointment of an expert psychiatrist. (See, Ex. A[2]) That motion- in the government's possession some six months before the merits hearing- notes that the government intended to introduce statements from the period of <u>March 29, 2002 through July 1, 2004</u> (¶4) and that ISN 707 had been subjected to <u>numerous coercive interrogations during that time frame.</u> (¶4) The motion further describes the need for the expert based on the enhanced interrogation methods utilized against ISN 707 as well as the medical history of ISN 707. The motion also provides a description of the history of negotiations between the government and defense counsel regarding the need for an expert and confirms the fact that an affidavit had been previously submitted to the government outlining the concerns of the expert in regards to the treatment and psychological condition of ISN 707 after reviewing his medical records. (¶5 pages 4-6)

This undeniably exculpatory information should have been provided to counsel for Petitioner long before the merits hearing but has not been provided by the government to this day. Counsel only found this out by reviewing the department of defense website which was updated in February 2011 with these various documents.

---

[1] ISN 707's habeas petition has been on hold while the commission proceedings were ongoing so there was no way for counsel to test the government's claims until these documents were unveiled in February 2011.

[2] http://www.defense.gov/news/AE%2064%20-%20Defense%20Motion%20for%20Expert%20Consultant%20-%20Psychologist(D023).pdf

4

By failing to provide this exculpatory information, the government has knowingly misled this Court and Petitioner's counsel by its repeated claims that not only had ISN 707 never made any allegations of mistreatment but that he was actually "happy" with the way he had been treated by US forces. The fact that the government misled this Court is further exacerbated by the fact that the statement relied on by the government in Petitioner's trial is dated only six days *after* ISN 707 arrived at Guantanamo from Bagram a time period during which the detainee had raised serious allegations about his abusive treatment and which is exactly within the time period of the statement relied on by the government in Petitioner's case. The Government was fully aware of the accusations of mistreatment and coercive interrogation by ISN 707 but withheld those important accusations from Petitioner's counsel. It is also important to note that present throughout the merit hearing were at least two staff attorneys from the Department of Defense. These attorneys were presumably also privy to ISN 707's abuse allegations, but they nonetheless chose to remain mute in the face of the Court's direct inquiry.

Finally, on February 17th 2011 the defense filed an affidavit by ISN 707 which was supplemented with information obtained by the defense regarding the treatment of ISN 707 while at Bagram and at Guantanamo. (http://www.defense.gov/news/DE%20N%20Unsworn%20Statement%20-%20Noor.pdf). The affidavit was placed on the department of defense website on February 22, 2011 which counsel discovered in the course of her ongoing investigation and again, not from the government. The affidavit is attached hereto as Ex. B. It must be

noted that the timing of the allegedly coercive mistreatment that ISN 707 complains of in his affidavit as occurring both at Bagram and later at Guantanamo was contemporaneous with the statement relied by the government at the merits hearing. The supposedly damning statement equating Petitioner with the name of Usamah al Jaza'iri and placing him in Afghanistan was made only six days after ISN 707 arrived at Guantanamo from Bagram, a time period in which ISN 707 claims he was being severely coerced and abused. Although, of course, the affidavit from ISN 707 was not available until this month it is clear from the Department of Defense website (and as shown above) that multiple documents and at least one affidavit by an expert for the defense were provided to the government more than one year ago that also raised the specific issue of ISN 707's alleged abusive treatment during the crucial time period of the document the government has asked this Court to rely on. Needless to say, this critical exculpatory information was never provided to counsel by the government.

Because this Court has not yet entered its classified opinion, nor has this Court yet ruled on the previously filed Motions to either enter the Writ or grant Petitioner a new hearing and for Sanctions, Petitioner for the reasons raised in those motion papers and herein, respectfully asks this Court to either enter the Writ or in the alternative to grant him a new hearing free from the multiple occurrences of misconduct that have plagued (and clearly continue to plague) these proceedings and further, to sanction the government for its contumacious conduct and vexatious multiplication of litigation pursuant to 28 USC Section 1927.

Respectfully Submitted,


/s/ H. Candace Gorman
Counsel for Petitioner


LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman (IL Bar #6184278)
220 S. Halsted
Suite 200
Chicago, IL 60661
Tel: (312) 427-2313

7

JA001957

## NOTICE OF FILING

To:    Olivia Hussey
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW, Room 7144
Washington, DC 20530

PLEASE TAKE NOTICE that on February 25, 2011, I filed with the Court Petitioner's Supplement to Motion for Entry of the Writ or, in the Alternative a New Hearing <u>and</u> for Sanctions.

/s/ H. Candace Gorman
Counsel for Petitioner

LAW OFFICE OF H. CANDACE GORMAN
H. Candace Gorman (IL Bar #6184278)
220 S. Halsted
Suite 200
Chicago, IL 60661
Tel: (312) 427-2313

JA001958

# EXHIBIT A

JA001959

D- _____

| UNITED STATES OF AMERICA | **Defense Motion**<br>**For Appointment of Expert Consultant**<br>**(Clinical Psychologist)** |
| :---: | :---: |
| v. | |
| NOOR UTHMAN MUHAMMED | 18 June 2010 |

1.   <u>**Timeliness:**</u>  The Convening Authority denied the Defense request for expert assistance on 15 June 2010.  The Defense submits this motion as soon as practicable thereafter.

2.   <u>**Relief Sought:**</u>  The Defense respectfully requests that this Commission order the appointment of Dr ████████ to the defense team as an expert consultant and order that he be authorized to perform up to at least 200 hours of services for the Defense.

3.   <u>**Burdens of Proof & Persuasion:**</u>  The Defense bears the burden of establishing that it is entitled to the requested relief, R.M.C. 905(c)(2)(A), and bears the burden of demonstrating the necessity for the expert assistance he requests. *United States v. Allen*, 31 M.J. 572 (1990), citing *United States v. Mustafa*, 22 M.J. 165, 167 (C.M.A. 1886); *United States v. Mann*, 30 M.J. 639 (NMCMR 1990); *United States v. True*, 28 M.J. 1057 (NMCMR 1989); *United States v. Tornowski*, 29 M.J. 578 (AFCMR 1989); *United States v. Kinsler*, 24 M.J. 855 (ACMR 1987); *See Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).  The Defense must show that the expert services requested would be of assistance and that denial of that assistance would result in a fundamentally unfair trial. *Id.* citing *Mann*, 30 M.J. at 641; *United States v. Van Horn*, 26 M.J. 434 (C.M.A. 1988).

JA001960

1

4. __Facts:__

a.      Noor has been in the custody of the United States since March 2002.  During his detention in Pakistan, Bagram and Guantanamo he has been subjected to numerous coercive interrogations.  The exact number of interrogations is unknown to the Defense.  The interrogation records, especially from Pakistan and Bagram, are woefully deficient.

b.      Noor has spent significant time in Camps 5 and 6, under conditions equivalent to solitary confinement.

c.      Noor's medical records demonstrate a failure of JTF-GTMO to treat his chronic medical problems.  JTF refused counsel's requests to speak with Noor's medical providers about his chronic pain and treatment.[1]  Consistent with JTF policy, the Government has redacted Noor's medical records to conceal the identity of the providers and has steadfastly refused the Defense requests for access to these individuals.

d.      Noor's cultural, linguistic, and religious background are relevant.  Noor was born in an underdeveloped and economically depressed area of Sudan.  (Attachment 1)

e.      On 4 March 2010 the Defense submitted an ex parte request to the Convening Authority (CA) for the appointment of Dr. ████████      The CA replied on 2 April 2010 indicating he would not consider ex parte expert requests.  (Attachment 2)

f.      On 29 April 2010, the Defense submitted a second request to the CA and to the Government.  (Attachment 3)

JA001961

---

[1] This refusal was subject to a Motion to Compel which was subsequently withdrawn by the Defense.

US V. NOOR UTHMAN MUHAMMED
APPELLATE EXHIBIT 64
Page 2 of 56

g.      On 7 May 2010, the Government submitted a response to the Defense request. The Government recommended an alternative psychologist, Dr. ███████, from the Walter Reed Forensic Psychiatry department.  (Attachment 4)

h.      Upon receiving notice of Dr. ████, the Defense conducted a telephonic interview with him to determine his qualifications.  Based on this interview, on 14 May 2010, the Defense submitted a supplement to the request for expert assistance explaining that Dr. ████ was not an adequate substitute for Dr. ██████  (Attachment 5)

i.      After receiving the Defense supplement, the Government attempted to locate another substitute but was unable to find a qualified expert who could satisfy the time requirements involved in this case.

j.      Dr. ██████ is uniquely qualified and the Defense has been unable to locate another expert with similar qualifications.  (Attachment 6)

k.      Dr. ██████ has conducted an initial review of Noor's medical records and has provided a declaration indicating his findings and recommendations.  (Attachment 1)

l.      The Government has provided the Defense a list of 17 statements made by Noor that it intends to introduce in its case-in-chief.  The dates of the statements range from 29 March 2002 to 1 July 2004.  The Government has also indicated to the Defense that it will submit some of these statements in the upcoming jurisdiction hearing currently scheduled for September 2010.

JA001962

3

**US V. NOOR UTHMAN MUHAMMED**
**APPELLATE EXHIBIT 64**
**Page 3 of 56**

5.    **Law and Argument**:

Noor "is entitled to an expert's assistance before trial to aid in the preparation of his defense upon a demonstration of necessity." *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F 2005). The Defense "must show that a reasonable probability exists 'both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *Id.* A three-part test is applied to determine if expert assistance is necessary. The defense must show: (1) why the expert assistance is needed; (2) what the expert assistance would accomplish; and (3) why the defense counsel and staff are unable to gather and present the evidence the expert assistant would be able to develop. *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994), *cert. denied*, 513 U.S. 965 (1994).

The facts in support of the three-part test are exhaustively presented in attachments 2 and 4. As the Commission is well aware, there are "inherent dangers in having to reveal strategic information in order to obtain" expert assistance.[2] However, if the Commission feels additional justification is necessary, the Defense respectfully requests an in camera review of the ex parte submission provided to the CA and/or an ex parte hearing for the Defense to present additional relevant matters to the commission. An ex parte hearing may be necessary in unique cases.[3] This is a unique case – unlike any presented in the American justice system. Noor has been held in confinement for over eight years before his trial. He has been subjected to various forms of

---

[2] Lieutenant Colonel Stephen R. Henley, *Developments in Evidence III—The Final Chapter*, ARMY LAW, May 1998 at n154.

[3] *See United States v. Kaspers, 47 M.J. 176 (1997). See also United States v. Ruppel, 45 M.J. 578 (A.F. Ct. Crim. App. 1997)* (holding that there is no right to an ex parte hearing). *But see United States v. Garries, 22 M.J. 280, 291 (C.M.A. 1986)* (indicating that the defense may be entitled to an ex parte hearing to demonstrate its need for an expert in "unusual" circumstances, though the court does not define what qualifies as "unusual")

JA001963

**US V. NOOR UTHMAN MUHAMMED**
**APPELLATE EXHIBIT 64**
**Page 4 of 56**

coercive interrogation over the course of several years. His conditions of confinement have frequently been tantamount to solitary confinement and included other forms of inhumane and abusive treatment.

The Government has indicated they will use approximately 17 statements made by Noor during the jurisdiction hearing and case in chief. Dr. ██████'s assistance is critical to assist the Defense prepare for those hearings and any related motions to suppress the statements. Noor was subjected to numerous interrogations and various methods of interrogation. Enhanced interrogation methods and maltreatment prevalent during Noor's eight years of detention have a wide range of physical, psychological, emotional, and cognitive consequences. The Defense must be allowed to determine the mental impact of interrogations and methods in order to make arguments regarding the admissibility of statements. Also relevant to admissibility of statements is the mental impact of the conditions of confinement.

The Defense must prepare a case in mitigation for sentencing. Dr. ██████'s assistance is important for this preparation. Dr. ██████ is capable of determining Noor's psychological condition prior to committing the offenses alleged by the Government. Dr. ██████ will also determine the impact of years of interrogation and detention and its relationship to Noor's history of chronic pain. Dr. ██████ is an expert in the area of chronic pain and eminently qualified to explain the connections between Noor's detention, chronic pain, and psychological condition. Indeed, Dr. ██████ believes from his preliminary review of the medical records that Noor may be suffering from undiagnosed and untreated ████████████████ and/or ██████.

An accused has, as a matter of Equal Protection and Due Process, a right to expert assistance when necessary to present an adequate defense. *See United States v. Robinson* 39 M.J. 88 (C.M.A. 1994); *Ake v. Oklahoma*, 470 U.S. 68 (1985); *United States v. Garries*, 22 M.J.

288 (C.M.A.), *cert. denied*, 479 U.S. 985 (1986). Failure to employ Dr. ▮▮▮▮ would effectively deprive Noor of his ability to present an adequate defense in this case and would deny him "[m]eaningful access to justice." *Ake*, 470 U.S. at 77.

The Government, as a matter of routine, summarily stated in the response dated 7 May 2010 that the Defense had not demonstrated necessity. However, realizing this case most likely warranted an expert, located and offered the Defense a proposed adequate substitute. When the Defense explained that this substitute was inadequate, the Government searched for yet another substitute. When the Government could locate a suitable candidate, it changed course and concluded that the Defense was not entitled to expert assistance based on the justification advanced by the Defense. The Convening Authority's conclusion is undermined by the detailed information provided by the Defense which meets the required necessity threshold. The Convening Authority claims that the Defense has not pointed to any specific portion of the medical records to support its position that expert assistance is necessary. Prior to seeking expert appointment, the Defense requested that Dr. ▮▮▮▮ review the unclassified medical records and provide the Defense with a preliminary opinion. The Defense outlined Dr. ▮▮▮▮ s concerns in a detailed affidavit. It is difficult to imagine a more detailed justification for the provision of expert assistance. The Convening Authority's denial of the Defense request was an arbitrary decision driven by the failure to locate an adequate Government substitute rather than an assessment of the necessity for expert assistance.

6.    **Oral Argument:**  The Defense requests oral argument at the next 803 session.

7.    **Witnesses & Evidence:**  The Defense relies on the attached documents as evidence in support of this motion. The defense will call the following witness:

1. Dr. ▮▮▮▮

JA001965

6

US V. NOOR UTHMAN MUHAMMED
APPELLATE EXHIBIT 64
Page 6 of 56

8. **Conference:** The Defense has conferred with the Prosecution regarding the requested

relief. The Prosecution has been unable to locate an acceptable substitute.

9. **Request for Public Release:** The Defense requests permission to release the

government's response to this motion and the court's ruling as soon as possible.

Respectfully submitted,

BY:     _____//s//_____          _____

Katharine Doxakis                    Amy Fitzgibbons
CDR, JAGC, USN

Christopher Kannady                 Howard Ross Cabot
Capt, USMC                          *Perkins Coie Brown & Bain*
Office of Military Commissions      ██████████████████████
1600 Defense Pentagon               Phoenix, AZ ██████
Washington DC 20301

Detailed Defense Counsel for        Civilian Pro Bono Counsel for
*Noor Uthman Muhammed*              *Noor Uthman Muhammed*

10. **Attachments:**

1. Declaration of Dr. ██████████ dated 4 March 2010
2. CA Memorandum dated 2 April 2010
3. Request for Expert Consultant dated 29 April 2010
4. Government Response to Defense Request dated 7 May 2010
5. Supplemental Request dated 14 May 2010
6. CV of Dr. ██████████

JA001966

7

# EXHIBIT B

JA001967

## MILITARY COMMISSIONS TRIAL JUDICIARY
## GUANTANAMO BAY

| | |
|---|---|
| UNITED STATES OF AMERICA | **STATEMENT OF** |
| v. | **NOOR UTHMAN MUHAMMED** |
| NOOR UTHMAN MUHAMMED | **February 17, 2011** |

1.      My names is Noor Uthman Muhammed. I am from Sudan. I was born in Kasala, Sudan which is on the Sudanese border with Eriteria. My family depended on its ability to raise animals and farm to survive. It was a very difficult life. In Sudanese culture, birthdays are not something that are important. I believe that I was born around 1967 but I've never marked that occasion. Living near the border was dangerous and there was often conflict between different tribes. I was taught that my family is a tribe, Mikal, within a group called the Beni Amir. We speak our own type of language, which is separate from Arabic. Life then was a daily struggle just to eat and stay safe. I don't have a strong memory of my parents because they died when I was very young. In Sudan, the tribe is your family and they took me in. We moved to Port Sudan, which was a big city compared to Kasala. I have a brother, Muhammed, who is about five years older than me. My parents' siblings also helped to raise me. I was permitted to go to school for a short time so I never learned anything beyond the basics-some math and some letters. The Quran and teachings of the Prophet Muhammed were also a part of my education from a very early age. I had to leave school in order to earn some kind of living so that I could eat. My extended family had their own children to take care of and I felt that I needed to be able to feed and clothe myself after I lost my parents. Although there should have been more opportunities in Port Sudan; there were not for a child or young man. I tried to sell things that I found or traded for in the market. I tried to do odd jobs for people like carpentry. I never had a place of my own to live; it's not like in the West-even if it is difficult you stay close to your family. I spent many years moving from house to house and sleeping on the floors in whatever house had the space for me. My brother Muhammed and my neice Awadia still live in Port Sudan. Awadia was a very young child when I left. Some of my parents' brothers and sisters are also still living in the Port Sudan area. It is painful for me to think of them there in Port Sudan. I never wanted them to worry about me or to cause them any pain.

2.      As I was growing up, I spent more time in the markets near the Port. Port Sudan is a stopping point for people on their way to Mecca and Medina. I was drawn to learn more about my faith as a Muslim. Looking back, our tribe and my family were not very strict in their practice of Islam. We had little time to think about Islam; we needed to think about food. While I was in the markets, I heard people talking about the pilgrimage to Mecca and also about Islam more generally. There were religious leaders who encouraged young men like me to learn about Islam. They had cassette tapes that they would give away. My reading was not good so I would listen to these tapes to try to expand my understanding of Islam. I began listening to these tapes

JA001968

DEFENSE EXHIBIT
PAGE _____ OF _____

in the late 1980s. The tapes explained the duties of being a Muslim; one of those duties was to be prepared to defend Islam. I also watched video tapes that helped explain Islam and some of the struggles that were going on outside Sudan. I learned that the Soviet Union was in Afghanistan fighting Muslims there. I also learned that there were many other places in the world where Muslims were faced with war. The videos and pictures showed horrible things; things that would keep me awake at night. I came to believe that the solution for stopping the murder of innocent Muslims was to train myself to help Muslims defend themselves either in their countries or in Sudan. To me, defending my religion does not mean I have to perform terrorist attacks against other people. I had heard that Afghanistan was a place for Muslims to go learn about defending our religion. So, in an effort to prepare myself and to escape my situation in Port Sudan, I accepted a loan to fund my travel to Afghanistan. There were many young men like me who left Sudan to try to learn more about Islam and to help Muslims in places where they were under attack. When I left, I could not read or write well. I did not speak English or any language outside of Arabic and my tribal dialect. I had never received any kind of military training before leaving Sudan.

3.     In 1994, I arrived at the Khaldan camp in Afghanistan so that I could receive training to prepare myself. At the time, I believed that I needed to be prepared to defend my faith and only planned to use this training if it became necessary. Khaldan was about the size of one-and-a-half soccer fields. It did not have a paid staff. The camp provided basic military training. The military training was very basic training and mostly dealt with small arms. I saw hundreds of people pass through the camp. Most trainees at the camp did not stay for more than a few months. Some flew in from the Gulf Countries for shorter stays like a week at a time; so that they could say that they had been to Afghanistan and fired a weapon. Some people got more advanced training at other camps and Khaldan didn't have the money or the experts to provide more advanced training.

4.     While at Khaldan, I participated in basic arms training. After my training, I stayed on at the camp and became one of the weapons trainers. There was no special selection process for trainers; if you could stay, you were asked to help by providing training. I decided to stop training people on weapons and requested that the emir, Ibn Sheikh Al-Libi give me different duties. My main responsibilities were to gather food, water, and supplies for the camp. Sometimes, I also was asked to run the camp when the camp leader was gone. The Camp belonged to Ibn Sheikh and he made the decisions about what would happen there. He fought with the mujahedeen in Afghanistan and was well-respected as a soldier. Ibn Sheikh had a council of trainers and others who could be consulted on issues related to the Camp. Although Ibn Sheikh consulted the council, he made the final decisions and did not have to follow the council's advice.

5.     In 1999, the camp moved, and in 2000, the camp closed. I did not go to any other camps after Khaldan closed. I learned that the Camp closed because Ibn Sheikh Al-Libi did not agree with the philosophies of the Taliban or Al Qaeda. Khaldan was really all I knew, so my goal was to get home to see my family that I had not seen for many years. In 2001 after the invasion of Afghanistan, it was not safe to remain. I did not have a passport, since it had been taken from me when I first traveled into Afghanistan. I had no way out, so I joined with others to cross the border into Pakistan so that I could try to make my way back to Sudan. I was told that people in

JA001969

2

Pakistan, including Abu Zubaydah, could assist me with the travel documents necessary to get back to Sudan. Returning to Sudan was my main goal.

6.    In March, 2002, I was in a house near Faisalabad, Pakistan. The house was two stories, and several rooms were able to be closed off from the rest of the house. I did not participate in any training at the safe house, other than to learn some basic English to pass the time. The house was raided during the night. I was brought to a Pakistani jail with many other men that had been picked up. I did not know what the Pakistanis intended to do with us. They held us in big cages and told us that anything could happen to us. You would treat animals better than the way that we were treated. We had very little food that you could eat. There were times that we asked the guards if they could bring us plants that we saw growing in the ground to help with the hunger. I was scared that I would just disappear. Every time that we were moved we were threatened. Growing up in Sudan, I knew and heard stories of the security services picking up people off the streets for questioning. Questioning could last for days and those families feared that they would never see their relatives again. Port Sudan is not far from Egypt and the Egyptians were notorious for snatching people off the streets, holding them and torturing them for information. Every time I moved, I feared that it was going to be the last time. There were at least three moves within Pakistan. Then I was released to the Americans. Both the Pakistanis and the Americans told me that they could hand me over to the Egyptians and no one would know that I had disappeared. The fear and uncertainty this caused me was overwhelming.

7.    In May 2002, I was transferred from Pakistan to Bagram Air Base, Afghanistan. We didn't know where we were being taken and I feared that it would be worse than Pakistan. During the movement to Bagram, I was hooded, shackled and chained to a group of other detainees. Upon our arrival, we were all thrown, kicked and handled roughly. At Bagram, I was interrogated daily; some days there were multiple interrogations. I was chained to my cell with my hands above my head for 12 hours per day; several days in a row. When I was chained to my cell in this way, the guards would also put a bag over my head. Some guards would show a little mercy by unchaining me and allowing me a short break to move my arms. This happened regularly. There were also times that I was shackled to the floor by both the arms and legs while I was on my knees for several hours at a time in a painful position. There were times that my cell was freezing cold and my clothes were taken away, while other times the heat in the cell was unbearable. There were periods of time when loud music was played 24 hours a day; so loud that you couldn't even think. There were several times that women were used to interrogate me or acted as guards. I found being in their presence very disturbing because in my faith such close contact with a woman is reserved for a husband and wife out of respect. Oftentimes, the female interrogators would wear clothing that you could see through or other clothing that was revealing and disrespectful. These women would come really close to me and attempt to touch me. As hard as this was, I was never humiliated more than when my clothes were taken away from me in the presence of female guards or interrogators. There were also times that female guards struck me when I had difficulty looking them in the eyes because I felt uncomfortable with them. There were many nights that we were woken up by the guards. They would yell at us to "get up" and "get against the wall." They would search us and tell us that we were getting ready to ship us off to Egypt. Other detainees would leave like this in the middle of the night and we were told by the translators that they had been taken away to Egypt. I was worried and I couldn't sleep. I kept thinking that tomorrow they are going to take me there and I was scared because I knew that their security police could make people disappear. I felt like these people at Bagram did not

consider me to be a human being and I had no dignity in their eyes. In Bagram, I lost all hope that I would ever have a chance to see my family again.

8.      I was transferred from Bagram to Guantanamo Bay, Cuba on August 5, 2002. I was again hooded, shackled and chained to a group of other detainees when I was transferred to Guantanamo. The flight to Guantanamo was significantly longer than the earlier flight I had taken from Pakistan to Afghanistan. On the flight, we were shackled together and stacked side by side. We were unable to move or to use the bathroom. Again when we landed, we were thrown and kicked. During this transfer, I was hit in the back of the head with a rifle; busting my two front my teeth. The worst time that I spent in Guantanamo Bay was while I was locked in Camp 5. I was there for two years in a cell by myself. I thought that I would lose my mind. I was interrogated almost daily when I first arrived at Guantanamo Bay. Some of the interrogators and guards, especially at the beginning of stay, would do everything that they could to humiliate detainees. Like at Bagram, the temperature in my cell was made very hot or very cold for long periods of time. There was a very dark interrogation room at Guantanamo Bay that the detainees called "hell." We were threatened or forced to spend extended periods of time in this room as punishment. While sitting in the dark, extremely loud music was played or you just hear people screaming. You could spend several hours in this room. The interrogators also constantly threatened to send detainees to "Romeo" which was a very small room with no blanket or mattress; your clothing down to your underwear would also be taken from you and you could be kept there for days. There were also many days and nights that I didn't sleep at all. A guard would watch us in our cell and yell or rattle the bars to keep us awake. I was also locked up in Camp 6, where again I was locked in a cell by myself. I was moved from Camp 6 to Camp 4 in 2008. Although I was still locked up, my life was much better in Camp 4; where we could spend more time outside and I lived with a group of other men.

9.      Since being locked up, my health has not been good. I have experienced pain and pressure in my eye and bleeding in my teeth. I have suffered from tingling sensations in my arms and legs. At night when I am trying to sleep, my muscles will move on their own and keep me from sleeping. There is something wrong with stomach and it often appears much bigger than it is and causes me pain. For periods of time, I was experiencing extreme pain in my back that made standing unbearable. At times, I have had very little energy. Sometimes, I asked for medical attention but I was also scared that the guards would trick me into taking medicine that would cause me to no longer know where I was or lose my mind.

10.     I have already spent almost nine years in confinement under the conditions I have mentioned here as well as subject to many other awful conditions your own Government and outside investigations have confirmed. These conditions are detailed in the attached document provided by my counsel.

11.     I have never been a member of the Taliban or al Qaeda. I understand that I have pled guilty to Material Support for Terrorism and Conspiracy to Commit Material Support, but I have never planned or participated in any terrorist attack. I hope to get home in the near future to see my family again before my time on this earth ends. I have done my best to be a compliant prisoner even in the face of the conditions that I have endured. I ask that you give me the opportunity to get home as soon as possible so that I can live out the rest of my days peacefully.

JA001971

4

UNCLASSIFIED/FOR PUBLIC RELEASE

**Attachment J (Modified)**

Summary of Open Source Materials

*AFGHANISTAN*

a.    Noor was captured 28 March 2002 in Pakistan. He was transferred to Bagram Collection Point ("BCP"). By August of 2002, Noor had been transferred to Guantanamo Bay Naval Station, Cuba (GTMO or Guantanamo).

b.    From June 2002 to April 2004 the U.S. formation that directed all Enduring Freedom operations in Afghanistan was designated Combined Joint Task Force-180 (CJTF-180), a corps-level headquarters. Prior to the arrival of CJTF-180 at Bagram, there was very little guidance on detainee operations or policy through technical channels.[1]

*Detention operations in Afghanistan*

c.    Generally concurrent with Noor's detention by U.S. forces in Afghanistan, the 211th Military Police Company (211th MP Co) was assigned to detention operations at Kandahar (approximately February 2002 to July 2002) and Bagram (approximately July 2002 to September 2002). In August/September 2002, the 211th MP Co was relieved in place by the 377th Military Police Company (377th MP Co). Prior to deployment to relive the 211th, the commander of 377th obtained copies of the standard operating procedures (SOP) for the 211th, rewrote portions of the SOP, and distributed copies of this revised SOP to members of 377th while they were still mobilized at Ft Dix.[2] Once members of the 377th MP Co arrived at Bagram, members of the 211st MP Co spent approximately two weeks training members of the 377th MP Co on local practices for detention operations.

d.    During one week in December 2002, two detainees died in U.S. custody at the BCP as the result of abusive detention and interrogation practices.

> The patterns of detainee abuse in the two incidents share some similarities. In both cases, for example, the [detainees] were handcuffed to fixed objects to above their heads in order to keep them awake. Additionally, interrogations in both incidents involved the use of physical violence, including kicking, beating and the use of "compliance blows" which involved striking the PUCs legs with the MP's knee. In both cases, blunt force trauma to the legs was implicated in the deaths.[3]

e.    Following the detainee deaths, the U.S. Army Criminal Investigation Command (CID) conducted a homicide investigation. The record of this investigation includes approximately 200 interviews with military police, intelligence personnel, interpreters, detainees, camp overhead

---

[1] *See CLAMO Legal Lessons Learned (2004)*, at 53.
[2] *See CID Report Habibullah and Dilawar (Oct 2004)*, at 449 (Exhibit 120). The 377th Commander apparently rewrote the SOP again while at Bagram.
[3] *Church Report (2005)*, at 235.

JA001972

personnel, and others. The record includes copies of classified SOPs and descriptions of recordkeeping practices. Investigators looked for the "source" of abusive detention practices conducted by members of the 377th MP Co, and questioned which practices originated with the 211th MP Co, the unit with whom Noor interacted at Bagram. The final report addressed practices and leadership problems that directly led to the deaths.[4]

f.     Following the detainee deaths, "LTG McNeill ordered a broad AR 15-6 investigation into conditions at the BCP. In February 2003, after reviewing the results of the investigation, LTG McNeill prohibited several interrogation techniques implicated in the detainees' deaths...."[5] The AR 15-6 charter specifically required the investigator to leave the investigation of the deaths to CID, but to investigate "tactics, techniques, and procedures (TTPs) as well as standard practices, which were dangerous, contrary to legal standard, or ill-advised."[6]

g.     Bagram guards and other US personnel have made sworn statements that they conducted, witnessed, or heard about the following activities:

- Use of pressure point control tactics to inflict pain on complaint detainees;[7]
- Use of loud music to disorient detainees;[8]
- Routine hooding and shackling of detainees;[9]
- Use of "compliance blows" on restrained detainees;
- Rough physical handling and medical exams during detainee in-processing;
- Hooding detainees during movement, transportation, and interrogations;
- Use of extended isolation;
- Corporal punishment for non-compliant detainees;
- Shackling for punishment;
- Throwing a detainee wearing three sets of shackles against wall; guard threw detainee around "like a rag doll" because he "felt like it" and that was "why he was there";[10]
- Ensuring escapee from group cell was "fucked up;"[11]
- Shoving detainees into wall during movements;[12]
- Compelling detainees to perform meaningless physical tasks, like constantly cleaning;[13]
- Forcing detainee to pick bottle caps out of human waste;[14] possibly on direction of military intelligence personnel;[15]
- Forcing detainee to hold stress positions;[16]

---

[4] *See Church Report (2005)*, at 236.

[5] *Church Report (2005)*, at 235. An "AR 15-6" is an administrative investigation ordered under Army Regulation 15-6, *Procedures for Investigating Officers and Boards of Officers. See generally AR 15-6 (1996)*.

[6] *CID Report Habibullah and Dilawar (Oct 2004)*, at 1206 (Exhibit 308).

[7] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 582 (Exhibit 148)..

[8] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 1421 *et seq* (Exhibit 344) (CID interview with former interrogator 519th MI, describing loud music used during initial detainee screening).

[9] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 487 (Exhibit 128).

[10] *Id.* at 751-752 (Exhibit 190).

[11] *Id.* at 751 (Exhibit 190).

[12] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 753 (Exhibit 190).

[13] *See, e.g., id.* at 815 (Exhibit 205).

[14] *See, e.g., id.* at 815 (Exhibit 205).

[15] *See id.* at 824 (Exhibit 207).

JA001973

UNCLASSIFIED/FOR PUBLIC RELEASE

- Beating mentally handicapped Afghan detainee because he screeched like character on cartoon "South Park;"[17]
- Picking up detainee by the neck;[18]
- Having growling dogs walk on bound, hooded detainees "as a big joke";[19]
- Threatening detainee with a dildo;[20]
- Squeezing detainee's shoulders while escorting, striking detainee in groin area;[21]
- Sidekicking detainee;[22]
- Repeatedly punching shackled detainee in the chest;[23]
- Isolation guard lets members of 377th 3d platoon into detainee's cell so they can take turns striking him to hear him cry out, "Allah!";[24] detainee later dies.

h.      In 2002, Bagram guards believed they were authorized to, and did as a matter of practice, deliver strikes and blows to detainees who were restrained. Guards sometimes struck detainees to neutralize an immediate security threat, but also beat detainees as "punishment" for non-compliance. "Compliance blows" used on restrained detainees included the "common peroneal strike", an extremely painful blow from the guard's knee to the common peroneal nerve along the detainee's upper femur. Non-compliance ranged from actively fighting or resisting guards, to talking, refusing to stand or sit, touching concertina wire, or generally disregarding any instructions given by a guard, whether the detainee understood the instruction or not. Some guards apparently struck restrained detainees as a form of amusement or revenge.[25] Two detainees at Bagram died in December 2002 from complications arising from repeated common peroneal strikes; medical personnel later testified victims' legs were "pulpified," similar to injuries from being run over by a bus, and would have required amputation.

i.      In 2002, Bagram guards used forced standing to punish detainees for non-compliance. Detainees were also forced to stand for extended periods of time in order to enforce sleep deprivation at the request of military intelligence personnel ("MI personnel"). Guards forced detainees to remain standing by restraining them to fixed surfaces. For example, a guard could bring a detainee into the entry section of the general detention area ("airlock") to stand: "If they refused to stand in the airlock, then they could be handcuffed to the airlock in a manner to keep them from sitting down."[26] Policy and practice regarding whether guards could shackle a

---

[16] See, e.g., CID Report Habibullah and Dilawar (Oct 2004), at 832-33 (Exhibit 209) (specific incident involving "roman chair" stress position led to guidance prohibiting its use).

[17] Id. at 842 (Exhibit 211).

[18] Id. at 890 (Exhibit 221).

[19] Id. at 886 (Exhibit 220).

[20] CID Report Habibullah and Dilawar (Oct 2004), at 898 (Exhibit 226).

[21] Id. at 899 (Exhibit 226).

[22] Id. at 913 (Exhibit 229).

[23] Id. at 1240 (Exhibit 311).

[24] See, e.g., CID Report Habibullah and Dilawar (Oct 2004), at 1349-1350 (Exhibit 324).

[25] See, e.g., id., at 842 (Exhibit 211) (describing beating of mentally handicapped Afghan detainee who screeched like character on cartoon "South Park"); id., at 1349-1350 (Exhibit 324) (describing isolation guard letting MPs into detainee's cell so they could take turns striking him to hear him cry out, "Allah!"; detainee later died).

[26] CID Report Habibullah and Dilawar (Oct 2004), at 1256 (Exhibit 312).

JA001974

UNCLASSIFIED/FOR PUBLIC RELEASE

detainee's hands over his head versus eye or waist level varied and was sometimes inconsistent.[27]

j.    Guards routinely hooded and shackled detainees for first days of their detention.[28] Guards also routinely hooded or goggled detainees during movements, for force protection, and to deny detainees knowledge of the detention facility.[29]

*Intelligence operations in Afghanistan*

k.    The 202nd Military Intelligence Battalion (202nd MI Bn) of the 513th Military Intelligence Brigade established interrogation operations in Afghanistan. The 202nd MI Bn reportedly produced nearly fifteen hundred Intelligence Information Reports (IIRs) in just over seven months, in a reports database that was called "superb" by CJTF-180's first director of counter-intelligence (CI) and human intelligence (HUMINT).[30]

l.    Generally concurrent with Noor's detention by U.S. forces at BCP, the 202nd MI Bn staffed the interrogation cell at Bagram that was responsible for conducting detainee interrogations. Two military intelligence personnel from the 519th Military Intelligence Battalion (519th MI Bn) were assigned to augment the 202nd MI Bn. In August/September of 2002, the 202nd MI Bn was replaced by the 519th MI Bn, and the two augmentees stayed on to train their unit on local practices developed by the 202nd MI Bn.

m.    At Bagram, intelligence personnel who were part of the Joint Interrogation Facility (JIF) at BCP conducted initial screening and interrogation, while personnel assign to the Joint Interrogation and Debriefing Center (JIDC) conducted follow-on exploitation.[31] JIF and JIDC personnel at Bagram conducted their own detainee interrogations.[32] Personnel from the Defense Intelligence Agency (DIA) set up the JIDC at Bagram around late June /early July 2002,[33] and presumably maintained separate records and routinely communicated with other, off-site elements of DIA and other members of the intelligence community.

n.    The government has not certified which agencies interrogated, took custody of, or interviewed Noor at Bagram.

o.    Numerous other intelligence agencies interrogated detainees at Bagram. "[A] host of national level intelligence agencies participate in the interrogation process utilizing a wide array

---

[27] *See, e.g., id.,* at 1255 (Exhibit 312) (interview with SJA who said he told MPs do not shackle detainees' arms overhead, yet detainees' arms were shackled overhead).

[28] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004),* at 487 (Exhibit 128).

[29] *See CJTF-180 Interrogation Techniques (24 January 2003),* at 3, 7.

[30] Ron Stallings, Michael Foley, *CI and HUMINT operations in support of OEF* (Oct-Dec, 2003) *available at* http://www.militaryphotos.net/forums/showthread.php?28026-CI-and-HUMINT-operations-in-support-of-OEF.

[31] *See generally DAIG Report (21 July 2004),* at 32 (Interrogation facilities in OEF identified themselves as JIFs and JIDCs, and their organization and command relationships were structured accordingly); *AFM 3-31 (2001),* at A-11 (describing roles of JIF and JIDC).

[32] *See, e.g., id.,* at 1212 (Exhibit 309) (CID interview with former CJTF-180 J-2X).

[33] *See CID Report Habibullah and Dilawar (Oct 2004),* at 1212 (Exhibit 309).

JA001975

UNCLASSIFIED/FOR PUBLIC RELEASE

of tactics. techniques and procedures."[34] In addition to conventional military forces, Other Than Conventional (OTC) military forces and other government intelligence agencies (OGA), conducted detainee operations and/or interrogations in Afghanistan. Military Special Mission Units (SMUs) serving in Afghanistan conducted their own interrogations under separate guidance,[35] and passed detainees to conventional forces. At one point, SMU Afghanistan requested a dedicated interrogation facility co-located at Bagram Collection Point.[36] OGA interrogated detainees held by military forces, and conducted detention operations.[37]

p.      Members of OTC military forces and OGAs would "show up" and demand access to detainees in military custody at BCP.[38] JTF-180 subsequently established coordination practices, and, in order to ensure outside agencies did not physically abuse detainees, a rule that no outside organization could conduct an interview/interrogation of a detainee without a JTF-180 interrogator present.[39]

q.      OTC military forces and OGAs presumably maintained separate records and routinely communicated with other, off-site elements of the intelligence community. The government has neither provided such records to the defense, nor certified OTC military forces and OGAs, did not interrogate, take custody of, or interview Noor at any point in US or foreign custody.

r.      In late 2002, CJTF-180 ordered an administrative investigation (AR 15-6) of two A/519th interrogators who physically abused detainees. A male and a female military intelligence agent reportedly assaulted the detainee they were interrogating: stepped on his legs, pushed him against the wall, kneed him, grabbed his ears.[40] The AR 15-6 report discussed a number of interrogation techniques, including sleep deprivation.[41] As a result of the AR 15-6 investigation, two A/519th interrogators were denied access to detainees.[42] It appears as though the chain of command did not act to initiate internal MI procedures required when MI personnel are suspected of misconduct.

s.      Following the detainee deaths in December 2002, members of the 519th MI Bn were placed under investigation. While the investigation was ongoing, 519th MI Bn was transferred to Abu Ghraib, Iraq. The 519th MI Bn conducted detainee interrogations at Abu Ghraib during a

---

[34] *CJTF-180 Interrogation Techniques (24 January 2003)*, at 10.

[35] *See SASC Detainee Report (November 20, 2008)*, at 153 (describing Jan 2003 SMU TF Afghanistan SOP that included use of isolation. multiple interrogators, stress positions. and sleep deprivation); *id.,* at 158 (SMU TF Iraq adopted SMU TF Afghanistan SOP "verbatim"); *id.,* at 159 ▮▮▮

[36] *See SASC Detainee Report (November 20, 2008)* at 151, citing ▮▮▮ [redacted in original] Interrogations Operations Decision Briefing (undated) (describing request for SMU interrogation facility for high value detainees co-located at the Bagram Collection Point).

[37] *DoJ OIG FBI & Detainee Interrogations (rev 2009)*, at 19.

[38] *CID Report Habibullah and Dilawar (Oct 2004)*, at 1305 (Exhibit 318).

[39] *See id.* at 1305, 1306 (Exhibit 318).

[40] *See CID Report Habibullah and Dilawar (Oct 2004)*, at 1340 (Exhibit 322) (CID interviewing CJTF-180 legal advisor).

[41] *See CID Report Habibullah and Dilawar (Oct 2004)*, at 1236 (Exhibit 311) (interview of former deputy SJA for CJTF-180).

[42] *See id.*, at 1236 (Exhibit 311).

JA001976

UNCLASSIFIED/FOR PUBLIC RELEASE

period of now-infamous detainee abuse. A subsequent investigation determined approaches and practices used at Abu Ghraib "clearly" came from documents and personnel in Afghanistan and Guantanamo, to the point where an intelligence SOP for Abu Ghraib created by the same 519th commander "was remarkably similar" to the Bagram SOP.[43]

t.　　　Bagram intelligence operations personnel have made sworn statements that they conducted, witnessed, or heard about the following activities associated with interrogation:

- Use of stress positions;[44]
- Sleep deprivation;[45]
- Beating and other forms of physical assault;[46]
- Sexual assault and other forms of sexual humiliation;[47]
- Taking pants off detainee;[48]
- Interrogator displayed penis to detainee;[49]
- Detainee held while interrogator simulated sexual acts;[50]
- Female interrogator kicked detainee in buttocks to force him back into kneeling stress position;[51]
- "The screaming technique;"[52]
- Forced physical training;[53]
- Detainee forced to roll across floor and kiss interrogator's boots;[54]
- Detainee forced to sweep the floor;[55]
- Threat that other interrogator with bad reputation would come;[56]
- Interrogator pulls on detainee's shackle chain, rubs hands in detainees' hair;[57]
- Interrogator grabs detainee's beard to turn his head;[58]
- Interrogator lies on detainee on floor, steps between detainee's legs near his crotch.[59]

---

[43] *Fay Report (2004)*, at 29.

[44] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)* .at 1052 (Exhibit 263); 1440 (Exhibit 344); 1094 (Exhibit 278); 409 (Exhibit 109).

[45] *See, e.g., id.,* at 410-411 (Exhibit 109).

[46] *See, e.g., id.* at 1261 (Exhibit 312); 1435, 1438 (Exhibit 344); 1435, 1437, 1440 (Exhibit 344) (describing dragging detainee by shirt and pinning him to wall).

[47] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 1051 (Exhibit 263) (describing taking pants off detainee); 1261 (Exhibit 312); 1438 (Exhibit 344)

[48] *See, e.g., id.,* at 1051 (Exhibit 263); 1261 (Exhibit 312).

[49] *Id.* at 1435, 1438 (Exhibit 344).

[50] *CID Report Habibullah and Dilawar (Oct 2004)*, at 1438 (Exhibit 344).

[51] *See id.* at 1435, 1438 (Exhibit 344).

[52] *Id.* at 1051 (Exhibit 263). *See also id.,* at 1118 (Exhibit 284).

[53] *See, e.g., id.* at 1052 (Exhibit 263).

[54] *CID Report Habibullah and Dilawar (Oct 2004)*, at 1094 (Exhibit 278).

[55] *See, e.g., d.* at 1097-1098 (Exhibit 278).

[56] *Id.* at 1395 (Exhibit 334); *id.,* at 1439 (Exhibit 344).

[57] *CID Report Habibullah and Dilawar (Oct 2004)*, at 1395 (Exhibit 334).

[58] *Id.* at 1434 (Exhibit 344).

[59] *Id.* at 1434-1435, 1437 (Exhibit 344).

JA001977

UNCLASSIFIED/FOR PUBLIC RELEASE

u.      FBI personnel surveyed by the Department of Justice Office of the Inspector General affirmed they observed or heard about the following forms of rough or aggressive detainee treatment in Afghanistan:[60]

- Depriving a detainee of food or water;
- Depriving a detainee of clothing;
- Depriving a detainee of sleep, or interrupting sleep by frequent cell relocation or by other methods;
- Beating a detainee;
- Threatening action to cause physical pain, injury, disfigurement, or death;
- Treatment or action causing significant physical pain or injury, or causing disfigurement or death;
- Placing a detainee on a hot surface or burning a detainee;
- Using shackles or other restraints in a prolonged manner;
- Requiring a detainee to maintain, or restraining a detainee in, a stressful or painful position;
- Forcing a detainee to perform demanding physical exercise;
- Hooding or blindfolding a detainee other than during transportation;
- Subjecting a detainee to extremely cold or hot room temperatures for extended periods;
- Subjecting a detainee to loud music;
- Subjecting a detainee to bright flashing lights or darkness;
- Isolating a detainee for an extended period of time;
- Using duct tape to restrain, gag or punish a detainee;
- Using rapid response teams and/ or forced cell extractions;
- Using a military working dog on or near a detainee other than during detainee transportation;
- Threatening to use military working dogs on or near a detainee;
- Disrespectful statements, handling, or actions involving the Koran;
- Shaving a detainee's facial or other hair to embarrass or humiliate a detainee;
- Touching a detainee or acting toward a detainee in a sexual manner;
- Holding detainee(s) who were not officially acknowledged or registered as such by the agency detaining the person;
- Sending a detainee to another country for a more aggressive interrogation;
- Threatening to send a detainee to another country for detention or more aggressive interrogation;
- Threatening to take action against a detainee's family;
- Other treatment or action causing severe emotional or psychological trauma to a detainee.[61]

v.      At Bagram in 2002, intelligence personnel sometimes placed detainees in stress positions during interrogation.[62] A stress position may be an abnormal human position, such as suspension

---

[60] *DoJ OIG FBI & Detainee Interrogations (rev 2009)*, at 213-215.
[61] *DoJ OIG FBI & Detainee Interrogations (rev 2009)*, at 213-215. "FBI agents were only present at a small percentage of detainee interrogations in the military zones, most of which were conducted by personnel from other agencies." *Id.* at 171.

JA001978

UNCLASSIFIED/FOR PUBLIC RELEASE

or inversion, or a normal human position, such as sitting, standing or lying, that a subject is forced to hold for an abnormal period of time or with an impediment to the position, such as an injury. Stress positions may be bound or unbound, and restraints can inflict pain or injury if misapplied or otherwise manipulated.

w.     Military personnel sometimes referred to stress positions as "safety positions."[63] A "safety position" was an awkward physical position from which a detainee could not easily physically hurt other people or himself, meant to be used for the safety of US personnel and as a substitute for shackling a detainee to a fixed object.[64] Even though "safety positions" were supposed to be used to protect US personnel, they were routinely "used to facilitate cooperation, instead of a true protective measure."[65] "Safety positions" should be evaluated as stress positions, even if not called so by guards or interrogators.

x.     Stress positions reportedly used at Bagram in 2002 included, *inter alia*, forcing a detainee to:

- lean against a wall with his weight supported only by his arms or head;[66]
- sit with only the wall for support in a "roman chair," "invisible chair," or "dream seat" position;
- kneel with his arms raised overhead[67] or hands locked behind his head;[68]
- sit on the floor with no chair;[69]
- stand with a chair next to him, not allowed to sit down on it;[70] and
- lie on his back with hands and feet in the air.[71]

y.     Some interrogators reportedly tested their own stamina in the positions to establish limits for their use,[72] or set case by case limits based on their subjective perception of whether the detainee made enough effort to hold the position, i.e., "attempted to do the task" or "just quit".[73] These practices suggest lack of supervision and an environment where abuse was more likely to

---

[62] *See generally CID Report Habibullah and Dilawar (Oct 2004)*, at 1430-1434 (Exhibit 344).

[63] *CID Report Habibullah and Dilawar (Oct 2004)*, at 1394 (Exhibit 334).

[64] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 1235 (Exhibit 311).

[65] *Id.*, at 1237 (Exhibit 311) (describing findings of AR 15-6 conducted after detainees' deaths); *id.*, at 409 (Exhibit 109) (describing "safety position" as tool of interrogators); *id.*, at 1398 (Exhibit 334) ("not used for safety"). *But see id.*, at 1264 (Exhibit 312) (AR 15-6 said safety positions were only used for security, even though they had also been used on occasion solely to cause detainee discomfort in interrogation).

[66] *CID Report Habibullah and Dilawar (Oct 2004)*, at 336 (Exhibit 85) (describing detainee forced to lean on wall with weight supported by arms or head.)

[67] *See, e.g. id.*at 409 (Exhibit 109) (describing "safety position" as tool of interrogators).

[68] *See, e.g., id.*at 1422 (Exhibit 344).

[69] *See, e.g., id.*at 1422 (Exhibit 344).

[70] *See CID Report Habibullah and Dilawar (Oct 2004)*, at 1422 (Exhibit 344).

[71] *See id* at 1422 (Exhibit 344).

[72] *See, e.g., id.*, at 1422 (Exhibit 344).

[73] *Id.* at 1423 (Exhibit 344). Note the interrogator who admitted to doing this appears to have been farther along the "nice" end of the personality spectrum. *Id.*, at 1424.

JA001979

UNCLASSIFIED//FOR PUBLIC RELEASE

occur. CIA interrogators used stress positions.[74] U.S. personnel sometimes struck detainees who fell out of stress positions.[75]

z.     Military intelligence personnel subjected detainees to sleep deprivation for interrogation purposes. Sleep deprivation may have been common as early as April 2002.[76] OTC military used sleep deprivation.[77] CIA interrogators also used sleep deprivation.[78]

> The MP's would be authorized to keep the detainees awake based on the direction of MI. During the execution of the mission, the MP's would employ various techniques to keep someone awake. That would include yelling at the individual, [sic] keeping the lights on; forced standing; and ultimately to enforce the forced standing, handcuffing the individual to something to keep them from sitting down.[79]

aa.     Sleep deprivation was meant to place detainees "in a vulnerable state-of-mind, causing confusion and disorientation…".[80] If Noor did not comply with instructions to stand or do some other activity that served as an "interruption or periodic awakening" for sleep adjustment, or if he physically resisted or acted out during sleep adjustment, then he may have been struck to compel compliance or as punishment.

bb.     Interrogators at forward locations and at BCP routinely used isolation and considered it among the most effective interrogation techniques.[81] OTC military also used isolation.[82] CIA interrogators used isolation.[83]

cc. Interrogators at forward locations and at BCP routinely used hoods and considered their use among the most effective interrogation techniques.[84] Hooding could interfere with a detainee's

---

[74] *See generally CIA OIG Special Review (May 7, 2004)* (describing role of CIA in interrogating terrorism suspects held by the CIA and by military forces).

[75] *See CJTF-180 Interrogation Techniques (24 January 2003)*, at 6 ( "mild physical contact" "used to enforce safety positions during intense interrogation designed to elicit emotional response."). *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 1435, 1438 (Exhibit 344) ("SGT ▇▇ [redacted in original] said she kicked a detainee in the butt because he would not stop sitting on his heels during an interrogation".).

[76] *See CID Report Habibullah and Dilawar (Oct 2004)*, at 1273 (Exhibit 313).

[77] *See SASC Detainee Report (November 20, 2008)*, at 153 (describing Jan 2003 SMU TF Afghanistan SOP that included use of isolation, multiple interrogators, stress positions, and sleep deprivation).

[78] *See generally CIA OIG Special Review (May 7, 2004)* (describing role of CIA in interrogating terrorism suspects held by the CIA and by military forces).

[79] *See CID Report Habibullah and Dilawar (Oct 2004)*, at 1252-1253 (Exhibit 312) (legal advisor for BCP from late Nov 2002 – June 2003). Note detainees were sometimes cuffed with hands overhead. *Id.*, at 1255 (Exhibit 312).

[80] *Id.*, at 3.

[81] *See CJTF-180 Interrogation Techniques (24 January 2003)*, at 2-3, 6-7, 8.

[82] *See SASC Detainee Report (November 20, 2008)*, at 153 (describing Jan 2003 SMU TF Afghanistan SOP that included use of isolation, multiple interrogators, stress positions, and sleep deprivation).

[83] *See generally CIA OIG Special Review (May 7, 2004)* (describing role of CIA in interrogating terrorism suspects held by the CIA and by military forces).

[84] *See CJTF-180 Interrogation Techniques (24 January 2003)*, at 3; *id.*, at 7 ("use of hood during interrogation" among effective interrogation techniques used by CJTF-180 interrogators at BCP, but changes "currently underway" to substitute blacked-out goggles for hoods).

JA001980

UNCLASSIFIED/FOR PUBLIC RELEASE

breathing, particularly if he was excited or hyperventilating.[85] "[W]hen used in conjunction with isolation, the hood disoriented the [detainee] and distorted his sense of place and time."[86] CIA interrogators used hooding and other forms of deprivation of light.[87]

dd.     Interrogators at Bagram considered deprivation of light and sound among the most effective interrogation techniques.[88] "It was effective in quickly breaking individuals that have immediate force protection information... This technique erodes a [detainee's] mental willingness to resist. When used with sleep deprivation, this techniques extends the disorientation period rendering the [detainee] more susceptible [to] other techniques."[89]

ee.     Interrogators at forward locations routinely used female interrogators or guards specifically to induce "shame/humiliation", "evoke[] deep feelings of shame," "reduce... feelings of pride."[90] BCP also used female interrogators and guards.

ff.     Military Intelligence personnel reportedly asked MPs to implement interrogation strategies outside the interrogation booth, ranging from a general "softening up" to specific forms of abuse. These included but were not limited to:

- restrained or unrestrained sleep deprivation;[91]
- forced physical training (aka "smoking sessions");[92]
- humiliating activities;[93]
- "extra chores;"[94] and
- enforced silence.[95]

---

[85] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 1256 (Exhibit 312) (after detainee deaths, legal advisor for BCP learned that chaining a detainee's hands over his head, combined with the hood, could cause breathing problems potentially exacerbated by the detainee getting excited and hyperventilating).
[86] *CJTF-180 Interrogation Techniques (24 January 2003)*, at 7.
[87] *See generally CIA OIG Special Review (May 7, 2004)* (describing role of CIA in interrogating terrorism suspects held by the CIA and by military forces).
[88] *See CJTF-180 Interrogation Techniques (24 January 2003)*, at 8 (deprivation of light and sound in living areas used "in the past" at Bagram,, not "currently used" circa January 2003; used again later. *See also Church Report (2005) (S)*, at 224-225.
[89] *CJTF-180 Interrogation Techniques (24 January 2003)*, at 7, 9.
[90] *CJTF-180 Interrogation Techniques (24 January 2003)*, at 3. *See id.*, at 4
[91] *See, e.g., CID Report Habibullah and Dilawar (Oct 2004)*, at 433 (Exhibit 117) ( MPs chained detainees in standing position; forced them to perform "extra chores"; enforced isolation with MP checking every 15 minutes; etc.); *id.*, at 832-33 (Exhibit 209) (MI instructed MPs to enforce stress positions, such as having detainees put their hands in the air, chaining detainees to the cages in kneeling or standing position "whichever was most uncomfortable", forcing detainees to sit in "roman" chair", i.e, squatting against the wall as if seated but with no chair; etc.).
[92] *Id.* at 736 (Exhibit 187) (guards told by MI to "PT" a couple of detainees for 24 hours); *id.*, at 1398 (Exhibit 334)(knew of 2-3 'smoking sessions' conducted between Sept 2002 – Jan 2003).
[93] E.g., guards allegedly forced detainee to pick bottle caps out of human waste, possibly at MI request. *See CID Report Habibullah and Dilawar (Oct 2004)*. at 815 (Exhibit 205); *id.*, at 824 (Exhibit 207).
[94] E.g., *id.* at 832-33 (Exhibit 209) (MI told MPs to give detainees extra chores such as picking up water bottles, scrubbing floors with tooth brushes, pulling the "shit buckets", etc.); *id.*, at 1420 (Exhibit 344) (detainees given extra duties such as taking out the trash, seperating meals for detainees, etc.).
[95] *Id* at 1258 (Exhibit 312) (the "no talking" rule was devised by MI and enforced by MP

JA001981

UNCLASSIFIED/FOR PUBLIC RELEASE

MPs sometimes subjected detainees to these and similar forms of treatment as punishment for detention operations infractions, independent from intelligence gathering efforts.

gg.     On January 24, 2003, CJTF-180 Deputy Staff Judge Advocate (SJA) LTC Robert Cotell produced a memorandum describing "current and past" interrogation techniques used by CJTF-180 interrogators, distinguishing between those on the battlefield and at BCP.[96] LTC Cotell identified interrogation techniques used by CJTF-180, including:

- up to 96 hours of isolation;
- the use of female interrogators to create "discomfort" and gain more information;
- sleep adjustment, defined as "four hours of sleep every 24 hours, not necessarily consecutive;"
- use of individual fears;
- removal of comfort items;
- use of safety positions;
- isolation;
- deprivation of light and sound in living areas;
- the use of a hood during interrogation; and
- mild physical contact.[97]

hh.     LTC Cotell's January 24, 2003 memo also recommended use of five additional techniques, including:

- "deprivation of clothing" to put detainees in a "shameful, uncomfortable situation;"
- "food deprivation;"
- "sensory overload--loud music or temperature regulation;"
- "controlled fear through the use of muzzled, trained, military working dogs;" and
- "use of light and noise deprivation.[98]

ii.     The January 24, 2003 memo was drafted in consultation with interrogators at BCP, and conventional and non-conventional military task forces.[99] In 2004, the BCP legal advisor provided computer files to CID agents investigating the December 2002 deaths of two detainees at Bagram; working documents compiled in January 2003 as this document was produced are reportedly among those files.[100]

jj.     CJTF-180 did not receive any response to its January 24, 2003 memorandum from either CENTCOM or the Joint Staff, and interpreted this silence to mean that the techniques then in use

---

[96] *CJTF-180 Interrogation Techniques (24 January 2003).*
[97] *SASC Detainee Report (November 20, 2008)* at 155, *citing* Memorandum from CJTF-180-OPS LAW for CENTCOM SJA, CJTF 180 Interrogation Techniques (January 24, 2003). "The Church Report called the distinction between stress positions and safety positions at the Bagram Collection Point 'largely academic.'" *Id.* at FN 1200, *citing Church Report (2005)* at 200.
[98] *Id.* at 155, *citing* Memorandum from CJTF-180-OPS LAW for CENTCOM SJA, CJTF 180 Interrogation Techniques (January 24, 2003).
[99] *See CJTF-180 Interrogation Techniques (24 January 2003),* at 1.
[100] *CID Report Habibullah and Dilawar (Oct 2004),* at 1265 (Exhibit 312).

JA001982

UNCLASSIFIED/FOR PUBLIC RELEASE

were unobjectionable to higher headquarters and therefore could be considered approved policy.[101]

*Law enforcement operations in Afghanistan*

kk.    Detainees at BCP were at all times the subject of practice and policy concerning detention operations. Detainees at BCP undergoing a course of law enforcement interviews or interrogations were also sometimes subject to a simultaneous course of military intelligence or OGA interrogations. "The military had custody and control over the detainees throughout Afghanistan, and FBI agents were required to arrange access to the detainees through military police and military intelligence personnel."[102]

ll.    According to the DOJ OIG:

DOJ witnesses told us that from the outset, there was an operating viewpoint dictated at a very high level that this was a military situation and the military approach should prevail, in part because the military controlled the detainees and locations... Several witnesses told us that the dispute over the best approach was exacerbated by the fact that the DOD interrogators were often inexperienced and not particularly well trained about al-Qaeda.[103]

mm.    According to the DOJ OIG:

[I]n May 2004 an FBI supervisor stationed in Afghanistan sent a series of e-mails to senior Counterterrorism Division officials in FBI Headquarters stating that although the military had temporarily restricted the use of aggressive interrogation techniques such as stress positions, dogs, and sleep deprivation, military interrogators were likely to resume such methods soon. The FBI supervisor stated that even if the FBI was not present during such interrogations, FBI agents would inherently be participating in the process because they would be interviewing detainees who had either recently been subjected to such techniques by the military or who would be subjected to them after the FBI interviews were completed.[104]

nn.    FBI agents told the DOJ OIG that "they either observed or heard that military or CIA personnel had falsely represented themselves as FBI agents in Afghanistan. One OIG survey respondent stated that he observed the impersonation of FBI personnel by others, and five agents reported that they head about such conduct from others."[105]

*GUANTANAMO*

oo.    By August of 2002, Noor had been transferred to GTMO.

---

[101] *Church Report (2005),*at 7. *See also id.,* at 201.
[102] *DoJ OIG FBI & Detainee Interrogations (rev 2009).* at 21.
[103] *Id.,* at 64-65.
[104] *Id.,* at xv.
[105] *Id.,* at 228.

JA001983

UNCLASSIFIED/FOR PUBLIC RELEASE

pp.    In August 2002, responsibility for detention operations and intelligence operations at GTMO was split between two units: Joint Task Force 160 (JTF-160) administered the detention camp, and Joint Task Force 170 (JTF-170) conducted intelligence operations, including interrogations. A series of assessments and evaluations conducted at GTMO in 2002 concluded that the intelligence-gathering mission would be enhanced by careful coordination with the detention operations mission.

qq.    In November 2002, the Pentagon reorganized the camp structure and merged the administrative and interrogation task forces as JTF-GTMO under the command of MG Geoffrey Miller. MG Miller's goal was to functionally integrate military intelligence with military police detention operations.

rr.    MG Miller purposefully engineered detention operations as an "enabler" for intelligence-gathering.

> Simply stated, the most significant aspect of the … organization [of JTF-GTMO] is that it places both intelligence and detention operations under the command of a single entity, designated Joint Task Force GTMO (JTF-GTMO), whereas the original organization had separate chains of command for intelligence and detention operations. This new structure has permitted greater cooperation among the military intelligence (MI) units that are responsible for interrogation and the military police (MP) units that are responsible for detention. In essence, this organization recognizes the primacy of the human intelligence collection mission at GTMO in support of the Global War on Terror, by ensuring a unity of effort between MI and MP units. This unity of effort between MI and MP units has been the subject of recent controversy, in light of MP participation in many of the abuses perpetrate at Abu Ghraib prison in Iraq….[106]

> In his September 2003 report on intelligence operations in Iraq, MG Miller, then-Commander of JTF-GTMO, stated that detention operations 'must act as an enabler for interrogations,' by helping to 'set conditions for successful interrogations.' Furthermore, he argued it is 'essential that the guard force be actively engaged in setting the conditions for successful exploitation of the internees,' and that '[j]oint strategic interrogation operations are hampered by a lack of active control of the internees within the detention environment.'[107]

*Detention operations at GTMO*

ss.    Detention operations came to serve a key role in the intelligence-gathering process at GTMO. The frequency and manner in which MPs conducted operations such as cell moves, control of comfort items, transfer to and from the interrogation booth, Immediate Reaction Forces and Forced Cell Extractions (IRFs/FCEs), use of military working dogs, and strip searches affected detainees physically and mentally, establishing conditions for subsequent interrogations. Military police personnel themselves implemented interrogation techniques meant

---

[106] *Church Report (2005)*, at 103-4.
[107] *Id.*, at 148.

JA001984

UNCLASSIFIED/FOR PUBLIC RELEASE

to be employed outside the interrogation room, such as environmental and dietary manipulation, provision of incentives for cooperation, and sleep deprivation.[108]

tt.      By early October 2002, there was "increasing pressure to get 'tougher' with detainee interrogations." If the interrogation policy memo did not contain coercive techniques, then it "wasn't going to go very far...."[109]

uu.      On 11 Oct 2002, JTF-GTMO J-2 requested approval for and described three categories of counter-resistance techniques:

- Category I: yelling, deception, multiple interrogators, false flag;

- Category II: stress positions, false documents, isolation, "change of scene", sensory deprivation, hooding, 20-hour interrogations (sleep deprivation), removal of comfort items, dietary restrictions, removal of clothing, forced grooming, exploitation of phobias;

- Category III: imminent death scenario, cold, water to induce feeling of suffocation, physical contact; "and other aversive techniques, such as those used in U.S. military interrogation resistance training or by other U.S. government agencies..."[110]

vv.      On 2 Dec 2002, the SECDEF authorized the Commander of USSOUTHCOM to employ, at his discretion, categories I and II techniques, and one category III technique.[111] The request and the approval process levied requirements for authorization and documentation of use of these techniques. The Government has failed to provide records relating to use of these techniques on Noor, or to certify these techniques were not used on Noor.

ww.      On 15 Jan 2003, SECDEF rescinded his December 2002 approval.[112] However, SECDEF stipulated that if USSOUTHCOM determined that "particular techniques in either of these categories [II or III] are warranted in an individual case, [the commander] should forward that request to [SECDEF]. Such a request should include a thorough justification for the employment of those techniques and a detailed plan for use of such techniques."[113] The Government has failed to provide records relating to use of these techniques on Noor, or to certify these techniques were not used on Noor.

---

[108] *See generally Church Report (2005)* (describing the relationship between military police and military intelligence; describing MP involvement in events that happen outside the interrogation room that are done in preparation for interrogations, including the role of MP record-keeping systems, and the MP role in applying techniques employed in the cellblock that set the conditions for subsequent interrogations in the interrogation room.). *Id.*, at 146, et seq. ("MPs are very involved, however, in events that happen outside the interrogation room that are done in preparation for interrogations.").

[109] *SASC Detainee Report (November 20, 2008)*, at xvii, 38.

[110] *JTF-170 J-2 Memo (11 Oct 2002).*

[111] *SECDEF Approval (2 Dec 2002).* The approved Category III technique was physical contact. The *Schlesinger Report (August 2004)* read the memo as requiring advance SECDEF notification for all techniques described in the memo. *Church Report (2005),* at 118.

[112] *SECDEF Memorandum (15 Jan 2003).*

[113] *Id.*

JA001985

UNCLASSIFIED/FOR PUBLIC RELEASE

xx.     On 16 Apr 2003, SECEF approved 24 techniques.[114] All of them required "appropriate specified senior approval for use with any specific detainee (after considering the foregoing and receiving legal advice)" and other "safeguards",[115] and four required SECDEF notification prior to use.[116] In addition to techniques approved by SECDEF on 16 April 2003, SOUTHCOM could request "additional interrogation techniques for a particular detainee."[117] The Commander was required to provide, via CJCS, "a written request describing the proposed technique, recommended safeguards, and the rationale for applying it with an identified detainee."[118] The Government has failed to provide records relating to use of these techniques on Noor, or to certify these techniques were not used on Noor.

yy.     The April 2003 GTMO Policy continued in effect for GTMO until September 2006, when the U.S. Army issued Field Manual 2-22.3.[119]

zz.     FBI personnel surveyed by the Department of Justice Office of the Inspector General affirmed they observed or heard about the following forms of rough or aggressive detainee treatment at Guantanamo:[120]

- Depriving a detainee of food or water;
- Depriving a detainee of clothing;
- Depriving a detainee of sleep, or interrupting sleep by frequent cell relocation or by other methods;
- Beating a detainee;
- Using water to prevent breathing by a detainee or to create the sensation of drowning;
- Using hands, rope, or anything else to choke or strangle a detainee;
- Threatening action to cause physical pain, injury, disfigurement, or death;
- Treatment or action causing significant physical pain or injury, or causing disfigurement or death;
- Using shackles or other restraints in a prolonged manner;
- Requiring a detainee to maintain, or restraining a detainee in, a stressful or painful position;
- Intentionally delaying or denying detainee medical care;
- Hooding or blindfolding a detainee other than during transportation;
- Subjecting a detainee to extremely cold or hot room temperatures for extended periods;
- Subjecting a detainee to loud music;
- Subjecting a detainee to bright flashing lights or darkness;

---

[114] *SECDEF Memorandum (16 April 2003), at Tab A.* Sometimes referred to as "the A-X memo."

[115] *SECDEF Memorandum (16 April 2003), at Tab B.* Text from this part of the SECDEF memo supports the argument that use of these techniques was closely planned and documented, and that information about treatment by detention operations a well as interrogators is relevant to the question of whether a detainee was coerced in interrogation.

[116] *SECDEF Memorandum (16 April 2003)* (incentive/removal of incentive; pride and ego down; Mutt and Jeff; and isolation).

[117] *Id.*

[118] *Id.*

[119] AFM 2-22.3 superseded AFM 34-52.

[120] *DoJ OIG FBI & Detainee Interrogations (rev 2009),* at 172-173.      JA001986

- Isolating a detainee for an extended period of time;
- Using duct tape to restrain, gag or punish a detainee;
- Using rapid response teams and/ or forced cell extractions;
- Using a military working dog on or near a detainee other than during detainee transportation;
- Threatening to use military working dogs on or near a detainee;
- Using spiders, scorpions, snakes, or other animals on or near a detainee;
- Disrespectful statements, handling, or actions involving the Koran;
- Shaving a detainee's facial or other hair to embarrass or humiliate a detainee;
- Placing a woman's clothing on a detainee;
- Touching a detainee or acting toward a detainee in a sexual manner;
- Holding detainee(s) who were not officially acknowledged or registered as such by the agency detaining the person;
- Sending a detainee to another country for a more aggressive interrogation;
- Threatening to send a detainee to another country for detention or more aggressive interrogation;
- Threatening to take action against a detainee's family;
- Other treatment or action causing severe emotional or psychological trauma to a detainee
- Other religious or sexual harassment or humiliation of a detainee;
- Other treatment of a detainee that in their opinion was unprofessional, unduly harsh or aggressive, coercive, abusive, or unlawful.[121]

aaa.    AFM 34-52 provided doctrine for MI interrogation operations, but only addressed general interrogation approaches and techniques, and did not address "new" approaches authorized by the SECDEF.  Guidance for employing interrogation techniques would have been especially important for techniques that pushed the limits or were outside of AFM 34-52. In 2008, former DoD General Counsel William Haynes testified before the Senate Armed Services Committee about the extent to which the interrogation techniques were subject to "limits" and "controls" to help keep them legal.[122] Former GTMO SJA Diane Beaver testified along similar lines.[123] In some cases, there is no doubt that techniques adopted later directly contravened SOPs adopted earlier; it is reasonable to surmise that either those SOPs were amended or superseded, or commanders allowed their interrogators to operated in direct contravention to the previously-

---

[121] *DoJ OIG FBI & Detainee Interrogations (rev 2009)*, at 172-173. "FBI agents were only present at a small percentage of detainee interrogations in the military zones, most of which were conducted by personnel from other agencies." *Id.* at 171.

[122] William Haynes II, Former General Counsel, DoD, Testimony before the Senate Armed Services Committee, Origins of Aggressive Interrogation Techniques (June 17, 2008) (Federal News Service).

> [T]here were interrogation plans that were supposed to be designed for each individual detainee who was to be interrogated -- that would involve a psychological review; there had to be medical care associated with it; there had to be a legal review; there had to be substantial command monitoring. There was a step process that they were supposed to go through. There were -- they were supposed to stop if anything came up. There were -- there were all sorts of conditions. ..".

[123] Diane Beaver, Former SHA, GTMO, Testimony before the Senate Armed Services Committee, Origins Of Aggressive Interrogation Techniques (June 17, 2008) (Federal News Service).

JA001987

UNCLASSIFIED/FOR PUBLIC RELEASE

established policy.[124] If personnel conducting interrogations relied upon a document for guidance, it should not matter whether it was in a draft form or not.

---

[124] JTF-170 had an interrogation SOP in place at least by August 2002, which, inter alia, prohibited at least one SERE-derived technique approved by the SECDEF in December 2002, stress positions. *SASC Detainee Report (November 20, 2008),* at 41, *citing* JTF-170 J2 Interrogation Section Standard Operating Procedures (August 20, 2002) (emphasis in original) (Detainees being interrogated will "remain seated and secured to the floor. DETAINEES WILL NOT BE PLACED IN STRESS POSITIONS").

JA001988